

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

COMMODITY FUTURES
TRADING COMMISSION,

Plaintiff,

v.

TRADERS DOMAIN FX LTD. d/b/a
THE TRADERS DOMAIN; FREDIRICK
TEDDY JOSEPH SAFRANKO a/k/a
TED SAFRANKO; DAVID WILLIAM
NEGUS-ROMVARI; ARES GLOBAL
LTD. d/b/a TRUBLUEFX; ALGO
CAPITAL LLC; ALGO FX CAPITAL
ADVISOR LLC n/k/a QUANT5
ADVISOR, LLC; ROBERT COLLAZO,
JR.; JUAN HERMAN a/k/a JJ HERMAN;
JOHN FORTINI; STEVEN LIKOS;
MICHAEL SHANNON SIMS; HOLTON
BUGGS, JR; CENTURION CAPITAL
GROUP INC.; ALEJANDRO
SANTIESTABAN a/k/a ALEX SANTI;
GABRIEL BELTRAN; and ARCHIE
RICE,

Defendants.

Civil Case No.

FILED BY_____ KP _____.D.C.

SEP 30 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

SEALED

## COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

I.      SUMMARY....................................................................................................................- 1 -
II.     JURISDICTION AND VENUE ...................................................................................- 6 -
III.    THE PARTIES ...............................................................................................................- 7 -
        A.      Plaintiff.............................................................................................................- 7 -
        B.      Defendants........................................................................................................- 7 -
IV.     FACTS.........................................................................................................................- 11 -
        A.      The Traders Domain Defendants' Fraudulent Scheme ...................................- 11 -
                a.      The TD Defendants Launch an Unregistered Offshore Brokerage and Begin
                Soliciting Customers ....................................................................................- 11 -
                b.      The TD Defendants Begin Soliciting for the TD Pool ............................- 13 -
                c.      The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud .-
                13 -
                d.      The TD Defendants Fraudulently Solicited Customers............................- 15 -
                        i.      The TD Defendants Made Misrepresentations and Omissions Regarding
                        its Trading Operations. ...............................................................................- 15 -
                        ii.     The TD Defendants Made Misrepresentations and Omissions Regarding
                        the Ability of Customers to Withdraw Their Funds ...................................- 18 -
                e.      The TD Defendants Falsified Trading Records........................................- 23 -
                f.      The TD Defendants Misappropriated Customer Funds............................- 25 -
                g.      Trubluefx Misappropriated Customer Funds............................................- 26 -
                h.      The TD Defendants Failed to Register with the CFTC ...........................- 27 -
                i.      Safranko and Negus-Romvari are Controlling Persons of TD .................- 28 -
        B.      The Algo Defendants' Fraudulent Scheme .....................................................- 30 -
                a.      Algo Begins Soliciting for the TD Pool ..................................................- 30 -
                b.      The Algo Defendants Fraudulently Solicited Customers .........................- 31 -
                        i.      The Algo Defendants Made Misrepresentations and Omissions Regarding
                        the Operation of the Trading Business ......................................................- 31 -
                        ii.     The Algo Defendants Made Misrepresentations and Omissions
                        Regarding the Location of Customer Funds...............................................- 34 -
                        iii.    The Algo Defendants Failed to Disclose That TD Was Placed on the
                        RED List ....................................................................................................- 35 -
                        iv.     The Algo Defendants Made Misrepresentations and Omissions
                        Regarding the Ability of Customers to Withdraw their Funds...................- 37 -
                c.      The Algo Defendants Knew or Should Have Known that TD Was Engaged In
                Fraud And Not Trading the Funds As Represented .................................................- 40 -
                        i.      The Algo Defendants Ignored Signs That TD Was Manipulating Trades..-
                        40 -
                        ii.     The Algo Defendants Ignored Public Warnings That TD Was Engaged
                        in Fraud ......................................................................................................- 43 -
                d.      The Algo Defendants Misappropriated and Commingled Customer Funds.- 44
                -
                e.      The Algo Defendants Failed to Register with the CFTC ..........................- 47 -
                f.      Collazo and Herman are Controlling Persons of Algo ............................- 48 -
        C.      The Sims' Fraudulent Scheme ........................................................................- 48 -
                a.      Sims Fraudulently Solicited Customers....................................................- 49 -
                        i.      Sims Made Misrepresentations and Omissions Regarding the Ownership
                        and Operation of the Trading Business ......................................................- 49 -

ii.   Sims Made Misrepresentations and Omissions Regarding Profit and Risk - 50 -

iii.   Sims Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds .......................................................... - 51 -

b.   Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented ...................................................... - 53 -

    i.   Sims Knew or Ignored Signs that TD was Manipulating Trade Data - 53 -

    ii.   Sims Concealed TD Wires and Customer Nationalities.................... - 54 -

    iii.   Sims Was Warned about doing Business with TD and Knew or Should Have Known About Public Warnings About TD ...................................... - 54 -

c.   Sims Misappropriated Customer Funds....................................................... - 55 -

D.   The Buggs' Fraudulent Scheme ........................................................................... - 56 -

a.   Buggs Begins Soliciting for the TD Pool ................................................... - 56 -

b.   Buggs Fraudulently Solicited Customers ................................................... - 57 -

    i.   Buggs Made Misrepresentations and Omissions Regarding Profit and Risk ........................................................................................................... - 57 -

    ii.   Buggs Made Misstatements and Omissions About the Trading Operation - 59 -

    iii.   Buggs Made Misrepresentations About the Ability of Customers to Withdraw Their Funds ............................................................................ - 60 -

c.   Buggs Knew or Should Have Known That TD Was Not Trading Customer Funds as Purported......................................................................................... - 61 -

    i.   Buggs Ignored Warnings That TD was Manipulating Trades ............ - 61 -

    ii.   Buggs Concealed the Purpose of TD Wires and Residency Status of Customers ............................................................................................... - 62 -

    iii.   Buggs Knew or Should Have Known About Other Public Warnings About TD ............................................................................................... - 63 -

d.   Buggs Misappropriated Customer Funds ................................................... - 64 -

E.   The Centurion Defendants' Fraudulent Scheme ................................................. - 66 -

a.   Centurion Begins Soliciting for the TD Pool ............................................. - 66 -

b.   The Centurion Defendants Fraudulently Solicited Customers .................. - 67 -

    i.   The Centurion Defendants Made Misrepresentations and Omissions Regarding Who Controlled Pool Funds...................................................... - 67 -

    ii.   The Centurion Defendants Made Misrepresentations and Omissions Regarding How the Funds Would Be Traded............................................ - 68 -

    iii.   The Centurion Defendants Made Misrepresentations and Omissions Regarding the Historical Profits of Their "Hedge Fund" ......................... - 69 -

    iv.   The Centurion Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds.................. - 71 -

c.   The Centurion Defendants Knew or Should Have Known that TD was Engaged in Fraud and Not Trading the Funds as Purported ................................. - 73 -

    i.   The Centurion Defendants Ignored Evidence that TD was Manipulating Trade Data ............................................................................................. - 73 -

    ii.   The Centurion Defendants Knew or Should Have Known About Public Warnings About TD ................................................................................ - 75 -

d.   The Centurion Defendants Misappropriated and Commingled Customer Funds   - 75 -

e.   The Centurion Defendants Failed to Register with the CFTC .................. - 78 -

   f. Santi and Beltran are Controlling Persons of Centurion ........................... - 79 -

V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS..- 79 -

VI. RELIEF REQUESTED .................................................................................... - 98 -

Plaintiff, Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.   SUMMARY

1.     From at least November 2019 through present (the "Relevant Period"), Traders Domain FX LTD. d/b/a/ The Traders Domain, by and through its officers, employees, and agents, ("TD") and its co-owners Frederick Teddy Joseph Safranko a/k/a/ Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari"), individually and as controlling persons of TD (collectively, the "TD Defendants") orchestrated a multi-layered scheme to solicit funds for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts.  Many, if not all, of the offered leveraged or margined transactions were transactions described in Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) ("leveraged or margined retail commodity transactions").

2.     Not only did the TD Defendants directly solicit customers, the vast majority of whom lived in the U.S., but they also engaged other individuals and entities ("sponsors") to solicit U.S. customers on TD's behalf—with each sponsor acting like a spoke extending from the TD hub.

3.     During the Relevant Period, the TD Defendants began soliciting individuals and/or entities ("customers") to deposit funds for the purpose of trading XAU/USD and other commodities on a leveraged or margined basis through various account offerings.  Starting in January 2021 and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in commodity pool operated by TD (the "TD Pool").  The TD Defendants committed fraud by knowingly or with reckless disregard making oral and written

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

fraudulent and material misrepresentations and omissions, including through the TD website, *thetradersdomain.com*, on social media, via text messages, email, newsletters, and/or in person in order to persuade potential and existing customers to transfer funds for the purpose of trading XAU/USD either through TD's various account offerings or via the TD Pool.  TD misappropriated customer funds by accepting customer money via third party bank accounts, payment processors, and crypto wallets, but failing to use at least some of those funds to trade XAU/USD and by charging commissions on purported trading profits that did not exist.  In addition, TD, and later it's successor in interest Ares Global d/b/a/ Trubluefx ("Trubluefx"), misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts.  TD and Safranko also falsified trading records, and the TD Defendants failed to register as required under the Act.

　　　4.　　In an effort to expand the scope of the fraud, the TD Defendants recruited entities and individuals to act as sponsors and solicit new customers in exchange for a percentage of purported trading profits in a manner akin to a multi-level marketing ("MLM") scheme.  In addition to the many sponsors spread all over the United States and internationally, the TD Defendants recruited the "Sponsor Defendants" (collectively with the TD Defendants and Trubluefx, "Defendants"), four distinct groups named in this complaint which drove the largest number of customers and funds to the TD Pool: (i) Algo Capital LLC ("Algo Capital") and Algo FX Capital Advisor, LLC ("Algo FX"), now known as Quant5 Advisor, LLC, by and through their officers, employees, and agents (collectively, "Algo"), Robert Collazo, Jr. ("Collazo"), Juan Herman ("Herman"), John Fortini ("Fortini"), and Stephen Likos (Likos) (collectively, the "Algo Defendants"); (ii) Michael Shannon Sims ("Sims"); (iii) Holton Buggs ("Buggs"); and (iv) Centurion Capital Group, Inc., by and through its officers, employees, and agents

- 2 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

("Centurion"), Alejandro Santiestaban a/k/a Alex Santi ("Santi"), Gabriel Beltran ("Beltran"), and Archie Rice ("Rice") (collectively, the "Centurion Defendants").

5.      As set forth below, each group of Sponsor Defendants engaged in a separate fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU/USD.  Although the Sponsor Defendants each intended the funds they solicited from customers to be traded in the TD Pool, at least some Sponsor Defendants purported to be soliciting for their own pools or "hedge funds."  The Sponsor Defendants solicited funds for the TD Pool even though each knew or should have known that TD was *not* trading the funds as represented.  Each of the Sponsor Defendants became aware of red flags that put them on notice that TD was not a legitimate trading operation.  The Sponsor Defendants faced a choice:  cease promoting TD in light of the alarming information they knew or follow the strong financial motivations they had to ignore the red flags and continue to collect generous commissions on the purported trading.  Each of the Sponsor Defendants chose the latter.  The Sponsor Defendants actively downplayed the red flags and continued to solicit customers, helping to create the false impression that customers were participating in legitimate trading even as the scheme was on the brink of collapse.

6.      Each of Sponsor Defendants knowingly made oral and written fraudulent and material misrepresentations and omissions on social media, via text messages, by telephone, and in person to potential and existing customers that they knew or should have known were false.  The Sponsor Defendants misappropriated customer funds, including by accepting funds intended for trading into bank accounts they controlled and/or collecting commissions on customer profits despite that the Sponsor Defendants knew or should have known that TD was not trading the

funds as purported. Some of the Sponsor Defendants also commingled customer funds and most were not registered as required under the Act.

7.     In the fall of 2022, the scheme began to unravel, and customers began to experience extreme withdrawal delays and/or were unable to withdraw their funds. To persuade customers that the withdrawal issues were not an indication of fraud, the TD Defendants provided numerous, conflicting excuses for the delays—including, in June 2023, announcing that TD had been acquired by Trubluefx. The TD Defendants falsely assured customers that their funds were safe and withdrawals would be processed. Notwithstanding the significant withdrawal delays, the Sponsor Defendants ignored or downplayed the withdrawal issues and continued to solicit funds from new and existing customers to be traded in the TD Pool. These misstatements allowed Defendants to continue their fraudulent scheme for more than six months and bilk customers out of millions of additional dollars.

8.     Each defendant knowingly or with reckless disregard for the truth engaged in the fraudulent scheme.

9.     By virtue of this conduct and the conduct described herein, Defendants have engaged, are engaging, or are about to engage in acts and practices that violate the following provisions of the Act and Regulations:

    **a. The TD Defendants and Trubluefx**
      i. TD, Safranko, Negus-Romvari, and Trubluefx violated Sections 4b(a)(2)(A),(C), 4o(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);
      ii. TD and Safranko violated 7 U.S.C. § 6b(a)(2)(B); and
      iii. TD violated Sections 4m(1) of the Act, 7 U.S.C. § 6m(1).

    **b. The Algo Defendants**
      i. Algo Capital, Algo FX, Collazo, Herman Fortini and Likos violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);
      ii. Algo Capital violated 7 U.S.C. § 6m(1); and

      iii.  Algo Capital and Algo FX violated Regulation 4.20(a)(1), (b)–(c), 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

c. **Sims**
      i.  Sims violated 7 U.S.C. §§ 6b(a)(2)(A),(C).

d. **Buggs**
      i.  Buggs violated 7 U.S.C. §§ 6b(a)(2)(A),(C).

e. **The Centurion Defendants**
      i.  Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6*o*(1)(A)–(B), and 6k(2);
      ii.  Centurion violated 7 U.S.C. § 6m(1); and
      iii.  Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

10.     Pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2023), an entity, as a principal, is liable for the acts of its agents, employees, or officers committed within the scope of their agency, employment or office.  At all relevant times, (i) Safranko and Negus-Romvari's acts were committed within the scope of their employment, agency, or office with TD; therefore, TD is liable as principal for Safranko and Negus-Romvari's violations of the Act and Regulations; (ii) Collazo, Herman, Fortini, and Likos's acts were committed within the scope of their employment, agency, or office with Algo Capital and Algo FX; therefore, Algo Capital and Algo FX are liable as principals for Collazo, Herman, Fortini, and Likos's violations of the Act and Regulations; (iii) Santi, Beltran, and Rice's acts were committed within the scope of their employment, agency, or office with Centurion; therefore, Centurion is liable as a principal for Santi, Beltran, and Rice's violations of the Act and Regulations.

11.     Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), an individual is liable for the acts of an entity which it directly or indirectly controls provided the individual knowingly induced the underlying violations of the act or failed to act in good faith.  At all relevant times: (1) Safranko and Negus-Romvari controlled TD and knowingly induced the underlying

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

violations or failed to act in good faith and, therefore, Safranko and Negus-Romvari are liable as

controlling persons for TD's violations of the Act and Regulations; (2) Collazo and Herman

controlled Algo Capital and Algo FX and knowingly induced the underlying violations or failed

to act in good faith and, therefore, Collazo and Herman are liable as controlling persons for Algo

Capital and Algo FX's violations of the Act and Regulations; and (3) Santi and Beltran

controlled Centurion and induced the underlying violations or failed to act in good faith and,

therefore, Santi and Beltran are liable as controlling persons for Centurion's violations of the Act

and Regulations.

12.     At least some of Defendants' conduct is ongoing—upon information and belief,

the majority of customer funds have not been returned.  Unless restrained and enjoined by this

Court, Defendants will likely continue to engage in acts and practices alleged in this Complaint

and similar acts and practices, as described below.

13.     Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7

U.S.C. § 13a-1, to enjoin Defendants' unlawful acts and practices and to compel their

compliance with the Act and the Regulations promulgated thereunder.  In addition, the CFTC

seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not

limited to, trading and registration bans, disgorgement, rescission, pre- and post-judgment

interest, and such other and further relief as the Court may deem necessary or appropriate.

## II.     JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1,

provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

15.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside in, transact, or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.  Venue also properly lies as to the alien defendants pursuant to 28 U.S.C. § 1391(c)(3).

### III.     THE PARTIES

#### A.  PLAINTIFF

16.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the CFTC's Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2023).

#### B.  DEFENDANTS

17.     Defendant **Traders Domain FX LTD. d/b/a The Traders Domain ("TD")** is an International Business Company formed in 2017 under the laws of St. Vincent and the Grenadines that has its principal operations in Canada.  TD was co-founded by Safranko and Negus-Romvari who, during the Relevant Period, acted as directors of TD.  TD has never been registered with the CFTC.  On July 14, 2022, the CFTC issued a press release notifying the public that TD, among other entities, had been added to its RED List (Registration Deficiency), and explicitly cautioned U.S. customers against doing business with those entities.

18.     Defendant **Fredirick Teddy Joseph Safranko, a/k/a Ted Safranko,** is a resident of Ontario or British Columbia, Canada.  During the Relevant Period, Safranko was a co-founder, director, and CEO of TD.  Safranko referred to himself and was known on various social media platforms as "Uncle Ted."  Since August 2020, Safranko has been an approved Principal of Utah based SAEG Capital General Management LP ("SAEG").  On January 31, 2023, SAEG and Safranko were sued by the Commission in the District Court for the Southern District of Texas for making false statements to the National Futures Association ("NFA") in violation of Section 9a(4) of the Act, 7 U.S.C. § 13(a)(4).  On September 5, 2023, the court entered an order of default judgment against SAEG and Safranko finding that they violated 7 U.S.C. § 13(a)(4) and imposing relief, including a permanent injunction, trading and registration bands, and a civil monetary penalty.  Safranko has never been registered with the CFTC in any other capacity.

