

**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**



FILED BY_____ D.C.

SEP 30 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

COMMODITY FUTURES
TRADING COMMISSION,

Plaintiff,

   v.

Civil Case No.

TRADERS DOMAIN FX LTD. d/b/a
THE TRADERS DOMAIN; FREDIRICK
TEDDY JOSEPH SAFRANKO a/k/a
TED SAFRANKO; DAVID WILLIAM
NEGUS-ROMVARI; ARES GLOBAL
LTD. d/b/a TRUBLUEFX; ALGO
CAPITAL LLC; ALGO FX CAPITAL
ADVISOR LLC n/k/a QUANT5
ADVISOR, LLC; ROBERT COLLAZO,
JR.; JUAN HERMAN a/k/a JJ HERMAN;
JOHN FORTINI; STEVEN LIKOS;
MICHAEL SHANNON SIMS; HOLTON
BUGGS, JR; CENTURION CAPITAL
GROUP INC.; ALEJANDRO
SANTIESTABAN a/k/a ALEX SANTI;
GABRIEL BELTRAN; and ARCHIE
RICE,

Defendants.

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S EXPEDITED *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER, APPOINTMENT OF TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

I.      INTRODUCTION ............................................................................................................... - 1 -
II.     THE PARTIES .................................................................................................................... - 7 -
III.    JURISDICTION AND VENUE ...................................................................................... - 10 -
IV.     STATEMENT OF FACTS ............................................................................................... - 11 -
        A.      The Traders Domain Defendants' Fraudulent Scheme ......................................... - 11 -
                a.      The TD Defendants Launch an Unregistered Offshore Brokerage and Begin
                Soliciting Customers ................................................................................................ - 12 -
                b.      The TD Defendants Begin Soliciting for the TD Pool .............................. - 13 -
                c.      The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud -
                13 -
                d.      The TD Defendants Fraudulently Solicited Customers ............................. - 15 -
        i.      The TD Defendants Made Misrepresentations and Omissions Regarding its Trading
        Operations ............................................................................................................................. - 15 -
        ii.     The TD Defendants Made Misrepresentations and Omissions Regarding the Ability
        of Customers to Withdraw Their Funds. ............................................................................... - 18 -
                e.      The TD Defendants Falsified Trading Records ........................................ - 23 -
                f.      The TD Defendants Misappropriated Customer Funds ............................. - 25 -
                g.      TruBluefx Misappropriated Customer Funds ........................................... - 27 -
                h.      The TD Defendants Failed to Register with the CFTC ............................ - 28 -
                i.      Safranko and Negus-Romvari are Controlling Persons of TD ................. - 29 -
        B.      The Algo Defendants' Fraudulent Scheme ......................................................... - 30 -
                a.      Algo Began Soliciting for the TD Pool .................................................... - 31 -
                b.      The Algo Defendants Fraudulently Solicited Customers .......................... - 31 -
                c.      The Algo Defendants Knew or Should Have Known that TD Was Engaged In
                Fraud And Not Trading the Funds As Represented .................................................. - 40 -
                d.      The Algo Defendants Misappropriated and Commingled Customer Funds - 44
                -
                e.      The Algo Defendants Failed to Register with the CFTC .......................... - 47 -
                f.      Collazo and Herman are Controlling Persons of Algo .............................. - 48 -
        C.      The Sims' Fraudulent Scheme ........................................................................... - 48 -
                a.      Sims Fraudulently Solicited Customers .................................................... - 49 -
                b.      Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not
                Trading the Funds As Represented .......................................................................... - 54 -
                c.      Sims Misappropriated Customer Funds .................................................... - 56 -
        D.      The Buggs' Fraudulent Scheme .......................................................................... - 56 -
                a.      Buggs Began Soliciting for the TD Pool .................................................. - 57 -
                b.      Buggs Fraudulently Solicited Customers .................................................. - 58 -
                c.      Buggs Knew or Should Have Known That TD Was Not Trading Customer
                Funds as Purported ................................................................................................. - 62 -
                d.      Buggs Misappropriated Customer Funds .................................................. - 65 -
        E.      THE CENTURION DEFENDANTS' FRAUDULENT SCHEME ....................... - 67 -
                a.      Centurion Begins Soliciting for the TD Pool ........................................... - 68 -
                b.      The Centurion Defendants Fraudulently Solicited Customers .................. - 68 -
                c.      The Centurion Defendants Knew or Should Have Known that TD was
                Engaged in Fraud and Not Trading the Funds as Purported ..................................... - 74 -

       d.     The Centurion Defendants Misappropriated and Commingled Customer Funds  - 76 -

       e.     The Centurion Defendants Failed to Register with the CFTC .................. - 79 -

       f.      Santi and Beltran are Controlling Persons of Centurion .......................... - 80 -

V.     ARGUMENT................................................................................................ - 80 -

    A.    COUNT ONE - Fraud in Connection with Leveraged or Margined Retail Commodity Transactions.................................................................................................... - 80 -

       a.     The TD, Algo, Sims, Buggs, and Centurion Defendants Committed Fraud by Making Material Misrepresentations and Omissions with Scienter...................... - 82 -

       b.     The TD Defendants, Trubluefx, Algo Defendants, Sims, Buggs, and Centurion Defendants Committed Fraud by Misappropriating Customer Funds .. - 87 -

       c.     TD and Safranko Committed Fraud by Issuing False Account Statements  - 91 -

    B.    COUNT TWO - Fraud and Deceit by CPOs and APs of CPOs............................ - 92 -

    C.    COUNT THREE - Failure to Register as a CPO or as an AP of a CPO ............... - 96 -

    D.    COUNT FOUR - Failure to Operate Pool as Separate Entity; Failure to Receive Pool Participant Funds in Pool's Name; Commingling of Pool Funds.................................... - 100 -

VI.    DEFENDANTS ARE DERIVATIVELY LIABLE FOR EACH OTHER'S MISCONDUCT  - 101 -

    A.    Control Person Liability ...................................................................................... - 101 -

VII.   RELIEF SOUGHT .............................................................................................. - 105 -

    A.    The Court Has Jurisdiction and Authority to Grant the Relief Sought. ............... - 105 -

    B.    The Commission Has Established That Ex Parte Relief Is Appropriate and Necessary. - 110 -

    C.    The Court Should Schedule a Show Cause Hearing and, Thereafter, Issue an Order of Preliminary Injunction.................................................................................................... - 113 -

    D.    The Court Should Order Expedited Discovery in Advance of the Show Cause Hearing. ................................................................................................................................. - 113 -

VIII.    CONCLUSION ................................................................................................. - 115 -

**PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S EXPEDITED *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER, APPOINTMENT OF TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Pursuant to 7 U.S.C. § 13a-1(a) of the Commodity Exchange Act (the "Act"), Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") respectfully moves the Court on an expedited basis for the immediate entry of an *ex parte* Statutory Restraining Order, without bond, appointment of a temporary receiver, and setting a date for a hearing to show cause as to why a preliminary injunction should not issue. In support of Plaintiff's *Ex Parte* Motion For Statutory Restraining Order, Appointment Of Temporary Receiver, And Other Equitable Relief the Commission submits the following memorandum of law, along with declarations and related exhibits attached thereto. Expedited consideration of this motion and the immediate entry of an *ex parte* Statutory Restraining Order is necessary because some of Defendants' fraudulent conduct, as described below, is ongoing, and the majority of customer funds have not been returned. Failure to enter an *ex parte* Statutory Restraining Order immediately risks further dissipation of customer funds.

## I.   INTRODUCTION

From at least November 2019 through present (the "Relevant Period"), Traders Domain FX LTD. d/b/a/ The Traders Domain, by and through its officers, employees, and agents, ("TD") and its co-owners Frederick Teddy Joseph Safranko a/k/a/ Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari"), individually and as controlling persons of TD (collectively, the "TD Defendants") orchestrated a multi-layered scheme to solicit funds for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts. Many, if not all, of the offered leveraged or margined transactions were transactions

described in Section 2(c) (2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) ("leveraged or margined retail commodity transactions").  Not only did the TD Defendants directly solicit customers, but they also engaged other individuals and entities ("sponsors") to solicit customers on TD's behalf – with each sponsor acting like a spoke extending from the TD hub.

During the Relevant Period, the TD Defendants began soliciting individuals and/or entities ("customers") to deposit funds for the purpose of trading XAU/USD and other commodities on a leveraged or margined basis through various account offerings.  Starting in January 2021 and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in commodity pool operated by TD (the "TD Pool").  The TD Defendants committed fraud by knowingly or with reckless disregard making oral and written fraudulent and material misrepresentations and omissions, including through the TD website, *thetradersdomain.com*, on social media, via text messages, email, newsletters, and/or in person in order to persuade potential and existing customers to transfer funds for the purpose of trading XAU/USD either through TD's various account offerings or via the TD Pool.  TD misappropriated customer funds by accepting customer money via third party bank accounts, payment processors, and crypto wallets, but failing to use at least some of those funds to trade XAU/USD and by charging commissions on purported trading profits that did not exist.  In addition, TD, and later its successor in interest Ares Global d/b/a/ Trubluefx ("Trubluefx"), misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts.  TD and Safranko also falsified trading records and the TD Defendants failed to register as required under the Act.

In an effort to expand the scope of the fraud, the TD Defendants recruited entities and individuals to act as sponsors and solicit new customers in exchange for a percentage of

purported trading profits in a manner akin to a multi-level marketing ("MLM") scheme.  In addition to the many sponsors spread all over the United States and internationally, the TD Defendants recruited the "Sponsor Defendants" (collectively with the TD Defendants and Trubluefx, "Defendants"), four distinct groups named in this complaint which drove the largest number of customers and funds to the TD Pool: (i) Algo Capital LLC ("Algo Capital") and Algo FX Capital Advisor, LLC ("Algo FX"), now known as Quant5 Advisor, LLC, by and through their officers, employees, and agents (collectively, "Algo"), Robert Collazo, Jr. ("Collazo"), Juan Herman ("Herman"), John Fortini ("Fortini"), and Stephen Likos (Likos) (collectively, the "Algo Defendants"); (ii) Michael Shannon Sims ("Sims"); (iii) Holton Buggs ("Buggs"); and (iv) Centurion Capital Group, Inc., by and through its officers, employees, and agents ("Centurion"), Alejandro Santiestaban a/k/a Alex Santi ("Santi"), Gabriel Beltran ("Beltran"), and Archie Rice ("Rice") (collectively, the "Centurion Defendants").

As set forth below, each group of Sponsor Defendants engaged in a separate fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU//USD. Although the Sponsor Defendants each intended the funds they solicited from customers to be traded in the TD Pool, at least some Sponsor Defendants purported to be soliciting for their own pools or "hedge funds."  The Sponsor Defendants solicited funds for the TD Pool even though each knew or should have known that TD was not trading the funds as represented.  Each of the Sponsor Defendants became aware of red flags that put them on notice that TD was not a legitimate trading operation.  The Sponsor Defendants faced a choice:  cease promoting TD in light of the alarming information they knew or follow the strong financial motivations they had to ignore the red flags and continue to collect generous commissions on the purported trading. Each of the Sponsor Defendants chose the latter.  The Sponsor Defendants actively downplayed

the red flags and continued to solicit customers, helping to create the false impression that customers were participating in legitimate trading even as the scheme was on the brink of collapse. Each of Sponsor Defendants knowingly made oral and written fraudulent and material misrepresentations and omissions on social media, via text messages, by telephone, and in person to potential and existing customers that they knew or should have known were false. The Sponsor Defendants misappropriated customer funds, including by accepting funds intended for trading into bank accounts they controlled and/or collecting commissions on customer profits despite that the Sponsor Defendants knew or should have known that TD was not trading the funds as purported. Some of the Sponsor Defendants also commingled customer funds and most were not registered as required under the Act.

In the fall of 2022, the scheme began to unravel, and customers began to experience extreme withdrawal delays and/or were unable to withdraw their funds. To persuade customers that the withdrawal issues were not an indication of fraud, the TD Defendants provided numerous, conflicting excuses for the delays—including, in June 2023, announcing that TD had been acquired by Trubluefx. The TD Defendants falsely assured customers that their funds were safe and withdrawals would be processed. Notwithstanding the significant withdrawal delays, the Sponsor Defendants ignored or downplayed the withdrawal issues and continued to solicit funds from new and existing customers to be traded in the TD Pool. These misstatements allowed Defendants to continue their fraudulent scheme for more than six months and bilk customers out of millions of additional dollars.

Additionally, at least some of Defendants' conduct is ongoing—upon information and belief, the majority of customer funds have not been returned. Unless restrained and enjoined by

this Court, Defendants will likely continue to engage in acts and practices alleged in the
Complaint and similar acts and practices, as further described herein and in the Complaint.

As described further below and alleged in the Commission's Complaint for Injunctive
Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief (the "Complaint"),
Defendants—either directly, as controlling persons, or as principals liable for their agents'
misconduct—have engaged, are engaging, or are about to engage in acts and practices that
violate the following provisions of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6k(2), 6m(1), and
6o(1)(A)–(B) of the Act, and 17 C.F.R. §§ 4.20(a)(1), (b)–(c) (2023) (the "Regulations").
Consequently, in accordance with 7 U.S.C. § 13a-1, the Commission moves the Court to enter an
*ex parte* Statutory Restraining Order (the "Proposed SRO") that preserves the status quo by:
(1) freezing Defendants' assets by prohibiting them or any person from withdrawing,
transferring, removing, dissipating, or disposing of any funds, assets, or other property; (2)
prohibiting Defendants from destroying any records; and (3) permitting the CFTC to inspect
Defendants' records, including through authorizing the copying of the records to allow
inspection to occur and requiring Defendants to provide information necessary to locate and
access those records.  Additionally, the Commission seeks the appointment of a temporary
receiver.  The Commission is entitled to this relief because it has made a *prima facie* showing
that the Defendants violated the Act and Regulations and are reasonably likely to violate them
again.

Furthermore, the Commission respectfully moves the Court to schedule a hearing to show
cause as to why a preliminary injunction should not issue against Defendants:  (1) continuing to
freeze Defendants' assets; (2) preventing Defendants from destroying records and books; (3)
permitting the Commission to inspect and copy Defendants' records and requiring Defendants to

provide information necessary to locate and access those records; and (4) prohibiting further violations of the Act and Regulations charged in the Complaint until the conclusion of this case.

The Commission also moves the Court to permit the parties to engage in expedited discovery in advance of the hearing to show cause as to why a preliminary injunction should not issue and to remove the prohibition on discovery set forth in Rule 26(d) prior to the early meeting of counsel required by Rule 26(f).

The present motion and memorandum in support incorporates by reference each factual allegation in the Complaint and is further supported by the sworn statements of the following declarants:

Maura M. Viehmeyer ("Viehmeyer Decl." or "MV Decl."), a futures trading investigator for the Commission, who provides facts regarding Defendants' identity, location, and organization, registration status with the Commission; bank accounts and activity; use of pool funds; and statements Defendants made to customers and prospective customers, which is attached hereto as Exhibit ("Ex.") A.

Declaration of Alejandro Alvarez ("Alvarez Decl."), attached as Exhibit B.  Declaration of Phyillis Auld ("Auld Decl."), attached as Exhibit C.  Declaration of Brian Bottorff ("Bottorff Decl."), attached as Exhibit D.  Declaration of David Chessler ("Chessler Decl."), attached as Exhibit E.  Declaration of Jamil Damji ("Damji Decl."), attached as Exhibit F. Declaration of Anthony Figlia ("Figlia Decl."), attached as Exhibit G.  Declaration of Virgil Gordon ("Gordon Decl."), attached as Exhibit H.  Declaration of Chris Groves ("Groves Decl."), attached as Exhibit I.  Declaration of April Moss ("Moss Decl."), attached as Exhibit J.  Declaration of Mark Prasalowicz ("Prasalowicz Decl."), attached as Exhibit K.  Declaration of David Sillman ("Sillman Decl."), attached as Exhibit L.  Declaration of Amber Silvey ("Silvey Decl."), attached

as Exhibit M.  Declaration of Melissa Taylor ("Taylor Decl."), attached as Exhibit N.

Declaration of Binyon Wright ("Wright Decl."), attached as Exhibit O.

## II.   THE PARTIES

Plaintiff **Commodity Futures Trading Commission** is an independent federal

regulatory agency charged by Congress with the responsibility of administering and enforcing

the provisions of the Act, 7 U.S.C. §§ 1–26, and the Commission's Regulations promulgated

thereunder, 17 C.F.R. pts. 1–190 (2023).

Defendant **Traders Domain FX LTD. d/b/a The Traders Domain ("TD")** is an

International Business Company formed in 2017 under the laws of St. Vincent and the

Grenadines that has its principal operations in Canada.  TD was co-founded by Safranko and

Negus-Romvari who, during the Relevant Period, acted as directors of TD.  TD has never been

registered with the CFTC.  On July 14, 2022, the CFTC issued a press release notifying the

public that TD, among other entities, had been added to its RED List (Registration Deficiency),

and explicitly cautioned U.S. customers against doing business with those entities.

Defendant **Fredirick Teddy Joseph Safranko, a/k/a Ted Safranko,** is a resident of

Ontario or Vancouver, Canada.  During the Relevant Period, Safranko was a co-founder,

director, and CEO of TD.  Safranko referred to himself and was known on various social media

platforms as "Uncle Ted."  Since August 2020, Safranko has been an approved Principal of

SAEG Capital General Management LP ("SAEG").  On January 31, 2023, SAEG and Safranko

were sued by the Commission for making false statement to the National Futures Association

("NFA") in violation of Section 9a(4) of the Act, 7 U.S.C. § 13(a)(4).  On September 5, 2023,

the District Court for the Southern District of Texas entered an order of default judgment against

SAEG and Safranko finding that they violated 7 U.S.C. § 13(a)(4) and imposing relief, including

a permanent injunction, trading and registration bands, and a civil monetary penalty. Safranko has never been registered with the CFTC in any other capacity.

Defendant **David William Negus-Romvari** is a resident of Ontario, Canada and Mexico. During the Relevant Period, Negus-Romvari was a co-founder and director of TD. Since September 2020, Negus-Romvari has been an approved Principal of SAEG Capital General Management LP. Negus-Romvari has never been registered with the CFTC in any other capacity.

Defendant **Ares Global Ltd. d/b/a Trubluefx** is a limited liability company incorporated in Saint Lucia in June 2023. Beginning in June 2023, Trubluefx assumed all business operations of TD, including taking control of customer accounts, communicating with customers, and purportedly trading customer funds. Trubluefx has the same registration address in St. Vincent and the Grenadines that was previously used by TD. Trubluefx has never been registered with the CFTC.

Defendant **Algo Capital LLC** is a limited liability company incorporated in the state of Florida in 2018. It has a business address of Miami, Florida. Algo Capital has never been registered with the CFTC.

Defendant **Algo FX Capital Advisor LLC n/k/a Quant5 Advisor, LLC** is a limited liability company incorporated in the state of Delaware in August 2021. It has a business address of Medley, Florida. In or around September 2022, Algo FX changed its name to Quant5 Advisor, LLC ("Quant5"). Algo FX was registered with the CFTC as a Commodity Pool Operator ("CPO") and a Commodity Trading Advisor ("CTA") from April 20, 2022 to March 24, 2023. During the Relevant Period, Algo Capital and Algo FX shared some of the same employees. The Algo Defendants used both Algo entities interchangeably to solicit customers

for the same commodity pool and deposited pool funds into the same bank accounts held in the name of Algo Capital, which were controlled by Collazo and Herman.

Defendant **Robert Collazo, Jr.** is a resident of Miami Lakes, Florida.  During the Relevant Period, Collazo was the President of Algo Capital and a Manager and owner of Algo FX.  Collazo has never been registered with the CFTC.

Defendant **Juan Jose Herman a/k/a/ JJ Herman** is a resident of Miami, Florida. During the Relevant Period, Herman was the Vice President of Algo Capital and a Manager and owner of Algo FX.  On August 29, 2022, Herman filed an application with NFA to be listed as a Principal for Quant5, but he withdrew that application on November 28, 2022.  Herman has never been registered with the CFTC in any other capacity.

Defendant **John Fortini** is a resident of North Miami, Florida.  During the Relevant Period, Fortini was Vice President and the CFO Portfolio Management of Algo Capital and Algo FX.  Fortini has never been registered with the CFTC.

Defendant **Stephen Likos** is a resident of Sunny Isles Beach, Florida.  During the Relevant Period, Likos was a sales representative for Algo Capital and Algo FX, and he received commissions based on the customers that he solicited for Algo.  Likos has never been registered with the CFTC.

Defendant **Michael Shannon Sims** is a resident of Sunny Isles Beach, Florida.  From January 24, 2020 to April 8, 2023, Sims was an approved Principal of an entity registered with the CFTC as a commodity pool ("CPO") operator and commodity trading advisor.  Sims has never been registered with the CFTC in any other capacity.  On January 31, 2023, the Commission sued Sims for aiding and abetting fraudulent conduct by another defendant in

violation of Section 4b(a)(2) and 4o of the Act, 7 U.S.C. §§ 6b(a)(2) and 6o and Commission Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2023).  This case is on-going.

Defendant **Holton Buggs, Jr.** is a resident of Houston, Texas.  Buggs has never been registered with the CFTC.

Defendant **Centurion Capital Group Inc.** is a company incorporated in the state of Florida in March 2022 with its principal office in Hiahleah Gardens, Florida.  Centurion has never been registered with the CFTC.

Defendant **Alejandro Santiestaban a/k/a Alex Santi** is a resident of Hialeah, Florida.  Santi owns Centurion Holdings LLC ("CH"), a limited liability company incorporated in the state of Delaware.  CH is listed on Centurion's registration documents as its President.  Upon information and belief, CH is a holding company through which Santi controls Centurion.  Santi has never been registered with the CFTC.

Defendant **Gabriel Beltran** is a resident of Hialeah, Florida.  Beltran owns GMJ Marketing LLC ("GMJ"), a limited liability company incorporated in the state of Florida.  GMJ is listed on Centurion's registration documents as its Vice President.  Upon information and belief, GMJ is a holding company through which Beltran controls Centurion.  Beltran has never been registered with the CFTC.

Defendant **Archie Rice** is a resident of Fulshear, Texas.  During the Relevant Period, Rice solicited customers on behalf of and as a representative of Centurion, including on at least one occasion meeting with a prospective customer in-person in Florida.  Rice has never been registered with the CFTC.

### III.    JURISDICTION AND VENUE

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1, provides that the CFTC may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside in, transact, or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District. Venue also properly lies as to the alien defendants pursuant to 28 U.S.C. § 1391(c)(3).

## IV.   STATEMENT OF FACTS

### A. THE TRADERS DOMAIN DEFENDANTS' FRAUDULENT SCHEME

As set forth in detail below, during the Relevant Period, TD and its co-owners Safranko and Negus-Romvari fraudulently solicited customers to deposit money for the purpose of trading XAU/USD, through individual accounts, copy trading accounts, and later participating in the TD Pool by making material misrepresentations and omissions to prospective and actual customers. In addition, TD and its successor in interest, Trubluefx, misappropriated customer funds, TD and Safranko falsified trading records; and the TD Defendants failed to register as required under the Act. Pursuant to this scheme, at least 2,046 customers deposited no less than $283 million for the purpose of participating in the TD Pool. Ex. A, *MV Decl.* ¶ 65.

**a. The TD Defendants Launch an Unregistered Offshore Brokerage and Begin Soliciting Customers**

In October 2017, TD was incorporated in St. Vincent and the Grenadines and, upon information and belief, Safranko and Negus-Romvari appointed themselves directors and sole shareholders. Ex. A, *MV Decl.* ¶¶ 36, 42b. Shortly thereafter, in December 2017, TD teased the launch of its retail brokerage via the Instagram handle @thetradersdomain. *Id.* at ¶ 51a(1). On December 31, 2017, TD announced on Instagram: "****THE TRADERS DOMAIN RETAIL BROKERAGE SITE LAUNCH FRIDAY JANUARY 5TH ****" and posted a video advertising the various features of the brokerage site. *Id.* The video indicated that TD was "Built by Traders for Traders" and boasted a "Renowned and Trusted Broker and Community." *Id.* The post directed people to its website, www.thetradersdomain.com. *Id.*

As early as 2018, the Traders Domain website, www.thetradersdomain.com, highlighted key features of the brokerage, including: "Client segregated accounts," "Reputable payment gateway providers," "Rapid withdrawal and deposits," "Industry Leading Execution," and "Desirable leverage from 1:500." *Id.* at ¶¶ 47, 48. In addition to offering trading accounts through which customers could trade their own funds, since at least January 2020, TD also solicited customers for the purpose of trading XAU/USD, both of which are commodities, and other commodities through investment style accounts that did not require customers to actively trade their own funds. *Id.* at ¶ 48. One type of investment account offered by TD was a "Percentage Allocation Management Model ("PAMM") account—a form of pooled trading whereby the trader executes trades on behalf of all participants and profits are distributed proportionately to all participants based on their share of the pool. *Id.* at ¶¶ 182, 184, 185. TD also advertised "copy trading" services which purportedly allowed customers to automate trading in their account by copying the trades done by a variety of "master traders," including Safranko.