19.     Defendant **David William Negus-Romvari** is a resident of Ontario, Canada and Mexico.  During the Relevant Period, Negus-Romvari was a co-founder and director of TD.  Since September 2020, Negus-Romvari has been an approved Principal of SAEG.  Negus-Romvari has never been registered with the CFTC in any other capacity.

20.     Defendant **Ares Global Ltd. d/b/a Trubluefx** is a limited liability company incorporated in Saint Lucia in June 2023.  Beginning in June 2023, Trubluefx assumed all business operations of TD, including taking control of customer accounts, communicating with customers, and purportedly trading customer funds.  Trubluefx has the same registration address in St. Vincent and the Grenadines that was previously used by TD.  Trubluefx has never been registered with the CFTC.

21.     Defendant **Algo Capital LLC** is a limited liability company incorporated in the state of Florida in 2018.  It has a business address of Miami, Florida.  Algo Capital has never been registered with the CFTC.

22.     Defendant **Algo FX Capital Advisor LLC n/k/a Quant5 Advisor, LLC** is a limited liability company incorporated in the state of Delaware in August 2021.  It has a business address of Medley, Florida.  In or around September 2022, Algo FX changed its name to Quant5 Advisor, LLC ("Quant5").  Algo FX n/k/a Quant5 was registered with the CFTC as a Commodity Pool Operator ("CPO") and a Commodity Trading Advisor ("CTA") from April 20, 2022 to March 24, 2023.  During the Relevant Period, Algo Capital and Algo FX shared some of the same employees.  The Algo Defendants used both Algo entities interchangeably to solicit customers for the same commodity pool and deposited pool funds into the same bank accounts held in the name of Algo Capital, which were controlled by Collazo and Herman.

23.     Defendant **Robert Collazo, Jr.** is a resident of Miami Lakes, Florida.  During the Relevant Period, Collazo was the President of Algo Capital and a Manager and owner of Algo FX.  Collazo has never been registered with the CFTC.

24.     Defendant **Juan Jose Herman a/k/a/ JJ Herman** is a resident of Miami, Florida. During the Relevant Period, Herman was the Vice President of Algo Capital and a Manager and owner of Algo FX.  On August 29, 2022, Herman filed an application with NFA to be listed as a Principal for Quant5, but he withdrew that application on November 28, 2022.  Herman has never been registered with the CFTC in any other capacity.

25.     Defendant **John Fortini** is a resident of North Miami, Florida.  During the Relevant Period, Fortini was Vice President and the CFO Portfolio Management of Algo Capital and Algo FX.  Fortini has never been registered with the CFTC.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

26.     Defendant **Stephen Likos** is a resident of Sunny Isles Beach, Florida.  During the Relevant Period, Likos was a sales representative for Algo Capital and Algo FX, and he received commissions based on the customers that he solicited for Algo.  Likos has never been registered with the CFTC.

27.     Defendant **Michael Shannon Sims** is a resident of Sunny Isles Beach, Florida. From January 24, 2020 to April 8, 2023, Sims was an approved Principal of an entity registered with the CFTC as a commodity pool ("CPO") operator and commodity trading advisor.  Sims has never been registered with the CFTC in any other capacity.  On January 31, 2023, in the same suit against Safranko, the Commission sued Sims for aiding and abetting fraudulent conduct by another defendant in violation of Section 4b(a)(2) and 4*o* of the Act, 7 U.S.C. §§ 6b(a)(2) and 6*o* and Commission Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2023).  This case is on-going.

28.     Defendant **Holton Buggs, Jr.** is a resident of Houston, Texas.  Buggs has never been registered with the CFTC.

29.     Defendant **Centurion Capital Group Inc.** is a company incorporated in the state of Florida in March 2022 with its principal office in Hiahleah Gardens, Florida.  Centurion has never been registered with the CFTC.

30.     Defendant **Alejandro Santiestaban a/k/a Alex Santi** is a resident of Hialeah, Florida.  Santi owns Centurion Holdings LLC ("CH"), a limited liability company incorporated in the state of Delaware.  CH is listed on Centurion's registration documents as its President. Upon information and belief, CH is a holding company through which Santi controls Centurion. Santi has never been registered with the CFTC.

31.     Defendant **Gabriel Beltran** is a resident of Hialeah, Florida.  Beltran owns GMJ

Marketing LLC ("GMJ"), a limited liability company incorporated in the state of Florida.  GMJ

is listed on Centurion's registration documents as its Vice President.  Upon information and

belief, GMJ is a holding company through which Beltran controls Centurion.  Beltran has never

been registered with the CFTC.

32.     Defendant **Archie Rice** is a resident of Fulshear, Texas.  During the Relevant

Period, Rice solicited customers on behalf of and as a representative of Centurion, including on

at least one occasion meeting with a prospective customer in-person in Florida.  Rice has never

been registered with the CFTC.

## IV.    FACTS

### A. THE TRADERS DOMAIN DEFENDANTS' FRAUDULENT SCHEME

33.     During the Relevant Period, TD and its co-owners Safranko and Negus-Romvari

fraudulently solicited U.S. customers to deposit money for the purpose of trading XAU/USD,

through individual accounts, copy trading accounts, and later participating in the TD Pool by

making material misrepresentations and omissions to prospective and actual customers.  In

addition, TD and its successor in interest, Trubluefx, misappropriated customer funds, TD and

Safranko falsified trading records; and the TD Defendants failed to register as required under the

Act.  Pursuant to this scheme, at least 2,046 customers deposited no less than $283 million for

the purpose of participating in the TD Pool, as well as assorted other commodities, through

pooled and individual accounts.

### a.    The TD Defendants Launch an Unregistered Offshore Brokerage and Begin Soliciting Customers

34.     In October 2017, TD was incorporated in St. Vincent and the Grenadines and,

upon information and belief, Safranko and Negus-Romvari appointed themselves directors and

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

sole shareholders.  Shortly thereafter, in December 2017, TD teased the launch of its retail

brokerage via the Instagram handle @thetradersdomain.  On December 31, 2017, TD announced

on Instagram: **"\*\*\*\*THE TRADERS DOMAIN RETAIL BROKERAGE SITE LAUNCH**

**FRIDAY JANUARY 5TH \*\*\*\*"** and posted a video advertising the various features of the

brokerage site.  The video indicated that TD was "Built by Traders for Traders" and boasted a

"Renowned and Trusted Broker and Community."  The post directed people to its website,

www.thetradersdomain.com.



35.     As early as 2018, the Traders Domain website, www.thetradersdomain.com,

highlighted key features of the brokerage, including:  "Client segregated accounts," "Reputable

payment gateway providers," "Rapid withdrawal and deposits," "Industry Leading Execution,"

and "Desirable leverage from 1:500."

36.     In addition to offering trading accounts through which customers could trade their

own funds, since at least January 2020, TD also solicited U.S. customers for the purpose of

trading XAU/USD, both of which are commodities, and other commodities through investment

style accounts that did not require customers to actively trade their own funds.  One type of

investment account offered by TD was a "Percentage Allocation Management Model ("PAMM")

account—a form of pooled trading whereby the trader executes trades on behalf of all

participants and profits are distributed proportionately to all participants based on their share of the pool. TD also advertised "copy trading" services which purportedly allowed customers to automate trading in their account by copying the trades done by a variety of "master traders," including Safranko.

37.     During this initial period, TD solicited customers for these PAMM and/or "copy trading" offerings through representations it made on website and social media accounts, which falsely claimed that TD was a "registered and licensed brokerage firm" that did not accept U.S. customers.

**b. The TD Defendants Begin Soliciting for the TD Pool**

38.     Upon information and belief, in or around January 2021, TD began to solicit potential customers for the express purpose "subscribing" or participating in the TD Pool—*i.e.* one or more PAMM-style accounts that purported to trade exclusively leveraged or margined XAU/USD and, upon information and belief, were controlled and traded by Safranko. The TD Defendants and customers described the TD Pool at various times as the "High-Risk PAMM" or "Gold PAMM" account.

39.     Upon information and belief, TD advertised that the TD Pool generated returns of more than 5,000% in 2021 and 7,000% in 2022.

40.     TD also told customers that they could set a risk limit on their PAMM account to protect against losses to their initial investment and earned profit.

**c. The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud**

41.     Since its inception, TD offered traders the opportunity to earn "affiliate commissions" and "bonus payments" based upon the monthly volume introduced to the platform through its "Introducing Broker" or "Partner Program." TD made these commissions and bonus payments to its partners by crediting their TD accounts. In December 2021, TD posted about its

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

"Referral Program" on Instagram encouraging users to "Tell A Friend" and "Earn Rebates" from their trading.



42.    In or around January 2021, the TD Defendants began to take additional steps to actively recruit new "Partners" or "Sponsors" for the purpose of driving new customers to the TD Pool.  The TD Defendants recruited U.S. individuals and/or entities—many of whom had established social media followings, MLM networks, or other clientele—to act as sponsors and solicit new U.S. customers for the TD Pool in exchange for a portion of purported trading revenues.  TD compensated sponsors for recruiting customers by paying them commissions— sometimes as high as 60 percent of customers' purported trading profits.

43.    For example, in March 2022, Negus-Romvari attended a meeting in Miami, Florida with sponsors and potential sponsors, including representatives of Algo and Centurion. As described further below in ¶ 55, following the meeting, Negus-Romvari continued to communicate with Centurion through Santi, Beltran, and Rice for the purpose of encouraging them to solicit customers for the TD Pool.

44.    On multiple occasions, including on or around April 11, 2022, Safranko and other representatives of TD held meetings with some or all of the Algo Defendants in or around

Miami, Florida.  Throughout the Relevant Period, Safranko communicated with the Algo

Defendants thousands of times by telephone, video conference, text message, and through other

messaging apps.

45.     Safranko also established relationships with other sponsors, including Sims and

Buggs.  Safranko communicated with Sims and Buggs via telephone and/or messaging

applications.  Additionally, on a number of occasions, Safranko participated in telephone and

video conferences with potential or existing customers that Buggs was soliciting.  On at least one

occasion, Safranko traveled with Buggs to Dubai in connection with TD.  Like the other Sponsor

Defendants, the TD Defendants paid Buggs and Sims commissions based on the customers that

they recruited for the TD Pool.

### d.  The TD Defendants Fraudulently Solicited Customers

46.     During the Relevant Period, the TD Defendants fraudulently solicited prospective

U.S. customers to deposit money for the purpose of trading leveraged or margined XAU/USD or

other commodities.  The TD Defendants made numerous fraudulent misrepresentations and

omissions regarding, among other things, (i) its trading operations and (ii) the ability of

customers to withdraw their funds.

### i.     *The TD Defendants Made Misrepresentations and Omissions Regarding its Trading Operations*

47.     TD made numerous representations about the trading of customer funds leading

customers to believe that all of the funds they directed to PAMM accounts, "copy trading"

accounts, and/or the TD Pool were being used to trade leveraged or margined XAU/USD.  In

addition, Negus-Romvari also made misrepresentations that TD was utilizing a "bot" or "algo" to

trade customer funds.

48.     Safranko made fraudulent misrepresentations by telling at least some customers that all funds deposited for the purpose of participating in the TD Pool would be used to trade leveraged or margined XAU/USD.  Safranko made these misrepresentations while pitching the success of the TD pool to potential customers.

49.     In addition, TD's account setup instructions, account activity provided to customers via a trading application, daily confirmation statements, and TD newsletters, all led customers to believe that their funds would be used to trade leveraged or margined XAU/USD using a PAMM, "copy trading" accounts, and/or the TD Pool.

50.     On its website, www.thetradersdomain.com, TD provided instructions and video tutorials on how to create an account and subscribe to TD's PAMM account.  One sponsor provided similar instructions in a nine-page document titled "HOW TO—Become TD Client & Subscribe to Trade Copying Service" the contents of which, on information and belief were provided by TD.  TD described in detail the steps a customer needed to take in order to participate in the TD Pool—including, creating a TD profile, opening an investment account, setting up a subscription to the Master Account ("MetaTrader 5 High Risk PAMM"), and funding their investment.  The account setup document describes how "the account can be funded and investment subscribed to trading copy services, to generate generous returns."  The account setup document further provides the misleading impression that all funds would be traded by warning that "trading can result in the loss of 100% of your capital."

51.     If customers deposited funds for the purpose of participating in the PAMM accounts, "copy trading" accounts, or TD Pool (via one of the methods described below at Part IV.A.f.), they were directed to download a trading application (the "Trading App").  Customers could purportedly view and monitor the trading activity in their TD trading account, but they did

not have the ability to make trades or withdraw funds. Through the Trading App customers observed that all of the funds intended for trading were available in their TD Account often within 48 hours of a deposit. For example, one customer wired his funds at TD's direction to a third-party bank account in the U.S. His TD account showed that it was credited with the full wire balance that same day and began "trading" the following day.

52.     Customers also received daily confirmation trading statements by email and through the Trading App showing the trading activity in their accounts. The daily confirmation statements showed the purported trades that day, and the customer's account balance less the TD commission.

53.     TD also periodically sent customers a newsletter, updating customers about issues and plans. In these newsletters and other customer communications TD created the misleading impression that all customer funds were being traded and that trade orders were being executed in the market, by warning customers that their funds were "at full risk anytime during trading" as well as describing its plans to improve order execution.

54.     In addition to misrepresenting that TD was trading all customer funds, TD also made misleading statements regarding how customer funds were being traded.

55.     For example, in the Spring and Summer of 2022, Negus-Romvari engaged in numerous conversations with the Centurion Defendants over text messages and Zoom. During those conversations Negus-Romvari shared a link purporting to show the trading results for "1+ year of the algo." Among other things, the results purportedly showed monthly gains of 15% for a "conservative" account, which, Negus Romvari explained, had a "40% lower risk profile." Thereafter, the Centurion Defendants solicited funds from customers for the purpose of trading leveraged or margined XAU/USD using the "bot" or "Algo" Negus-Romvari had described.

56.     The statements set out in ¶¶ 47-55 were false.  First, TD did not utilize an algorithm or "bot" to trade funds in the TD Pool.  Upon information and belief, Safranko was responsible for manually trading funds in the TD Pool.  Second, these statements created the misleading impression that all customer funds were used to trade leveraged or margined XAU/USD.  In fact, only a fraction, if any, of the funds deposited for the purpose of participating in the TD were actually traded.  As set forth in detail below in Part IV.A.f., although customers were led to believe that they were funding their TD accounts through a variety of methods, customer funds were diverted and misappropriated in a variety of ways without ever being sent to fund a trading account.

### ii.     *The TD Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw Their Funds*

57.     Beginning in August 2022, TD began to experience "liquidity problems" and was unable to fulfill customer withdrawal requests.  Rather than provide truthful information to these customers about their funds, the TD Defendants lied to customers about the purported reasons for the delays and offered false assurances that withdrawals would be processed.  The TD Defendants made these statements via a variety of channels, including email, TD Newsletters, text messages, Telegram, on videoconferences, and in-person.  In fact, upon information and belief, the TD Defendants lacked the funds to repay their customers, because customer funds had been misappropriated and not traded as purported, and the scheme was on the brink of collapse.

58.     For example, on August 4, 2022, Negus-Romvari advised the Centurion Defendants that they were "requesting many withdrawals consitently [sic]" and as a result they would be "processed in a queue" and could take "20 days to a month to process."  Negus-Romvari explained that the TD Pool was "not an ATM" and that it was normal in the "highest

level of finance" for "[h]edge funds . . . the best ones" to "lock funds including profits for months/sometimes years."

59.     On August 31, 2022, TD announced an "adjustment in [the withdrawal] timelines" to all of its customer in the first edition of the "TD Newsletter." The Newsletter stated: "Currently, we are working to have all withdrawals completed **within 20 business days**," (emphasis added) explaining that all withdrawals must "go through a screening process that includes our compliance area where we must review the entire trade history."

60.     TD also advised some customers and sponsors that, in or around August 2022, TD had lost its banking relationships as a result of customers submitting withdrawal requests with incorrect wire information.

61.     These statements were false. The withdrawal delays were not caused by TD's compliance screening process or the loss of its screening process. Rather, TD was unable to fulfill customer withdrawals because, upon information and belief, its scheme was on the brink of collapse. Nor did TD process pending delays within 20 days or a month as promised. Customers continue to be unable to withdrawal their funds more than two years after the timeline adjustment was announced.

62.     In or around October 2022, after announcing that TD had established a new banking relationship, TD introduced a cryptocurrency payment processing firm based in Utah ("Crypto Payment Processing Firm") to act as the interface between the bank and TD customers for the purpose of handling wire transfer, ACH, and certain cryptocurrency withdrawals. TD told customers that the Crypto Payment Processing Firm would allow TD to "expand our processing capabilities" and provide payments "faster than our current 20 business day period."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

63.     These statements were also false.  Crypto Payment Processing Firm did not fix any of the withdrawal issues which were the result of the fact that TD had misappropriated customer funds and did not trade them as purported.  Upon information and belief, the majority of TD customers were unable to withdraw their customer funds from their accounts via Crypto Payment Processing Firm.

64.     On December 11, 2022, TD sent another edition of its "Newsletter" titled "2022 Wrap Up" to its customer base.  TD set forth yet another new timeframe for purported withdrawals specifically for customers participating in the TD Pool.  TD stated that "All clients who use the High-Risk PAMM section will now be restricted in terms of withdrawal processing to **1 withdrawal per 45 business days and the withdrawal will be processed within this time frame.  The longest the withdrawal will take with this policy will be 45 business days.**" (emphasis added).

65.     As the withdrawal timeframes continued to change, so did the excuses.  During a December 2022 video conference, Safranko told Santi and certain customers that customer withdrawals were being held up by banking issues.  Nevertheless, Safranko promised that their pending withdrawals would be fulfilled by January 31, 2023.