*Id*. at ¶ 184.  During this initial period, TD solicited customers for these PAMM and/or "copy trading" offerings through representations it made on website and social media accounts, which falsely claimed that TD was a "registered and licensed brokerage firm" that did not accept U.S. customers.  *Id*. at ¶¶ 46h, 47.

### b.  The TD Defendants Begin Soliciting for the TD Pool

Upon information and belief, in or around January 2021, TD began to solicit potential customers for the express purpose "subscribing" or participating in the TD Pool—*i.e.* one or more PAMM-style accounts that purported to trade exclusively leveraged or margined XAU/USD and, upon information and belief, were controlled and traded by Safranko.  Ex. A, *MV Decl.* ¶ 185.  The TD Defendants and customers described the TD Pool at various times as the "High-Risk PAMM" or "Gold PAMM" account.  *Id*.  Upon information and belief, TD advertised that the TD Pool generated more than 5,000% in 2021 and 7,000% in 2022.  *Id*.  TD also told customers that they could set a risk limit on their PAMM account to protect against losses to their initial investment and earned profit.  *Id*. ¶ 185*;* Ex. E, *Chesser Decl*. ¶ 8.

### c.  The TD Defendants Recruited "Sponsors" to Expand the Scope of the Fraud

Since its inception, TD offered traders the opportunity to earn "affiliate commissions" and "bonus payments" based upon the monthly volume introduced to the platform through its "Introducing Broker" or "Partner Program."  Ex. A, *MV Decl.* ¶¶ 47, 48, 87.  TD made these commissions and bonus payments to its partners by crediting their TD accounts.  *Id*. at ¶¶ 56, 57, 87, 89.  In December 2021, TD posted about its "Referral Program" on Instagram encouraging users to "Tell A Friend" and "Earn Rebates" from their trading.  *Id*. at ¶ 51a(2).

In or around January 2021, the TD Defendants began to take additional steps to actively recruit new "Partners" or "Sponsors" for the purpose of driving new customers to the TD Pool. *Id*. at ¶ 86.  The TD Defendants recruited individuals and/or entities—many of whom had

established social media followings, MLM networks, or other clientele—to act as sponsors and solicit new U.S. customers for the TD Pool in exchange for a portion of purported trading revenues. Ex. E, *Chessler Decl.* ¶ 5; Ex. F, *Damji Decl.* ¶ 4. TD compensated sponsors for recruiting customers by paying them commissions—sometimes as high as 60 percent of customers' purported trading profits.

For example, in March 2022, Negus-Romvari attended a meeting in Miami, Florida with sponsors and potential sponsors, including representatives of Algo and Centurion. Ex. A, *MV Decl.* ¶ 57. As described further below, following the meeting, Negus-Romvari continued to communicate with Centurion through Santi, Beltran, and Rice for the purpose of encouraging them to solicit customers for the TD Pool. *Id.*

On multiple occasions, including on or around April 11, 2022, Safranko and other representatives of TD held meetings with some or all of the Algo Defendants in or around Miami, Florida. *Id.* at ¶ 56a. Throughout the Relevant Period, Safranko communicated with the Algo Defendants thousands of times by telephone, video conference, text message, and through other messaging apps. *Id.* at ¶¶ 42a, 44g, 56a, 58, 63, 68c, 81, 82, 93, 121, 183, 192, 194a, 194e, 196, 197, 200d.

Safranko also established relationships with other sponsors, including Sims and Buggs. Safranko communicated with Sims and Buggs via telephone and/or messaging applications. *Id.* ¶¶ 56b, 190d. Additionally, on a number of occasions, Safranko participated in telephone and video conferences with potential or existing customers that Buggs was soliciting. On at least one occasion, Safranko traveled with Buggs to Dubai in connection with TD. Like the other Sponsor Defendants, the TD Defendants paid Buggs and Sims commissions based on the customers that they recruited for the TD Pool. *Id.* at ¶ 56, 87, 141, 181.

**d. The TD Defendants Fraudulently Solicited Customers**

During the Relevant Period, the TD Defendants fraudulently solicited prospective

customers to deposit money for the purpose of trading leveraged or margined XAU/USD or other

commodities.  The TD Defendants made numerous fraudulent misrepresentations and omissions

regarding, among other things, (i) its trading operations and (ii) the ability of customers to

withdraw their funds.

> **i.   *The TD Defendants Made Misrepresentations and Omissions Regarding its Trading Operations.***

TD made numerous representations about the trading of customer funds leading

customers to believe that all of the funds they directed to PAMM accounts, "copy trading"

accounts, and/or the TD Pool were being used to trade leveraged or margined XAU/USD.  Ex. A,

*MV. Decl.* at ¶¶ 46-49, 51, 184, 185.  In addition, Negus-Romvari also made misrepresentations

that TD was utilizing a "bot" or "algo" to trade customer funds.  *Id.* at ¶¶ 57a, 57e.

Safranko made fraudulent misrepresentations by telling at least some customers that all

funds deposited for the purpose of participating in the TD Pool would be used to trade leveraged

or margined XAU/USD.  Ex. E, *Chessler Decl.* ¶¶ 5, 7-9.  Safranko made these

misrepresentations while pitching the success of the TD pool to potential customers.  *Id.*

In addition, TD's account setup instructions, account activity provided to customers via a

trading application, daily confirmation statements, and TD newsletters, all led customers to

believe that their funds would be used to trade leveraged or margined XAU/USD using a

PAMM, "copy trading" accounts, and/or the TD Pool.  Ex. A, *MV Decl.* ¶¶ 86, 102, 114, 142-

149, 170, 181, 186, 187, 193c, 194a.  On its website, www.thetradersdomain.com, TD provided

instructions and video tutorials on how to create an account and subscribe to TD's PAMM

account.  *Id.* at ¶12.  One sponsor provided similar instructions in a nine-page document titled

"HOW TO—Become TD Client & Subscribe to Trade Copying Service" the contents of which, on information and belief were provided by TD. *Id*. at ¶¶ 54, 142-147. TD described in detail the steps a customer needed to take in order to participate in the TD Pool—including, creating a TD profile, opening an investment account, setting up a subscription to the Master Account ("MetaTrader 5 High Risk PAMM"), and funding their investment. *Id*. The account setup document describes how "the account can be funded and investment subscribed to trading copy services, to generate generous returns." *Id*. The account setup document further provides the misleading impression that all funds would be traded by warning that "trading can result in the loss of 100% of your capital." *Id*.

If customers deposited funds for the purpose of participating in the PAMM accounts, "copy trading" accounts, or TD Pool (via one of the methods described below in Part IV.A.f.), they were directed to download a trading application (the "Trading App"). *Id*. at ¶¶ 86, 102, 114, 144, 170, 186. Customers could purportedly view and monitor the trading activity in their TD trading account, but they did not have the ability to make trades or withdraw funds. Ex. G, *Figlia Decl.* ¶ 14; Ex. I, *Groves Decl.* ¶ 11; Ex. L, *Silvey Decl*. ¶ 12; Ex. M, *Taylor Decl*. ¶ 14. Through the Trading App customers observed that all of the funds intended for trading were available in their TD Account often within 48 hours of a deposit. Ex. B, *Alvarez Decl.* ¶ 9 (account funded in four hours). For example, one customer wired his funds at TD's direction to a third-party bank account. His TD account showed that it was credited with the full wire balance that same day and began "trading" the following day. Ex. F, *Damji Decl*. ¶¶ 14, 15.

Customers also received daily confirmation trading statements by email and through the Trading App showing the trading activity in their accounts. Ex. A, *MV Decl.* ¶ 181. The daily confirmation statements showed the purported trades that day, and the customer's account

balance less the TD commission.  *Id.*  TD also periodically sent customers a newsletter, updating

customers about issues and plans.  *Id.* at ¶¶ 44g(1), 80, 193c, 193e, 193f, 193g, 193h, 193i, 194a,

194b, 194c, 194d, 194f, 200a, 208a, 213, 220, 229.  In these newsletters and other customer

communications TD created the misleading impression that all customer funds were being traded

and that trade orders were being executed in the market, by warning customers that their funds

were "at full risk anytime during trading" as well as describing its plans to improve order

execution.  *Id.* at ¶ 188.

In addition to misrepresenting that TD was trading all customer funds, TD also made

misleading statements regarding how customer funds were being traded.  For example, in the

Spring and Summer of 2022, Negus-Romvari engaged in numerous conversations with the

Centurion Defendants over text messages and Zoom.  *Id.* at ¶¶ 57, 159.  During those

conversations Negus-Romvari shared a link purporting to show the trading results for "1+ year of

the algo."  *Id.* at ¶ 57e.  Among other things, the results purportedly showed monthly gains of

15% for a "conservative" account, which, Negus Romvari explained, had a "40% lower risk

profile."  *Id.*  Thereafter, the Centurion Defendants solicited funds from customers for the

purpose of trading leveraged or margined XAU/USD using the "bot" or "Algo" Negus-Romvari

had described.  *Id.* at ¶¶ 159, 160, 163, 164.

The statements set out in in the paragraphs above were false.  First, TD did not utilize an

algorithm or "bot" to trade funds in the TD Pool.  Upon information and belief, Safranko was

responsible for manually trading funds in the TD Pool.  *Id.* at ¶¶ 44g(1), 93, 94a, 185, 189d,

189d, 190i; Ex. E, *Chessler Decl.* ¶ 8.  Second, these statements created the misleading

impression that all customer funds were used to trade leveraged or margined XAU/USD.  In fact,

only a fraction, if any, of the funds deposited for the purpose of participating in the TD were actually traded.  Ex. A, *MV Decl.* ¶¶ 73, 78, 83, 99, 150a, 150b, 176, 182.

As set forth in detail below (in Part IV.A.f.), although customers were led to believe that they were funding their TD accounts through a variety of methods, customer funds were diverted and misappropriated in a variety of ways without ever being sent to fund a trading account.

> ### ii.   *The TD Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw Their Funds.*

Beginning in August 2022, TD began to experience "liquidity problems" and was unable to fulfill customer withdrawal requests.  Ex. A, *MV Decl.* ¶ 192.  Rather than provide truthful information to these customers about their funds, the TD Defendants lied to customers about the purported reasons for the delays and offered false assurances that withdrawals would be processed.  *Id.* at ¶¶ 196a, 196b, 196c, 197.  The TD Defendants made these statements via a variety of channels, including email, TD Newsletters, text messages, Telegram, on videoconferences, and in-person.  *Id.* at ¶¶ 193c, 193d, 193e, 193f, 193g, 193h, 193i, 194a, 194b, 194c,194d, 194e, 194f, 194; Ex. G, *Figlia Declaration* ¶ 19; Ex. L, *Sillman Decl.* ¶ 28.  In fact, upon information and belief, the TD Defendants lacked the funds to repay their customers, because customer funds had been misappropriated and not traded as purported, and the scheme was on the brink of collapse.

For example, on August 4, 2022, Negus-Romvari advised the Centurion Defendants that they were "requesting many withdrawals consitently [sic]" and as a result they would be "processed in a queue" and could take "20 days to a month to process."  Ex. A, *MV Decl.* ¶ 194e.  Negus-Romvari explained that the TD Pool was "not an ATM" and that it was normal in the "highest level of finance" for "[h]edge funds . . . the best ones" to "lock funds including profits for months/sometimes years."  *Id.*  On August 31, 2022, TD announced an "adjustment in [the

withdrawal] timelines" to all of its customer in the first edition of the "TD Newsletter." *Id*. at

¶¶193c, 200a. The Newsletter stated: "Currently, we are working to have all withdrawals

completed **within 20 business days**," (emphasis added) explaining that all withdrawals must "go

through a screening process that includes our compliance area where we must review the entire

trade history." *Id*. at ¶ 193c. TD also advised some customers and sponsors that, in or around

August 2022, TD had lost its banking relationships as a result of customers submitting

withdrawal requests with incorrect wire information. *Id*. at ¶ 194f; Ex. E, *Chessler Decl*. ¶ 13;

Ex. L, *Sillman Decl*. ¶ 16.

These statements were false. The withdrawal delays were not caused by TD's

compliance screening process or the loss of its screening process. Rather, TD was unable to

fulfill customer withdrawals because, upon information and belief, its scheme was on the brink

of collapse. Nor did TD process pending delays within 20 days or a month as promised.

Customers continue to be unable to withdrawal their funds more than two years after the timeline

adjustment was announced. Ex. A, *MV Decl*. ¶¶ 207, 212, 219, 228, 232.

In or around October 2022, after announcing that TD had established a new banking

relationship, TD introduced a cryptocurrency payment processing firm based in Utah ("Crypto

Payment Processing Firm") to act as the interface between the bank and TD customers for the

purpose of handling wire transfer, ACH, and certain cryptocurrency withdrawals. *Id*. at ¶¶ 80,

81. TD told customers that the Crypto Payment Processing Firm would allow TD to "expand our

processing capabilities" and provide payments "faster than our current 20 business day period."

*Id*. at ¶ 193e. These statements were also false. Crypto Payment Processing Firm did not fix any

of the withdrawal issues which were the result of the fact that TD had misappropriated customer

funds and did not trade them as purported. *Id*. at ¶¶ 188, 207, 212, 219, 228, 232. Upon

information and belief, the majority of TD customers were unable to withdraw their customer funds from their accounts via Crypto Payment Processing Firm.

On December 11, 2022, TD sent another edition of its "Newsletter" titled "2022 Wrap Up" to its customer base. *Id*. at ¶ 194a. TD set forth yet another new timeframe for purported withdrawals specifically for customers participating in the TD Pool. *Id*. at ¶ 193f. TD stated that "All clients who use the High-Risk PAMM section will now be restricted in terms of withdrawal processing to **1 withdrawal per 45 business days and the withdrawal will be processed within this time frame. The longest the withdrawal will take with this policy will be 45 business days.**" (emphasis added). *Id*.

As the withdrawal timeframes continued to change, so did the excuses. During a December 2022 video conference, Safranko told Santi and certain customers that customer withdrawals were being held up by banking issues. *Id*. at ¶¶ 196, 196c; Ex. G, *Figlia Decl.* ¶ 19; Ex. I, *Groves Decl.* ¶ 19. *See also* Ex. E, *Chessler Decl.* at ¶ 13. Nevertheless, Safranko promised that their pending withdrawals would be fulfilled by January 31, 2023. Ex. A, *MV Decl.* ¶ 196a; Ex. I, *Groves Decl.* ¶ 19.

In or around December 29, 2022, TD posted an "Update" on the Dashboard of the Trading App:

> Seasons greetings to all of The Traders Domain Clients. We are pleased to announce that we have updated our banking channels so we are able to move funds quicker and outstanding transactions will be cleared shortly. We appreciate the patience and apologize for the delay. Please also note that the timelines that were provided in the newsletter are just temporary until we stress test our current banking vehicles.

*Id*. at ¶ 194a.

Safranko also held multiple video and in-person meetings with customers where he made misstatements and provided additional false assurances that withdrawals would be paid

imminently. Ex. E, *Chessler Decl.* ¶ 13.  For example, on or around January 9, 2023, Safranko

held a video meeting with a number of customers. Ex. L, *Sillman Decl.* ¶ 30.  During this

meeting, Safranko showed the customers documents that he claimed proved that TD was a

legitimate business and had funds to repay all outstanding withdrawals.  *Id.*  These documents

included a December 8, 2022 letter from a Financial Services Company based in UAE

purporting to hold $150 million for TD and an August 24, 2022 "audit report" from a Mexican

accounting firm purporting to show that TD had net revenue of $500 million in 2022.  *Id.*

Shortly thereafter, on or around January 19, 2023, Safranko held an in-person meeting in

Vancouver, British Columbia with two customers.  *Id.*  During the meeting, Safranko showed

additional documents that purportedly showed that TD had the funds to repay all outstanding

withdrawals.  *Id.*  However, when these customers asked Safranko to log in to certain accounts to

demonstrate proof of funds, he refused to do so.  *Id.*  Safranko promised to provide additional

documents and proof in a follow-up meeting, but that meeting never materialized.  *Id.*  Safranko

eventually ceased all communication with these customers without providing the additional

documents and proof.  *Id.*; Ex. E, *Chessler Decl.* ¶ 13.

Throughout late winter and spring 2023, TD continued to communicate with customers

about delays in withdrawals.  On February 6, 2023, TD sent another Newsletter to clients stating

that "there continues to be improvement on distributions and timing." Ex. A, *MV Decl.* ¶ 193g.

The Newsletter blamed the delays on the rapid growth of the High-Risk PAMM account:  "In the

span of 6 months, Traders Domain has grown by 30%" specifically "in the High Risk PAMM

section" and the " the additional users . . . created strain on our processing system."  *Id.* at

¶ 194d.

Despite these significant withdrawal delays, as recently as March 2023—more than seven months after TD's purported liquidity problems started—TD's website still promised customers that they could access their funds via "Fast Withdrawals." *Id*. at ¶ 48. These statements were also false. Upon information and believe, the withdrawal delays were not caused by strain on TD's processing system cause or the need to "stress test" TD's compliance screening process. Rather, TD was unable to fulfill customer withdrawals because its scheme was on the brink of collapse. Contrary to Safranko's assurances, TD did not have the funds to pay all pending withdrawal requests. Nor were the increased withdrawal timelines "temporary." *Id*. at ¶ 194a. TD did not meet the updated 45-day withdrawal timeline or comply with any of the other promised deadlines. *Id*. at ¶ 193f. Customers continue to be unable to withdrawal their funds more than two years after the timeline adjustment was announced. *Id*. at ¶¶ 207, 212, 219, 228, 232..

On March 21, 2023, TD announced in a newsletter that TD was allegedly being acquired, but that "**WITHDRAWALS WILL CONTINUE TO PROCESS**." *Id*. at ¶ 193h. TD explained that "This acquisition allows for more choice for processing and banking which allows for faster transaction both in and out of the brokerage."

On June 13, 2023, TD sent its "Final Newsletter" which stated that the transition to the new platform would be completed that week and any future communications would be from the "new brokerage platform." Ex. A, *MV Decl*. ¶ 193i. TD assured its clients that pool funds would be transferred to the new brokerage:

> In terms of the PAMM system, you all were subscribed to, you will have access to that feature once again to move funds out of your investment account for withdrawals. The subscription feature will be automatically enabled. If you do not wish to have your account subscribed, you will have 48 hours to unsubscribe

your account, so your funds are no longer being traded by the
master trader.

*Id.* at ¶ 228.  The Final Newsletter also assured clients that, despite the transition

to the new platform, withdrawals would continue to be processed:

> **WITHDRAWALS**
> You will see a much more organized and smooth flow of
> withdrawals go out with the new platform due to their strong
> payment processing solutions in place.  Please DO NOT message
> the support inbox constantly with your order number, we will
> have all this data migrated over and are fully aware of each and
> everyone one of your withdrawals.  There is no sugar coating it,
> there are many withdrawals to tend to, and they will get to them
> as fast as possible, but this will not be an overnight fix.  We do
> not have an exact timeframe on when all backlog will clear the
> moment [sic], please be patient while we diligently work to clean
> up this mess.

*Id.* at ¶ 193i.

These statements were also false.  Despite TD's assurances that the acquisition would

lead to "faster transaction[s]" and an "organized and smooth flow of withdrawals," hundreds, if

not thousands of customers have been unable to withdraw their funds more than a year after the

transition to Trubluefx.  *Id.* at ¶¶ 207, 212, 219, 228, 232.  Despite Trubluefx representing that it

was holding TD customer accounts in full, upon information and belief, TrublueFx lacks the

funds to repay customers, because the funds were misappropriated and not traded as purported.

*Id.* at ¶¶ 230, 231, 232.

**e.  The TD Defendants Falsified Trading Records**

To conceal the fraud, TD and Safranko falsified trading records.  As discussed above,

once a customer opened an account with TD (either directly or as described below, through a

sponsor), they were directed to download the Trading App.  *Id.* at ¶¶ 102, 114, 144, 170, 186;

Ex. E, *Chessler Decl.* ¶ 10.  The Trading App enabled customers to actively monitor the trading

activity in their TD trading account.  Ex. A, *MV Decl.* ¶ 181.  In addition, TD sent daily

confirmation statements via email to customers (or in some instances, to their sponsors) showing,

among other things, the trading activity, margin, and account balance for the account.  Ex. C,

*Auld Decl.* ¶¶ 13, 15.

Throughout the Relevant Period, customers observed through the Trading App and in

their daily confirmation statements trading results that were nearly always positive.  In order to

achieve these remarkable gains, TD manipulated trade data to "disappear" purported trading

losses.  Ex. A, *MV Decl.* ¶¶ 190a, 190d, 190f.  Although the trading activity customers observed

through the Trading App was nearly always positive, on a number of occasions customers

observed temporary large losses in their accounts.  Ex. B, *Alvarez Decl.* ¶ 10; Ex. C, *Auld Decl.*

¶ 21; Ex. D, *Bottorff Decl.* ¶ 21; Ex. E, *Chessler Decl.* ¶ 11; Ex. F, *Damji Decl.* ¶ 19; Ex. I,

*Groves Decl.* ¶ 17; Ex. K, *Prasalowicz Decl.* ¶ 17.  When those customers raised concerns with

TD (either directly or through their sponsors), the TD Defendants would respond (either directly

or through a sponsor) that the losses were the result of "slippage" or "system errors" and assured

customers that the losses would be reversed.  Ex. B, *Alvarez Decl.* ¶ 10; Ex. E, *Chessler Decl.*

¶ 11; Ex. F, *Damji Decl.* ¶ 19.  TD informed at least one customer that TD had a had a "standing

agreement" with its "Liquidity Provider who is our counterparty" to reverse within 24 to 48

hours any losing trades caused by slippage.. Ex. A, *MV Decl.* ¶ 189.

TD's explanations for the trading loss reversals were false.  For example, on October 12,

2022, one customer observed nearly a 52% loss in his account.  Ex. L, *Sillman Decl.* ¶ 19.

Within a few hours TD had adjusted the account to reflect only a very small loss for the day.  *Id.*

However, the customer observed that the trades were adjusted by TD **to prices where the**

**market was not trading at those times on those days**.  *Id.*  The customer documented the

irregularities by taking screenshots of the Trading App and sought an explanation from TD.  *Id.*

TD responded that the adjustments were caused by technical issues, including the alleged

difference between the aggregator pricing and what the Trading App software could handle.  *Id.*

at ¶ 20.  When the customer further pressed TD to explain how trades were being adjusted hours

after they were executed to prices not reflective of the market, TD again referenced technical

issues but did not respond to the customer's specific questions.  *Id.*

    **f.   The TD Defendants Misappropriated Customer Funds**

        Rather than accept funds in the name of the TD Pool, the TD Defendants instead directed

customers to deposit funds through a variety of means including via:  (1) wire transfer into bank

accounts held in the names of various third parties but controlled by TD (Ex. A, *MV Decl.* ¶¶ 99,

126,147, 154, 173, 176); (2) via various payment processors contracted by TD, who acted at the

direction of TD; (*Id.* at ¶¶ 80, 81, 105, 126, 154, 173), and (3) crypto currency wallets, which, on

information and belief, were controlled by TD (*Id.* at ¶¶ 48, 54,66b, 81, 83, 147, 169, 173, 181).

        For example, during the Relevant Period, TD directly and as discussed further below,

through the Sponsor Defendants, caused no less than $180 million in customer funds to be

deposited into bank accounts held in the name of various third-party entities that TD controlled

through a TD agent who was the signatory on these accounts.  *Id.* at ¶ 65.   None of these third-

party entities were firms that engaged in trading.  None of the funds deposited in these third-

party bank accounts were ever sent to TD or any other firm that engaged in trading.  *Id.* at ¶ 188.

Instead, TD directed its agent to use customer funds deposited into the third-party bank accounts

to make payments unrelated to trading and to make Ponzi-style payments to other customers.  *Id.*

at ¶¶ 73, 73b, 73c, 73d, 74, 75, 76, 78, 83, 84, 85, 98, 99, 99a, 99b, 100, 116, 147, 148, 150, 173,

176, 176a, 176b, 177.

Indeed, Safranko admitted that TD made Ponzi-style payments by using new customer deposits to fund pending withdrawals for other customers.  In a video conference that occurred in or around November 2022, Safranko stated that "transfers coming in" can be used to "exit [] people out with that deposit."  *Id.* at ¶ 183.  Similarly, in a call with customers in or around August 2022, Safranko said that TD does a lot of "ledger transactions" and "instead of moving money from our liquidity pool, we just do a simple accounting" by using new customer deposits to pay withdraw requests for different customers.  *Id.*

During the Relevant Period, TD also accepted deposits from customers via various payment processing firms that accepted credit and debit card transactions.  *Id.* at ¶¶ 80, 81, 105, 126, 154, 173.  Beginning in at least 2019, Traders Domain engaged a payment processing firm ("Payment Processing Firm") based in Utah to accept credit and debit card deposits from U.S. customers through TD's website.  *Id.* at ¶¶ 17, 63, 65, 69, 70.  During the Relevant Period, Payment Processing Firm accepted at least $19 million in customers, deposits for TD.