66.     In or around December 29, 2022, TD posted an "Update" on the Dashboard of the Trading App:

> Seasons greetings to all of The Traders Domain Clients.  We are pleased to announce that we have updated our banking channels so we are able to move funds quicker and outstanding transactions will be cleared shortly.  We appreciate the patience and apologize for the delay.  Please also note that the timelines that were provided in the newsletter are just temporary until we stress test our current banking vehicles.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

67.     Safranko also held multiple video and in-person meetings with customers where he made misstatements and provided additional false assurances that withdrawals would be paid imminently.  For example, on or around January 9, 2023, Safranko held a video meeting with a number of customers.  During this meeting, Safranko showed the customers documents that he claimed proved that TD was a legitimate business and had funds to repay all outstanding withdrawals.  These documents included a December 8, 2022 letter from a Financial Services Company based in UAE purporting to hold $150 million for TD and an August 24, 2022 "audit report" from a Mexican accounting firm purporting to show that TD had net revenue of $500 million in 2022.

68.     Shortly thereafter, on or around January 19, 2023, Safranko held an in-person meeting in Vancouver, British Columbia with two customers.  During the meeting, Safranko showed additional documents that purportedly showed that TD had the funds to repay all outstanding withdrawals.  However, when these customers asked Safranko to log in to certain accounts to demonstrate proof of funds, he refused to do so.  Safranko promised to provide additional documents and proof in a follow-up meeting, but that meeting never materialized.  Safranko eventually ceased all communication with these customers without providing the additional documents and proof.

69.     Throughout late winter and spring 2023, TD continued to communicate with customers about delays in withdrawals.  On February 6, 2023, TD sent another Newsletter to clients stating that "there continues to be improvement on distributions and timing."  The Newsletter blamed the delays on the rapid growth of the High-Risk PAMM account:  "In the span of 6 months, Traders Domain has grown by 30%" specifically "in the High Risk PAMM section" and the " the additional users . . . created strain on our processing system."

70.     Despite these significant withdrawal delays, as recently as March 2023—more than seven months after TD's purported liquidity problems started—TD's website still promised customers that they could access their funds via "Fast Withdrawals."

71.     These statements were also false.  Upon information and belief, the withdrawal delays were not caused by strain on TD's processing system cause or the need to "stress test" TD's compliance screening process.  Rather, TD was unable to fulfill customer withdrawals because its scheme was on the brink of collapse.  Contrary to Safranko's assurances, TD did not have the funds to pay all pending withdrawal requests.  Nor were the increased withdrawal timelines "temporary."  TD did not meet the updated 45-day withdrawal timeline or comply with any of the other promised deadlines.  Customers continue to be unable to withdrawal their funds more than two years after the timeline adjustment was announced.

72.     On March 21, 2023, TD announced in a newsletter that TD was allegedly being acquired, but that "**WITHDRAWALS WILL CONTINUE TO PROCESS**." (emphasis in original) TD explained that "This acquisition allows for more choice for processing and banking which allows for faster transaction both in and out of the brokerage"

73.     On June 13, 2023, TD sent its "Final Newsletter" which stated that the transition to the new platform would be completed that week and any future communications would be from the "new brokerage platform."  TD assured its clients that pool funds would be transferred to the new brokerage:

> In terms of the PAMM system, you all were subscribed to, you will have access to that feature once again to move funds out of your investment account for withdrawals.  The subscription feature will be automatically enabled.  If you do not wish to have your account subscribed, you will have 48 hours to unsubscribe your account, so your funds are no longer being traded by the master trader.

The Final Newsletter also assured clients that, despite the transition to the new platform,

withdrawals would continue to be processed:

**WITHDRAWALS**

You will see a much more organized and smooth flow of
withdrawals go out with the new platform due to their strong
payment processing solutions in place. Please DO NOT message
the support inbox constantly with your order number, we will
have all this data migrated over and are fully aware of each and
everyone one of your withdrawals. There is no sugar coating it,
there are many withdrawals to tend to, and they will get to them
as fast as possible, but this will not be an overnight fix. We do
not have an exact timeframe on when all backlog will clear the
moment [sic], please be patient while we diligently work to clean

74.    These statements were also false. Despite TD's assurances that the acquisition

would lead to "faster transaction[s]" and an "organized and smooth flow of withdrawals,"

hundreds, if not thousands of customers have been unable to withdraw their funds more than a

year after the transition to Trubluefx. Despite Trubluefx representing that it was holding TD

customer accounts in full, upon information and belief, Trubluefx lacks the funds to repay

customers, because the funds were misappropriated and not traded as purported.

**e. The TD Defendants Falsified Trading Records**

75.    To conceal the fraud, TD and Safranko falsified trading records.

76.    As discussed above, once a customer opened an account with TD (either directly

or as described below, through a sponsor), they were directed to download the Trading App. The

Trading App enabled customers to actively monitor the trading activity in their TD trading

account. In addition, TD sent daily confirmation statements via email to customers (or in some

instances, to their sponsors) showing, among other things, the trading activity, margin, and

account balance for the account.

77.     Throughout the Relevant Period, customers observed through the Trading App and in their daily confirmation statements trading results that were nearly always positive.  In order to achieve these remarkable gains, TD manipulated trade data to "disappear" purported trading losses.  Although the trading activity customers observed through the Trading App was nearly always positive, on a number of occasions customers observed temporary large losses in their accounts.  When those customers raised concerns with TD (either directly or through their sponsors), the TD Defendants would respond (either directly or through a sponsor) that the losses were the result of "slippage" or "system errors" and assured customers that the losses would be reversed.  TD informed at least one customer that TD had a had a "standing agreement" with its "Liquidity Provider who is our counterparty" to reverse within 24 to 48 hours any losing trades caused by slippage.

78.     TD's explanations for the trading loss reversals were false.  For example, on October 12, 2022, one customer observed nearly a 52% loss in his account.  Within a few hours TD had adjusted the account to reflect only a very small loss for the day.  However, the customer observed that the trades were adjusted by TD **to prices where the market was not trading at those times on those days**.  The customer documented the irregularities by taking screenshots of the Trading App and sought an explanation from TD.  TD responded that the adjustments were caused by technical issues, including the alleged difference between the aggregator pricing and what the Trading App software could handle.  When the customer further pressed TD to explain how trades were being adjusted hours after they were executed to prices not reflective of the market, TD again referenced technical issues but did not respond to the customer's specific questions.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

**f.   The TD Defendants Misappropriated Customer Funds**

79.    Rather than accept funds in the name of the TD Pool, the TD Defendants instead directed customers to deposit funds through a variety of means including via:  (1) wire transfer into U.S. bank accounts held in the names of various third parties but controlled by TD; (2) via various payment processors contracted by TD, who acted at the direction of TD; and (3) crypto currency wallets, which, on information and belief, were controlled by TD.

80.    For example, during the Relevant Period, TD directly and as discussed further below, through the Sponsor Defendants, caused no less than $180 million in customer funds to be deposited into bank accounts held in the name of various third-party entities that TD controlled through a TD agent who was the signatory on these accounts.  None of these third-party entities were firms that engaged in trading.  None of the funds deposited in these third-party bank accounts were ever sent to TD or any other firm that engaged in trading.  Instead, TD directed its agent to use customer funds deposited into the third-party bank accounts to make payments unrelated to trading and to make Ponzi-style payments to other customers.

81.    Indeed, Safranko admitted that TD made Ponzi-style payments by using new customer deposits to fund pending withdrawals for other customers.  In a video conference that occurred in or around November 2022, Safranko stated that "transfers coming in" can be used to "exit [] people out with that deposit."  Similarly, in a call with customers in or around August 2022, Safranko said that TD does a lot of "ledger transactions" and "instead of moving money from our liquidity pool, we just do a simple accounting" by using new customer deposits to pay withdraw requests for different customers.

82.    During the Relevant Period, TD also accepted deposits from customers via various payment processing firms that accepted credit and debit card transactions.  Beginning in

- 25 -

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

at least 2019, Traders Domain engaged a payment processing firm ("Payment Processing Firm") based in Utah to accept credit and debit card deposits from U.S. customers through TD's website. During the Relevant Period, Payment Processing Firm accepted at least $19 million in customers deposits for TD.

83.     None of the funds accepted by Payment Processing Firm were ever sent to TD or to any other entity engaged in trading. Instead, TD directed Payment Processing Firm to use customer funds to pay expenses unrelated to trading and to make Ponzi-style payments to other customers.

84.     In addition, TD also accepted deposits via cryptocurrency directly and, after October 2022, via Crypto Payment Processor, which accepted at least $16 million in customer deposits for TD. Upon information and belief, millions of dollars in customer funds were accepted through these crypto channels and never returned despite withdrawal and liquidation requests.

85.     As a result of the TD Defendants' misappropriation, upon information and belief, the majority of TD customers have been unable to withdraw funds deposited with TD for the purpose of trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

### g.  Trubluefx Misappropriated Customer Funds

86.     Trubluefx misappropriated customer funds that were "migrated" to its platform following a purported acquisition by refusing to return those funds despite repeated withdrawal and liquidation requests.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

87.     On July 19, 2023, TD customers received an email welcoming them to Trubluefx. The welcome email provided instructions on how customers could access their "migrated" accounts. Trubluefx also assured customers that it was "fully aware" of all "current pending withdrawals" and promised to provide "more clarity" on an "exact timeline" for the resumption of withdrawals in future emails. The welcome email directed customers to visit the website for www.Trubluefx.com, which indicates in the "About Us" page that Trubluefx is operated by Ares Global Ltd.

88.     Trubluefx continued to assure customers that withdrawals would eventually be processed. On October 20, 2023—*more than a year* after customers began experiencing withdrawal issues—Trubluefx continued to tell clients that withdrawals would resume and blamed broader economic conditions for the delays:

> Withdrawals: We have made progress getting to a complete resolution on this matter but we still have many steps to complete. This is a long process due to the current economic and banking situation. As you can see we are truly working on this situation to get resolved. Trading has graciously started and our team is working around the clock to get additional tasks completed. Please give us time while we navigate. Upon full functionality we will notify you via email.

89.     Despite purporting to hold TD customer funds and receiving repeated withdrawal requests, to date thousands of customers have been unable to withdraw their funds from Trubluefx.

**h.  The TD Defendants Failed to Register with the CFTC**

90.     As described above, during the Relevant Period, TD was acting as an unregistered CPO by soliciting funds from individuals, including U.S. customers, for a commodity pool for the purpose of trading leveraged or margined XAU/USD.

91.     Although TD's website claimed that TD did not "accept applications from residents of the U.S.," among other countries, TD actively solicited and accepted funds from U.S. customers, including through sponsors. For example, TD and sponsors directed U.S. customers to select "CRYPTO" as their country of origin (instead of USA, which was not listed as an option) when creating a TD account.

92.     TD used telephone, emails, wire transfers, internet and other means or instrumentalities of interstate commerce to solicit, accept and receive customer funds for the purposes of trading XAU/USD.

93.     TD was never registered as a CPO and was not exempt or excluded from registration as a CPO.

94.     During the Relevant Period, Safranko and Negus-Romvari were acting as unregistered APs of a CPO, TD, by soliciting customers to participate in the TD Pool while associated with TD as a partner, officer, employee, or similar agent.

95.     Neither Safranko nor Negus-Romvari were ever registered as an AP of TD.

**i.   Safranko and Negus-Romvari are Controlling Persons of TD**

96.     Safranko and Negus-Romvari are controlling persons of TD. Safranko and Negus-Romvari incorporated and registered TD in Saint Vincent and the Grenadines in 2017 as co-owners. In addition, upon information and belief, Safranko opened bank accounts in the name of TD, and both Safranko and Negus-Romvari paid invoices on behalf of TD from their personal accounts throughout the Relevant Period.

97.     Although Safranko and Negus-Romvari later took steps to hide their role with TD, they were still firmly in control of TD operations throughout the Relevant Period. Beginning in or around May 2019, Safranko and Negus-Romvari took steps to conceal Negus-

Romvari's role with TD.  Upon information and belief, Safranko and Negus-Romvari removed

Negus-Romvari as a Director and re-issued all of TD's shares to Safranko.

98.    Upon information and belief, in or around January 2020, Safranko also "resigned"

on paper as a Director and cancelled his shares.  Three years later, on January 18, 2023, despite

Safranko's previous resignation, TD sent its customers an email notifying them that Safranko

was purportedly no longer the director or CEO but assured customers of his continued

involvement with the business:

> With this communication we would like to update you on
> leadership changes at The Traders Domain.   Effective,
> immediately, Ted Safranko will step down as CEO and Director
> of Traders Domain.
>
> Please be noted this is not a short term decision, [W]e have
> enrolled a new director and CEO in the name of [REDACTED]
> back in January 2020 and we have taken the time since to hand
> over the processes and responsibilities to streamline the business
> and guarantee business continuity.
>
> Ted Safranko is—and will remain to be available as a trusted
> advisor to the business and be in communication with our clients
> and community as we address and resolve the current withdrawal
> delays and customer support scale up.

99.    Even after being removed as a co-owner on paper, Negus-Romvari continued to

control the day-to-day operations of TD, including by paying invoices on behalf of TD out of his

personal accounts, travelling to meetings on behalf of TD for the purpose of recruiting sponsors,

communicating with sponsors, and paying invoices on behalf of TD.

100.    Similarly, after "resigning" as director January 2020, Safranko continued to

identify himself in email as the CEO of TD and represented himself as the owner of TD to

Sponsors and customers in various virtual and electronic meetings that took place in 2022 and

2023.  Safranko also moderated the Traders Domain Official Community Chat on Telegram and

used this forum to communicate numerous times a week with more than 3,800 TD customers on topics including the status of customer withdrawals, the purported reasons for payment delays, TD's liquidity, and the alleged acquisition of TD by another brokerage.

**B. THE ALGO DEFENDANTS' FRAUDULENT SCHEME**

101.     Beginning in at least October 2021 through the present (the "Relevant Algo Period"), Algo, that is Algo Capital and Algo FX, now known as Quant5, by and through their officers, employees, and agents  and Robert Collazo, Jr., Juan Herman, John Fortini, and Stephen Likos (previously defined as the "Algo Defendants") fraudulently solicited customers for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Algo (the "Algo Pool") by making material misrepresentations and omissions to prospective and actual customers.  In fact, Algo was using customer funds to participate in the TD Pool despite the fact that Algo knew or should have known that TD was not trading customer funds as it purported (*see* below at Part IV.B.c).  In addition, the Algo Defendants misappropriated and commingled customer funds and/or failed to register as required under the Act.  Pursuant to this scheme, at least 242 Algo customers deposited no less than $39 million for the purposes of participating in the Algo Pool.

**a.     Algo Begins Soliciting for the TD Pool**

102.     Algo first became involved with TD in 2019 when they were shopping for a brokerage on which Algo could trade its own customer funds manually or using its own algorithm.  Safranko participated in numerous teleconferences and in-person meetings in or around Miami, Florida with Collazo, Herman, and/or Fortini, including to discuss how Algo Capital could collect commissions based on the trading of customer funds at TD.  Algo began using TD as a brokerage in 2019 and continued to work closely and communicate with Safranko throughout the Relevant Algo Period.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

103.     In or around October 2021, after suffering large trading losses, Algo advised its customers that it was switching to a "XAU/USD strategy."  Thereafter, Algo stopped engaging in its own proprietary trading of customer funds and instead used those funds to participate in the TD Pool, while misrepresenting and/or failing to disclose this fact to actual and prospective customers.

**b.  The Algo Defendants Fraudulently Solicited Customers**

104.     During the Relevant Algo Period, the Algo Defendants fraudulently solicited prospective customers—through in-person meetings, text messages, messaging apps, telephone calls, emails, and websites—to deposit money for the purpose of trading leveraged or margined XAU/USD.  The Algo Defendants made numerous fraudulent misrepresentations and omissions regarding:  (i) the operation of the trading business; (ii) the location of customer funds; (iii) TD's addition to the CFTC RED List; and (iv) the ability of customers to withdraw their funds.

105.     On information and belief, some, if not all of the Algo customers are not ECPs.

      i.     ***The Algo Defendants Made Misrepresentations and Omissions Regarding the Operation of the Trading Business***

106.     During the Relevant Algo Period, the Algo Defendants made fraudulent misrepresentations and omissions about how customer funds were traded.

107.     Some or all of the Algo Defendants made these false and misleading statements to prospective customers on telephone calls, in text messages, and during in-person meetings.  For example, during phone calls and in text messages, Fortini falsely told numerous prospective customers that Algo was trading customer funds using its own proprietary trading algorithm.  Likos similarly told at least one prospective customer that Algo used its proprietary algorithm to trade, and he claimed that the algorithm never had a losing month and usually generated monthly returns of around twenty percent.

108.    The Algo Defendants also made false statements about the trading operation in written customer agreements.  The Algo Defendants sent these written agreements to customers electronically through Algo's DocuSign account that was used by Collazo, Fortini, and Likos, and through an Algo Support email account (support@algocapitalfx.com) used by the Algo Defendants.  Many of these agreements were signed by Fortini on behalf of Algo Capital or Algo FX, and upon information and belief were approved by Collazo and Herman.  In communications with other Algo Defendants, Collazo stated that he received copies of every customer agreement.  The Algo FX customer agreements stated that all customer communications should be directed to either Collazo or Fortini, in their capacity as "Manager."

109.    For example, in one version of its customer agreement, titled "Software As A Service Agreement," Algo provided a license to use its "proprietary algorithmic trading software" in exchange for 15% to 50% of the customer's trading profits.  This version also stated that the "algorithmic trading program" would occur in a "hosted environment provided and maintained by [Algo]."  Another version of the customer agreement, titled "Investment Management Agreement" or "Separately Managed Account Agreement," misleadingly stated that Algo would "buy, sell, exchange, convert and otherwise invest or trade" customer funds using its "gold intra-day trading strategy" and future investments may include other "algorithmic FX strategies," in exchange for 25% to 50% of the customer's trading profits.