None of the funds accepted by Payment Processing Firm were ever sent to TD or to any other entity engaged in trading.  *Id.* at ¶ 78.  Instead, TD directed Payment Processing Firm to use customer funds to pay expenses unrelated to trading and to make Ponzi-style payments to other customers.  *Id.* at ¶¶ 74, 75, 76, 78.

In addition, TD also accepted deposits via cryptocurrency directly and, after October 2022, via Crypto Payment Processor, which accepted at least $16 million in customer deposits for TD.  *Id.* at ¶¶ 48, 54, 66b, 81, 83, 147, 169, 173, 181.  Upon information and belief, millions of dollars in customer funds were accepted through these crypto channels and never returned despite withdrawal and liquidation requests.  *Id.* at ¶ 66b.

As a result of the TD Defendants' misappropriation, upon information and belief, the majority of TD customers have been unable to withdraw funds deposited with TD for the purpose of trading leveraged or margined XAU/USD. *Id.* at ¶¶ 207, 212, 219, 228, 232; Ex. B, *Alvarez Decl.* ¶¶ 20, 21; Ex. C, *Auld Decl.* ¶¶ 25, 26; Ex. D, *Bottorff Decl.* ¶¶ 32, 33; Ex. E, *Chessler Decl.* ¶¶ 14, 15; Ex. F, *Damji Decl.* ¶¶ 22, 25; Ex. G, *Figlia Decl.* ¶¶ 22, 23; Ex. H, *Gordon Decl.* ¶¶ 19, 20; Ex. K, *Prasalowicz Decl.* ¶¶ 25, 26; Ex. M, *Silvey Decl.* ¶¶ 30, 31; Ex. N, *Taylor Decl.* ¶¶ 20, 21. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures.

### g. TruBluefx Misappropriated Customer Funds

Trubluefx misappropriated customer funds that were "migrated" to its platform following a purported acquisition by refusing to return those funds despite repeated withdrawal and liquidation requests.

On July 19, 2023, TD customers received an email welcoming them to Trubluefx. Ex. A, *MV Decl.* ¶ 230. The welcome email provided instructions on how customers could access their "migrated" accounts. *Id.* Trubluefx also assured customers that it was "fully aware" of all "current pending withdrawals" and promised to provide "more clarity" on an "exact timeline" for the resumption of withdrawals in future emails. *Id.* The welcome email directed customers to visit the website for www.Trubluefx.com, which indicates in the "About Us" page that Trubluefx is operated by Ares Global Ltd. *Id.*

Trubluefx continued to assure customers that withdrawals would eventually be processed. *Id.* at ¶ 231. On October 20, 2023—*more than a year* after customers began experiencing withdrawal issues—Trubluefx continued to tell clients that withdrawals would resume and blamed broader economic conditions for the delays:

> Withdrawals: We have made progress getting to a complete
> resolution on this matter but we still have many steps to complete.
> This is a long process due to the current economic and banking
> situation. As you can see we are truly working on this situation to
> get resolved. Trading has graciously started and our team is working
> around the clock to get additional tasks completed. Please give us
> time while we navigate. Upon full functionality we will notify you
> via email. *Id.*

Despite purporting to hold TD customer funds and receiving repeated withdrawal

requests, to date thousands of customers have been unable to withdraw their funds from

Trubluefx. *Id.* at ¶ 232.

### h. The TD Defendants Failed to Register with the CFTC

As described above, during the Relevant Period, TD was acting as an unregistered CPO

by soliciting funds from individuals, including U.S. customers, for a commodity pool for the

purpose of trading leveraged or margined XAU/USD.

Although TD's website claimed that TD did not "accept applications from residents of

the U.S.," among other countries, TD actively solicited and accepted funds from U.S. customers,

including through sponsors. Ex. A, *MV Decl.* ¶¶ 46h, 47e, 52, 53, 53d, 54, 95. For example, the

TD and sponsors directed U.S. customers to select "CRYPTO" as their country of origin (instead

of USA, which was not listed as an option) when creating a TD account. *Id.* at ¶¶ 54, 143; Ex. E,

*Chessler Decl.* ¶ 10.

TD used telephone, emails, wire transfers, internet and other means or instrumentalities

of interstate commerce to solicit, accept and receive customer funds for the purposes of trading

XAU/USD. Ex. A, *MV Decl.* ¶¶ 44g, 56a, 56b, 56c, 80, 193c, 193f, 193g, 193i, 196, 197.

TD was never registered as a CPO and was not exempt or excluded from registration as a

CPO. *Id.* at ¶ 35a. During the Relevant Period, Safranko and Negus-Romvari were acting as

unregistered APs of a CPO, TD, by soliciting customers to participate in the TD Pool while

associated with TD as a partner, officer, employee, or similar agent.  *Id.* at ¶¶ 42a, 43, 44a, 44b, 44g, 44h, 44i, 56, 57.  Neither Safranko nor Negus-Romvari were ever registered as an AP of TD.  *Id.* at ¶¶ 36b, 36c.

    **i.  Safranko and Negus-Romvari are Controlling Persons of TD**

    Safranko and Negus-Romvari are controlling persons of TD.  Safranko and Negus-Romvari incorporated and registered TD in Saint Vincent and the Grenadines in 2017 as co-owners.  Ex. A, *MV Decl.* ¶¶ 36a, 42a.  In addition, upon information and belief, Safranko opened bank accounts in the name of TD, and both Safranko and Negus-Romvari paid invoices on behalf of TD from their personal accounts throughout the Relevant Period.  *Id.* at ¶ 44a.

    Although Safranko and Negus-Romvari later took steps to hide their role with TD, they were still firmly in control of TD operations throughout the Relevant Period.  Beginning in or around May 2019, Safranko and Negus-Romvari took steps to conceal Negus-Romvari's role with TD.  *Id.* at ¶¶ 42a, 44b.  Upon information and belief, Safranko and Negus-Romvari removed Negus-Romvari as a Director and re-issued all of TD's shares to Safranko.  *Id.*

    Upon information and belief, in or around January 2020, Safranko also "resigned" on paper as a Director and cancelled his shares.  *Id.* at ¶ 44b.  Three years later, on January 18, 2023, despite Safranko's previous resignation, TD sent its customers an email notifying them that Safranko was purportedly no longer the director or CEO but assured customers of his continued involvement with the business:

> With this communication we would like to update you on leadership changes at The Traders Domain.  Effective, immediately, Ted Safranko will step down as CEO and Director of Traders Domain.
>
> Please be noted this is not a short term decision, [W]e have enrolled a new director and CEO in the name of [REDACTED] back in January 2020 and we have taken the time since to hand

over the processes and responsibilities to streamline the business
and guarantee business continuity.

Ted Safranko is—and will remain to be available as a trusted
advisor to the business and be in communication with our clients
and community as we address and resolve the current withdrawal
delays and customer support scale up. *Id.* at ¶ 44c.

Even after being removed as a co-owner on paper, Negus-Romvari continued to control

the day-to-day operations of TD, including by executing contracts on behalf of TD, travelling to

meetings on behalf of TD for the purpose of recruiting sponsors, communicating with sponsors,

and paying invoices on behalf of TD. Ex. A, *MV Decl.* ¶¶ 44a, 44f, 44i, 53c, 57.

Similarly, after "resigning" as director January 2020, Safranko continued to identify

himself in email as the CEO of TD and represented himself as the owner of TD to Sponsors and

customers in various virtual and electronic meetings that took place in 2022 and 2023. *Id.* at

¶¶ 44c, 44h; Ex. E, *Chessler Decl.* ¶ 8; Ex. I, *Groves Decl.* ¶ 19. Safranko also moderated the

Traders Domain Official Community Chat on Telegram and used this forum to communicate

numerous time a week with more than 3,800 TD customers on topics including the status of

customer withdrawals, the purported reasons for payment delays, TD's liquidity, and the alleged

acquisition of TD by another brokerage. Ex. A, *MV Decl.* ¶¶ 44g(1), 55; Ex. J, *Moss Decl.* ¶ 17;

Ex. M, *Silvey Decl.* ¶ 22.

## B. THE ALGO DEFENDANTS' FRAUDULENT SCHEME

Beginning in at least October 2021 through the present (the "Relevant Algo Period"),

Algo, that is Algo Capital and Algo FX, now known as Quant5 Advisor, LLC, by and through

their officers, employees, and agents  and Robert Collazo, Jr., Juan Herman, John Fortini, and

Stephen Likos (previously defined as the "Algo Defendants") fraudulently solicited customers

for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Algo

(the "Algo Pool") by making material misrepresentations and omissions to prospective and actual customers. In fact, Algo was using customer funds to participate in the TD Pool despite the fact that Algo knew or should have known that TD was not trading customer funds as it purported (*see* below at Part IV.B.c). In addition, the Algo Defendants misappropriated and commingled customer funds and/or failed to register as required under the Act. In addition, the Algo Defendants misappropriated and commingled customer funds and/or failed to register as required under the Act. Pursuant to this scheme, at least 242 Algo customers deposited no less than $39 million for the purposes of participating in the Algo Pool. Ex. A., *MV Decl.* ¶ 105.

### a. Algo Began Soliciting for the TD Pool

Algo first became involved with TD in 2019 when they were shopping for a brokerage on which Algo could trade its own customer funds manually or using its own algorithm. Ex. A., *MV Decl.* ¶ 93. Safranko participated in numerous teleconferences and in-person meetings in or around Miami, Florida with Collazo, Herman, and/or Fortini, including to discuss how Algo Capital could collect commissions based on the trading of customer funds at TD. *Id.* at ¶ 56a. Algo began using TD as a brokerage in 2019 and continued to work closely and communicate with Safranko throughout the Relevant Algo Period.

In or around October 2021, after suffering large trading losses, Algo advised its customers that it was switching to a "XAU/USD strategy." *Id.* at ¶ 93. Thereafter, Algo stopped engaging in its own proprietary trading of customer funds and instead used those funds to participate in the TD Pool, while misrepresenting and/or failing to disclose this fact to actual and prospective customers. *Id.*

### b. The Algo Defendants Fraudulently Solicited Customers

During the Relevant Algo Period, the Algo Defendants fraudulently solicited prospective customers—through in-person meetings, text messages, messaging apps, telephone calls, emails,

and websites—to deposit money for the purpose of trading leveraged or margined XAU/USD.

The Algo Defendants made numerous fraudulent misrepresentations and omissions regarding:

(i) the operation of the trading business; (ii) the location of customer funds; (iii) TD's addition to

the CFTC RED List; and (iv) the ability of customers to withdraw their funds.  On information

and belief, some, if not all of the Algo customers are not ECPs. Ex. A., *MV Decl.* ¶ 108.

> **i.**   ***The Algo Defendants Made Misrepresentations and Omissions Regarding the Operation of the Trading Business***

During the Relevant Algo Period, the Algo Defendants made fraudulent

misrepresentations and omissions about how customer funds were traded.

Some or all of the Algo Defendants made these false and misleading statements to

prospective customers on telephone calls, in text messages, and during in-person meetings.  For

example, during phone calls and in text messages, Fortini falsely told numerous prospective

customers that Algo was trading customer funds using its own proprietary trading algorithm.  Ex.

D, *Bottorff Decl.* ¶ 7; Ex. K, *Prasalowicz Decl.* ¶ 6; Ex. N, *Taylor Decl.* ¶ 6.  Likos similarly told

at least one prospective customer that Algo used its proprietary algorithm to trade, and he

claimed that the algorithm never had a losing month and usually generated monthly returns of

around twenty percent.  Ex. M, *Silvey Decl.* ¶ 5.

The Algo Defendants also made false statements about the trading operation in written

customer agreements.  The Algo Defendants sent these written agreements to customers

electronically through Algo's DocuSign account that was used by Collazo, Fortini, and Likos,

and through an Algo Support email account (support@algocapitalfx.com) used by the Algo

Defendants.  Ex. A, *MV Decl.* ¶ 94.  These agreements were signed by Fortini on behalf of Algo

Capital or Algo FX, and upon information and belief were approved by Collazo and Herman.  *Id.*

at ¶¶ 92, 94a-c.  In communications with other Algo Defendants, Collazo stated that he received

copies of every customer agreement. *Id.* at ¶ 92. The Algo FX customer agreements stated that all customer communications should be directed to either Collazo or Fortini, in their capacity as "Manager." *Id.* For example, in one version of its customer agreement, titled "Software As A Service Agreement," Algo provided a license to use its "proprietary algorithmic trading software" in exchange for 15% to 50% of the customer's trading profits. *Id.* at ¶ 94a. This version also stated that the "algorithmic trading program" would occur in a "hosted environment provided and maintained by [Algo]." *Id.* Another version of the customer agreement, titled "Investment Management Agreement" or "Separately Managed Account Agreement," misleadingly stated that Algo would "buy, sell, exchange, convert and otherwise invest or trade" customer funds using its "gold intra-day trading strategy" and future investments may include other "algorithmic FX strategies," in exchange for 25% to 50% of the customer's trading profits. *Id.* at ¶¶ 94b-c.

These statements were false. Beginning in at least October 2021 (*i.e.*, the beginning of the Relevant Algo Period), Algo stopped using its own proprietary algorithm to trade customer funds. *Id.* at ¶ 93. The Algo Defendants' internal communications, emails, and text messages acknowledged that, from at least October 2021 forward, Algo stopped using its own trading algorithm and instead purportedly directed customer funds to the TD Pool, which was supposedly being traded by Safranko. *Id.* at ¶ 94a. During a December 19, 2023, deposition in a creditor proceeding involving Algo Capital, a representative of Algo Capital testified that Algo stopped using its proprietary trading algorithm in October 2021, and thereafter Safranko purportedly traded funds for Algo. *Id.* Moreover, Safranko acknowledged Algo's false claims when he wrote the following to Herman and Fortini on January 29, 2023: "[I] wish you guys had told them you weren[']t trading cause that is causing a lot of headache [sic][.] [E]veryone is

asking why Algo cap claimed they had algos then 'ted' was trading[.]  [T]hat is the big issue[.]"
*Id.* at ¶ 93.

Moreover, the Algo Defendants failed to disclose to prospective and current customers
that Safranko, rather than Algo personnel or an Algo algorithm, was trading customer funds.  For
example, beginning in October 2021, Algo began having customers sign a "Rider" agreement
that purportedly advised customers of its new trading strategy.  *Id.* at ¶ 94a.  Like the other
customer agreements, the Rider was sent to customers through Algo's DocuSign account used by
Collazo, Fortini, and Likos, and through the Algo Support email account used by the Algo
Defendants.  The Rider did not disclose that Algo was no longer using its own trading algorithm,
it failed to identify TD or Safranko, and did not state that Safranko, or anyone other than Algo,
would be trading customer funds.  *Id.*

Throughout the Relevant Algo Period, numerous customers were deceived by these
fraudulent misrepresentations and omissions, including a customer who wrote the following
message to the Algo Defendants in February 2023, after the withdrawal problems started and
Algo began revealing information about TD:  "For the record, please know I invested my money
with Algo Capital, not Traders Domain.  I was told that Algo was a trading software, but it
appears that Ted from Traders Domain was facilitating all trades, not Algo's software."  *Id.* at
¶ 101d.

### ii.  *The Algo Defendants Made Misrepresentations and Omissions Regarding the Location of Customer Funds*

Not only did the Algo Defendants mislead customers about who would be doing the
trading, they also made fraudulent misrepresentations and omissions about where customer
money was being held.

Rather than send customer money to TD to trade, as further described below, the Algo Defendants directed customers to deposit funds into bank accounts owned and controlled by Collazo and Herman. Ex. A, *MV Decl.* ¶ 4e. The Algo Defendants never sent funds from these bank accounts to TD or any other brokerage or trading firm. Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not further transferred to any brokerage or trading firm. Other times, Algo retained the customer funds in its bank account but claims to have engaged in some ledger maneuvers that purportedly funded Algo customer accounts to some degree at TD.

Nevertheless, the Algo Defendants, both in its written agreements and orally, misled customers about where their funds were being held and failed to inform customers about Algo's arrangement with TD, or that funds would be transferred to third party entities that were not trading firms. For example, during telephone conversations with prospective customers Fortini and Likos led customers to believe that their funds were being held by Algo, and they did not disclose Algo's purported arrangement with TD. Ex. K, *Prasalowicz Decl.* ¶ 7; Ex. N, *Taylor Decl.* ¶ 6; Ex. M, *Silvey Decl.* ¶ 6. As part of Algo's solicitation, the Algo Defendants sent prospective customers a "New Client Information" form that welcomed them to "the ALGO Family" and provided them the opportunity to participate in Algo's "exclusive fund." Ex. A, *MV Decl.* ¶ 97.

Indeed, numerous customers were shocked to learn that the Algo Defendants purportedly directed their funds to TD without their knowledge or authorization, including but not limited to those who wrote the following messages to the Algo Defendants:

- "'The Broker' is not mentioned anywhere in my 7-page contract that I signed with Algo Capital. It was to my utmost surprise to find out that Algo was not in possession of my funds." *Id.* at ¶ 101b.

- "My Debt is with Algo Capital, I have been dealing with Algo Capital Staff including [salesperson T.R.] & John Fortini CEO. I visited the offices of . . . Algo Capital, before I made my decision to invest after being invited by [salesperson T.R.]. My Money was paid to Algo Capital Group[.] . . . My money owned [sic] is not from Traders Domain, I have had no dealing with them what so ever." *Id.* at ¶ 101a.

- "I did not invest my money with TD nor did I agree to use them as a brokerage, I invested it with Algo. I was initially told that Algo was a trading software, which in fact it appears that Ted from TD was facilitating all the trades, not the software." *Id.* ¶ 101c.

- "I have no idea who Traders Domain or Ted Safranko are, but I have a contract with Algo Capital where I deposited money to be invested, and then requested the withdrawal of those funds last year." *Id.* at ¶ 101e.

### iii.   *The Algo Defendants Failed to Disclose That TD Was Placed on the RED List*

The Algo Defendants failed to disclose to actual customers and prospective customers who were solicited after July 14, 2022, that the CFTC had explicitly cautioned U.S. customers against doing business with TD by placing it on the CFTC's RED (Registration Deficiency) List.

The Algo Defendants learned in July or August 2022 that TD was added to the CFTC's RED List. Ex. A, *MV Decl.* ¶ 198.  In early August 2022, Fortini sent Herman a text message with a link to the CFTC's webpage listing TD on the RED List as of July 14, 2022, and stated: "Ummm don't think that's good[.]  Don't say anything call u in 5." *Id.* at ¶ 198a.  On December 13, 2022, Fortini sent a message to Likos acknowledging that the Algo Defendants learned of TD's addition to the RED List in July or August of 2022:  "Any broker who takes us clients is supsoed [sic] to register with cftc /nfa thags [sic] what the red list is . . . Our attorney sent us that end of July / august." *Id.* at ¶ 198c.  In another message between Collazo, Fortini, and Likos on December 13, 2022, Likos sent a link to the CFTC's RED List from July 14, 2022, which included TD, and Fortini responded, "We def spoke about this in july." *Id.* at ¶ 198b.

Despite knowing about and understanding the significance of the CFTC's warnings about TD, the Algo Defendants did not disclose this material information to prospective and current customers.  For example, during telephone calls with prospective customers that occurred after

they learned of TD's addition to the RED List in July 2022, Fortini and Likos solicited customers without disclosing that Algo was using an unregistered, offshore brokerage that had been flagged on CFTC's RED List, which warned customers to "exercise extreme caution" and "watch for the RED flags of fraud." Ex. N, *Taylor Decl.* ¶ 7; Ex. M, *Silvey Decl.* ¶ 6. The Algo Defendants did not send out a communication to their existing customers notifying them of TD's addition to the RED List. Nor did the Algo Defendants update their written solicitations, including the customer agreements, to disclose this information to prospective customers. As one customer explained in a March 16, 2023 email to the Algo Defendants: "There is also the matter of the CFTC red listing in July 2022, this was not communicated to myself and had I have known I would have chosen to mitigate my risk." Ex. A, *MV Decl.* ¶ 198.

### iv.   *The Algo Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds*

The Algo Defendants made fraudulent misrepresentations and omissions to customers about withdrawals including: (i) misleading customers to believe that Algo had control of their funds, (ii) making false and inconsistent statements about the timing of withdrawals, (iii) providing false assurances about the security of funds and the reasons for delays, and (iv) soliciting new customers without disclosing the significant withdrawal problems. These misrepresentations and omissions allowed the scheme to proceed for months after it initially began to unravel.

The Algo Defendants misled customers to believe that Algo had control of their money by requiring customers to submit all withdrawal requests directly to Algo through a "Withdraw Request Form." Ex. A, *MV Decl.* ¶ 199. Algo, in turn, submitted corresponding withdrawal requests to TD without copying its customers. *Id.* As a result of this arrangement, Algo knew

exactly how many of its customers were attempting to withdraw funds and how long those customers were waiting on withdrawals. *Id.*

Because the Algo Defendants directed customers to deposit funds into bank accounts controlled by Collazo and Herman and never sent those funds to TD, they should have been able to repay customers who made these withdrawal requests to Algo. However, the Algo Defendants lacked the funds to repay their customers because they misappropriated customer funds for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments, as detailed below.

Beginning in or around August 2022, TD began experiencing significant delays in its ability to pay withdrawals, including to Algo's customers. *Id.* at ¶ 200. On August 30, 2022, Herman stated, in a chat with Safranko and Fortini, that Algo had customers who had been waiting 30 days for withdrawals. By September 20, 2022, the issue had become even more severe, and Algo had a backlog of more than 33 outstanding customer withdrawals some of which had been pending since August 1. *Id.* at ¶ 200d. In the weeks and months thereafter, the backlog continued to grow and, as Algo Defendants' internal communications stated, the situation for TD and Algo was getting "uglier and uglier every day." *Id.* at ¶ 201a. By January 5, 2023, Algo had outstanding customer withdrawal requests to TD of approximately $27 million. *Id.* at ¶ 201.

Despite knowing that Algo did not control the funds and TD was unable to repay customer withdrawals in a timely manner if at all, the Algo Defendants continued to make false promises to customers about the timing of withdraws. For example, the "Withdraw Request Form" email that Algo sent to customers during this time period falsely stated that it would "take seven to fourteen business days for the proceeds of [a] withdrawal to transmit to your account

following the month end reconciliation." *Id.* at ¶ 204. Fortini provided similarly false and inconsistent information to another Algo customer who made a withdrawal request on October 9, 2022, telling her that the withdrawal would take five to seven business days. *Id.*

In addition, the Algo Defendants provided false assurances about the security of funds and the reasons for delays to customers who expressed concerns about the status of their funds, even though they knew or should have known that these statements were false. For example, on November 15, 2022, Likos falsely assured one Algo customer about her pending withdrawal: "I can't apologize enough for this but ***there's no fear about the safety of your money***." *Id.* at ¶ 203a. (emphasis added). Meanwhile, in internal communications with other Algo Defendants Likos expressed serious concerns about the growing withdrawal backlog and went so far as to proclaim to Fortini, "we're fucked." *Id.*

In addition to these false assurances, the Algo Defendants used other means to lull their customers into believing that their funds were safe, and withdrawals were forthcoming. On November 9, 2022, the Algo Defendants used a new customer deposit to make a partial repayment to a different Algo customer who had an outstanding withdrawal request. *Id.* at ¶ 206a. Likos falsely told the customer who was repaid that the funds were an initial tranche repaid by TD and he expected more funds from TD to follow. However, Likos acknowledge his lie to Fortini by telling him that, "I can buy us some time with that story." *Id.*

The Algo Defendants also provided false assurances to customers by repeating inconsistent timeframes provided by TD, despite the fact that the Algo Defendants knew or should have known that this information was false. For example, on December 6, 2022, the Algo Defendants sent an email, drafted by Collazo, Fortini, and other agents of Algo, to all customers and told them that "our broker expects to complete the withdrawals for August & September, and

October within the coming weeks.  The broker is also confident that November requests will be completed by the end of December, or, at the latest, early January."  *Id.* at ¶ 202a.  Similarly, on December 15, 2022, the Algo Defendants sent an email, from the Algo Support account used by the Algo Defendants, to a customer and stated: "we are expecting all clients['] past funds to be sent by the broker before the end of next week."  *Id.* at ¶ 202b.  On December 19, 2022, the Algo Defendants sent another email from the Algo Support account and told another customer that "August, September, and October requests should be wrapped up this month and sent to your Savvy Digital Wallet."  *Id.* at ¶ 202c.  The Algo Defendants parroted these statements from TD and Safranko despite acknowledging among themselves that there was "zero proof backing" anything Safranko said and comparing Safranko to another Ponzi-schemer who "held clients off for 2 years" with similar unsubstantiated excuses.  *Id.* at ¶ 203c.

Moreover, between August 2022 and at least January 2023, the Algo Defendants continued to solicit and/or accept funds from new customers without disclosing the significant withdrawal problems.  *Id.* at ¶¶ 205; 206.

### c.   The Algo Defendants Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented

During the Relevant Algo Period, the Algo Defendants ignored and/or downplayed numerous red flags that should have alerted them to the fact that TD was engaged in fraud and was not trading customer funds as purported, including (i) evidence that TD was manipulating trade data and (ii) public warnings that TD was engaged in fraud.