110.    These statements were false.  Beginning in at least October 2021 (*i.e.*, the beginning of the Relevant Algo Period), Algo stopped using its own proprietary algorithm to trade customer funds.  The Algo Defendants' internal communications, emails, and text messages acknowledged that, from at least October 2021 forward, Algo stopped using its own trading algorithm and instead purportedly directed customer funds to the TD Pool, which was

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

supposedly being traded by Safranko. During a December 19, 2023, deposition in a creditor proceeding involving Algo Capital, a representative of Algo Capital testified that Algo stopped using its proprietary trading algorithm in October 2021, and thereafter Safranko purportedly traded funds for Algo. Moreover, Safranko acknowledged Algo's false claims when he wrote the following to Herman and Fortini on January 29, 2023: "[I] wish you guys had told them you weren[']t trading cause that is causing a lot of headache [sic][.] [E]veryone is asking why Algo cap claimed they had algos then 'ted' was trading[.] [T]hat is the big issue[.]"

111. Moreover, the Algo Defendants failed to disclose to prospective and current customers that Safranko, rather than Algo personnel or an Algo algorithm, was trading customer funds. For example, beginning in October 2021, Algo began having customers sign a "Rider" agreement that purportedly advised customers of its new trading strategy. Like the other customer agreements, the Rider was sent to customers through Algo's DocuSign account used by Collazo, Fortini, and Likos, and through the Algo Support email account used by the Algo Defendants. The Rider did not disclose that Algo was no longer using its own trading algorithm, it failed to identify TD or Safranko, and did not state that Safranko, or anyone other than Algo, would be trading customer funds.

112. Throughout the Relevant Algo Period, numerous customers were deceived by these fraudulent misrepresentations and omissions, including a customer who wrote the following message to the Algo Defendants in February 2023, after the withdrawal problems started and Algo began revealing information about TD: "For the record, please know I invested my money with Algo Capital, not Traders Domain. I was told that Algo was a trading software, but it appears that Ted from Traders Domain was facilitating all trades, not Algo's software."

ii. ***The Algo Defendants Made Misrepresentations and Omissions Regarding the Location of Customer Funds***

113.    Not only did the Algo Defendants mislead customers about who would be doing the trading, they also made fraudulent misrepresentations and omissions about where customer money was being held.

114.    Rather than send customer money to TD to trade, as further described in Section IV.B.d below, the Algo Defendants directed customers to deposit funds into bank accounts owned and controlled by Collazo and Herman.  The Algo Defendants never sent funds from these bank accounts to TD or any other brokerage or trading firm.  Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not further transferred to any brokerage or trading firm.  Other times, Algo retained the customer funds in its bank account but claims to have engaged in some ledger maneuvers that purportedly funded Algo customer accounts to some degree at TD.

115.    Nevertheless, the Algo Defendants, both in its written agreements and orally, misled customers about where their funds were being held and failed to inform customers about Algo's arrangement with TD, or that funds would be transferred to third party entities that were not trading firms.  For example, during telephone conversations with prospective customers Fortini and Likos led customers to believe that their funds were being held by Algo, and they did not disclose Algo's purported arrangement with TD.  As part of Algo's solicitation, the Algo Defendants sent prospective customers a "New Client Information" form that welcomed them to "the ALGO Family" and provided them the opportunity to participate in Algo's "exclusive fund."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

116.    Indeed, numerous customers were shocked to learn that the Algo Defendants

purportedly directed their funds to TD without their knowledge or authorization, including but

not limited to those who wrote the following messages to the Algo Defendants:

- "'The Broker' is not mentioned anywhere in my 7-page contract that I signed with Algo Capital. It was to my utmost surprise to find out that Algo was not in possession of my funds."

- "My Debt is with Algo Capital, I have been dealing with Algo Capital Staff including [salesperson T.R.] & John Fortini CEO. I visited the offices of . . . Algo Capital, before I made my decision to invest after being invited by [salesperson T.R.]. My Money was paid to Algo Capital Group[.] . . . My money owned [sic] is not from Traders Domain, I have had no dealing with them what so ever."

- "I did not invest my money with TD nor did I agree to use them as a brokerage, I invested it with Algo. I was initially told that Algo was a trading software, which in fact it appears that Ted from TD was facilitating all the trades, not the software."

- "I have no idea who Traders Domain or Ted Safranko are, but I have a contract with Algo Capital where I deposited money to be invested, and then requested the withdrawal of those funds last year."

### iii.    *The Algo Defendants Failed to Disclose That TD Was Placed on the RED List*

117.    The Algo Defendants failed to disclose to actual customers and prospective

customers who were solicited after July 14, 2022, that the CFTC had explicitly cautioned U.S.

customers against doing business with TD by placing it on the CFTC's RED (Registration

Deficiency) List.



118.    The Algo Defendants learned in July or August 2022 that TD was added to the

CFTC's RED List.  In early August 2022, Fortini sent Herman a text message with a link to the

CFTC's webpage listing TD on the RED List as of July 14, 2022, and stated: "Ummm don't

think that's good[.]  Don't say anything call u in 5."  On December 13, 2022, Fortini sent a

message to Likos acknowledging that the Algo Defendants learned of TD's addition to the RED

List in July or August of 2022:  "Any broker who takes us clients is supsoed [sic] to register with

cftc /nfa thags [sic] what the red list is . . . Our attorney sent us that end of July / august."  In

another message between Collazo, Fortini, and Likos on December 13, 2022, Likos sent a link to

the CFTC's RED List from July 14, 2022, which included TD, and Fortini responded, "We def

spoke about this in july."

119.    Despite knowing about and understanding the significance of the CFTC's

warnings about TD, the Algo Defendants did not disclose this material information to

prospective and current customers.  For example, during telephone calls with prospective

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

customers that occurred after they learned of TD's addition to the RED List in July 2022, Fortini and Likos solicited customers without disclosing that Algo was using an unregistered, offshore brokerage that had been flagged on CFTC's RED List, which warned customers to "exercise extreme caution" and "watch for the RED flags of fraud." The Algo Defendants did not send out a communication to their existing customers notifying them of TD's addition to the RED List. Nor did the Algo Defendants update their written solicitations, including the customer agreements, to disclose this information to prospective customers. As one customer explained in a March 16, 2023 email to the Algo Defendants: "There is also the matter of the CFTC red listing in July 2022, this was not communicated to myself and had I have known I would have chosen to mitigate my risk."

iv.   ***The Algo Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds***

120.   The Algo Defendants made fraudulent misrepresentations and omissions to customers about withdrawals including: (i) misleading customers to believe that Algo had control of their funds, (ii) making false and inconsistent statements about the timing of withdrawals, (iii) providing false assurances about the security of funds and the reasons for delays, and (iv) soliciting new customers without disclosing the significant withdrawal problems. These misrepresentations and omissions allowed the scheme to proceed for months after it initially began to unravel.

121.   The Algo Defendants misled customers to believe that Algo had control of their money by requiring customers to submit all withdrawal requests directly to Algo through a "Withdraw Request Form." Algo, in turn, submitted corresponding withdrawal requests to TD without copying its customers. As a result of this arrangement, Algo knew exactly how many of

its customers were attempting to withdraw funds and how long those customers were waiting on withdrawals.

122.     Because the Algo Defendants directed customers to deposit funds into bank accounts controlled by Collazo and Herman and never sent those funds to TD, they should have been able to repay customers who made these withdrawal requests to Algo.  However, the Algo Defendants lacked the funds to repay their customers because they misappropriated customer funds for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments, as detailed in ¶¶ 143 to 157 below.

123.     Beginning in or around August 2022, TD began experiencing significant delays in its ability to pay withdrawals, including to Algo's customers.  On August 30, 2022, Herman stated, in a chat with Safranko and Fortini, that Algo had customers who had been waiting 30 days for withdrawals.  By September 20, 2022, the issue had become even more severe, and Algo had a backlog of more than 33 outstanding customer withdrawals some of which had been pending since August 1.  In the weeks and months thereafter, the backlog continued to grow and, as Algo Defendants' internal communications stated, the situation for TD and Algo was getting "uglier and uglier every day."  By January 5, 2023, Algo had outstanding customer withdrawal requests to TD of approximately $27 million.

124.     Despite knowing that Algo did not control the funds and TD was unable to repay customer withdrawals in a timely manner if at all, the Algo Defendants continued to make false promises to customers about the timing of withdraws.  For example, the "Withdraw Request Form" email that Algo sent to customers during this time period falsely stated that it would "take seven to fourteen business days for the proceeds of [a] withdrawal to transmit to your account following the month end reconciliation."  Fortini provided similarly false and inconsistent

information to another Algo customer who made a withdrawal request on October 9, 2022, telling her that the withdrawal would take five to seven business days.

125.    In addition, the Algo Defendants provided false assurances about the security of funds and the reasons for delays to customers who expressed concerns about the status of their funds, even though they knew or should have known that these statements were false.  For example, on November 15, 2022, Likos falsely assured one Algo customer about her pending withdrawal: "I can't apologize enough for this but ***there's no fear about the safety of your money***." (emphasis added).  Meanwhile, in internal communications with other Algo Defendants Likos expressed serious concerns about the growing withdrawal backlog and went so far as to proclaim to Fortini, "we're fucked."

126.    In addition to these false assurances, the Algo Defendants used other means to lull their customers into believing that their funds were safe, and withdrawals were forthcoming.  On November 9, 2022, the Algo Defendants used a new customer deposit to make a partial repayment to a different Algo customer who had an outstanding withdrawal request.  Likos falsely told the customer who was repaid that the funds were an initial tranche repaid by TD and he expected more funds from TD to follow.  However, Likos acknowledge his lie to Fortini by telling him that, "I can buy us some time with that story."

127.    The Algo Defendants also provided false assurances to customers by repeating inconsistent timeframes provided by TD, despite the fact that the Algo Defendants knew or should have known that this information was false.  For example, on December 6, 2022, the Algo Defendants sent an email, drafted by Collazo, Fortini, and other agents of Algo, to all customers and told them that "our broker expects to complete the withdrawals for August & September, and October within the coming weeks.  The broker is also confident that November requests will be

completed by the end of December, or, at the latest, early January." Similarly, on December 15, 2022, the Algo Defendants sent an email, from the Algo Support account used by the Algo Defendants, to a customer and stated: "we are expecting all clients['] past funds to be sent by the broker before the end of next week." On December 19, 2022, the Algo Defendants sent another email from the Algo Support account and told another customer that "August, September, and October requests should be wrapped up this month and sent to your Savvy Digital Wallet." The Algo Defendants parroted these statements from TD and Safranko despite acknowledging among themselves that there was "zero proof backing" anything Safranko said and comparing Safranko to another Ponzi-schemer who "held clients off for 2 years" with similar unsubstantiated excuses.

128.     Moreover, between August 2022 and at least January 2023, the Algo Defendants continued to solicit and/or accept funds from new customers without disclosing the significant withdrawal problems.

### c.   The Algo Defendants Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented

129.     During the Relevant Algo Period, the Algo Defendants ignored and/or downplayed numerous red flags that should have alerted them to the fact that TD was engaged in fraud and was not trading customer funds as purported, including (i) evidence that TD was manipulating trade data and (ii) public warnings that TD was engaged in fraud.

### i.   *The Algo Defendants Ignored Signs That TD Was Manipulating Trades*

130.     The Algo Defendants ignored and failed to disclose to prospective and current customers that TD manipulated trade data, including by erasing losing trades.

131.     Once customers deposited funds with Algo, the Algo Defendants provided them instructions to download the Trading App that they could use to track trading activity and performance. Throughout the Relevant Period, customers observed results on the Trading App

that were nearly always positive—a fact which the Algo Defendants used to encourage customers to deposit additional funds and to recruit new customers. Likos, one of Algo's top salespeople, offered the following description of this sales strategy: "We'll get him hooked like hookers on meth . . . I'll have them put a mil in by month 3[.] Watch[.]"

132.     As early as May 8, 2019, when Algo was using TD as a brokerage for its proprietary trading, Safranko told Herman that he had the ability to manipulate TD's trading data to remove losses. In a WhatsApp message discussing certain Algo trades, Safranko told Herman to "figure out what the total loss could be and if you want it erased I will get the liquidity provider to pull the deals from the accounts."

133.     The Algo Defendants knew that the ability to alter trading data suggested that the trading results were not real. On October 26, 2021, Likos, while discussing a list of questions from an Algo customer, sent the following question to Fortini: "If the liquidity provider can refund bad trades how can we ensure that the profitable trades are being passed through the provider to the market?" In response, Fortini instructed Likos not to answer the customer's "questions about if the trades are real."

134.     On numerous occasions, Algo customers while monitoring their accounts via the Trading App observed suspicious trading patterns that they brought to the attention of the Algo Defendants. In response, the Algo Defendants consistently told customers that the irregularities were caused by technical issues, and they would be corrected by the broker. For example, on the morning of October 11, 2022, Algo customers observed trading losses in their accounts. Later that day, Algo sent an email, drafted by Herman and edited by Collazo, to all customers which claimed the losses were the result of a "glitch" when the "servers did not update" and they did

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

not represent actual trading losses. Algo assured its customers that their accounts would be updated, and the losses would be reversed.

135.     Notwithstanding what they told customers, the Algo Defendants acknowledged to each other that these suspicious trading patterns were actually a sign that Safranko was manipulating trades. For instance, on October 12, 2022, when discussing TD's trade adjustments, Fortini and Likos exchanged the following messages:

> Fortini:  If u ever worked for bookie u know u can lose games cuz ur making the money off everyone. Else with ur percent/ I feel like Ted [Safranko] doing that/ But at some point losses can outdo his gains"
>
> Likos:  ***Because u think he covered up old losses***
>
> Fortini:  ***Yea for sure.*** In past the trades he closed stayed on the trade history he just deleted them[.]  (emphasis added)

Moreover, on October 17, 2022, the Algo Defendants observed Safranko close a trade at a price that the market did not reach that day. Fortini and Likos, in a text exchange, expressed disbelief about how this was possible:

> Likos:  How the fuck would he take profit at 1657 if it never reached there? Or am I reading something wrong
>
> Fortini:  Not sure but maybe our charts not same
>
> Likos:  I mean.:: no where [sic] ever close lol
>
> Fortini:  Yea 1659

136.     Similarly, on December 13, 2022, Fortini and Likos were discussing certain trades that Safranko manipulated. Fortini stated, "He obviously can change orders." Likos responded that Safranko "deleted [a] bunch of trades completely." Likos asked how they can explain this to Algo's customers and Fortini responded "No idea . . . ." Fortini also said he was not going to confront Safranko about this manipulation because "I want to get money out."

- 42 -

ii.    ***The Algo Defendants Ignored Public Warnings That TD Was Engaged in Fraud***

137.    The Algo Defendants repeatedly ignored public information indicating that TD was engaged in fraud.  For instance, on June 29, 2020, a prospective customer emailed the Algo Defendants and told them he did due diligence on TD, which was listed as one of Algo's potential brokers, before investing with Algo and found three concerning articles.  The customer shared the articles with the Algo Defendants in his email.  The first article, https://theforexreview.com/2018/10/31/thetradersdomain-review/, identified TD as an "offshore broker"; described it as a "scam"; gave it a rating of 1/5 stars (with 1 being the lowest) and a similar 1/5 for "Safety of funds"; and contained several customer reviews that described Safranko as "a well known scammer" who stole funds from the brokerage.[1]  The second article, https://www.forexpeacearmy.com/forex-reviews/14449/thetradersdomain-forex-brokers, contained some similarly negative customer reviews.  The third article, https://scamwatcher.org/the-traders-domain-review/, upon information and belief,[2] identified numerous red flags including that TD:  was an unregulated broker, not transparent, communicated poorly, did not let customers withdraw their funds, and did not guarantee the safety of customer funds.

138.    Rather than take this information seriously or offer any meaningful substantive response that addressed these warnings, the Algo Defendants downplayed the significance of these negative reviews and instead blamed them on disgruntled customers. The Algo Defendants assured the prospective customer that they had a "personal relationship" with the "broker."

---

[1] This article indicates that it was published October 31, 2018 and updated on November 30, 2022.  The customer reviews referenced in this paragraph were posted in 2019.

[2] The earliest archived version of this article is from December 9, 2022.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

139.     In addition, as set forth above in Part IV.B.b.iii, the Algo Defendants ignored the CFTC's addition of TD to the Red List and accompanying press release which warned that "a customer should be wary of providing funds to that entity."

140.     In addition to the numerous red flags about TD that the Algo Defendants had direct knowledge of, yet chose to dismiss, other public information should have alerted to the fact that TD was engaged in fraud.  In September 2022, the Trading App was removed from the Apple App Store.  As explained in a September 24, 2022 Foxnewsgroup.com article that referenced a September 2022 *Forbes* article, the Trading App had a plug-in "which can be used by scammers to manipulate those market prices, and simulate account balances, profits or losses. The *Forbes* article also noted that "Everything looks and feels real, but it's all fabrication."

141.     Despite observing numerous losing trades disappear in real time and knowing about numerous internet warnings and red flags regarding TD's fraudulent activity, the Algo Defendants continued to solicit customers for the scheme.

### d.  The Algo Defendants Misappropriated and Commingled Customer Funds

142.     Once prospective customers indicated their desire to participate in the Algo Pool, the Algo Defendants sent them one or more of the customer agreements described above for their electronic signature.  Fortini countersigned these agreements on behalf of Algo.  The Algo Defendants also provided customers with instructions to deposit funds, which directed customers to deposit funds into bank accounts controlled by Collazo and Herman.

143.     During the Relevant Algo Period, rather than accept funds in the name of the Algo Pool as is required under the Act, the Algo Defendants instead accepted funds into bank accounts held in the name of Algo Capital that were owned and controlled by Collazo and Herman (collectively, as described in ¶¶ 144 and 145, the "Algo Accounts").

144.     The Algo Defendants accepted no less than $32 million from Algo customers into Algo Capital's TD Bank account ending in *6056 that was owned and controlled by Collazo and Herman.