#### i.   *The Algo Defendants Ignored Signs That TD Was Manipulating Trades*

The Algo Defendants ignored and failed to disclose to prospective and current customers that TD manipulated trade data, including by erasing losing trades.

Once customers deposited funds with Algo, the Algo Defendants provided them instructions to download the Trading App that they could use to track trading activity and performance. Ex. A, *MV Decl.* ¶ 102. Throughout the Relevant Period, customers observed results on the Trading App that were nearly always positive—a fact which the Algo Defendants used to encourage customers to deposit additional funds and to recruit new customers. Likos, one of Algo's top salespeople, offered the following description of this sales strategy: "We'll get him hooked like hookers on meth . . . I'll have them put a mil in by month 3[.] Watch[.]" *Id.* at ¶ 96c.

As early as May 8, 2019, when Algo was using TD as a brokerage for its proprietary trading, Safranko told Herman that he had the ability to manipulate TD's trading data to remove losses. In a WhatsApp message discussing certain Algo trades, Safranko told Herman to "figure out what the total loss could be and if you want it erased I will get the liquidity provider to pull the deals from the accounts." *Id.* at ¶ 190a.

The Algo Defendants knew that the ability to alter trading data suggested that the trading results were not real. On October 26, 2021, Likos told Fortini that he received the following question from a customer: "If the liquidity provider can refund bad trades how can we ensure that the profitable trades are being passed through the provider to the market?" In response, Fortini instructed Likos not to answer the customer's "questions about if the trades are real." *Id.* at ¶ 190b.

On numerous occasions, Algo customers while monitoring their accounts via the Trading App observed suspicious trading patterns that they brought to the attention of the Algo Defendants. In response, the Algo Defendants consistently told customers that the irregularities were caused by technical issues and they would be corrected by the broker. For example, on the

morning of October 11, 2022, Algo customers observed trading losses in their accounts. Later that day, Algo sent an email, drafted by Herman and edited by Collazo, to all customers which claimed the losses were the result of a "glitch" when the "servers did not update" and they did not represent actual trading losses. Algo assured its customers that their accounts would be updated, and the losses would be reversed. *Id.* at ¶ 190g.

Notwithstanding what they told customers, the Algo Defendants acknowledged to each other that these suspicious trading patterns were actually a sign that Safranko was manipulating trades. For instance, on October 12, 2022, when discussing TD's trade adjustments, Fortini and Likos exchanged the following messages:

> Fortini:  If u ever worked for bookie u know u can lose games cuz ur making the money off everyone. Else with ur percent/ I feel like Ted [Safranko] doing that/ But at some point losses can outdo his gains"
>
> Likos:  ***Because u think he covered up old losses***
>
> Fortini:  ***Yea for sure.***  In past the trades he closed stayed on the trade history he just deleted them[.]  (emphasis added)

*Id.* ¶ 190h.  Moreover, on October 17, 2022, the Algo Defendants observed Safranko close a trade at a price that the market did not reach that day. *Id.*  Fortini and Likos, in a text exchange, expressed disbelief about how this was possible:

> Likos:  How the fuck would he take profit at 1657 if it never reached there? Or am I reading something wrong
>
> Fortini:  Not sure but maybe our charts not same
>
> Likos:  I mean.:: no where ever close lol
>
> Fortini:  Yea 1659

*Id.* at ¶ 190i.  Similarly, on December 13, 2022, Fortini and Likos were discussing certain trades that Safranko manipulated.  Fortini stated, "He obviously can change orders."  Likos responded that Safranko "deleted [a] bunch of trades completely."  Likos asked how they can explain this to

Algo's customers and Fortini responded "No idea . . . ." Fortini also said he was not going to confront Safranko about this manipulation because "I want to get money out." *Id.* at ¶ 190j.

### ii. *The Algo Defendants Ignored Public Warnings That TD Was Engaged in Fraud*

The Algo Defendants repeatedly ignored public information indicating that TD was engaged in fraud. For instance, on June 29, 2020, a prospective customer emailed the Algo Defendants and told them he did due diligence on TD, which was listed as one of Algo's potential brokers, before investing with Algo and found three concerning articles. Ex. A, *MV Decl.* ¶¶ 96a; 189a. The first article, https://theforexreview.com/2018/10/31/thetradersdomain-review/, identified TD as an "offshore broker"; described it as a "scam"; gave it a rating of 1/5 stars (with 1 being the lowest) and a similar 1/5 for "Safety of funds"; and contained several customer reviews that described Safranko as "a well known scammer" who stole funds from the brokerage.[1] *Id.* ¶ 189a. The second article, https://www.forexpeacearmy.com/forex-reviews/14449/thetradersdomain-forex-brokers, contained some similarly negative customer reviews. *Id.* The third article, https://scamwatcher.org/the-traders-domain-review/, upon information and belief,[2] identified numerous red flags including that TD: was an unregulated broker, not transparent, communicated poorly, did not let customers withdraw their funds, and did not guarantee the safety of customer funds. *Id.*

Rather than take this information seriously or offer any meaningful substantive response that addressed these warnings, the Algo Defendants downplayed the significance of these negative reviews and instead blamed them on disgruntled customers. *Id.* at ¶ 96a. The Algo

---

[1] This article indicates that it was published October 31, 2018 and updated on November 30, 2022. The customer reviews referenced in this paragraph were posted in 2019.

[2] The earliest archived version of this article is from December 9, 2022.

Defendants assured the prospective customer that they had a "personal relationship" with the "broker." *Id.*

In addition, as set forth above (in Part IV.B.b.iii), the Algo Defendants ignored the CFTC's addition of TD to the Red List and accompanying press release which warned that "a customer should be wary of providing funds to that entity."

In addition to the numerous red flags about TD that the Algo Defendants had direct knowledge of, yet chose to dismiss, other public information should have alerted to the fact that TD was engaged in fraud. *Id.* ¶ 191. In September 2022, the Trading App—the exclusive method of monitoring TD customer accounts was—removed from the Apple App Store. As explained in a September 26, 2022 *Forbes* article, the Trading App had a plug-in "which can be used by scammers to manipulate those market prices, and simulate account balances, profits or losses. Everything looks and feels real, but it's all fabrication." *Id.*

Despite observing numerous losing trades disappear in real time and knowing about numerous internet warnings and red flags regarding TD's fraudulent activity, the Algo Defendants continued to solicit customers for the scheme.

### d. The Algo Defendants Misappropriated and Commingled Customer Funds

Once prospective customers indicated their desire to participate in the Algo Pool, the Algo Defendants sent them one or more of the customer agreements described above for their electronic signature. Fortini countersigned these agreements on behalf of Algo. Ex. A, *MV Decl.* ¶ 94. The Algo Defendants also provided customers with instructions to deposit funds, which directed customers to deposit funds into bank accounts controlled by Collazo and Herman. *Id.* at ¶ 98.

During the Relevant Algo Period, rather than accept funds in the name of the Algo Pool as is required under the Act, the Algo Defendants instead accepted funds into bank accounts held

in the name of Algo Capital that were owned and controlled by Collazo and Herman (collectively, the "Algo Accounts"). *Id.*

The Algo Defendants accepted no less than $32 million from Algo customers into Algo Capital's TD Bank account ending in *6056 that was owned and controlled by Collazo and Herman. *Id. at* ¶ 105.

The Algo Defendants accepted no less than $105,000 from Algo customers into Algo Capital's Oceans Bank account ending in *7405 that was owned and controlled by Collazo and Herman. *Id.*

Once deposited into the TD Bank account ending in *6056, customer funds were commingled with non-pool funds. *Id.* at ¶ 106.

The Algo Defendants never sent any customer funds from the Algo Accounts to TD or any other brokerage or trading firm. *Id.* at ¶ 99.

Instead, at times, Algo sent some of the customer funds to third party bank accounts and those funds were not transferred by those third parties to any brokerage or trading firm. *Id.* Other times, Algo retained the customer funds in its bank accounts but claims to have engaged in ledger maneuvers to purportedly fund Algo customer accounts at TD. *Id.* at ¶ 100. Algo made these ledger maneuvers even though it knew or should have known that TD was not trading customer funds as purported, and without disclosing to customers that this was how it was purportedly funding their accounts. Despite the fact that none of the customer funds were actually sent to TD, after depositing money into the Algo Accounts, customers nonetheless observed via the Trading App that their trading accounts appeared to be funded, typically within a few hours or days.

After accepting customer funds into the Algo Accounts, Algo, Collazo, and Herman misappropriated some of those funds by using them for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments. *Id.* at ¶ 99. For example, on December 29, 2021, $40,000 was wired by an Algo customer into one of the Algo Accounts at a time when the account had a balance of approximately $236. On January 4, 2022, Fortini falsely told the customer that Algo sent her "funds over to [the] broker already." However, no funds deposited by customer were sent from the Algo Account to TD. Instead, on January 3, 2022, $15,000 was of the funds deposited by the customer were used to make payments to a business controlled by Fortini. *Id.* at ¶ 99a.

On April 5, 2022, three Algo customers wired a combined $200,100 to one of the Algo accounts at a time when the balance was approximately $42,772. On April 5, 2022, Algo made a $100,000 Ponzi-style payment to another Algo customer, at least some of which was sourced by the deposits from these three customers. *Id.* ¶ 99b.

On September 20, 2022, $155,000 was wired by three Algo customers into one of the Algo Accounts, at a time when the account had a balance of approximately $10,000. That same day, nearly all of these funds were used to make a $35,000 payment to a business controlled by Herman, and $130,000 in Ponzi-style payments to other customers who did not deposit these funds. *Id.* at ¶ 206b.

On October 7, 2022, $300,000 was deposited by an Algo customer into one of the Algo Accounts, at a time when the account had a balance of approximately $100,000. That same day, at least $99,000 of the customer's deposit was used to make a payment to a business controlled by Collazo or to a business controlled by Herman, and $79,000 to make Ponzi-style payments to two other customers. *Id.* at ¶ 206c.

Likos misappropriated funds by accepting at least $635,000 from Algo customers directly into his personal bank account at Bank of America ending *6670 between August 2022 and December 2022. *Id.* at ¶ 206d. None of those were ever sent to Algo, TD, or to any other brokerage or trading firm. Once deposited into Likos's account, the customer funds were used for purposes other than trading. *Id.*

In addition, Fortini misappropriated funds by accepting at least $557,000 from Algo customers directly into a bank account at JP Morgan held in the name of a consulting company owned by Fortini and ending *9976 between August 2022 and November 2022. *Id.* at ¶ 206e. None of those were ever sent to Algo, TD, or to any other brokerage or trading firm. Once deposited into Fortini's account, the customer funds were used for purposes other than trading. *Id.*

Algo, Collazo, Herman, and Likos misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers. They also misappropriated funds, upon information and belief, by taking commissions which ranged between 15-50% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist.

Upon information and belief, large numbers of Algo customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. *Id.* at ¶ 207.

**e. The Algo Defendants Failed to Register with the CFTC**

As described above, during the Relevant Algo Time Period, Algo Capital was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis.

Algo Capital used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customers' funds for the purposes of trading XAAUSD.

Algo Capital was never registered as a CPO and was not exempt or excluded from registration as a CPO. Ex. A, *MV Decl.* ¶ 37a.

During the Relevant Algo Time Period, Collazo, Herman, Fortini, Likos were acting as unregistered APs of Algo Capital, an unregistered CPO, and Algo FX, a registered CPO, by soliciting customers to participate in the Algo Pool while associated with Algo Capital and Algo FX as a partner, officer, employee, or similar agent. *Id.* at ¶ 37c-f.

Collazo, Herman, Fortini, and Likos were never registered as APs of Algo Capital or Algo FX. *Id.*

### f. Collazo and Herman are Controlling Persons of Algo

Collazo and Herman are controlling persons of Algo. Ex. A, *MV Decl.* ¶ 92. As stated above, Collazo and Herman are co-owners of Algo Capital and Algo FX. *Id.* at ¶ 37c-d. Collazo is the President of Algo Capital and Manager of Algo FX. *Id.* at ¶ 37c. Herman is the Vice President of Algo Capital and Manager of Algo FX. *Id.* at ¶ 37d. Collazo and Herman controlled the Algo Capital bank accounts that accepted all customer funds. *Id.* at ¶ 4e. Collazo and Herman controlled the day-to-day operations, finance, accounts, and books and records of Algo Capital and Algo FX.

### C. THE SIMS' FRAUDULENT SCHEME

Beginning in at least September 2021 through at least March 2023 (the "Relevant Sims Period"), Michael Sims fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by his "hedge fund" by making material misrepresentations and omissions to prospective and actual customers. Ex. A,

*MV Decl.* ¶¶ 109-111, 113, 118, 122.  In fact, Sims was using customer funds to participate in the TD Pool despite the fact that Sims knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.C.b).  In addition, Sims misappropriated customer funds and failed to register as required under the Act.  Pursuant to this scheme, at least 42 Sims customers deposited no less than $22 million for the purposes of trading leveraged or margined XAU/USD.  *Id.* at ¶¶ 124-126.

### a. Sims Fraudulently Solicited Customers

After working with other sponsors to solicit customer for TD, beginning in at least September 2021, Sims began soliciting customers for his own "hedge fund," through telephone calls, text messages, messaging apps, and in-person meetings.  *Id.* ¶¶ 109-112; Ex. C, *Auld Decl.* ¶¶ 4-7; Ex. J, *Moss Decl.* ¶¶ 5-6. Sims made numerous fraudulent misrepresentations and omissions about: (i) the ownership and operation of the trading business, (ii) the profit and risk associated with the purported trading, and (iii) ability and timeliness of customer withdrawal requests.  On information and belief, some if not all of the Sims customers are not ECPs.  Ex. A, *MV Decl.* ¶¶ 113-116, 118, 122, 124-128; Ex. C., *Auld Decl.* ¶¶ 6-7, 19, 23-25, 27; Ex. J, *Moss Decl.* ¶ 21.

### i. Sims Made Misrepresentations and Omissions Regarding the Ownership and Operation of the Trading Business

From the outset, Sims told prospective customers that he was soliciting funds for his hedge fund. Ex. A, *MV Decl.* ¶¶ 109-110. Sims claimed his hedge fund had been in operation for more than 10 years and employed a team of experienced traders to trade leveraged or margined XAU/USD on behalf of its customers.  Ex. C, *Auld Decl.* ¶ 6; Ex. J, *Moss Decl.* ¶ 6; Ex. H, *Gordon Decl.* ¶ 6.

These statements were false.  Sims was not soliciting funds on behalf of a hedge fund. Sims did not own any "hedge fund" let alone one that had been in operation for more than 10 years and employed a team of traders.  Neither Sims, personally, nor any hedge fund or other entity owned by him traded any funds on behalf of customers.  Rather, as Sims later admitted to a customer, he was a sponsor that recruited customers for the TD Pool.  Ex. H, *Gordon Decl.* ¶ 21; Ex. A, *MV Decl.* ¶¶ 110-116, 119-120, 122.

Sims also fraudulently omitted material information from prospective and current customers.  For example, Sims failed to disclose to prospective customers that their funds would be sent offshore and traded by an unregistered brokerage, either in his solicitations or in customer agreements.  Ex. A, *MV Decl.* ¶¶ 113-116; Ex. C, *Auld Decl.* ¶ 6.  At least some of the prospective customers who believed their fund were being traded by Sims' hedge fund were not given any disclosure documents or customer agreements at all.  Ex. C, *Auld Decl.* ¶ 9.

Sims also knew and omitted to tell customers that the National Futures Association ("NFA") had warned against doing business with TD.  In April 2022, in connection with an audit of another firm acting as TD sponsor with which Sims was involved, the NFA highlighted the dangers of U.S. customer money going to an offshore, unregistered broker.  The NFA specifically advised that, pursuant NFA bylaws, commodity pools "cannot be doing business with that firm."  Sims did not disclose any of the NFA concerns about TD to his prospective or current customers.  Ex. A, *MV Decl.* ¶¶ 119-123.

Finally, in addition to misrepresenting the identity and location of the trading operation, Sims also omitted to tell at least one prospective customer that he would be charging commissions, and sizeable ones at that.  Only after this customer received his first account statement did he notice a sizeable withdrawal from his account.  When the customer questioned

Sims about the withdrawals, Sims informed him that there would be "daily and monthly commissions" which would range from 40-50%. Sims did not explain who would be receiving these commissions, nor what percentage Sims himself would take. Ex. H, *Gordon Decl*. ¶¶ 8-12.

### ii. *Sims Made Misrepresentations and Omissions Regarding Profit and Risk*

In order to entice prospective and current customers to deposit funds for the purposes of participating in the pooled trading of leveraged or margined XAU/USD by his hedge fund, Sims also made false representations about purported trading profits. For example, Sims repeatedly told customers that his hedge fund generated monthly trading profits of 40%. Ex. H, *Gordon Decl*. ¶ 5; Ex. C, *Auld Decl*. ¶ 7. Additionally, Sims claimed that the hedge fund was profitable every month and that that the pool only had two "losing days" in its last six to seven years of operation. Ex. J, *Moss Decl*. ¶ 7. Once a customer set up his or her account, Sims would facilitate the downloading and setting up of the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the hedge fund was making substantial trading profits. Ex. J, *Moss Decl*. ¶¶ 9-11; Ex. C, *Auld Decl*. ¶¶ 14-15, 21; Ex. A, *MV Decl*. ¶ 114; Ex. H, *Gordon Decl*. ¶ 10.

These statements were false. In fact, the hedge fund did not generate a monthly trading profit of 40%, because the hedge fund was not trading customer funds as claimed by Sims. Moreover, Sims knew or should have known, as discussed below in Part IV.C.b, the trading statements on the Trading App, were in fact false. Ex. A, *MV Decl*. ¶¶ 111-112, 114-116, 122-126.

Sims also made fraudulent misrepresentations to prospective customers about the risk involved with the trading. When asked about the potential of losing capital, Sims told at least

one customer that there were stop-loss parameters in place to prevent that. *Id.* ¶ 118. This was false; there were no stop loss parameters in place for the purported trading to prevent loss of capital.

### iii.   Sims Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds

Sims also made misrepresentations to prospective and current customers about the timeframe and ability to withdraw their funds allowing the scheme to proceed for months after it initially began to unravel.

Sims advised some, if not all, customers that withdrawals would take 48 hours.  For example, Sims told at least one prospective customer that anytime she wanted to withdraw her funds, she could text him and her money would be in her account within 48 hours. Ex. J, *Moss Decl.* ¶ 10.

However, Sims' customers experienced significant delays in withdrawing their funds for weeks and months.  Since at least September 2022, numerous customers requested to withdraw funds without success.  When customers asked Sims about the status of these withdrawal requests, Sims repeatedly made excuses for delays and provided false statements about the timing of the withdrawals. *Id.* ¶¶ 12-17; Ex. C, *Auld Decl.* ¶¶ 19, 23; Ex. H, *Gordon Decl.* ¶¶ 14-19.

For example, in early September 2022, one Sims customer submitted a request to Sims to withdraw $160,000 from the pool. Ex. H, *Gordon Decl.* ¶¶ 14-19.  Sims told the customer that the withdrawal would take approximately twenty to twenty-five business days due to certain banking issues which Sims did not further describe. *Id.* However, Sims failed to satisfy even this new, extended timeline.  This customer made another withdrawal request for additional funds in October 2022. *Id.* When he inquired again about the status of his pending withdrawal

requests (September and October 2022), Sims responded, "Everything is in Que [sic]. The transition slowed the broker withdrawals down. Everything should be caught up soon and back to normal times." *Id.* When the customer followed up about the still pending withdrawal requests in November 2022, Sims' assistant told him "Your withdrawal could come any day now." To date, this customer has not received any funds from Sims, TD, or Trubluefx. *Id*.

Similarly, another Sims' customer submitted a request to withdraw $20,000 in November 2022. Sims provided repeated excuses for the delay that he knew or should have known were false. For example, in April 2023, five months after the request was submitted and after several rounds of excuses, Sims told the customer "everything will start to get back on track as soon as the acquisition is finished. They [i.e., TD] were bought out." Ex. C, *Auld Decl*. ¶¶ 19, 23. Sims knew or should have known that this was false. Sims had witnessed the various conflicting excuses for the withdrawal delays advanced by TD beginning in September 2022. Ex. A, *MV Decl*. ¶¶ 208-212. Later, Sims stopped responding to customer's communications seeking information about the pending withdrawal. Ex. C, *Auld Decl*. ¶ 23. To date, the customer has not received any funds from Sims, TD, or Trubluefx. *Id*. ¶ 25.

Sims also attempted to dissuade customers from taking withdrawals from their accounts. In February 2023, Sims told a customer who was considering making a withdraw that she should consider sticking with her plan to let a one-year period go by in order to compound her returns. Sims also explained that TD was backlogged in getting to the withdrawal requests at this time. Only after the customer repeatedly stated that she was concerned about the delays she was hearing about from other customers did Sims tell her to make a withdrawal request. Ex. J, *Moss Decl*. ¶¶ 12-17.

**b. Sims Knew or Should Have Known that TD Was Engaged In Fraud And Not Trading the Funds As Represented**

*i.   Sims Knew or Ignored Signs that TD Was Manipulating Trade Data*

Sims knew or should have known that TD was not a legitimate brokerage and engaged in fraudulent activity. On numerous occasions customers observed large losses in their accounts via the Trading App, but implausibly the large losses were nearly always "corrected" by days' end. When customers questioned Sims or TD about these "corrections," he downplayed their concerns and told the customers that these were errors, or "slippage" and not real losses. When at least one customer directly questioned Sims as to the irregularities in her account over text, Sims did not respond. Ex. C, *Auld Decl.* ¶ 21; Ex. A, *MV Decl.* ¶¶ 189-190.

As it turns out, Sims himself had already identified the questionable trading account irregularities and raised concerns. As early as November 2021, Sims noted the discrepancies in conversation with other sponsors. Sims explained that he had seen large losses in the TD high risk account, but they went away at the end of the day. In contrast, Sims could see that the same XAU/USD trades were being done at another brokerage, and those trades did not reflect the same "slippage" that were used to explain the TD discrepancies. Ex. A, *MV Decl.* ¶ 190c. In a text to another sponsor, Sims queried: "Issue when I see big losses and they go away on high risk. I understand slippage issues etc. … **But if it's the same trades on lower risk, how does it not effect [Redacted Brokerage Name] too?**" (emphasis added). *Id.*

*ii.   Sims Concealed TD Wires and Customer Nationalities*

In addition to the other indications of fraudulent TD activity about which Sims knew or should have known, Sims demonstrated his knowledge that TD was engaged in potentially illegal and problematic activities by directing potential customers to disguise their funding payments. Sims, though his assistant, instructed potential and current customers to conceal the purpose of

these deposits by directing that they use certain opaque language in the wire transfer memorandum. Ex. A, *MV Decl.* ¶ 116; Ex. C, *Auld Decl.* ¶ 16; Ex. J, *Moss Decl.* ¶ 8; Ex. H, *Gordon Decl.* ¶ 8. For example, Sims instructed one customer that his deposit should say "Services for [customer]" and further told this customer: "**REMEMBER: In the [wire] memo or if they ask you what it's for put 'services'[.] Nothing about investment/trading/hedge fund.**" Ex. H, *Gordon Decl.* ¶ 8.

iii. ***Sims Was Warned about Doing Business with TD and Knew or Should Have Known About Public Warnings About TD***

As described above, Sims learned in April 2022 that the NFA had expressly warned against doing business with TD. Sims also ignored or recklessly failed to investigate numerous warnings about TD and Safranko circulating on the internet. Ex. A, *MV Decl.* ¶ 123.  As described above, as early as 2020, several websites flagged TD as a concern and published numerous customer complaints.  Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List.  *Id.* ¶ 198. As described above, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.  *Id.* ¶ 191.

These myriad warnings should have alerted Sims that TD was engaged in a fraud. However, despite the availability of these public warnings, Sims' own concerns that the trading was manufactured, and knowing that NFA had explicitly prohibited U.S. customers from doing business with TD, Sims continued to solicit pool customers and directing their funds to the TD Pool.

**c. Sims Misappropriated Customer Funds**

Despite the fact that Sims knew or should have known that TD was not trading customer funds as purported, Sims directed millions of dollars in customer funds to the TD Pool, and misappropriated customer funds by taking sizable commissions. Sims' commission ranged from 40-50% of the purported trading profit. Ex. A, *MV Decl*. ¶¶ 114-116, 124-126; Ex. C, *Auld Decl*. ¶ 7; Ex. J. *Moss Decl*. ¶ 10; Ex. H, *Gordon Decl*. ¶ 10.

Specifically, Sims directed customers to deposit funds into bank accounts held by two entities, which he did not own or control. Neither of the entities were a trading firm and upon information and belief, Sims did not have any agreements with these entities regarding the management or trading of customer funds. None of the funds deposited in the third-party bank accounts were ever sent to TD or any other brokerage or firm engaged in trading. Ex. A, *MV Decl*. ¶¶ 116, 124-126. Nevertheless, once deposited into the third-party accounts, customers observed via the Trading App that their accounts were funded leaving the customers to believe that their money was being traded. Ex. C. *Auld Decl*. ¶¶ 16-18; Ex. H. *Gordon Decl*. ¶¶ 8-13; Ex. J, *Moss Decl*. ¶¶ 8-11.