145.     The Algo Defendants accepted no less than $105,000 from Algo customers into Algo Capital's Oceans Bank account ending in *7405 that was owned and controlled by Collazo and Herman.

146.     Once deposited into the TD Bank account ending in *6056, customer funds were commingled with non-pool funds.

147.     The Algo Defendants never sent any customer funds from the Algo Accounts to TD or any other brokerage or trading firm.

148.     Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not transferred by those third parties to any brokerage or trading firm.  Other times, Algo retained the customer funds in its bank accounts but claims to have engaged in ledger maneuvers to purportedly fund Algo customer accounts at TD.  Algo made these ledger maneuvers even though it knew or should have known that TD was not trading customer funds as purported, and without disclosing to customers that this was how it was purportedly funding their accounts.  Despite the fact that none of the customer funds were actually sent to TD, after depositing money into the Algo Accounts, customers nonetheless observed via the Trading App that their trading accounts appeared to be funded, typically within a few hours or days.

149.     After accepting customer funds into the Algo Accounts, Algo, Collazo, and Herman misappropriated some of those funds by using them for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

150.    For example, on December 29, 2021, $40,000 was wired by an Algo customer into one of the Algo Accounts at a time when the account had a balance of approximately $236. On January 4, 2022, Fortini falsely told the customer that Algo sent her "funds over to [the] broker already." However, no funds deposited by customer were sent from the Algo Account to TD. Instead, on January 3, 2022, $15,000 of the funds deposited by the customer were used to make payments to a business controlled by Fortini.

151.    On April 5, 2022, three Algo customers wired a combined $200,100 to one of the Algo accounts at a time when the balance was approximately $42,772. On April 5, 2022, Algo made a $100,000 Ponzi-style payment to another Algo customer, at least some of which was sourced by the deposits from these three customers.

152.    On September 20, 2022, $155,000 was wired by three Algo customers into one of the Algo Accounts, at a time when the account had a balance of approximately $10,000. That same day, nearly all of these funds were used to make a $35,000 payment to a business controlled by Herman, and $130,000 in Ponzi-style payments to other customers who did not deposit these funds.

153.    On October 7, 2022, $300,000 was deposited by an Algo customer into one of the Algo Accounts, at a time when the account had a balance of approximately $100,000. That same day, at least $99,000 of the customer's deposit was used to make a payment to a business controlled by Collazo or to a business controlled by Herman, and $79,000 to make Ponzi-style payments to two other customers.

154.    Likos misappropriated funds by accepting at least $635,000 from Algo customers directly into his personal bank account at Bank of America ending *6670 between August 2022 and December 2022. None of those were ever sent to Algo, TD, or to any other brokerage or

trading firm.  Once deposited into Likos's account, the customer funds were used for purposes other than trading.

155.    In addition, Fortini misappropriated funds by accepting at least $557,000 from Algo customers directly into a bank account at JP Morgan held in the name of a consulting company owned by Fortini and ending *9976 between August 2022 and November 2022.  None of those were ever sent to Algo, TD, or to any other brokerage or trading firm.  Once deposited into Fortini's account, the customer funds were used for purposes other than trading.

156.    Algo, Collazo, Herman, Fortini, and Likos misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers.  They also misappropriated funds, upon information and belief, by taking commissions which ranged between 15-50% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist.

157.    Upon information and belief, large numbers of Algo customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD.

**e.  The Algo Defendants Failed to Register with the CFTC**

158.    As described above, during the Relevant Algo Period, Algo Capital was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis.

159.    Algo Capital used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customers' funds for the purposes of trading XAU/USD.

160.     Algo Capital was never registered as a CPO and was not exempt or excluded from registration as a CPO.

161.     During the Relevant Algo Period, Collazo, Herman, Fortini, Likos were acting as unregistered APs of Algo Capital, an unregistered CPO, and Algo FX, a registered CPO, by soliciting customers to participate in the Algo Pool while associated with Algo Capital and Algo FX as a partner, officer, employee, or similar agent.

162.     Collazo, Herman, Fortini, and Likos were never registered as APs of Algo Capital or Algo FX.

**f.   Collazo and Herman are Controlling Persons of Algo**

163.     Collazo and Herman are controlling persons of Algo.  As stated above, Collazo and Herman are co-owners of Algo Capital and Algo FX.  Collazo is the President of Algo Capital and Manager of Algo FX.  Herman is the Vice President of Algo Capital and Manager of Algo FX.  Collazo and Herman controlled the Algo Capital bank accounts that accepted customer funds.  Collazo and Herman controlled the day-to-day operations, finance, accounts, and books and records of Algo Capital and Algo FX.

**C.  THE SIMS' FRAUDULENT SCHEME**

164.     Beginning in at least September 2021 through present (the "Relevant Sims Period"), Michael Sims fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by his "hedge fund" by making material misrepresentations and omissions to prospective and actual customers.  In fact, Sims was using customer funds to participate in the TD Pool despite the fact that Sims knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.C.b).  In addition, Sims misappropriated customer funds and failed to register as required

under the Act.  Pursuant to this scheme, at least 42 Sims customers deposited no less than $22

million for the purposes of trading leveraged or margined XAU/USD.

### a.  Sims Fraudulently Solicited Customers

165.    After working with other sponsors to solicit customer for TD, beginning in at least

September 2021, Sims began soliciting customers for his own "hedge fund," through telephone

calls, text messages, messaging apps, and in-person meetings.  Sims made numerous fraudulent

misrepresentations and omissions about:  (i) the ownership and operation of the trading business,

(ii) the profit and risk associated with the purported trading, and (iii) ability and timeliness of

customer withdrawal requests.

166.    On information and belief, some if not all of the Sims customers are not ECPs.

### i.  *Sims Made Misrepresentations and Omissions Regarding the Ownership and Operation of the Trading Business*

167.    From the outset, Sims told prospective customers that he was soliciting funds for

his hedge fund.  Sims claimed his hedge fund had been in operation for more than 10 years and

employed a team of experienced traders to trade leveraged or margined XAU/USD on behalf of

its customers.

168.    These statements were false.  Sims was not soliciting funds on behalf of a hedge

fund.  Sims did not own any "hedge fund" let alone one that had been in operation for more than

10 years and employed a team of traders.  Neither Sims, personally, nor any hedge fund or other

entity owned by him traded any funds on behalf of customers.  Rather, as Sims later admitted to

a customer, he was a sponsor that recruited customers for the TD Pool.

169.    Sims also fraudulently omitted material information from prospective and current

customers.  For example, Sims failed to disclose to prospective customers that their funds would

be sent offshore and traded by an unregistered brokerage, either in his solicitations or in

- 49 -

customer agreements. At least some of the prospective customers who believed their fund were being traded by Sims' hedge fund were not given any disclosure documents or customer agreements at all.

170.     Sims also knew and omitted to tell customers that the National Futures Association ("NFA") had warned against doing business with TD. In April 2022, in connection with an audit of another firm acting as TD sponsor with which Sims was involved, the NFA highlighted the dangers of U.S. customer money going to an offshore, unregistered broker. The NFA specifically advised that, pursuant NFA bylaws, commodity pools "cannot be doing business with that firm." Sims did not disclose any of the NFA concerns about TD to his prospective or current customers.

171.     Finally, in addition to misrepresenting the identity and location of the trading operation, Sims also omitted to tell at least one prospective customer that he would be charging commissions, and sizeable ones at that. Only after this customer received his first account statement did he notice a sizeable withdrawal from his account. When the customer questioned Sims about the withdrawals, Sims informed him that there would be "daily and monthly commissions" which would range from 40-50%. Sims did not explain who would be receiving these commissions, nor what percentage Sims himself would take.

ii.     ***Sims Made Misrepresentations and Omissions Regarding Profit and Risk***

172.     In order to entice prospective and current customers to deposit funds for the purposes of participating in the pooled trading of leveraged or margined XAU/USD by his hedge fund, Sims also made false representations about purported trading profits. For example, Sims repeatedly told customers that his hedge fund generated monthly trading profits of 40%. Additionally, Sims claimed that the hedge fund was profitable every month and that that the pool

- 50 -

only had two "losing days" in its last six to seven years of operation.  Once a customer set up his or her account, Sims would facilitate the downloading and setting up of the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their account, but they did not have the ability to make trades or withdraw funds.  The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the hedge fund was making substantial trading profits.

173.    These statements were false.  In fact, the hedge fund did not generate a monthly trading profit of 40%, because the hedge fund was not trading customer funds as claimed by Sims.  Moreover, Sims knew or should have known, as discussed below in Part IV.C.b, the trading statements on the Trading App, were in fact false.

174.    Sims also made fraudulent misrepresentations to prospective customers about the risk involved with the trading.  When asked about the potential of losing capital, Sims told at least one customer that there were stop-loss parameters in place to prevent that.  This was false; there were no stop loss parameters in place for the purported trading to prevent loss of capital.

iii.    ***Sims Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds***

175.    Sims also made misrepresentations to prospective and current customers about the timeframe and ability to withdraw their funds allowing the scheme to proceed for months after it initially began to unravel.

176.    Sims advised some, if not all, customers that withdrawals would take 48 hours. For example, Sims told at least one prospective customer that anytime she wanted to withdraw her funds, she could text him and her money would be in her account within 48 hours.

177.    However, Sims' customers experienced significant delays in withdrawing their funds for weeks and months.  Since at least September 2022, numerous customers requested to

withdraw funds without success.  When customers asked Sims about the status of these withdrawal requests, Sims repeatedly made excuses for delays and provided false statements about the timing of the withdrawals.

178.    For example, in early September 2022, one Sims customer submitted a request to Sims to withdraw $160,000 from the pool.  Sims told the customer that the withdrawal would take approximately twenty to twenty-five business days due to certain banking issues which Sims did not further describe.  However, Sims failed to satisfy even this new, extended timeline.  This customer made another withdrawal request for additional funds in October 2022.  When he inquired again about the status of his pending withdrawal requests (September and October 2022), Sims responded, "Everything is in Que [sic].  The transition slowed the broker withdrawals down.  Everything should be caught up soon and back to normal times."  When the customer followed up about the still pending withdrawal requests in November 2022, Sims' assistant told him "Your withdrawal could come any day now."  To date, this customer has not received any funds from Sims, TD, or Trubluefx.

179.    Similarly, another Sims' customer submitted a request to withdraw $20,000 in November 2022.  Sims provided repeated excuses for the delay that he knew or should have known were false.  For example, in April 2023, five months after the request was submitted and after several rounds of excuses, Sims told the customer "everything will start to get back on track as soon as the acquisition is finished.  They [i.e., TD] were bought out."  Sims knew or should have known that this was false.  Sims had witnessed the various conflicting excuses for the withdrawal delays advanced by TD beginning in September 2022.  Later, Sims stopped responding to the customers communications seeking information about the pending withdrawal.  To date, the customer has not received any funds from Sims, TD, or Trubluefx.

180.     Sims also attempted to dissuade customers from taking withdrawals from their accounts.  In February 2023, Sims told a customer who was considering making a withdraw that she should consider sticking with her plan to let a one-year period go by in order to compound her returns.  Sims also explained that TD was backlogged in getting to the withdrawal requests at this time.  Only after the customer repeatedly stated that she was concerned about the delays she was hearing about from other customers did Sims tell her to make a withdrawal request.

### b. Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented

#### i. *Sims Knew or Ignored Signs that TD was Manipulating Trade Data*

181.     Sims knew or should have known that TD was not a legitimate brokerage and engaged in fraudulent activity.  On numerous occasions customers observed large losses in their accounts via the Trading App, but implausibly the large losses were nearly always "corrected" by days' end.  When customers questioned Sims or TD about these "corrections," he downplayed their concerns and told the customers that these were errors, or "slippage" and not real losses.  When at least one customer directly questioned Sims as to the irregularities in her account over text, Sims did not respond.

182.     As it turns out, Sims himself had already identified the questionable trading account irregularities and raised concerns.  As early as November 2021, Sims noted the discrepancies in conversation with other sponsors.  Sims explained that he had seen large losses in the TD high risk account, but they went away at the end of the day.  In contrast, Sims could see that the same XAU/USD trades were being done at another brokerage, and those trades did not reflect the same "slippage" that were used to explain the TD discrepancies.  In a text to another sponsor, Sims queried:  "Issue when I see big losses and they go away on high risk.  I

understand slippage issues etc. … **But if it's the same trades on lower risk, how does it not effect [Redacted Brokerage Name] too?"** (emphasis added).

### ii.   *Sims Concealed TD Wires and Customer Nationalities*

183.    In addition to the other indications of fraudulent TD activity about which Sims knew or should have known, Sims demonstrated his knowledge that TD was engaged in potentially illegal and problematic activities by directing potential customers to disguise their funding payments.  Sims, though his assistant, instructed potential and current customers to conceal the purpose of these deposits by directing that they use certain opaque language in the wire transfer memorandum.  For example, Sims instructed one customer that his deposit should say "Services for [customer]" and further told this customer: "**REMEMBER: In the [wire] memo or if they ask you what it's for put 'services'[.] Nothing about investment/trading/hedge fund.**"

### iii.  *Sims Was Warned about doing Business with TD and Knew or Should Have Known About Public Warnings About TD*

184.    As described above in ¶ 170, Sims learned in April 2022 that the NFA had expressly warned against doing business with TD.

185.    Sims also ignored or recklessly failed to investigate numerous warnings about TD and Safranko circulating on the internet.  As described above in ¶ 137, as early as 2020, several websites flagged TD as a concern and published numerous customer complaints.  Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List.  As described above in ¶ 140, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

186.     These myriad warnings should have alerted Sims that TD was engaged in a fraud. However, despite the availability of these public warnings, Sims' own concerns that the trading was manufactured, and knowing that NFA had explicitly prohibited U.S. customers from doing business with TD, Sims continued to solicit pool customers and directing their funds to the TD Pool.

        c.     **Sims Misappropriated Customer Funds**

187.     Despite the fact that Sims knew or should have known that TD was not trading customer funds as purported, Sims directed millions of dollars in customer funds to the TD Pool, and misappropriated customer funds by taking sizable commissions.  Sims' commission ranged from 40-50% of the purported trading profit.

188.     Specifically, Sims directed customers to deposit funds into bank accounts held by two entities, which he did not own or control.  Neither of the entities were a trading firm and upon information and belief, Sims did not have any agreements with these entities regarding the management or trading of customer funds.  None of the funds deposited in the third-party bank accounts were ever sent to TD or any other brokerage or firm engaged in trading.  Nevertheless, once deposited into the third-party accounts, customers observed via the Trading App that their accounts were funded leaving the customers to believe that their money was being traded.

189.     Upon information and belief, large numbers of Sims customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD.  Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

**D. THE BUGGS' FRAUDULENT SCHEME**

190.    Beginning in at least February 2021 continuing through present (the "Relevant Buggs Period"), Buggs fraudulently solicited customers to deposit money for the purpose of participating in the TD Pool by making material misrepresentations and omission to actual and prospective customers.  Buggs solicited customers for the TD Pool despite the fact that Buggs knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.D.c).  In addition, Buggs misappropriated customer funds and failed to register as required under the Act.  Pursuant to this scheme, at least 517 Buggs customers deposited no less than $54 million for the purpose of trading leveraged or margined XAU/USD.

**a.  Buggs Begins Soliciting for the TD Pool**

191.    Around February 2021, Buggs purchased a trading education company, and despite not being a licensed trader, began expanding the company beyond training and education. Buggs built upon his already large network of MLM businesses and industry acquaintances to begin soliciting customers for the TD Pool.  Several months after the purchase of his trading company, Buggs began operating as a "sponsor" to solicit customers for the purpose of trading XAU/USD and then directed their funds to the TD Pool.

192.    Using his existing MLM businesses and the associates affiliated with them, Buggs held out the opportunity to participate in his "private trading hedge fund" through his "private broker" as a reward for hitting certain sales tiers in his other MLM businesses.  Once associates hit the "emerald" level they were given the opportunity to participate in the trading via Buggs' "private broker," creating an aura of exclusivity.  Buggs concealed the identity of TD until associates reached the higher "diamond" level and executed a non-disclosure agreement.

193.    Buggs also solicited prospective customers beyond his pre-existing MLM network through in-person events.  For example, in early 2022, Buggs invited approximately

fifteen prospective customers to a dinner meeting in San Diego, California. Similarly, in 2022 Buggs attended a conference in Miami, Florida, during which he solicited at least two customers for the commodity pool.

194.    Buggs also solicited other individuals with whom he had previous business deals or through acquaintances. In these instances, Buggs would demonstrate the remarkable trading returns that he was purportedly experiencing in his TD account by showing acquaintances his account on the Trading App or sending them screen shots of his returns. During these conversations, Buggs also told these prospective customers that he had been able to withdraw large sums of money from his TD account as a way of vouching for TD's trustworthiness.

**b. Buggs Fraudulently Solicited Customers**

195.    During the Relevant Buggs Period, Buggs fraudulently solicited customers—through, telephone, messaging apps, and in-person events such as conferences and dinners—to deposit money for the purposes of trading leveraged and margined XAU/USD despite the fact that he knew or should have known that TD was not trading the funds as purported. Buggs made numerous fraudulent misrepresentations and omissions about: (i) the profit and risk associated with the purported trading, (ii) the mechanics and structure of the trading operation, and (iii) the ability of customers to withdraw their funds.

196.    Upon information and belief, some if not all of Buggs' customers were not ECPs.

i.    ***Buggs Made Misrepresentations and Omissions Regarding Profit and Risk***

197.    Using his MLM businesses and network of industry connections, Buggs touted the incredible returns that the commodity pool generated through leveraged or margined trading of XAU/USD. He told prospective customers that the commodity pool had an "incredible winning streak" and claimed that it "never had a losing month". Buggs told at least one

individual that he was making 30% returns or more monthly and sent screenshots of those returns displayed in the Trading App, including screenshots showing that his rate of return for the year was 4000 %.  Buggs boasted to a business associate by text that "**I HAVE A MONEY PRINTING MACHINE**."  In some instances, Buggs used the Trading App to show prospective customers the purported XAU/USD trading history and accounts that he controlled with "balances" of approximately $80 million and $650 million.