Upon information and belief, large numbers of Sims customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Ex. C, *Auld Decl*. ¶¶ 19, 22-25; Ex. H, *Gordon Decl*. ¶¶ 14-19; Ex. J, *Moss Decl*. ¶¶ 16-19. Upon information and belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures. Ex. A, *MV Decl*. ¶¶ 126, 212.

**D. THE BUGGS' FRAUDULENT SCHEME**

Beginning in at least February 2021 continuing through present (the "Relevant Buggs Period"), Buggs fraudulently solicited customers to deposit money for the purpose of

participating in the TD Pool by making material misrepresentations and omission to actual and

prospective customers.  Buggs solicited customers for the TD Pool despite the fact that Buggs

knew or should have known TD was not trading customer funds as it purported (*see* below at

Part IV.D.c).  In addition, Buggs misappropriated customer funds and failed to register as

required under the Act.  Pursuant to this scheme, at least 517 Buggs customers deposited no less

than $54 million for the purpose of trading leveraged or margined XAU/USD.

### a.  Buggs Began Soliciting for the TD Pool

Around February 2021, Buggs purchased a trading education company, and despite not

being a licensed trader, began expanding the company beyond training and education.  Ex. O,

*Wright Decl.* ¶ 4; Ex. A, *MV Decl.* ¶ 129.  Buggs built upon his already large network of MLM

businesses and industry acquaintances to begin soliciting customers for the TD Pool.  Ex. F,

*Damji Decl.* ¶¶ 4, 6, 9.  Several months after the purchase of his trading company, Buggs began

operating as a "sponsor" to solicit customers for the purpose of trading XAU/USD and then

directed their funds to the TD Pool.  Ex. A, *MV Decl.* ¶¶ 129, 130.

Using his existing MLM businesses and the associates affiliated with them, Buggs held

out the opportunity to participate in his "private trading hedge fund" through his "private broker"

as a reward for hitting certain sales tiers in his other MLM businesses.  *Id.* at ¶ 130.  Once

associates hit the "emerald" level they were given the opportunity to participate in the trading via

Buggs' "private broker," creating an aura of exclusivity.  *Id.*  Buggs concealed the identity of TD

until associates reached the higher "diamond" level and executed a non-disclosure agreement.

*Id.*

Buggs also solicited prospective customers beyond his pre-existing MLM network

through in-person events.  For example, in early 2022, Buggs invited approximately fifteen

prospective customers to a dinner meeting in San Diego, California.  Ex. A, *MV Decl.* ¶ 132.

Similarly, in 2022 Buggs attended a conference in Miami, Florida, during which he solicited at least two customers for the commodity pool. Ex. F, *Damji Decl.* ¶ 4.

Buggs also solicited other individuals with whom he had previous business deals or through acquaintances. Ex. E, *Chessler Decl.* ¶¶ 4, 5. In these instances, Buggs would demonstrate the remarkable trading returns that he was purportedly experiencing in his TD account by showing acquaintances his account on the Trading App or sending them screen shots of his returns. *Id.* ¶ 5; Ex. F, *Damji Decl.* ¶ 9; Ex. O, *Wright Decl.* ¶ 4. During these conversations, Buggs also told these prospective customers that he had been able to withdraw large sums of money from his TD account as a way of vouching for TD's trustworthiness. Ex. E, *Chessler Decl.* ¶ 6.

**b. Buggs Fraudulently Solicited Customers**

During the Relevant Buggs Period, Buggs fraudulently solicited customers—through, telephone, messaging apps, and in-person events such as conferences and dinners—to deposit money for the purposes of trading leveraged and margined XAU/USD despite the fact that he knew or should have known that TD was not trading the funds as purported. Buggs made numerous fraudulent misrepresentations and omissions about: (i) the profit and risk associated with the purported trading, (ii) the mechanics and structure of the trading operation, and (iii) the ability of customers to withdraw their funds. Upon information and belief, some if not all of Bugg's customers were not ECPs.

**i.   *Buggs Made Misrepresentations and Omissions Regarding Profit and Risk***

Using his MLM businesses and network of industry connections, Buggs touted the incredible returns that the commodity pool generated through leveraged or margined trading of XAU/USD. Ex. A, *MV Decl.* ¶130; Ex. E, *Chessler Decl.* ¶¶ 4, 5; Ex. F, *Damji Decl.* ¶¶ 4, 6, 9, 10. He told prospective customers that the commodity pool had an "incredible winning streak"

and claimed that it "never had a losing month". Buggs told at least one individual that he was

making 30% returns or more monthly and sent screenshots of those returns displayed in the

Trading App, including screenshots showing that his rate of return for the year was 4000 %. Ex.

E, *Chessler Decl.* ¶ 5; Ex. A, *MV Decl.* ¶ 140. Buggs boasted to a business associate by text that

"**I HAVE A MONEY PRINTING MACHINE.**" In some instances, Buggs used the Trading

App to show prospective customers the purported XAU/USD trading history and accounts that

he controlled with "balances" of approximately $80 million and $650 million. Ex. F, *Damji*

*Decl.* ¶ 6.

Once a customer opened a TD account through Buggs, he facilitated the setup of the

Trading App for each customer. Ex. E, *Chessler Decl.* ¶ 10; Ex. F, *Damji Decl.* ¶¶ 11, 13; Ex. A,

*MV Decl.* ¶ 142. Through the Trading App, customers could purportedly view and monitor the

trading activity in their TD trading account, but they did not have the ability to make trades or

withdraw funds. The trading activity customers observed through the Trading App was nearly

always positive and led customers to believe that the pool was making substantial "trading

profits." Ex. F, *Damji Decl.* ¶ 16. At least some customers who were solicited by Buggs,

observed the purported gains and deposited even more funds into their TD trading accounts. Ex.

E, *Chessler Decl.* ¶ 12; Ex. F, *Damji Decl.* ¶ 16.

These assertions about incredible gains were on their face, unrealistic and unattainable.

Buggs knew or should have known that these purported trading returns were false.

In addition to claiming unrealistic, sustained returns, Buggs simultaneously

misrepresented that there was *de minimis* risk associated with the TD Pool. When soliciting

some prospective customers, Buggs falsely claimed that the trading of XAU/USD was capped in

risk, and stated that there was a 3-4% maximum risk per trade. Ex. A, *MV Decl.* ¶ 138. Buggs

separately told another prospective customer that that maximum potential loss was 1% of the account balance on any given day. Ex. F, *Damji Decl.* ¶ 19. Buggs knew or should have known that his assurances about risk of the purported trading at TD were not true. On more than one occasion, customers observed large trading losses that would inexplicably disappear from the account later in the day. Ex. E, *Chessler Decl.* ¶ 11; Ex. F, *Damji Decl.* ¶ 19. Similarly, the customer who was told that his maximum potential loss was 1%, observed losses in his account on several occasions, including an approximately thirty percent loss in his account on one notable day. Ex. F, *Damji Decl.* ¶ 19. At times when they observed losses, these customers reached out to Buggs to ask why they were seeing these losses, more than the 3-4% maximum risk they had been promised. Ex. F, *Damji Decl.* ¶ 19. Over text, social media, and/or Zoom, Buggs, and Safranko, would reassure customers that the discrepancies were "system updates" or "lags." Ex. E, *Chessler Decl.* ¶11; Ex. F, *Damji Decl.* ¶ 19.

### ii.   *Buggs Made Misstatements and Omissions About the Trading Operation*

Additionally, Buggs made false statements and fraudulent omissions to customers as to how the TD Pool operated. For example, Buggs falsely told at least one customer that the commodity pool used a "very conservative" algorithmic trading bot. Ex. F, *Damji Decl.* ¶¶ 7, 19. Months later, when this customer questioned Buggs about some irregular trading activity in the account, Buggs revealed to the customer that trading was done by Safranko, not an algorithmic trading bot. Ex. F, *Damji Decl.* ¶ 19.

Buggs also knew and omitted to disclose to customers that Safranko had total control over the TD Pool, including the ability to reverse losing trades back to accounts. Ex. O, *Wright Decl.* ¶ 7. Customers initially did not know who was doing the trading and controlling the TD Pool, but eventually learned that it was "Uncle Ted" through live streams of the purported trading. Ex. A, *MV. Decl.* ¶ 131; Ex. F, *Damji Decl.* ¶ 19.

In 2021, at least one prospective customer told Buggs that he had conducted a background check on Safranko and was concerned about the negative information and reviews he had seen online. Ex. E, *Chessler Decl.* ¶ 6.  When assuring this prospective customer about the TD and Safranko warnings that he raised, Buggs made additional fraudulent statements.  Buggs reassured this customer that he traded "right beside [Safranko]"; that Buggs was "in control of [his customers'] funds." Ex. A., *MV Decl.* ¶ 133.  These statements were false and misleading.  In fact, Buggs did not trade his own customers' funds, nor was he in control over the funds purportedly sent to TD.  And, despite knowing about the various warnings about and negative reviews of TD and Safranko, Buggs continued to solicit new customers for the TD Pool and failed to tell current customers about those warnings and negative reviews. Ex. O, *Wright Decl.* ¶ 8; Ex. A, *MV Decl.* ¶ 134.

### iii.     *Buggs Made Misrepresentations About the Ability of Customers to Withdraw Their Funds*

Buggs also made misrepresentations to prospective and current customers about the ability of customer to withdraw funds and gave false assurances when withdrawals were delayed.  For example, while soliciting a business associate, Buggs repeatedly reassured him that he could withdraw his funds whenever he wanted, and that Buggs, personally, had been able to take sizeable withdrawals whenever he wanted. Ex. E, *Chessler Decl.* ¶ 6.  Buggs frequently made these types of assurances about liquidity when touting TD.  Ultimately, this customer was unable to withdraw any of his funds from his TD account. Ex. E, *Chessler Decl.* ¶¶ 13-15.

Buggs continued to make false assurances about the ability of customers to withdraw funds even after customers began to experience significant withdrawal difficulties and delays in the Fall of 2022.  In February 2023, when one customer contacted Buggs to inquire about the delay in obtaining his withdrawal, Buggs falsely assured him that "withdrawals have steadily

gone out" from TD.  Ex F, *Damji Decl.* ¶ 23.  Buggs knew or should have known that this statement was false:  Ex. A, *MV Decl.* ¶¶ 213-214.  Withdrawals had not steadily gone out since August 2022.  Ex. A, *MV Decl.* ¶¶ 192-193.

In an effort to insulate himself from claims that he was complicit in a fraudulent scheme, Buggs also claimed to a complaining customer that he also "had not withdrawn my trading profits as they sit in TD."  Ex. A, *MV Decl.* ¶ 217.  Buggs knew that this statement was false: While regular customers withdrawals had been stalled for months, Buggs, and his family, had taken at least a million dollars in purported trading profits from TD accounts during this time period.  *Id.* at ¶ 217.

Buggs repeated TD's explanations for the withdrawal delays that he knew or should have known were false.  TD cycled through various conflicting excuses during the Fall of 2022 for its inability to process withdrawals.  Ex. A, *MV Decl.* ¶¶ 192, 194a, 194b, 194c, 194d, 194e, 194f. Buggs advised customers that it was taking TD longer to process withdrawals because of issues with TD's liquidity provider and because certain customers were making errors when submitting withdrawal requests, which was delaying all withdrawals.  At various points, customers were told by Buggs and/or his agents, that the delays in withdrawals were because:  the trading platform was "migrating the system", the brokerage had legal issues, the broker was selling the company, and the platform had been attacked by hackers.  Ex. F, *Damji Decl.* ¶ 20.

### c. Buggs Knew or Should Have Known That TD Was Not Trading Customer Funds as Purported

Buggs knew or should have known that TD was not trading customer funds as purported. Buggs (i) ignored warnings from experienced traders that TD was manipulating trades and that Buggs and TD were both required to be registered; (ii) instructed customers in their wires and

account setup to conceal the funding of trading accounts and their U.S. residency; and (iii) knew

or should have known about other public warnings about TD.

     ***i.   Buggs Ignored Warnings that TD Was Manipulating Trades***

     Buggs ignored explicit warnings from individuals with extensive trading experience that

the trading loss erasures from the TD Pool were an indication of fraud. Ex. A, *MV Decl.* ¶ 156.

When a business associate of Buggs who could observe the trading in the TD Pool questioned

Buggs about the disappearance of losing trades from the TD account, Buggs responded that

because Safranko owned the brokerage, he could credit back the losses. Ex. O, *Wright Decl.* ¶ 7.

The business associate advised Buggs that Safranko crediting back the trading losses was an

indication that Safranko was probably "faking the trading." *Id.*

     Buggs continued to ignore warnings from other experienced traders that the TD Pool

showed fraudulent activity. Ex. A, *MV Decl.* ¶ 156. At least one other former employee of

Buggs, who was also an experienced trader, informed Buggs that, based upon the crediting of the

losses, Safranko likely had control over both sides of a purported trade. *Id.* This former

employee told Buggs that it was possible, based upon this structure, that in fact no trading was

going on at TD. *Id.*

     Buggs also ignored warnings from both of these experienced traders that Buggs and TD,

and their employees, were not licensed or registered, as required, to trade or sell the XAU/USD.

*Id.*; Ex. O, *Wright Decl.* ¶ 9. One of the former employees went so far as to show Buggs

portions of the CFTC website to demonstrate to him the registration requirements that applied to

TD and Buggs. Ex. O, *Wright Decl.* ¶ 9.

     ***ii.   Buggs Concealed the Purpose of TD Wires and Residency Status of Customers***

     Buggs knew or should have known that TD was engaged in illegal and fraudulent

conduct because, as an agent of TD, Buggs was directing potential and current customers to

disguise the purpose of their funding payments and countries of origin. Buggs, himself and through his assistant, instructed potential and current customers to conceal the purpose of these deposits by directing that they use certain opaque language in the wire transfer memorandum. Ex. A, *MV Decl*. ¶ 148. For example, he instructed one customer that the deposit should say "services (ONLY!)" and if the wire "reference include[d] anything else, the wire will be returned & the related account closed. No exceptions!" Ex. F, *Damji Decl*. ¶¶ 11-12. Other customers were similarly instructed that in order to participate in the pool through Buggs, that they must wire funds with the memo line for "Services." Ex. A, *MV Decl*. ¶ 148.

Buggs also instructed TD customers to take deceptive steps when funding their TD account through cryptocurrency. When customers opted to fund TD accounts with cryptocurrency, they were asked their country of residence in the TD account set-up instructions. Buggs and/or his assistant instructed US customers that they should choose "crypto" of their country of origin, rather than the USA. Ex. A, *MV Decl*. ¶¶ 142-143; Ex. E, *Chessler Decl*. ¶10.

### iii. *Buggs Knew or Should Have Known About Other Public Warnings About TD*

Buggs was warned numerous times by experienced traders that TD was probably engaged in a fraud. Ex. O, *Wright Decl*. ¶ 7. Separately, Buggs also knew that TD trading was manufactured by observing numerous disappearing losing trades. Ex. E, *Chessler Decl*. ¶ 11; Ex. F, *Damji Decl*. ¶ 19. If the disappearing losing trades wasn't alarming enough, Buggs also knew that Safranko had the ability to credit back the losing trades. Ex. O, *Wright Decl*. ¶ 7. Buggs was also warned that TD did not hold required registrations with the CFTC, and that he should be registered as well. *Id*. at ¶ 6. Finally, at least one customer told Buggs that he had performed background research on Safranko and TD, which had uncovered troubling complaints about them on the internet. Ex. E, *Chessler Decl*. ¶ 6.

These warnings made it incumbent on Buggs to perform some due diligence regarding TD lest he recklessly continue to invest customer money in a seeming fraud. However, despite serving in a role where he solicited customers to deposit funds for the purpose of participating in the TD Pool and holding himself out as having experience and insight into TD, Buggs did nothing to independently investigate these red flags or allegations levied against TD. If he had, even a cursory internet search would have revealed that (i) as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints; (ii) that in July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List; and (iii), in September 2022 the Trading App was removed for the Apple App Store because, as reported by Forbes and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams. Ex. A, *MV Decl.* ¶¶ 189a, 191,198.

Instead of heeding or investigating the numerous red flags signaling that TD was a fraud and not engaged in legitimate trading, Buggs downplayed the warnings and continued to solicit customers for the TD Pool, collecting millions of dollars in commissions on purported trading profits.

### d. Buggs Misappropriated Customer Funds

Despite the fact that Buggs knew or should have known that TD was not trading customer funds as purported, Buggs misappropriated some TD customer funds by accepting TD a portion of customer funds into bank accounts he controlled and using those funds for personal use. Ex. A, *MV Decl.* ¶¶150, 150a, 150b. Buggs also misappropriated TD customer funds by taking sizable commissions on purported trading profits when he knew or should have known that profits reflected in the TD Pool account were false. *Id.* at ¶ 141.

Initially, when a customer informed Buggs that they wanted to set up their trading account, Buggs, or his assistant acting at his direction, assisted the customers with funding their

accounts. *Id*. at ¶ 142; Ex. E, *Chessler Decl*. ¶¶ 10, 12; Ex. F, *Damji Decl*. ¶¶ 10-14. Customers were given the option to fund their TD account through bank wire or cryptocurrency. Ex. A, *MV Decl*. ¶ 147. In most instances, when customers chose the bank wire option, Buggs, directed customers to deposit funds into a bank account held by a third-party entity. *Id*. Buggs, did not own or control this third-party entity or its bank account. The third-party entity was not a trading firm nor did Buggs have any agreement with the third-party regarding the management or trading of customer funds. *Id*. at ¶ 188. None of the funds deposited into the third-party bank accounts were ever sent to TD or any other brokerage or trading firm. *Id*.

In a small number of instances, Buggs gave several TD customers the ability to fund their accounts more quickly than the two normal funding routes through bank wire to third-party accounts or cryptocurrency. For these customers, Buggs accepted wires into bank accounts he controlled, and told one of the customers that he would make a "ledger transaction" to fund his TD accounts. *Id*. at ¶ 150. None of the customer funds deposited into these Buggs-controlled accounts were ever sent to TD or any other brokerage or trading firm. *Id*. Instead, Buggs misappropriated some of these customer funds for purposes unrelated to trading. *Id*.

For example, although he started with a bank account balance of approximately $45,000, between April 11-13th, Buggs accepted four wires from TD customers each including memo lines incorporating the word "Services," totaling $370,000. *Id*. at ¶ 150a. Buggs did not wire or otherwise transfer these funds to any known brokerage or trading entity. Buggs also took in an additional $110,000 from another source into the account. On April 14, 2022, Buggs used all or some of the $370,000 to wire $465,000 to a third party with a memo "Balance for Lambo." *Id*.

In another example, at the end of April 18, 2022, Buggs had a balance of approximately $70,000 in his bank account. *Id*. at ¶ 150b. Buggs accepted wires, each of which with memo

lines including the description "Services," from three customers totaling $545,000 into this account. *Id.* Buggs failed to transfer the funds to any known brokerage or trading entity. Two days after the customers wired the funds to Buggs' account, Buggs wired $350,000 for the purchase of a condo. *Id.*

Upon information and belief, Buggs also misappropriated customer funds by taking commissions of 40–50% of purported profits on trading that he knew or should have known was fabricated. *Id.* at ¶ 141.

Upon information and belief, large numbers of Buggs customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. *Id.* at ¶ 219. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures. *Id.*

### E. THE CENTURION DEFENDANTS' FRAUDULENT SCHEME

Beginning in at least March 2022 through the present ("Relevant Centurion Period"), Centurion, Alejandro Santiestaban a/k/a Alex Santi, Gabriel Beltran, and Archie Rice (previously defined as, the Centurion Defendants), fraudulently solicited customers to deposit money for the purpose of participating in pooled trading of leveraged or margined XAU/USD by Centurion's "hedge fund" (the "Centurion Pool") by making material misrepresentations and omissions to prospective and actual customers. Ex. A., *MV Decl.* ¶¶ 159-164. In fact, Centurion was using customer funds to participate in the TD Pool despite the fact that Centurion knew or should have known TD was not trading customer funds as it purported (*see* below at Part IV.E.c). Additionally, the Centurion Defendants misappropriated and commingled customer funds and failed to register as required under the Act. Pursuant to this scheme, at least 47 Centurion

customers deposited no less than $8.4 million for the purposes of participating in the Centurion

Pool. *Id*. at ¶¶ 171-178.

   **a.   Centurion Begins Soliciting for the TD Pool**

   The Centurion Defendants first learned of the opportunity to solicit customers for the TD

Pool during a March 2022 meeting in Miami. Ex. A., *MV Decl*. ¶ 159.

   Thereafter, the Centurion Defendants engaged in numerous conversations with Negus-

Romvari over text messages and Zoom call. During those conversations Negus-Romvari

provided the Centurion a "PAMM manager overview' and "profit split[s]" and commissions.

Negus-Romvari encouraged the Centurion Defendants to bring in customers by offering to lower

the "performance fee" charged by TD from 50% of profits to 20% if Centurion brought in at

least $2 million in deposits. On May 17, 2022, Negus-Romvari shared a link which purported to

show trading results for "1+ year of the algo." Among other things, the results purportedly

showed monthly gains of 15% for a "conservative" account, which, Negus Romvari explained,

had a "40% lower risk profile." On information and belief, the Centurion Defendants deposited

funds for the purpose of "copy trading' the "bot" or "Algo" Negus-Romvari had described. *Id*. at

¶¶ 57, 159.

   Ultimately, the Centurion Defendants began to act as a sponsor for TD and to solicit

customers to deposit funds for the purported purpose of trading leveraged or margined

XAU/USD in the Centurion Pool when, in fact, the Centurion Defendants were directing those

funds to be traded in the TD Pool. *Id*. at ¶¶ 160-161, 165-166.

   **b.   The Centurion Defendants Fraudulently Solicited Customers**

   During the Relevant Centurion Period, Centurion fraudulently solicited prospective

customers—through in-person meetings, texts messages, telephone calls, emails, and various

social media accounts controlled by Beltran and Santi—to deposit money for the purpose of

trading leveraged or margined XAU/USD. Ex. A, *MV Decl.* ¶¶ 160-165, 167; Ex. G., *Figlia Decl.* ¶¶ 5-6; Ex. I, *Groves Decl.* ¶¶ 5-9; Ex. B, *Alvarez Decl.* ¶¶ 5-6. The Centurion Defendants made numerous fraudulent misrepresentations and omissions regarding (i) who controlled customer funds; (ii) how customer funds would be traded; (iii) historical profits of their "hedge fund"; and (iv) the ability of customers to withdraw their funds. On information and belief, some, if not all of Centurion's customers, are not ECPs. Ex. A, *MV Decl.* ¶¶ 162-166, 180; Ex. G, *Figlia Decl.* ¶¶ 5-6, 18-21, 24; Ex. I, *Groves Decl.* ¶¶ 6-8, 15, 17-20, 23; Ex. B., *Alvarez Decl.* ¶¶ 6-7, 13-18, 22.

### i. *The Centurion Defendants Made Misrepresentations and Omissions Regarding Who Controlled Pool Funds*

To entice prospective customers to deposit money for the purposes of participating in the Centurion Pool, social media posts by Santi led customers to believe that the Centurion "hedge fund" was in control of the funds. For example, in or around March 2022, Santi posted a message on one of his social media accounts indicating that "Centurion Capital Hedge Fund Is Now Live" for investors with a "$100k Min Deposit." Ex. A, *MV Decl.* ¶ 161; Ex. I, *Groves Decl.* ¶ 5. In addition, Beltran falsely told at least one customer that "Centurion controlled all of the funds." Ex. I, *Groves Decl.* ¶ 6. Centurion did not control customers funds. Rather than holding the funds in an account controlled by Centurion as they represented they would, Centurion was using the funds to participate in the TD Pool. Ex. A, *MV Decl.* ¶¶ 165-166, 171-173.

### ii. *The Centurion Defendants Made Misrepresentations and Omissions Regarding How the Funds Would be Traded*

The Centurion Defendants also made false and conflicting statements about the method Centurion was using to trade the funds, representing, at various times, that: (i) Centurion used an "algorithmic trading bot" or "AI" to trade the funds; (ii) Alex Santi manually traded the account;

and/or (iii) another unspecified "pro trader" "managed" the account.  Ex. A, *MV Decl.* ¶¶ 162-164; Ex. G, *Figlia Decl.* ¶ 5; Ex. I, *Groves Decl.* ¶ 7; Ex. B, *Alvarez Decl.* ¶ 6.

Moreover, Centurion sent customers a "Forex Account Management Agreement" which similarly represents that Centurion is trading the funds using an algorithm.  The Agreement represents that Centurion, as "Manager" "is a "group of retail traders in the name of Manager" and that the Client is entering into the Agreement because he wishes "to have Manager apply an Expert Advisor Trading Bot to the Client Funds."  Ex. A, *MV Decl.* ¶ 165; Ex. G, *Figlia Decl.* ¶ 10; Ex. B, *Alvarez Decl.* ¶ 7.