198.    Once a customer opened a TD account through Buggs, he facilitated the setup of the Trading App for each customer.  Through the Trading App, customers could purportedly view and monitor the trading activity in their TD trading account, but they did not have the ability to make trades or withdraw funds.  The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the pool was making substantial "trading profits."  At least some customers who were solicited by Buggs, observed the purported gains and deposited even more funds into their TD trading accounts.

199.    These assertions about incredible gains were on their face, unrealistic and unattainable.  Buggs knew or should have known that these purported trading returns were false.

200.    In addition to claiming unrealistic, sustained returns, Buggs simultaneously misrepresented that there was *de minimis* risk associated with the TD Pool.  When soliciting some prospective customers, Buggs falsely claimed that the trading of XAU/USD was capped in risk, and stated that there was a 3-4% maximum risk per trade.  Buggs separately told another prospective customer that that maximum potential loss was 1% of the account balance on any given day.  Buggs knew or should have known that his assurances about risk of the purported trading at TD were not true.  On more than one occasion, customers observed large trading losses that would inexplicably disappear from the account later in the day.  Similarly, the customer who

was told that his maximum potential loss was 1%, observed losses in his account on several

occasions, including an approximately thirty percent loss in his account on one notable day. At

times when they observed losses, these customers reached out to Buggs to ask why they were

seeing these losses, in excess of the 3-4% maximum risk they had been promised. Over text,

social media, and/or Zoom, Buggs, and Safranko, would reassure customers that the

discrepancies were "system updates" or "lags."

ii.   ***Buggs Made Misstatements and Omissions About the Trading Operation***

201.   Additionally, Buggs made false statements and fraudulent omissions to customers

as to how the TD Pool operated. For example, Buggs falsely told at least one customer that the

commodity pool used a "very conservative" algorithmic trading bot. Months later, when this

customer questioned Buggs about some irregular trading activity in the account, Buggs revealed

to the customer that trading was done by Safranko, not an algorithmic trading bot.

202.   Buggs also knew and omitted to disclose to customers that Safranko had total

control over the TD Pool, including the ability to reverse losing trades back to accounts.

Customers initially did not know who was doing the trading and controlling the TD Pool, but

eventually learned that it was "Uncle Ted" through live streams of the purported trading.

203.   In 2021, at least one prospective customer told Buggs that he had conducted a

background check on Safranko and was concerned about the negative information and reviews

he had seen online. When assuring this prospective customer about the TD and Safranko

warnings that he raised, Buggs made additional fraudulent statements. Buggs reassured this

customer that he traded "right beside [Safranko]"; that Buggs was "in control of [his customers']

funds." These statements were false and misleading. In fact, Buggs did not trade his own

customers' funds, nor was he in control over the funds purportedly sent to TD. And, despite

knowing about the various warnings about and negative reviews of TD and Safranko, Buggs continued to solicit new customers for the TD Pool and failed to tell current customers about those warnings and negative reviews.

### iii. *Buggs Made Misrepresentations About the Ability of Customers to Withdraw Their Funds*

204.    Buggs also made misrepresentations to prospective and current customers about the ability of customer to withdraw funds and gave false assurances when withdrawals were delayed.  For example, while soliciting a business associate, Buggs repeatedly reassured him that he could withdraw his funds whenever he wanted, and that Buggs, personally, had been able to take sizeable withdrawals whenever he wanted.  Buggs frequently made these types of assurances about liquidity when touting TD.  Ultimately, this customer was unable to withdraw any of his funds from his TD account.

205.    Buggs continued to make false assurances about the ability of customers to withdraw funds even after customers began to experience significant withdrawal difficulties and delays in the Fall of 2022.  In February 2023, when one customer contacted Buggs to inquire about the delay in obtaining his withdrawal, Buggs falsely assured him that "withdrawals have steadily gone out" from TD.  Buggs knew or should have known that this statement was false:  Withdrawals had not steadily gone out since August 2022.

206.    In an effort to insulate himself from claims that he was complicit in a fraudulent scheme, Buggs also claimed to a complaining customer that he also "had not withdrawn my trading profits as they sit in TD."  Buggs knew that this statement was false:  While regular customers withdrawals had been stalled for months, Buggs, and his family, had taken at least a million dollars in purported trading profits from TD accounts during this time period.

207.    Buggs repeated TD's explanations for the withdrawal delays that he knew or should have known were false.  TD cycled through various conflicting excuses during the Fall of 2022 for its inability to process withdrawals.  Buggs advised customers that it was taking TD longer to process withdrawals because of issues with TD's liquidity provider and because certain customers were making errors when submitting withdrawal requests, which was delaying all withdrawals.  At various points, customers were told by Buggs and/or his agents, that the delays in withdrawals were because:  the trading platform was "migrating the system", the brokerage had legal issues, the broker was selling the company, and the platform had been attacked by hackers.

### c.  Buggs Knew or Should Have Known That TD Was Not Trading Customer Funds as Purported

208.    Buggs knew or should have known that TD was not trading customer funds as purported.  Buggs (i) ignored warnings from experienced traders that TD was manipulating trades and that Buggs and TD were both required to be registered; (ii) instructed customers in their wires and account setup to conceal the funding of trading accounts and their U.S. residency; and (iii) knew or should have known about other public warnings about TD.

#### i.    *Buggs Ignored Warnings That TD was Manipulating Trades*

209.    Buggs ignored explicit warnings from individuals with extensive trading experience that the trading loss erasures from the TD Pool were an indication of fraud.  When a business associate of Buggs who could observe the trading in the TD Pool questioned Buggs about the disappearance of losing trades from the TD account, Buggs responded that because Safranko owned the brokerage, he could credit back the losses.  The business associate advised Buggs that Safranko crediting back the trading losses was an indication that Safranko was probably "faking the trading."

210.     Buggs continued to ignore warnings from other experienced traders that the TD Pool showed fraudulent activity.  At least one other former employee of Buggs, who was also an experienced trader, informed Buggs that, based upon the crediting of the losses, Safranko likely had control over both sides of a purported trade.  This former employee told Buggs that it was possible, based upon this structure, that in fact no trading was going on at TD.

211.     Buggs also ignored warnings from both of these experienced traders that Buggs and TD, and their employees, were not licensed or registered, as required, to offer trading in XAU/USD.  One of the former employees went so far as to show Buggs portions of the CFTC website to demonstrate to him the registration requirements that applied to TD and Buggs.

ii.     ***Buggs Concealed the Purpose of TD Wires and Residency Status of Customers***

212.     Buggs knew or should have known that TD was engaged in illegal and fraudulent conduct because, as an agent of TD, Buggs was directing potential and current customers to disguise the purpose of their funding payments and countries of origin.  Buggs, himself and through his assistant, instructed potential and current customers to conceal the purpose of these deposits by directing that they use certain opaque language in the wire transfer memorandum. For example, he instructed one customer that the deposit should say "services (ONLY!)" and if the wire "reference include[d] anything else, the wire will be returned & the related account closed.  No exceptions!"  Other customers were similarly instructed that in order to participate in the pool through Buggs, that they must wire funds with the memo line for "Services."

213.     Buggs also instructed TD customers to take deceptive steps when funding their TD account through cryptocurrency.  When customers opted to fund TD accounts with cryptocurrency, they were asked their country of residence in the TD account set-up instructions.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

Buggs and/or his assistant instructed US customers that they should choose "crypto" of their country of origin, rather than the USA.

### iii. *Buggs Knew or Should Have Known About Other Public Warnings About TD*

214.     Buggs was warned numerous times by experienced traders that TD was probably engaged in a fraud.  Separately, Buggs also knew that TD trading was manufactured by observing numerous disappearing losing trades.  If the disappearing losing trades wasn't alarming enough, Buggs also knew that Safranko had the ability to credit back the losing trades. Buggs was also warned that TD did not hold required registrations with the CFTC, and that he should be registered as well.  Finally, at least one customer told Buggs that he had performed background research on Safranko and TD, which had uncovered troubling complaints about them on the internet.

215.     These warnings made it incumbent on Buggs to perform some due diligence regarding TD lest he recklessly continue to invest customer money in a seeming fraud. However, despite serving in a role where he solicited customers to deposit funds for the purpose of participating in the TD Pool and holding himself out as having experience and insight into TD, Buggs did nothing to independently investigate these red flags or allegations levied against TD.  If he had, even a cursory internet search would have revealed that (i) as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints; (ii) that in July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List; and (iii), in September 2022 the Trading App was removed for the Apple App Store because, as reported by Forbes and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

216. Instead of heeding or investigating the numerous red flags signaling that TD was a fraud and not engaged in legitimate trading, Buggs downplayed the warnings and continued to solicit customers for the TD Pool, collecting millions of dollars in commissions on purported trading profits.

**d. Buggs Misappropriated Customer Funds**

217. Despite the fact that Buggs knew or should have known that TD was not trading customer funds as purported, Buggs misappropriated some TD customer funds by accepting TD a portion of customer funds into bank accounts he controlled and using those funds for personal use. Buggs also misappropriated TD customer funds by taking sizable commissions on purported trading profits when he knew or should have known that profits reflected in the TD Pool account were false.

218. Initially, when a customer informed Buggs that they wanted to set up their trading account, Buggs, or his assistant acting at his direction, assisted the customers with funding their accounts. Customers were given the option to fund their TD account through bank wire or cryptocurrency. In most instances, when customers chose the bank wire option, Buggs, directed customers to deposit funds into a bank account held by a third-party entity. Buggs, did not own or control this third-party entity or its bank account. The third-party entity was not a trading firm nor did Buggs have any agreement with the third-party regarding the management or trading of customer funds. None of the funds deposited into the third-party bank accounts were ever sent to TD or any other brokerage or trading firm.

219. In a small number of instances, Buggs gave several TD customers the ability to fund their accounts more quickly than the two normal funding routes through bank wire to third-party accounts or cryptocurrency. For these customers, Buggs accepted wires into bank accounts

he controlled, and told one of the customers that he would make a "ledger transaction" to fund his TD accounts.  None of the customer funds deposited into these Buggs-controlled accounts were ever sent to TD or any other brokerage or trading firm.  Instead, Buggs misappropriated some of these customer funds for purposes unrelated to trading.

220.    For example, although he started with a bank account balance of approximately $45,000, between April 11-13th, Buggs accepted four wires from TD customers each including memo lines incorporating the word "Services," totaling $370,000.  Buggs did not wire or otherwise transfer these funds to any known brokerage or trading entity.  Buggs also took in an additional $110,000 from another source into the account.  On April 14, 2022, Buggs used all or some of the $370,000 to wire $465,000 to a third party with a memo "Balance for Lambo."

221.    In another example, at the end of April 18, 2022, Buggs had a balance of approximately $70,000 in his bank account.  Buggs accepted wires, each of which with memo lines including the description "Services," from three customers totaling $545,000 into this account.  Buggs failed to transfer the funds to any known brokerage or trading entity.  Two days after the customers wired the funds to Buggs' account, Buggs wired $350,000 for the purchase of a condo.

222.    Upon information and belief, Buggs also misappropriated customer funds by taking commissions of 40–50% of purported profits on trading that he knew or should have known was fabricated.

223.    Upon information and belief, large numbers of Buggs customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD.  Upon information belief, customers who deposited funds via

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

**E. THE CENTURION DEFENDANTS' FRAUDULENT SCHEME**

224.    Beginning in at least March 2022 through the present ("Relevant Centurion Period"), Centurion, Alejandro Santiestaban a/k/a Alex Santi, Gabriel Beltran, and Archie Rice (previously defined as, the Centurion Defendants), fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Centurion's "hedge fund" (the "Centurion Pool") by making material misrepresentations and omissions to prospective and actual customers.  In fact, Centurion was using customer funds to participate in the TD Pool despite the fact that Centurion knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.E.c).  Additionally, the Centurion Defendants misappropriated and commingled customer funds and failed to register as required under the Act.  Pursuant to this scheme, at least 47 Centurion customers deposited no less than $8.4 million for the purposes of participating in the Centurion Pool.

**a.  Centurion Begins Soliciting for the TD Pool**

225.    The Centurion Defendants first learned of the opportunity to solicit customers for the TD Pool during a March 2022 meeting in Miami (as described above at ¶ 43).

226.    Thereafter, the Centurion Defendants engaged in numerous conversations with Negus-Romvari over text messages and Zoom calls.  During those conversations Negus-Romvari provided the Centurion a "PAMM manager overview' and "profit split[s]" and commissions. Negus-Romvari encouraged the Centurion Defendants to bring in customers by offering to lower the "performance fee" charged by TD from 50% of profits to 20% if Centurion brought in at least $2 million in deposits.  On May 17, 2022, Negus-Romvari shared a link which purported to show trading results for "1+ year of the algo."  Among other things, the results purportedly

showed monthly gains of 15% for a "conservative" account, which, Negus Romvari explained, had a "40% lower risk profile." On information and belief, the Centurion Defendants deposited funds for the purpose of "copy trading' the "bot" or "Algo" Negus-Romvari had described.

227.    Ultimately, the Centurion Defendants began to act as a sponsor for TD and to solicit customers to deposit funds for the purported purpose of trading leveraged or margined XAU/USD in the Centurion Pool when, in fact, the Centurion Defendants were directing those funds to be traded in the TD Pool.

**b.  The Centurion Defendants Fraudulently Solicited Customers**

228.    During the Relevant Centurion Period, Centurion fraudulently solicited prospective customers—through in-person meetings, texts messages, telephone calls, emails, and various social media accounts controlled by Beltran and Santi—to deposit money for the purpose of trading leveraged or margined XAU/USD. The Centurion Defendants made numerous fraudulent misrepresentations and omissions regarding (i) who controlled customer funds; (ii) how customer funds would be traded; (iii) historical profits of their "hedge fund"; and (iv) the ability of customers to withdraw their funds.

229.    On information and belief, some, if not all of Centurion's customers, are not ECPs.

i.  ***The Centurion Defendants Made Misrepresentations and Omissions Regarding Who Controlled Pool Funds***

230.    To entice prospective customers to deposit money for the purposes of participating in the Centurion Pool, social media posts by Santi led customers to believe that the Centurion "hedge fund" was in control of the funds. For example, in or around March 2022, Santi posted a message on one of his social media accounts indicating that "Centurion Capital Hedge Fund Is Now Live" for investors with a "$100k Min Deposit."

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF



In addition, Beltran falsely told at least one customer that "Centurion controlled all of the funds." Centurion did not control customers funds. Rather than holding the funds in an account controlled by Centurion as they represented they would, Centurion was using the funds to participate in the TD Pool.

     ii.  ***The Centurion Defendants Made Misrepresentations and Omissions Regarding How the Funds Would Be Traded***

   231.  The Centurion Defendants also made false and conflicting statements about the method Centurion was using to trade the funds, representing, at various times, that:

     i.  Centurion used an "algorithmic trading bot" or "AI" to trade the funds;

     ii.  Alex Santi manually traded the account; and/or

     iii.  another unspecified "pro trader" "managed" the account.

   232.  Moreover, Centurion sent customers a "Forex Account Management Agreement" which similarly represents that Centurion is trading the funds using an algorithm. The Agreement represents that Centurion, as "Manager" "is a "group of retail traders in the name of

Manager" and that the Client is entering into the Agreement because he wishes "to have Manager apply an Expert Advisor Trading Bot to the Client Funds."

233.    On another occasion when a customer was having difficulty obtaining a withdrawal due to alleged issues with the broker, the customer questioned Rice: "Okay, I thought this was your company though. Is it not." Rice responses confirmed the customers false belief that Centurion was managing the trading and merely using the broker to process trades: "Managing, yes. But still need a broker to process transactions of course inside the market."

234.    These statements were false. Centurion did not trade any of customer funds by applying a "Bot" or algorithm or having Santi or a "pro trader" make the trades. Despite what they told their customers, the Centurion Defendants did not do the trading on behalf of their customers.

### iii.    *The Centurion Defendants Made Misrepresentations and Omissions Regarding the Historical Profits of Their "Hedge Fund"*

235.    The Centurion Defendants also made fraudulent misrepresentations about the trading performance of the Centurion Pool. The Centurion Defendants falsely told prospective customers that the Centurion Pool earned monthly returns ranging from 10 to 60 percent.

236.    For example, in June 2022, Beltran posted an image purporting to show transactions in XAU/USD trades overlaid with the caption, "Autopilot 17k profits in 3 days." The post further stated, "If you wonder what's this it's an investment acc manage by a pro trader that produces 40-60% monthly returns[.]" [sic]. Santi advertised a "10%+ Monthly ROI DEAL" and invited potential customers to send him a direct message to obtain additional information.




237.    Beltran and Rice also sent prospective customers text messages touting purported profits earned on certain Centurion trading accounts.  For example, on one occasion in September 2022, Beltran sent a prospective customer a screen shot of an account that he alleged was started "end of Dec last year" which purported to show more than $4.4 million in "withdrawals" and only $1 million in deposits, representing a profit of more than $3 million over a 9 month period and an annualized return on investment of more than 600%.  On another occasion in December 2022, when asked by a customer, "What have been your historical returns here and how have the losses been historically."  Rice responded that the monthly returns "[a]fter broker fees & commission & profit splits" was "10-12%."

238.    The Centurion Defendants also encouraged customers to use these fraudulent misrepresentations to recruit new participants by offering referral or "affiliate" fees for each new customer brought in.  For example, Beltran sent a customer a video purporting to show trading profits overlaid with the text "Autopilot 17k profits in 3 days 😎" and encouraged him to post the video on Facebook to see if he could solicit new customers.

239.     These statements were false.  Centurion did not trade any customer funds much less generate the large, purported returns being advertised.

iv.     ***The Centurion Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds***

240.     The Centurion Defendants made false and inconsistent statements about the process for withdrawing customer funds and provided false assurances when withdrawals were delayed allowing the scheme to continue for months after it began to unravel.