On another occasion when a customer was having difficulty obtaining a withdrawal due to alleged issues with the broker, the customer questioned Rice:  "Okay, I thought this was your company though.  Is it not."  Rice responses confirmed the customers false belief that Centurion was managing the trading and merely using the broker to process trades:  "Managing, yes.  But still need a broker to process transactions of course inside the market."  Ex. A, *MV Decl.* ¶ 166.

These statements were false.  Centurion did not trade any of customer funds by applying a "Bot" or algorithm or having Santi or a "pro trader" make the trades.  Despite what they told their customers, the Centurion Defendants did not do the trading on behalf of their customers.  Ex. A, *MV Decl.* ¶ 175.

### iii. *The Centurion Defendants Made Misrepresentations and Omissions Regarding the Historical Profits of Their "Hedge Fund"*

The Centurion Defendants also made fraudulent misrepresentations about the trading performance of the Centurion Pool.  The Centurion Defendants falsely told prospective customers that the Centurion Pool earned monthly returns ranging from 10 to 60 percent.  Ex. A, *MV Decl.* ¶ 163.

For example, in June 2022, Beltran posted an image purporting to show transactions in XAU/USD trades overlaid with the caption, "Autopilot 17k profits in 3 days." *Id*. The post further stated, "If you wonder what's this it's an investment acc manage by a pro trader that produces 40-60% monthly returns[.]" [sic]. Santi advertised a "10%+ Monthly ROI DEAL" and invited potential customers to send him a direct message to obtain additional information. *Id*.

Beltran and Rice also sent prospective customers text messages touting purported profits earned on certain Centurion trading accounts. For example, on one occasion in September 2022, Beltran sent a prospective customer a screen shot of an account that he alleged was started "end of Dec last year" which purported to show more than $4.4 million in "withdrawals" and only $1 million in deposits, representing a profit of more than $3 million over a 9 month period and an annualized return on investment of more than 600%. *Id*. On another occasion in December 2022, when asked by a customer, "What have been your historical returns here and how have the losses been historically." Rice responded that the monthly returns "[a]fter broker fees & commission & profit splits" was "10-12%." *Id*.

The Centurion Defendants also encouraged customers to use these fraudulent misrepresentations to recruit new participants by offering referral or "affiliate" fees for each new customer brought in. For example, Beltran sent a customer a video purporting to show trading profits overlaid with the text "Autopilot 17k profits in 3 days 😎" and encouraged him to post the video on Facebook to see if he could solicit new customers. *Id*. at ¶ 190.

These statements were false. Centurion did not trade any customer funds much less generate the large, purported returns being advertised. *Id*. at ¶ 175.

### iv.     *The Centurion Defendants Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw their Funds*

The Centurion Defendants made false and inconsistent statements about the process for withdrawing customer funds and provided false assurances when withdrawals were delayed allowing the scheme to continue for months after it began to unravel.

When initially soliciting customers the Centurion Defendants falsely represented that they could withdraw funds on a monthly basis by submitting a request to Centurion.  Ex. G, *Figlia Decl.* ¶ 5; Ex. B, *Alvarez Decl.* ¶ 6.  Centurion would then submit the request to TD.  Ex. A, *MV Decl.* ¶ 222.  However, in, or around August 4, 2022, the Centurion Defendants were alerted by Negus-Romvari that TD was unable to process in a timely manner all of the withdrawals Centurion had requested on behalf of its customers.  *Id*. at ¶ 194.e.

Negus-Romvari told the Centurion Defendants that they were requesting too many withdrawals and that any recently submitted withdrawal requests "wont [sic] be processed any time soon."  *Id*.  In response, Rice asked on a WhatsApp thread that also included Santi and Beltran:

> So Dave question bro, if we have 10M inside you're saying we can only withdraw up to 5% of that each month?
> I think that's kinda low considering the high returns . . . . . that means each client can only pull a very small % of their funds each month.
> **So realistically are they EVER entitled to their funds or there will be an issue when they want to liquidate their accts for whatever "emergency reasoning."**  (emphasis added)

*Id*. at ¶ 220.  After being alerted to withdrawal issues by Negus-Romvari and expressing concerns that customers may never be able to withdraw funds, the Centurion Defendants did not share these concerns with customers and failed to disclose to customers who were solicited after August 2022 that Centurion's existing customers were experiencing significant delays on withdrawals requests.  *Id*. at ¶ 221.

Instead, they made various and conflicting excuses to their customers about the withdrawal delays.  For example, in or around September or October 2022 in response to the delays, the Centurion Defendants told at least one customer that Centurion was switching to a quarterly, as opposed to a monthly, withdrawal system.  Centurion informed other customers that the delays were the result of issues with Traders Domain—not Centurion—revealing to some for the first time that Traders Domain—not Centurion—had possession of the funds.  In January 2023, when a customer expressed concern that the Centurion Defendants were engaged in a Ponzi scheme, Beltran falsely assured him that TD was "processing withdrawals non[] stop for regular trading acc's What we are waiting is for the pamms."  *Id.* at ¶ 223.

In or around March 7, 2023, Centurion sent a demand letter to TD detailing that, since December 2022, Centurion had made "dozens of requests for withdrawals totaling $19,143,698.82" which remained to be processed and accusing TD, Safranko, and Negus-Romvari of "misappropriate[ing]" and "deliberately withholding" those funds and operating a "Ponzi scheme."  They did not disclose these concerns to customers and instead continued to provide false assurances for months after they personally came to believe the TD Defendants were engaged in a fraud.  *Id.* at ¶ 224.

For example, on March 18, 2023, Rice assured one customer who was expressing concern about his pending withdrawal that "theres [sic] no doubt in my mind" that the funds would be returned.  On April 24, 2023, when a customer reached out to Beltran because she was unable to login to her TD account via the Trading App and requested to withdraw $75,000, Beltran advised her "there [sic] currently migrating the broker to a new platform We are waiting for them to be finished Once they are done we will provide the new login credentials."  In June 2023, when the same Centurion customer reached out for an update, Beltran forwarded her statements Safranko

made on Telegram and assured her that "they should be giving access to all the accounts" and that "At [sic] soon as we get access absolutely we can submit the request." *Id.* at ¶ 223d.-e.

### c. The Centurion Defendants Knew or Should Have Known that TD was Engaged in Fraud and Not Trading the Funds as Purported

During the Relevant Centurion Period, the Centurion Defendants knew or should have known that TD was not trading the funds as promised and, rather, was engaged in fraud. The Centurion Defendants ignored evidence that TD was manipulating trade data. In addition, the Centurion Defendants should have known about other public warnings circulating on the internet that would have alerted them to TD's fraud.

#### i. *The Centurion Defendants Ignored Evidence that TD was Manipulating Trade Data*

After receiving a customer's initial deposit, the Centurion Defendants would provide the customer with log-in information for the Trading App. Through the Trading App, customers could purportedly view and monitor the trading activity in their Centurion trading account, but they did not have the ability to make trades or withdraw funds. The trading activity customers observed through the Trading App was nearly always positive and led customers to believe that the pool was making substantial trading profits. Ex. G, *Figlia Decl.* ¶¶ 14-15; Ex. I, *Groves Decl.* ¶ 11; Ex. B, *Alvarez Decl.* ¶ 10.

However, on occasion, when monitoring their accounts via the Trading App, customers observed large losses in their accounts only to have those losses later corrected. For example, in or around October 2022, several customers observed substantial trading losses that appeared to nearly wipe out the value of their accounts. When those customers raised the issue with Centurion, a Centurion "customer service representative" downplayed the customers' concerns and claimed the losses were the result of a "system error" and did not represent actual trading losses. The Centurion representative assured those customers that the account would be updated,

and the losses reversed.  When customers asked how this was possible, the Centurion

representative claimed that it had the ability to credit the account and reverse the losses, an

indication that the trading was falsified.  Later that day, customers observed through the Trading

App that the trading losses in the account were reversed.  Ex. G, *Figlia Decl.* ¶ 15; Ex. I, *Groves*

*Decl* ¶ 17; Ex. B, *Alvarez Decl*. ¶ 10.

　　　Similarly, on or around November 30, 2022, some customers observed their trading

account value drop by approximately fifty percent.  When asked about this, Centurion again

stated that these did not represent actual trading losses and minimized customer concerns by

suggesting that they were the result of a "systems error" and a "glitch that will be corrected."

Again, the trading losses were reversed later in the day.  Ex. G, *Figlia Decl*. ¶ 15.

　　　Centurion knew that TD had the ability to alter trade data on completed trades.  TD's

ability to alter trade data on completed trades, should have alerted the Centurion Defendants that

TD was not actually trading customers' funds as purported and/or was altering trade data to hide

trading losses.  Ex. A, *MV Decl*. ¶¶ 190-191.

　　　This is particularly true given Santi's purported trading experience.  Santi holds himself

out as an "expert" trader.  On various social media platforms, websites, and podcasts, Santi

advertises that he has been trading forex for more than five years and has made millions of

dollars doing so.  In connection with one of his other businesses, Santi sells educational courses

and "mentoring" to other traders.  Its website prominently displays the CFTC banner, falsely

suggesting that he and/or the business are registered with the CFTC.  Moreover, Santi

acknowledge that traders often used deception to make their results appear to be more profitable

than they were in reality.  For example, Santi advised a customer that "it is all marketing" and

"not everything is the way it seems."  Santi told the customer that he would take screen shots of

his trading gains and profits, but not of his trading losses to give the appearance of profitability. *Id.* at ¶ 162; Ex. G, *Figlia Decl.* ¶ 5.

> ### ii.    The Centurion Defendants Knew or Should Have Known About Public Warnings About TD

In addition to the evidence of trade manipulation, there were numerous warnings about TD and Safranko circulating on the internet that should have alerted the Centurion Defendants to the fact that TD was engaged in fraud.

As described above, as early as 2020, several websites, flagged TD as a concern and published numerous customer complaints.  Moreover, as of July 14, 2022, the CFTC cautioned consumers about doing business with TD by placing it on the CFTC's RED List.  Ex. A, *MV Decl.* ¶ 36. Additionally, as described above, in September 2022 the Trading App was removed for the Apple App Store because, as reported by *Forbes* and by other sources, the Trading App was repeatedly used by fraudsters to assist in perpetrating scams.  *Id.* at ¶ 191.

Despite its knowledge of the manipulated trade data and the publicly available warnings, the Centurion Defendants continued to solicit customers for the TD Pool.  *Id.* at ¶ 190e.-f.

> ### d.  The Centurion Defendants Misappropriated and Commingled Customer Funds

Once prospective customers indicated their desire to participate in the Centurion Pool, Centurion would send them a Forex Account Management Agreement for their electronic signature.  Thereafter, rather than accept funds in the name of the Centurion Pool as is required under the Act, the Centurion Defendants instead directed customers to, alternatively, deposit funds via:  (i) wire transfer into bank accounts held in the names of other entities that Santi, Beltran, and/or Rice owned and controlled; (ii) wire transfer into bank accounts held in the name of a third party jeweler; (iii) crypto currency into wallets which, upon information and belief,

were controlled by the Centurion Defendants, the TD Defendants, or their agents.  Ex. A, *MV Decl.* ¶ 174.

Centurion customers deposited funds into bank accounts controlled by Santi, Beltran, and Rice for the purposes of trading leveraged or margined XAU/USD in the Centurion Pool, including:

- Centurion customers deposited no less than $40,000 into a Wells Fargo account ending in *3012 held in the name of Centurion Capital Group, Inc. and controlled by Santi and Beltran.

- Centurion customers deposited no less than $2.7 million into a Wells Fargo account ending in *3745 held in the name of a Santi-controlled business.

- Centurion customers deposited no less than $1.95 million into a Wells Fargo account ending in *2211 held in the name of another Santi-controlled business.

- Centurion customers deposited no less than $845,000 into a J.P. Morgan Chase account ending in *7579 held in the name of a Beltran-controlled business.

- Centurion customers deposited no less than $1.6 million into a Comerica account ending in *6339 held in the name of a Rice-controlled business.

Once deposited into one of the accounts described immediately above (the "Centurion Accounts"), customer funds were commingled with non-pool funds.  *Id.* at ¶¶ 177-178.  No funds were ever sent from the Centurion Accounts directly to TD or any other brokerage or trading firm.  *Id.* at ¶¶ 174-178.

Despite the lack of direct transfers, after depositing money into the Centurion Accounts, customers nonetheless observed via the Trading App that their accounts appeared to be funded typically within a few hours or days.  Ex. B, *Alvarez Decl.* ¶ 9.  The Centurion Defendants also misappropriated some of the customer funds deposited into the Centurion Accounts by using them for purposes unrelated to trading, to pay themselves, and to make Ponzi-style payments.  For example, on August 2, 2022, $40,000 was deposited via wire transfer by a customer into the

Wells Fargo account held in the name of Centurion Capital Group, Inc. and controlled by Santi and Beltran at a time when the account had a balance of $11.39. On August 15, 2022, nearly all of the $40,000 was transferred to a personal bank account of Santi leaving only $31.39 remaining in the account. Ex. A, *MV Decl.* ¶ 176.

On September 30, 2022, a customer deposited $1,200,000.00 via wire transfer into a Wells Fargo account held in the name of a Santi-controlled business at a time when the balance was $645.99. Within four days, Santi had spent all of $1,200,000.00 including by making $564,000 in Ponzi-style payments to other customers. *Id.* at  ¶ 225.

On April 18, 2022, a customer sent $100,000 to the Comerica account ending in 6339 held in the name of a Rice-controlled business at a time when the balance in the account was only $8,668,50. By April 26, 2022, Rice had misappropriated at least $40,000 of that deposit, transferring $18,684 to another bank account held in the name of, another business entity owned by him, writing a check for $2,500 to a tile company for "Home Install", and sending a $14,000 wire to a design company. *Id.* at ¶ 176.a.

In addition to directing customers to deposit funds into the Centurion Accounts, the Centurion Defendants also directed some customers to wire money to accounts controlled by a third-party jeweler ("Jeweler Accounts") who Centurion purportedly used as a source for cryptocurrency. Centurion customers deposited no less than $838,000 into the Jeweler Accounts. None of the customer funds deposited into the Jeweler Accounts were sent to TD or another trading firm. Despite the lack of direct transfers, after depositing money into the Jeweler Accounts, customers nonetheless observed via the Trading App that their accounts appeared to be funded typically within a few hours or days. *Id.* at ¶ 174.

On information and belief, the primary method by which Centurion customers deposited funds for purported trading was via cryptocurrency. Centurion instructed customers to deposit funds into cryptocurrency wallets, which upon information and belief were controlled by the Centurion Defendants, the TD Defendants, or their agents. After depositing money into the cryptocurrency wallets, customers observed via the Trading App that their accounts appeared to be funded typically within a few hours or days. *Id.* ¶¶ 169-173.

The Centurion Defendants misappropriated customer funds when they used the money for purposes other than trading, such as for their personal expenses and to make Ponzi-style payments to other customers. The Centurion Defendants also misappropriated funds, upon information and belief, by taking commissions which ranged between 40-60% of the purported trading profits, despite the fact that they knew or should have known that those profits did not really exist. *Id.* at ¶¶ 171-178.

Upon information and belief, large numbers of Centurion customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD. Upon information belief, customers who deposited funds via cryptocurrency have also been unable to withdraw their funds, which are not accounted for in the above figures. *Id.* at ¶¶ 220-228; Ex. G, *Figlia Decl.* ¶¶ 18-22; Ex. I, *Groves Decl.* ¶¶ 18-21; Ex. B, *Alvarez Decl.* ¶¶ 13-20.

### e. The Centurion Defendants Failed to Register with the CFTC

As described above, during the Relevant Centurion Period, Centurion was acting as an unregistered CPO by soliciting funds from individuals for a commodity pool for the purpose of trading XAU/USD on a leveraged or margined basis. Centurion used telephone, emails, wire transfers, internet, and other means or instrumentalities of interstate commerce to solicit, accept, and receive customer funds for the purposes of trading XAU/USD. Centurion was never

registered as a CPO and was not exempt or excluded from registration as a CPO. Ex. A, *MV Decl*. ¶ 40. During the Relevant Centurion Period, Santi, Beltran, and Rice were acting as unregistered APs of an unregistered CPO, Centurion, by soliciting customers to participate in the Centurion Pool while associated with Centurion as a partner, officer, employee, or similar agent. *Id*. at ¶¶ 160-166; Ex. B, *Alvarez Decl*. ¶ 6; Ex. I, *Groves Decl*. ¶¶ 5-7; Ex. G, *Figlia Decl*. ¶ 5. Santi, Beltran, and Rice were never registered as an AP of Centurion. Ex. A, *MV Decl*. ¶ 40.

### f.  Santi and Beltran are Controlling Persons of Centurion

Santi and Beltran are controlling persons of Centurion. As stated above, Santi and Beltran are co-owners of Centurion. Additionally, Santi and Beltran hold the offices of President and Vice President of Centurion, respectively. Ex. A, *MV Decl*. ¶ 40. In addition, Santi and Beltran controlled bank accounts, including in the name of Centurion, that accepted customer funds. *Id*. at ¶ 4.h. Santi and Beltran controlled the day-to-day operations, finance, accounts, and books and records of Centurion and had the ability to hire and fire Centurion employees. *Id*. at ¶¶ 40, 159-163; Ex. G, *Figlia Decl*. ¶ 5; Ex. I, *Groves Decl*. ¶ 6; Ex. B, *Alvarez Decl*. ¶ 5.

### V.  ARGUMENT

#### A.  COUNT ONE - FRAUD IN CONNECTION WITH LEVERAGED OR MARGINED RETAIL COMMODITY TRANSACTIONS

**Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act (Directly Against TD, Safranko, Negus-Romvari, Trubluefx, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Sims, Buggs, Centurion, Santi, Beltran, and Rice)**

**Violations of 7 U.S.C. § 6b(a)(2)(B) of the Act, (Directly Against TD and Safranko)**

**Violations of 7 U.S.C. § 6b(a)(2)(A), (C), Section 4b(a)(2)(A), (C) of the Act. (Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts of its agents; Santi and Beltran as Control Persons of Centurion; Centurion for the acts and omissions of its agents)**

**Violations of 7 U.S.C. § 6b(a)(2)(B), Section 4b(a)(2)(B) of the Act.**

**(Indirectly Against Safranko and Negus-Romvari as Control Persons of TD; TD for the acts and omissions of its agents)**

In connection with leveraged or margined retail commodity transactions, including the XAU/USD transactions described herein, each of the Defendants named above violated the Act as further described below.

7 U.S.C. § 6b(a)(2)(A)–(C) of the Act makes it unlawful:

> (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

> > (A) to cheat or defraud or attempt to cheat or defraud the other person;

> > (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D), retail commodity transactions, including the XAU/USD transactions described herein, are subject to 7 U.S.C. § 6b "as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery" provided that it is "entered into with or offered to"(i) a "person that is not an eligible contract participant" (ii) "on a leveraged or margined basis."

Section 1a(18)(A)(xi) of the Act, 7 U.S.C. § 1a(18)(A)(xi), defines an eligible contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the

transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

As alleged in the Complaint and as set forth herein, the TD Defendants, Trubluefx, Algo Defendants, Sims, Buggs, and the Centurion Defendants, committed fraud in connection with leveraged or margined retail commodity transactions in violation of Sections 4b(a)(2)(A),(C) of the Act, 7 U.S.C. § 6b(a)(2)(A),(C) by making material misrepresentations and omissions and/or misappropriating customer funds.  TD and Safranko also committed fraud in violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B), by providing customers with false account statements.

### a. The TD, Algo, Sims, Buggs, and Centurion Defendants Committed Fraud by Making Material Misrepresentations and Omissions with Scienter

To prove fraud by misrepresentations or omissions under Sections 4b the Act, the Commission must show that the Defendants made: (1) a false or misleading representation or deceptive omission; (2) with scienter; (3) that was material. *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328-29 (11th Cir. 2002).  The Commission has satisfied each of these elements.

### i. The TD Defendants, Algo Defendants, Sims, Buggs, and Centurion Defendants Made Material Misrepresentations and Omissions (Elements 1 and 3)

"Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald*, 310 F.3d at 1328 (citation omitted) (finding that over-emphasis of profit potential, downplaying risk of loss, and the relationship of options to a cash market were misrepresentations).  In addition, omissions are actionable where a defendant's failure to disclose information would render the defendant's prior speech misleading or deceptive. *See, e.g.*, *R.J. Fitzgerald*, 310 F.3d at 1328–33 (finding actionable omissions included failure to disclose that 95% of customers lost money).  A misrepresentation or omission is material if "a reasonable investor would consider it important in

deciding whether to make an investment." *See, e.g.*, *id.* at 1328–30 (misrepresentations concerning the riskiness and profitability of an investment were material); *CFTC v. Maldonado*, No. 4:20-CV-03185, 2021 WL 4295250, at *6 (S.D. Tex. Sept. 21, 2021) (information about account balances and profits were material); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000) (reporting erroneous account balances, among other representations, were material).

As described in the Complaint and above, the TD Defendants, the Algo Defendants, Sims, Buggs, and the Centurion Defendants each made material misrepresentations and omissions when soliciting existing and prospective customers to deposit money for the purpose of trading leveraged or margined XAU/USD.

**The TD Defendants**

The TD Defendants made material misrepresentations regarding, among other things, its trading operations and the ability of customers to withdraw their funds. For example, the TD Defendants misrepresented that all customer funds would be used to trade leveraged or margined XAU/USD. In one instance, TD also made misrepresentations that TD was able to generate significant profits by using a "bot" or algorithm to trade those funds. After customers began experiencing significant withdraw delays in August of 2022, the TD Defendants made numerous and conflicting excuses for the delays and falsely assured customers that their funds were safe and withdraws would be processed. These misrepresentations and omissions were material to prospective and existing customers, because, in deciding whether to invest in the TD Pool, a reasonable individual would have considered it important to know how their funds were being traded and whether they would be able to withdrawal their funds.

**The Algo Defendants**

The Algo Defendants made material misrepresentations and omissions regarding, among other things, the operation of the trading business, the location of customer funds, TD's addition to the CFTC RED List, and the ability of customers to withdraw their funds.  For example, the Algo Defendants misrepresented to customers that Algo was using its own proprietary trading algorithm to trade customer funds.  The Algo Defendants materially omitted to disclose to customers that, rather than being held by Algo, some customer funds were being sent to third parties and other customer funds were purportedly being transferred to TD via ledger transactions.  After learning that TD was added to the CFTC RED List in July 2022 and discussing internally their concerns, Algo failed to disclose this to existing and prospective customers.  Finally, the Algo Defendants made fraudulent misrepresentations and omissions about the timing of withdrawals and safety of customer funds.  These misrepresentations and omissions were material to prospective and existing customers, because, in deciding whether to participate in the Algo Pool, a reasonable individual would have considered it important to know how their funds would be traded, where the funds would be held, that public fraud warnings had been issued against the entity trading their funds, and whether they would be able to withdrawal their funds.

***Sims***

Sims made material misrepresentations and omissions regarding, among other things, the ownership and operation of the trading business, the profit and risk associated with the purported trading, and the ability of customers to withdraw their funds.  For example, Sims falsely told prospective customers that he was soliciting funds for a commodity pool operated by his own hedge fund when, in fact, he was acting as a sponsor for TD—an entity the NFA had warned him against doing business with (a fact he also did not disclose to customers).  He also falsely told

customers that his hedge fund generated monthly trading profits of 40%. Sims also falsely told customers that that they could withdraw their funds within 48 hours. These misrepresentations and omissions were material to prospective and existing customers, because in deciding whether to deposit money with Sims for the purpose of participating in his hedge fund, a reasonable individual would have considered it important to know that their funds would actually be traded by TD, not Sims or his hedge fund. Similarly, when deciding whether to deposit money with Sims' hedge fund, a reasonable investor would have considered it important to know the actual profits generated by the hedge fund, and whether they would be able to withdrawal their funds.

***Buggs***

Buggs made material misrepresentations and omissions regarding, among other things, the profit and risk associated with the purported trading, the mechanics and structure of the trading operation, and the ability of customers to withdraw their funds. For example, Buggs falsely told prospective customers that the commodity pool never had a losing month, shared screenshots of his trading returns showing an annual return of 400% and advised customers that the risk was capped at 3-4% per trade. Buggs also provided false assurances to customers regarding withdrawal delays. These misrepresentations and omissions were material to prospective and existing customers, because, in deciding whether to deposit money for the purpose of participating in leveraged and margined trading of XAU/USD, a reasonable individual would have considered it important to know about the pool's historical performance, risk of loss, and ability to withdraw funds.

***The Centurion Defendants***

The Centurion Defendants made material misrepresentations and omissions regarding, among other things, who controlled pool funds, how customer funds would be traded, the historical

profits of their "hedge fund", and the ability of customers to withdraw their funds. For example, the Centurion Defendants led customers to believe that their "hedge fund" was in control of funds and falsely told customers, at various times, that an algorithmic bot, Alex Santi, or another "pro trader" was trading the funds. The Centurion Defendants also told customers that their hedge fund earned monthly profits between 10 and 60 %. In addition, the Centurion Defendants made false and inconsistent statements about the ability of customers to withdraw their funds. These misrepresentations and omissions were material to prospective and existing customers, because, in deciding whether to deposit money for the purpose of participating in the Centurion Pool, a reasonable individual would have considered it important to know who controlled the funds, how they would be traded, and the pool's historical performance. Additionally, a reasonable in the Centurion Pool would have found it important whether they would be able to withdraw funds.