241.     When initially soliciting customers the Centurion Defendants falsely represented that they could withdraw funds on a monthly basis by submitting a request to Centurion. Centurion would then submit the request to TD.  However, in, or around August 4, 2022, the Centurion Defendants were alerted by Negus-Romvari that TD was unable to process in a timely manner all of the withdrawals Centurion had requested on behalf of its customers.

242.     Negus-Romvari told the Centurion Defendants that they were requesting too many withdrawals and that any recently submitted withdrawal requests "wont [sic] be processed any time soon."  In response, Rice asked on a WhatsApp thread that also included Santi and Beltran:

> So Dave question bro, if we have 10M inside you're saying we can only withdraw up to 5% of that each month?
> I think that's kinda low considering the high returns . . . . . that means each client can only pull a very small % of their funds each month.
> **So realistically are they EVER entitled to their funds or there will be an issue when they want to liquidate their accts for whatever "emergency reasoning."**  (emphasis added)

243.     After being alerted to withdrawal issues by Negus-Romvari and expressing concerns that customers may never be able to withdraw funds, the Centurion Defendants did not share these concerns with customers and failed to disclose to customers who were solicited after

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

August 2022 that Centurion's existing customers were experiencing significant delays on withdrawals requests.

244.    Instead, they made various and conflicting excuses to their customers about the withdrawal delays.  For example, in or around September or October 2022 in response to the delays, the Centurion Defendants told at least one customer that Centurion was switching to a quarterly, as opposed to a monthly, withdrawal system.  Centurion informed other customers that the delays were the result of issues with Traders Domain—not Centurion—revealing to some for the first time that Traders Domain—not Centurion—had possession of the funds.  In January 2023, when a customer expressed concern that the Centurion Defendants were engaged in a Ponzi scheme, Beltran falsely assured him that TD was "processing withdrawals non[] stop for regular trading acc's What we are waiting is for the pamms."

245.    In or around March 7, 2023, Centurion sent a demand letter to TD detailing that, since December 2022, Centurion had made "dozens of requests for withdrawals totaling $19,143,698.82" which remained to be processed and accusing TD, Safranko, and Negus-Romvari of "misappropriate[ing]" and "deliberately withholding" those funds and operating a "Ponzi scheme."  They did not disclose these concerns to customers and instead continued to provide false assurances for months after they personally came to believe the TD Defendants were engaged in a fraud.

246.    For example, on March 18, 2023, Rice assured one customer who was expressing concern about his pending withdrawal that "theres [sic] no doubt in my mind" that the funds would be returned.  On April 24, 2023, when a customer reached out to Beltran because she was unable to login to her TD account via the Trading App and requested to withdraw $75,000, Beltran advised her "there [sic] currently migrating the broker to a new platform We are waiting

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

for them to be finished Once they are done we will provide the new login credentials." In June 2023, when the same Centurion customer reached out for an update, Beltran forwarded her statements Safranko made on Telegram and assured her that "they should be giving access to all the accounts" and that "At [sic] soon as we get access absolutely we can submit the request."

### c. The Centurion Defendants Knew or Should Have Known that TD was Engaged in Fraud and Not Trading the Funds as Purported

247.     During the Relevant Centurion Period, the Centurion Defendants knew or should have known that TD was not trading the funds as promised and, rather, was engaged in fraud. The Centurion Defendants ignored evidence that TD was manipulating trade data. In addition, the Centurion Defendants should have known about other public warnings circulating on the internet that would have alerted them to TD's fraud.

#### i.     *The Centurion Defendants Ignored Evidence that TD was Manipulating Trade Data*

248.     After receiving a customer's initial deposit, the Centurion Defendants would provide the customer with log-in information for the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their Centurion trading account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the pool was making substantial trading profits.

249.     However, on occasion, when monitoring their accounts via the Trading App, customers observed large losses in their accounts only to have those losses later corrected.

250.     For example, in or around October 2022, several customers observed substantial trading losses that appeared to nearly wipe out the value of their accounts. When those customers raised the issue with Centurion, a Centurion "customer service representative" downplayed the customers' concerns and claimed the losses were the result of a "system error"

and did not represent actual trading losses. The Centurion representative assured those customers that the account would be updated, and the losses reversed. When customers asked how this was possible, the Centurion representative claimed that it had the ability to credit the account and reverse the losses, an indication that the trading was falsified. Later that day, customers observed through the Trading App that the trading losses in the account were reversed.

251. Similarly, on or around November 30, 2022, some customers observed their trading account value drop by approximately fifty percent. When asked about this, Centurion again stated that these did not represent actual trading losses and minimized customer concerns by suggesting that they were the result of a "systems error" and a "glitch that will be corrected." Again, the trading losses were reversed later in the day.

252. Centurion knew that TD had the ability to alter trade data on completed trades. TD's ability to alter trade data on completed trades, should have alerted the Centurion Defendants that TD was not actually trading customers' funds as purported and/or was altering trade data to hide trading losses.

253. This is particularly true given Santi's purported trading experience. Santi holds himself out as an "expert" trader. On various social media platforms, websites, and podcasts, Santi advertises that he has been trading forex for more than five years and has made millions of dollars doing so. In connection with one of his other businesses, Santi sells educational courses and "mentoring" to other traders. Its website prominently displays the CFTC banner, falsely suggesting that he and/or the business are registered with the CFTC. Moreover, Santi acknowledge that traders often used deception to make their results appear to be more profitable than they were in reality. For example, Santi advised a customer that "it is all marketing" and

- 74 -

"not everything is the way it seems." Santi told the customer that he would take screen shots of his trading gains and profits, but not of his trading losses to give the appearance of profitability.

ii. ***The Centurion Defendants Knew or Should Have Known About Public Warnings About TD***

254. In addition to the evidence of trade manipulation, there were numerous warnings about TD and Safranko circulating on the internet that should have alerted the Centurion Defendants to the fact that TD was engaged in fraud.

255. As described above in ¶ 137, as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints. Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List. Additionally, as described above in ¶ 140, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.

256. Despite its knowledge of the manipulated trade data and the publicly available warnings, the Centurion Defendants continued to solicit customers for the TD Pool.

**d. The Centurion Defendants Misappropriated and Commingled Customer Funds**

257. Once prospective customers indicated their desire to participate in the Centurion Pool, Centurion would send them a Forex Account Management Agreement for their electronic signature. Thereafter, rather than accept funds in the name of the Centurion Pool as is required under the Act, the Centurion Defendants instead directed customers to, alternatively, deposit funds via: (i) wire transfer into bank accounts held in the names of other entities that Santi, Beltran, and/or Rice owned and controlled; (ii) wire transfer into bank accounts held in the name of a third party jeweler; (iii) crypto currency into wallets which, upon information and belief, were controlled by the Centurion Defendants, the TD Defendants, or their agents.

258.     Centurion customers deposited funds into bank accounts controlled by Santi,

Beltran, and Rice for the purposes of trading leveraged or margined XAU/USD in the Centurion

Pool, including:

- Centurion customers deposited no less than $40,000 into a Wells Fargo account ending in *3012 held in the name of Centurion Capital Group, Inc. and controlled by Santi and Beltran.

- Centurion customers deposited no less than $2.7 million into a Wells Fargo account ending in *3745 held in the name of a Santi-controlled business.

- Centurion customers deposited no less than $1.95 million into a Wells Fargo account ending in *2211 held in the name of another Santi-controlled business.            .

- Centurion customers deposited no less than $845,000 into a J.P. Morgan Chase account ending in *7579 held in the name of a Beltran-controlled business.

- Centurion customers deposited no less than $1.6 million into a Comerica account ending in *6339 held in the name of a Rice-controlled business.

259.     Once deposited into one of the accounts described in ¶ 258 (the "Centurion

Accounts"), customer funds were commingled with non-pool funds.

260.     No funds were ever sent from the Centurion Accounts directly to TD or any other

brokerage or trading firm.

261.     Despite the lack of direct transfers, after depositing money into the Centurion

Accounts, customers nonetheless observed via the Trading App that their accounts appeared to

be funded typically within a few hours or days.

262.     The Centurion Defendants also misappropriated some of the customer funds

deposited into the Centurion Accounts by using them for purposes unrelated to trading, to pay

themselves, and to make Ponzi-style payments.

263.     For example, on August 2, 2022, $40,000 was deposited via wire transfer by a

customer into the Wells Fargo account held in the name of Centurion Capital Group, Inc. and

controlled by Santi and Beltran at a time when the account had a balance of $11.39. On August 15, 2022, nearly all of the $40,000 was transferred to a personal bank account of Santi leaving only $31.39 remaining in the account.

264.    On September 30, 2022, a customer deposited $1,200,000.00 via wire transfer into a Wells Fargo account held in the name of a Santi-controlled business at a time when the balance was $645.99. Within four days, Santi had spent all of $1,200,000.00 including by making $564,000 in Ponzi-style payments to other customers.

265.    On April 18, 2022, a customer sent $100,000 to the Comerica account ending in 6339 held in the name of a Rice-controlled business at a time when the balance in the account was only $8,668,50. By April 26, 2022, Rice had misappropriated at least $40,000 of that deposit, transferring $18,684 to another bank account held in the name of, another business entity owned by him, writing a check for $2,500 to a tile company for "Home Install", and sending a $14,000 wire to a design company.

266.    In addition to directing customers to deposit funds into the Centurion Accounts, the Centurion Defendants also directed some customers to wire money to accounts controlled by a third-party jeweler ("Jeweler Accounts") who Centurion purportedly used as a source for cryptocurrency. Centurion customers deposited no less than $838,000 into the Jeweler Accounts. None of the customer funds deposited into the Jeweler Accounts were sent to TD or another trading firm. Despite the lack of direct transfers, after depositing money into the Jeweler Accounts, customers nonetheless observed via the Trading App that their accounts appeared to be funded typically within a few hours or days.

267.    On information and belief, the primary method by which Centurion customers deposited funds for purported trading was via cryptocurrency. Centurion instructed customers to

deposit funds into cryptocurrency wallets, which upon information and belief were controlled by the Centurion Defendants, the TD Defendants, or their agents. After depositing money into the cryptocurrency wallets, customers observed via the Trading App that their accounts appeared to be funded typically within a few hours or days.

268. The Centurion Defendants misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers. The Centurion Defendants also misappropriated funds, upon information and belief, by taking commissions which ranged between 40-60% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist.

269. Upon information and belief, large numbers of Centurion customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

**e.    The Centurion Defendants Failed to Register with the CFTC**

270. As described above, during the Relevant Centurion Period, Centurion was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis.

271. Centurion used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customer funds for the purposes of trading XAU/USD.

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

272.    Centurion was never registered as a CPO and was not exempt or excluded from registration as a CPO.

273.    During the Relevant Centurion Period, Santi, Beltran, and Rice were acting as unregistered APs of an unregistered CPO, Centurion, by soliciting customers to participate in the Centurion Pool while associated with Centurion as a partner, officer, employee, or similar agent.

274.    Santi, Beltran, and Rice were never registered as an AP of Centurion.

**f.  Santi and Beltran are Controlling Persons of Centurion**

275.    Santi and Beltran are controlling persons of Centurion.  As stated above, Santi and Beltran are co-owners of Centurion.  Additionally, Santi and Beltran hold the offices of President and Vice President of Centurion, respectively.  In addition, Santi and Beltran controlled bank accounts, including in the name of Centurion, that accepted customer funds. Santi and Beltran controlled the day-to-day operations, finance, accounts, and books and records of Centurion and had the ability to hire and fire Centurion employees.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

### COUNT ONE
**Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act (Directly Against TD, Safranko, Negus-Romvari, Trubluefx, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Sims, Buggs, Centurion, Santi, Beltran, and Rice)**

**Violations of 7 U.S.C. § 6b(a)(2)(B), Section 4b(a)(2)(B) of the Act.
(Directly Against TD and Safranko)**

**Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act.
(Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts of its agents; Santi and Beltran as Control Persons of Centurion; Centurion for the acts and omissions of its agents)**

**Violations of 7 U.S.C. § 6b(a)(2)(B), Section 4b(a)(2)(B) of the Act**.
**(Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the acts and omissions of its agents)**

**Fraud in Connection with Leveraged or Margined Retail Commodity Transactions**

276.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

277.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

(2)    for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A)    to cheat or defraud or attempt to cheat or defraud the other person;

(B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

278.    Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D), retail commodity transactions, including the XAU/USD transactions described herein, are subject to 7 U.S.C. § 6b "as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery" provided that it is "entered into with or offered to"(i) a "person that is not an eligible contract participant" (ii) "on a leveraged or margined basis."

279.    Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), defines an eligible contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual

enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

***The TD Defendants and Trubluefx***

280.    During the Relevant Period, TD, Safranko, Negus-Romvari, and Trubluefx, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with leveraged or margined retail commodity transactions that were offered on a leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, (2) made or caused to be made false reports or statements to other persons; and/or (3) deceived or attempted to deceive other persons.

      a. TD, Safranko, and Negus-Romvari did so by making material misrepresentations and omissions with scienter regarding, among other things, TD's trading operations and the ability of customers to withdraw their funds.

      b. TD and Safranko did so by falsifying trading records.

      c. TD and Trubluefx did so by knowingly or recklessly misappropriating customer funds.

281.    On information and belief, some, if not all of the customers who deposited money at the direction of the TD Defendants for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

282.    By reason of the foregoing, TD and Safranko violated 7 U.S.C. § 6b(a)(2)(A)–(C) and Negus-Romvari and Trubluefx violated 7 U.S.C. § 6b(a)(2)(A), (C).

283.    The foregoing acts, misrepresentations, omissions, and failures of Safranko and Negus-Romvari occurred within the scope of their employment or office with TD.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A)–(C).

284. Throughout the Relevant Period, Safranko and Negus-Romvari controlled TD, directly or indirectly, and did not act in good faith or knowingly induced TD's conduct alleged in this Count. Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Safranko and Negus-Romvari are liable for TD's violations of 7 U.S.C. § 6b(a)(2)(A)−(C).

***The Algo Defendants***

285. During the Relevant Period, Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail commodity transactions that were offered on a leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2) deceived or attempted to deceive other persons.

  a. Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos did so by making material misrepresentations and omissions with scienter regarding, among other things, the operation of the trading business; the location of customer funds; that TD was placed on the RED List; and/or the ability of customers to withdraw funds.

  b. Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos, did so by knowingly or recklessly misappropriating customer funds.

286. On information and belief, some, if not all of the customers who deposited money at the direction of the Algo Defendants for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

287. By reason of the foregoing, Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos violated 7 U.S.C. § 6b(a)(2)(A), (C).

288. The foregoing acts, misrepresentations, omissions, and failures of Collazo, Herman, Fortini, and Likos occurred within the scope of their employment or office with Algo Capital and Algo FX, or while acting as an agent on their behalf. Therefore, pursuant to 7 U.S.C.

§ 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6b(a)(2)(A),(C).

289.    Throughout the Relevant Algo Period, Collazo and Herman controlled Algo Capital and Algo FX, directly or indirectly, and did not act in good faith or knowingly induced Algo Capital's and Algo FX's conduct alleged in this Count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Collazo and Herman and are liable for Algo Capital's and Algo FX's violations of 7 U.S.C. § 6b(a)(2)(A), (C).

**Sims**

290.    During the Relevant Sims Period, Sims, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail commodity transactions that were offered on a leveraged or margined basis, willfully or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons and/or (2) deceived or attempted to deceive other persons.

        a.  Sims did so by making material misrepresentations and omissions regarding, among other things, the ownership and operations of the trading business; historical profits and risk; and the ability of customers to withdraw their funds.

        b.  Sims also did so by knowingly or recklessly misappropriating customer funds.

291.    On information and belief, some, if not all of the customers who, at the direction of Sims, deposited money for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

292.    By reason of the foregoing, Sims violated 7 U.S.C. § 6b(a)(2)(A), (C).

**Buggs**

293.    During the Relevant Buggs Period, Buggs by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

commodity transactions that were offered on a leveraged or margined basis, willfully or

recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2)

deceived or attempted to deceive other persons.

> a. Buggs did so making material misrepresentations and omissions regarding, among other things, the profit and risk associated with the purported trading; the mechanics and structure of the trading operation; and the ability of customers to withdraw funds.

> b. Buggs also did so by knowingly or recklessly misappropriating customer funds.

294.    On information and belief, some of the customers who, at the direction of Buggs,

deposited money for the purpose of trading leveraged or margined retail commodity transactions

(as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

295.    By reason of the foregoing, Buggs violated 7 U.S.C. § 6b(a)(2)(A), (C).

***The Centurion Defendants***

296.    During the Relevant Centurion Period, Centurion, Santi, Beltran and Rice, by use

of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in

connection with retail commodity transactions that were offered on a leveraged or margined

basis (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2)

deceived or attempted to deceive other persons.

> a. Centurion, Santi, Beltran, and Rice did so by making material misrepresentations and omissions with scienter regarding, among other things, who controlled customer funds; how customer funds would be traded; historical profits of their "hedge fund"; and/or the ability of customers to withdraw funds.

> b. Centurion, Santi, Beltran, and Rice also did so by knowingly or recklessly misappropriating customer funds.

297.    On information and belief, some, if not all of the customers who, at the direction

of the Centurion Defendants, deposited money for the purposes of purposes of trading leveraged

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

298.    By reason of the foregoing, Centurion, Santi, Beltran, and Rice violated 7 U.S.C. § 6b(a)(2)(A), (C).

299.    The foregoing acts, misrepresentations, omissions, and failures of Santi, Beltran, and Rice occurred within the scope of their employment or office with Centurion, or while acting as an agent on its behalf.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1 .2 (2023), Centurion, is liable as principal for their acts, omissions, or failures in violation of 7 U.S.C. § 6b(a)(2)(A), (C).