### ii.   *The TD Defendants, Algo Defendants, Sims, Buggs, and the Centurion Defendants Acted with Scienter (Element 2)*

The TD Defendants, Algo Defendants, Sims, Buggs, and Centurion Defendants made these misrepresentations and omissions with scienter. "[S]cienter is established if defendant intended to defraud, manipulate, or deceive, or if [a] defendant's conduct represents an extreme departure from standards of ordinary care." *R.J. Fitzgerald*, 310 F.3d at 1328. "Scienter is shown when Defendants' conduct involves highly unreasonable omissions or misrepresentations . . . that present a danger of misleading customers which is either known to the Defendant or so obvious that Defendant must have been aware of it." *CFTC v. U.S. Coin Bullion LLC*, *20*-cv-40, 2021 WL 8946141, at *9 (M.D. Fla. 2021). A defendant acts recklessly when, for example, he fails to conduct sufficient diligence on an investment prior to soliciting customers for the investment. *See, e.g.*, *CFTC v. Complete Devs.*, No. 10-CV-2287, 2014 WL 794181, at *17 (N.D. Ohio Feb. 26, 2014) (holding intermediary's provision of information "to potential

investors regarding the risk, interest rate, guaranteed principal, and security" based on

discussions with principals "without independent verification of the accuracy of that information

. . . is at least reckless and sufficient to establish scienter").

Here, the TD Defendants acted with scienter by making misrepresentations and omissions

that they knew to be false.  The TD Defendants knew they were not trading all customer funds

and that they were not trading any funds using a bot or algorithm.  The TD Defendants also knew

that the real reason they were unable to pay withdrawals was because the scheme was on the

brink of collapse.

The Algo Defendants, Sims, Buggs, and Centurion Defendants acted with scienter by

making misrepresentations and omissions that they knew to be false (such as falsely representing

that they were trading funds themselves when they were not) or that they should have known

were false based on known red-flags or warnings they were aware of or could have discovered

had they conducted even basic diligence on Safranko or TD prior to soliciting customers.

> **b.  The TD Defendants, Trubluefx, Algo Defendants, Sims, Buggs, and Centurion Defendants Committed Fraud by Misappropriating Customer Funds**

The TD Defendants, Trubluefx, Algo Defendants, Sims, Buggs, and Centurion

Defendants also violated Section 4b of the Act, 7 U.S.C. § 6b(a)(2)(A),(C), by misappropriating

customer funds.  Misappropriation "constitutes willful and blatant fraudulent activity."  *CFTC v.*

*Allied Markets,* LLC, 371 F.Supp.3d 1035, 1049 (M.D. Fla. 2019) (finding that Defendants

violated the anti-fraud provisions of the CEA by using invested funds to pay Defendants'

expenses and to pay "returns" to other customers"); *see also CFTC v. Notus LLC,* No. 1:22-CV-

20291, 2024 WL 1717486, at *8 (S.D. Fla. Apr. 22, 2024) (finding on motion for default that

defendants misappropriated funds in violation of Section 4b of the Act by "accepting the deposit

of [] customer funds into bank accounts in the names of Corporate Defendants and failing to use

the funds to trade as promised"); *CFTC v Driver,* 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012),

*aff'd sub nom. CFTC v. Driver*, 585 F. App'x 366 (9th Cir. 2014) (finding that Defendants

committed misappropriation where undisputed facts show that Defendants traded only a portion

of funds obtained from customers and used the remainder to pay withdrawing investors and

Defendant's personal expenses).  As described in the Complaint and herein, the TD, Trubluefx,

the Algo Defendants, Sims, Buggs, and the Centurion Defendants each committed fraud by

misappropriating customer funds.

***TD and Trubluefx***

TD violated Section 4b of the Act by misappropriating customer funds.  As set forth in

the Complaint and described above, TD directed customers to deposit funds for trading via

various third-party bank accounts that TD controlled through a TD agent who was the signatory

on these accounts, or payment processing firms.  None of the funds deposited into the third-party

bank accounts or via payment processing firms were ever sent to TD or any other entity engaged

in trading.  Instead, TD directed its agent who was the signatory on the third-party bank accounts

and payment processing firms to use customer funds to pay expenses unrelated to trading and to

make Ponzi-style payments to other customers.  As a result of TD Defendants' misappropriation,

upon information and belief, the majority of TD customers have been unable to withdraw funds

deposited with TD for the purpose of trading leveraged or margined XAU/USD.  Upon

information belief, customers who deposited funds via cryptocurrency have also been unable to

withdraw their funds.

Trubluefx also misappropriated customer funds.  In June 2023, TD announced that it had

been acquired by Trubluefx and that all customer funds had been "migrated" to the new

platform.  Despite purporting to hold TD customer funds and receiving repeated withdrawal

requests, to date thousands of customers have been unable to withdraw their funds from Trubluefx.

**The Algo Defendants**

The Algo Defendants also violated Section 4b of the Act by misappropriating customer funds. As set forth in the Complaint and above, the Algo Defendants directed customers to deposit funds into bank accounts held in the name of Algo Capital that were owned and controlled by Collazo and Herman (the "Algo Accounts"). Once deposited into the Algo Accounts, customer funds were never sent to TD or any other trading firms. At times, the Algo Defendants transferred customer funds to third-party bank accounts that had no apparent relationship to trading. At other times, Algo retained customer funds in its bank accounts and purported to do ledger maneuvers that purportedly fully funded customer accounts at TD. Algo, Collazo, and Herman also misappropriated customer funds deposited in the Algo Accounts by using them to pay expenses unrelated to trading, to make payments to themselves, and to make Ponzi-style payments to other customers.

In addition, Likos and Fortini misappropriated customer funds by accepting customer funds into bank accounts that they owned and controlled. Those funds were never sent to Algo, TD, or any other trading firm, and were used for purposed other than trading.

The Algo Defendants also misappropriated customer funds, upon information and belief, by taking commissions, which ranged between 15-50% of purported trading profits, even though they knew or should have none that TD was not trading customer funds as purported. Upon information and belief, large numbers of Algo customers have been unable to withdraw customer funds that were deposited for the purpose of participating in the trading leveraged or margined XAU/USD.

*Sims*

Sims also violated Section 4b of the Act by misappropriating customer funds. As set

forth in the Complaint and above, Sims directed customers to deposit funds into various bank

accounts held in the name of third parties. None of the funds deposited into the third-party

accounts were ever sent to TD or any other brokerage or firm engaged in trading. Sims also

misappropriated customer funds by taking commissions between from 40-50% of purported

trading profits, even though Sims knew or should have known that TD was not trading customer

funds as purported. Upon information and belief, large numbers of Sims customers have been

unable to withdraw customer funds that were deposited for the purpose of participating in the

trading leveraged or margined XAU/USD. Upon information belief, customers who deposited

funds via cryptocurrency have also been unable to withdraw their funds.

*Buggs*

Buggs also violated Section 4b of the Act by misappropriating customer funds. As set

forth in the Complaint and above, Buggs directed customers to deposit funds into various bank

accounts held in the name of third parties. None of the funds deposited into the third-party

accounts were ever sent to TD or any other brokerage or firm engaged in trading. In addition,

Buggs accepted a portion of customer funds into bank accounts he controlled and purported to

fund customer accounts via a "ledger transaction." Buggs used the customer funds deposited

into his personal accounts to pay expenses unrelated to trading, including for expensive vehicles

and a condo. In addition, Buggs misappropriated customer funds by taking commissions

between from 40-50% of purported trading profits, despite that Buggs knew or should have

known that TD was not trading customer funds as purported. Upon information and belief, large

numbers of Buggs customers have been unable to withdraw customer funds that were deposited

for the purpose of participating in the trading leveraged or margined XAU/USD.  Upon

information belief, customers who deposited funds via cryptocurrency have also been unable to

withdraw their funds.

*The Centurion Defendants*

     The Centurion Defendants also violated Section 4b of the Act by misappropriating

customer funds.  As set forth in the Complaint and above, Centurion directed customers to

deposit funds in multiple ways including via (i) wire transfer to bank accounts held in the name

of Centurion or other entities that Santi, Beltran, or Rice controlled (the "Centurion Accounts"),

(ii) wire transfer to bank accounts held in the name of a third-party jeweler ("Jeweler

Accounts"), or (iii) crypto currency.  Once funds were deposited into the Centurion or Jeweler

Accounts, they were never sent to TD or any other brokerage or firm engaged in trading.  Santi,

Beltran, and Rice also misappropriated customer funds deposited in the Centurion Accounts by

using them to pay expenses unrelated to trading or to make Ponzi-style payments to other

customers.  Centurion also misappropriated customer funds by taking commissions which ranged

between 40-60% of purported trading profits.  Upon information and belief, large numbers of

Centurion customers have been unable to withdraw customer funds that were deposited for the

purpose of participating in the trading leveraged or margined XAU/USD.  Upon information

belief, customers who deposited funds via cryptocurrency have also been unable to withdraw

their funds.

     **c.  TD and Safranko Committed Fraud by Issuing False Account Statements**

     TD and Safranko also violated 7 U.S.C. § 6b(a)(2)(B) when they created and issued false

account statements to customers.  *See, e.g.*, *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1107

(C.D. Cal. 2003) (finding false and misleading statements as to amount and location of investors'

money violated 7 U.S.C. § 6b(a)(2)(B)); *Noble Wealth*, 90 F. Supp. 2d at 686 (finding

defendant's profit claims constituted false reports and fraud within the meaning of the Act). As detailed in the Complaint and above, TD and Safranko provided customers with access to view the trades and activity in their account through the Trading Application. In addition, TD sent daily confirmation statements via emails to customers showing, among other things, the trading activity, margin, and account balance for the account. These account statements were false. Both the daily confirmation statements as well as information accessed through the Trading Application showed near constant positive trading returns. To achieve these results, TD manipulated trade data to eliminate losses which Safranko later acknowledged in conversations with customers.

**B.  COUNT TWO - FRAUD AND DECEIT BY CPOS AND APS OF CPOS**

**Violations of 7 U.S.C. § 6o(1)(A)–(B), Section 4o(1)(A)–(B) of the Act**

**(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)**

**(Indirectly Against Safranko and Negus-Romvari as a Control Person of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and Beltran as Control Persons of Centurion; Centurion or the acts and omissions of its agents)**

By the same conduct described above, the above-named Defendants also violated 7 U.S.C. § 6o(1), because they were acting as CPOs or as an AP of CPOs. 7 U.S.C. § 6o(1) provides that [i]t shall be unlawful for a . . . [CPO or an AP of a CPO], by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

> (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

> (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1) is a parallel statute to 7 U.S.C. § 6b—the same conduct that violates the latter

can violate the former.  *CFTC v. Am. Bullion Exch. Abex, Corp.*, No. SACV101876DOCRNBX,

2014 WL 12603558, at *5 (C.D. Cal. Sept. 16, 2014); *Driver*, 877 F. Supp. 2d at 978.  In the

Eleventh Circuit, Section 6*o*(1)(A) requires the Commission to prove scienter[3]; however, no such

requirement exists to prove a violation of 7 U.S.C. § 6*o*(1)(B).  *Messer v. E.F. Hutton & Co.*, 847

F.2d 673, 677-79 (11th Cir. 1988); *see also CFTC v. Fingerhut*, 1:20-CV-21887, 2021 WL

65069 (S.D. Fla. Jan. 7, 2021) at *9, FN4.  "The Eleventh Circuit has held that . . . the scienter

standard is satisfied by a showing of 'intent to deceive, manipulate, or defraud,' or 'severe

recklessness,' which refers only to 'those highly unreasonable omissions or representations that

involve not merely simple or inexcusable negligence, but an extreme departure from the

standards of ordinary care," *SEC v. Profile Solutions*, 2024 WL 3103910 (S.D. Fla. March 27,

2024), at *8 (internal citations omitted). The only additional element set forth in 7 U.S.C. § 6*o*(1)

is that Defendants' conduct must involve use of the mails or any means or instrumentality of

interstate commerce, which it did based on the facts described *supra* in Part. IV.  7 U.S.C.

§ 6*o*(1) applies to all CPOs and APs whether registered, required to be registered, or exempt

from registration.  *See Weinberg*, 287 F. Supp. 2d at 1107-08 (so noting with respect to CPOs).

    7 U.S.C. § 1a(10)(A) defines a "commodity pool" as "any investment trust, syndicate, or

similar form of enterprise operated for the purpose of trading in commodity interest," including

for the trading of leveraged or margined retail commodity transactions.  7 U.S.C. § 1a(11)(A)(i)

defines a CPO, in relevant part, as any person:

---

[3] The *Messer* court concluded that "Section 6*o*(1)(A) [of the Act] contains the same scienter requirement as Section 10b and Rule 10b-5 of the federal securities laws, while Section 6*o*(1)(B) does not require proof of scienter…The Supreme Court has held that Section 10b and Rule 10b-5 are not violated in the absence of a showing of scienter – an intent to deceive, manipulate or defraud." (quoting, *Santa Fe Indus. v. Green*, 430 U.S. 462, 473-74 (1977)).

[E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—

(I)   commodity for future delivery, security futures product, or swap; [or]

(II)   agreement, contract, or transaction described in [S]ection 2(c)(2)(C)(i) [of the Act] or [S]ection 2(c)(2)(D)(i) [of the Act].

17 C.F.R.§ 1.3 (2023), defines an AP of a CPO as a natural person associated with:

(3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

***The TD Defendants***

### 1.   TD is a CPO

During the Relevant Period, TD solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i) of the Act); therefore, TD acted as a CPO as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

### 2.   Safranko and Negus-Romvari are APs of a CPO

During the Relevant Period, Safranko and Negus-Romvari were associated with TD, a CPO, as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool.  Therefore, Safranko and Negus-Romvari were APs of a CPO as defined by 17 C.F.R. § 1.3 (2023).

### 3.   TD, as a CPO, and Safranko and Negus-Romvari, as APs of a CPO, Violated 7 U.S.C. § 6*o*(1)(A)–(B) Through Their Fraudulent Misconduct

TD, Safranko and Negus-Romvari violated 7 U.S.C. § 6o(1) by making material misrepresentations and omission with scienter, misappropriating customer funds, and/or falsifying trading records as described *supra* at Part IV.A.d-f, and using the mails or means or instrumentalities of interstate commerce to carry out their fraudulent scheme.

*The Algo Defendants*

### 1.  Algo Capital and Algo FX are CPOs

During the Relevant Algo Period, Algo Capital and Algo FX solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i) of the Act); therefore, Algo Capital and Algo FX acted as CPOs as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

### 2.  Collazo, Herman, Fortini, and Likos are APs of a CPO

During the Relevant Algo Period, Collazo, Herman, Fortini, and Likos were associated with Algo Capital and Algo FX, both CPOs, as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool.  Therefore, each of Collazo, Herman, Fortini, and Likos were APs of CPOs as defined by 17 C.F.R. § 1.3 (2023).

### 3.  As CPOs and APs of CPOs Violated 7 U.S.C. § 6o(1)(A)–(B) Through Their Fraudulent Misconduct

Algo Capital, Algo FX, Collazo, Herman, Fortini, and Likos violated 7 U.S.C. § 6o(1) by making material misrepresentations and omissions with scienter and/or misappropriating customer funds as described *supra* in Part IV.B.b, d, and using the mails or means or instrumentalities of interstate commerce to carry out their fraudulent scheme.

*The Centurion Defendants*

### 1.  Centurion is a CPO

During the Relevant Period, Centurion solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i) of the Act); therefore, Centurion acted as a CPO as defined by 7 U.S.C. § 1a(11)(A)(i)(II).

### 2. Santi, Beltran, and Rice are APs of a CPO

During the Relevant Centurion Period, each of Santi, Beltran and Rice were associated with Centurion, as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool. Therefore, each of Santi, Beltran and Rice were APs of CPOs as defined by 17 C.F.R. § 1.3 (2023).

### 3. As CPOs and APs of CPOs Violated 7 U.S.C. § 6*o*(1)(A)–(B) Through Their Fraudulent Misconduct

Centurion, Santi, Beltran, and Rice violated 7 U.S.C. § 6*o*(1) by making material misrepresentations and omission with scienter and misappropriating customer funds as described *supra* at Part IV.E.b, d, and using the mails or means or instrumentalities of interstate commerce to carry out their fraudulent scheme.

### C. COUNT THREE - FAILURE TO REGISTER AS A CPO OR AS AN AP OF A CPO

**Violations of 7 U.S.C. § 6k(2), Section 4k(2) of the Act**
**(Directly Against TD, Safranko, Negus-Romvari, Algo Capital, Algo FX, Collazo, Herman, Fortini, Likos, Centurion, Santi, Beltran, and Rice)**

**Violations of 7 U.S.C. § 6m(1), Section 4m(1) of the Act**
**(Directly Against TD, Algo Capital, and Centurion)**

**Violations of 7 U.S.C. §§ 6k(2) and 6m(1), Sections 4k(2) and 4m(1) of the Act**
**(Indirectly Against Safranko and Negus-Romvari As Control Persons of TD; TD for the acts and omissions of its agents; Herman and Collazo as Control Persons of Algo Capital and Algo FX; Algo Capital and Algo FX for the acts and omissions of its agents; Santi and Beltran as Control Persons of Centurion; Centurion for the acts and omissions of its agents)**

7 U.S.C. § 1a(11)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any—
> . . .
> agreement, contract, or transaction described in . . . [S]ection 2(c)(2)(D)(i) [of the Act.]

Subject to certain exceptions not relevant here, 7 U.S.C. § 6m(1) states that it shall be "unlawful for any . . . [CPO], unless registered under this chapter, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such . . . [CPO] . . . ."

Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2)(i) makes it unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the [CFTC]" as an AP of the CPO.

7 U.S.C. § 6k(2) also prohibits a CPO from permitting "such a person to become or remain associated with" it, in any such capacity, if the CPO knew or should have known that such person was not registered as an AP.

***The TD Defendants***

During the Relevant Time Period, TD failed to register as a CPO and Safranko and Negus-Romvari failed to register as APs of a CPO (*i.e.*, TD).

Section 7 U.S.C. § 6m(l), provides that it is unlawful for a CPO, unless registered, to make use of the mails or any means or instrumentality of interstate commerce in connection with

his business as a CPO.  7 U.S.C. § 6k(2) states that APs of CPOs who are soliciting for participation in a pool must register with the Commission.  *See, e.g., Am. Bullion*, 2014 WL 12603558, at *7 (finding defendants who should have registered but failed to register as CPOs and APs violated the Act and Regulations).

For the reasons described above, TD is a CPO because it operated or solicited funds, securities, or property for a pooled investment vehicle from pool participants for the purpose of trading in leveraged or margined retail commodity transactions.  TD, while using the mails or means of interstate commerce in connection with its business as a CPO, did not register with the Commission as a CPO, in violation of 7 U.S.C. § 6m(1).  Each of Safranko and Negus-Romvari associated with TD as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, each of Safranko and Negus-Romvari acted as an AP of a CPO.  Neither of Safranko nor Negus-Romvari registered with the Commission as an AP of TD; thus, Safranko and Negus-Romvari each acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2).  TD supervised Safranko and Negus-Romvari and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

***The Algo Defendants***

During the Relevant Algo Period, Algo Capital and Algo FX, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions.  Algo Capital, unlike Algo FX, was not registered with the CFTC as a CPO in violation of 7 U.S.C. § 6m(1).  During the Relevant Algo Period, Collazo, Herman, Fortini, and

Likos associated with Algo Capital and Algo FX as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, each of Collazo, Herman, Fortini, and Likos acted as an AP of a CPO. None of Collazo, Herman, Fortini, or Likos registered with the Commission as an AP of Algo Capital or Algo FX; thus, Collazo, Herman, Fortini, and Likos each acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2). Algo Capital and Algo FX supervised Collazo, Herman, Fortini, and Likos and permitted them to solicit customers for a commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

### *The Centurion Defendants*

During the Relevant Centurion Period, Centurion, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for a pooled investment vehicle for the purpose of trading in leveraged or margined retail commodity transactions. Centurion was not registered with the CFTC as a CPO, in violation of 7 U.S.C. § 6m(1). During the Relevant Centurion Period, Santi, Beltran, and Rice associated with Centurion as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for a participation in a commodity pool; therefore, each of Santi, Beltran and Rice acted as an AP of a CPO. None of Santi, Beltran or Rice registered with the Commission as an AP of Centurion; thus, Santi, Beltran and Rice each acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2). Centurion supervised Santi, Beltran, and Rice and permitted them to solicit customers for the commodity pool knowing that they were unregistered, in violation of 7 U.S.C. § 6k(2).

**D. COUNT FOUR - FAILURE TO OPERATE POOL AS SEPARATE ENTITY; FAILURE TO RECEIVE POOL PARTICIPANT FUNDS IN POOL'S NAME; COMMINGLING OF POOL FUNDS**

**Violations of 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023), Regulation 4.20(a)(1), (b)–(c). (Directly Against Algo Capital, Algo FX, and Centurion)**

**(Indirectly Against Herman and Collazo as Control Persons of Algo Capital and Algo FX; and Santi and Beltran as Control Persons of Centurion)**

Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2023), requires a CPO, whether registered or not, to operate its pool as a legal entity separate from that of the CPO.  Regulation 4.20(b) prohibits CPOs, whether registered or not, from receiving pool participant funds in any name other than that of the pool.  *See, e.g., Am. Bullion*, 2014 WL 12603558, at *7 (finding CPOs violated Regulations 4.20(a)(1) and (b) when they failed to operate pool as separate legal entity and received pool funds in a name other than that of the pool).  Regulation 4.20(c) prohibits a CPO, whether registered or not, from commingling the property of any pool it operates with the property of any other person. *See, e.g., CFTC v. Capitol Equity FX LLC*, No. EDCV17743JGBSKX, 2017 WL 9565340, at *5 (C.D. Cal. July 31, 2017) (holding that CPO violated Regulation 4.20(c) by commingling pool funds with non-pool property).

***The Algo Defendants***

During the Relevant Algo Period, Algo Capital, while unregistered and acting as a CPO, violated Regulation 4.20(a)(1), (b)-(c) by failing to operate the commodity pool as a separate legal entity from Algo Capital; failing to receive customer funds in the pool's name; and commingling customer funds with non-pool assets.

During the Relevant Algo Period, Algo FX, while registered and acting as a CPO, violated 17 C.F.R. § 4.20(a)(1), (b)–(c) (2023) by failing to operate the commodity pool as a legal entity separate from Algo FX; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

***The Centurion Defendants***

During the Relevant Centurion Period, Centurion, while unregistered and acting as a CPO, violated Regulation 4.20(a)(1), (b)-(c) by failing to operate the commodity pool as a separate legal entity from Centurion; failing to receive funds in the pool's name; and commingling customer funds with non-pool assets.

## VI.   DEFENDANTS ARE DERIVATIVELY LIABLE FOR EACH OTHER'S MISCONDUCT

### A. CONTROL PERSON LIABILITY

In addition to their direct liability, certain defendants are also derivatively liable as controlling persons as described herein. Controlling persons are liable for violations of the entities they control under certain circumstances. 7 U.S.C. § 13c(b), states that a controlling person of an entity is liable for the violations of that entity if the controlling person knowingly induced the violations, directly or indirectly, or did not act in good faith. The fundamental purpose of 7 U.S.C. § 13c(b) is to allow the Commission "to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself." *CFTC v. Hunter Wise Commodities*, LLC, 21 F. Supp. 3d 1317, 1350 (S.D. Fla. 2014) (quoting *R.J. Fitzgerald*, 310 F.3d at 1334). As the Eleventh Circuit has stated, 7 U.S.C. § 13c(b) is "about power, and imposing liability for those who fail to exercise it to prevent illegal conduct." *R.J. Fitzgerald*, 310 F.3d at 1334.

To establish controlling person liability under 7 U.S.C. § 13c(b), the Commission must show both: (1) control; and (2) lack of good faith or knowing inducement of the acts constituting the violation. *See* 7 U.S.C. § 13(b); *see also In re First Nat'l Trading Corp.*, CFTC No. 90-28,

1994 WL 378010, at *11-12 (Jul. 20, 1994), *aff'd without opinion sub nom. Pick v. CFTC*, 99

F.3d 1139 (6th Cir. 1996).

To establish the first element, control, a defendant must possess general control over the

operation of the entity principally liable. *See, e.g., R.J. Fitzgerald*, 310 F.3d at 1334

(recognizing an individual who "exercised the ultimate choice-making power within the firm

regarding its business decisions" as a controlling person). Evidence that a defendant is an

officer, founder, principal, or the authorized signatory on the company's bank accounts indicates

the power to control a company. *See In re Spiegel*, CFTC No. 85-19, 1988 WL 232212, at *8

(Jan. 12, 1988).