300.    Throughout the Relevant Centurion Period, Santi and Beltran controlled Centurion, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Centurion's conduct alleged in this Count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. §  13c(b), Santi and Beltran and are liable for Centurion's violations of 7 U.S.C. § 6b(a)(2)(A), (C).

***

301.    For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)–(C).

## COUNT TWO
### Violations of 7 U.S.C. § 6*o*(1)(A)–(B), Section 4*o*(1)(A)–(B) of the Act

**(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)**

**(Indirectly Against Safranko and Negus-Romvari as a Control Person of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital**

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

**and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and Beltran as Control Persons of Centurion; Centurion or the acts and omissions of its agents)**

### Fraud and Deceit by CPOs and APs of CPOs

302.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

303.    7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the CFTC or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from "(A) . . . employ[ing] any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) . . . engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

304.    Section 1a(11)(A)(i) of the Act, 7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
> . . .
>
> > (II) agreement, contract, or transaction described in  . . . [S]ection 2(c)(2)(D)(i) [of the Act].

305.    Regulation 1.3, 17 C.F.R. § 1.3 (2023), defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

*The TD Defendants*

306.       During the Relevant Period, TD solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, TD was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

307.       During the Relevant Period, TD, while acting as an unregistered CPO, committed fraud in violation of 7 U.S.C. § 6*o*(1)(A) and (B) by, among other things, misappropriating customer funds; making material misrepresentations and omissions with scienter; and issuing false account statements to TD customers.

308.       During the Relevant Period, Safranko and Negus-Romvari were associated with TD as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged. Therefore, Safranko and Negus-Romvari were acting as APs of a CPO.

309.       During the Relevant Period, Safranko while acting as an unregistered AP of a CPO, committed fraud in violation of 7 U.S.C. § 6*o*(1)(A) and (B) by making material misrepresentations and omissions with scienter; and by issuing false account statements to TD customers.  Negus-Romvari, while acting as an unregistered AP of a CPO, committed fraud in violation of 7 U.S.C. § 6*o*(1)(A) and (B) by making material misrepresentations and omissions with scienter.

310.       The foregoing acts, misrepresentations, omissions, and failures of Safranko and Negus-Romvari occurred within the scope of their employment or office with TD.  Therefore,

pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B).

311.     Throughout the Relevant Period, Safranko and Negus-Romvari controlled TD, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, TD's conduct alleged in this Count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Safranko and Negus-Romvari are liable for TD's violations of 7 U.S.C. § 6o(1)(A) and (B).

***The Algo Defendants***

312.     During the Relevant Algo Period, Algo Capital and Algo FX solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX were acting as CPOs, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

313.     During the Relevant Algo Period, Algo Capital, while acting as an unregistered CPO, and Algo FX, while registered as a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

314.     During the Relevant Algo Period, Collazo, Herman, Fortini, and Likos were associated with Algo Capital and Algo FX as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged.  Therefore, Collazo, Herman, Fortini, and Likos were APs of two CPOs.

315.     During the Relevant Algo Period, while acting as unregistered APs of two CPOs, Collazo, Herman, Fortini, and Likos committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

316.     The foregoing acts, misrepresentations, omissions, and failures of Collazo, Herman, Fortini, and Likos occurred within the scope of their employment or office with Algo Capital and Algo FX or while acting as an agent on their behalf.   Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B).

317.     Throughout the Relevant Algo Period, Collazo and Herman controlled, directly or indirectly, Algo Capital and Algo FX and did not act in good faith or knowingly induced, directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Collazo and Herman and are liable for Algo Capital's and Algo FX's violations of 7 U.S.C. § 6o(1)(A) and (B).

### *The Centurion Defendants*

318.     During the Relevant Centurion Period, Centurion solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Centurion was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

319.     During the Relevant Centurion Period, Centurion, while acting as an unregistered CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

- 89 -

320.     During the Relevant Centurion Period, Santi, Beltran, and Rice were associated with Centurion as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged.  Therefore, Santi, Beltran, and Rice were acting as APs of a CPO as defined by 17 C.F.R. § 1.3 (2023).

321.     During the Relevant Centurion Period, Santi, Beltran, and Rice, while acting as unregistered APs of a CPO, committed fraud in violation of 7 U.S.C. § 6o(1)(A) and (B) by, among other things, misappropriating customer funds and making material misrepresentations and omissions with scienter.

322.     The foregoing acts, misrepresentations, omissions, and failures of Santi, Beltran, and Rice occurred within the scope of their employment or office with Centurion or while acting as an agent on their behalf.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Centurion is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6o(1)(A) and (B).

323.     Throughout the Relevant Centurion Period, Santi and Beltran, controlled, directly or indirectly, Centurion and did not act in good faith or knowingly induced, directly or indirectly, Centurion's conduct alleged in this Count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Santi and Beltran and are liable for Centurion's violations of 7 U.S.C. § 6o(1)(A) and (B).

***

324.     For each Defendant named in this charge, each misappropriation, misrepresentation and omission of material fact, and false statement, including but not limited to

- 90 -

those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C.

§ 6*o*(1)(A) and (B).

### COUNT THREE
**Violations of 7 U.S.C. § 6k(2), Section 4k(2) of the Act**
**(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)**

**Violations of 7 U.S.C. § 6m(1), Section 4m(1) of the Act**
**(Directly Against TD, Algo Capital, and Centurion)**

**Violations of 7 U.S.C. §§ 6k(2) and 6m(1), Sections 4k(2) and 4m(1) of the Act**
**(Indirectly Against Safranko and Negus-Romvari As Control Persons of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and Beltran as Control Persons of Centurion; Centurion for the acts and omissions of its agents)**

**Failure to Register as a CPO or as an AP of a CPO**

325.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

326.    7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
> . . .
> (II) agreement, contract, or transaction described in   . . . [S]ection 2(c)(2)(D)(i) [of the Act].

327.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it

shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the

mails or any means or instrumentality of interstate commerce in connection with his business as

such . . . [CPO] . . . ."

328.    Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2)(i) makes it

unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant

or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the [CFTC]" as an AP of the CPO.

329.    7 U.S.C. § 6k(2) also prohibits a CPO from permitting "such a person to become or remain associated with" it, in any such capacity, if the CPO knew or should have known that such person was not registered as an AP.

***The TD Defendants***

330.    During the Relevant Period, TD, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, TD was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

331.    TD is not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

332.    During the Relevant Period, Safranko and Negus-Romvari each associated with TD as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, Safranko and Negus-Romvari acted as APs of a CPO as defined by 7 U.S.C. § 6k(2)(i).

333.    Safranko and Negus-Romvari are not registered with the CFTC as an AP of TD; thus, Safranko and Negus-Romvari acted as unregistered APs of a CPO in violation of 7 U.S.C. § 6k(2)(i).

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER EQUITABLE RELIEF

334.     TD supervised Safranko and Negus-Romvari and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

335.     The foregoing acts, omissions, and failures occurred within the scope of Safranko's and Negus-Romvari's employment or office with TD.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), TD is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

336.     Throughout the Relevant Period, Safranko and Negus-Romvari controlled, directly or indirectly, TD, and did not act in good faith or knowingly induced, directly or indirectly, TD's conduct alleged in this Count.  Therefore, Safranko and Negus-Romvari are also liable for TD's violations of 7 U.S.C. §§ 6k(2) and 6m(1) pursuant to 7 U.S.C. § 13c(b).

*The Algo Defendants*

337.     During the Relevant Algo Period, Algo Capital and Algo FX, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX were acting as CPOs, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

338.     Algo Capital, unlike Algo FX, was not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

339.     During the Relevant Algo Period, Collazo, Herman, Fortini, and Likos associated with Algo Capital and Algo FX as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool or

supervision of someone so engaged; therefore, Collazo, Herman, Fortini, and Likos acted as APs of Algo Capital and Algo FX, as defined by 7 U.S.C. § 6k(2)(i).

340.    Collazo, Herman, Fortini, and Likos were not registered with the CFTC as APs of Algo Capital and Algo FX; thus, Collazo, Herman, Fortini, and Likos acted as unregistered APs of two CPOs in violation of 7 U.S.C. § 6k(2)(i).

341.    Algo Capital and Algo FX supervised Collazo, Herman, Fortini, and Likos and permitted them to solicit customers for a commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

342.    The foregoing acts, omissions, and failures occurred within the scope of Collazo's, Herman's, Fortini's, and Likos's employment or office with Algo Capital and Algo FX, or while acting as an agent on their behalf.   Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Algo Capital and Algo FX are liable as principals for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

343.    Throughout the Relevant Algo Period, Herman and Collazo controlled, directly or indirectly, Algo Capital and Algo FX, and did not act in good faith or knowingly induced, directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. 13c(b), Collazo and Herman are liable for Algo Capital's and Algo FX's violations of 7 U.S.C. § 6k(2) and Algo Capital's violation of 7 U.S.C. § 6m(1).

***The Centurion Defendants***

344.    During the Relevant Centurion Period, Centurion, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity

transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Centurion was acting as a CPO, as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

345.    Centurion is not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).

346.    During the Relevant Centurion Period, Santi, Beltran, and Rice each associated with Centurion as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, Santi, Beltran, and Rice each acted as APs of a CPO as defined by 7 U.S.C. § 6k(2)(i).

347.    Santi, Beltran, and Rice were not registered with the CFTC as APs of Centurion; thus, Santi, Beltran, and Rice acted as unregistered APs of a CPO in violation of 7 U.S.C. § 6k(2)(i).

348.    Centurion supervised Santi, Beltran, and Rice and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

349.    The foregoing acts, omissions, and failures occurred within the scope of Santi's, Beltran's, and Rice's employment or office with Centurion or while acting as an agent on their behalf.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2023), Centurion is liable as principal for their acts, misrepresentations, omissions, and failures in violation of 7 U.S.C. § 6k(2).

350.    Throughout the Relevant Centurion Period, Santi and Beltran controlled, directly or indirectly, Centurion and did not act in good faith or knowingly induced, directly or indirectly,

Centurion's conduct alleged in this Count.  Therefore, Collazo and Herman are also liable for Centurion's violations of 7 U.S.C. §§ 6k(2) and 6m(1) pursuant to 7 U.S.C. 13c(b).

***

351.    Each instance that TD, Algo Capital, and Centurion, acted as a CPO but failed to register with the CFTC as such are alleged as a separate and distinct violation.

352.    Each instance that TD, Algo Capital, Algo FX, and Centurion supervised and permitted an unregistered AP to solicit customers for a commodity pool is alleged as a separate and distinct violation.

353.    Each instance that Safranko, Negus-Romvari, Collazo, Herman, Fortini, Likos, Santi, Beltran, and Rice acted as an AP of a CPO but failed to register with the CFTC as such is alleged as a separate and distinct violation.

**COUNT FOUR**
**Violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023), Regulation 4.20(a)(1), (b)–(c).**
**(Directly Against Algo Capital, Algo FX, and Centurion)**

**(Indirectly Against Herman and Collazo as Control Persons of Algo Capital and Algo FX; and Santi and Beltran as Control Persons of Centurion)**

**Failure to Operate Pool as Separate Entity; Failure to Receive Pool Participant Funds in Pool's Name; Commingling of Pool Funds**

354.    Paragraphs 1 through 275 are re-alleged and incorporated herein by reference.

355.    Regulation 5.4, 17 C.F.R. § 5.4 (2023), states that 17 C.F.R. Pt. 4 applies to any person required to register as a CPO pursuant to 17 C.F.R. pt. 5 (2023).

356.    17 C.F.R. § 4.20(a)(1) (2023) requires a CPO, whether registered or not, to operate its commodity pool as a legal entity separate from that of the CPO.

357.    17 C.F.R. § 4.20(b) (2023) prohibits a CPO, whether registered or not, from receiving pool funds in any name other than that of the pool.

358.     17 C.F.R. § 4.20(c) (2023) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person.

**The Algo Defendants**

359.     During the Relevant Algo Period, Algo Capital, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Algo Capital; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

360.     During the Relevant Algo Period, Algo FX, while registered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Algo FX; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

361.     Throughout the Relevant Algo Period, Herman and Collazo controlled, directly or indirectly, Algo Capital and Algo FX, and did not act in good faith or knowingly induced, directly or indirectly, Algo Capital's and Algo FX's conduct alleged in this Count.  Therefore, under 7 U.S.C. § 13c(b), Herman and Collazo are liable for Algo Capital's and Algo FX's violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

**The Centurion Defendants**

362.     During the Relevant Centurion Period, Centurion, while unregistered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Centurion; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

363.     Throughout the Relevant Centurion Period, Santi and Beltran controlled, directly or indirectly, Centurion, and did not act in good faith or knowingly induced, directly or

indirectly, Centurion's conduct alleged in this Count. Therefore, under 7 U.S.C. § 13c(b), Santi and Beltran are liable for Centurion's violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

***

364.    For each Defendant named in this charge, each act of failing to operate a pool as a legal entity separate from that of the CPO, improperly receiving customer funds, and commingling the property of the pool with non-pool property, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023).

## VI.    RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find that,

    1)    with respect to the TD Defendants and Trubluefx,

        a.    TD, Safranko, Negus-Romvari, and Trubluefx violated Sections 4b(a)(2)(A),(C), 4o(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

        b.    TD and Safranko violated 7 U.S.C. § 6b(a)(2)(B);

        c.    TD violated Sections 4m(1) of the Act, 7 U.S.C. § 6m(1);

    2)    with respect to the Algo Defendants,

        a.    Algo Capital, Algo FX, Collazo, Herman Fortini and Likos violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

        b.    Algo Capital violated 7 U.S.C. § 6m(1); and

        c.    Algo Capital and Algo FX violated Regulation 4.20(a)(1), (b)–(c), 17

- 98 -

C.F.R. § 4.20(a)(1), (b)–(c) (2023);

3) Sims violated 7 U.S.C. §§ 6b(a)(2)(A),(C);

4) Buggs violated 7 U.S.C. §§ 6b(a)(2)(A),(C);

5) with respect to the Centurion Defendants:

    a. Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Centurion violated 7 U.S.C. § 6m(1); and

    c. Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

B.      Enter an order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and any other person or entity associated with them, from engaging in the conduct described above, in violation of the following Sections of the Act and Regulations:

1) with respect to the TD Defendants and Trubluefx, prohibiting

    a. TD, Safranko, Negus-Romvari, and Trubluefx from violating Sections 4b(a)(2)(A),(C), 4o(1)(A)–(B), and 4k(2) of the Act, 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. TD and Safranko from violating 7 U.S.C. § 6b(a)(2)(B); and

    c. TD from violating Sections 4m(1) of the Act, 7 U.S.C. § 6m(1);

2) with respect to the Algo Defendants, prohibiting

    a. Algo Capital, Algo FX, Collazo, Herman Fortini and Likos from violating 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Algo Capital from violating 7 U.S.C. § 6m(1); and

    c. Algo Capital and Algo FX from violating Regulation 4.20(a)(1), (b)–(c), 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

3) Prohibiting Sims from violating 7 U.S.C. §§ 6b(a)(2)(A),(C);

4) Prohibiting Buggs from violating 7 U.S.C. §§ 6b(a)(2)(A),(C);

5) with respect to the Centurion Defendants, prohibiting:

    a. Centurion, Santi, Beltran, and Rice violated 7 U.S.C. §§ 6b(a)(2)(A),(C), 6o(1)(A)–(B), and 6k(2);

    b. Centurion violated 7 U.S.C. § 6m(1); and

    c. Centurion violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023);

A. Enter an order of permanent injunction permanently restraining, enjoining, and prohibiting Defendants, and their affiliates, agents, servants, employees, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1) trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2023)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3) having any commodity interests traded on any Defendant's behalf;

4) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6) applying for registration or claiming exemption from registration with the CFTC

in any capacity, and engaging in any activity requiring such registration or

exemption from registration with the CFTC except as provided for in Regulation

4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2023); and

7)   acting as a principal (as that term is defined in Regulation 3.1(a),

17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person

registered, exempted from registration, or required to be registered with the CFTC

except as provided for in 17 C.F.R. § 4.14(a)(9).

B.      Enter an order directing Defendants, as well as any third-party transferee and/or

successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits

received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading

profits derived, directly or indirectly, from acts or practices which constitute violations of the Act

and Regulations as described herein, including pre-judgment and post-judgment interest;

C.      Enter an order requiring Defendants as well as any successors thereof, to make

full restitution to every person who has sustained losses proximately caused by the violations

described herein, including pre-judgment and post-judgment interest;

D.      Enter an order directing Defendants as well as any successors thereof, to rescind,

pursuant to such procedures as the Court may order, all contracts and agreements, whether

implied or express, entered into between, with or among Defendants and any of the customers

whose funds were received by Defendants as a result of the acts and practices that constituted

violations of the Act and Regulations as described herein;

E.      Enter an order directing Defendants to pay a civil monetary penalty assessed by

the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as

adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act

COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, RESTITUTION, AND OTHER
EQUITABLE RELIEF

Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599–600, *see*

17 C.F.R. § 143.8 (2023), for each violation of the Act and Regulations, as described herein;

      F.     Enter an order requiring Defendants to pay costs and fees as permitted by

28 U.S.C. §§ 1920, 2413(a)(2); and

      G.     Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


Dated: September 30, 2024       Respectfully submitted,

               COMMODITY FUTURES
               TRADING COMMISSION

               ALISON B. WILSON (D.C. Bar 475992)
               *(Attorney-In-Charge)*
               KELLY M. FOLKS (VA Bar 72124)
               SEAN HENNESSY (D.C. Bar 1011564)
               SARAH WASTLER (D.C. Bar 944534)
               Attorneys for Plaintiff
               COMMODITY FUTURES
               TRADING COMMISSION
               1155 21st Street, N.W.
               Washington, D.C. 20581
               Telephone: (202) 418-5000
               awilson@cftc.gov
               kfolks@cftc.gov
               shennessy@cftc.gov
               swastler@cftc.gov