### The TD Defendants: Safranko and Nevus-Romvari

Safranko and Negus-Romvari are controlling persons of TD. Safranko and Negus-

Romvari incorporated and registered TD in Saint Vincent and the Grenadines in 2017 as co-

owners. In addition, Safranko opened bank accounts in the name of TD, and both Safranko and

Negus-Romvari executed contracts on behalf of TD throughout the Relevant Time Period.

Although Safranko and Negus-Romvari later took steps to hide their role with TD, they were still

firmly in control of TD operations throughout the Relevant Time Period. Beginning in or around

May 2019, shortly after receiving an inquiry from Canadian regulators, Safranko and Negus-

Romvari took steps to conceal Negus-Romvari's role with TD. Safranko and Negus-Romvari

removed Negus-Romvari as a Director and re-issued all of TD's shares to Safranko. Similarly,

after "resigning" as director January 2020, Safranko continued to identify himself as the CEO of

TD in email communications and represented himself as the owner of TD to Sponsors and

customers in various virtual and electronic meetings that took place in 2022 and 2023.

### Algo: Collazo and Herman

Collazo and Herman are controlling persons of Algo. Collazo and Herman are co-owners of Algo Capital and Algo FX. Collazo is the President of Algo Capital and Manager of Algo FX. Herman is the Vice President of Algo Capital and Manager of Algo FX. Collazo and Herman controlled the Algo Capital bank accounts that accepted all customer funds. Collazo and Herman controlled the day-to-day operations, finance, accounts, and books and records of Algo Capital and Algo FX.

**Centurion: Santi and Beltran**

Santi and Beltran are co-owners of Centurion. Additionally, Santi and Beltran hold the offices of President and Vice President of Centurion, respectively. In addition, Santi and Beltran controlled bank accounts, including in the name of Centurion, that accepted customer funds. Santi and Beltran controlled the day-to-day operations, finance, accounts, and books and records of Centurion and had the ability to hire and fire Centurion employees.

*****

To establish the second element of controlling person liability, the Commission must show the controlling person knowingly induced, directly or indirectly, the acts constituting the violation, or did not act in good faith. *R.J. Fitzgerald*, 310 F.3d at 1334; *Hunter Wise*, 21 F. Supp. 3d at 1350. To show knowing inducement, the Commission must show that a defendant had actual or constructive knowledge of the core activities that constituted the violation of the Act or the Commission's Regulations, and allowed the activities to continue. *R.J. Fitzgerald*, 310 F.3d at 1334; *In re Spiegel*, 1988 WL 232212, at *7–8. The Commission meets this burden.

**The TD Defendants**

Safranko and Nevus-Romvari were at the center of TD's fraudulent scheme from the very beginning. Safranko and Nevus-Romvari fraudulently solicited customers and ran the meetings

- 103 -

during which TD made the false representations and omissions, and communicated with customers to reinforce those falsehoods. Safranko actively took steps to hide his deep involvement in the fraud from regulators. In addition, Safranko and Negus-Romvari opened and controlled the many of TD's bank accounts. As such, both Safranko and Nevus-Romvari had actual knowledge of the conduct constituting TD's violations of the Act and Regulations as alleged in the Complaint. Because Safranko and Nevus-Romvari controlled TD, and knowingly induced the acts constituting its violations of the Act and Regulations, they are each liable as a controlling person for TD's violations of the Act and Regulations.

### The Algo Defendants

Collazo and Herman knowingly induced the acts because, as described above, they controlled the Algo bank accounts that accepted all customer funds, controlled the day-to-day operations, finance, accounts, and books and records of Algo Capital and Algo FX, communicated with customers directly, and drafted and approved customer communications and agreements. It could only have been Collazo and Herman, then, who orchestrated the misappropriation of the customer funds entrusted to Algo Capital and Algo FX – including payment to themselves. Collazo and Herman were also aware that customer funds were being used for purposed other than trading.

### The Centurion Defendants

As noted above, Santi and Beltran controlled day-to-day operations and bank accounts that accepted customer funds. As with the Algo Defendants, here, the wrongful acts – such as paying oneself from customer funds deposited for trading purposes – are clearly intentional. As such, there is no question that control person liability is appropriate for both Santi and Beltran.

## VII.   RELIEF SOUGHT

As described above and in the Complaint, Defendants have committed fraud in violation

of 7 U.S.C. §§ 6b(a)(2)(A)–(C), 6k(2), 6m(1), and 6o(1)(A)–(B), and 17 C.F.R. §§ 4.20(a)(1),

(b)–(c) (2023).   Through the interconnected fraud schemes, Defendants have already defrauded

at least 2,046 customers of more than $280 million and there is a reasonable likelihood that

Defendants are continuing their fraud.   The Commission's request for the Proposed SRO is

necessary to preserve the status quo.   The Proposed SRO freezes Defendants' assets, prohibits

Defendants from destroying any records, permits the CFTC to inspect and copy Defendants'

records, and requires Defendants to provide information necessary to locate and access those

records, appoints a temporary receiver, and provides for expedited discovery.   The Commission

seeks this relief pursuant to 7 U.S.C. § 13a-1(a).

### A.  THE COURT HAS JURISDICTION AND AUTHORITY TO GRANT THE RELIEF SOUGHT.

7 U.S.C. § 13a-1(a) authorizes the CFTC to seek injunctive and other relief in a district

court against any person whenever it shall appear to the Commission that such person has

engaged, is engaging, or is about to engage in any act or practice constituting a violation of any

provision of the Act or any rule, regulation, or order thereunder.   7 U.S.C. § 13a-1(a) further

authorizes the Commission to seek, and the Court to grant, certain specific *ex parte* relief,

namely— a restraining order which "[1] prohibits any person from destroying, altering, or

disposing of, or refusing to permit authorized representatives of the Commission to inspect,

when and as requested, any books and records or other documents[,] or [2] which prohibits any

person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets

or other property . . . ."   Mindful that notice "may result in the destruction of books and records

and the dissipation of customer funds," Congress authorized courts to issue such relief *ex parte*

"to prevent possible removal or destruction of potential evidence or other impediments to

legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and

other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, at

53–54, 93 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3902–03, 3942. *See, e.g.*, *CFTC v. Van*

*Beuningen*, 2016 WL 9454431 at *1-2. (N.D. Ga. March 29, 2016).

The Eleventh Circuit has held that a *prima facie* showing of illegality is sufficient to

empower "district courts to issue permanent or temporary injunctions." *CFTC v. Hunter Wise*

*Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014)[4], *citing CFTC v. Muller*, 570 F.2d 1296,

1300 (5th Cir. 1978) (recognizing that, upon a *prima facie* showing of illegality, district courts

have "inherent power as a court of equity to order such temporary, ancillary relief in order to

preserve the *status quo* so that an ultimate decision for the Commission could be effective.");

*accord CFTC v. Notus* LLC, No. 1:22-CV-20291, 2023 WL 6196953, at *5 (S.D. Fla. Sept. 22,

2023); *CFTC v. Fingerhut*, No. 1:20-CV-21887, 2021 WL 65069, at *7 (S.D. Fla. Jan. 7, 2021).

As such, courts in this district have applied 7 U.S.C. § 13a-1 in the Commission's enforcement

---

[4] In *Hunter Wise*, the Eleventh Circuit made clear that a court deciding whether to issue a statutory restraining order under the Commodity Exchange Act, 7 U.S.C. § 13a-1, "does not employ the familiar preliminary injunction formula, which requires that a plaintiff clearly establish a substantial likelihood of success on the merits and the likelihood of irreparable injury, among other things," but instead the "standard is lower" and requires the CFTC to make a prima facie showing of illegality. *Hunter Wise*, 749 F.3d at 974; *see also, e.g.*, *CFTC v. Notus LLC*, No. 1:22-CV-20291, 2023 WL 6196953, at *5 (S.D. Fla. Sept. 22, 2023) (explaining that the standard for a statutory restraining order "under the Commodity Exchange Act is lower" than the four-factor preliminary injunction test). In a recent case, *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024), the Supreme Court held that courts must use the traditional four-part test for preliminary injunctions when evaluating National Labor Relations Board's request for preliminary injunction under the National Labor Relations Act ("NLRA"). *See also SEC v. Chappell*, 107 F.4th 114, 128 (3d Cir. 2024). However, the Eleventh Circuit has not addressed the recent *Starbucks* decision involving the NLRA and there are no decisions in this Circuit which suggest that it alters the applicable standard for a CEA statutory restraining order set forth in *Hunter Wise*. To the extent the CFTC is required to demonstrate the traditional four factors—(1) a substantial likelihood of success on the merits, (2) irreparable injury in the absence of an injunction, (3) that its threatened injury without the injunction outweighs the defendants' under it, and (4) that the injunction is not adverse to the public interest—those factors are clearly satisfied in this case for the reasons explained in this motion.

cases to issue *ex parte* SROs like the one sought here. *See, e.g.*, *CFTC v. Systematic Alpha Mgmt., LLC*, No. 23-21527-CIV, 2023 WL 4363979, at *1 (S.D. Fla. Apr. 24, 2023) (granting ex parte motion for statutory restraining order freezing assets and permitting inspection of records and expedited discovery); *CFTC v. Bluprint LLC*, 22-cv-80092, Dkt. # 11 (Jan. 20, 2022) (granting ex parte motion for statutory restraining order and motion for expedited discovery); *CFTC v. Mintline, Inc.*, No. 14-61125-CIV, 2014 WL 4050014, at *1 (S.D. Fla. May 14, 2014) (granting ex parte motion for statutory restraining order freezing assets and permitting inspection of records); *see also CFTC v. Van Beuningen*, No. 1:16-CV-978-TCB, 2016 WL 9454431, at *1 (N.D. Ga. Mar. 29, 2016) (granting ex parte motion for statutory restraining order).

First, the proposed *ex parte* SRO freezes Defendants' assets, which is relief that fits squarely within the Court's authority under the plain language of 7 U.S.C. § 13a-1(a).  An asset freeze is especially appropriate where, as here, the Commission seeks disgorgement and restitution. *See CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) (holding in the context of an injunction pending satisfaction of judgment that "a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"); *Muller*, 570 F.2d at 1301 (similar in granting a preliminary injunction); *SEC v. Evolution Capital Advisors, LLC*, 866 F. Supp.2d 661, 668 (S.D. Tex. 2011) ("The court is also empowered to freeze defendants' assets to preserve the status quo, and to prevent dissipation of monies obtained by fraud, and protect investors") (citing *Muller*, 570 F.2d at 1300); *SEC v. Abdallah*, No. 14-cv-1155, 2014 WL 12597836, at *2 (N.D. Ohio May 30, 2014) (similar in the context of a temporary restraining order); *F.T.C. v. Health Formulas, LLC*, No. 14-CV-01649, 2015 WL 4623126, at *2 (D. Nev. Aug. 3, 2015) ("As it stated in its Temporary Restraining Order . . . the Court has found that the asset freeze is necessary to preserve the possibility of future relief.").  As another district court explained, "an

order imposing a temporary freeze of assets is often necessary simply to preserve the status quo while an investigation is conducted to clarify the sources of various funds." *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979) (context of a preliminary injunction); *see also CFTC v. Steele*, No. 05-CV-3130, 2005 WL 3723267, at *1 (N.D. Ill. May 26, 2005) (*ex parte* restraining order freezing assets necessary to preserve the *status quo*).

Second, the Proposed SRO also requires Defendants to preserve certain records and allow Commission representatives to inspect such records.  Preservation and inspection will allow the Commission to identify assets, victims, and the scope of Defendants' wrongdoing, as well as ensure that Defendants do not destroy evidence of their fraud.  To facilitate inspection, the Commission requests that the Court (i) require Defendants to identify and provide the location of and, if applicable, passwords to access such records; (ii) authorize the Commission to take steps to inspect such records from an offsite location or remotely; and (iii) authorize the copying of records (with any records being returned to Defendants afterwards) as part of the order requiring preservation and allowing inspection of the records.

Although 7 U.S.C. § 13a-1(a) does not expressly provide for these steps to facilitate inspection, the provision does permit inspection of books, records, or other documents "*when and as requested*" (emphasis added).  This contemplates the Commission's selection of not only the time, but the means of inspection not specifically articulated in the statute.  Indeed, such authority is necessary to give practical meaning to the Commission's right to inspect.  "The law has long recognized that the '[a]uthorization of an act also authorizes a necessary predicate act.'" *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring in the judgment) (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 192 (2012) (discussing the "predicate-act canon")); *see also id.* ("'[W]henever a power is given by a statute,

everything necessary to the making of it effectual or requisite to attain the end is implied'"

(quoting 1 J. Kent, Commentaries on American Law 464 (13th ed. 1884))); *cf. McCulloch v.*

*Maryland*, 17 U.S. 316, 409–10 (1819) ("The government which has a right to do an act, and has

imposed on it, the duty of performing that act, must, according to the dictates of reason, be

allowed to select the means . . . .").

Provisions requiring Defendants to identify the location of assets, authorizing offsite

and/or remote inspection, and authorizing the Commission to copy records are necessary

predicates to the Commission's ability to inspect that will ensure important records related to

Defendants' relevant conduct and customer funds are not destroyed and allow Commission

representatives to have a real and meaningful opportunity to inspect, review, and carefully

analyze all such records.  Such relief is consistent with the strong policy enunciated by Congress,

"to prevent any possible destruction of evidence and conversion of assets."  H.R. Rep. No. 97-

565, at 53–54.  This relief is particularly appropriate here given that some of these Defendants

are not registered with the Commission and therefore are under no regulatory obligation to

maintain records that may be material to determining the full extent of the violative conduct.

Numerous courts have previously required identification of, the provision of information (such

as passwords) regarding, and authorized copying of, records in similar *ex parte* circumstances.

*See ,e.g.*, *CFTC v. Allensworth*, No. 17-CV-07102 (C.D. Cal. Oct. 3, 2017) (ECF # 15, SRO at

6–7); *CFTC v. Khara*, No. 15-CV-03497, 2015 WL 10849125, at *4 (S.D.N.Y. May 5, 2015);

*CFTC v. RFF GP, LLC*, No. 13–CV–382, 2013 WL 4083748, at *4 (E.D. Tex. Jul. 9, 2013);

*Financial Robotics, Inc.*, No. 4:11-cv-02446 (S.D. Tex. June 30, 2011); *Yancy*, No.4:10-cv-

02955 (S.D. Tex. Aug. 18, 2010) (ECF # 5, at ¶¶ 21-27) .

Third, the Proposed SRO appoints a temporary receiver.  7 U.S.C. § 13a-1(a) specifically

authorizes the CFTC to seek, and the Court to grant, a restraining order which provides for the *ex*

*parte* appointment of a temporary receiver to administer such restraining order and to perform

such other duties as the court may consider appropriate.  Federal Courts have appointed

temporary receivers under circumstances similar to those presented here.  *See, e.g.*, *CFTC v.*

*TMTE, Inc. a/k/a Metals.com, et al.*, No. 3:20-cv-02910-X (N.D. Tex. Sept. 22, 2020) (ECF #

16) (Order granting *ex parte* motion for statutory restraining order, appointment or receiver, and

other equitable relief); *CFTC v. RFF GP, LLC*, No. 4:13-CV-382, 2013 WL 4083748, at *1, 5

(E.D. Tex. July 10, 2013) (granting CFTC's *ex parte* motion for entry of statutory restraining

order freezing assets, appointing a temporary receiver, prohibiting destruction of records, and

permitting expedited discovery); *CFTC v. Financial Robotics, Inc.*, No.4:11-cv-2446 (S.D. Tex.

June 30, 2011) (ECF # 6, at ¶ 29, Order Granting SRO and appointing temporary receiver);

*CFTC v. Offshore Financial Consultants of Florida, Inc.*, No. 02-CV-60769, 2002 WL 1788031,

t *4 (S.D. Fla. June 5, 2002) (granting CFTC's *ex parte* motion for entry of statutory restraining

order freezing assets, appointing a temporary receiver and prohibiting destruction of records).

## B.  THE COMMISSION HAS ESTABLISHED THAT EX PARTE RELIEF IS APPROPRIATE AND NECESSARY.

As required in the Eleventh Circuit, the Commission has made a verified *prima facie*

showing that Defendants violated the Act and Regulations.  Through the evidence described

above, in the Complaint, and in the attached Appendix, the Commission has shown specifically

that Defendants have fraudulently solicited and accepted funds from customers that were

intended for trading leveraged or margined gold-U.S. dollar pair transactions, but Defendants did

not direct those funds to any trading firm.  Instead, Defendants misappropriated a portion of the

funds for other purposes, including to pay personal expenses, fund their unrelated businesses,

and make Ponzi-style payments. This conduct was sustained, willful, and egregious, and there is a substantial likelihood that Defendants are continuing their fraud and will continue to violate the Act and Regulations. As such, the entry of a restraining order freezing assets and preventing destruction of records is both warranted and critical in this case and necessary to preserve the status quo until this matter is fully adjudicated.

The Proposed SRO is necessary in this case to prevent Defendants from dissipating assets and destroying or preventing access to their books and records. The fact that Defendants have engaged in such large-scale misappropriation of pool funds, as detailed in the Viehmeyer Declaration, is sufficient reason to freeze the assets of Defendants. Moreover, as detailed in the Viehmeyer Declaration and above, Defendants have already taken steps to conceal their fraudulent schemes, including by disguising transactions involving customers funds as payments for "services", opening and closing numerous bank accounts, and by submitting false bank statements to regulators. Absent immediate injunctive relief, and if Defendants were given notice of this motion and the requested relief, Defendants may further dissipate or shield fraudulently obtained assets. In addition, the Commission needs to ensure that what assets remain are available to satisfy any such equitable remedies the Court may later award to the victims of Defendants' fraud. An asset freeze is especially appropriate where, as here, the Commission seeks disgorgement and restitution. *See Levy*, 541 F.3d at 1114 (holding in the context of an injunction pending satisfaction of judgment that "a district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"); *Muller*, 570 F.2d at 1301 (affirming district court's imposition of asset freeze "to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event that the court should ultimately order disgorgement of the allegedly misappropriated funds").

Preventing destruction of records is similarly critical in this case. As described above, there is evidence Defendants have engaged in their fraudulent schemes at least three years. Defendants are likely in possession of records that identify all participants in Defendants' commodity pools, the amounts contributed by each customer, and the dates of those contributions, as well as other records that establish the scope, duration, and operation of these fraudulent schemes. Defendants may be in possession of records regarding the transfers of pool funds they received from Defendants, the sources of those funds, and other evidence showing that they have no legitimate claim to those funds. Given that these critical documents are all in the possession of Defendants, and that Defendants can easily destroy these documents (and have a strong incentive to do so if they become aware of imminent enforcement by the Commission), the Commission needs an order preserving these records and making them accessible at the outset of this litigation. *See, e.g., Allensworth*, (SRO at 3–4) (granting emergency motion for SRO upon finding good cause to restrain defendants from destroying records and allow Commission to inspect and copy records); *Valois*, (SRO, at 3, 7) (same); *CFTC v. Heierle*, No. 07-CV-22396, 2007 WL 4351424 at *4 (S.D. Fla. Sept. 12, 2007) (same with respect to defendants and relief defendants). Absent immediate access, Defendants would have an opportunity to frustrate Commission efforts to identify victims of the fraud, hold Defendants liable for the full extent of their wrongdoing, and provide redress to all victims of Defendants' fraud.

Finally, a temporary receiver is necessary in this case given the size and scope of Defendants' fraudulent scheme. Appointing a receiver will help ensure that all available pool funds, and any assets obtained using pool funds, can be used to provide redress to Defendants' customers. In addition, to the extent there is not sufficient funds to compensate all of the victims

of Defendants' fraud, a receiver will facilitate the marshalling of assets and the claims process

and ensure that all investors are treated equitably.  Under the Proposed SRO, the receiver will be

able to accomplish this goal by maintaining the status quo and preventing diversion and waste of

assets to the detriment of Defendants' customers.

### C.    THE COURT SHOULD SCHEDULE A SHOW CAUSE HEARING AND, THEREAFTER, ISSUE AN ORDER OF PRELIMINARY INJUNCTION.

As an *ex parte* SRO is not indefinite in nature, the Commission also respectfully moves

the Court to schedule a hearing to show cause as to why a preliminary injunction should not

issue within a reasonable time following the Court's issuance of the Proposed SRO.

As set forth above, the CFTC is entitled to a preliminary injunction under 7 U.S.C. § 13a-

1(a) if it, as it does here, makes a *prima facie* showing that the Defendants have violated the law

and that there is a reasonable likelihood that the defendants will repeat their violations.  For the

reasons set forth above, Plaintiff has satisfied this standard.  Therefore, based on the evidence

and arguments set forth in this Memorandum, the Commission requests that, following a hearing,

the Court enter a preliminary injunction under 7 U.S.C. § 13a-1(a) against Defendants (1)

continuing to freeze Defendants' assets; (2) preventing Defendants from destroying records and

books; (3) permitting the Commission to inspect and copy Defendants' records and requiring

Defendants to provide information necessary to locate and access those records; and (4)

prohibiting further violations of the Act and Regulations charged in the Complaint until the

conclusion of this case.

### D.  THE COURT SHOULD ORDER EXPEDITED DISCOVERY IN ADVANCE OF THE SHOW CAUSE HEARING.

The Commission also seeks a provision in the Proposed SRO allowing the parties to

conduct expedited discovery in advance of a hearing to show cause as to why a preliminary

injunction should not issue.  More specifically, the Commission seeks the ability to take

depositions of Defendants and non-parties subject to two calendar days' notice pursuant to Fed. R. Civ. P. 30(a) and 45, with notice given personally, by facsimile, or by electronic mail. The Commission further seeks the ability, if necessary, to conduct those depositions remotely and to exceed the seven-hour time limit. Rule 26(d) grants a trial court discretion to order expedited discovery. Expedited discovery is appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings. *See Rule 26(d) and Advisory Committee Notes accompanying 1993 Amendments to Subdivision (d)* (recognizing that cases involving requests for preliminary injunction are among the special instances in which expedited discovery prior to the time ordinarily allowed by Rule 26(d) is appropriate); *see also Philadelphia Newspapers, Inc. v. Gannett Satellite Info. Network, Inc.*, No. 98-CV-2782, 1998 WL 404820, at *2 (E.D. Pa. July 15, 1998). District courts in the Eleventh Circuit and elsewhere have ordered expedited discovery in connection with Commission statutory restraining orders in advance of preliminary injunction hearings in similar circumstances. *See, e.g., CFTC v. Systematic Alpha Management, LLC, et al.*, 2023 WL 4363979 (S.D. Fla. April 24, 2023) (granting expedited discovery in Order Granting SRO); *CFTC v. Yancy*, No.4:10-cv-2955 (S.D. Tex. Aug. 18, 2010) (ECF # 5, at ¶¶ 29-30, granting expedited discovery Order Granting SRO); *CFTC v. Pishon Holding LLC*, No. 17-CV-00847 (W.D. Wash. June 1, 2017) (Order at 9–10). (granting Commission leave to conduct expedited discovery, including depositions and document requests, to "allow the [Commission] to determine the full extent of Defendants' alleged wrongdoing . . . , locate Defendants' other customers, identify customer funds and other assets, and clarify the sources of various funds"); *CFTC v. Trademasters, USA, LLC*, No. 16-CV-01938 (D. Nev. Aug. 18, 2016) (Order Granting Motion for Expedited Discovery; permitting expedited discovery including depositions, document requests, and third-party subpoenas "to gain information about customers . . . and help

discovery); *CFTC v. Smith*, No. 10-CV-00009, 2010 WL 1759542, at \*4-5 (W.D. Va. Feb. 23, 2010) (order granting motion for *ex parte* statutory restraining order and expedited discovery; permitting depositions of Defendants, Relief Defendants, and non-parties). Here, expedited discovery will allow the Commission to determine the full extent of Defendants' wrongdoing (including, but not limited to, the possible involvement of others); locate other Pool Participants; identify and assess Defendants' entitlement to funds, assets, and other property; and clarify the sources of funds, assets, and other property in advance of a hearing.

## VIII.   CONCLUSION

The Commission has made a *prima facie* showing that, since at least November 2019 continuing through the present, Defendants have engaged, are engaging, and/or are about to engage in a fraudulent scheme in violation of federal laws. Defendants' customers entrusted them with millions of dollars based on Defendants' misrepresentations and omissions. The Commission requests expedited entry of the Proposed SRO, which will immediately stop this fraud and preserve the status quo, avoid dissipation of assets, and minimize the risk of destruction of records pending a hearing regarding the entry of a preliminary injunction.

Dated: September 30, 2024          Respectfully submitted,

COMMODITY FUTURES
TRADING COMMISSION

ALISON B. WILSON (D.C. Bar 475992)
KELLY M. FOLKS (VA Bar 72124)
SEAN HENNESSY (D.C. Bar 1011564)
SARAH M. WASTLER (D.C. Bar 944534)
Attorneys for Plaintiff
COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581

COMMODITY FUTURES
TRADING COMMISSION
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
awilson@cftc.gov
kfolks@cftc.gov
shennessy@cftc.gov
swastler@cftc.gov