Redacted

```
<a
href="mailto:  Redacted  @yahoo.com">  Redacted  @yahoo.com</a>
****1321
$3,000.00
```

- bret.kobe3/4/2021, 11:42:44 AM

  `<at id="8:ted.safranko">ted.safranko</at>` need funds Verification for

- bret.kobe3/4/2021, 11:42:32 AM

  `<at id="8:live:63f48ce35bf98021">Ivan</at>` the New API Doc with the New Credit Card processing_mode &quot;parcel_processing&quot; will function similar to Echeck with each transaction Returning a processing, denied or completed status... The completed status during non business hours can take up to 12 hours for a complete status and during business hours it can be from 1 minute to a couple of hours , this is only a temporary Band aid until &quot;auth_capture&quot; is back up and running so make sure you keep it available as we will be going back to the auth-capture

- davidstory13/4/2021, 10:56:40 AM

  the description on the clients bank account will be Pilot Traders LLC

- ted.safranko3/4/2021, 10:14:25 AM

  `<at id="8:live:63f48ce35bf98021">Ivan</at> <at id="8:live:175759b2c44d5834">Andrew</at>`

- ted.safranko3/4/2021, 10:14:18 AM

  Ok perfect

- davidstory13/4/2021, 10:07:15 AM

  but you can start accepting credit cards ``

- davidstory13/4/2021, 10:06:59 AM

  but you can start accepting credit cards ``

- davidstory13/4/2021, 10:06:49 AM



EXHIBIT

120

TO THE DECLARATION OF MAURA M. VISHMEYER
PURSUANT TO 28 U.S.C. § 1746

DSTORY003015

I will have bret explain <at id="8:live:63f48ce35bf98021">Ivan B2Broker</at> how this api works... the one you currently have will work as soon as we finalize our fixes... so this one is just temporary

- davidstory13/4/2021, 10:05:33 AM

  this is a band-aid until we fix our back end issue we are still working on

- davidstory13/4/2021, 10:04:47 AM

  <at id="8:ted.safranko">ted.safranko</at> here is a new api for accepting credit cards

- davidstory13/4/2021, 10:04:12 AM

  <URIObject uri="https://api.asm.skype.com/v1/objects/0-wus-d1-8a53e94cc88d2d3303fbc07e7a138099" url_thumbnail="https://api.asm.skype.com/v1/objects/0-wus-d1-8a53e94cc88d2d3303fbc07e7a138099/views/original" type="File.1" doc_id="0-wus-d1-8a53e94cc88d2d3303fbc07e7a138099">To view this file, go to: <a href="https://login.skype.com/login/sso?go=webclient.xmm&docid=0-wus-d1-8a53e94cc88d2d3303fbc07e7a138099">https://login.skype.com/login/sso?go=webclient.xmm&docid=0-wus-d1-8a53e94cc88d2d3303fbc07e7a138099</a><OriginalName v="GIB Traders Domain API Connection E-check and Credit Card with new Mode.pdf"></OriginalName><FileSize v="1503217"></FileSize></URIObject>

- davidstory13/4/2021, 9:39:43 AM

  yw

- ted.safranko3/4/2021, 9:39:39 AM

  thanks

- davidstory13/4/2021, 9:38:49 AM

  ok will do

- ted.safranko3/4/2021, 9:38:16 AM

  please send 100usd to ▮Redacted▮
  <a href="mailto:▮Redacted▮@yahoo.com"▮Redacted▮@yahoo.com</a>

href="mailto: Redacted @gmail.com"> Redacted @gmail.com</a>
****0094
$10,000.00

- davidstory15/19/2021, 11:15:18 AM

  yw

- ted.safranko5/19/2021, 11:15:01 AM

  ok thank you

- davidstory15/19/2021, 11:14:47 AM

  <at id="8:ted.safranko">ted.safranko</at> as of today the description on credit
  card charges for your customers will show up as IK ENTERPRISE HOLDINGS
  DRAPER UT on their statement...please make all your clients aware... thanks

- ted.safranko5/19/2021, 9:49:06 AM

  ok

- davidstory15/19/2021, 9:48:52 AM

  <at id="8:ted.safranko">ted.safranko</at> we will need account info as this
  individual only has 700 left to send
  he processed 2500 and we have already sent 1800

- davidstory15/19/2021, 9:39:37 AM

  yw

- ted.safranko5/19/2021, 9:39:34 AM

  ty

- davidstory15/19/2021, 9:39:27 AM

  ok will do

- ted.safranko5/19/2021, 9:39:19 AM

  please send 1000usd to Redacted
  <a href="mailto:Redacted@gmail.com">Redacted@gmail.com</a>



- davidstory16/14/2021, 9:41:42 AM

  <at id="8:ted.safranko">ted.safranko</at> for all Pending and future CC payments the client will enter the deposit as they have been with no change in your system... they will then receive an email coming from PT adventures with a subject line TD Domain Invoice... they need to open it... they will see a digital invoice from PT adventures for consulting services... they need to click on pay invoice and re enter the credit card details... then the CC deposit will be completed... the descriptor of the payment on their statement will appear as PT Sales

- davidstory16/14/2021, 9:33:12 AM

  ok willdo

- ted.safranko6/14/2021, 9:06:10 AM

  ok perfect

- davidstory16/14/2021, 8:35:16 AM

  <at id="8:ted.safranko">ted.safranko</at> as you probably already know we have been behind on CC deposits due to back end issues.. all deposits will be processed... so clients will see a charge in the next few days....all CC charges will show up in the clients statement as PT sales... please let all clients know the new descriptor...Business on CC deposits will proceed as normal... Thanks

- bret.kobe6/14/2021, 8:20:19 AM

  <at id="8:ted.safranko">ted.safranko</at> need Funds Verification for Redacted
  Redacted
  <a href="mailto: Redacted @gmail.com"> Redacted @gmail.com</a>
  ****3678
  $3,000.00

- ted.safranko6/14/2021, 7:43:58 AM

  Ok

- davidstory16/14/2021, 7:43:50 AM

  yes it has been it will be back to normal this week

- ted.safranko6/14/2021, 7:41:02 AM



EXHIBIT

122

TO THE DECLARATION OF MAURA M. WENMEYER
PURSUANT TO 38 U.S.C. § 1746

DSTORY002755

- ted.safranko12/9/2021, 9:47:33 AM

  Or names?

- ted.safranko12/9/2021, 9:47:25 AM

  Do you want me to provide email addresses

- ted.safranko12/9/2021, 9:47:14 AM

  Ok

- davidstory112/9/2021, 9:46:14 AM

  ok it's fine a for a few clients but not for all...make sure these client are
  trustworthy...also make sure we have invoice for these clients just in case the
  bank asked for it...they probably won't but just in case

- ted.safranko12/9/2021, 9:28:09 AM

  ok thank you

- davidstory112/9/2021, 9:28:04 AM

  let me find out

- ted.safranko12/9/2021, 9:27:08 AM

  so if we just tell those 2-3 clients they will be the only ones depositing over 3K

- ted.safranko12/9/2021, 9:26:57 AM

  i wont change the language on the site but we have a few big clients that want
  to make bigger deposits

- ted.safranko12/9/2021, 9:26:25 AM

  per day

- ted.safranko12/9/2021, 9:26:23 AM

  are we able to up the ticket size for credit cards to 10,000?

- ted.safranko12/9/2021, 9:04:36 AM



EXHIBIT

123

TO THE DECLARATION OF MAURA M. VEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Just landed

- davidstory15/26/2020, 4:45:21 PM

  Thanks

- ted.safranko5/26/2020, 4:45:13 PM

  safe flight

- davidstory15/26/2020, 4:45:06 PM

  Ok getting ready to take off I will ping you when I land

- ted.safranko5/26/2020, 4:44:44 PM

  Yeah if you are free within the next hour or so just ping me

- ted.safranko5/26/2020, 3:03:43 PM

  Ok thanks

- davidstory15/26/2020, 3:53:44 PM

  If you have time I can call you now and we talk about it

- davidstory15/26/2020, 2:59:42 PM

  Yes I can do it...let's talk tomorrow morning on how we are going to do it

- ted.safranko5/26/2020, 1:54:35 PM

  Hey are you able to generate a business invoice for that Caye Bank Transfer. They are requesting something from your side. I don't know if we just name it E-commerce payment or something

- davidstory15/21/2020, 10:05:00 AM

  exactly

- ted.safranko5/21/2020, 10:03:28 AM

  To ensure funds are there

- ted.safranko5/21/2020, 10:03:22 AM



EXHIBIT
124

TO THE DECLARATION OF MAURA M. VENHMEYER
PURSUANT TO 28 U.S.C. § 1746

<quote author="ted.safranko" authorname="ted.safranko" timestamp="1586438966" conversation="19:6d19135005e14af5b89bfc0a4dee82c8@thread.skype" messageid="1586438965879" cuid="7185374099200817432"><legacyquote>[1586438966] ted.safranko: </legacyquote><at id=" ">David</at> please process another 100.00usd for <span style="background:black;color:white">Redacted Redacted</span> @yahoo.com<legacyquote>

<<< </legacyquote></quote>to credit <span style="background:black;color:white">Redacted</span> account or debit?

- 19:6d19135005e14af5b89bfc0a4dee82c8@thread.skype4/9/2020, 11:13:25 AM

  <addmember><eventtime>1586452405336</eventtime><initiator>8:ted.safra nko</initiator><target>8:davenegus420</target></addmember>

- davidstory14/9/2020, 10:25:53 AM

  One for credit card and one for ACH

- davidstory14/9/2020, 10:25:38 AM

  That is why there is two different API

- davidstory14/9/2020, 10:24:55 AM

  It's different

- davidstory14/9/2020, 10:24:51 AM

  Credit card is all credits transaction around the world

- davidstory14/9/2020, 10:24:38 AM

  ACH is a checking account debit within the United States only

- davidstory14/9/2020, 10:24:12 AM

  No credit card is not the same as ACH

- live:63f48ce35bf980214/9/2020, 10:23:46 AM

  ok sorry I thought it is the same thing

- davidstory14/9/2020, 10:21:59 AM



EXHIBIT
125

TO THE DECLARATION OF MAURA M. WIDMEYER
PURSUANT TO 28 U.S.C. § 1746

DSTORY003691

- ted.safranko 2/10/2022, 9:58:31 AM

  Please send 142103.99 to [Redacted] address. [Redacted] Santa Rosa Beach, FL 32459. Wells Fargo Address 2010 US-19 W, Santa Rosa Beach, FL 32459. Acct# [Redacted]7068 RT# 063107513 (He originally did an ach for 168K)

- ted.safranko 1/28/2022, 7:34:55 AM

  <URIObject uri="https://api.asm.skype.com/v1/objects/0-eus-d12-b4febe1d134bb3b26af38ac6cb07c31e" url_thumbnail="https://api.asm.skype.com/v1/objects/0-eus-d12-b4febe1d134bb3b26af38ac6cb07c31e/views/original" type="File.1" doc_id="0-eus-d12-b4febe1d134bb3b26af38ac6cb07c31e">To view this file, go to: <a href="https://login.skype.com/login/sso?go=webclient.xmm&docid=0-eus-d12-b4febe1d134bb3b26af38ac6cb07c31e">https://login.skype.com/login/sso?go=webclient.xmm&docid=0-eus-d12-b4febe1d134bb3b26af38ac6cb07c31e</a><OriginalName v="December 2021 Statement[51276].pdf"></OriginalName><FileSize v="237704"></FileSize></URIObject>

- davidstory 12/10/2022, 9:54:30 AM

  ok

- ted.safranko 2/10/2022, 9:54:21 AM

  EXHIBIT
  126
  TO THE DECLARATION OF MAURA M. VIEHMEYER
  PURSUANT TO 28 U.S.C. § 1746

  <quote author="davidstory1" authorname="David Story" timestamp="1644511797" conversation="19:6d19135005e14af5b89bfc0a4dee82c8@thread.skype" messageid="1644511796696" cuid="10012296759683720306"><legacyquote>[1644511797] David Story: </legacyquote>it's a canadian bank...we can't run ACH from a canadian bank <legacyquote>

  <<< </legacyquote></quote>ok can you cancel it

- davidstory 12/10/2022, 9:49:56 AM

  <quote author="[B. K.]" authorname="[B. K.]" timestamp="1644424365" conversation="19:6d19135005e14af5b89bfc0a4dee82c8@thread.skype" messageid="1644424364807" cuid="14052562275055644799"><legacyquote>[1644424365] Bret Kobe: </legacyquote><at id=" ">ted.safranko</at> Need Funds Verification wayne anderson
  <a href="mailto:[Redacted]@live.ca">[Redacted]@live.ca</a>

<<< </legacyquote></quote>ok

- ted.safranko4/29/2020, 8:27:16 AM

  <quote author="davidstory1" authorname="David Story"
  timestamp="1588170418" conversation="8:davidstory1"
  messageid="1588170418068"
  cuid="13287513803434994798"><legacyquote>[1588170418] David Story:
  </legacyquote>Yeah not a problem....we are building the refund withdrawal
  system so at some point everything will match <legacyquote>

  <<< </legacyquote></quote>Thats perfect the system is running really well

- davidstory14/29/2020, 8:27:14 AM

  It's both

- ted.safranko4/29/2020, 8:27:01 AM

  i am trying to figure out if this is both ACH and credit/debit or just one of the
  intruments

- ted.safranko4/29/2020, 8:27:00 AM

  <URIObject uri="https://api.asm.skype.com/v1/objects/0-eus-d7-
  90d81c91222280d8e3df4aabc2b1dd8a"
  url_thumbnail="https://api.asm.skype.com/v1/objects/0-eus-d7-
  90d81c91222280d8e3df4aabc2b1dd8a/views/imgt1_anim" type="Picture.1"
  doc_id="0-eus-d7-90d81c91222280d8e3df4aabc2b1dd8a" width="1655"
  height="340">To view this shared photo, go to: <a
  href="https://login.skype.com/login/sso?go=xmmfallback?pic=0-eus-d7-
  90d81c91222280d8e3df4aabc2b1dd8a">https://login.skype.com/login/sso?go=x
  mmfallback?pic=0-eus-d7-
  90d81c91222280d8e3df4aabc2b1dd8a</a><OriginalName
  v="picturemessage_pcvm4f4j.445.png"></OriginalName><FileSize
  v="41614"></FileSize><meta type="photo"
  originalName="picturemessage_pcvm4f4j.445.png"></meta></URIObject>

- davidstory14/29/2020, 8:26:57 AM

  Yeah not a problem....we are building the refund withdrawal system so at some
  point everything will match

- ted.safranko4/29/2020, 8:26:24 AM



**EXHIBIT**

**127**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

DSTORY003978

so i dont have to bug you all the time

- ted.safranko4/29/2020, 8:26:18 AM

ok thanks i really like the ease of the interface just want to get my numbers matching

- davidstory14/29/2020, 8:26:00 AM

Ok we can get an accurate number

- ted.safranko4/29/2020, 8:25:27 AM

so i want to figure out how much to send to our account

- davidstory14/29/2020, 8:25:25 AM

Yes and all the credits and refunds as well

- ted.safranko4/29/2020, 8:25:15 AM

I am just trying to figure out if it makes sense to send funds to our liquidity pool now because we have over 100K

- ted.safranko4/29/2020, 8:23:29 AM

<URIObject uri="https://api.asm.skype.com/v1/objects/0-eus-d10-afa70cdb693fbf68f153d7af2cfcfc71"
url_thumbnail="https://api.asm.skype.com/v1/objects/0-eus-d10-afa70cdb693fbf68f153d7af2cfcfc71/views/imgt1_anim" type="Picture.1"
doc_id="0-eus-d10-afa70cdb693fbf68f153d7af2cfcfc71" width="1643"
height="352">To view this shared photo, go to: <a
href="https://login.skype.com/login/sso?go=xmmfallback?pic=0-eus-d10-afa70cdb693fbf68f153d7af2cfcfc71">https://login.skype.com/login/sso?go=xmm
fallback?pic=0-eus-d10-afa70cdb693fbf68f153d7af2cfcfc71</a><OriginalName
v="picturemessage_gb14bbj1.nlf.png"></OriginalName><FileSize
v="28266"></FileSize><meta type="photo"
originalName="picturemessage_gb14bbj1.nlf.png"></meta></URIObject>

- ted.safranko4/29/2020, 8:23:27 AM

Hey David I am seeing the balance currently for our account total at 158K so that minus fees and holds will be less correct

- davidstory13/2/2020, 8:50:18 AM

- davidstory18/13/2020, 10:10:20 AM

  yes I will get it to you next week if that is ok

- ted.safranko8/13/2020, 10:09:39 AM

  could we also get a current report of the balances in the acct when you have a chance

- davidstory18/13/2020, 10:08:56 AM

  ok perfect

- ted.safranko8/13/2020, 10:08:35 AM

  <quote author="davidstory1" authorname="David Story" timestamp="1597284477" conversation="19:6d19135005e14af5b89bfc0a4dee82c8@thread.skype" messageid="1597284476519" cuid="778536427368325108 2"><legacyquote>[1597284477] David Story: </legacyquote><at id=" ">ted.safranko</at> ░Redacted░ submitted two echeck a of $10,000 each...can we get proof of funds and a possible picture of a signed check for each transaction? <legacyquote>

  <<< </legacyquote></quote>She is sending information it should only be 1 payment

- ted.safranko8/12/2020, 8:34:51 PM

  Thanks

- bret.kobe8/12/2020, 8:13:41 PM

  sent 1000usd t░ ▓Redacted▓
  <a href="mailto:░Redacted░@yahoo.com">░Redacted░@yahoo.com</a>

- davidstory18/12/2020, 8:08:29 PM

  Ok thanks

- ted.safranko8/12/2020, 8:08:22 PM

  I'll get that

- ted.safranko8/12/2020, 8:08:18 PM



EXHIBIT

128

TO THE DECLARATION OF MAURA M. VIENMEYER
PURSUANT TO 28 U.S.C. § 1746

i want to really bad 

- d_wagon9/19/2021, 12:40:15 AM

  man you gotta travel here lol

- davidstory19/19/2021, 12:40:03 AM

  the US is turning to shit really fast

- d_wagon9/19/2021, 12:39:48 AM

  I guess its becase they dont want people to evaed taxes that way

- davidstory19/19/2021, 12:39:43 AM

  i know i'm jealous

- d_wagon9/19/2021, 12:39:29 AM

  its soo fucking nice

- d_wagon9/19/2021, 12:39:25 AM

  in dubai its 0%

- davidstory19/19/2021, 12:39:14 AM

  yup

- d_wagon9/19/2021, 12:39:08 AM

  lol beuase as soon as it lands in canada its a 18% tax hit haha

- davidstory19/19/2021, 12:38:58 AM

  and we cover anything that he needs

- davidstory19/19/2021, 12:38:49 AM

  it just stays with us

- davidstory19/19/2021, 12:38:42 AM



**EXHIBIT**

**129**

TO THE DECLARATION OF MAURA M. WEHMEYER
PURSUANT TO 28 U.S.C. § 1746

but he hardly withdraws

- davidstory19/19/2021, 12:38:28 AM

  he keeps it with us and if he needs anything we can wire to canda

- d_wagon9/19/2021, 12:38:08 AM

  How does Ted do it

- davidstory19/19/2021, 12:38:05 AM

  very

- davidstory19/19/2021, 12:38:01 AM

  yes

- d_wagon9/19/2021, 12:37:56 AM

  more tight with how people do things

- davidstory19/19/2021, 12:37:41 AM

  5 years ago no problem 

- davidstory19/19/2021, 12:37:51 AM

  5 years ago no problem 

- d_wagon9/19/2021, 12:37:45 AM

  yeah thats exactly what it is

- davidstory19/19/2021, 12:37:34 AM

  and they things are now

- davidstory19/19/2021, 12:37:28 AM

  its the political shit

- davidstory19/19/2021, 12:37:15 AM

it has nothing to do with how

- d_wagon9/19/2021, 12:37:12 AM

  Im here now setting up a company and banking lol

- davidstory19/19/2021, 12:36:57 AM

  yes it's always the safest

- d_wagon9/19/2021, 12:36:53 AM

  what if its a business account in dubai and we can cut invoices

- d_wagon9/19/2021, 12:36:34 AM

  hmmm so the safest way is to transfer within US i guss

- davidstory19/19/2021, 12:35:54 AM

  but we need to be really careful 

- davidstory19/19/2021, 12:36:18 AM

  but we need to be really careful 

- davidstory19/19/2021, 12:35:44 AM

  not saying it can't be done 

- davidstory19/19/2021, 12:36:08 AM

  not saying it can't be done 

- davidstory19/19/2021, 12:35:29 AM

  i don't i would have to research it...but the way things are sending money to that part of the world would be a red flag

- d_wagon9/19/2021, 12:34:25 AM

| | |
|---|---|
| Total Transactions Submitted to OSG Billing or PT Adventures by Traders Domain Clients | $54,740,877.04 |
| Denied Transactions | $34,894,767.29 |
| **Collected Amounts to the Bank** | **$19,846,109.75** |
| | |
| Returns | $2,657,646.40 |
| Credits | $7,872,928.71 |
| Settlements | $2,607,604.84 |
| Total Balance Before Fees | $6,707,929.80 |
| | |
| All Fees | |
| Denied Fee ($1.80) 15268 Transactions | $27,482.40 |
| Processing Fee (18% of transaction amount) | $3,572,299.76 |
| API Setup Fee (one time) | $5,000.00 |
| Setup Fee (one time) | $20,000.00 |
| Custom Back office Build (one time) | $75,000.00 |
| E-check\ACH Fee ($15.65) 4965 Transactions | $77,702.25 |
| Anti Fraud Database ($15) 32,039 Transactions | $480,585.00 |
| Returned Fee ($125) 476 Transactions | $59,500.00 |
| Credited Fee ($50) 3319 Tramactions | $165,950.00 |
| Import Fee ($5) 1341 Transactions | $6,705.00 |
| Verification Fee ($15) 27,949 Transactions | $419,235.00 |
| API User Fee ($2.75) 32,039 Transactions | $88,107.25 |
| Gateway Fee ($2.00) 32,039 Transactions | $64,078.00 |
| Tech Fee ($12) 32,039 Transactions | $384,468.00 |
| Deposit Fee | $850,000.00 |
| | |
| Total Fees | $6,296,112.66 |
| Fees Paid to Third Parties | $1,678,931.78 |
| **Total Fees Collected by OSG Billing or PT Adventures** | **$4,617,180.88** |
| | |
| **Current Balance Owed to Traders Domain** | **$411,817.14** |



EXHIBIT
130
TO THE DECLARATION OF MAURA M. VIEHMEYER PURSUANT TO 28 U.S.C. § 1746

Description

Total of all credit card, ACH and E-check transactions submitted by Traders Domain clients
All transactions denied through our anti-fraud or verification processes
Total of submitted transactions less the denied transactions

Transactions Returned or chargedback (Echeck/ ACH and Credit Card)
Amounts Credited back to Traders Domain clients based on instructions received from Traders Domain
Amounts paid directly to Traders Domain or to third parties on Traders Domain's behalf based on instructions received from Traders Domain
Collected amounts (line 5) less returns, credits and settlements (lines 7-9)

A fee for a transaction that is denied within our system (paid by Traders Domain)
A fee for payment Processing the transactions
Programing of an API to connect to Traders Domain System
Programing our system to talk to Traders domain system based on Traders domain needs
Programing a customized back end office dashboard for Traders Domain
Fee per E-check (bank Draft creation) and/or ACH debit
We build and maintain a database with millions of emails, names, addresses and credit card numbers that have previously been used for fraud.
A fee per transaction that has returned or charged back
A fee per transaction when money is sent to Traders Domain clients
A fee everytime the API imports a file of transactions from Traders Domain system to our system
When a transaction comes in to our system it is verified by our office staff to make sure its not a fraudulent transaction
When a Traders Domain Client uses the system to submit a transaction
Build out and tech maintenance of the gateway between Traders Domain System and our system
Build out and maintenace of our tech system
Final Deposit if the account is closed due to excessive chargebacks or fraud

Sum of all fees (lines 13-27)
See notes to lines 14, 18, 20 and 21
Line 29 less Line 30

Collected amounts (line 5) less all returns, credits, settlements and fees (lines 7, 8, 9, and 29)

Notes

See supporting data in "Collected Transactions" and "Denied Transactions" tabs. The "Denied By Typo" transactions are not included in the total transactions amount.
See supporting data in "Denied Transactions" tab.
See supporting data in "Denied Transactions" tab.

See supporting data in "Returned Transactions" tab.
See supporting data in "Credits to Customers" tab.
See supporting data in "Settlements to Traders Domain" tab.

See supporting data in "Denied Transactions" tab.
See "Collected Transactions" tab. 8% of fee is paid to Cliq ($1,587,688.78); 10% of fee paid to OSG Billing or PT Adventures ($1,984,610.98).

See "E-CheckACH Fees" tab. Bank charges $7.00 per transaction ($34,755.00). Fee to OSG Billing or PT Adventures is $8.65 per transaction ($42,947.25).
See "Anti-Fraud Database Fees" tab. This database has built over 25 years of payments processing experience.
See "Returned Transactions" tab. Cliq charges $35.00 per transaction ($16,660.00); OSG Billing or PT Adventures fee is $90 ($42,840.00)
See "Credits to Customers" tab. Paypal charges $12.00 for each transaction ($39,828.00); our system fee is $38 ($126,122.00).
See "Import Fees" tab.
See "Verification Fees" tab.
See "API User Fees" tab.
See "Gateway Fees" tab.
See "Tech Fees" tab.
We charged this fee when closing the account with Traders Domain; purpose is to protect against future chargebacks or fraud claims.

| Date | Customer | Transaction_Amount | 18% Fees |
|---|---|---|---|
| 12/20/2020 | Redacted | 3,500.00 | $630.00 |
| 12/17/2020 | | 150.00 | $27.00 |
| 12/16/2020 | | 2,000.00 | $360.00 |
| 12/16/2020 | | 2,000.00 | $360.00 |
| 12/15/2020 | | 3,500.00 | $630.00 |
| 12/16/2020 | | 130.00 | $23.40 |
| 12/15/2020 | | 933.69 | $168.06 |
| 12/15/2020 | | 275.00 | $49.50 |
| 12/15/2020 | | 275.00 | $49.50 |
| 12/14/2020 | | 100.00 | $18.00 |
| 12/13/2020 | | 100.00 | $18.00 |
| 12/14/2020 | | 400.00 | $72.00 |
| 12/14/2020 | | 5,000.00 | $900.00 |
| 12/13/2020 | | 200.00 | $36.00 |
| 12/13/2020 | | 450.00 | $81.00 |
| 12/14/2020 | | 400.00 | $72.00 |
| 12/07/2020 | | 2,000.00 | $360.00 |
| 12/14/2020 | | 1,000.00 | $180.00 |
| 12/14/2020 | | 120.00 | $21.60 |
| 12/14/2020 | | 100.00 | $18.00 |
| 12/13/2020 | | 67.00 | $12.06 |
| 12/11/2020 | | 1,180.00 | $212.40 |
| 12/12/2020 | | 150.00 | $27.00 |
| 12/11/2020 | | 200.00 | $36.00 |
| 12/12/2020 | | 950.00 | $171.00 |
| 12/10/2020 | | 100.00 | $18.00 |
| 12/11/2020 | | 900.00 | $162.00 |
| 12/10/2020 | | 500.00 | $90.00 |
| 12/10/2020 | | 500.00 | $90.00 |
| 12/11/2020 | | 608.86 | $109.59 |
| 12/10/2020 | | 650.00 | $117.00 |
| 12/10/2020 | | 200.00 | $36.00 |
| 12/10/2020 | | 200.00 | $36.00 |
| 12/10/2020 | | 50.00 | $9.00 |
| 12/09/2020 | | 100.00 | $18.00 |
| 12/09/2020 | | 150.32 | $27.06 |
| 12/09/2020 | | 200.00 | $36.00 |
| 12/09/2020 | | 75.00 | $13.50 |
| 12/09/2020 | | 100.00 | $18.00 |
| 12/09/2020 | | 100.00 | $18.00 |
| 12/09/2020 | | 400.00 | $72.00 |
| 12/09/2020 | | 50.00 | $9.00 |
| 12/09/2020 | | 500.00 | $90.00 |
| 12/09/2020 | | 2,000.00 | $360.00 |
| 12/08/2020 | | 300.00 | $54.00 |
| 12/09/2020 | | 400.00 | $72.00 |

EXHIBIT
131
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| Date | | Amount | Fee |
|---|---|---|---|
| 01/03/2022 | Redacted | 1,000.00 | $180.00 |
| 01/03/2022 | | 500.00 | $90.00 |
| 01/03/2022 | | 1,250.00 | $225.00 |
| 01/02/2022 | | 50.00 | $9.00 |
| 01/02/2022 | | 500.00 | $90.00 |
| 01/01/2022 | | 3,000.00 | $540.00 |
| 01/01/2022 | | 1,100.00 | $198.00 |
| 01/01/2022 | | 1,000.00 | $180.00 |
| 12/31/2021 | | 3,000.00 | $540.00 |
| 12/31/2021 | | 3,000.00 | $540.00 |
| 12/31/2021 | | 300.00 | $54.00 |
| 12/31/2021 | | 3,000.00 | $540.00 |
| 12/31/2021 | | 1,500.00 | $270.00 |
| 12/31/2021 | | 500.00 | $90.00 |
| 12/26/2021 | | 3,000.00 | $540.00 |
| 12/26/2021 | | 3,000.00 | $540.00 |
| 12/25/2021 | | 2,000.00 | $360.00 |
| 12/21/2021 | | 500.00 | $90.00 |
| 02/08/2023 | | 1,000.00 | $180.00 |
| 02/09/2023 | | 100.00 | $18.00 |
| 02/09/2023 | | 120.00 | $21.60 |
| 02/09/2023 | | 150.00 | $27.00 |
| 02/09/2023 | | 2,500.00 | $450.00 |
| 02/09/2023 | | 100.00 | $18.00 |
| 02/09/2023 | | 5,000.00 | $900.00 |
| 02/09/2023 | | 1,200.00 | $216.00 |
| 02/08/2023 | | 3,000.00 | $540.00 |
| 02/08/2023 | | 150.00 | $27.00 |
| 02/08/2023 | | 2,500.00 | $450.00 |
| 02/08/2023 | | 3,000.00 | $540.00 |
| 02/08/2023 | | 150.00 | $27.00 |
| 02/07/2023 | | 3,000.00 | $540.00 |
| 02/07/2023 | | 3,000.00 | $540.00 |
| 02/07/2023 | | 500.00 | $90.00 |
| 02/07/2023 | | 1,000.00 | $180.00 |
| 02/07/2023 | | 5,000.00 | $900.00 |
| 02/07/2023 | | 500.00 | $90.00 |
| 02/07/2023 | | 175.00 | $31.50 |
| 02/07/2023 | | 2,500.00 | $450.00 |
| 02/07/2023 | | 50.00 | $9.00 |
| 02/07/2023 | | 2,000.00 | $360.00 |
| 02/07/2023 | | 74.00 | $13.32 |
| 02/04/2023 | | 50.00 | $9.00 |
| 02/04/2023 | | 4,600.00 | $828.00 |
| 02/04/2023 | | 5,000.00 | $900.00 |
| 02/05/2023 | | 5,000.00 | $900.00 |
| 02/05/2023 | | 200.00 | $36.00 |

| Date | Redacted | Amount | Fee |
|---|---|---|---|
| 01/03/2023 | | 1,500.00 | $270.00 |
| 01/03/2023 | | 1,000.00 | $180.00 |
| 01/03/2023 | | 1,000.00 | $180.00 |
| 01/03/2023 | | 1,000.00 | $180.00 |
| 01/03/2023 | | 500.00 | $90.00 |
| 01/03/2023 | | 50.00 | $9.00 |
| 01/03/2023 | | 100.00 | $18.00 |
| 01/03/2023 | | 200.00 | $36.00 |
| 01/03/2023 | | 150.00 | $27.00 |
| 01/03/2023 | | 5,000.00 | $900.00 |
| 01/02/2023 | | 100.00 | $18.00 |
| 01/03/2023 | | 50.00 | $9.00 |
| 01/03/2023 | | 150.00 | $27.00 |
| 12/31/2022 | | 2,400.00 | $432.00 |
| 12/31/2022 | | 5,000.00 | $900.00 |
| 12/31/2022 | | 100.00 | $18.00 |
| 12/31/2022 | | 5,000.00 | $900.00 |
| 01/01/2023 | | 500.00 | $90.00 |
| 01/01/2023 | | 5,000.00 | $900.00 |
| 01/01/2023 | | 2,000.00 | $360.00 |
| 01/01/2023 | | 100.00 | $18.00 |
| 01/02/2023 | | 1,500.00 | $270.00 |
| 01/02/2023 | | 3,000.00 | $540.00 |
| 01/02/2023 | | 1,500.00 | $270.00 |
| 01/02/2023 | | 150.00 | $27.00 |
| 01/02/2023 | | 300.00 | $54.00 |
| 01/02/2023 | | 1,000.00 | $180.00 |
| 01/02/2023 | | 200.00 | $36.00 |
| 01/02/2023 | | 500.00 | $90.00 |
| 01/02/2023 | | 3,500.00 | $630.00 |
| 01/02/2023 | | 1,200.00 | $216.00 |
| Totals | | 19,846,109.75 | $3,572,299.75 |

ok let me speak to the client

- davidstory12/15/2021, 5:01:02 PM

For that amount we really need to see a balance...and the full account number if that one were to come back for any reason than bank is not going to be happy

- ted.safranko2/15/2021, 5:00:02 PM

he has deposited with us before

- ted.safranko2/15/2021, 4:59:58 PM

yes that is his account

- davidstory12/15/2021, 4:59:46 PM

Ok did he send funds verification?

- ted.safranko2/15/2021, 4:59:03 PM

<URIObject uri="https://api.asm.skype.com/v1/objects/0-wus-d3-993d6584ba3d8898366ac110bf1911bd" url_thumbnail="https://api.asm.skype.com/v1/objects/0-wus-d3-993d6584ba3d8898366ac110bf1911bd/views/imgt1_anim" type="Picture.1" doc_id="0-wus-d3-993d6584ba3d8898366ac110bf1911bd" width="1124" height="296">To view this shared photo, go to: <a href="https://login.skype.com/login/sso?go=xmmfallback?pic=0-wus-d3-993d6584ba3d8898366ac110bf1911bd">https://login.skype.com/login/sso?go=xmmfallback?pic=0-wus-d3-993d6584ba3d8898366ac110bf1911bd</a><OriginalName v="image_2021_02_15T23_59_02_134Z.png"></OriginalName><FileSize v="50150"></FileSize><meta type="photo" originalName="image_2021_02_15T23_59_02_134Z.png"></meta></URIObject>

- ted.safranko2/15/2021, 4:58:49 PM

For ▮Redacted▮ deposit please just use 1x22K not 2 that were processed

- ted.safranko2/15/2021, 4:54:52 PM

exactly

- davidstory12/15/2021, 4:54:43 PM



**EXHIBIT**

**132**

TO THE DECLARATION OF MAURA M. WEHMEYER
PURSUANT TO 28 U.S.C. § 1746

And I can keep the banks happy

- davidstory12/15/2021, 4:54:35 PM

Yes I agree

- ted.safranko2/15/2021, 4:54:05 PM

no problem it helps manages expectations

- davidstory12/15/2021, 4:53:38 PM

Thanks I appreciate it

- ted.safranko2/15/2021, 4:53:21 PM

Yeah just to keep in line with your scheduling no problems

- davidstory12/15/2021, 4:53:10 PM

Ok perfect

- ted.safranko2/15/2021, 4:52:57 PM

I have told the client 10 business days minimum

- davidstory12/15/2021, 4:52:44 PM

I will schedule it

- ted.safranko2/15/2021, 4:52:22 PM

please send 15000usd to Redacted
Redacted Hialeah Florida 33015
Bank of America
Account number Redacted 4319
Route number 063100277

- ted.safranko2/15/2021, 4:23:14 PM

Ty

- davidstory12/15/2021, 4:23:09 PM

Ok will do

{02111591-1 }

```
<URIObject uri="https://api.asm.skype.com/v1/objects/0-wus-d1-
efe69dbd7a86f6d0d605699744eec52d"
url_thumbnail="https://api.asm.skype.com/v1/objects/0-wus-d1-
efe69dbd7a86f6d0d605699744eec52d/views/imgt1_anim" type="Picture.1"
doc_id="0-wus-d1-efe69dbd7a86f6d0d605699744eec52d" width="1280"
height="720">To view this shared photo, go to: <a
href="https://login.skype.com/login/sso?go=xmmfallback?pic=0-wus-d1-
efe69dbd7a86f6d0d605699744eec52d">https://login.skype.com/login/sso?go=x
mmfallback?pic=0-wus-d1-
efe69dbd7a86f6d0d605699744eec52d</a><OriginalName
v="Screenshot_20210408-204451_WhatsApp.jpg"></OriginalName><FileSize
v="485850"></FileSize><meta type="photo"
originalName="Screenshot_20210408-
204451_WhatsApp.jpg"></meta></URIObject>
```

- davidstory14/8/2021, 5:41:53 PM

  yw

- ted.safranko4/8/2021, 5:36:16 PM

  thanks

- davidstory14/8/2021, 5:36:03 PM

  ok will do

- ted.safranko4/8/2021, 5:35:39 PM

  please send 20u sd to Redacted
  <a href="mailto:Redacted@gmail.com">Redacted@gmail.com</a>

- davidstory14/8/2021, 2:55:33 PM

  ok

- ted.safranko4/8/2021, 2:55:27 PM

  ok ill double check his account stats

- davidstory14/8/2021, 2:55:12 PM

  let me know if oyu want me to proceed

- davidstory14/8/2021, 2:54:58 PM



EXHIBIT
133
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

{02111591-1 }

DSTORY002928

so unless he made money in trading he will be negative

- ted.safranko4/8/2021, 2:54:38 PM

  ok

- davidstory14/8/2021, 2:54:30 PM

  his account shows $270 positive

- davidstory14/8/2021, 2:54:10 PM

  <URIObject uri="https://api.asm.skype.com/v1/objects/0-wus-d6-
  67aa19185806b03e5c1e5dc23af1d312"
  url_thumbnail="https://api.asm.skype.com/v1/objects/0-wus-d6-
  67aa19185806b03e5c1e5dc23af1d312/views/original" type="File.1" doc_id="0-
  wus-d6-67aa19185806b03e5c1e5dc23af1d312">To view this file, go to: <a
  href="https://login.skype.com/login/sso?go=webclient.xmm&docid=0-wus-d6-
  67aa19185806b03e5c1e5dc23af1d312">https://login.skype.com/login/sso?go=w
  ebclient.xmm&docid=0-wus-d6-
  67aa19185806b03e5c1e5dc23af1d312</a><OriginalName v="Redacted
  Redacted Account Standings.xlsx"></OriginalName><FileSize
  v="14198"></FileSize></URIObject>

- ted.safranko4/8/2021, 2:52:56 PM

  ok

- davidstory14/8/2021, 2:52:46 PM

  let me pull a report and you can make an assesment

- ted.safranko4/8/2021, 2:47:55 PM

  he had i think 1000 actually deposit

- davidstory14/8/2021, 2:47:26 PM

  <at id="8:ted.safranko">ted.safranko</at> are you sure you want to send
  funds to  Redacted  as all his transactions have returned

- ted.safranko4/8/2021, 2:45:10 PM

  please send 1902.73usd to  Redacted
  <a href="mailto:Redacted@gmail.com">Redacted@gmail.com</a>

- ted.safranko9/21/2020, 8:43:38 AM

  Ok ill investigate

- davidstory19/21/2020, 8:37:47 AM

  &lt;at id="8:ted.safranko"&gt;ted.safranko&lt;/at&gt; ▮Redacted▮ &lt;a
  href="mailto:▮Redacted▮@gmail.com"&gt;▮Redacted▮@gmail.com&lt;/a&gt;
  ****3320 $200.00 Charged back

- davidstory19/21/2020, 7:35:08 AM

  Ok will do

- ted.safranko9/21/2020, 3:58:37 AM

  please send 8000usd to ▮Redacted▮
  &lt;a
  href="mailto:▮Redacted▮@gmail.com"&gt;▮Redacted▮@gmail.com&lt;
  /a&gt;

- davidstory19/20/2020, 10:31:05 PM

  Ok will do



**EXHIBIT**

**134**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

- ted.safranko9/20/2020, 10:30:41 PM

  Please send 403.28usd to ▮Redacted▮
  &lt;a href="mailto:▮Redacted▮@gmail.com"&gt;▮Redacted▮@gmail.com&lt;/a&gt;
  

- ted.safranko9/20/2020, 3:26:35 PM

  so we need separate statements under the info page for each deposit method

- ted.safranko9/20/2020, 3:26:22 PM

  too many clients are trying to make multiple deposits and the info is related to
  the crypto deposit method

- ted.safranko9/20/2020, 3:26:06 PM

  &lt;at id="8:live:63f48ce35bf98021"&gt;Ivan&lt;/at&gt; can you please adjust the
  language on the site to state that clients should not make multiple deposit
  attempts under the FIAT option and that an email will be received when the
  deposit has completed through compliance



29

Start Time: 1/15/2020 12:06:49 PM(UTC-7)
Last Activity: 10/27/2022 3:47:59 PM(UTC-6)
Number of attachments: 81
Source: Skype
Account: fransta12
Body file: chat-1218.txt

Participants:

siciliano707
dm

ted.safranko
ted.safranko

fransta12
Francisco (owner)

S. C.

live:tradermdt
T

davenegus420
DN

D. F.

8:live:.cid.eddb6d11f549e46

Identifier: 19:c657c0c5f61a4b058ca0565bc01b85d3@thread.skype

---

From: 19:c657c0c5f61a4b058ca0565bc01b85d3@thread.skype

ted.safranko added ted.safranko to this conversation

Label: System

1/15/2020 12:06:30 PM(UTC-7)

---

From: 19:c657c0c5f61a4b058ca0565bc01b85d3@thread.skype

ted.safranko added DN to this conversation

Label: System

1/15/2020 12:06:32 PM(UTC-7)

---

From: ted.safranko ted.safranko

Hey guys set up this chat so you can meet Francisco

1/15/2020 12:06:49 PM(UTC-7)

---

**EXHIBIT**

**135**

TO THE DECLARATION OF MAURA M. VIDHMEYER
PURSUANT TO 28 U.S.C. § 1746

19868



From: ted.safranko ted.safranko
Hes going to be joining us as a partner
1/15/2020 12:07:01 PM(UTC-7)

From: live:tradermdf T
(hi)
Attachments:

Size: 0
File name: hi
(Empty File)
1/15/2020 12:07:15 PM(UTC-7)

From: ted.safranko ted.safranko
As he has his series 3 already and trades actively so he is a good addition
1/15/2020 12:07:16 PM(UTC-7)

From: ted.safranko ted.safranko
@t and I met him already
1/15/2020 12:07:29 PM(UTC-7)

From: ted.safranko ted.safranko
daver D. when you are around we can get everyone on a call
1/15/2020 12:07:43 PM(UTC-7)

From: fransta12 Francisco (owner)
Hi Everyone
1/15/2020 12:09:31 PM(UTC-7)

From: davenegus420 DN
Francisco hello nice to e meet you
1/15/2020 12:23:27 PM(UTC-7)

From: davenegus420 DN
Thanks Francisco I'll send mine tomorrow
3/26/2020 5 13 14 AM(UTC-6)

From: live:tradermdt T
hey just registered and sent in fingerprint stuff... witht he registation .. when it comes to employment/residential... it will ask you to date back so many years  make sure there isnt a gap . make sure all the years are filled
3/27/2020 10:24 36 AM(UTC-6)

From  live:tradermdt T
if you answered yes to felony, make sure you get the template and fill out the form. get the court documents as support documents.. and you will have to send to francisco to file
3/27/2020 10:25:25 AM(UTC-6)

From: live:tradermdt T
he will upload the DMP file(yes to felon)
3/27/2020 10 25:49 AM(UTC-6)

From: live:tradermdt T
the finger print you . have to manually send in to their address in chicaggo
3/27/2020 10:26 02 AM(UTC-6)

From: live:tradermdt T
they say you . have to file it throughg online registration . but as a register.. we dont have the same back end like his to file
3/27/2020 10:26 54 AM(UTC-6)

From: live:tradermdt T
so thats why francisco has to file those extra stuff
3/27/2020 10:27 04 AM(UTC-6)

From: ted.safranko ted.safranko
Just a heads up guys Tin is paying our registration for nfa as we are conditionally approved. Dave and I are just waiting to get finger printed so we can get this stuff on the road
5/11/2020 10:00 40 AM(UTC-6)

**EXHIBIT**

**136**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

From: D. M.

Hey boys just got back from mountains! Apologies I missed the chat earlier

12/16/2020 7:26:03 PM(UTC-7)

From: S. C.

Hey everyone is your around at 12;00PM EST today we have a call with Gate39 Brand team. I believe they will be presenting some example brands

12/17/2020 6:14:31 AM(UTC-7)

From: S. C.

Microsoft Teams meeting
Join on your computer or mobile app
Click here to join the meeting&lt;https://teams.microsoft.com/l/meetup-join/19%3ameeting_OGIyYWFhNTQtMmEyZi00YmMyLWE3MWYtMTRmM2I0ZDAyZWQz%40thread.v2/0?context=%7b%22Tid%22%3a%22633c0093-c4d3-4c4b-aebd-db7968f33dc2%22%2c%22Oid%22%3a%22987c304a-fabf-417d-998b-4b03a3f09955%22%7d&gt;

12/17/2020 6:14:49 AM(UTC-7)

From: S. C.

Hey everyone if your around at 12;00PM EST today we have a call with Gate39 Brand team. I believe they will be presenting some example brands

12/17/2020 6:15:04 AM(UTC-7)

From: live:tradermdt T

Hey S. I'll be on the road to the airport.. parts of the 1h trip there .. signal is spotty. FYI.. if anything just go without me if I cannot make it or get cut off

12/17/2020 6:16:44 AM(UTC-7)

From: live:tradermdt T

Hey S. I'll be on the road to the airport.. parts of the 1h trip there .. signal is spotty. FYI.. if anything just go without me if I cannot make it or get cut off

12/17/2020 6:17:59 AM(UTC-7)

From: S. C.

Alright sounds good Tin! Thanks for the headsup

12/17/2020 6:18:11 AM(UTC-7)

From: S. C.

D. are you joining?

12/17/2020 10:01:38 AM(UTC-7)

EXHIBIT
137
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

From: live.tradermdt T

I'll join in a bit once I get passed security of your still on

12/17/2020 10:02:36 AM(UTC-7)

From: davenegus420 DN

just finished T it was recorded so well pass that over

12/17/2020 10:26:58 AM(UTC-7)

From: davenegus420 DN

and they will send the document we went through of all the branding so you can review also, i think we are going to have an internal call with everyone to decided what makes sense

12/17/2020 10:27:20 AM(UTC-7)

From: live.tradermdt T

Thanks just got through security. I trust you guys made the right choice

12/17/2020 10:27:24 AM(UTC-7)

From: Redacted

Attachments:



Size: 0
(Empty File)

12/17/2020 12:11:40 PM(UTC-7)

From: S. C.

Attachments:



Size: 0
(Empty File)

12/17/2020 12:12:14 PM(UTC-7)

From: Redacted dm

Good day gentlemen! I like the logo ideas! Which one is everyone's fave?

12/17/2020 1:04:14 PM(UTC-7)

From: ted.safranko ted.safranko

Looking at the top 2 dominic

12/17/2020 1:16:41 PM(UTC-7)

From: Redacted dm

Yea I love option 2! Super clean and fresh yet fancy and prominent

12/17/2020 1:18:01 PM(UTC-7)

From: ted.safranko ted.safranko

Yeah so when Tin lands and gets settled we can get on a call either today or tomorrow and finalize our decision

12/17/2020 1:18:33 PM(UTC-7)

From: Redacted dm

Ok im ready for either. Good choice on the team who is making everything for us!! They are solid

12/17/2020 1:19:55 PM(UTC-7)

From: S. C.

Yeah option one and two are my favourite. Option one with font from option two is a really nice look

12/17/2020 1:21:07 PM(UTC-7)

From: S. C.

Option one I feel is good for a more personal touch and option two looks like a strong logo

12/17/2020 1:21:32 PM(UTC-7)

From: ted.safranko ted.safranko

Yeah I can see us using option one like when we lease an office building

12/17/2020 1:25:14 PM(UTC-7)

From: ted.safranko ted.safranko

Would be a good logo for the side of the building

12/17/2020 1:25:23 PM(UTC-7)

From: [REDACTED] S. C. [REDACTED]
I can see this when you come up an elevator and right behind the receptionist is this  But I feel like it's a little to corporate looking rather than inviting look like logo one

12/17/2020 1:30:26 PM(UTC-7)

From: [REDACTED] S. C. [REDACTED]
Attachments:



Size: 0
[Empty File]

12/17/2020 1:30:26 PM(UTC-7)

From: ted.safranko ted.safranko
Yeah

12/17/2020 1:30:36 PM(UTC-7)

From: ted.safranko ted.safranko
Axe capital

12/17/2020 1:30:41 PM(UTC-7)

From: ted.safranko ted.safranko
Lol

12/17/2020 1:30:42 PM(UTC-7)

From: [REDACTED] S. C. [REDACTED]
Lmfao

12/17/2020 1:30:54 PM(UTC-7)

From: [REDACTED] S. C. [REDACTED]
Yeah

12/17/2020 1:30:55 PM(UTC-7)

From: [Redacted] dm
I agree, option 1 has more flow to it. Looks more natural and organic

12/17/2020 1:34:35 PM(UTC-7)

From: davenegus420 DN
Attachments:



Size: 0
(Empty File)

12/17/2020 1:50:12 PM(UTC-7)

From: davenegus420 DN
Attachments:



Size: 0
(Empty File)

12/17/2020 1:50:12 PM(UTC-7)

From: davenegus420 DN

yeah we were talking on the call about how this logo looks like many things.
-wise eye to forsee the future
-there is a S and a C inside the logo so it works for (S)aeg (C)apital
-it also looks almost like two hands that are doing a hand shake (safe and trust worthy)

12/17/2020 1:50:12 PM(UTC-7)

From: davenegus420 DN

Option two also looks clean and high end though

12/17/2020 3:41:38 PM(UTC-7)

From: Redacted dm

Thats also true. I think either or would be a solid decision.

12/17/2020 3:50:34 PM(UTC-7)

From: Redacted dm

Thats also true. I think either or would be a solid decision.

12/17/2020 3:51:56 PM(UTC-7)

From: Redacted dm

Thats also true. I think either or would be a solid decision.

12/18/2020 12:17:01 PM(UTC-7)

From: Redacted .dm
Whatsup boys were we planning on getting on a call today?
12/18/2020 3:10:46 PM(UTC-7)

From: ted.safranko ted.safranko
Thursday guys are we ok with a call
12/22/2020 1:53:01 PM(UTC-7)

From: ted.safranko ted.safranko
Let's get a wrap up before Christmas talk about 2020 and where we are going in 2021
12/22/2020 1:53:19 PM(UTC-7)

From: live.tradermdt T
Ok
12/22/2020 1:53:42 PM(UTC-7)

From: fransta12 Francisco (owner)
What time?
12/22/2020 2:16:03 PM(UTC-7)

From: S. C.
Sounds good I'm good for tomorrow or Thursday
12/22/2020 2:16:05 PM(UTC-7)

From: S. C.
What time were you thinking
12/22/2020 2:16:13 PM(UTC-7)

From: ted.safranko ted.safranko
Let's get a wrap up before Christmas talk about 2020 and where we are going in 2021
12/22/2020 2:16:39 PM(UTC-7)

From: davenegus420 DN
Works for me

12/22/2020 2:16:53 PM(UTC-7)

From: Redacted dm
I'm available also. Same time as usual?

12/22/2020 2:17:31 PM(UTC-7)

From: ted.safranko ted.safranko
Let's get a wrap up before Christmas talk about 2020 and where we are going in 2021

12/22/2020 2:17:39 PM(UTC-7)

From: ted.safranko ted.safranko
Yeah let's try to do 3pm eastern so noon on the west coast

12/22/2020 2:41:03 PM(UTC-7)

From: ted.safranko ted.safranko
On Thursday

12/22/2020 2:41:08 PM(UTC-7)

From: live.tradermdt T
ok im down

12/22/2020 2:41:21 PM(UTC-7)

From: fransta12 Francisco (owner)
That works perfect for me

12/22/2020 2:41:28 PM(UTC-7)

From: live.tradermdt T
ijust talked to my assistant

12/22/2020 2:41:29 PM(UTC-7)

From: live.tradermdt T
we good bro

12/22/2020 2:41:31 PM(UTC-7)

From: Redacted dm
That works for me

12/22/2020 2:42:29 PM(UTC-7)

From: ted.safranko ted.safranko
Lol ok perfect

12/22/2020 2:43:40 PM(UTC-7)

From: davenegus420 DN
[1608673290] T: ijust talked to my assistant
&lt;&lt;&lt;

12/22/2020 4:09:39 PM(UTC-7)

From: Redacted dm
Whatsup boys

12/24/2020 12:56:48 PM(UTC-7)

From: Redacted dm
Merry Christmas eve!

12/24/2020 12:56:55 PM(UTC-7)

From: ted.safranko ted.safranko
Hello

12/24/2020 12:56:59 PM(UTC-7)

From: ted.safranko ted.safranko
Is everyone around for the call

12/24/2020 12:57:04 PM(UTC-7)

From: Redacted dm
Yep yep

12/24/2020 12:57:09 PM(UTC-7)

From: live:tradermdt T
Yeah

12/24/2020 12:57:18 PM(UTC-7)

From: fransta12 Francisco (owner)
I'm here

12/24/2020 12:57:19 PM(UTC-7)

From: ted.safranko ted.safranko
S. C. ON

12/24/2020 12:58:25 PM(UTC-7)

From: fransta12 Francisco (owner)
Call 00h 27m 55s

12/24/2020 1:27:08 PM(UTC-7)

From: Redacted dm
Merry Christmas everyone hope everyone's day is a special one!

12/25/2020 12:11:28 PM(UTC-7)

From: 8.live D. F.
Merry Christmas!

12/25/2020 12:11:48 PM(UTC-7)

From: live:tradermdt T
Merry Christmas

12/25/2020 12:11:58 PM(UTC-7)

From: davenegus420 DN
Merry Christmas all!

12/25/2020 12:12:08 PM(UTC-7)

From: fransta12 Francisco (owner)
Merry Christmas!
12/25/2020 12:18:08 PM(UTC-7)

From: S. C.
Merry Christmas everyone ! Enjoy the holidays
12/25/2020 12:27:46 PM(UTC-7)

From: davenegus420 DN
So are we comfortable moving forward with the Eye logo?
12/31/2020 9:50:28 AM(UTC-7)

From: ted safranko ted safranko
Yeah lets move forward with it
12/31/2020 10:27:14 AM(UTC-7)

From: live.tradermdt T
Ok let's do it.
12/31/2020 10:27:50 AM(UTC-7)

From: Redacted dm
Yep! Sounds like a plan
12/31/2020 2:31:26 PM(UTC-7)

From: Redacted dm
Happy new years eve!
12/31/2020 2:31:38 PM(UTC-7)

From: 8.live D. F.
12/31/2020 3:19:18 PM(UTC-7)

From: davenegus420 DN
Happy New Years everyone!
12/31/2020 3:19:37 PM(UTC-7)



From: 8.live    D. F.
12/31/2020 3:19:48 PM(UTC-7)

From: live.tradermdt T
Ok let's do it.
12/31/2020 3:19:50 PM(UTC-7)

From: ted.safranko ted.safranko
Yeah lets move forward with it
12/31/2020 3:19:53 PM(UTC-7)

From: Redacted dm
Yep! Sounds like a plan
12/31/2020 3:19:55 PM(UTC-7)

From: 8.live    D. F.
Happy New Years Eve!!!
12/31/2020 3:19:56 PM(UTC-7)

From: Redacted dm
Happy new years eve!
12/31/2020 3:20:00 PM(UTC-7)

From: fransta12 Francisco (owner)
Happy New Years Eve!
12/31/2020 3:20:02 PM(UTC-7)

From: live.tradermdt T
Happy birthday!
12/31/2020 3:20:30 PM(UTC-7)



From: davenegus420 DN

or please provide a screenshot of the email that the NFA sent you from the current list of questions so we can see the context of their description of "due Wednesday"

7/20/2021 4:12:47 PM(UTC-6)

From: fransta12 Francisco (owner)

Currently tied up but here's the screenshot

7/20/2021 4:13:35 PM(UTC-6)

From: fransta12 Francisco (owner)

Attachments:

Size: 0
(Empty File)

7/20/2021 4:13:46 PM(UTC-6)

From: davenegus420 DN

Thanks!

7/20/2021 4:14:22 PM(UTC-6)

From:          S. C.

Francisco When will you be available?

7/20/2021 4:14:45 PM(UTC-6)

From: davenegus420 DN

Attachments:

Size: 0
(Empty File)

7/20/2021 4:17:03 PM(UTC-6)

**EXHIBIT**

**138**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

From: fransta12 Francisco (owner)

I'm not sure, I'll let you know as soon as I know

7/20/2021 4:22:32 PM(UTC-6)

19544



From: davenegus420 DN
Francisco are you available now?
7/20/2021 5:14:19 PM(UTC-6)

From: ted.safranko ted.safranko
Call 01h 14m 06s
7/20/2021 5:17:08 PM(UTC-6)

From: fransta12 Francisco (owner)
Sorry I'm currently in meetings
7/20/2021 5:32:46 PM(UTC-6)

From: ted.safranko ted.safranko
no worries we will catch up in the morning
7/20/2021 5:33:04 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok perfect
7/20/2021 5:33:23 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
[Image.PNG]
7/20/2021 6:50:14 PM(UTC-6)

From: ted.safranko ted.safranko
Ok left a voice mail for Christine as well to talk to her tomorrow
7/20/2021 6:58:05 PM(UTC-6)

From: ████ S. C. ████
That's awesome
7/20/2021 6:59:31 PM(UTC-6)

From [S. C.]
9am is , 10am est ?

7/20/2021 6:59:40 PM(UTC-6)

From: davenegus420 DN
Attachments:



Size: 0
(Empty File)

7/20/2021 7:11:56 PM(UTC-6)

From: davenegus420 DN
Correct 10am

7/20/2021 7:11:59 PM(UTC-6)

From: davenegus420 DN
Microsoft Teams meeting
Join on your computer or mobile app
Click here to join the meeting
Or call in (audio only)
+1 646-893-7101,,564449858#   United States, New York City
Phone Conference ID: 564 449 858#

7/20/2021 7:12:02 PM(UTC-6)

From: ted.safranko ted.safranko
ok First Bank is uploaded.   Please review with a fine tooth comb   I also made a spreadsheet to discuss what we need

7/20/2021 8:13:37 PM(UTC-6)

From: ted.safranko ted.safranko
for wire receipts and also invoices

7/20/2021 8:13:46 PM(UTC-6)

From [S. C.]
https://drive.google.com/drive/folders [Redacted]

7/20/2021 8:14:12 PM(UTC-6)

From ▓▓▓ S. C. ▓▓▓
There is invoices there

7/20/2021 8:14:20 PM(UTC-6)

From: ted.safranko ted.safranko
just grabbed them

7/20/2021 8:30:33 PM(UTC-6)

From: ted.safranko ted.safranko
Ill keep finding more and adding them to that folder for both banks

7/20/2021 8:30:43 PM(UTC-6)

From: ted.safranko ted.safranko
T can you find any wire receipts and start putting them here or in the drive so we can start matching up to the statements

7/20/2021 8:31:08 PM(UTC-6)

From: ted.safranko ted.safranko
also we need to write up a promissory note for Tin

7/20/2021 8:31:25 PM(UTC-6)

From: davenegus420 DN
Im not seeing anything uploaded to the drive for bank statements

7/20/2021 8:31:30 PM(UTC-6)

From: davenegus420 DN
are they there yet ted.safranko?

7/20/2021 8:31:34 PM(UTC-6)

From: ted.safranko ted.safranko
Yup First bank is done

7/20/2021 8:31:39 PM(UTC-6)

From: ted.safranko ted.safranko
New folder in the 7/19 folder called bank statements
7/20/2021 8:31:53 PM(UTC-6)

From: davenegus420 DN
Francisco Are you still tied up?
we haven't heard from you all day
7/20/2021 8:32:09 PM(UTC-6)

From: ted.safranko ted.safranko
New folder in the 7/19 folder called bank statements
7/20/2021 8:32:45 PM(UTC-6)

From: ted.safranko ted.safranko
New folder in the 7/19 folder called bank statements
7/20/2021 8:32:47 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
[Empty File]
7/20/2021 8:35:20 PM(UTC-6)

From: davenegus420 DN
TD tran investments. What are we going to explain this one as?
7/20/2021 8:35:31 PM(UTC-6)

From: ted.safranko ted.safranko
Promissory note from tin
7/20/2021 8:35:41 PM(UTC-6)

From: live.tradermdt T
thats my business
7/20/2021 8:35:43 PM(UTC-6)

From: davenegus420 DN
TD stands for = ?
7/20/2021 8:35:44 PM(UTC-6)

From: live:tradermdt T
that does not mean traders domian
7/20/2021 8:35:57 PM(UTC-6)

From: ted.safranko ted.safranko
Tin D Tran
7/20/2021 8:35:59 PM(UTC-6)

From: live:tradermdt T
i had it before
7/20/2021 8:36:00 PM(UTC-6)

From: live:tradermdt T
its me and my partner intial
7/20/2021 8:36:08 PM(UTC-6)

From: davenegus420 DN
perfect, just clarifying
7/20/2021 8:36:09 PM(UTC-6)

From: davenegus420 DN
'investments' might be suspicious
7/20/2021 8:36:25 PM(UTC-6)

From: 19:d3987cd7b67d4c20838a5850c6a51580@thread.skype
S. C.
7/20/2021 8:36:35 PM(UTC-6)

From: davenegus420 DN
as far as optics, may look like we a grouping investors?
7/20/2021 8:36:36 PM(UTC-6)

From: 19:d3987cd7b67d4c20838a5850c6a51580@thread.skype

S. C.

7/20/2021 8:36:37 PM(UTC-6)

From: ted.safranko ted.safranko
We can explain it.  And we will.

7/20/2021 8:37:00 PM(UTC-6)

From: ted.safranko ted.safranko
We can explain it.  And we will.

7/20/2021 8:37:11 PM(UTC-6)

From: ted.safranko ted.safranko
We can explain it.  And we will.

7/20/2021 8:37:13 PM(UTC-6)

From: davenegus420 DN
as far as optics, may look like we are grouping investors?

7/20/2021 8:37:20 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
(Empty File)

7/20/2021 8:41:46 PM(UTC-6)

From: davenegus420 DN
Whats this invoice for?

7/20/2021 8:41:50 PM(UTC-6)

From: davenegus420 DN
payment*

7/20/2021 8:41:57 PM(UTC-6)

From: live:tradermdt T
i have that
7/20/2021 8:41:59 PM(UTC-6)

From: live:tradermdt T
incvoice
7/20/2021 8:42:03 PM(UTC-6)

From: live:tradermdt T
im getting it together
7/20/2021 8:42:08 PM(UTC-6)

From: davenegus420 DN
okay, what was it for?
7/20/2021 8:42:15 PM(UTC-6)

From: fransta12 Francisco (owner)
What's up?
7/20/2021 8:42:55 PM(UTC-6)

From: live:tradermdt T
Attachments:

Size: 0
[OPEN FILE]
7/20/2021 8:43:50 PM(UTC-6)

From: live:tradermdt T
1900 invoice
7/20/2021 8:43:50 PM(UTC-6)

From: davenegus420 DN
thanks
7/20/2021 8:44:15 PM(UTC-6)



From: davenegus420 DN
[1626835430] T: 1900 invoice
&lt;&lt;&lt; This was Redacted I am assuming?
7/20/2021 8:45:46 PM(UTC-6)

From: ted.safranko ted.safranko
Yes
7/20/2021 8:47:20 PM(UTC-6)

From: ted.safranko ted.safranko
Yes
7/20/2021 8:47:24 PM(UTC-6)

From: ted.safranko ted.safranko
Yes
7/20/2021 8:47:27 PM(UTC-6)

From: ted.safranko ted.safranko
Yes
7/20/2021 8:47:27 PM(UTC-6)

From: ted.safranko ted.safranko
Attachments:

Size: 0
(Empty File)
7/20/2021 9:11:48 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
(Empty File)
7/20/2021 9:51:56 PM(UTC-6)

From: davenegus420 DN
Attachments:



Size: 0
(Empty File)

7/20/2021 9:51:56 PM(UTC-6)

From: live.tradermdt T
Attachments:



Size: 0
(Empty File)

7/20/2021 9:53:36 PM(UTC-6)

From: live.tradermdt T
Attachments:



Size: 0
(Empty File)

7/20/2021 9:56:06 PM(UTC-6)

From: live.tradermdt T
Call 01h 09m 05s

7/20/2021 10:00:35 PM(UTC-6)

From: davenegus420 DN
Not sure if it matters, ACA invoices are listed as Redacted address

7/20/2021 10:03:20 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
(mobile Foo)

7/20/2021 10:03:22 PM(UTC-6)

From: ted.safranko ted.safranko
Yup that is my address

7/20/2021 10:03:30 PM(UTC-6)

From: davenegus420 DN
do you think they want transactions for month of July even though we are not completed the month? for bank accounts

7/20/2021 10:07:45 PM(UTC-6)

From: ted.safranko ted.safranko
Nah

7/20/2021 10:08:02 PM(UTC-6)

From: ted.safranko ted.safranko
What can we give them a screen shot

7/20/2021 10:08:11 PM(UTC-6)

From: ted.safranko ted.safranko
What can we give them a screen shot

7/20/2021 10:10:13 PM(UTC-6)

From: ted.safranko ted.safranko
What can we give them a screen shot

7/20/2021 10:10:16 PM(UTC-6)

From: davenegus420 DN
Attachments:



Size: 0
(Empty File)

7/20/2021 10:11:52 PM(UTC-6)

From: davenegus420 DN
On april statement correct me if im wrong, looks like a credit has a - beside it?

7/20/2021 10:12:05 PM(UTC-6)

From: live:tradermdt T
ok let me check

7/20/2021 10:12:10 PM(UTC-6)

From: davenegus420 DN
I re calculated every wire for First bank from Inception to June, looks good everything adds up

7/20/2021 10:23:16 PM(UTC-6)

From: live:tradermdt T
got it corrected and added

7/20/2021 10:26:06 PM(UTC-6)

From: davenegus420 DN
Okay so we have 3 invoices from Refinitiv but only two statements show payments out. The third invoice Refinitiv sent for 1572 was on January but on the statement we sent NFA we didn't have this on that statment for that month

7/20/2021 10:27:02 PM(UTC-6)

From: davenegus420 DN
do we want to remove the January Invoice then and only submit the two?

7/20/2021 10:27:16 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
(Empty File)

7/20/2021 10:27:59 PM(UTC-6)

From: davenegus420 DN
Attachments:

Size: 0
(Empty File)

7/20/2021 10:28:00 PM(UTC-6)

From: davenegus420 DN
the other two line up

7/20/2021 10:28:06 PM(UTC-6)

From: live.tradermdt T
that refinistive is in april

7/20/2021 10:28:59 PM(UTC-6)

From: davenegus420 DN
we have 3

7/20/2021 10:29:11 PM(UTC-6)

From: davenegus420 DN
https://drive.google.com/drive/u/0/folders ████ Redacted ████

7/20/2021 10:29:35 PM(UTC-6)

From: davenegus420 DN
524 00 November
1572 January
1572 April

7/20/2021 10:30:05 PM(UTC-6)

From: live.tradermdt T
but closing

7/21/2021 3:57:37 AM(UTC-6)

From: ted.safranko ted.safranko
ok

7/21/2021 3:57:53 AM(UTC-6)

From: davenegus420 DN
Let's hold off on sending anything until we have a call with legal and compliance then we can have a group call to discuss

7/21/2021 5:47:41 AM(UTC-6)

From: S. C.
For Whitney Bank what are the orginal two $5000 incoming wires

7/21/2021 6:10:12 AM(UTC-6)

From: ted.safranko ted.safranko
Deposits from Tin

7/21/2021 6:21:44 AM(UTC-6)

From: ted.safranko ted.safranko
That's just where we have to speak to the deposits

7/21/2021 6:24:58 AM(UTC-6)

From: ted.safranko ted.safranko
I know we will need to provide info etc so that is why we need to understand how to present this stuff

7/21/2021 6:25:22 AM(UTC-6)

From: ted.safranko ted.safranko
Let's wait to see what [Redacted] says as well as if [Redacted] calls me back

7/21/2021 6:31:31 AM(UTC-6)

19550

From: fransta12 Francisco (owner)

I can do either

10/4/2022 5:38:06 PM(UTC-6)

From: S. C.

Okay lets shoot for Thursday if that works for the others as well

10/6/2022 1:11:08 PM(UTC-6)

From: fransta12 Francisco (owner)

Sounds good

10/6/2022 1:15:20 PM(UTC-6)

From: fransta12 Francisco (owner)

What time?

10/6/2022 1:15:26 PM(UTC-6)

From: S. C.

afternoon lets say

10/6/2022 1:27:34 PM(UTC-6)

From: fransta12 Francisco (owner)

Ok sounds good, I will be in cali so I will be in pacific time

10/6/2022 1:30:30 PM(UTC-6)

From: ted.safranko ted.safranko

Guys we need to have a call tomorrow

10/26/2022 4:58:26 PM(UTC-6)

From: ted.safranko ted.safranko

Need to talk about the nfa re registration

10/26/2022 4:58:36 PM(UTC-6)

**EXHIBIT**

**139**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

From: fransta12 Francisco (owner)

I'm available in the afternoon

10/26/2022 5:02:09 PM(UTC-6)

From: ████ S. C. ████
Sure no problem ill be around
10/26/2022 5:08:02 PM(UTC-6)

From: live:tradermdt T
Ok
10/26/2022 5:08:13 PM(UTC-6)

From: ted.safranko ted safranko
Ok maybe 2pm pst
10/26/2022 5:08:23 PM(UTC-6)

From: ted.safranko ted safranko
5pm east
10/26/2022 5:08:27 PM(UTC-6)

From: live:tradermdt T
Ok
10/26/2022 5:09:58 PM(UTC-6)

From: Redacted dm
I'm there boys
10/26/2022 5:39:31 PM(UTC-6)

From: fransta12 Francisco (owner)
Works for me
10/26/2022 5:39:51 PM(UTC-6)

From: Redacted dm
Ready to roll !
10/27/2022 2:58:11 PM(UTC-6)

From: fransta12 Francisco (owner)
Call 00h 46m 45s
10/27/2022 3:47:59 PM(UTC-6)



From: fransta12 Francisco (owner)

Ok I was just wondering because I have been receiving an email from the NFA reminding that your application is going to be withdrawn if it's not completed by August

7/9/2020 9:27:40 PM(UTC-6)

From: fransta12 Francisco (owner)

From what I believe the last thing they are waiting on is the updated documents for the shares showing the change with Tins status and on your app it says you need to complete a verification

7/9/2020 9:23:40 PM(UTC-6)

From: ted safranko ted safranko

Ok so I need to get that share changed for tin and then do the verification for myself

7/9/2020 9:27:44 PM(UTC-6)

From: ted safranko ted safranko

I'll handle that tomorrow

7/9/2020 9:27:49 PM(UTC-6)



From: fransta12 Francisco (owner)

(y)

Attachments:

Size: 0
File name: yes
yes
(Empty File)

7/10/2020 7:29:23 AM(UTC-6)



From: ted safranko ted safranko

Attachments:

Size: 0
(Empty File)

7/14/2020 5:14:50 AM(UTC-6)

EXHIBIT
140

TO THE DECLARATION OF AMARA M. VENNETTES
PURSUANT TO 28 U.S.C. § 1746

20095



From: ted.safranko ted.safranko
Attachments:

Size: 0
(Empty File)

7/14/2020 5:14:50 AM(UTC-6)

From: ted.safranko ted.safranko
Those should work  Removing Tin as a director

7/14/2020 5:14:50 AM(UTC-6)

From: fransta12 Francisco (owner)
Perfect I will get these to the NFA

7/14/2020 6:19:58 AM(UTC-6)

From: ted.safranko ted.safranko
ok

7/14/2020 6:21:08 AM(UTC-6)

From: fransta12 Francisco (owner)
Hey ted, I've been looking to start trading forex. Do you have demo accounts that can be opened through your brokerage's website?

7/15/2020 9:22:48 PM(UTC-6)

From: ted.safranko ted.safranko
Yup I can get you one

7/15/2020 9:27:08 PM(UTC-6)

From: ted.safranko ted.safranko
Oh are you available tomorrow to jump on a call with our legal teams

7/15/2020 9:27:28 PM(UTC-6)

From: ted.safranko ted.safranko
I want you to hear where we are at etc

7/15/2020 9:27:38 PM(UTC-6)

20096

**To:**      Charles Jenks[CJenks@NFA.Futures.Org]
**From:**    Francisco S[francisco@saegcapital.com]
**Sent:**    Tue 7/14/2020 8:25:54 AM (UTC-04:00)
**Subject:** Re: Tin Tran (NFA !D #529737)
Updated Director Registry.pdf
BVI BC Directors written resolutions [Appointment of Director]_signed_June30th.pdf

Hi Mr. Jenks,
   Here are the docs as requested.

Thanks,
Francisco Story

Get Outlook for iOS

---

**From:** Charles Jenks <CJenks@NFA.Futures.Org>
**Sent:** Wednesday, June 3, 2020 7:17:53 AM
**To:** FRANCISCO@SAEGCAPITAL.COM <FRANCISCO@SAEGCAPITAL.COM>
**Subject:** Tin Tran (NFA ID #529737)

Mr. Story,

On 3/27/2020, Tin Tran verified his 8-R with a Yes answer to Criminal Disclosure question A. On 4/8/2020, the firm withdrew Mr. Tran's pending registration as a principal of SAEG Capital. The reason for withdrawal was voluntary. Mr. Tran was listed as an owner only with 10% or more interest in the company. Please note that prior to SAEG Capital becoming registered, the firm must provide documentation/proof that Tin Tran is not required to be listed as a principal of SAEG Capital (NFA ID #529630) and has divested his 10% interest in the company.

If you have any questions, please contact me via response email to Cjenks@nfa.futures.org or by phone at (312) 781-1285.

Thank you,

**Charles Jenks**
Registration Investigator II, Registration Department
NFA
300 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
T: 312.781.1285
F: 312.559.3411
CJenks@nfa.futures.org



Disclaimer:
This message (including attachments(s)) is confidential and intended for the addressee only.  If you received this email in error, please notify the sender immediately.  Unauthorized distribution, disclosure or copying of this email is prohibited.

The opinions expressed in this email are based upon the representations you have made to a representative of the Registration Department of National Futures Association ("NFA").  Any different, changed, or omitted facts or conditions might render this opinion void.  Moreover, this response represents the opinions of Registration Staff and does not necessarily reflect the views of NFA.



EXHIBIT
141
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Registration No.: **2015301**
Client No.:

REGISTER OF DIRECTORS FOR:
**Saeg Capital Ltd.**

| Date of Appointment | Name & Residential / Registered Office / Principal Office Address | Office Held | Place& Date of Birth / Incorporation | Nationality | Service Address | Date of Resignation |
|---|---|---|---|---|---|---|
| 16/10/2019 | **Frederick Teddy Joseph Safranko** ███ Avenue, Scarborough, Ontario, Canada | Director | Canada ███ 1979 | Canadian | ███ Scarborough, Ontario, Canada | - |
| 16/10/2019 | **David Negus-Romvari** ███, Hamilton, Canada | Director | Canada ███ 995 | Canadian | ███ Hamilton, Canada | - |
| 13/06/2019 | ███ Gig Harbor, United States of America | Director | Washington ███ 970 | American | ███ Gig Harbor, United States of America | 16/10/2019 |
| 30/06/2020 | **Tin Tran** ███, Biloxi, Mississippi 39532, United States of America | Director | Biloxi, Mississippi ███/1987 | American | ███ iloxi, Mississippi 39532, United States of Americ | 30/06/2020 |

# Saeg Capital Ltd.
**(the "Company")**

## WRITTEN RESOLUTIONS OF THE SOLE SHAREHOLDER OF THE COMPANY DATED 30 JUNE 2020

**THE SOLE SHAREHOLDER** wishes to convene an urgent meeting of shareholders without notice for the purpose of changing the director.

**AFTER CAREFUL CONSIDERATION**

**IT IS HEREBY RESOLVED THAT:**

1) The Shareholders meeting be called without notice,

2) The present director be removed, and the shareholder hereby elects **Frederick Safranko** and **David Negus-Romvari** to be the directors of the company, and

3) The changes contemplated above take place at the close of this meeting.

**IT IS FURTHER RESOLVED** that the Company's Registered Agent ABM Corporate Services, Ltd be and is instructed to record such changes in the Company's Register of Directors.

**GENERAL AUTHORISATION**

1. **IT IS RESOLVED** that, in connection with the actions contemplated by the foregoing resolutions, each of the Directors and officers and ABM Corporate Services, Ltd. be authorised, in the name and on behalf of the Company, to do such further acts and things deemed necessary or appropriate in connection with, or to carry out the actions contemplated by, the foregoing resolutions, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to make, execute, deliver, issue or file (or cause to be made, executed, delivered or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents and waivers, and all amendments to any such agreements, documents, instruments or certificates, and to pay, or cause to be paid, all such payments, deemed necessary or advisable to carry out the intent of the foregoing resolutions, the authority for the taking of any such action and the execution and delivery of such of the foregoing to be conclusively evidenced thereby.

-

**RATIFICATION**

2.    **IT IS RESOLVED** that any and all actions of the Company taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be ratified, confirmed, approved and adopted in all respects as fully as if such actions had been presented to for approval, and approved by, all the Directors prior to such action being taken.

**COUNTERPARTS AND ELECTRONIC COMMUNICATIONS**

3.    **IT IS RESOLVED** that this written resolution may consist of several documents, including written electronic communications including e-mailed, facsimiled, imaged, scanned, photographed or portable document format or represented by any other substitute for writing or partly one and partly another, in like form each signed or assented to by one or more directors and when taken together shall form one document.


_____

**Frederick Safranko**
**Director**

| From: | Francisco S |
|---|---|
| To: | Elizabeth Brooks |
| Cc: | Matthew Pendell |
| Subject: | Re: NFA Follow Up |
| Date: | Friday, June 25, 2021 5:03:22 PM |
| Attachments: | image001.jpg |

Hi Elizabeth,

Neither The Firm Saeg Capital General Management LP nor any of its principals have a connection with the aforementioned website or profile. We are well aware that one of our directors is tending to a family law dispute that does not impact or have any bearing on Sage Capital, May I ask whose inquiring?

Thanks,
Francisco Story




**Francisco Story | Investment Manager**
Saeg Capital | An Alternative Solution for Capital Preservation
Series 3 | Series 34 | NFA_ID: 0529630
francisco@saegcapital.com | Redacted

---

**From:** Elizabeth Brooks <EBrooks@NFA.Futures.Org>
**Sent:** Friday, June 25, 2021 1:57:35 PM
**To:** FRANCISCO@SAEGCAPITAL.COM <FRANCISCO@SAEGCAPITAL.COM>
**Cc:** Matthew Pendell <MPendell@NFA.Futures.Org>
**Subject:** NFA Follow Up

Hi Francisco,

I hope all is well. We received an inquiry that we would like to follow up with you on. Specifically, does the firm, SAEG Capital General Management LP (0529360), or any of its principals have any connection to the website, https://thetradersdomain.com/ or to the Instagram account "uncle_ted_"? If so, please explain in detail.

We look forward to hearing from you soon.

Best Regards,
Elizabeth

**Elizabeth Brooks**
Senior Analyst II, Financial Analysis and Surveillance
NFA
300 S. Riverside Plaza, Suite 1800



**EXHIBIT**
**142**
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Chicago, IL 60606

T: 312-781-7817

ebrooks@nfa.futures.org



CONFIDENTIALITY NOTICE: The information contained in this email message and attachments is confidential, intended only for the use of the individual or entity named above. If the reader of   this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently   delete the original message, attachments and any electronic copies from your system and destroy any hard copy versions of the message and attachments.   The opinions expressed in this e-mail are based upon the representations you have made to a representative of the Compliance Department of National Futures Association ("NFA").  Any different, changed, or   omitted facts or conditions might render this opinion void.  Moreover, this response represents the opinions of Compliance Staff and does not necessarily reflect the views of NFA.

**From:** Ted Safranko
**To:** Francisco S
**Subject:** Re: NFA Follow Up
**Date:** Friday, June 25, 2021 4:02:45 PM
**Attachments:** image001.jpg
                  image001.jpg

Francisco

Can you call me

On Fri., Jun. 25, 2021, 1:00 p.m. Francisco S, <francisco@saegcapital.com> wrote:

Hey Ted,

I just received the following message from the NFA just now.

 **Francisco Story | Investment Manager**
**Saeg Capital** | An Alternative Solution for Capital Preservation
Series 3 | Series 34 | NFA ID: 0529630
francisco@saegcapital.com | Redacted

**From:** Elizabeth Brooks <EBrooks@NFA.Futures.Org>
**Sent:** Friday, June 25, 2021 1:57:35 PM
**To:** FRANCISCO@SAEGCAPITAL.COM <FRANCISCO@SAEGCAPITAL.COM>
**Cc:** Matthew Pendell <MPendell@NFA.Futures.Org>
**Subject:** NFA Follow Up

Hi Francisco,

I hope all is well. We received an inquiry that we would like to follow up with you on. Specifically, does the firm, SAEG Capital General Management LP (0529360), or any of its principals have any connection to the website, https://thetradersdomain.com/ or to the Instagram account "uncle_ted_"? If so, please explain in detail.

We look forward to hearing from you soon.

Best Regards,
Elizabeth



**EXHIBIT**
**143**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

**Elizabeth Brooks**

Senior Analyst II, Financial Analysis and Surveillance

NFA

300 S. Riverside Plaza, Suite 1800

Chicago, IL 60606

T: 312-781-7817

ebrooks@nfa.futures.org



CONFIDENTIALITY NOTICE: The information contained in this email message and attachments is confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently   delete the original message, attachments and any electronic copies from your system and destroy any hard copy versions of the message and attachments.   The opinions expressed in this e-mail are based upon the representations you have made to a representative of the Compliance Department of National Futures Association ("NFA").  Any different, changed, or   omitted facts or conditions might render this opinion void.  Moreover, this response represents the opinions of Compliance Staff and does not necessarily reflect the views of NFA.

From: ted.safranko ted.safranko
Yeah we have a lot of good interest
10/29/2020 8:59:35 AM(UTC-6)

From: ted.safranko ted.safranko
So its going to take off
10/29/2020 8:59:40 AM(UTC-6)

From: fransta12 Francisco (owner)
That's really good news
10/29/2020 11:54:22 AM(UTC-6)

From: ted.safranko ted.safranko
Yup
10/29/2020 11:54:38 AM(UTC-6)

From: fransta12 Francisco (owner)
Hey Ted here's your wire pin
5/27/2021 9:19:12 AM(UTC-6)

From: fransta12 Francisco (owner)
Attachments:



Size: 0
(empty file)
5/27/2021 9:19:18 AM(UTC-6)

From: fransta12 Francisco (owner)
Hey Ted I just forwarded you an email I received from the NFA just barely, call me when you can
6/25/2021 2:01:45 PM(UTC-6)

From: ted.safranko ted.safranko
Call 00h 00m 20s
6/25/2021 2:03:42 PM(UTC-6)

**EXHIBIT**
**144**
TO THE DECLARATION OF MAURA M. VIDMAYER
PURSUANT TO 28 U.S.C. § 1746

20115

From: ted.safranko ted.safranko
Call 00h 00m 36s

6/25/2021 2:04:44 PM(UTC-6)

From: fransta12 Francisco (owner)
I can't hear anything when I answer

6/25/2021 2:04:56 PM(UTC-6)

From: fransta12 Francisco (owner)
Missed call 00h 00m 03s

6/25/2021 2:05:27 PM(UTC-6)

From: fransta12 Francisco (owner)
Missed call

6/25/2021 2:06:20 PM(UTC-6)

From: fransta12 Francisco (owner)
So reading the email they asked if "Saeg Capital or any of its principals have a connection
with tradersdomain or The Instagram Uncle Ted" so should I say that sage Capital itself
does not have a connection but since your a principal should I write that you do own those
separately from Sage?

6/25/2021 2:18:53 PM(UTC-6)

From: ted.safranko ted.safranko
Traders domain is not owned by me it was sold a while ago.

6/25/2021 2:38:26 PM(UTC-6)

From: ted.safranko ted.safranko
So we have no legal ties to it

6/25/2021 2:38:49 PM(UTC-6)

From: fransta12 Francisco (owner)
Oh gotcha wb the Instagram profile?

6/25/2021 2:38:53 PM(UTC-6)

From: ted.safranko ted.safranko
I dont have any interest
6/25/2021 2:38:56 PM(UTC-6)

From: ted.safranko ted.safranko
I wouldn't talk about the profile I would inquire further on who is asking
6/25/2021 2:39:46 PM(UTC-6)

From: ted.safranko ted.safranko
And confirm that our director is attending to legal matters and it does not impact or have any bearing on saeg
6/25/2021 2:40:08 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok sounds good
6/25/2021 2:40:51 PM(UTC-6)

From: fransta12 Francisco (owner)
Attachments:

Size: 0
(Empty File)
6/25/2021 2:45:05 PM(UTC-6)

From: fransta12 Francisco (owner)
How's this?
6/25/2021 2:45:07 PM(UTC-6)

From: ted.safranko ted.safranko
Say family law dispute
6/25/2021 3:00:33 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok ill add that but other than that good to go?
6/25/2021 3:01:01 PM(UTC-6)

From: ted.safranko ted.safranko
Yes
6/25/2021 3:01:27 PM(UTC-6)

From: ted.safranko ted.safranko
Cause what we don't want is them trying to investigate organizations for finance
6/25/2021 3:01:52 PM(UTC-6)

From: ted.safranko ted.safranko
So if we say family law they will know it's a court battle already and nothing fraudulent
6/25/2021 3:02:07 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok sounds good. I'll send that out with the family law dispute.
6/25/2021 3:02:37 PM(UTC-6)

From: ted.safranko ted.safranko
Ok thanks
6/25/2021 3:08:56 PM(UTC-6)

From: ted.safranko ted.safranko
Just spoke to my lawyer he is contacting them now too
6/25/2021 3:09:08 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok Sounds good, I already sent that email to them
6/25/2021 3:13:50 PM(UTC-6)

From: ted.safranko ted.safranko
Thank you
6/25/2021 3:14:30 PM(UTC-6)

From: ted.safranko ted.safranko
He said that should be fine
6/25/2021 3:14:35 PM(UTC-6)

From: ted.safranko ted.safranko
Cause he says they get legal requests all the time like that and as soon as you say family law they move on

6/25/2021 3:15:02 PM(UTC-6)

From: fransta12 Francisco (owner)
Ok perfect

6/25/2021 3:15:09 PM(UTC-6)

From: ted.safranko ted.safranko
Hey can you send me any responses to our filings or confirmations from the NfA

6/26/2021 8:42:11 PM(UTC-6)

From: ted.safranko ted.safranko
I have to give them to my lawyer to prove we haven't started yet

6/26/2021 8:42:26 PM(UTC-6)

From: fransta12 Francisco (owner)
The NFA doesn't send me any responses or confirmation only their webpage system that I file it with just shows a received under the quarterly filing that I file. I can see if I can get a copy of what I filed if that works

6/26/2021 9:04:24 PM(UTC-6)

From: ted.safranko ted.safranko
Ok thank you

6/26/2021 9:14:58 PM(UTC-6)

From: fransta12 Francisco (owner)
Attachments:



Size: 0
(empty file)

6/26/2021 9:18:03 PM(UTC-6)

20119

---------- Forwarded message ----------
From: <tsafranko@Redacted>
Date: Fri, Feb 10, 2023 at 6:15 PM
Subject: RE: Traders Domain Credit Card Processing
To: David Story <pilotdavid42@Redacted>

Hi David,


Please forward this information to Ricardo Espinoza the owner of Traders Domain.  I have not held any
ownership of the company since 2020.  You can reach him at admin@thetradersdomain.com


Thanks

**EXHIBIT**

**145**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

1

FS-CANCEL-000001

**From:** David Story <pilotdavid42@Redacted>
**Sent:** February 10, 2023 7:22 PM
**To:** tsafranko@Redacted
**Subject:** Traders Domain Credit Card Processing

Hi Ted,

Unfortunately we are going to have to stop all Credit Card and echeck Billing for deposits in Traders Domain Retail Forex trading accounts. We will send out a full accounting of all transactions in and out of your account with us shortly.

Thank you

David Story

-----|-----

\_____O(___)O_____/

**DAVID STORY**

**CELL -** Redacted

Redacted

**EMAIL-** PILOTDAVID42@Redacted M

Redacted

2

---------- Forwarded message ---------
From: **David Story** <pilotdavid42@Redacted>
Date: Fri, Feb 10, 2023 at 6:21 PM
Subject: Credit Card and Echeck Billing for Traders Domain
To: <admin@thetradersdomain.com>


Hi Ricardo,

Unfortunately we are going to have to stop all Credit Card and echeck Billing for deposits in Traders Domain Retail Forex trading accounts. We will send out a full accounting of all transactions in and out of your account with us shortly.

Thank You
David Story

```
        -----!-----
_____O(___)O_____/
```

1

FS-CANCEL-000003



**DAVID STORY**
**CELL-** Redacted
Redacted
**EMAIL- PILOTDAVID42@** Redacted
Redacted

2

**To:** ▓▓▓Redacted▓▓ ▓ ▓▓▓Redacted▓▓▓
**From:** Francisco Story[fransta13@▓Redacted▓]
**Sent:** Fri 3/11/2022 8:08:59 PM (UTC-05:00)
**Subject:** Re: 2021 Taxes

Hi ▓Redacted▓,

Yes for Utah Airways and OSG Billing and IK Enterprise Holdings that is correct and that's fine for the billing by the hour. For PT Adventures the 1099-k shows the $▓Redacted▓ revenue and the excel file's $▓Redacted▓ should include that and debits made from the account via expenses and payments made to the clients for 2021 which is why that number would be less. I was mistaken when I said that our total take from the 1099k was $▓Redacted▓. that number includes ACH debits that were made into OSG billing which would not be included in that 1099k since that is only credit card transactions. I will get that report to you here in a little bit that shows the exact breakdown of the income of credit card vs ACH. For the 1099k so our actual take from the 1099k should be lower. Also Some of the clients moneys haven't been payed out yet as they ask us to hold the funds for them until they need it transferred. So I will give you the exact number that's owed to them etc. For UA Aviation yes that seems right. Some of the expenses that those companies accrued were payed through the other companies so all in all between everything they should all be accounted for between all companies together if that makes sense. For Pilot Traders yes that is correct there was no money made by Pilot Traders for 2021 but I think there were some expenses. That were payed via transfers from other company accounts (that you hold the excel files for) into pilot traders. Hopefully this answers your questions. If you need further clarification let me know. We will be out at sea from Saturday Afternoon until Monday. I will get you the breakdown report to clarify the 1099k sometime tonight.

Thanks,
Francisco

---

**From:** ▓▓Redacted▓▓ < ▓▓▓Redacted▓▓▓ >
**Sent:** Friday, March 11, 2022 5:22:23 PM
**To:** Francisco Story <fransta13@▓Redacted▓>
**Subject:** Re: 2021 Taxes



EXHIBIT
146
TO THE DECLARATION OF MAURA M. WENMEYER
PURSUANT TO 28 U.S.C. § 1746

Thanks for sending this information!
I have done a quick pass over the information and have the following questions:

1. Utah Airways
    1. I see a Profit and Loss statement, but it only shows $▓Redacted▓ of income. I'm assuming that the other Utah Airways shows all the expenses. I'm assuming that you want us to go through and classify these expenses for the tax return? If so, that would be billed at our hourly rates.
2. OSG
    1. Similar to Utah Airways. We have the transaction details. I'm assuming that you want us to go through and classify the income and expenses for the tax return? If so, that would be billed at our hourly rates.
3. IK Enterprise Holdings:
    1. I'm showing about $▓Redacted▓ of income (these were the Square Inc and the Stripe Transfers) and only about $▓ worth of expenses. Does that seem right?
4. PT Adventures:
    1. In looking at the 1099-K, it shows revenue of $▓Redacted▓. This is a bit higher than the excel file you sent, which shows $▓Redacted▓. Let me know if I am missing something.
    2. Based on your email, PT adventures transferred some out to clients. Can you break out the amount that PT Adventures paid vs. what OSG Billing paid of the $▓Redacted▓?
    3. Besides the transfer of money to clients, I didn't see any additional expenses shown on PT Adventures bank statements. Does that seem right?
5. UA Aviation:
    1. I'm showing about $▓Redacted▓ of income and only about $▓ worth of expenses. Does that seem right?
6. Pilot Traders:
    1. I didn't see any activity. Let me know if I missed it.

**ARTICLES OF ASSOCIATION**

**OF**

**ARES GLOBAL LTD.**

International Business Company
......................................................................

**ARES GLOBAL LTD.**



1. In these Articles, if not inconsistent with the subject or context, the words and expressions standing in the first column of the following table shall bear the meanings set opposite them respectively in the second column thereof.

| Words | Meanings |
|---|---|
| capital | The sum of the aggregate par value of all outstanding shares with par value of the Company and shares with par value held by the Company as treasury shares plus: |
| | (a) the aggregate of the amounts designated as capital of all outstanding shares without par value of the Company and shares without par value held by the Company as treasury shares, and |
| | (b) the amounts as are from time to time transferred from surplus to capital by a resolution of directors. |
| member | A person who holds shares in the Company. |
| resolution of directors | (a) a resolution approved at a duly constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a simple majority of the directors present who voted and did not abstain where the meeting was called on proper notice or if on short notice, if those directors not present have waived notice or if on short notice, if those directors not present have waived notice; or |

EXHIBIT

147

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Page 1 of 21

                                            (b) a resolution consented to in writing by all directors or of all members of the committee, as the case may be.

**resolution of members**      (a) A resolution approved at a duly constituted meeting of the members of the Company by the affirmative vote of:

                i.   a simple majority of the votes of the shares which were present at the meeting and were voted and not abstained, or

                ii.  a simple majority of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority of the votes of the remaining shares entitled to vote thereon which were present at the meeting and were voted and not abstained; or

              (b) a resolution consented to in writing by:

                i.   an absolute majority of the votes of shares entitled to vote thereon, or

                ii.  an absolute majority of the votes of each class or series of shares entitled to vote thereon as a class or series and of an absolute majority of the votes of the remaining shares entitled to vote thereon;

**securities**                Shares and debt obligations of every kind, and options, warrants and rights to acquire shares, or debt obligations.

**surplus**                 The excess, if any, at the time of the determination of the total assets of the Company over the aggregate of its total liabilities, as shown in its books of account, plus the Company's capital.

**the Memorandum**      The Memorandum of Association of the Company as originally framed or as from time to time amended.

**the Act**                 The International Business Companies Act, Cap 12.14 of the Revised Laws of Saint Lucia

| | |
|---|---|
| the Seal | The Common Seal of the Company. |
| these Articles | These Articles of Association as originally framed or as from time to time amended. |
| treasury Shares | Shares in the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled. |

"Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed or represented or reproduced by any mode of representing or reproducing words in a visible form.

In these Articles the word "person" includes a trust, the estate of a deceased individual, a partnership, or an unincorporated association of persons.

Save as aforesaid any words or expressions defined in the Act shall bear the same meaning in these Articles.

Words denoting the singular shall include the plural and vice versa and words denoting the masculine shall include the feminine.

A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

A reference to money in these Articles is a reference to the currency of the United States of America unless otherwise stated.

**BUSINESS ACTIVITY OF THE COMPANY**

2.  The Business activities are in particular but not exclusively, commercial, financial, lending, borrowing, trade, services activities, Forex brokerage, training and managed accounts services in currency Contract for Difference agreements, namely precious metals Contract for Difference agreements, index Contract for Difference agreements, and any other contract for difference agreements entered into, but does not include )(a) shares and stock in the share capital of a company;(b) any instrument creating or acknowledging indebtedness, in particular, debentures, debenture stock, loan stock, bonds and notes; and (c) bonds and other instruments creating or acknowledging indebtedness issued by or on behalf of any

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
JUN 20 2023
FILED

participating Government and excluding any security as defined by The Securities Act CAP 12.18 of the revised laws of Saint Lucia Or any 'securities' as defined by The Securities Act CAP 12.18 of the revised Laws of Saint Lucia, do not require a particular licence and can be carried out by the Company in accordance with its Articles of Association and Memorandum (Articles of Incorporation)

## REGISTERED SHARES

3.  The Company shall issue to every member holding shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signatures of the director or officer and the Seal may be facsimiles.

4.  If a share certificate for shares is worn out or lost it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.  Any member receiving such share certificate shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of wrongful or fraudulent use or representation made by any person by virtue of the possession of such share certificate.

5.  If several persons are registered as joint holder of any shares, any one of such persons may give an effectual receipt of any dividend payable in respect of such shares.

## SHARES, AUTHORIZED CAPITAL AND CAPITAL

6.  Subject to the provisions of these Articles the unissued shares of the Company shall be at the disposal of the directors who may offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions and subject to such designations, powers, preferences, rights, qualifications, limitations and restrictions whether in regard to dividend, voting, return of capital or otherwise as the Company may by resolution of directors determine.

7.  Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property or any combination of the foregoing as shall be determined by a resolution of directors.

8.  Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value, and in the absence of fraud the

decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved.

9. A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

10. Treasury shares may be disposed of by the Company on such terms and conditions as the Company may by resolution of directors determine.

11. The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

12. Upon the issue by a company incorporated under this Act of a share without par value, the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the shares is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

13. The Company may purchase, redeem or otherwise acquire and hold its own shares only out of surplus but no purchase, redemption or other acquisition shall be made unless the directors determine that immediately after the purchase, redemption or other acquisition:

    (a) the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

    (b) the realizable assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in the books of account and its capital

and, in the absence of fraud, the decision of the directors as to the realizable assets of the Company is conclusive, unless a question of law is involved.

14. The Company may only purchase or otherwise acquire its own shares without fulfilling the requirements of Regulation 12 in exchange for newly issued shares of equal value in the Company or pursuant to an order of the court.

15. Shares that the Company purchases, redeems or otherwise acquires pursuant to Regulations 12 or 13 may be cancelled or held as treasury shares unless the shares are purchased, redeemed or otherwise acquired out of capital pursuant to Regulation 31 in which case they shall be cancelled but they shall be available for reissue. Upon the cancellation of a share, the

SAINT LUCIA
REGISTRY OF INTERNATIONAL BUSINESS
COMPANIES   PARTNERSHIPS   TRUSTS
JUN 20 2023

amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company.

16. Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

17. No notice of a trust, whether expressed, implied or constructive, shall be entered in the share register.

## TRANSFER OF SHARES

18. Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

19. The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

20. Subject to any limitations in the Memorandum, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share register closed for more than 60 days in any period of 12 months.

## TRANSMISSION OF SHARES

21. The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations.

22. Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a

member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall for all purposes be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

23. Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

24. What amounts to incompetence on the part of a person is a matter to be determined by the court having regard to all the relevant evidence and the circumstances of the case.


## REDUCTION OR INCREASE IN AUTHORIZED CAPITAL OR CAPITAL

25. With the prior or subsequent approval by a resolution of members, the Company may by a resolution of directors amend its Memorandum to increase or reduce its authorized capital and in connection therewith the Company may increase or reduce the number of shares which the Company may issue, increase or reduce the par value of any of its shares or effect any combination of the foregoing.

26. Where the Company reduces its authorized capital under the foregoing regulation, then, for purposes of computing the capital of the Company, any capital that before the reduction was represented by shares but immediately following the reduction is no longer represented by shares shall be deemed to be capital transferred from surplus to capital.

27. The Company may amend its Memorandum to divide the shares, including issued shares, of a class or series of shares into a larger number of shares of the same class or series.

28. The Company may amend its Memorandum to combine the shares, including issued shares, of a class or series of shares into a smaller number of shares of the same class or series.

29. The capital of the Company may by a resolution of directors be increased by transferring an amount of the surplus of the Company to capital and, subject to the provisions of Regulations 29 and 30, the capital of the Company may be reduced by transferring an amount of the capital of the company to surplus.

30. No reduction of capital shall be effected that reduces the capital of the Company to an amount that is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares

SAINT LUCIA
COMPANIES PARTNERSHIPS · TRUSTS
JUN 20 2023
FILED

without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

31. No reduction of capital shall be effected unless the directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realizable assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realizable value of the assets of the Company is conclusive, unless a question of law is involved.

32. Where the Company reduces its capital under Regulation 28 the Company may:

    (a) return to its members any amount received by the Company upon the issue of any of its shares;

    (b) purchase, redeem or otherwise acquire its shares out of capital; or

    (c) cancel any capital that is lost or not represented by assets having a realizable value.

## MEETINGS AND CONSENTS OF MEMBERS

33. The directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside Saint Lucia as the directors consider necessary or desirable.

34. Upon the written request of members holding more than 50 percent of the outstanding voting shares in the Company the directors shall convene a meeting of members.

35. The directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company.

36. A meeting of members held in contravention of the requirement in Regulation 34 is valid:

    (a) if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

(b) if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose presence at the meeting shall be deemed to constitute waiver.

37. The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

38. A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

39. The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

40. An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the meeting shall accept as properly evidencing the wishes of the member appointing the proxy. Only members who are individuals may appoint proxies.

[Name of Company]

I/We ................................................... being a member of the above Company with shares HEREBY APPOINT ............................................... of .............................................. or failing him ................................................ of .............................................. to be my/our proxy to vote for me/us at the meeting of members to be held on the ...... day of ................................ and at any adjournment thereof.

[Any restrictions on voting to be inserted here.]

Signed this ......... day of .........................

...........................................

Member

41. The following shall apply in respect of joint ownership of shares:

(a) if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member.

(b) if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners, and

(c) if two or more of the joint owners are present in person or by proxy they must vote as one.

42. A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

43. A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares of each class or series of shares entitled to vote on resolutions of members to be considered at the meeting. If a quorum is present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

44. If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are not present within one hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meting, the meeting shall be dissolved.

45. At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting.  If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose some one of their number to be the chairman.  If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

46. The chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

47. At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in the minutes

thereof.  If the chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken.  If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meting by the chairman.

48. Any person other than an individual shall be regarded as one member and subject to Regulation 48 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence.  In case of doubt, the directors may in good faith seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

49. Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorize such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorized shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise it were an individual member of the Company.

50. The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested in default of which the vote by such proxy or on behalf of such person shall be disregarded.

### DIRECTORS

51. The first directors of the Company shall be elected by the subscribers to the Memorandum and thereafter, the directors shall be elected by the directors or the members for such term as the directors or the members determine.  A director may be an individual or a company.

52. The minimum number of directors shall be one and the maximum number shall be seven (7).

53. Each director shall hold office until his successor takes office or until his death, resignation or removal.

54. A director may be removed from office, with or without cause, by a resolution of members or by resolution of directors.

55. A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

56. A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors.

57. With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

58. A director shall not require a share qualification, but nevertheless shall be entitled to attend and speak at any meeting of the members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

## POWERS OF DIRECTORS

59. The business and affairs of the Company shall be managed by the directors who may pay all expenses incurred preliminary to and in connection with the formation and registration of the Company and may exercise all such powers of the Company as are not by the Act or by the Memorandum or these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may be authorized by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirement made by a resolution of members shall prevail if it be inconsistent with these Articles nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

60. The directors may, by a resolution of directors, appoint any person, including a person who is a director, to be an officer or agent of the Company.

61. Every officer or agent of the Company has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles or in the resolution of directors appointing the officer or agent, except that no officer or agent has any power or authority with respect to the matters requiring a resolution of directors under the Act.

62. Any director who is a body corporate may appoint any person its duly authorized representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

63. The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may act only for the purpose of increasing the number of directors to that number or summoning a meeting of members.

64. All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for moneys paid to the Company, shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, in such manner as the directors shall from time to time by resolution determine.


## PROCEEDINGS OF DIRECTORS

65. The directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside Saint Lucia as the directors may determine to be necessary or desirable.

66. A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

67. A director shall be given not less than 3 days notice of meetings of directors. A meeting of directors held without 3 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting have waived notice of the meeting and for this purpose, the presence of a director at a meeting shall be deemed to constitute a waiver on his or her part. The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

68. A director may by a written instrument appoint an alternate who need not be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and to vote or consent in place of the director.

69. A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors, unless there are only 2 directors in which case the quorum shall be 2.

70. If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Act or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of

directors.  Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

71. At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting.  If there is no chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside.  If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the directors present shall choose some one of their number to be chairman of the meeting.

72. The directors shall cause the following corporate records to be kept:

   (a) minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

   (b) copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

   (c) such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

73. The books, records and minutes shall be kept at the registered office of the Company.

74. The directors may, by a resolution of directors, designate one or more committees each consisting of one or more directors.

75. Each committee of directors has such powers and authorities as the directors, including the power and authority to affix the Seal as set forth in the resolution of directors establishing the committee, except that no committee has any power or authority with respect to the matters requiring a resolution of directors under Regulations 55 and 59.

76. The meetings and proceedings of each committee of directors consisting of 2 or more members shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not suspended by any provisions in the resolution establishing the committee.


**OFFICERS**

77. The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient.  Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, a President and one or

more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable.  Any number of offices may be held by the same person.

78. The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at all meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

79. The salaries of all officers shall be fixed by resolution of directors.

80. The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors.  Any vacancy occurring in any office of the Company may be filled by resolution of directors.

## CONFLICT OF INTERESTS

81. If the requirements of Regulations 81 and 82 are satisfied, no agreement or transaction between the Company and one or more of its directors or liquidators, or any person in which any director or liquidator has a financial interest or to whom any director or liquidator is related, including as a director or liquidator of that other person, is void or voidable for this reason only or by reason only that the director or liquidator is present at the meeting of directors or liquidators or at the meeting of the committee of directors or liquidators that approves the agreement or transaction or that the vote or consent of the director or liquidator is counted for that purpose.

82. An agreement or transaction referred to in Regulation 80 is valid if:

    (a) the material facts of the interest of each director or liquidator in the agreement or transaction and his interest on or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors or liquidators; and

(b) the agreement or transaction is approved or ratified by a resolution of directors or liquidators that has been approved without counting the vote or consent of any interested director or liquidator or by the unanimous vote or consent of all disinterested directors or liquidators if the votes or consents of all disinterested directors or liquidators are insufficient to approve a resolution of directors or liquidators.

83. An agreement or transaction referred to in Regulation 80 is valid if:

(a) the material facts of the interest of each director or liquidator in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the members entitled to vote at a meeting of members; and

(b) the agreement or transaction is approved or ratified by a resolution of members.

84. A director or liquidator who has an interest in any particular business to be considered at a meeting of directors, liquidators or members may be counted for purposes of determining whether the meeting is duly constituted.

## INDEMNIFICATION

85. Subject to Regulation 85, the Company may indemnify against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who:

(a) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

(b) is or was, at the request of the Company, serving as a director, officer or liquidator of, or in other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

86. Regulation 84 only applies to a person referred to in that subsection if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

87. The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no

reasonable cause to believe that his conduct was unlawful, is in the absence of fraud, sufficient for the purposes of this Regulation, unless a question of law is involved.

88. The termination of any proceedings by any judgement, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

89. If a person referred to in Regulation 84 has been successful in defence of any proceedings referred to in that Regulation the person is entitled to be indemnified against all expenses, including legal fees, and against all judgements, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

90. The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 84.

91. The directors shall provide for the safe custody of the Seal.  The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorized from time to time by resolution of directors.  The directors may provide for a facsimile of the Seal and of the signature of any director or authorized person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the seal had been affixed to such instrument and the same had been signed as hereinbefore described.

### DIVIDENDS

92. The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus.  In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorizing the dividends, a fair and proper value for the assets to be so distributed.

93. The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

94. The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

95. No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realizable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realizable value of the assets of the company is conclusive, unless a question of law is involved.

96. Notice of any dividend that may have been declared shall be given to each member in the manner hereinafter mentioned and all dividends unclaimed for 3 years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

97. No dividend shall bear interest as against the Company.

98. A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the share.

99. In the case of a dividend of authorized but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

100.    In the case of a dividend of authorized but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distribution, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

## ACCOUNTS

101.    A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares.

102.    The books of account shall be kept at the registered office of the Company.

103.    The directors shall unless such requirement be waived by resolution of members cause to be made out and shall serve on the members or lay before a meeting of members at some date not later than eighteen months after the incorporation of the Company and subsequently once at least in every calendar year a profit and loss account for a period in the case of the first account since the incorporation of the Company and in any other case, since the preceding account, made to a date not earlier than the date of the notice by

more than twelve months, and a balance sheet as at the date to which the profit and loss account is made up. The Company's profit and loss account and balance sheet shall be drawn up so as to give respectively a true and fair view of the profit or loss of the Company for that financial period, and a true and fair view of the state of affairs of the Company as at the end of that financial period.

104.    A copy of such profit and loss account and balance sheet shall be served on every member in the manner and with similar notice to that prescribed herein for calling a meeting of members or upon such shorter notice as the members may agree to accept.

105.    The Company may by resolution of directors include in the computation of surplus for any purpose the unrealized appreciation of the assets of the Company, and, in the absence of fraud, the decision of the directors as to the value of the assets is conclusive, unless a question of law is involved.

## AUDIT

106.    The Company may by resolution of members call for the accounts to be examined by auditors.

107.    The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

108.    The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

109.    The remuneration of the auditors of the Company:

(a) in the case of auditors appointed by the directors, may be fixed by resolution of directors;

(b) subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

110.    The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not:

(a) In their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

SAINT LUCIA
REGISTRY OF BUSINESS
COMPANIES PARTNERSHIPS & TRUST
JUN 20 2023
FILED

(b) all the information and explanations required by the auditors have been obtained.

111.    The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

112.    Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

113.    The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## NOTICES

114.    Any notice, information or written statement to be given by the Company to members must be served in the case of members holding registered shares by mail addressed to each member at the address shown in the share register.

115.    Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail, to the registered agent of the Company.

116.    Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## PENSION AND SUPERANNUATION FUNDS

117.    The directors may establish and maintain or procure the establishment and maintenance of any non-contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or

officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the wives, widows, families and dependents of any such person, and may make payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid.   Subject always, if the Act shall so require, to particulars with respect thereto being disclosed to the members, and to the proposal being approved by the Company by resolution of members, a director holding any such employment, or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension allowance or emolument.

## ARBITRATION

118.   Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Act touching anything done or executed, omitted or suffered in pursuance of the Act touching any breach or alleged breach or otherwise relating to the premises of to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to 2 arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

119.   If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

## VOLUNTARY WINDING UP AND DISSOLUTION

120.   The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares it may voluntarily commence to wind up and dissolve by resolution of directors.

## CONTINUATION

121.   The Company may by a resolution of members or by a resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside of Saint Lucia in the manner provided under those laws.

   For the purpose of incorporating an International Business Company under the laws of Saint Lucia we, **FORTGATE OFFSHORE INVESTMENT AND LEGAL SERVICES LTD.** hereby subscribe our name to these Articles of Association this **20ᵗʰ**, day of **June 2023.**



...............................................
**Tonjaka Ewart Hinkson**
**For & on behalf of Date**
**Fortgate Offshore Investment and Legal Services Ltd.**

20ᵗʰ , June 2023
.....................
**Date**



# SAVVY

## On-Boarding Application

1. Please complete all relevant information. This form is fillable, click the TAB button to proceed to next box.
2. Sign the form on page 3. Digital signature is acceptable.
3. Email the completed form and required ID documents to support@savvywallet.io

### COMPANY INFORMATION

| | |
|---|---|
| **Company DBA Name** The Traders Domain | **Company Legal Name** Traders Domain FX ltd |
| **Address** Girffith Corporate Centre #305 | **Address** Girffith Corporate Centre #305 |
| **City** Kingstown | **City** Kingstown |
| **State** Beachmont | **State** Beachmont |
| **Zip** PO BOX 1510 | **Zip** PO BOX 1510 |
| **Company Email Address** admin@thetradersdomain.com | **Company Phone Number** Redacted |
| **Company Website URL** https://www.thetradersdomain.com/ | **Filed bankruptcy in last 5 years** ☐ Yes ☐ No |
| **Corporation Type** Corporation | **State of Inc.** Beachmont |
| **Date of Inc.** October 4th 2017 | **Is this an e-commerce only business** ☐ Yes ☐ No |
| **Is company public/private** Private | **Are you PCI compliant** |
| **Business type:** B2B ☐  B2C ☐ | **PCI Compliance Level** |
| **Is your business BBB.org discoverable** Yes ☐  No ☐ | |
| **Social Media Presence** Yes ☐  No ☐ | **Social Media URL** |
| **Corporate Tax ID (EIN) #** N/A | **NAICS Code** N/A |

**Company Summary (description of business model**
Foreign Exchange Spot Trading

### LEGAL PROCEEDINGS

Does your Company have any pending or threatened administrative proceedings, enforcement proceedings, actions, audits, investigations, or inquiries of any federal, state, or local regulatory or government agency?   Yes ☐   No ☐
If "yes" - please give complaining party and nature of investigation.

**EXHIBIT**
**148**
TO THE DECLARATION OF MAURA M. WEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Rev.1_2021

1



## OWNER INFORMATION

| | | |
|---|---|---|
| 1) Owner Name **Fotos Fotiou** | Title **CEO** | |
| % owned **100%** | Email **admin@thetradersdomain.com** | |
| DOB Redacted **1981** | Driver License # Redacted **2847** | State of ID **Limassol** |
| Address **Redacted** | City **Limaasol** | |
| State **Limassol** | Zip **3095** | Phone **Redacted** |
| 2) Owner Name | Title | |
| % owned | Email | |
| DOB | Driver License # | State of ID |
| Address | City | |
| State | Zip | Phone |
| 3) Owner Name | Title | |
| % owned | Email | |
| DOB | Driver License # | State of ID |
| Address | City | |
| State | Zip | Phone |

## PROJECTIONS

| Avg. Card Value ($) **1000** | Min Card Value ($) **100** | Max Card Value ($) **5000** |
|---|---|---|
| Volume (# of cards) Year 1 **1000** | Year 2 **3000** | Year 3 **10000** |

## PROGRAM WALK-THROUGH

Please be very specific. Who is getting a card and why.

Clients that are using our platform will be registering to receive the card so their profits can be transferred from our platform to their personal wallet.  There is full kyc done for clients who request this option.

Rev.1_2021

2

# SAVVY

## ISSUANCE INFORMATION

Which currency (ies) will your program issue?

☒ USD     ☒ EUR     ☒ GBP     ☒ CAD     ☐ MXN

☐ INR     ☐ YEN     ☐ CUP

## USD ISSUANCE

| | | |
|---|---|---|
| Will any of your recipients be located outside of the US? | ☒ Yes | ☐ No |
| If yes, will at least 50% of the recipients be in the US? | ☒ Yes | ☐ No (if no, we will require further information) |

Does your company have a presence in the European Union?   Yes ☒     No ☐

## Currency and Volume (USD, EUR, GBP, MXN, INR, YEN, CUP )

| What Currency | Paying to What Country | Projected Annual Volume of Cards |
|---|---|---|
| USD | USA/Canada/South America | 10000 |
| EUR | Europe/UK | 1000 |
| GBP | Europe/UK | 1000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |



AUTHORIZED SIGNER

## Authorization:

The undersigned, the Signing Officer of the Company:

(a) certifies that the Company's products are legal in all jurisdictions in which they are sold; and

(b) certifies that the information set out within this application is correct and complete.

_____

Signature of Signing Officer (Digital Signature Accepted on above line)

_____

Printed name of signing officer  Fotos Fotou

Title of signing officer   CEO

Date  April 17 2022

_____

**Please sign the completed form.  Attach a copy of owners driver's license, Articles of Inc, and Company EIN and email all documents to support@savvywallet.io**



KYΠΡΙΑΚΗ ΔΗΜΟΚΡΑΤΙΑ  KIBRIS CUMHURİYETİ  REPUBLIC OF CYPRUS
ΔΙΑΒΑΤΗΡΙΟ / PASAPORT / PASSPORT

Είδος / Tip / Type — Κωδικός / Kodu / Code — Αρ. Διαβατηρίου / Pasaport No / Passport No
P — CYP — 847

Επώνυμο / Soyadı / Surname (1)
ΦΩΤΙΟΥ
FOTIOU
Όνομα / Adı / Given Names (2)
ΦΩΤΟΣ
FOTOS
Ιθαγένεια / Tabiiyet / Nationality (3)
ΚΥΠΡΙΑΚΗ
CYPRIOT
Τόπος γέννησης / Doğum yeri / Place of Birth (4)
ΛΕΜΕΣΟΣ
LEMESOS
Υπογραφή / İmza / Signature (10)

Φύλο / Cinsiyet / Sex (5)
APPEN / M
Ημερ. Γέν. / Doğum tarihi / Date of Birth (7)
1981
Ημερ. Έκδ. / Veriliş / Issued on (6)
13/09/2021
Λήγει την / Bitiminin / Expires on (8)
13/09/2031
Εκδ. Αρχή / Veren makam / Issuing Auth (9)
T.A.Π.M
C.R.M.D

P<CYPFOTIOU<<FOTOS<<<<<<<<<<<<<<<<<<<<<<<<<<
8476CYP81   M3109133<<<<<<<<<<<<<<00





EXHIBIT
149
TO THE DECLARATION OF MAURA M. VEHMEYER
PURSUANT TO 28 U.S.C. § 1746



**Αρχή Ηλεκτρισμού Κύπρου**
**Electricity Authority of Cyprus**
www.eac.com.cy

Αγίου Ανδρέου 55, 3036 Λεμεσός
Ημερ. Παράδοσης για ΦΠΑ    06/09/2021
Αρ. Μητρώου ΦΠΑ    Redacted 020C
ΑΦΤ    Redacted 266G

Όνομα Πελάτη    **FOTOS FOTIOU**

Αρ. Λογαριασμού    Redacted 319 8

Αρ. Μετρητή/τών    Redacted 09
Αρ. Υποστατικού    Redacted 7630

Εγκ.Ισχύος/Ασφάλεια    30 AMP 3-Φ
Διατίμησή/σεις    01-Οικιακή

Κύκλος: 04    Διαδρομή: LIM31

☏ 1800    Βλάβες/κλαδέματα/οδικός φωτισμός
☏ 1818    Πληροφορίες λογαριασμών

**ΔΙΕΥΘΥΝΣΗ ΥΠΟΣΤΑΤΙΚΟΥ**
Redacted

3120 Limassol

| ΕΝΔΕΙΞΕΙΣ ΜΕΤΡΗΤΗ (kWh) | | | | |
|---|---|---|---|---|
| Διατίμηση | Τελευταία | Προηγούμενη | ΣΜ | Κατανάλωση |
| 01 | 44338 | 43021 | | 1317 |
| **Σύνολο κατανάλωσης** | | | | **1.317 kWh** |
| Αντίστοιχη περσινή κατανάλωση | | | | 924 kWh |

| ΑΝΑΛΥΣΗ ΓΙΑ ΤΗΝ ΠΕΡΙΟΔΟ 06/07/2021 - 06/09/2021 | Αξία (€) |
|---|---|
| **Χρεώσεις Διατίμησης 01** | |
| Παραγωγή Ηλεκτρικής Ενέργ. (1.317 kWh x €0,0882) | 116,16 |
| Χρήση Δικτύου (1.317 kWh x €0,028) | 36,88 |
| Επικουρικές Υπηρεσίες (1.317 kWh x €0,0066) | 8,69 |
| Μέτρηση Κατανάλωσης | 0,98 |
| Προμήθεια Ηλεκτρικής Ενέργειας | 4,64 |
| **Σύνολο με Βασική Τιμή Καυσίμων** | **167,35** |
| Αναπροσαρμογή Καυσίμων (1.317kWh x €0,046518) | 61,26 |
| Υποχρεώσεις Δημόσιας Ωφελείας (1.317kWh x €0,00044) | 0,58 |
| **Σύνολο πριν το ΦΠΑ (19%)** | **229,19** |
| Ταμείο ΑΠΕ & ΕΞΕ (1.317kWh x €0,005) | 6,59 |
| Σύνολο χρεώσεων περιόδου εκτός ΦΠΑ | 235,78 |
| ΦΠΑ (19%) | 43,55 |
| **Σύνολο χρεώσεων περιόδου** | **279,33** |
| Υπόλοιπο από μεταφορά | 141,78 |
| Πληρωμές | -236,00 |



**ΚΑΤΑΝΑΛΩΣΗ ΑΝΑ ΠΕΡΙΟΔΟ**

924    1317
ΑΝΤΙΣΤΟΙΧΗ ΠΕΡΙΟΔΗ    ΤΡΕΧΟΥΣΑ
ΠΕΡΙΟΔΟΣ

Πληρωμή με μηνιαίες δόσεις. Ποσό δόσης €122

Βασική τιμή καυσίμων: €300/ΜΤ (Μετρικό Τόνο)
Τρέχουσα τιμή καυσίμων: €501,69/ΜΤ
Αναπροσ. τιμής καυσίμων (με θερμ. αέρα): €0,046518/kWh
Αναπροσ. τιμής για δικαιώμ. θερμ. αερίων: €0,022340/kWh

| **Υπόλοιπο προς μεταφορά** | |
|---|---|
| Πληρωτέο μέχρι 29/09/2021 | **€185,11** |



**Αρχή Ηλεκτρισμού Κύπρου**
**Electricity Authority of Cyprus**

Αριθμός Λογαριασμού
Redacted 319 8

Ψηφία Ελέγχου
095

Περίοδος Κατανάλωσης
**06/07/2021 - 06/09/2021**

ΠΛΗΡΩΜΕΣ ΛΟΓΑΡΙΑΣΜΩΝ
Λευκωσία, Τηλ. 22202243/ 2343
supplynic@eac.com.cy
Κακοπετριά, Τηλ. 22922417
Λεμεσός, Τηλ. 25205007/ 5254
supplylim@eac.com.cy
Πλάτρες, Τηλ. 25813034
Λάρνακα, Τηλ. 24204235/ 4238
supplylar@eac.com.cy
Παραλίμνι, Τηλ. 23821277
supplypar@eac.com.cy
Πάφος, Τηλ. 26206192/ 6248
supplypafos@eac.com.cy

04  LIM31

**Υπόλοιπο προς μεταφορά**
**€185,11**

Πληρωτέο μέχρι 29/09/2021

Redacted
Redacted    85,11

# WILFRED SERVICES LTD.

Registered Agent and Trustee

## CERTIFICATE OF INCUMBENCY

## Traders Domain FX Ltd.

### Saint Vincent and the Grenadines Business Company No: 24284 BC 2017

The undersigned Registered Agent of Traders Domain FX Ltd., ("the Company") hereby certifies that:

- The Company has been incorporated under the laws of Saint Vincent and the Grenadines ("SVG") on October 4, 2017;

- The Company has authorized capital of US$1,000 divided into 1000 Shares with a par value of US$1.00 each;

- The Registered Agent of the Company is WILFRED SERVICES LTD.;

- The Registered Office of the Company is Beachmont Business Centre, Suite 304, Kingstown, Saint Vincent and the Grenadines.

- Each of the persons named below (each a "Director"), whose respective office appears opposite such Director's name and is duly elected, qualified and acting incumbent of such Director's office

| NAME | OFFICE |
|------|--------|
| RICARDO LOPEZ ESPINOZA | DIRECTOR |
| FOTOS FOTIOU | DIRECTOR |

- The Company is authorized to issue Registered Shares ONLY and has issued 1000 shares to:

RICARDO LOPEZ ESPINOZA
ADDRESS: AND TECOLOTEB201 CP.00000, PAVO REAL GAVIOTA, IXTAPA LOS TAMARINDOS C.P. 48282 JALISCO MEXICO

According to the records available to us there are no legal, liquidation, arbitration or administrative proceedings pending or threatened against the Company and no receiver has been appointed over the assets of the Company.

The undersigned is qualified to make this certification and is authorized to give this certificate;

Dated this 21ˢᵗ      day of June, 2022

WILFRED SERVICES LTD. – License Number: 7 RA 1997


Elizabeth Ollivierre
For Registered Agent
WILFRED SERVICES LTD.



**EXHIBIT**

150

TO THE DECLARATION OF MAURA M. VISHMEYER
PURSUANT TO 28 U.S.C. § 1746

**APOSTILLE**

(Convention de La Haye du 5 Octobre 1961)

1.  Country: St. Vincent and the Grenadines

    This public document

2.  has been signed by **Elizabeth Ollivierre**

3.  acting in the capacity as Registered Agent

4.  bears the seal of the Registered Agent, St. Vincent

**CERTIFIED**

5.  at the Financial
    Services Authority

6.  The 22nd day of June 2022

7.  by _Derek Stroe_ — Executive Director/
    Deputy Executive Director/
    Manager Administration
    St. Vincent and the Grenadines

8.  No. FSA- 1518/2022

9.  Seal/Stamp

10. Signature

    Executive Director/Deputy Executive Director/
    Manager Administration

22. 06. 22

61

1   registration in any capacity for Tin Tran.  However,

2   in March 2020, Tran filed an application for approval

3   as a principal of SAEG Capital General Management LP,

4   formerly SAEG Capital General Management and SAEG

5   Capital Limited.  Tran remains pending approval as a

6   (inaudible) of SAEG GC from March 27th, 2020, until

7   April 8, 2020, when Tran's pending application for

8   approval was withdrawn."  Mr. Story, do you recall Mr.

9   Tran applying for approval as a principal of SAEG

10  Capital General Management LP in March 2020?

11       A    Yes.

12       Q    Did you assist Mr. Tran with his application

13  at all?

14       A    I believe I gave him the details that he

15  would need to do to apply, yes.

16       Q    To the best of your understanding, why was

17  Mr. Tran applying to be a principal of SAEG Capital

18  General Management LP?

19       A    To my understanding, he was going to be one

20  of the partners.

21       Q    And I know we had talked about the meeting

22  in January 2020, and you indicated -- and correct me

23  if I'm wrong -- that Mr. Tran was not involved in the

24  conversations about the hedge fund.  Is that correct?

25       A    That is correct.

EXHIBIT
151
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

[3/17/2023 10:04 AM] Story, Francisco 20230317

62

1    Q    So, at what point did Mr. Tran become

2    involved in the conversations about the hedge fund?

3    A    When they added me into their partner Skype

4    group.  When I met all the partners.

5    Q    Okay.  So, when you were introduced into the

6    partner Skype chat, that was the first time you were

7    made aware that Mr. Tran was involved in the hedge

8    fund.

9    A    Yes.

10   Q    Okay.  And do you recall approximately when

11   that was?

12   A    Sometime after the meeting.  I believe it

13   was sometime in February.

14   Q    Okay.  And to the best of your

15   understanding, what role was Mr. Tran going to have

16   with SAEG GM?

17   A    At the moment of registration, I did not

18   what his role -- his involvement would be in the fund

19   itself.

20   Q    Okay.  Was there any discussion, though?  I

21   mean I understand you didn't know what he was going to

22   be doing for the hedge fund.  Was there any discussion

23   about what his role could possibly be with SAEG GM?

24   A    No.  At that time, we didn't even discuss

25   everyone's roles quite yet.

64

1       A     No.

2       Q     Do you recall why Mr. Tran withdrew his

3   application as a principal of SAEG GM?

4       A     I believe -- I'm not too sure, but I believe

5   there were some concerns with Ted Safranko over his

6   felony charge of him being involved with him being

7   involved with any sort of fund.

8       Q     I'm sorry.  Could you explain that a little

9   more?

10      A     Yes.  He had a prior felony charge.  I don't

11  know of what.  And I believe there were some concerns

12  with Ted Safranko over that.

13      Q     Do you recall what Mr. Safranko's concerns

14  consisted of?  I mean was he concerned about the NFA,

15  or was he concerned about Mr. Tran himself?

16      A     I think it was more concerns of the NFA,

17  from what I believe, but I don't know exactly.

18      Q     Okay.  Did you assist Mr. Tran in

19  withdrawing his application as a -- for approval as a

20  principal for SAEG GM?

21      A     I believe at the time I was the one who was

22  registering SAEG.  So, I had to -- I was instructed to

23  remove him from the registration, I believe.

24      Q     Just as a way of background, did you have,

25  for instance, an ID with the NFA that allowed you to

**EXHIBIT**

**152**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

65

1    do the registration documents?

2        A    Yes.

3        Q    Okay.  So, was it through your ID affiliated

4    with the NFA that you were submitting and withdrawing

5    documents on behalf of SAEG GM?

6        A    I believe so, yes.

7        Q    Did anyone else from SAEG have an NFA ID

8    that was being used for the SAEG GM registration

9    process?

10       A    They only had IDs to register themselves as

11   principals, not to file documents on behalf of SAEG.

12   As part of this process, did you ever share your ID or

13   password with anyone else at SAEG GM so that they

14   could submit documents or withdraw documents?

15       A    I did not.  I don't believe so.

16       Q    I understand you were in communication with

17   the SAEG partners on this Skype chat.  Were there any

18   other methods by which you were communicating with the

19   SAEG partners?

20       A    No.

21       Q    Did you ever have any text messages directly

22   with Mr. Tran?

23       A    I did after the meeting.

24       Q    Okay.  And what were the topics of

25   conversation that you were having with Mr. Tran over

66

1    text?

2         A    The topics were he was interested in

3    snowboarding.  And since I was in Utah, he was asking

4    about coming to snowboard or something to that effect.

5    And so, I believe I gave him some answers or something

6    to that effect.

7         Q    Did he ever come snowboard in Utah?

8         A    He did not.  He planned on it, but he never

9    did.

10        Q    Have you communicated with him since the

11   filing of the CFTC lawsuit?

12        A    No.

13        Q    Has he tried to communicate with you since

14   the filing of the CFTC lawsuit?

15        A    No.

16        Q    Other than Mr. Safranko's concern about Mr.

17   Tran's record with regard to his registration status,

18   did anyone else have any other concerns about Mr. Tran

19   being registered with SAEG GM?

20        A    I don't believe so.  I believe it was just

21   Ted.  And Ted would suggest it, and everyone would

22   kind of agree because he was the one running

23   everything.

24        Q    Has Mr. Safranko communicated with you at

25   all since the filing of the CFTC lawsuit?

103

```
1   SAEG, what -- were people being paid out of that bank
2   account?
3       A    There were some bills that were paid out of
4   that bank account, yes.
5       Q    Okay.  And were you paying them out of that
6   bank account, or was someone else?
7       A    Someone else was initiating it.  I did from
8   time to time, would approve the payment going out, but
9   I wasn't the one initiating.
10      Q    Okay.  And do you know whether the
11  programmers were paid out of that Wintrust bank
12  account?
13      A    I'm not sure if they were.
14      Q    Other than individuals or services being
15  paid for out of that Wintrust bank account, how else
16  would things be paid for that were services or things
17  provided to SAEG that needed to be paid?
18      A    I wasn't --
19      Q    Sorry.  That was...
20      A    I wasn't entirely sure where they were
21  coming out of.  I do remember if there was any NFA
22  invoices or anything, I would ask Ted how to get these
23  bills paid.  And then from time, he would tell me,
24  "Oh, okay.  Tell Tin.  He's paying the bills."  So, I
25  don't know what account he paid it from.  From what I
```

**EXHIBIT**

153

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

116

 1        Q     And in the next paragraph down, the letter

 2   states, "In order to ensure that the process of

 3   sending records to NFA is as simple and efficient as

 4   possible, we have implemented a process which will

 5   allow each firm to submit records relating to the exam

 6   to a separate secure electronic folder in the NFA's

 7   regulatory filing system, RFS, via the following

 8   link."  Do you see that sentence?

 9        A     Yes.

10        Q     Mr. Story, did you -- were you able to

11   submit documents through the NFA's regulatory filing

12   system?

13        A     Yes.

14        Q     And how did you go about doing that?

15        A     I logged in to the NFA ID, I believe, and I

16   clicked the button that said the regulatory filing

17   system.

18        Q     And when you say the NFA ID, was that

19   something that you had to have with your registration

20   status?

21        A     I believe so, yes.

22        Q     Was there anyone else who was participating

23   in this NFA exam from the SAEG side?

24        A     Yes.

25        Q     Who else was participating?

EXHIBIT

154

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

117

```
1        A    All the partners, Ted, Dave, [S. C.],
2   and eventually Tin Tran.
3        Q    Were you the only person who submitted docs
4   on behalf of SAEG GM through the RFS system?
5        A    Yes.
6        Q    At the time of the audit in July of 2021,
7   where were you residing?
8        A    I was residing -- 2021.  I believe I was
9   residing in my parents' home at that time.
10       Q    Okay.  Did you discuss with your parents the
11  NFA exam?
12       A    I just said that, "Oh, I have an NFA exam
13  that's going on."
14       Q    Where was Mr. Safranko living during this
15  time in January 2021 -- excuse me -- July of 2021?
16       A    I'm not sure, because I don't know when he
17  moved from his original place of residence to Cancun -
18  - Vancouver.
19       Q    Vancouver.
20       A    I don't know.  I don't know what timeframe
21  that was.
22       Q    Okay.  But was he living there in Utah at
23  the time of this exam?
24       A    Mr. Safranko?
25       Q    Yes.
```

| | |
|---|---|
| **From:** | S. L. ████ Redacted@me.com> on behalf of S. L.███ <Redacted@me.com> |
| **To:** | Algo Capital |
| **Sent:** | 18-Feb-23 5:50:10 PM |
| **Subject:** | Re: Update: Regarding The Broker (The Traders Domain) |

Also to keep clarify and confirm this on email thread.
My Debt is with Algo Capital, I have been dealing with Algo Capital Staff including ████ T. R. ████ & John Fortini CEO
I visited the offices of Bit5ive and Algo Capital, before I made my decision to invest after being invited by ████ T. R. ████
My Money was paid to Algo Capital Group

I closed my account on the 8th November 2022 with a balance of $27,38577 after not receiving the last withdrawal request of $7,500 I made on the 14th October 2022.

I will have an accurate statement of funds and dates drawn up showing exact balance owed.

So to confirm – My money owned is not from Traders Domain, I have had no dealing with them what so ever

Regards

S.

This e-mail and any attachments are confidential and solely for the use of the intended recipient. They may contain material protected by legal professional or other privilege. If you are not the intended recipient or the person responsible for delivering to the intended recipient, you are not authorised to and must not disclose, copy, distribute or retain this e-mail or its attachments. Viva Music - 4beat LTD Registered in England no 11555703

On 18 Feb 2023, at 12:27, S. L. ████ <Redacted@me.com> wrote:

Can you please send over my contract with Algo Capital
I have mine here on my computer and will check against each other

Thank you

Regards

S.

This e-mail and any attachments are confidential and solely for the use of the intended recipient. They may contain material protected by legal professional or other privilege. If you are not the intended recipient or the person responsible for delivering to the intended recipient, you are not authorised to and must not disclose, copy, distribute or retain this e-mail or its attachments. Viva Music - 4beat LTD Registered in England no 11555703

On 18 Feb 2023, at 11:24, Algo Capital <Support@algocapitalfx.com> wrote:

Dear Algo Capital Family,

This is a difficult e-mail to write.

EXHIBIT
155
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

In response to Traders Domain's excuses for why they cannot process withdrawals, plus other concerns raised by some of you, we have continued to maintain an open line of communication with Ted Safranko of Traders Domain. On several occasions, Ted has openly stated that Traders Domain is in possession of all funds belonging to Algo Capital customers. He has repeatedly promised that he would make Algo Capital customers whole. For a time, we believed that Ted would honor his clear commitments.

We are optimistic by nature, and it was optimism that led us to invest sizable amounts of our personal funds in Traders Domain as well. Unfortunately, recent events have dealt a severe blow to our optimism.

Ted's explanations have become increasingly superficial and unsatisfying. We have doubts Ted and Trader's Domain will honor their commitment to you and relinquish the funds that belong to Algo Capital customers. We know that many of you share those doubts.

Understandably, some of you have asked us about pursuing legal claims against Ted. We are exploring all options now and invite any of our customers wishing to coordinate these efforts to contact us. We pledge our full cooperation and assistance in this endeavor.

In the event Algo Capital recovers any customer funds from Ted or Traders Domain, we commit to the following:

- We will promptly notify you if any funds arrive.

- We will hold those funds in trust for the benefit of all our customers until such time as we determine a fair and transparent way to distribute them.

- Because this is your money, we pledge to pay out any funds we might receive to our customers first. Only when all our customers' claims have been satisfied will we try to obtain a measure of recovery for the personal funds we have also invested, side by side, with yours.

**Finally, we are fully committed to honoring our client's wishes in regard to the status of their accounts. To that end, please let us know if you would like to close your Traders Domain account with us or transfer your account to yourself. Due to the circumstances, if you choose to leave your account open at this time, we are waiving all Algo Capital fees indefinitely.**

It is our sincere hope that, despite this hardship, we can forge ahead into a bright and

promising future.

Yours truly,

Algo Capital

*Copyright © 2023 Algo Capital, All rights reserved.*
You opted in when you registered as a Algo Capital Client

**Our mailing address is:**
Algo Capital
12301 NW 112th Ave Unit 112
Miami, FL 33178

<u>Add us to your address book</u>

Want to change how you receive these emails?
You can <u>update your preferences</u> or <u>unsubscribe from this list</u>.

Email Marketing
Powered by
Mailchimp

| | |
|---|---|
| **From:** |  Redacted@Redacted net> on behalf of **M. F.** <Redacted@Redacted net> |
| **To:** | 'Support AlgoCapital' |
| **Sent:** | 24-Feb-23 5:48:39 PM |
| **Subject:** | RE: Account Closure |

Hello,

Thank you for the update. I hope the plan is not to wait for the legal process to take place to settle up with the investors. That could take years and truthfully I did not invest my money with TD nor did I agree to use them as a brokerage, I invested it with Algo. I was initially told that Algo was a trading software, which in fact it appears that Ted from TD was facilitating all the trades, not the software. I have certainly been patient, but at some point something has to give here as I'm sure many investors will be taking their own legal action if their funds are not recouped. I hope it doesn't get to that point.

Please continue to keep me informed and either way I'll be following up.

Thank you,

M. F.
Owner|President
Redacted
Redacted
Redacted
Cooper City, FL 33330
(Office) Redacted
(Cell) Redacted
(Fax) Redacted
Redacted@Redacted net
Redacted
Redacted

## Redacted

"CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may not use, disclose, copy, or disseminate this information. Please contact the sender by e-mail immediately and destroy all copies of the original message including all attachments."

**From:** Support AlgoCapital <support@algocapitalfx.com>
**Sent:** Friday, February 24, 2023 12:22 PM
**To:** Manny Fajardo <mfajardo@plcorp.net>
**Subject:** Re: Account Closure



Hi M.

Unfortunately, the situation remains fluid, so I am unable to provide a definitive update at this point. Our team is working diligently to get the most accurate and up-to-date information about the status of your account, and we will update you as soon as more information is available.

Nonetheless, our legal team is actively preparing a course of action, and we expect to present it to you in the near future. We are committed to keeping you informed on your account situation and to providing you with the

best solution possible.

I appreciate your patience and understanding during this process. If you have any questions or concerns in the meantime, we would be happy to schedule a call with you to discuss this matter further.

On Mon, Feb 20, 2023 at 12:49 PM M. F. <Redacted@Redacted.net> wrote:
Thank you! When can I expect my funds being sent to Savvy?



M. F.
Owner|President
Redacted
Cooper City, FL 33330
Office: Redacted
Cell: Redacted
Fax:
Redacted@Redacted.net
Redacted

On Feb 20, 2023, at 12:40 PM, Support AlgoCapital <support@algocapitalfx.com> wrote:



Thank you M. below is your closing withdrawal with the traders domain .

On Mon, Feb 20, 2023 at 7:41 AM M. F. <Redacted@Redacted.net> wrote:
Hello,

Please close my account from trading immediately. My total investment and money sent to Algo was $45k. I withdrew $6500, which was paid out. I have a pending withdrawal for $10k that has yet to be paid out. Please close my account and return my full balance via the savvy info below.

- Redacted@Redacted.net
- ID: Redacted

Thanks,



M. F.
Owner|President
Redacted
Cooper City, FL 33330
(Office: Redacted
(Cell: Redacted
(Fax: Redacted
Redacted.net
Redacted
Redacted

"CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may not use, disclose, copy, or disseminate this information. Please contact the sender by e-mail immediately and destroy all

copies of the original message including all attachments."

--

Thank you,

Algo Capital Support



Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.



a:   3250 NE 1st Ave. Suite 208
     Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

<manny fa.pdf>

--

Thank you,

Algo Capital Support



Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.



a:   3250 NE 1st Ave. Suite 208
     Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algar Capital is not responsible for errors or omissions in this message and accepts no responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

RC_00080157

FOIA - CONFIDENTIAL TREATMENT REQUESTED

**From:**  B. D. Redacted@gmail.com> on behalf of B. D. Redacted@gmail.com>
**To:** Support AlgoCapital
**Sent:** 06-Mar-23 8:04:20 PM
**Subject:** Re: Update: Regarding The Broker (The Traders Domain)

Dear Algo:

I received the below email forwarded to me in reference to delays in processing the closure of my account and the transmittal of my funds into my possession. I have since reached out to the individuals previously identified to me as working for Algo Capital, who have informed me that they do not actually work for Algo at all, and that I would need to reach out to this email address to get further information. Can someone please promptly provide me with additional details as to what is going on and the status of my funds. I have no idea who Traders Domain or Ted Safranko are, but I have a contract with Algo Capital where I deposited money to be invested, and then requested the withdrawal of those funds last year. Some time after I requested a withdrawal I was informed the entire account would be closed due to a shift in Algo's account strategy and all of the funds would be sent to me. This was months ago. I am now being told there is an issue with that withdrawal. In addition to being provided further information, can I please have a phone number to speak to someone live who actually works at Algo?

Thanks.
 B. D.
Redacted

On Tue, Feb 21, 2023 at 9:31 AM J. H. Redacted@icloud.com> wrote:
Here is what I got Saturday.

J. H.
Redacted

Begin forwarded message:

**From:** Algo Capital <Support@algocapitalfx.com>
**Date:** February 18, 2023 at 11:24:43 AM EST
**To:** Redacted@icloud.com
**Subject: Update: Regarding The Broker (The Traders Domain)**
**Reply-To:** Algo Capital <Support@algocapitalfx.com>

Dear Algo Capital Family,

This is a difficult e-mail to write.



In response to Traders Domain's excuses for why they cannot process withdrawals, plus other concerns raised by some of you, we have continued to maintain an open line of communication with Ted Safranko of Traders Domain. On several occasions, Ted has

openly stated that Traders Domain is in possession of all funds belonging to Algo Capital customers. He has repeatedly promised that he would make Algo Capital customers whole. For a time, we believed that Ted would honor his clear commitments.

We are optimistic by nature, and it was optimism that led us to invest sizable amounts of our personal funds in Traders Domain as well. Unfortunately, recent events have dealt a severe blow to our optimism.

Ted's explanations have become increasingly superficial and unsatisfying. We have doubts Ted and Trader's Domain will honor their commitment to you and relinquish the funds that belong to Algo Capital customers. We know that many of you share those doubts.

Understandably, some of you have asked us about pursuing legal claims against Ted. We are exploring all options now and invite any of our customers wishing to coordinate these efforts to contact us. We pledge our full cooperation and assistance in this endeavor.

In the event Algo Capital recovers any customer funds from Ted or Traders Domain, we commit to the following:

- We will promptly notify you if any funds arrive.

- We will hold those funds in trust for the benefit of all our customers until such time as we determine a fair and transparent way to distribute them.

- Because this is your money, we pledge to pay out any funds we might receive to our customers first. Only when all our customers' claims have been satisfied will we try to obtain a measure of recovery for the personal funds we have also invested, side by side, with yours.

**Finally, we are fully committed to honoring our client's wishes in regard to the status of their accounts. To that end, please let us know if you would like to close your Traders Domain account with us or transfer your account to yourself. Due to the circumstances, if you choose to leave your account open at this time, we are waiving all Algo Capital fees indefinitely.**

It is our sincere hope that, despite this hardship, we can forge ahead into a bright and promising future.

Yours truly,

Algo Capital

*Copyright © 2023 Algo Capital, All rights reserved.*
You opted in when you registered as a Algo Capital Client

**Our mailing address is:**
Algo Capital
12301 NW 112th Ave Unit 112
Miami, FL 33178

Add us to your address book

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.


Email Marketing
Powered by
Mailchimp

8:53



D. L.
L.

Mike, John just advised me that my money is in Trader Domain. That is very upsetting as I did not authorize that move. John said you moved the money from my Algo Capital account to Trader Domain last summer, which is why I've had trouble seeing my account and no one can explain why my log in did not work. I didn't authorize that move and I didn't open a new account. I need to understand how my money was moved without my permission. I need to have my $90,000 wired to my account. If I don't have the money wired by next week, I will be forced to contact my friend who is the Director of Enforcement at the FTC. None of this seem legal, Mike. And T. R. appears to be in the same situation so I will advise the FTC of her situation too.

iMessage



**EXHIBIT**
**158**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Collazo, Robert < Redacted >;Mike Simms <+ Redacted > |
| **Sent:** | |
| **Subject:** | (No Subject) |

Mike Simms <+ Redacted >
2019-05-31T10:22:11.0000000Z
Question do we have a 10% stop loss as I was told and have sold to all clients?



EXHIBIT
159
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

| | |
|---|---|
| **From:** | N. A.   Redacted   Redacted.com> on behalf of   N. A. Redacted  5Redacted.com> |
| **To:** | Support AlgoCapital |
| **Sent:** | 06-Mar-23 3:54:19 PM |
| **Subject:** | Re: Update: Regarding The Broker (The Traders Domain) |

Hi,

I have continued to follow up Traders Domain directly in respect of both my outstanding withdrawal and how they expect to manage accounts in the future

To date I have received generic responses which haven't shed much light on the situation.

As you are aware there is extensive debate on various social media forums as to what is actually going on with Traders Domain, much of it is highly concerning regarding both TD and Ted Safranko's history. I understand that a lot may well be conjecture however in light of the CFTC instigating proceedings that name Ted Safranko and SAEG Capital the situation is becoming more alarming particularly as I made my initial transfer of capital directly to SAEG as instructed by Algo Capital.

There is also the matter of the CFTC red listing in July 2022, this was not communicated to myself and had I have known I would have chosen to mitigate my risk

I'm keen to understand how Algo Capital plan to support individual investors to secure our funds.

I understand that this continues to be a fluid situation, however, almost two weeks have passed since my last communication with Algo Capital.

N. A.

Sent from my iPhone

On 23 Feb 2023, at 21:25, Support AlgoCapital <support@algocapitalfx.com> wrote:

Dear   N.

Thank you for your recent inquiry. I am writing to confirm that we have received your message.

Our team is currently reviewing your inquiry and we will respond as soon as possible. It is understandable that the uncertainty surrounding your account can be stressful, and I sympathize with your concerns.

The situation remains fluid, so I am unable to provide a definitive update at this point. Our team is working diligently to get the most accurate and up-to-date information about the status of your account, and we will update you as soon as more information is available. Nonetheless, our legal team is actively preparing a course of action, and we expect to present it to you in the near future. We are committed to keeping you informed on your account situation and to providing you with the best solution possible.

I appreciate your patience and understanding during this process.

Thank you,

Algo Capital Support



**EXHIBIT**
**160**
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s) disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are nc cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-i have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any d the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do nc represent those of the company.

On Thu, Feb 23, 2023 at 3:37 PM ▮▮ N. A. ▮▮ < ▮Redacted▮ @Redacted.com> wrote:
Hi,

Any news?

Regards

▮ N. ▮

Sent from my iPhone

On 21 Feb 2023, at 19:38,  ▮ N. A. ▮  < ▮Redacted▮ @Redacted.com> wrote:

Hi,

Additionally, has Algo been able to verify that withdrawals are actually landing into Savvy??

I note that there was a recent $1m transfer from TD to Savvy

Thanks again,

▮ N. ▮

Sent from my iPhone

On 21 Feb 2023, at 16:18, ▮ N. A. ▮ < ▮Redacted▮ @Redacted.com> wrote:

Hi,

Thank you for your email

A disappointing and stressful outcome for all unless TD, specifically Ted Safranko comes good on some of his many promises

Lots to consider as we move forward but it would be helpful if you could kindly provide some clarity on how the principal amount might be addressed in the first instance? Like everyone I'm keen to see some funds returned asap.

My account is ▮Redacted▮414 and to date I have received $130k in cleared funds from TD which leaves my remaining principal amount at $171,000

I look forward to hearing from you

▮ N. A. ▮
▮ Redacted ▮

FOIA - CONFIDENTIAL TREATMENT REQUESTED                    RC_00074028

Sent from my iPhone

On 18 Feb 2023, at 16:24, Algo Capital <Support@algocapitalfx.com> wrote:

Dear Algo Capital Family,

This is a difficult e-mail to write.

In response to Traders Domain's excuses for why they cannot process withdrawals, plus other concerns raised by some of you, we have continued to maintain an open line of communication with Ted Safranko of Traders Domain. On several occasions, Ted has openly stated that Traders Domain is In possession of all funds belonging to Algo Capital customers. He has repeatedly promised that he would make Algo Capital customers whole. For a time, we believed that Ted would honor his clear commitments.

We are optimistic by nature, and it was optimism that led us to invest sizable amounts of our personal funds in Traders Domain as well. Unfortunately, recent events have dealt a severe blow to our optimism.

Ted's explanations have become Increasingly superficial and unsatisfying. We have doubts Ted and Trader's Domain will honor their commitment to you and relinquish the funds that belong to Algo Capital customers. We know that many of you share those doubts.

Understandably, some of you have asked us about pursuing legal claims against Ted. We are exploring all options now and invite any of our customers wishing to coordinate these efforts to contact us. We pledge our full cooperation and assistance in this endeavor.

In the event Algo Capital recovers any customer funds from Ted or Traders Domain, we commit to the following:

- 

    We will promptly notify you if any funds arrive.

RC_00074029

- 

We will hold those funds in trust for the benefit of all our customers until such time as we determine a fair and transparent way to distribute them.

- 

Because this is your money, we pledge to pay out any funds we might receive to our customers first. Only when all our customers' claims have been satisfied will we try to obtain a measure of recovery for the personal funds we have also invested, side by side, with yours.

**Finally, we are fully committed to honoring our client's wishes in regard to the status of their accounts. To that end, please let us know if you would like to close your Traders Domain account with us or transfer your account to yourself. Due to the circumstances, if you choose to leave your account open at this time, we are waiving all Algo Capital fees indefinitely.**

It is our sincere hope that, despite this hardship, we can forge ahead into a bright and promising future.

Yours truly,

Algo Capital

*Copyright © 2023 Algo Capital, All rights reserved.*
You opted in when you registered as a Algo Capital Client

**Our mailing address is:**
Algo Capital
12301 NW 112th Ave Unit 112
Miami, FL 33178

Add us to your address book

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.

FOIA - CONFIDENTIAL TREATMENT REQUESTED



Email Marketing
Powered by
Mailchimp



a: 3250 NE 1st Ave. Suite 208
Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

08/30/2018 THU 14:50  FAX                                                    Ø001/003

8/30/2018                            Division of Corporations

### Florida Department of State



Division of Corporations
Electronic Filing Cover Sheet

Note: Please print this page and use it as a cover sheet. Type the fax audit number
(shown below) on the top and bottom of all pages of the document.

(((H18000254502 3)))



H180002545023ABC

Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing
so will generate another cover sheet.

To:
    Division of Corporations
    Fax Number    : (850)617-6381

From:
    Account Name  : PERLMAN, BAJANDAS, YEVOLI, & ALBRIGHT, P.L.
    Account Number : I20040000167
    Phone         : (305)377-0809
    Fax Number    : (305)377-0781

**Enter the email address for this business entity to be used for future
annual report mailings. Enter only one email address please.**

Email Address: _Cmora @ pbyalaw.com_

## FLORIDA LIMITED LIABILITY CO.
## ALGO CAPITAL, LLC

| Certificate of Status | 1 |
|---|---|
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $130.00 |

**EXHIBIT**
**161**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

AUG 30 2018
.C. Kinsey

Electronic Filing Menu        Corporate Filing Menu        Help

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                    JH_00014960

08/30/2018 THU 16:51  FAX                                                            ☒002/003

Fax Audit Number: H18000254502 3

## ARTICLES OF ORGANIZATION
## OF
## ALGO CAPITAL, LLC
## A FLORIDA LIMITED LIABILITY COMPANY

In forming a Florida Limited Liability Company (the "Company") under the Florida Revised Limited Liability Act, Chapter 605 of the Florida Statutes, the undersigned adopts the following Articles of Organization:

### ARTICLE I
### NAME

The name of the Company is **ALGO CAPITAL, LLC.**

### ARTICLE II
### ADDRESS

The principal and mailing address of the Company is 3250 NE 1ˢᵗ Avenue, Suite 208, Miami, FL 33137.

### ARTICLE III
### REGISTERED AGENT AND REGISTERED ADDRESS

The Registered Agent of the Company is PBYA Corporate Services, LLC, the address of which is: 200 South Andrews Avenue, Suite 600, Fort Lauderdale, FL 33301.

### ARTICLE IV
### MANAGEMENT

The Company shall be **MANAGER-MANAGED**. The initial manager who shall serve until the first annual meeting of the member(s) or until a successor(s) is elected and qualified is as follows:

> Manager:    Robert D. Collazo Jr.
>             3250 NE 1ˢᵗ Avenue
>             Suite 208
>             Miami, FL 33137

### ARTICLE V
### PURPOSE

The purpose for which this Company is organized is any and all lawful business.

IN WITNESS WHEREOF, the undersigned authorized representative has hereunto set his hand and seal on this 30ᵗʰ day of August, 2018.

Ricardo Bajandas, Esq.
Authorized Representative

FOIA - CONFIDENTIAL TREATMENT REQUESTED                    Fax Audit Number: H18000254502 3

JH_00014961

08/30/2018 THU 14:51 FAX                                                              @003/003

Fax Audit Number: H18000254502 3

## CERTIFICATE OF DESIGNATION
## OF
## REGISTERED AGENT/REGISTERED OFFICE

Pursuant to the provisions of Section 605.0113, Florida Statutes, the undersigned limited liability company submits the following statement in designating the registered office/registered agent, in the State of Florida.

The name of the Company is **ALGO CAPITAL, LLC.**

The Registered Agent of the Company is PBYA Corporate Services, LLC, the address of which is: 200 South Andrews Avenue, Suite 600, Fort Lauderdale, FL 33301.

Having been named as registered agent and to accept service of process for the foregoing limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Dated as of the 30th day of August, 2018.

SIGNED:

**PBYA Corporate Services, LLC**

By: Perlman, Bajandas, Yevoli & Albright, P.L., MGRM

By: _____
Ricardo Bajandas, Esq., Manager

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                  JH_00014962

## 2022 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT

DOCUMENT# L18000207799

**Entity Name:** ALGO CAPITAL, LLC

**Current Principal Place of Business:**

12301 NW 112 AVE
SUITE 110
MEDLEY, FL 33178

**Current Mailing Address:**

12301 NW 112 AVE
SUITE 110
MEDLEY, FL 33178 US

**FEI Number:** 83-1807070

**Name and Address of Current Registered Agent:**

COLLAZO, JR., ROBERT D
Redacted
MEDLEY, FL 33178 US

**FILED**
**Apr 30, 2022**
**Secretary of State**
**5735775719CC**

**Certificate of Status Desired:** Yes

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: _____

Electronic Signature of Registered Agent                                           Date

**Authorized Person(s) Detail :**

| | | | | |
|---|---|---|---|---|
| Title | PRESIDENT | | Title | VP |
| Name | COLLAZO, ROBERT D JR | | Name | HERMAN, JUAN |
| Address | Redacted | | Address | Redacted |
| City-State-Zip: | MEDLEY FL 33178 | | City-State-Zip: | HIALEAH FL 33018 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ROBERT D COLLAZO JR                               CEO                               04/30/2022

Electronic Signature of Signing Authorized Person(s) Detail                                           Date

**EXHIBIT**

162

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00014980

| | |
|---|---|
| **From:** | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
| **To:** | Redacted@███com |
| **Sent:** | 27-Apr-21 10:50:12 PM |
| **Subject:** | Algo Capital Login and Information |

Hey R. below you will find you login information .

R. N.

$50,000 Investment began 4/8/21
Investment is trading under our Aggressive Strategy

Broker- Traders Domain

Metatrader access
Account #: Redacted 2514
Login: Redacted 2514
Password: Redacted

Algo Capital
6951 Nw 16 street
Miami Fl, 33126

Account Representative
John Fortini Vice President
Redacted

Thank you,

Algo Capital Support

Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s) disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are nc cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-n have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any d the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do nc represent those of the company.

**EXHIBIT**

163

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Herman, JJ < [Redacted] >;Ted < [Redacted] >s.whatsapp.net> |
| **Sent:** | |
| **Subject:** | (No Subject) |

Ted < [Redacted] >s.whatsapp.net>
2019-04-17T12:33:07.0000000Z
I also may wand to run by you and Joe potentially owning the brokerage. Dave and I have
been debating back and forth and we really think your organization with the client base
you have for that software would be huge. And truthfully Dave and I enjoyed building the
brokerage but now we want a bigger challenge

**EXHIBIT**

**164**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00017844

| | |
|---|---|
| **From:** | Ted Safranko <tjsafranko+1.Redacted@hubspotstarter.net> on behalf of Ted Safranko <tjsafranko+1Redacted@hubspotstarter.net> |
| **To:** | support@algocapitalfx.com |
| **Sent:** | 18-Jan-23 9:25:02 PM |
| **Subject:** | The Traders Domain change of leadership |



**EXHIBIT**

**165**

TO THE DECLARATION OF MAURA M. VISHMEYER
PURSUANT TO 28 U.S.C. § 1746

Dear valued client of The Traders Domain,

With this communication we would like to update you on leadership changes at The Traders Domain. **Effective immediately, Ted Safranko will step down as CEO and Director of The Traders Domain.**

Please be noted, this is not a short-term decision, we have enrolled a new director and CEO in the name of **Arthikai Kanagar** back in January 2020 and we have taken the time since to hand over the processes and responsibilities to streamline the business and guarantee business continuity.

Ted Safranko is-- and will remain to be available as a trusted advisor to the business and be in communication with our clients and community as we address and resolve

JH_00075823

the current withdrawal delays and customer support scale up.

**About the traders domain**
The Traders Domain FX Ltd. Is an international business company registered through Wilfred Services Ltd in St. Vincent and the Grenadines. Business registration number 24284 IBC 2017 in accordance with the Financial Laws (Miscellaneous Amendment) Act no. 10 of 2014.

With kind regards,

The Traders Domain



Unsubscribe Manage preferences

Send free email today
HubSpo

Welcome to LiveChat  —  ✕



**Tin**
Support Agent

👍 | 💬 | ✉️

Tin 📱

## Yes

We do not solicit or accept to US clients. But we do offer crypto accounts to trade forex. A client can simply open a live account under crypto and select crypto under country. Crypto accounts can deposit/withdraw through crypto and PayPal methods only.

We are working on more regulations.





EXHIBIT
166
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00012301

| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Herman, JJ < Redacted >;Ted < Redacted @s.whatsapp.net> |
| **Sent:** | |
| **Subject:** | (No Subject) |

Ted < Redacted @s.whatsapp.net>
2019-02-28T21:30:49.0000000Z
so 30% on the overall month profits not per trade



| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Herman, JJ < Redacted >; Ted < Redacted @s.whatsapp.net> |
| **Sent:** | |
| **Subject:** | (No Subject) |

Ted < Redacted @s.whatsapp.net>
2019-04-17T12:34:00.0000000Z
Next week maybe we can have a serious discussion and talk some numbers. Give you guys a turn key profitable shop and then full assistance and then onboarding with those new clients

**EXHIBIT**
**168**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

**From:** Sender Unspecified
**To:** Herman, JJ < Redacted >;Ted < Redacted @s.whatsapp.net>
**Sent:**
**Subject:** (No Subject)

Herman, JJ < Redacted >
2019-04-17T12:37:53.0000000Z
Sounds great to me ted me and robert are ready and soon we'll be sending thousands of
clients over we are almost done w the back end for the new group coming on board



EXHIBIT
169
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| From: | Ted Safranko <tsafranko@saegcapital.com> on behalf of Ted Safranko <tsafranko@saegcapital.com> |
|---|---|
| To: | H. K. |
| CC: | Support AlgoCapital; Steven Likos (steven@ Redacted |
| Sent: | 16-Oct-20 7:25:46 PM |
| Subject: | Re: Algo Capital / Traders domain |

Hi H.

Here you go:

335 Slaughter Station Rd, Hartley, DE 19953.

Our NFA/CFTC registration is 0529630 in case you require that.  We are registered as a commodity pool operator.

Thanks

On Fri., Oct. 16, 2020, 3:21 p.m. H. K. <Redacted@ Redacted com> wrote:
Hi Ted,
Oppenheimer is asking for the address of your company.  Would send that over?  I'm not in the office.
Best, H.

Get Outlook for iOS

From: Ted Safranko <tsafranko@saegcapital.com>
Sent: Thursday, October 15, 2020 1:45:06 PM
To: H. K. <Redacted@ Redacted com>; Support AlgoCapital <support@algocapitalfx.com>
Cc: Steven Likos (steven@ Redacted ) <steven@ Redacted >
Subject: RE: Algo Capital / Traders domain

Hi H.

The wire denomination is ok in GBP or USD.  We will do the conversion on our end if you wish to trade in GBP that is also a possibility as well.  I will defer to the Algo Capital team to help assist with the actual account set up as we will do all the naming or e you are fully registered so B. P. A. Trustees & RSA of B. R. S. will be reflected on your account and your statements.

When you are ready to proceed with the wire please let us know and confirm the amount so we can alert our banking partners.

Ted Safranko

CEO, Saeg Capital Ltd.

From: H. K.
Sent: Thursday, October 15, 2020 1:36 PM

EXHIBIT
170
TO THE DECLARATION OF MAURA M. WENMEYER
PURSUANT TO 28 U.S.C. § 1746

**To:** Ted Safranko; Support AlgoCapital
**Cc:** Steven Likos (steven@ ████ Redacted ████
**Subject:** RE: Algo Capital / Traders domain

Hi Ted:

Ready to set up the account.  Please set up the account under the name ████ B. P. A. ████
Trustees & RSA of ████ B. R. S. ████  I asked John via text, but will ask you here:  does the wire
have to be in USD or can it be in GBP?

Thanks,

**H.**

(p) Redacted

(m) Redacted

(f) Redacted

www. Redacted .com



**DISCLAIMER AND CONFIDENTIALITY NOTICE**

Redacted reserves the right, to the extent permitted by law, to retain and monitor all email communications through its network. Unless otherwise expressly stated, the information contained in this email is not intended as an offer to sell or buy any security, even if such security is mentioned in this email. Redacted DOES NOT ACCEPT TRADE INSTRUCTIONS VIA EMAIL. Nothing contained herein constitutes an offer to invest in any fund offered by Redacted offering is made by Private Placement Offering Memorandum only. This email and any attachments may refer to a research report or to a market opinion or analysis. Redacted makes no warranty as to their accuracy and completeness, and such information may be superseded by later information. Views expressed in a research or analyst report may be different from Redacted views.

Past performance is not indicative of future returns.

Redacted does not agree to keep any information received confidential unless so agreed to in a written confidentiality agreement prior to receipt. If you are not the intended recipient you are hereby notified that any use, printing, copying or disclosure is strictly prohibited. Please delete this email and any attachments, without printing, copying, forwarding or saving them and notify the sender immediately by reply email.

If you would no longer like to receive emails from Bishop, please reply to this message with the word "REMOVE" in the subject line.

**From:** Ted Safranko <tsafranko@saegcapital.com>
**Sent:** Thursday, October 8, 2020 9:52 AM
**To:** Support AlgoCapital <support@algocapitalfx.com>; ████ H. K. ████ <Redacted Redacted
Redacted .com>

**Subject:** RE: Algo Capital / Traders domain

Hi,

Thanks for the Introduction. ▇H.▇ the funds can be sent directly to us here at Saeg Capital. As soon as the wire hits our account we can then credit the account accordingly. There are no restrictions to the amount you can wire to this account either as it is set up to handle large volume.

Swift for HOME BANK:

Bank of New York Mellon

Swift code: IRVTUS3N

ABA number: 021000018

Account name: western union business solutions

Acct number: ▇Redacted▇9192

Address: 240 Greenwich St, New York, NY 10286

**PLEASE ADD Payment instruction: 59763-US, SAEG CAPITAL LTD▇Redacted▇2702, Home Bank ****

Thank you

Ted Safranko

CEO, Saeg Capital Ltd.

**From:** Support AlgoCapital
**Sent:** Thursday, October 8, 2020 9:48 AM
**To:** ▇Redacted▇@▇Redacted▇com; Ted Safranko
**Subject:** Algo Capital / Traders domain

Hey ▇H.▇ , I have Ted on CC here. We all have spoken in the past and he is the owner of the broker so he can set up the new fund directly with you. As soon as the account is set up we will connect our Algo and begin trading.

--

Thank you,

FOIA - CONFIDENTIAL TREATMENT REQUESTED

## Algo Capital Support

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137
    support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137
w:  www.algocapitalfx.com  e: support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137
w:  www.algocapitalfx.com  e: support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

JH_00047971

**From:**  Sender Unspecified
**To:**  Herman, JJ < Redacted >;Ted < Redacted @s.whatsapp.net>
**Sent:**
**Subject:**  (No Subject)


Ted < Redacted @s.whatsapp.net>
2019-03-04T18:22:24.0000000Z
Ok for wires we need proof of address and proof of residence for client. We use a 3rd
party wire service



**EXHIBIT**

**171**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

## SOFTWARE AS A SERVICE AGREEMENT

This **Software As a Service Agreement** (the "Agreement") is made as of 6/18/2021____, 2021, ("Effective Date") between ____Redacted____, with principal offices at ____Redacted_____ ("Customer") and Algo Capital, LLC. a Florida limited liability company, with its principal office at 3250 NE 1st Ave, Ste 208, Miami, FL 33137 ("Vendor").

**WHEREAS,** Vendor is in the business of supplying software applications and related services to companies in the financial services industry, including, among other things, algorithmic trading software in the forex and non-security cryptocurrency markets;

**WHEREAS,** Customer is a [entity or person] that desires the use of the Vendor's proprietary algorithmic trading software application products and services; and

**WHEREAS,** Vendor and Customer desire to enter into this Agreement defining their respective rights and responsibilities and memorializing the terms and conditions pursuant to which Vendor will provide to Customer the Services for a fee.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements contained herein, the parties intending to be legally bound hereby agree as follows:

**Definitions**

a.  **"aaS"** is an acronym for "As A Service" and means the combined software and support services provided in this Agreement.

b.  **"Base Components"** means the software environment as specified in Schedule C that Vendor makes available for use by Customer as part of the Service.

c.  **"Cloud Hosting"** means the provision of products and services in a hosted, virtualized environment, accessible via the internet.

d.  **"Vendor Software"** means Vendor proprietary software applications and user interfaces as defined in Schedule A and made available to Customer by Vendor as part of the Service. Vendor Software may contain third-party components licensed to Vendor.

e.  **"Customer Data"** means all data, files, including hypertext markup language files, documents, audio and visual information, graphics, scripts, programs, applets or servlets that Customer creates, installs, uploads to or transfers in or through the Service or provides in the course of using the Service, excluding identification and other information provided by Customer relative to Customer Users.

f.  **"Electronic Communications"** shall mean any transfer of signs, signals, text, images, sounds, data or intelligence of any nature transmitted in whole or part electronically to or from the Service.

g.  **"Product Support Services"** shall mean the support provided by Vendor to remediate, correct, or abate errors in the Vendor Software.

**EXHIBIT**
**172**
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026518

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

h.  **"Service"** shall mean the software in a hosted environment provided and maintained by Vendor to which Customer is being granted access under this Agreement via activating the Vendor Software as outlined in Schedule A.

i.  **"Term"** means any Initial Term and/or Renewal Term as defined in Section 6 of this Agreement.

j.  **"Third Party Products"** means application software products provided by third party vendors, including operating system and application software with which the Vendor Software interfaces and which provides certain functionality essential to the operation of the Vendor Software. Third Party Products are licensed to Vendor for incorporation and use in the hosted environment as part of the Service as set forth in the Statement of Work. For the sake of clarity, the term Third-Party Products does not refer to third-party software components or brokerage accounts, if any, incorporated or used by, the Vendor Software.

k.  **"User(s)"** means Customer's employees, representatives, consultants, contractors or agents who are authorized to use the Service and have been supplied user identifications and passwords by Customer or on Customer's behalf.

## 1.   PROVISION OF SERVICES

In consideration of the fees paid by Customer under this Agreement, Vendor agrees to provide Customer access to the Service. Specific components of the Service to be provided to Customer are as outlined in the Schedules annexed hereto.

## 2.   LICENSE GRANTS

Subject to the terms and conditions of this Agreement, Vendor grants to Customer during the Term of this Agreement the nontransferable, nonexclusive worldwide right to permit Users to (a) use the Service, including the Base Components thereof (b) use the any training material solely in connection with the Service, all solely for Customer's own internal business operations. Customer acknowledges and agrees that the license granted, for the items listed in Schedule A herein, is not a concurrent user license and that the rights granted to Customer in this Agreement are subject to all of the following agreements and restrictions: (i) the maximum number of Users that Customer authorizes to access the Service shall not exceed the number of licenses Customer has been granted, as set forth in Schedule A; (ii) licenses cannot be shared or used by more than one individual User; (iii) Customer shall not license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose or otherwise commercially exploit or make the Service available to any third party other than an authorized User; (iv) Customer shall not modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the Service, including without limitation the Vendor Software and that are provided as a part thereof, or access the Service in order to build a similar or competitive product or service; (v) Customer shall not create Internet "links" to the Service or "frame" or "mirror" any part of the Service, including any content contained in the Service, on any other server or device; (vi) except as expressly stated herein, no part of the Service may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means, including but not limited to electronic, mechanical, photocopying, recording, or other means; (vii) Customer agrees to make every reasonable effort to prevent unauthorized third parties from accessing the Service; (viii) Customer acknowledges and agrees that Vendor or its Third Party Vendors shall own all right, title and interest in and to all intellectual property rights in the Service and any suggestions, en-

Page 2 of 21

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

hancement requests, feedback, or recommendations provided by Customer or its Users relating to the Service or, including all unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, know-how and other trade secret rights, and all other intellectual property rights, derivatives or improvements thereof; (ix) unauthorized use, resale or commercial exploitation of any part of the Service in any way is expressly prohibited; (x) Customer does not acquire any rights in the Service, express or implied, other than those expressly granted in this Agreement and all rights not expressly granted to Customer are reserved by Vendor and Third Party Vendors; and (xi) this Agreement is not a sale and does not convey any rights of ownership in or related to the Service, Vendor Software, Third Party Products, to Customer.

## 3.   LICENSES FROM CUSTOMER

Subject to the terms and conditions of this Agreement, Customer grants to Vendor and its Third Party Vendors the non-exclusive, nontransferable worldwide right to copy, store, record, transmit, display, view, print or otherwise use (a) Customer Data solely to the extent necessary to provide the Service to Customer, and (b) any trademarks that Customer provides Vendor for the purpose of including them in Customer's user interface of the Service ("Customer Trademarks"). Customer acknowledges and agrees that Customer Data and information regarding Customer and Customer's Users that is provided to Vendor and its Third Party Vendors in connection with this Agreement may be (a) processed by Vendor and its Third Party Vendors to the extent necessary to provide the Service and (b) transferred outside of the country or any other jurisdiction where Customer and Customer's Users are located.  In addition, Customer acknowledges and agrees that it is Customer's obligation to inform Customer's Users and customers of the processing of Customer Data and information regarding Customer and Customer's Users pursuant to this Agreement and to ensure that such Users and customers have given any necessary consent to such processing as required by all applicable data protection legislation.  Customer shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness and copyright of all Customer Data and information regarding Customer and Customer's Users. Customer agrees that the license to the Customer Data shall survive termination of this Agreement solely for the purpose of storing backup Customer Data in accordance with the terms of this Agreement.

## 4.   PROPRIETARY RIGHTS

Customer acknowledges and agrees that the Service and any necessary software used in connection with the Service contain proprietary and confidential information that is protected by applicable intellectual property and other laws.  Customer further acknowledges and agrees that the content or information presented to the Customer through the Service may be protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws.  Except where expressly provided otherwise by Vendor, nothing in the Service, or the Agreement shall be construed to confer any license to any of Vendor's (or its third party manufacturer's, author's, developer's, vendor's, and service provider's ("Third Party Vendors"), intellectual property rights, whether by estoppel, implication, or otherwise.  Without limiting the generality of the foregoing,

FOIA - CONFIDENTIAL TREATMENT REQUESTED   JH_00026520

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

any names or trademarks of the Vendor Software listed on Schedule A and other Vendor service marks, logos and product service names are marks of Vendor (the "Vendor Marks"). Customer agrees not to display or use the Vendor marks, or the marks of any Third Party Vendor, in any manner without the owner's express prior written permission. Vendor reserves the right to sub-contract any or all services provided hereunder to third parties.

## 5.   LICENSE FEE, TERM AND PAYMENT

The initial term ("Initial Term") of this Agreement will commence on the Effective Date on a month-to-month basis, until such time as either party provides thirty (30) days' written notice to the other party of its intent to cancel the Agreement. Customer shall pay Vendor the fee detailed in the Payment Schedule set forth below.

Payment Schedule: Customer agrees to pay a monthly licensing fee to the Vendor for the use of the Vendor Software, which shall be calculated as follows: the lower of 50%  Performance Fee on a High Watermark calculation basis (profit share) or $40,000.00

Invoices shall be payable within five (5) days after receipt thereof. In addition to any remedies Vendor may have pursuant to this Agreement or at law for non-payment, delinquency in payment may result in a delay or suspension of the right to use the Service.  In the event Vendor incurs any costs (including reasonable attorney's fees) from efforts collecting overdue fees from Customer, Customer agrees to pay such costs.  Customer further agrees to pay all foreign, federal, states, and local taxes, if applicable, to Customer's access to, use, or receipt of the Service.

## 6.   TERMS OF SERVICE

### 6.1.    Service Extensions or Updates

Customer further agrees that, unless explicitly stated otherwise, any new features that augment or enhance the Service, and or any new service subsequently purchased by Customer pursuant to an amendment accepted by Vendor referencing this Agreement will be subject to this Agreement.

### 6.2.    Customer Must Have Internet Access

In order to use the Service, Customer must have or must obtain access to the World Wide Web, either directly or through devices that access Web-based Content.  Customer must also provide all equipment necessary to make (and maintain) such connection to the World Wide Web.

### 6.3.    Email and Notices

Customer agrees to provide Vendor with Customer's e-mail address (es), and to accept emails (or other Electronic Communications) from Vendor at the e-mail address Customer specifies.  Notwithstanding any provision in the Agreement to the contrary, acknowledgement by an officer of Customer is not required with respect to e-mail communications pertaining to the Customer's

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026521

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

routine use of the Service, including without limitation communications relating to the support, maintenance, or the updating of the Service. Customer further agrees the Vendor may provide any and all required notices including legal notices to Customer through either e-mail (or other electronic transmission), or by mail or express delivery service in accordance with Section 14.

### 6.4. *Passwords, Access, and Notification*

Customer may designate up to the number of Users that corresponds to the number of permitted Users set forth in Schedule A. Customer will provide and assign unique password and user names to each authorized User for each license purchased. Customer acknowledges and agrees that Customer is prohibited from sharing passwords and or user names with unauthorized users. Customer will be responsible for the confidentiality and use of Customer's (including its employees') passwords and user names. Customer will also be responsible for all Electronic Communications, including those containing business information, account registration, account holder information, financial information, Customer Data, and all other data of any kind contained within emails or otherwise entered electronically through the Service or under Customer's account. Vendor will act as though any Electronic Communications it receives under Customer's passwords, User name, and/or account number will have been sent by Customer. Customer agrees to notify Vendor if Customer becomes aware of any loss or theft or unauthorized use of any of Customer's passwords, user names, and/or account number.

### 6.5. *Customer's Responsibilities*

Customer agrees to comply with all applicable local, state, national and foreign laws, treaties, regulations and conventions in connection with its use of the Service, including without limitation those related to data privacy, international communications, and the exportation of technical or personal data. Customer will ensure that any use of the Service by Customer's Users is in accordance with the terms of this Agreement. Customer agree to notify Vendor immediately of any unauthorized use of any password or account or any other known or suspected breach of security or any known or suspected distribution of Customer Data. Customer acknowledges and agrees that the Service is subject to the U.S. Export Administration Laws and Regulations. Customer agrees that no part of the Service or information obtained through use of the Service, is being or will be acquired for, shipped, transferred, or re-exported, directly or indirectly, to proscribed or embargoed countries or their nationals, nor be used for nuclear activities, chemical biological weapons, or missile projects unless authorized by the U.S. Government. Proscribed countries are set forth in the U.S. Export Administration Regulations and are subject to change without notice, and Customer must comply with the list as it exists in fact. Customer certifies that neither Customer nor any Users are on the U.S. Department of Commerce's Denied Persons List or affiliated lists or on the U.S. Department of Treasury's Specially Designated Nationals List. Customer agrees to comply strictly with all U.S. export laws and assumes sole responsibility for obtaining licenses to export or re-export as may be required. Any unauthorized use of the Service may violate copyright laws, trademark laws, the laws of privacy and publicity, and communications regulations and statutes. The Customer also certifies that they will not use the Vendor Software to circumvent any applicable Anti-Money Laundering, Bank Secrecy, or Know Your Customer regulations. The Service may use encryption technology that is subject to licensing requirements

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

under the U.S. Export Administration Regulations, 15 C.F.R. Parts 730-774 and Council Regulation (EC) No. 1334/2000.

In addition to its responsibilities in this Agreement, Customer is responsible for all Customer responsibilities indicated in the Schedules attached hereto or entered into pursuant hereto and all other responsibilities not designated as responsibilities of Vendor.

Customer is solely responsible for obtaining all licenses and permissions necessary related to the Content, including without limitation licenses for any third-party software included in the Content.

Customer shall not resell the Services directly or indirectly to third parties.

### 6.6.    Transmission of Data

Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to Customer's use of the Service.  Customer expressly consents to Vendor's interception and storage of Electronic Communications and/or Customer Data, and Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the internet, and over various networks, only part of which may be owned and/or operated by Vendor.   Customer acknowledges and understands that changes to Customer's Electronic Communications may occur in order to conform and adapt such data to the technical requirements of connecting networks or devices.  Customer further understands that Electronic Communications may be accessed by unauthorized parties when communicated across the Internet, network communications facilities, telephone, or other electronic means.  Customer agrees that Vendor is not responsible for any Electronic Communications and/or Customer Data which are lost, altered, intercepted or stored without authorizations during the transmission of any data whatsoever across networks not owned and/or operated by Vendor.

### 6.7.    Vendor's Support

Vendor will make commercially reasonable efforts to promote Customer's successful utilization of the Service, including but not limited to maintenance and support, providing Customer with phone and on-line help, and product support as set forth in Schedule B.  Product Support pertains to support designed to remedy errors in Vendor Software.

### 6.8.    Confidential Information

Each party may have access to information that is confidential to the other party ("Confidential Information").  For purposes of this Agreement, Confidential Information shall include any information that is clearly identified in writing at the time of disclosure as confidential as well as any information that, based on the circumstances under which it was disclosed, a reasonable person would believe to be confidential.  Customer's Confidential Information shall include, but not be limited to, Customer Data.  A party's Confidential Information shall not include information

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026523

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

that (i) is or becomes a part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure without any obligation of confidentiality and had not been obtained by the other party either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure; (iv) is independently developed by the other party without use of or reference to the other party's Confidential Information, as established by written records. The parties agree to use commercially reasonable efforts not to make each other's Confidential Information available in any form to any third party.  Notwithstanding the foregoing, Customer acknowledges and agrees that Vendor may disclose Customer's Confidential Information to its Third Party Vendors solely to the extent necessary to provide products or services under this Agreement.  This Section will not  be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; provided, however, that a party who has been subpoenaed or otherwise compelled by a valid law or court order to disclose Confidential Information (the "Responding Party") shall first have given sufficient and prompt written notice to the other party of the receipt of any subpoena or other request for such disclosure, so as to permit such party an opportunity to obtain a protective order or take other appropriate action.  The Responding Party will cooperate in the other party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be afforded the Confidential Information.  If the Responding Party is compelled as a matter of law to disclose the Confidential Information, it may disclose to the party compelling the disclosure only that part of the Confidential Information as is required by law to be disclosed.

Notwithstanding anything to the contrary in this Agreement, Content is not included in Confidential Information as defined above.  To the extent Vendor has any access to Content in the course of providing the Services, Vendor's entire obligation to keep Content confidential is stated in this Section below.  Vendor shall not, intentionally (i) access Customer's Content or (ii) disclose Customer's Content to any third party, except to the extent: (a) Customer makes its Content publicly available, (b) as necessary for Vendor to provide, or obtain third-party supplier support for, the Services or to provide information requested by Customer, or (c) as specifically authorized by Customer in writing.  Vendor's obligation to protect Content from unauthorized use, access or disclosure is: (i) to provide the Security Services specifically set forth in this Agreement and (ii) maintain and enforce the then-current standard Vendor security policies and standards applicable to the Services as practiced at the service locations from which Vendor is providing the Services to Customer.

The obligations in this Section shall not apply to the recipient of Confidential Information and/or Vendor with respect to Content to the extent disclosure of Confidential Information or Content is required to comply with laws or respond to requests by a regulatory or judicial body and/or as otherwise required for legal process.  In the event that any such disclosure is required, the recipient, and/or Vendor with respect to Content, reserves the right to charge the other party on a time-and-materials basis for recipient's/Vendor's reasonable efforts related to its compliance and response, including, if applicable, reasonable attorney's fees.

Page 7 of 21

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

## 7.   SUSPENSION/TERMINATION

### 7.1.   *Suspension for Delinquent Account*

Vendor reserves the right to suspend Customer's access and/or use of the Service for any account for which any payment is due but remains unpaid after five day's written notice of such delinquency.  Customer agrees that Vendor shall not be liable to Customer, or to any third party, for any suspension of the Service resulting from Customer's non-payment of the fees as described in this Section.

### 7.2.   *Suspension for Ongoing Harm*

Customer agrees that Vendor may, with reasonably contemporaneous telephonic or electronic mail notice to Customer, suspend Customer's access to the Service if Vendor reasonably concludes that Customer's use of the Service is causing immediate and ongoing harm to Vendor or others.  Vendor will use commercially reasonable efforts to resolve the issues causing the suspension of Service.  Customer agrees that Vendor will not be liable to Customer or to any third party for any suspension of the Service under such circumstances as described in this Section.

### 7.3.   *In the Event of a Breach*

A. Either party may terminate this Agreement upon sixty (60) days' written notice to the other party in the event of a breach of any material obligation under this Agreement, provided that the alleged breach is not cured during the sixty (60) day notice period.  Upon termination or expiration of this Agreement, Customer shall have no rights to continue use of the Service.

B. Customer may cancel this Agreement, to be effective at the end of the then current Term, by providing Vendor with at least thirty (30) days' prior written notice

### 7.4.   *Handling of Customer Data In the Event of Termination*

Customer acknowledges and agrees that following termination of this Agreement, Customer shall return all related materials to Vendor and Vendor may immediately deactivate Customer's account.  Furthermore, unless otherwise agreed-upon by the Parties in writing, Vendor shall remove or overwrite all applicable Content from Vendor's systems following the effective date of termination or cancellation. Prior to any such deletion or destruction, however, Vendor shall either (1) grant Customer reasonable access to the Service for the sole purpose of Customer retrieving Customer Data or (2) transfer all Customer Data to other media for delivery to Customer.  Customer agrees that Vendor shall not be liable to Customer or to any third party for any termination of Customer access to the Service or deletion of Customer Data, provided that Vendor is in compliance with the terms of this Section.  Notwithstanding the foregoing, nothing shall preclude Vendor from maintaining one copy of Customer Data if required by law.

### 8.5   *Handling of Application In the Event of Termination*

Customer data, Customer license keys used in hosting, accessing brokerage accounts, and Customer application documentation updated during the period by application support would be returned to the Customer within fifteen (15) days of the effective date of termination.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026525

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

## 8. MODIFICATION/DISCONTINUATION/MAINTENANCE

### 8.1. Modification to or Discontinuation of the Service

Vendor reserves the right at any time and from time to time to modify, temporarily or permanent-ly, the Service (or any part thereof), provided such modification does not diminish the functional-ity of the Service to the Customer on which the Customer materially relies. Notwithstanding the foregoing, except for routinely scheduled down time, or as otherwise provided in this Agreement, Vendor shall use commercially reasonable efforts to notify Customer prior to any such modifica-tion; further, Vendor shall consider the Customer's validation needs and requirements in connec-tion with any modification of the Service and, except as otherwise noted in Section 8.3, shall val-idate the Service as modified to the same extent provided in the Schedules. Customer acknowl-edges that Vendor reserves the right to discontinue offering the Service at the conclusion of Cus-tomer's then current Term. Customer agrees that Vendor will not be liable to Customer or any third party for any modification or discontinuance of the Service as described in this Section 9.

### 8.2. Modification to Third Party Software and Support Cost

In the event that Vendor incur any increased cost from Third party software licenses or annual support fees during the term of this agreement, Vendor reserves the right to pass these costs onto the Customer.

### 8.3. Maintenance

In order to perform maintenance, including application upgrades, there will be routinely sched-uled down time. Customer shall give Vendor one (1) week notice in the event that such routinely schedule maintenance conflicts with its operations at a critical time. Upon the receipt of such notice, the parties shall work together to find a mutually convenient time to perform such main-tenance. Vendor further reserves the right on approximately a monthly basis to issue new releas-es in which Vendor adds functionality to the Service. Customer acknowledges that these periodic major releases can take several hours to complete (up to eight hours). Vendor shall consult with the Customer and, unless otherwise agreed upon, shall install such major releases during routine-ly scheduled down time as set forth above

In the event that Vendor, in its sole discretion, determines that any unscheduled maintenance is necessary, Vendor will use commercially reasonable efforts to notify Customer as soon as it be-comes aware of such need.

## 9. WARRANTIES

### 9.1. Warranty of Functionality

Vendor warrants to Customer during the Term of this Agreement that the Service will comply with the material functionality described in the Schedule A and that such functionality will be maintained in all material respects in subsequent upgrades to the Service, subject to risks out-lined in Section 10. Customer's sole and exclusive remedy for Vendor's breach of this warranty

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026526

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

shall be that Vendor shall use commercially reasonable efforts to correct such errors or modify the Service to achieve the material functionality described in within a reasonable period of time. However, Vendor shall have no obligation with respect to this warranty claim unless notified of such claim within (30) days of the first material functionality problem.  Further, Vendor shall have no obligation with respect to this warranty claim, and Customer may not terminate the Agreement, where any alleged nonconformity is due to User error as reasonably determined by the parties after investigation and analysis by Vendor.  Vendor does not warrant that the Service will be free of non-material errors, bugs, or minor interruption, or that all such errors will be corrected.

### 9.2.   *Data Maintenance and Backup Warranty*

In the event of a breach of this provision, Vendor will use commercially reasonable efforts to correct Customer Data or restore Customer Data within three (3) business days (or as otherwise agreed in writing between the parties depending upon the back-up options selected by Customer).  Provided Vendor complies with the procedures set forth in Schedule D, it shall be deemed to have satisfied its obligation with respect to this warranty.

### 9.3.   *Non-Infringement Warranty*

Vendor warrants that it is the sole owner of and or has full power and authority to grant the license and use of the Service and other rights granted by the Agreement to Customer with respect to the Service and that neither the performance by Customer in its utilization of the Service, nor the license of and authorized use by Customer of the Service as described herein, will in any way constitute an infringement or other violation of any U. S. copyright, trade secret, trademark, patent, invention, proprietary information, non-disclosure, or other rights of any third party.

## 10.  DISCLAIMER OF WARRANTIES

10.1 EXCEPT AS OTHERWISE STATED IN SECTION 10 ABOVE, VENDOR DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE SERVICE WILL BE SECURE, TIMELY, PROFITABLE, UNINTERRUPED OR ERROR FREE, OR THAT THE SERVICE WILL MEET CUSTOMER REQUIREMENTS OR THAT ALL ERRORS IN THE SERVICE AND/OR DOCUMENTATION WILL BE CORRECTED OR THAT THE SYSTEM THAT MAKES THE SERVICE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS OR THE SERVICE WILL OPERATE IN COMBINATION WITH OTHER HARDWARE, SOFTWARE, SYSTEMS OR DATA NOT PROVIDED BY VENDOR OR THE OPERATION OF THE SERVICES WILL BE SECURE OR THAT VENDOR AND ITS THIRD PARTY VENDORS WILL BE ABLE TO PREVENT THIRD PARTIES FROM ACCESSING CUSTOMER DATA OR CUSTOMER'S CONFIDENTIAL INFORMATION, OR ANY ERRORS WILL BE CORRECTED OR ANY STORED CUSTOMER DATA WILL BE ACCURATE OR RELIABLE.  THE WARRANTIES STATED IN SECTION 9 ABOVE ARE THE SOLE AND EXCLUSIVE WARRANTIES OFFERED BY VENDOR.  THERE ARE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PUR-

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026527

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

POSE. EXCEPT AS STATED IN SECTION 10 ABOVE, THE SERVICE IS PROVIDED TO CUSTOMER ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND IS FOR COMMERCIAL USE ONLY. CUSTOMER ASSUMES ALL RESPONSIBILITY FOR DETERMINING WHETHER THE SERVICE OR THE INFORMATION GENERATED THEREBY IS ACCURATE OR SUFFICIENT FOR THE CUSTOMER'S PURPOSE.

### 10.2 RISK DISCLOSURE FOR FINANCIAL INSTRUMENTS TRADING

Trading financial instruments on margin carries a high level of risk and may not be suitable for all investors. The high degree of leverage can work against Customer as well as for Customer. Before deciding to trade or invest in financial instruments Customer should carefully consider Customer investment objectives, level of experience, and risk appetite. Customer could sustain a loss of some or all of Customer investment and therefore Customer should not invest money that Customer cannot afford to lose. Customer should be aware of all the risks associated with financial instruments trading and also seek advice from an independent financial advisor.

### 10.3 MARKET INFORMATION AND OPINIONS

All opinions, news, research, analysis, prices or other information contained or provided with this service are provided as general market commentary and it is not intended to be investment advice. Vendor will not accept liability for any loss or damage, including, but without limitation to, any loss of profit and trading loss, which may arise directly or indirectly from use of or reliance on such information.

### 10.4 INTERNET TRADING RISKS

There are risks associated with use of all internet-based deal trading and order entry systems. These include but are not limited to, the failure of hardware, software and internet connections. Vendor does not control signal power, its reception or routing via the internet, configuration of Customer equipment or reliability of Customer connection and cannot be responsible for communication failures, distortions or delays when trading via the internet. Customer may employ back-up systems and contingency plans to minimize the possibility of system failure, and trading via telephone may be available.

### 10.5 ACCURACY OF INFORMATION

The content on the information provided with any strategy provided under this contract is subject to change at any time without notice and is provided for the sole purpose of assisting traders in making independent investment decisions. Vendor has taken reasonable measures to ensure the accuracy of the information. However Vendor does not guarantee its accuracy and will not accept liability for any loss or damage which may arise directly or indirectly from the content or Customer inability to understand the provided information, or for any delay in or failure of the transmission or the receipt of any instruction or notification.

### 10.6 MARKET RISKS and ONLINE TRADING FINANCIAL INSTRUMENTS

Trading platforms provide order entry and tracking of orders. All stoploss, limit and entry orders are intended to minimize slippage but no guarantee can be made that it will do so, especially in

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026528

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

volatile market conditions. Trading on-line, no matter how convenient or efficient does not necessarily reduce risks associated with trading of any financial instruments.

Factors that are particularly likely to affect price and interest rate levels and volatility, and thus trading volumes, include: global and domestic economic, political and market conditions; concerns over inflation, deflation, legislative and regulatory changes, government fiscal and monetary policy - including actions by the Federal Reserve, other foreign monetary units governing bodies, and investor and consumer confidence levels; weather conditions including hurricanes and other significant events, natural and other unnatural disasters like large oil spills that impact the production of commodities; war, acts of terrorism and any unforeseen market closures or disruptions in trading; real and perceived changes in the supply and demand of commodities underlying the Vendor's service, including changes as a result of technological improvements; and credit quality of market participants, the availability of capital and the levels of assets under management. Any one or more of these factors may reduce trading activity, which could make the use of the Vendor Software less attractive, and in turn could further discourage existing and potential market participants and thus accelerate a decline in the level of trading activity and potentially related services such as data. Further, most of these factors are beyond the Vendor's control if any of these unfavorable conditions were to persist over a lengthy period of time and trading volumes were to decline substantially and for a long enough period. Global financial markets conditions and decreased trading volume may impact the Vendor Software's performance. The conditions in global financial markets will impact the Vendor Software's performance

Price movements for commodity interests are influenced by, among other things: changing supply and demand relationships; trade, fiscal, monetary, and exchange control programs and policies of governments; US and foreign political and economic events and policies; changes in national and international interest rates and rates of inflation; currency devaluations and revaluations; and emotions of the marketplace. None of these factors can be controlled by the Vendor and no assurance can be given that the Algorithmic trading will result in profitable trades, or that Customer will not incur substantial losses.

Revenues may decline due to competition from other alternative trading systems. A dramatic increase in computer-based or other electronic trading may adversely affect the Vendor Software's trading revenues, reduce participating in trading and associated access to market information and lead to the creation of new and stronger competitors. If the Vendor is unable to keep up with rapid changes in technology and client preferences, the Vendor may not be able to compete effectively. The Vendor uses some open-source software in its technology, most often as small components within a larger product or service, to augment algorithms, functionalities or libraries the Vendor, its subsidiaries, or its affiliates create, and the Vendor may use more open-source software in the future. Open-source code is also contained in some third-party software the Vendor relies on. The Vendor Software may be harmed by computer and communications systems failures and delays. The Vendor and third party licensors support and maintain many of the systems that comprise of the Vendor Software and electronic platforms. The Vendor's or third party's failure to monitor or maintain these systems, or to find replacements for defective components

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026529

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

within a system in a timely and cost-effective manner when necessary, could have a material adverse effect on the Vendor Software's performance.

The Vendor's systems, or those of its third party providers, may fail or be shut down or, due to capacity constraints, may operate slowly, causing one or more of the following: unanticipated disruption in service to its participants; slower response time and delays in its participants' trade execution and processing; incomplete or inaccurate accounting, recording or processing of trades; distribution of inaccurate or untimely market data to participants who rely on this data in their trading activity; or financial loss. The Vendor may experience system failures due to power or telecommunications failures, human error on the part of the Vendor's employees or on the part of its vendors or participants, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, cyber attacks, intentional acts of vandalism or terrorism and similar events. If any one or more of these situations were to arise, they could result in damage to the Vendor Software or electronic platform, which could prompt participants to trade elsewhere or expose the Vendor to litigation or regulatory sanctions. As a consequence, the Vendor Software's performance could suffer materially. Heavy use of computer systems during peak trading times or at times of unusual market volatility could cause those systems to operate slowly or even to fail for periods of time. However, the Vendor cannot assure the Customer that its estimates of future trading volume will be accurate or that the Vendor's systems will always be able to accommodate actual trading volume without failure or degradation of performance. Although many of the Vendor's systems are designed to accommodate additional volume and products and services without redesign or replacement, the Vendor will need to continue to make significant investments in additional hardware and software and telecommunications infrastructure to accommodate the increases in volume of order and trading transaction traffic and to provide processing and other services to third parties. If the Vendor cannot increase the capacity and capabilities of its systems to accommodate an increasing volume of transactions and to execute the Vendor's business strategy, its ability of its Vendor Software to achieve profitability would be adversely affected. The Vendor's systems and those of its third party service providers may be vulnerable to security risks, hacking and cyber attacks, which could result in wrongful use of the Vendor's and Customer's information.

## 10.7 NO ASSURANCES

This agreement does not make any assurance that use of the Vendor Software will be profitable. Because automated trading, trading software and investment advisory services, like many other industries, historically has been categorized by rapid regulatory changes and intense competition, specific market conditions may result in occasional or permanent reduction in the gains and amount of capital in the Customer's brokerage account. Trading volume on the Vendor's platform is driven by the degree of volatility - the magnitude and frequency of fluctuations - in prices and levels of the underlying commodities, forex, financial benchmarks or other instruments. Volatility increases the need to hedge price risk and creates opportunities for speculative or arbitrage trading. Were there to be a sustained period of stability in the prices or levels of the

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026530

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

underlying commodities, securities, forex, benchmarks or other instruments, the Vendor Software may experience lower trading volumes, slower growth or declines in profitability.

### 11.8 REGULATORY RISKS

The Vendor's businesses and those of many of its clients have been and continue to be subject to increased legislation and regulatory scrutiny, and the face the risk of changes to this regulatory environment and business in the future. The Vendor is and will continue to be subject to extensive regulation in the jurisdictions around the world in which it operates, and in particular in the U.S. The Vendor faces the risk of significant actions by regulatory and taxing authorities in all jurisdictions in which the Vendor conducts its businesses and hold investments that may affect its business, the activity of its market participants, and as a consequence, the Vendor Software's results. Among other things, as a result of regulators enforcing existing laws and regulations, the Vendor could be censured, fined, prohibited from engaging in some of its business activities, subjected to limitations or conditions on its business activities or subjected to new or substantially higher taxes or other governmental charges in connection with the conduct of the Vendor's business or with respect to its employees. The Vendor's compliance and risk management methods, as well as the Vendor's fulfillment of its regulatory obligations, might not be effective. The Vendor's ability to comply with complex and changing laws and rules is largely dependent on its establishment and maintenance of compliance, audit and reporting systems. While the Vendor has policies and procedures to identify, monitor and manage its risks and regulatory obligations, the Vendor cannot assure that its policies and procedures will always be effective or that the Vendor will always be successful in monitoring or evaluating the risks to which the Vendor is or may be exposed. If the Vendor fails to comply with any of these obligations, regulators could take a variety of actions that could impair the Vendor's ability to conduct its business.

## 11.  LIMITATIONS OF LIABILITY

### 12.1    *No Consequential Damages*

NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUDING WITHOUT LIMITATION, INTERRUPTION OF BUSINESS, LOST PROFITS, LOST OR CORRUPTED DATA OR CONTENT, LOST REVENUE ARISING OUT OF THIS AGREEMENT (INCLUDING WITHOUT LIMITATION THE SERVICE, THE USE OF THE SERVICE OR THE INABILITY TO USE SERVICE), EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### 12.2    *DIRECT DAMAGE LIMITATIONS*

12.2.1 IN NO EVENT SHALL THE AGGREGATE LIABILITY OF VENDOR OR ANY THIRD PARTY VENDORS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY LICENSE, USE, OR OTHER EMPLOYMENT OF THE SERVICE, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON BREACH OR RE-

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026531

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

PUDIATION OF CONTRACT, BREACH OF WARRANTY, TORT, OR OTHERWISE, EX-CEED THE TOTAL AMOUNTS ACTUALLY PAID BY CUSTOMER IN THE ONE (1) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM.   THERE SHALL BE ONLY ONE AGGREGATE LIABILITY CAP UNDER THIS AGREEMENT EVEN IF THERE ARE MULTIPLE CLAIMS; EACH CLAIM SHALL RE-DUCE THE AMOUNT AVAILABLE IN THE AGGREGATE LIABILITY CAP.

12.2.2 EXCEPT FOR A FAILURE OF VENDOR TO COMPLY WITH ITS OBLIGATIONS WITH RESPECT TO BACKUP SERVICES, AND SUBJECT TO SECTION 12.2.1 ABOVE, VENDOR SHALL NOT BE LIABLE FOR ANY DAMAGES RESULTING FROM THE LOSS OR CORRUPTION OF ANY DATA OR CONTENT WHETHER RESULTING FROM DE-LAYS, NONDELIVERIES, MISDELIVERIES, SERVICE INTERRUPTIONS OR OTHER-WISE.

12.3   *EXCLUSIONS*

THE LIMITATIONS OF LIABILITY SET FORTH IN SECTIONS 12.1 AND 12.2 SHALL NOT APPLY WITH RESPECT TO: (I) DAMAGES TO PERSONS AND/OR TANGIBLE PROPERTY OCCASIONED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, (II) BREACHES BY CUSTOMER OF LICENSE TERMS APPLICABLE TO VENDOR PROVIDED SOFTWARE AND THIRD PARTY PRODUCTS AS SET FORTH IN SECTION 2 ABOVE, (III) CUSTOMER'S UNAUTHORIZED USE OF VENDOR'S OR THIRD PARTY VENDOR'S INTELLECTUAL PROPERTY, MATERIALS OR ASSETS; (IV) DAMAGES INCURRED AS A RESULT OF A BREACH BY A PARTY OF ITS OBLIGA-TIONS UNDER SECTION 7.8 THAT RESULT IN THE DISCLOSURE OF CONFIDENTIAL INFORMATION OF THE OTHER PARTY, OR (V) CLAIMS THAT ARE THE SUBJECT OF INDEMNIFICATION PURSUANT TO SECTION 13 (WHICH ARE SUBJECT TO THE LIM-ITS, IF ANY CONTAINED THEREIN).   DAMAGES AS LIMITED BY THIS SECTION 12 ARE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY IF ANOTHER REMEDY IS PRO-VIDED AND SUCH REMEDY IS DEEMED TO FAIL OF ITS ESSENTIAL PURPOSE.

## 12.   INDEMNIFICATION

### 12.1.   *Personal Injury and Property Damage*

Each party (the "**Indemnifying Party**") agrees to defend at its expense and indemnify and hold harmless the other party and its affiliates, directors, officers, employees, agents, successors and assigns (each an "**Indemnified Party**"), in accordance with the procedures described in this Sec-tion, from and against any and all losses, costs, damages, liabilities and expenses including with-out limitation, reasonable legal fees and expenses paid to or for the benefit of an unaffiliated third party (collectively, "**Losses**") arising from or in connection with any such third party claim for:  (i) the death or bodily injury of any person caused by the negligence or willful misconduct of the Indemnifying Party; or (ii) the damage, loss or destruction of any real or tangible personal property caused by the negligence or willful misconduct of the Indemnifying Party.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026532

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

### 12.2. Infringement

Vendor will indemnify, defend and hold harmless Customer for Losses Customer incurs as a direct result of any unaffiliated third party claim based on any claim that the Service infringes any U.S. copyright, trademark or trade secret, except to the extent resulting from (i) Customer's modification of the Service or combination by Customer the Services with other products or services if the Service would not have been infringing but for such combination or modification, (ii) Customer's use of the Service in a manner not authorized herein or for which it was not designed, (iii) Customer's failure to use an updated non-infringing version of the applicable intellectual property to the extent Customer was notified that the update cured an infringement, (iv) changes to the Service made by Vendor at the direction of the Customer or (v) Customer Data. If any item for which Vendor has an indemnification obligation under this Section becomes, or in Vendor's reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceeding, Vendor will, in addition to indemnifying Customer as provided in this Section, promptly take the following actions, at no additional charge to Customer, in the listed order of priority:  (a) secure the right to continue using the item or (b) replace or modify the item to make it non-infringing.  If neither of such actions can be accomplished by Vendor using commercially reasonable efforts, and only in such event, Vendor will remove the item from the Service and the applicable Service fee will be equitably adjusted to reflect such removal.  This Section 13.2 states Customer's sole and exclusive remedy for Vendor's infringement or misappropriation of intellectual property of a third party.

### 12.3. Customer's Indemnity

Customer shall defend and indemnify Vendor and its Third Party Vendors against any and all Losses incurred by Vendor and its Third Party Vendors arising out of or in connection with a claim by a third party (i) alleging that the Customer Data or the Customer Trademarks, or any use thereof, infringes the rights of, or has caused harm to, a third party, or (ii) arising out of Customer's breach of Sections 7.5 and 7.8.

Customer will indemnify, defend and hold harmless Vendor, its affiliates, successors, and assigns, including the applicable officers, directors, employees, and agents thereof for damages, costs and attorneys' fees Vendor incurs from any unaffiliated third-party claim arising from Customer's Content or Customer's or any end user's use of the Services.

### 12.4. Indemnification Procedures

The party seeking indemnification shall give prompt notice of the claim and will tender the defense; provided, however, that such party's failure to provide notification shall not affect the indemnifying party's indemnification obligations except to the extent that the failure to notify delays or prejudices the indemnifying party's ability to defend the applicable claim.  The indemnifying party shall conduct the defense and shall have control of the litigation, and the indemnified party shall cooperate in defending against the claim.  The indemnified party shall have the right, at any time and at its own expense, to participate in the defense of the claim with counsel of its own choosing.  The indemnifying party shall not make any settlement of the claim that results in any liability or imposes any obligation on the indemnified party without the prior written consent

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026533

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

of the indemnified party. If the indemnifying party fails to (i) respond to the notice of a claim, or (ii) assume the defense of a claim, the party seeking indemnification shall have the right to defend the claim in such manner as it may deem appropriate, at the reasonable cost, expense, and risk of the indemnifying party, and the indemnifying shall promptly reimburse the indemnified party for all such costs and expenses.

## 13.  NOTICES

Except as otherwise provided in Section 7.4 above, any notice required or permitted under the terms of this Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by registered or certified mail return receipt requested, (c) sent by overnight courier, (d) sent by facsimile (with a hard copy mailed on the same date), (e) by email whose receipt is acknowledged by an officer of the receiving Party. If to Vendor, a notice shall be forwarded to **Name**            , at  **Address**            , Attn. Product Support Manager, with a copy to Algo Capital, 3250 NE 1st Ave Set 208, Miami, Fl 33137, Attn: John Fortini, and if to Customer, a notice shall be forwarded to Customer at the address provided on the signature page herein. Notices shall be considered to have been given at the time of actual delivery in person, five business days after posting if by mail, one business day if by overnight courier service, or upon receipt of machine confirmation of successful transmission by facsimile or email as described herein.

## 14.  SURVIVAL

The following provisions shall survive any termination of this Agreement: Sections 5, 7, 8, 10, 11, 12, 13, 14, 19 and 20.

## 15.  NO ASSIGNMENT

Customer may not assign this Agreement without the prior written approval of Vendor. Any purported assignment in violation of this section shall be void.

## 16.  U.S. GOVERNMENT RESTRICTED RIGHTS

Any use of the Service by or on behalf of the United States of America, its agencies and/or instrumentalities ("U.S. Government"), is provided with Restricted Rights. Use, duplication, or disclosure by the U.S. Government is subject to restrictions as set forth in subparagraph I(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 or subparagraphs I(1) and (2) of the Commercial Computer Software – Restricted Rights at 48 CFR 52.227-19, as applicable.

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                                                                                JH_00026534

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

## 17.  FORCE MAJEURE

Neither party will be liable to the other for any failure or delay in the performance of such party's non-monetary obligations due to causes beyond its control, such as failure or delay caused, directly or indirectly, by fire, flood, earthquakes, other elements of nature, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, epidemics, communications line or power failures, or governmental laws, court orders, and regulations imposed after the fact.

## 20   GENERAL PROVISIONS

Any action related to this Agreement will be governed by Florida law and controlling U.S. federal law.  No choice of law rules of any jurisdiction will apply.  Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Service shall be subject to the exclusive jurisdiction of the state and federal courts located in Miami-Dade, Florida. This Agreement, together with the Schedules annexed hereto, represents the parties' entire understanding relating to the use of the Service and supersedes any prior or contemporaneous, conflicting or additional, communications.  No text or information set forth shall add to or vary the terms and conditions of this Agreement.  If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect.  No joint venture, partnership, employment, or agency relationship exists between Vendor and Customer as a result of this Agreement or use of the Service.  The failure of Vendor to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Vendor in writing Vendor reserves the right to assign its right to receive and collect payments hereunder.  Any rights not expressly granted herein are reserved by Vendor.

**IN WITNESS WHEREOF**, this Agreement is duly executed by an authorized representative of both parties as of the Effective Date.

VENDOR

By:_Algo Capital_____

**Customer Mailing Address:**

Redacted

_____

Attn: __C. C.__

CUSTOMER

By: C. C.

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                           JH_00026535

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

### Schedule A – Vendor Licensed Software

The licenses set forth below shall be available to Customer during the term of the agreement.

| Licensed Software | Number of Shared Servers | Number of Named Users |
|---|---|---|
| Algo Capital Software | 1 | 1 |

### DESCRIPTION OF SERVICE:

The primary target of this algorithmic trading program is a continuous growth of the initial account budget. Strong development of the account balance by minimizing risks is the main aim of the Vendor Software. This is accomplished by the placement of trades and its related hedge trades in a very specific manner: combined with an advanced close logic which allows a balanced development of founds secured by a precisely calculated account size correlated to the trading volume.

The design as well as the code programing part of the main algorithms contained in the Vendor Software follows some well-known principles initially described by Ralph Nelson Elliot and Fibonacci, as well as some additional fundamental and widely known paradigms. This very specific combination of components finally results in much more than only the simple summary of its parts.

In order to activate the service, Customer must select a broker, fund the brokerage account, and send an email to Vendor including the credentials for the brokerage account and instruction to activate the Vendor Software. After receiving instruction from the Customer, the Vendor shall activate the Vendor Software.

The Vendor Software shall use a proprietary intraday automated strategy that places, exits and monitors the trades, on behalf of the Customer. By activating the Vendor Software, the Customer assumes any and all risks associated with the Vendor Software, including risks highlighted in Section 10, 11, and any other occurrence that could result in financial injury to the Customer.

To deactivate the Vendor Software, Customer must email Vendor as outlined in Schedule B. Vendor shall deactivate the Vendor Software within twenty-four (24) hours after the close of any outstanding trade.

Broker Requirements:

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026536

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

Customer shall select a broker which meets the following specifications: must be an ECN Broker; use Metatrader and/or Ninjatrader platform; accepts US-based clients; have Webtrader accessibility; API access FIX/REST.

Broker options include but are not limited to: MyFXChoice.com; TheTradersDomain.com; Oanda.com; Forex.Com

## SCHEDULE B – PRODUCT SUPPORT

During the Term of this Agreement and for so long as Customer is entitled to receive the Service hereunder, Vendor shall provide the following Product Support Services through its Support Centers ("SC") for the Vendor Software as follows

a. The SC will be the primary point of contact for all product support inquiries. The SC may be contacted via email at SUPPORT@ALGOCAPITAL.COM
b. The SC will receive, log, and respond to inquiries within 24 hours from the Customer concerning errors or defects in the Vendor Software.

## SCHEDULE C

Vendor and Customer have agreed on the following services, which is based on data from Customer, industry and vendor software.

BASE COMPONENTS:

Access to Vendor Software

Vendor Managed Shared Servers

Vendor Managed Web Support

Vendor Managed Firewalls and Managed VPN

Assumptions
- Vendor assumes that Customer will continue to pay support and maintenance for the user licenses.
- Customer shall keep a funded brokerage account which the Vendor Software will use to execute trades on behalf of the Customer.
- Customer users will access the service via emailing Vendor for authorization.

Page 20 of 21

DocuSign Envelope ID: 38C40CEC-02E5-4CA5-9A2E-B2663F2FCF46

**\*A \$40 bank wire fee will be deducted from initial funds upon account activation. This deduction will be reflected on your account balance\***

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00026538

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22890DBDC8E

# SOFTWARE AS A SERVICE AGREEMENT

This **Software As a Service Agreement** (the "Agreement") is made as of _____7/1/2022_____
("Effective Date") between ████ S. L. ████_____, with principal residential address at
████ Redacted ████  Solihull, B92 7FJ. UK
("Customer") and Algo Capital, LLC, a Florida limited liability company, with its principal
office at 3250 NE 1st Ave, Ste 208, Miami, FL 33137 ("Vendor").

**WHEREAS,** Vendor is in the business of supplying software applications and related services to
companies in the financial services industry, including, among other things, algorithmic trading
software in the forex and non-security cryptocurrency markets;

**WHEREAS,** Customer desires the use of the Vendor's proprietary algorithmic trading software
application products and services; and

**WHEREAS,** Vendor and Customer desire to enter into this Agreement defining their respective
rights and responsibilities and memorializing the terms and conditions pursuant to which Vendor
will provide to Customer the Services for a fee.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements contained herein,
the parties intending to be legally bound hereby agree as follows:

## Definitions

a. **"aaS"** is an acronym for "As A Service" and means the combined software and support
   services provided in this Agreement.
b. **"Base Components"** means the software environment as specified in Schedule C that Vendor
   makes available for use by Customer as part of the Service.
c. **"Cloud Hosting"** means the provision of products and services in a hosted, virtualized
   environment, accessible via the internet.
d. **"Vendor Software"** means Vendor proprietary software applications and user interfaces as
   defined in Schedule A and made available to Customer by Vendor as part of the Service. Vendor
   Software may contain third-party components licensed to Vendor.
e. **"Customer Data"** means all data, files, including hypertext markup language files,
   documents, audio and visual information, graphics, scripts, programs, applets or servlets that
   Customer creates, installs, uploads to or transfers in or through the Service or provides in the
   course of using the Service, excluding identification and other information provided by
   Customer relative to Customer Users.
f. **"Electronic Communications"** shall mean any transfer of signs, signals, text, images,
   sounds, data or intelligence of any nature transmitted in whole or part electronically to or from
   the Service.
g. **"Product Support Services"** shall mean the support provided by Vendor to remediate,
   correct, or abate errors in the Vendor Software.

**EXHIBIT**
**173**
TO THE DECLARATION OF MAURA M. VIEMMEYER
PURSUANT TO 28 U.S.C. § 1746

Page 1 of 19

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

h. **"Service"** shall mean the software in a hosted environment provided and maintained by Vendor to which Customer is being granted access under this Agreement via activating the VendorSoftware as outlined in Schedule A.

i. **"Term"** means any Initial Term and/or Renewal Term as defined in Section 6 of this Agreement.

j. **"Third Party Products"** means application software products provided by third party vendors, including operating system and application software with which the Vendor Software interfaces and which provides certain functionality essential to the operation of the Vendor Software. Third Party Products are licensed to Vendor for incorporation and use in the hosted environment as part of the Service as set forth in the Statement of Work. For the sake of clarity, the term Third-Party Products does not refer to third-party software components or brokerage accounts, if any, incorporated or used by, the Vendor Software.

k. **"User(s)"** means Customer's employees, representatives, consultants, contractors or agents who are authorized to use the Service and have been supplied user identifications and passwords by Customer or on Customer's behalf.

## 1. PROVISION OF SERVICES

In consideration of the fees paid by Customer under this Agreement, Vendor agrees to provide Customer access to the Service. Specific components of the Service to be provided to Customer are as outlined in the Schedules annexed hereto.

## 2. LICENSE GRANTS

Subject to the terms and conditions of this Agreement, Vendor grants to Customer during the Term of this Agreement the non-transferable, non-exclusive worldwide right to permit Users to (a) use the Service, including the Base Components thereof (b) use the any training material solely in connection with the Service, all solely for Customer's own internal business operations. Customer acknowledges and agrees that the license granted, for the items listed in Schedule A herein, is not a concurrent user license and that the rights granted to Customer in this Agreement are subject to all of the following agreements and restrictions: (i) the maximum number of Users that Customer authorizes to access the Service shall not exceed the number of licenses Customer has been granted, as set forth in Schedule A; (ii) licenses cannot be shared or used by more than one individual User;

(iii) Customer shall not license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose or otherwise commercially exploit or make the Service available to any third party other than an authorized User; (iv) Customer shall not modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the Service, including without limitation the Vendor Software and that are provided as a part thereof, or access the Service in order to build a similar or competitive product or service; (v) Customer shall not create Internet "links" to the Service or "frame" or "mirror" any part of the Service, including any content contained in the Service, on any other server or device; (vi) except as expressly stated herein, no part of the Service may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means, including but not limited to electronic, mechanical, photocopying, recording, or other means; (vii) Customer agrees to make every reasonable effort to prevent unauthorized third parties from accessing the Service; (viii) Customer acknowledges and agrees that Vendor or its Third Party Vendors shall own all right, title and interest in and to all intellectual property rights in the Service and any suggestions, enhancement requests, feedback, or recommendations provided by Customer or its Users relating to the Service or, including all unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, know-how and other trade secret rights, and all other intellectual property

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009616

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

rights, derivatives or improvements thereof; (ix) unauthorized use, resale or commercial exploitation of any part of the Service in any way is expressly prohibited; (x) Customer does not acquire any rights in the Service, express or implied, other than those expressly granted in this Agreement and all rights not expressly granted to Customer are reserved by Vendor and Third Party Vendors; and (xi) this Agreement is not a sale and does not convey any rights of ownership in or related to the Service, Vendor Software, Third Party Products, to Customer.

## 3. LICENSES FROM CUSTOMER

Subject to the terms and conditions of this Agreement, Customer grants to Vendor and its Third Party Vendors the non-exclusive, non-transferable worldwide right to copy, store, record, transmit, display, view, print or otherwise use (a) Customer Data solely to the extent necessary to provide the Service to Customer, and (b) any trademarks that Customer provides Vendor for the purpose of including them in Customer's user interface of the Service ("Customer Trademarks"). Customer acknowledges and agrees that Customer Data and information regarding Customer and Customer's Users that is provided to Vendor and its Third Party Vendors in connection with this Agreement may be (a) processed by Vendor and its Third Party Vendors to the extent necessary to provide the Service and (b) transferred outside of the country or any other jurisdiction where Customer and Customer's Users are located. In addition, Customer acknowledges and agrees that it is Customer's obligation to inform Customer's Users and customers of the processing of Customer Data and information regarding Customer and Customer's Users pursuant to this Agreement and to ensure that such Users and customers have given any necessary consent to such processing as required by all applicable data protection legislation. Customer shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness and copyright of all Customer Data and information regarding Customer and Customer's Users. Customer agrees that the license to the Customer Data shall survive termination of this Agreement solely for the purpose of storing backup Customer Data in accordance with the terms of this Agreement.

## 4. PROPRIETARY RIGHTS

Customer acknowledges and agrees that the Service and any necessary software used in connection with the Service contain proprietary and confidential information that is protected by applicable intellectual property and other laws. Customer further acknowledges and agrees that the content or information presented to the Customer through the Service may be protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws. Except where expressly provided otherwise by Vendor, nothing in the Service, or the Agreement shall be construed to confer any license to any of Vendor's (or its third party manufacturer's, author's, developer's, vendor's, and service provider's ("Third Party Vendors"), intellectual property rights, whether by estoppel, implication, or otherwise. Without limiting the generality of the foregoing, any names or trademarks of the Vendor Software listed on Schedule A and other Vendor service marks, logos and product service names are marks of Vendor (the "Vendor Marks"). Customer agrees not to display or use the Vendor marks, or the marks of any Third Party Vendor, in any manner without the owner's express prior written permission. Vendor reserves the right to subcontract any or all services provided hereunder to third parties.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009617

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

## 5. LICENSE FEE, TERM AND PAYMENT

The initial term ("Initial Term") of this Agreement will commence on the Effective Date on a month-to-month basis, until such time as either party provides thirty (30) days' written notice to the other party of its intent to cancel the Agreement. Customer shall pay Vendor the fee detailed in the Payment Schedule set forth below.

Payment Schedule: Customer agrees to pay a monthly licensing fee to the Vendor for the use of the Vendor Software, which shall be calculated on performance as follows:

Initial Investment Amount: $ _25000_

Conservative Fund: 30% of monthly gain

Moderate Fund: 50% of monthly gain

Invoices shall be payable within five (5) days after receipt thereof. In addition to any remedies Vendor may have pursuant to this Agreement or at law for non-payment, delinquency in payment may result in a delay or suspension of the right to use the Service. In the event Vendor incurs any costs (including reasonable attorney's fees) from efforts collecting overdue fees from Customer, Customer agrees to pay such costs. Customer further agrees to pay all foreign, federal, states, and local taxes, if applicable, to Customer's access to, use, or receipt of the Service.

## 6. TERMS OF SERVICE

### 6.1. Service Extensions or Updates

Customer further agrees that, unless explicitly stated otherwise, any new features that augment or enhance the Service, and or any new service subsequently purchased by Customer pursuant to an amendment accepted by Vendor referencing this Agreement will be subject to this Agreement.

### 6.2. Customer Must Have Internet Access

In order to use the Service, Customer must have or must obtain access to the World Wide Web, either directly or through devices that access Web-based Content. Customer must also provide all equipment necessary to make (and maintain) such connection to the World Wide Web.

### 6.3. Email and Notices

Customer agrees to provide Vendor with Customer's e-mail address (es), and to accept emails (or other Electronic Communications) from Vendor at the e-mail address Customer specifies. Notwithstanding any provision in the Agreement to the contrary, acknowledgement by an officer of Customer is not required with respect to e-mail communications pertaining to the Customer's routine use of the Service, including without limitation communications relating to the support, maintenance, or the updating of the Service. Customer further agrees the Vendor may provide any and all required notices including legal notices to Customer through either e-mail (or other electronic transmission), or by mail or express delivery service in accordance with Section 14.

### 6.4. Passwords, Access, and Notification

Customer may designate up to the number of Users that corresponds to the number of permitted Users set forth in Schedule A. Customer will provide and assign unique password and user names

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009618

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

to each authorized User for each license purchased. Customer acknowledges and agrees that Customer is prohibited from sharing passwords and or user names with unauthorized users. Customer will be responsible for the confidentiality and use of Customer's (including its employees') pass- words and user names. Customer will also be responsible for all Electronic Communications, including those containing business information, account registration, account holder information, financial information, Customer Data, and all other data of any kind contained within emails or otherwise entered electronically through the Service or under Customer's account. Vendor will act as though any Electronic Communications it receives under Customer's passwords, User name, and/or account number will have been sent by Customer. Customer agrees to notify Vendor if Customer becomes aware of any loss or theft or unauthorized use of any of Customer's passwords, user names, and/or account number.

### 6.5.  Customer's Responsibilities

Customer agrees to comply with all applicable national and foreign laws, treaties, regulations and conventions in connection with its use of the Service, including without limitation those related to data privacy, international communications, and the exportation of technical or personal data. Customer will ensure that any use of the Service by Customer's Users is in accordance with the terms of this Agreement. Customer agree to notify Vendor immediately of any unauthorized use of any password or account or any other known or suspected breach of security or any known or suspected distribution of Customer Data. Customer acknowledges and agrees that the Service is subject to the U.S. Export Administration Laws and Regulations. Customer agrees that no part of the Service or information obtained through use of the Service, is being or will be acquired for, shipped, transferred, or re-exported, directly or indirectly, to proscribed or embargoed countries or their nationals, nor be used for nuclear activities, chemical biological weapons, or missile projects unless authorized by the U.S. Government. Proscribed countries are set forth in the U.S. Export Administration Regulations and are subject to change without notice, and Customer must comply with the list as it exists in fact. Customer certifies that neither Customer nor any Users are on the U.S. Department of Commerce's Denied Persons List or affiliated lists or on the U.S. Department of Treasury's Specially Designated Nationals List. Customer agrees to comply strictly with all U.S. export laws and assumes sole responsibility for obtaining licenses to export or re-export as may be required. Any unauthorized use of the Service may violate copyright laws, trademark laws, the laws of privacy and publicity, and communications regulations and statutes. The Customer also certifies that they will not use the Vendor Software to circumvent any applicable Anti-Money Laundering, Bank Secrecy, or Know Your Customer regulations. The Service may use encryption technology that is subject to licensing requirements under the U.S. Export Administration Regulations, 15 C.F.R. Parts 730-774 and Council Regulation (EC) No. 1334/2000.

In addition to its responsibilities in this Agreement, Customer is responsible for all Customer responsibilities indicated in the Schedules attached hereto or entered into pursuant hereto and all other responsibilities not designated as responsibilities of Vendor.

Customer is solely responsible for obtaining all licenses and permissions necessary related to the Content, including without limitation licenses for any third-party software included in the Content.

Customer shall not resell the Services directly or indirectly to third parties.

FOIA - CONFIDENTIAL TREATMENT REQUESTED     JH_00009619

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

### 6.6. *Transmission of Data*

Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to Customer's use of the Service. Customer expressly consents to Vendor's interception and storage of Electronic Communications and/or Customer Data, and Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the internet, and over various networks, only part of which may be owned and/or operated by Vendor. Customer acknowledges and understands that changes to Customer's Electronic Communications may occur in order to conform and adapt such data to the technical requirements of connecting networks or devices. Customer further understands that Electronic Communications may be accessed by unauthorized parties when communicated across the Internet, network communications facilities, telephone, or other electronic means. Customer agrees that Vendor is not responsible for any Electronic Communications and/or Customer Data which are lost, altered, intercepted or stored without authorizations during the transmission of any data whatsoever across networks not owned and/or operated by Vendor.

### 6.7. *Vendor's Support*

Vendor will make commercially reasonable efforts to promote Customer's successful utilization of the Service, including but not limited to maintenance and support, providing Customer with phone and on-line help, and product support as set forth in Schedule B. Product Support pertains to support designed to remedy errors in Vendor Software.

### 6.8. *Confidential Information*

Each party may have access to information that is confidential to the other party ("Confidential Information"). For purposes of this Agreement, Confidential Information shall include any infomation that is clearly identified in writing at the time of disclosure as confidential as well as any information that, based on the circumstances under which it was disclosed, a reasonable person would believe to be confidential. Customer's Confidential Information shall include, but not be limited to, Customer Data. A party's Confidential Information shall not include information that (i) is or becomes a part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure without any obligation of confidentiality and had not been obtained by the other party either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure;
(iv) is independently developed by the other party without use of or reference to the other party's Confidential Information, as established by written records. The parties agree to use commercially reasonable efforts not to make each other's Confidential Information available in any form to any third party. Notwithstanding the foregoing, Customer acknowledges and agrees that Vendor may disclose Customer's Confidential Information to its Third Party Vendors solely to the extent necessary to provide products or services under this Agreement. This Section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; provided, however, that a party who has been subpoenaed or otherwise compelled by a valid law or court order to disclose Confidential Information (the "Responding Party") shall first have given sufficient and prompt written notice to the other party of the receipt of any subpoena or other request for such disclosure, so as to permit such party an opportunity to obtain a protective order or take other appropriate action. The Responding Party will cooperate in the other party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be afforded the Confidential Information. If

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009620

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

the Responding Party is compelled as a matter of law to disclose the Confidential Information, it may disclose to the party compelling the disclosure only that part of the Confidential Information as is required by law to be disclosed.

Notwithstanding anything to the contrary in this Agreement, Content is not included in Confidential Information as defined above. To the extent Vendor has any access to Content in the course of providing the Services, Vendor's entire obligation to keep Content confidential is stated in this Section below. Vendor shall not, intentionally (i) access Customer's Content or (ii) disclose Customer's Content to any third party, except to the extent: (a) Customer makes its Content publicly available, (b) as necessary for Vendor to provide, or obtain third-party supplier support for, the Services or to provide information requested by Customer, or (c) as specifically authorized by Customer in writing. Vendor's obligation to protect Content from unauthorized use, access or disclosure is: (i) to provide the Security Services specifically set forth in this Agreement and (ii) maintain and enforce the then-current standard Vendor security policies and standards applicable to the Services as practiced at the service locations from which Vendor is providing the Services to Customer.

The obligations in this Section shall not apply to the recipient of Confidential Information and/or Vendor with respect to Content to the extent disclosure of Confidential Information or Content is required to comply with laws or respond to requests by a regulatory or judicial body and/or as otherwise required for legal process. In the event that any such disclosure is required, the recipient, and/or Vendor with respect to Content, reserves the right to charge the other party on a time-and-materials basis for recipient's/Vendor's reasonable efforts related to its compliance and response, including, if applicable, reasonable attorney's fees.

## 7.   SUSPENSION/TERMINATION

### 7.1.   *Suspension for Delinquent Account*

Vendor reserves the right to suspend Customer's access and/or use of the Service for any account for which any payment is due but remains unpaid after five day's written notice of such delinquency. Customer agrees that Vendor shall not be liable to Customer, or to any third party, for any suspension of the Service resulting from Customer's non-payment of the fees as described in this Section.

### 7.2.   *Suspension for Ongoing Harm*

Customer agrees that Vendor may, with reasonably contemporaneous telephonic or electronic mail notice to Customer, suspend Customer's access to the Service if Vendor reasonably concludes that Customer's use of the Service is causing immediate and ongoing harm to Vendor or others. Vendor will use commercially reasonable efforts to resolve the issues causing the suspension of Service. Customer agrees that Vendor will not be liable to Customer or to any third party for any suspension of the Service under such circumstances as described in this Section.

FOIA - CONFIDENTIAL TREATMENT REQUESTED                        JH_00009621

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

### 7.3. In the Event of a Breach

A. Either party may terminate this Agreement upon sixty (60) days' written notice to the other party in the event of a breach of any material obligation under this Agreement, provided that the alleged breach is not cured during the sixty (60) day notice period. Upon termination or expiration of this Agreement, Customer shall have no rights to continue use of the Service.

B. Customer may cancel this Agreement, to be effective at the end of the then current Term, by providing Vendor with at least thirty (30) days' prior written notice

### 7.4. Handling of Customer Data In the Event of Termination

Customer acknowledges and agrees that following termination of this Agreement, Customer shall return all related materials to Vendor and Vendor may immediately deactivate Customer's account. Furthermore, unless otherwise agreed-upon by the Parties in writing, Vendor shall remove or overwrite all applicable Content from Vendor's systems following the effective date of termination or cancellation. Prior to any such deletion or destruction, however, Vendor shall either (1) grant Customer reasonable access to the Service for the sole purpose of Customer retrieving Customer Data or (2) transfer all Customer Data to other media for delivery to Customer. Customer agrees that Vendor shall not be liable to Customer or to any third party for any termination of Customer access to the Service or deletion of Customer Data, provided that Vendor is in compliance with the terms of this Section. Notwithstanding the foregoing, nothing shall preclude Vendor from maintaining one copy of Customer Data if required by law.

### 8.5 Handling of Application In the Event of Termination

Customer data, Customer license keys used in hosting, accessing brokerage accounts, and Customer application documentation updated during the period by application support would be re-turned to the Customer within fifteen (15) days of the effective date of termination.

## 8. MODIFICATION/DISCONTINUATION/MAINTENANCE

### 8.1. Modification to or Discontinuation of the Service

Vendor reserves the right at any time and from time to time to modify, temporarily or permanently, the Service (or any part thereof), provided such modification does not diminish the functionality of the Service to the Customer on which the Customer materially relies. Notwithstanding the foregoing, except for routinely scheduled down time, or as otherwise provided in this Agreement, Vendor shall use commercially reasonable efforts to notify Customer prior to any such modification; further, Vendor shall consider the Customer's validation needs and requirements in connection with any modification of the Service and, except as otherwise noted in Section 8.3, shall validate the Service as modified to the same extent provided in the Schedules. Customer acknowledges that Vendor reserves the right to discontinue offering the Service at the conclusion of Customer's then current Term. Customer agrees that Vendor will not be liable to Customer or any third party for any modification or discontinuance of the Service as described in this Section 9.

### 8.2. Modification to Third Party Software and Support Cost

In the event that Vendor incur any increased cost from Third party software licenses or annual support fees during the term of this agreement, Vendor reserves the right to pass these costs onto the Customer.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009622

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

### 8.3.  *Maintenance*

In order to perform maintenance, including application upgrades, there will be routinely scheduled down time. Vendor further reserves the right on approximately a monthly basis to issue new releases in which Vendor adds functionality to the Service. Customer acknowledges that these periodic major releases can take several hours to complete (up to eight hours). Vendor shall consult with the Customer and, unless, shall install such major releases during routinely scheduled down time as set forth above

In the event that Vendor, in its sole discretion, determines that any unscheduled maintenance is necessary, Vendor will use commercially reasonable efforts to notify Customer as soon as it becomes aware of such need.

## 9.  WARRANTIES

### 9.1.  *Warranty of Functionality*

Vendor warrants to Customer during the Term of this Agreement that the Service will comply with the material functionality described in the Schedule A and that such functionality will be maintained in all material respects in subsequent upgrades to the Service, subject to risks outlined in Section 10. Customer's sole and exclusive remedy for Vendor's breach of this warranty shall be that Vendor shall use commercially reasonable efforts to correct such errors or modify the Service to achieve the material functionality described in within a reasonable period of time. However, Vendor shall have no obligation with respect to this warranty claim unless notified of such claim within (30) days of the first material functionality problem. Further, Vendor shall have no obligation with respect to this warranty claim, and Customer may not terminate the Agreement, where any alleged nonconformity is due to User error as reasonably determined by the parties after investigation and analysis by Vendor. Vendor does not warrant that the Service will be free of non-material errors, bugs, or minor interruption, or that all such errors will be corrected.

### 9.2.  *Data Maintenance and Backup Warranty*

In the event of a breach of this provision, Vendor will use commercially reasonable efforts to correct Customer Data or restore Customer Data within three (3) business days (or as otherwise agreed in writing between the parties depending upon the back-up options selected by Customer). Provided Vendor complies with the procedures set forth in Schedule D, it shall be deemed to have satisfied its obligation with respect to this warranty.

### 9.3.  *Non-Infringement Warranty*

Vendor warrants that it is the sole owner of and or has full power and authority to grant the license and use of the Service and other rights granted by the Agreement to Customer with respect to the Service and that neither the performance by Customer in its utilization of the Service, nor the license of and authorized use by Customer of the Service as described herein, will in any way constitute an infringement or other violation of any U. S. copyright, trade secret, trademark, patent, invention, proprietary information, non-disclosure, or other rights of any third party.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009623

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

## 10. DISCLAIMER OF WARRANTIES

1. EXCEPT AS OTHERWISE STATED IN SECTION 10 ABOVE, VENDOR DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE SERVICE WILL BE SECURE, TIMELY, PROFITABLE, UNINTERRUPED OR ERROR FREE, OR THAT THE SERVICE WILL MEET CUSTOMER REQUIREMENTS OR THAT ALL ERRORS IN THE SERVICE AND/OR DOCUMENTATION WILL BE CORRECTED OR THAT THE SYSTEM THAT MAKES THE SER- VICE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS OR THE SERVICE WILL OPERATE IN COMBINATION WITH OTHER HARDWARE, SOFTWARE, SYSTEMS OR DATA NOT PROVIDED BY VENDOR OR THE OPERATION OF THE SERVICES WILL BE SECURE OR THAT VENDOR AND ITS THIRD PARTY VEN- DORS WILL BE ABLE TO PREVENT THIRD PARTIES FROM ACCESSING CUSTOMER DATA OR CUSTOMER'S CONFIDENTIAL INFORMATION, OR ANY ERRORS WILL BE CORRECTED OR ANY STORED CUSTOMER DATA WILL BE ACCURATE OR RELIA- BLE. THE WARRANTIES STATED IN SECTION 9 ABOVE ARE THE SOLE AND EXCLU- SIVE WARRANTIES OFFERED BY VENDOR. THERE ARE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS STATED IN SECTION 10 ABOVE, THE SERVICE IS PROVIDED TO CUSTOMER ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND IS FOR COMMERCIAL USE ONLY. CUS- TOMER ASSUMES ALL RESPONSIBILITY FOR DETERMINING WHETHER THE SER- VICE OR THE INFORMATION GENERATED THEREBY IS ACCURATE OR SUFFICIENT FOR THE CUSTOMER'S PURPOSE.

2. RISK DISCLOSURE FOR FINANCIAL INSTRUMENTS TRADING

Trading financial instruments on margin carries a high level of risk and may not be suitable for all investors. The high degree of leverage can work against Customer as well as for Customer. Before deciding to trade or invest in financial instruments Customer should carefully consider Customer investment objectives, level of experience, and risk appetite. Customer could sustain a loss of some or all of Customer investment and therefore Customer should not invest money that Customer cannot afford to lose. Customer should be aware of all the risks associated with financial instruments trading and also seek advice from an independent financial advisor.

3. MARKET INFORMATION AND OPINIONS

All opinions, news, research, analysis, prices or other information contained or provided with this service are provided as general market commentary and it is not intended to be investment advice. Vendor will not accept liability for any loss or damage, including, but without limitation to, any loss of profit and trading loss, which may arise directly or indirectly from use of or reliance on such information.

4. INTERNET TRADING RISKS

There are risks associated with use of all internet-based deal trading and order entry systems. These include but are not limited to, the failure of hardware, software and internet connections. Vendor does not control signal power, its reception or routing via the internet, configuration of Customer equipment or reliability of Customer connection and cannot be responsible for communication failures, distortions or delays when trading via the internet. Customer may employ

Page 10 of 19

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

back-up systems and contingency plans to minimize the possibility of system failure, and trading via telephone may be available.

## 5. ACCURACY OF INFORMATION

The content on the information provided with any strategy provided under this contract is subject to change at any time without notice and is provided for the sole purpose of assisting traders in making independent investment decisions. Vendor has taken reasonable measures to ensure the accuracy of the information. However Vendor does not guarantee its accuracy and will not accept liability for any loss or damage which may arise directly or indirectly from the content or Customer inability to understand the provided information, or for any delay in or failure of the transmission or the receipt of any instruction or notification.

## 6. MARKET RISKS and ONLINE TRADING FINANCIAL INSTRUMENTS

Trading platforms provide order entry and tracking of orders. All stoploss, limit and entry orders are intended to minimize slippage but no guarantee can be made that it will do so, especially in volatile market conditions. Trading on-line, no matter how convenient or efficient does not necessarily reduce risks associated with trading of any financial instruments.

Factors that are particularly likely to affect price and interest rate levels and volatility, and thus trading volumes, include: global and domestic economic, political and market conditions; concerns over inflation, deflation, legislative and regulatory changes, government fiscal and monetary policy - including actions by the Federal Reserve, other foreign monetary units governing bodies, and investor and consumer confidence levels; weather conditions including hurricanes and other significant events, natural and other unnatural disasters like large oil spills that impact the production of commodities; war, acts of terrorism and any unforeseen market closures or disruptions in trading; real and perceived changes in the supply and demand of commodities under- lying the Vendor's service, including changes as a result of technological improvements; and credit quality of market participants, the availability of capital and the levels of assets under management. Any one or more of these factors may reduce trading activity, which could make the use of the Vendor Software less attractive, and in turn could further discourage existing and potential market participants and thus accelerate a decline in the level of trading activity and potentially related services such as data. Further, most of these factors are beyond the Vendor's control if any of these unfavourable conditions were to persist over a lengthy period of time and trading volumes were to decline substantially and for a long enough period. Global financial markets conditions and decreased trading volume may impact the Vendor Software's performance. The conditions in global financial markets will impact the Vendor Software's performance

Price movements for commodity interests are influenced by, among other things: changing supply and demand relationships; trade, fiscal, monetary, and exchange control programs and policies of governments; US and foreign political and economic events and policies; changes in national and international interest rates and rates of inflation; currency devaluations and revaluations; and emotions of the marketplace. None of these factors can be controlled by the Vendor and no assurance can be given that the Algorithmic trading will result in profitable trades, or that Customer will not incur substantial losses.

Revenues may decline due to competition from other alternative trading systems. A dramatic increase in computer-based or other electronic trading may adversely affect the Vendor Software's trading revenues, reduce participating in trading and associated access to market information and lead to the creation of new and stronger competitors. If the Vendor is unable to keep up with

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009625

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

rapid changes in technology and client preferences, the Vendor may not be able to compete effectively. The Vendor uses some open-source software in its technology, most often as small components within a larger product or service, to augment algorithms, functionalities or libraries the Vendor, its subsidiaries, or its affiliates create, and the Vendor may use more open-source software in the future. Open-source code is also contained in some third-party software the Vendor relies on. The Vendor Software may be harmed by computer and communications systems failures and delays. The Vendor and third party licensors support and maintain many of the systems that comprise of the Vendor Software and electronic platforms. The Vendor's or third party's failure to monitor or maintain these systems, or to find replacements for defective components within a system in a timely and cost-effective manner when necessary, could have a material adverse effect on the Vendor Software's performance.

The Vendor's systems, or those of its third party providers, may fail or be shut down or, due to capacity constraints, may operate slowly, causing one or more of the following: unanticipated disruption in service to its participants; slower response time and delays in its participants' trade execution and processing; incomplete or inaccurate accounting, recording or processing of trades; distribution of inaccurate or untimely market data to participants who rely on this data in their trading activity; or financial loss. The Vendor may experience system failures due to power or telecommunications failures, human error on the part of the Vendor's employees or on the part of its vendors or participants, natural disasters, fire, sabotage, hardware or software malfunctions or defects, computer viruses, cyber attacks, intentional acts of vandalism or terrorism and similar events. If any one or more of these situations were to arise, they could result in damage to the Vendor Software or electronic platform, which could prompt participants to trade elsewhere or expose the Vendor to litigation or regulatory sanctions. As a consequence, the Vendor Software's performance could suffer materially. Heavy use of computer systems during peak trading times or at times of unusual market volatility could cause those systems to operate slowly or even to fail for periods of time. However, the Vendor cannot assure the Customer that its estimates of future trading volume will be accurate or that the Vendor's systems will always be able to accommodate actual trading volume without failure or degradation of performance. Although many of the Vendor's systems are designed to accommodate additional volume and products and services without redesign or replacement, the Vendor will need to continue to make significant investments in additional hardware and software and telecommunications infrastructure to accommodate the increases in volume of order and trading transaction traffic and to provide processing and other services to third parties. If the Vendor cannot increase the capacity and capabilities of its systems to accommodate an increasing volume of transactions and to execute the Vendor's business strategy, its ability of its Vendor Software to achieve profitability would be adversely affected. The Vendor's systems and those of its third party service providers may be vulnerable to security risks, hacking and cyber attacks, which could result in wrongful use of the Vendor's and Customer's information.

### 7.   NO ASSURANCES

This agreement does not make any assurance that use of the Vendor Software will be profitable. Because automated trading, trading software and investment advisory services, like many other industries, historically has been categorized by rapid regulatory changes and intense competition, specific market conditions may result in occasional or permanent reduction in the gains and amount of capital in the Customer's brokerage account. Trading volume on the Vendor's platform is driven by the degree of volatility - the magnitude and frequency of fluctuations - in prices and levels of the underlying commodities, forex, financial benchmarks or other

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009626

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

instruments. Volatility increases the need to hedge price risk and creates opportunities for speculative or arbitrage trading. Were there to be a sustained period of stability in the prices or levels of the underlying commodities, securities, forex, benchmarks or other instruments, the Vendor Soft- ware may experience lower trading volumes, slower growth or declines in profitability.

### 11.8 REGULATORY RISKS

The Vendor's businesses and those of many of its clients have been and continue to be subject to increased legislation and regulatory scrutiny, and the face the risk of changes to this regulatory environment and business in the future. The Vendor is and will continue to be subject to extensive regulation in the jurisdictions around the world in which it operates, and in particular in the

U.S. The Vendor faces the risk of significant actions by regulatory and taxing authorities in all jurisdictions in which the Vendor conducts its businesses and hold investments that may affect its business, the activity of its market participants, and as a consequence, the Vendor Software's results. Among other things, as a result of regulators enforcing existing laws and regulations, the Vendor could be censured, fined, prohibited from engaging in some of its business activities, subjected to limitations or conditions on its business activities or subjected to new or substantially higher taxes or other governmental charges in connection with the conduct of the Vendor's business or with respect to its employees. The Vendor's compliance and risk management methods, as well as the Vendor's fulfillment of its regulatory obligations, might not be effective. The Vendor's ability to comply with complex and changing laws and rules is largely dependent on its establishment and maintenance of compliance, audit and reporting systems. While the Vendor has policies and procedures to identify, monitor and manage its risks and regulatory obligations, the Vendor cannot assure that its policies and procedures will always be effective or that the Vendor will always be successful in monitoring or evaluating the risks to which the Vendor is or may be exposed. If the Vendor fails to comply with any of these obligations, regulators could take a variety of actions that could impair the Vendor's ability to conduct its business.

## 11.  LIMITATIONS OF LIABILITY

1.      *No Consequential Damages*

NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR EXEMPLARY, PUNI-TIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUD-ING WITHOUT LIMITATION, INTERRUPTION OF BUSINESS, LOST PROFITS, LOST OR CORRUPTED DATA OR CONTENT, LOST REVENUE ARISING OUT OF THIS AGREE-MENT (INCLUDING WITHOUT LIMITATION THE SERVICE, THE USE OF THE SERVICE OR THE INABILITY TO USE SERVICE), EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009627

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

2.      *DIRECT DAMAGE LIMITATIONS*

2.1.   IN NO EVENT SHALL THE AGGREGATE LIABILITY OF VENDOR OR ANY THIRD PARTY VENDORS ARISING OUT OF OR IN CONNECTION WITH THIS AGREE-MENT, INCLUDING ANY LICENSE, USE, OR OTHER EMPLOYMENT OF THE SERVICE, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON BREACH OR REPUDIATION OF CONTRACT, BREACH OF WARRANTY, TORT, OR OTHERWISE, EX- CEED THE TOTAL AMOUNTS ACTUALLY PAID BY CUSTOMER IN THE ONE (1) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. THERE SHALL BE ONLY ONE AGGREGATE LIABILITY CAP UNDER THIS AGREEMENT EVEN IF THERE ARE MULTIPLE CLAIMS; EACH CLAIM SHALL REDUCE THE AMOUNT AVAILABLE IN THE AGGREGATE LIABILITY CAP.

2.2.   EXCEPT FOR A FAILURE OF VENDOR TO COMPLY WITH ITS OBLIGATIONS WITH RESPECT TO BACKUP SERVICES, AND SUBJECT TO SECTION 12.2.1 ABOVE, VENDOR SHALL NOT BE LIABLE FOR ANY DAMAGES RESULTING FROM THE LOSS OR CORRUPTION OF ANY DATA OR CONTENT WHETHER RESULTING FROM DE- LAYS, NONDELIVERIES, MISDELIVERIES, SERVICE INTERRUPTIONS OR OTHER- WISE.

3.      *EXCLUSIONS*

THE LIMITATIONS OF LIABILITY SET FORTH IN SECTIONS 12.1 AND 12.2 SHALL NOT APPLY WITH RESPECT TO: (I) DAMAGES TO PERSONS AND/OR TANGIBLE PROP-ERTY OCCASIONED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, (II) BREACHES BY CUSTOMER OF LICENSE TERMS APPLICABLE TO VEN-DOR PROVIDED SOFTWARE AND THIRD PARTY PRODUCTS AS SET FORTH IN SEC-TION 2 ABOVE, (III) CUSTOMER'S UNAUTHORIZED USE OF VENDOR'S OR THIRD PARTY VENDOR'S INTELLECTUAL PROPERTY, MATERIALS OR ASSETS; (IV) DAM-AGES INCURRED AS A RESULT OF A BREACH BY A PARTY OF ITS OBLIGATIONS UNDER SECTION 7.8 THAT RESULT IN THE DISCLOSURE OF CONFIDENTIAL INFOR-MATION OF THE OTHER PARTY, OR (V) CLAIMS THAT ARE THE SUBJECT OF INDEMNIFICATION PURSUANT TO SECTION 13 (WHICH ARE SUBJECT TO THE LIMITS, IF ANY CONTAINED THEREIN). DAMAGES AS LIMITED BY THIS SECTION 12 ARE CUS- TOMER'S SOLE AND EXCLUSIVE REMEDY IF ANOTHER REMEDY IS PROVIDED AND SUCH REMEDY IS DEEMED TO FAIL OF ITS ESSENTIAL PURPOSE.

## 12. INDEMNIFICATION

### *12.1. Personal Injury and Property Damage*

Each party (the **"Indemnifying Party"**) agrees to defend at its expense and indemnify and hold harmless the other party and its affiliates, directors, officers, employees, agents, successors and assigns (each an **"Indemnified Party"**), in accordance with the procedures described in this Section, from and against any and all losses, costs, damages, liabilities and expenses including without limitation, reasonable legal fees and expenses paid to or for the benefit of an unaffiliated third party (collectively, **"Losses"**) arising from or in connection with any such third party claim

Page 14 of 19

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

for:

(i) the death or bodily injury of any person caused by the negligence or willful misconduct of the Indemnifying Party; or (ii) the damage, loss or destruction of any real or tangible personal property caused by the negligence or willful misconduct of the Indemnifying Party.

### 12.2.   Infringement

Vendor will indemnify, defend and hold harmless Customer for Losses Customer incurs as a direct result of any unaffiliated third party claim based on any claim that the Service infringes any U.S. copyright, trademark or trade secret, except to the extent resulting from (i) Customer's modification of the Service or combination by Customer the Services with other products or services if the Service would not have been infringing but for such combination or modification, (ii) Customer's use of the Service in a manner not authorized herein or for which it was not designed, (iii) Customer's failure to use an updated non-infringing version of the applicable intellectual property to the extent Customer was notified that the update cured an infringement, (iv) changes to the Service made by Vendor at the direction of the Customer or (v) Customer Data. If any item for which Vendor has an indemnification obligation under this Section becomes, or in Vendor's reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceed- ing, Vendor will, in addition to indemnifying Customer as provided in this Section, promptly take the following actions, at no additional charge to Customer, in the listed order of priority: (a) secure the right to continue using the item or (b) replace or modify the item to make it non-infringing. If neither of such actions can be accomplished by Vendor using commercially reasonable efforts, and only in such event, Vendor will remove the item from the Service and the applicable Service fee will be equitably adjusted to reflect such removal. This Section 13.2 states Customer's sole and exclusive remedy for Vendor's infringement or misappropriation of intellectual property of a third party.

### 12.3.   Customer's Indemnity

Customer shall defend and indemnify Vendor and its Third Party Vendors against any and all Losses incurred by Vendor and its Third Party Vendors arising out of or in connection with a claim by a third party (i) alleging that the Customer Data or the Customer Trademarks, or any use thereof, infringes the rights of, or has caused harm to, a third party, or (ii) arising out of Customer's breach of Sections 7.5 and 7.8.

Customer will indemnify, defend and hold harmless Vendor, its affiliates, successors, and assigns, including the applicable officers, directors, employees, and agents thereof for damages, costs and attorneys' fees Vendor incurs from any unaffiliated third-party claim arising from Customer's Content or Customer's or any end user's use of the Services.

### 12.4.   Indemnification Procedures

The party seeking indemnification shall give prompt notice of the claim and will tender the defence; provided, however, that such party's failure to provide notification shall not affect the indemnifying party's indemnification obligations except to the extent that the failure to notify delays or prejudices the indemnifying party's ability to defend the applicable claim. The indemnifying party shall conduct the defense and shall have control of the litigation, and the indemnified party shall cooperate in defending against the claim. The indemnified party shall have the right, at any time and at its own expense, to participate in the defense of the claim with counsel of its own choosing. The indemnifying party shall not make any settlement of the claim that results in any liability or imposes any obligation on the indemnified party without the prior written consent of

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                              JH_00009629

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

the indemnified party. If the indemnifying party fails to (i) respond to the notice of a claim, or (ii) assume the defense of a claim, the party seeking indemnification shall have the right to defend the claim in such manner as it may deem appropriate, at the reasonable cost, expense, and risk of the indemnifying party, and the indemnifying shall promptly reimburse the indemnified party for all such costs and expenses.

## 13. NOTICES

Except as otherwise provided in Section 7.4 above, any notice required or permitted under the terms of this Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by registered or certified mail return receipt requested, (c) sent by overnight courier, (d) sent by facsimile (with a hard copy mailed on the same date), (e) by email whose receipt is acknowledged by an officer of the receiving Party. If to Customer, a notice shall be forwarded to Customer at the address provided on the signature page herein. Notices shall be considered to have been given at the time of actual delivery in person, five business days after posting if by mail, one business day if by overnight courier service, or upon receipt of machine confirmation of successful transmission by facsimile or email as described herein.

## 14. SURVIVAL

The following provisions shall survive any termination of this Agreement: Sections 5, 7, 8, 10, 11, 12, 13, 14, 19 and 20.

## 15. NO ASSIGNMENT

Customer may not assign this Agreement without the prior written approval of Vendor. Any purported assignment in violation of this section shall be void.

## 16. U.S. GOVERNMENT RESTRICTED RIGHTS

Any use of the Service by or on behalf of the United States of America, its agencies and/or instrumentalities ("U.S. Government"), is provided with Restricted Rights. Use, duplication, or disclosure by the U.S. Government is subject to restrictions as set forth in subparagraph I(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 or subparagraphs I(1) and (2) of the Commercial Computer Software – Restricted Rights at 48 CFR 52.227- 19, as applicable.

## 17. FORCE MAJEURE

Neither party will be liable to the other for any failure or delay in the performance of such party's non-monetary obligations due to causes beyond its control, such as failure or delay caused, directly or indirectly, by fire, flood, earthquakes, other elements of nature, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, epidemics, communications line or power failures, or governmental laws, court orders, and regulations imposed after the fact.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009630

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

## 20  GENERAL PROVISIONS

Any action related to this Agreement will be governed by Florida law and controlling U.S. federal law. No choice of law rules of any jurisdiction will apply. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Service shall be subject to the exclusive jurisdiction of the state and federal courts located in Miami-Dade, Florida. This Agreement, together with the Schedules annexed hereto, represents the parties' entire understanding relating to the use of the Service and supersedes any prior or contemporaneous, conflicting or additional, communications. No text or information set forth shall add to or vary the terms and conditions of this Agreement. If any provision of this Agreement is held by a court of competent juris- diction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect. No joint venture, partnership, employment, or agency relation- ship exists between Vendor and Customer as a result of this Agreement or use of the Service. The failure of Vendor to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Vendor in writing Vendor re- serves the right to assign its right to receive and collect payments hereunder. Any rights not expressly granted herein are reserved by Vendor.

**IN WITNESS WHEREOF**, this Agreement is duly executed by an authorized representative of both parties as of the Effective Date.

|                         |                         |
|-------------------------|-------------------------|
| **Vendor**              | **Client**              |
| Signed: _John Fortini_  | Signed: _S. L._         |
| On Behalf of Algo Capital | Name: _S. L._         |
| Date: 7/1/2022          | Date: 7/1/2022          |
|                         |                         |
|                         | **Address:**            |
|                         | Redacted                |
|                         | Solihull                |
|                         | B92 7FJ                 |

Page 17 of 19

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009631

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

### Schedule A – Vendor Licensed Software

The licenses set forth below shall be available to Customer during the term of the agreement.

| Licensed Software | Number of Shared Servers | Number of Named Users |
|---|---|---|
| Algo Capital Software | 1 | 1 |

### DESCRIPTION OF SERVICE:

The primary target of this algorithmic trading program is a continuous growth of the initial account budget. Strong development of the account balance by minimizing risks is the main aim of the Vendor Software. This is accomplished by the placement of trades and its related hedge trades in a very specific manner: combined with an advanced close logic which allows a balanced development of founds secured by a precisely calculated account size correlated to the trading volume.

The design as well as the code programming part of the main algorithms contained in the Vendor Software follows some well-known principles initially described by Ralph Nelson Elliot and Fibonacci, as well as some additional fundamental and widely known paradigms. This very specific combination of components finally results in much more than only the simple summary of its parts.

In order to activate the service, Customer must select a broker, fund the brokerage account, and send an email to Vendor including the credentials for the brokerage account and instruction to activate the Vendor Software. After receiving instruction from the Customer, the Vendor shall activate the Vendor Software.

The Vendor Software shall use a proprietary intraday automated strategy that places, exits and monitors the trades, on behalf of the Customer. By activating the Vendor Software, the Customer assumes any and all risks associated with the Vendor Software, including risks highlighted in Section 10, 11, and any other occurrence that could result in financial injury to the Customer.

To deactivate the Vendor Software, Customer must email Vendor as outlined in Schedule B. Vendor shall deactivate the Vendor Software within twenty-four (24) hours after the close of any outstanding trade.

Broker Requirements:

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009632

DocuSign Envelope ID: 36206702-8A46-47A2-80E0-C22B90DBDC8E

Customer shall select a broker which meets the following specifications: must be an ECN Broker; use Metatrader and/or Ninjatrader platform; accepts US-based clients; have Webtrader accessibility; API access FIX/REST.

Broker options include but are not limited to: MyFXChoice.com; TheTradersDomain.com; Oanda.com; Forex.Com

## SCHEDULE B – PRODUCT SUPPORT

During the Term of this Agreement and for so long as Customer is entitled to receive the Service hereunder, Vendor shall provide the following Product Support Services through its Support Centers ("SC") for the Vendor Software as follows

a. The SC will be the primary point of contact for all product support inquiries. The SC may be contacted via email at SUPPORT@ALGOCAPITAL.COM
b. The SC will receive, log, and respond to inquiries within 24 hours from the Customer concerning errors or defects in the Vendor Software.

## SCHEDULE C

Vendor and Customer have agreed on the following services, which is based on data from Customer, industry and vendor software.

BASE COMPONENTS:

    Access to Vendor Software

    Vendor Managed Shared Servers

    Vendor Managed Web Support

    Vendor Managed Firewalls and Managed VPN

Assumptions
- Vendor assumes that Customer will continue to pay support and maintenance for the user licenses.
- Customer shall keep a funded brokerage account which the Vendor Software will use to execute trades on behalf of the Customer.
- Customer users will access the service via emailing Vendor for authorization.

**\*A $40 bank wire fee will be deducted from initial funds upon account activation. This deduction will be reflected on your account balance\***

Page 19 of 19

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009633

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

# SOFTWARE AS A SERVICE AGREEMENT



**EXHIBIT**

**174**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

This **Software As a Service Agreement** (the "Agreement") is made as of ___7/5/2021___
("Effective Date") between ~~Redacted~~ _____, with principal residential address at
~~Redacted~~, Borehamwood WD6 2BH

("Customer") and Algo Capital, LLC, a Florida limited liability company, with its principal
office at 3250 NE 1st Ave, Ste 208, Miami, FL 33137 ("Vendor").

**WHEREAS,** Vendor is in the business of supplying software applications and related services
to companies in the financial services industry, including, among other things, algorithmic trading
software in the forex and non-security cryptocurrency markets;

**WHEREAS,** Customer is a [entity or person] that desires the use of the Vendor's proprietary
algorithmic trading software application products and services; and

**WHEREAS,** Vendor and Customer desire to enter into this Agreement defining their respective
rights and responsibilities and memorializing the terms and conditions pursuant to which Vendor
will provide to Customer the Services for a fee.

**NOW, THEREFORE,** in consideration of the mutual promises and agreements contained
herein, the parties intending to be legally bound hereby agree as follows:

## Definitions

a.  **"aaS"** is an acronym for "As A Service" and means the combined software and support
services provided in this Agreement.

b.  **"Base Components"** means the software environment as specified in Schedule C that Vendor
makes available for use by Customer as part of the Service.

c.  **"Cloud Hosting"** means the provision of products and services in a hosted, virtualized
environment, accessible via the internet.

d.  **"Vendor Software"** means Vendor proprietary software applications and user interfaces as
defined in Schedule A and made available to Customer by Vendor as part of the Service.
Vendor Software may contain third-party components licensed to Vendor.

e.  **"Customer Data"** means all data, files, including hypertext markup language files,
documents, audio and visual information, graphics, scripts, programs, applets or servlets that
Customer creates, installs, uploads to or transfers in or through the Service or provides in the
course of using the Service, excluding identification and other information provided by
Customer relative to Customer Users.

f.  **"Electronic Communications"** shall mean any transfer of signs, signals, text, images,
sounds, data or intelligence of any nature transmitted in whole or part electronically to or
from the Service.

g.  **"Product Support Services"** shall mean the support provided by Vendor to remediate,

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009878

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

correct, or abate errors in the Vendor Software.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009879

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

h. **"Service"** shall mean the software in a hosted environment provided and maintained by Vendor to which Customer is being granted access under this Agreement via activating the VendorSoftware as outlined in Schedule A.

i. **"Term"** means any Initial Term and/or Renewal Term as defined in Section 6 of this Agreement.

j. **"Third Party Products"** means application software products provided by third party vendors, including operating system and application software with which the Vendor Software interfaces and which provides certain functionality essential to the operation of the Vendor Software. Third Party Products are licensed to Vendor for incorporation and use in the hostedenvironment as part of the Service as set forth in the Statement of Work. For the sake of clarity,the term Third-Party Products does not refer to third-party software components or brokerageaccounts, if any, incorporated or used by, the Vendor Software.

k. **"User(s)"** means Customer's employees, representatives, consultants, contractors or agents who are authorized to use the Service and have been supplied user identifications and pass-words by Customer or on Customer's behalf.

## 1. PROVISION OF SERVICES

In consideration of the fees paid by Customer under this Agreement, Vendor agrees to provide Customer access to the Service. Specific components of the Service to be provided to Customer are as outlined in the Schedules annexed hereto.

## 2. LICENSE GRANTS

Subject to the terms and conditions of this Agreement, Vendor grants to Customer during the Term of this Agreement the non-transferable, non-exclusive worldwide right to permit Users to (a) use the Service, including the Base Components thereof (b) use the any training material solely in connection with the Service, all solely for Customer's own internal business operations. Customer acknowledges and agrees that the license granted, for the items listed in Schedule A herein, is nota concurrent user license and that the rights granted to Customer in this Agreement are subject to all of the following agreements and restrictions: (i) the maximum number of Users that Customer authorizes to access the Service shall not exceed the number of licenses Customer has been granted,as set forth in Schedule A; (ii) licenses cannot be shared or used by more than one individual User;

(iii) Customer shall not license, sell, rent, lease, transfer, assign, distribute, display, host, outsource, disclose or otherwise commercially exploit or make the Service available to any third party other than an authorized User; (iv) Customer shall not modify, make derivative works of, disassemble, reverse compile, or reverse engineer any part of the Service, including without limitation the Vendor Software and that are provided as a part thereof, or access the Service in order to build a similar or competitive product or service; (v) Customer shall not create Internet "links" to the Service or "frame" or "mirror" any part of the Service, including any content contained in the Service, on anyother server or device; (vi) except as expressly stated herein, no part of the Service may be copied,reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form orby any means, including but not limited to electronic, mechanical, photocopying, recording, or other means; (vii) Customer agrees to make every reasonable effort to prevent unauthorized thirdparties from accessing the Service; (viii) Customer acknowledges and agrees that Vendor or its Third Party Vendors shall own all right, title and interest in and to all

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009880

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

intellectual property rights in the Service and any suggestions, enhancement requests, feedback, or recommendations provided by Customer or its Users relating to the Service or, including all unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, know-how and other trade secret rights, and all other intellectual property rights, derivatives or improvements thereof; (ix) unauthorized use, resale or commercial exploitation of any part of the Service in any way is expressly prohibited; (x) Customer does not acquire any rights in the Service, express or implied, other than those expressly granted in this Agreement and all rights not expressly granted to Customer are reserved by Vendor and Third Party Vendors; and (xi) this Agreement is not a sale and does not convey any rights of ownership in or related to the Service, VendorSoftware, Third Party Products, to Customer.

## 3.   LICENSES FROM CUSTOMER

Subject to the terms and conditions of this Agreement, Customer grants to Vendor and its Third Party Vendors the non-exclusive, non-transferable worldwide right to copy, store, record, transmit, display, view, print or otherwise use (a) Customer Data solely to the extent necessary to provide the Service to Customer, and (b) any trademarks that Customer provides Vendor for the purpose of including them in Customer's user interface of the Service ("Customer Trademarks"). Customer acknowledges and agrees that Customer Data and information regarding Customer and Customer's Users that is provided to Vendor and its Third Party Vendors in connection with this Agreement may be (a) processed by Vendor and its Third Party Vendors to the extent necessary to provide the Service and (b) transferred outside of the country or any other jurisdiction where Customer and Customer's Users are located. In addition, Customer acknowledges and agrees that it is Customer's obligation to inform Customer's Users and customers of the processing of Customer Data and information regarding Customer and Customer's Users pursuant to this Agreement and to ensure that such Users and customers have given any necessary consent to such processing as required by all applicable data protection legislation. Customer shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness and copyright of all Customer Data and information regarding Customer and Customer's Users. Customer agrees that the license to the Customer Data shall survive termination of this Agreement solely for the purpose of storing backup Customer Data in accordance with the terms of this Agreement.

## 4.   PROPRIETARY RIGHTS

Customer acknowledges and agrees that the Service and any necessary software used in connection with the Service contain proprietary and confidential information that is protected by applicable intellectual property and other laws. Customer further acknowledges and agrees that the content or information presented to the Customer through the Service may be protected by copyrights, trademarks, service marks, patents or other proprietary rights and laws. Except where expressly provided otherwise by Vendor, nothing in the Service, or the Agreement shall be construed to confer any license to any of Vendor's (or its third party manufacturer's, author's, developer's, vendor's, and service provider's ("Third Party Vendors"), intellectual property rights, whether by estoppel, implication, or otherwise. Without limiting the generality of the foregoing, any names or trademarks of the Vendor Software listed on Schedule A and other Vendor service marks, logos and product service names are marks of Vendor (the "Vendor

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                                                                    JH_00009881

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Marks"). Customer agrees not to display or use the Vendor marks, or the marks of any Third Party Vendor, in any manner without the owner's express prior written permission. Vendor reserves the right to subcontract any or all services provided hereunder to third parties.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009882

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

## 5. LICENSE FEE, TERM AND PAYMENT

The initial term ("Initial Term") of this Agreement will commence on the Effective Date on a month-to-month basis, until such time as either party provides thirty (30) days' written notice to the other party of its intent to cancel the Agreement. Customer shall pay Vendor the fee detailed in the Payment Schedule set forth below.

Payment Schedule: Customer agrees to pay a monthly licensing fee to the Vendor for the use of the Vendor Software, which shall be calculated on performance as follows:

Initial Investment Amount: $15,000.00

Conservative Fund: 15% of monthly gain

Invoices shall be payable within five (5) days after receipt thereof. In addition to any remedies Vendor may have pursuant to this Agreement or at law for non-payment, delinquency in payment may result in a delay or suspension of the right to use the Service. In the event Vendor incurs any costs (including reasonable attorney's fees) from efforts collecting overdue fees from Customer, Customer agrees to pay such costs. Customer further agrees to pay all foreign, federal, states, and local taxes, if applicable, to Customer's access to, use, or receipt of the Service.

## 6. TERMS OF SERVICE

### 6.1. Service Extensions or Updates

Customer further agrees that, unless explicitly stated otherwise, any new features that augment or enhance the Service, and or any new service subsequently purchased by Customer pursuant to an amendment accepted by Vendor referencing this Agreement will be subject to this Agreement.

### 6.2. Customer Must Have Internet Access

In order to use the Service, Customer must have or must obtain access to the World Wide Web, either directly or through devices that access Web-based Content. Customer must also provide all equipment necessary to make (and maintain) such connection to the World Wide Web.

### 6.3. Email and Notices

Customer agrees to provide Vendor with Customer's e-mail address (es), and to accept emails (or other Electronic Communications) from Vendor at the e-mail address Customer specifies. Not- withstanding any provision in the Agreement to the contrary, acknowledgement by an officer of Customer is not required with respect to e-mail communications pertaining to the Customer's routine use of the Service, including without limitation communications relating to the support, maintenance, or the updating of the Service. Customer further agrees the Vendor may provide any and all required notices including legal notices to Customer through either e-mail (or other electronic transmission), or by mail or express delivery service in accordance with Section 14.

### 6.4. Passwords, Access, and Notification

FOIA - CONFIDENTIAL TREATMENT REQUESTED JH_00009883

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Customer may designate up to the number of Users that corresponds to the number of permitted Users set forth in Schedule A. Customer will provide and assign unique password and user names to each authorized User for each license purchased. Customer acknowledges and agrees that Customer is prohibited from sharing passwords and or user names with unauthorized users. Customer will be responsible for the confidentiality and use of Customer's (including its employees') pass-words and user names. Customer will also be responsible for all Electronic Communications, including those containing business information, account registration, account holder information, financial information, Customer Data, and all other data of any kind contained within emails or otherwise entered electronically through the Service or under Customer's account. Vendor will act as though any Electronic Communications it receives under Customer's passwords, User name, and/or account number will have been sent by Customer. Customer agrees to notify Vendor if Customer becomes aware of any loss or theft or unauthorized use of any of Customer's passwords, user names, and/or account number.

### 6.5. *Customer's Responsibilities*

Customer agrees to comply with all applicable national and foreign laws, treaties, regulations and conventions in connection with its use of the Service, including without limitation those related to data privacy, international communications, and the exportation of technical or personal data. Customer will ensure that any use of the Service by Customer's Users is in accordance with the terms of this Agreement. Customer agree to notify Vendor immediately of any unauthorized use of any password or account or any other known or suspected breach of security or any known or suspected distribution of Customer Data. Customer acknowledges and agrees that the Service is subject to the U.S. Export Administration Laws and Regulations. Customer agrees that no part of the Service or information obtained through use of the Service, is being or will be acquired for, shipped, transferred, or re-exported, directly or indirectly, to proscribed or embargoed countries or their nationals, nor be used for nuclear activities, chemical biological weapons, or missile projects unless authorized by the U.S. Government. Proscribed countries are set forth in the U.S. Export Administration Regulations and are subject to change without notice, and Customer must comply with the list as it exists in fact. Customer certifies that neither Customer nor any Users are on the U.S. Department of Commerce's Denied Persons List or affiliated lists or on the U.S. Department of Treasury's Specially Designated Nationals List. Customer agrees to comply strictly with all U.S. export laws and assumes sole responsibility for obtaining licenses to export or re-export as may be required. Any unauthorized use of the Service may violate copyright laws, trademark laws, the laws of privacy and publicity, and communications regulations and statutes. The Customer also certifies that they will not use the Vendor Software to circumvent any applicable Anti-Money Laundering, Bank Secrecy, or Know Your Customer regulations. The Service may use encryption technology that is subject to licensing requirements under the U.S. Export Administration Regulations, 15 C.F.R. Parts 730-774 and Council Regulation (EC) No. 1334/2000.

In addition to its responsibilities in this Agreement, Customer is responsible for all Customer responsibilities indicated in the Schedules attached hereto or entered into pursuant hereto and all other responsibilities not designated as responsibilities of Vendor.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009884

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E7B-A6DF-0195FA4A93C5

Customer is solely responsible for obtaining all licenses and permissions necessary related to the Content, including without limitation licenses for any third-party software included in the Content.

Customer shall not resell the Services directly or indirectly to third parties.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009885

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

### 6.6.   Transmission of Data

Customer understands that the technical processing and transmission of Customer's Electronic Communications is fundamentally necessary to Customer's use of the Service. Customer expressly consents to Vendor's interception and storage of Electronic Communications and/or Customer Data, and Customer acknowledges and understands that Customer's Electronic Communications will involve transmission over the internet, and over various networks, only part of which may be owned and/or operated by Vendor. Customer acknowledges and understands that changes to Customer's Electronic Communications may occur in order to conform and adapt such data to the technical requirements of connecting networks or devices. Customer further understands that Electronic Communications may be accessed by unauthorized parties when communicated across the Internet, network communications facilities, telephone, or other electronic means. Customer agrees that Vendor is not responsible for any Electronic Communications and/or Customer Data which are lost, altered, intercepted or stored without authorizations during the transmission of any data whatsoever across networks not owned and/or operated by Vendor.

### 6.7.   Vendor's Support

Vendor will make commercially reasonable efforts to promote Customer's successful utilization of the Service, including but not limited to maintenance and support, providing Customer with phone and on-line help, and product support as set forth in Schedule B. Product Support pertains to support designed to remedy errors in Vendor Software.

### 6.8.   Confidential Information

Each party may have access to information that is confidential to the other party ("Confidential Information"). For purposes of this Agreement, Confidential Information shall include any infomation that is clearly identified in writing at the time of disclosure as confidential as well as any information that, based on the circumstances under which it was disclosed, a reasonable person would believe to be confidential. Customer's Confidential Information shall include, but not be limited to, Customer Data. A party's Confidential Information shall not include information that

(i) is or becomes a part of the public domain through no act or omission of the other party; (ii) was in the other party's lawful possession prior to the disclosure without any obligation of confidentiality and had not been obtained by the other party either directly or indirectly from the disclosing party; (iii) is lawfully disclosed to the other party by a third party without restriction on disclosure;

(iv) is independently developed by the other party without use of or reference to the other party's Confidential Information, as established by written records. The parties agree to use commercially reasonable efforts not to make each other's Confidential Information available in any form to any third party. Notwithstanding the foregoing, Customer acknowledges and agrees that Vendor may disclose Customer's Confidential Information to its Third Party Vendors solely to the extent necessary to provide products or services under this Agreement. This Section will not be construed to prohibit disclosure of Confidential Information to the extent that such disclosure is required by law or valid order of a court or other governmental authority; provided,

FOIA - CONFIDENTIAL TREATMENT REQUESTED JH_00009886

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

however, that a party who has been subpoenaed or otherwise compelled by a valid law or court order to disclose Confidential Information (the "Responding Party") shall first have given sufficient and prompt written notice to the other party of the receipt of any subpoena or other request for such disclosure, so as to permit such party an opportunity to obtain a protective order or take other appropriate action. The Responding Party will cooperate in the other party's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be afforded the Confidential Information. If the Responding Party is compelled as a matter of law to disclose the Confidential Information, it may disclose to the party compelling the disclosure only that part of the Confidential Information as is required by law to be disclosed.

Notwithstanding anything to the contrary in this Agreement, Content is not included in Confidential Information as defined above. To the extent Vendor has any access to Content in the course of providing the Services, Vendor's entire obligation to keep Content confidential is stated in this Section below. Vendor shall not, intentionally (i) access Customer's Content or (ii) disclose Customer's Content to any third party, except to the extent: (a) Customer makes its Content publicly available, (b) as necessary for Vendor to provide, or obtain third-party supplier support for, the Services or to provide information requested by Customer, or (c) as specifically authorized by Customer in writing. Vendor's obligation to protect Content from unauthorized use, access or disclosure is: (i) to provide the Security Services specifically set forth in this Agreement and (ii) maintain and enforce the then-current standard Vendor security policies and standards applicable to the Services as practiced at the service locations from which Vendor is providing the Services to Customer.

The obligations in this Section shall not apply to the recipient of Confidential Information and/or Vendor with respect to Content to the extent disclosure of Confidential Information or Content is required to comply with laws or respond to requests by a regulatory or judicial body and/or as otherwise required for legal process. In the event that any such disclosure is required, the recipient, and/or Vendor with respect to Content, reserves the right to charge the other party on a time-and-materials basis for recipient's/Vendor's reasonable efforts related to its compliance and response, including, if applicable, reasonable attorney's fees.

## 7.   SUSPENSION/TERMINATION

### 7.1.   Suspension for Delinquent Account

Vendor reserves the right to suspend Customer's access and/or use of the Service for any account for which any payment is due but remains unpaid after five day's written notice of such delinquency. Customer agrees that Vendor shall not be liable to Customer, or to any third party, for any suspension of the Service resulting from Customer's non-payment of the fees as described in this Section.

### 7.2.   Suspension for Ongoing Harm

Customer agrees that Vendor may, with reasonably contemporaneous telephonic or electronic mail notice to Customer, suspend Customer's access to the Service if Vendor reasonably concludes that Customer's use of the Service is causing immediate and ongoing harm to Vendor or others.

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                                   JH_00009887

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Vendor will use commercially reasonable efforts to resolve the issues causing the suspension of Service. Customer agrees that Vendor will not be liable to Customer or to any third party for any suspension of the Service under such circumstances as described in this Section.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009888

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

### 7.3.  In the Event of a Breach

A. Either party may terminate this Agreement upon sixty (60) days' written notice to the other party in the event of a breach of any material obligation under this Agreement, provided that the alleged breach is not cured during the sixty (60) day notice period. Upon termination or expiration of this Agreement, Customer shall have no rights to continue use of the Service.

B. Customer may cancel this Agreement, to be effective at the end of the then current Term, by providing Vendor with at least thirty (30) days' prior written notice

### 7.4.  Handling of Customer Data In the Event of Termination

Customer acknowledges and agrees that following termination of this Agreement, Customer shall return all related materials to Vendor and Vendor may immediately deactivate Customer's ac- count. Furthermore, unless otherwise agreed-upon by the Parties in writing, Vendor shall remove or overwrite all applicable Content from Vendor's systems following the effective date of termination or cancellation. Prior to any such deletion or destruction, however, Vendor shall either (1) grant Customer reasonable access to the Service for the sole purpose of Customer retrieving Customer Data or (2) transfer all Customer Data to other media for delivery to Customer. Customer agrees that Vendor shall not be liable to Customer or to any third party for any termination of Customer access to the Service or deletion of Customer Data, provided that Vendor is in compliance with the terms of this Section. Notwithstanding the foregoing, nothing shall preclude Vendor from maintaining one copy of Customer Data if required by law.

### 8.5  Handling of Application In the Event of Termination

Customer data, Customer license keys used in hosting, accessing brokerage accounts, and Customer application documentation updated during the period by application support would be re- turned to the Customer within fifteen (15) days of the effective date of termination.

## 8.  MODIFICATION/DISCONTINUATION/MAINTENANCE

### 8.1.  Modification to or Discontinuation of the Service

Vendor reserves the right at any time and from time to time to modify, temporarily or permanently, the Service (or any part thereof), provided such modification does not diminish the functionality of the Service to the Customer on which the Customer materially relies. Notwithstanding the foregoing, except for routinely scheduled down time, or as otherwise provided in this Agreement, Vendor shall use commercially reasonable efforts to notify Customer prior to any such modification; further, Vendor shall consider the Customer's validation needs and requirements in connection with any modification of the Service and, except as otherwise noted in Section 8.3, shall validate the Service as modified to the same extent provided in the Schedules. Customer acknowledges that Vendor reserves the right to discontinue offering the Service at the conclusion of Customer's then current Term. Customer agrees that Vendor will not be liable to Customer or any third party for any modification or discontinuance of the Service as described in this Section 9.

### 8.2.  Modification to Third Party Software and Support Cost

In the event that Vendor incur any increased cost from Third party software licenses or annual

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009889

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

support fees during the term of this agreement, Vendor reserves the right to pass these costs onto the Customer.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009890

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

### *8.3. Maintenance*

In order to perform maintenance, including application upgrades, there will be routinely scheduleddown time. Vendor further reserves the right on approximately a monthly basis to issue new re- leases in which Vendor adds functionality to the Service. Customer acknowledges that these periodic major releases can take several hours to complete (up to eight hours). Vendor shall consult with the Customer and, unless, shall install such major releases during routinely scheduled down time as set forth above

In the event that Vendor, in its sole discretion, determines that any unscheduled maintenance is necessary, Vendor will use commercially reasonable efforts to notify Customer as soon as it be-comes aware of such need.

## 9. WARRANTIES

### *9.1. Warranty of Functionality*

Vendor warrants to Customer during the Term of this Agreement that the Service will comply with the material functionality described in the Schedule A and that such functionality will be maintained in all material respects in subsequent upgrades to the Service, subject to risks outlined in Section 10. Customer's sole and exclusive remedy for Vendor's breach of this warranty shall be that Vendor shall use commercially reasonable efforts to correct such errors or modify the Serviceto achieve the material functionality described in within a reasonable period of time. However, Vendor shall have no obligation with respect to this warranty claim unless notified of such claim within (30) days of the first material functionality problem. Further, Vendor shall have no obligation with respect to this warranty claim, and Customer may not terminate the Agreement, where any alleged nonconformity is due to User error as reasonably determined by the parties after investigation and analysis by Vendor. Vendor does not warrant that the Service will be free of non-material errors, bugs, or minor interruption, or that all such errors will be corrected.

### *9.2. Data Maintenance and Backup Warranty*

In the event of a breach of this provision, Vendor will use commercially reasonable efforts to correct Customer Data or restore Customer Data within three (3) business days (or as otherwise agreed in writing between the parties depending upon the back-up options selected by Customer). Provided Vendor complies with the procedures set forth in Schedule D, it shall be deemed to havesatisfied its obligation with respect to this warranty.

### *9.3. Non-Infringement Warranty*

Vendor warrants that it is the sole owner of and or has full power and authority to grant the license and use of the Service and other rights granted by the Agreement to Customer with respect to the Service and that neither the performance by Customer in its utilization of the Service, nor the license of and authorized use by Customer of the Service as described herein, will in any way constitute an infringement or other violation of any U. S. copyright, trade secret, trademark, patent,invention, proprietary information, non-disclosure, or other rights of any third party.

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                    JH_00009891

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

## 10. DISCLAIMER OF WARRANTIES

1. EXCEPT AS OTHERWISE STATED IN SECTION 10 ABOVE, VENDOR DOES NOT REPRESENT THAT CUSTOMER'S USE OF THE SERVICE WILL BE SECURE, TIMELY, PROFITABLE, UNINTERRUPED OR ERROR FREE, OR THAT THE SERVICE WILL MEETCUSTOMER REQUIREMENTS OR THAT ALL ERRORS IN THE SERVICE AND/ OR DOCUMENTATION WILL BE CORRECTED OR THAT THE SYSTEM THAT MAKES THE SER- VICE AVAILABLE WILL BE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS OR THE SERVICE WILL OPERATE IN COMBINATION WITH OTHER HARDWARE, SOFTWARE, SYSTEMS OR DATA NOT PROVIDED BY VENDOR OR THE OPERATION OF THE SERVICES WILL BE SECURE OR THAT VENDOR AND ITS THIRD PARTY VEN- DORS WILL BE ABLE TO PREVENT THIRD PARTIES FROM ACCESSING CUSTOMER DATA OR CUSTOMER'S CONFIDENTIAL INFORMATION, OR ANY ERRORS WILL BE CORRECTED OR ANY STORED CUSTOMER DATA WILL BE ACCURATE OR RELIA- BLE. THE WARRANTIES STATED IN SECTION 9 ABOVE ARE THE SOLE AND EXCLU- SIVE WARRANTIES OFFERED BY VENDOR. THERE ARE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. EXCEPT AS STATED IN SECTION 10 ABOVE, THE SERVICE IS PROVIDED TO CUSTOMER ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND IS FOR COMMERCIAL USE ONLY. CUS- TOMER ASSUMES ALL RESPONSIBILITY FOR DETERMINING WHETHER THE SER- VICE OR THE INFORMATION GENERATED THEREBY IS ACCURATE OR SUFFICIENT FOR THE CUSTOMER'S PURPOSE.

2. RISK DISCLOSURE FOR FINANCIAL INSTRUMENTS TRADING

Trading financial instruments on margin carries a high level of risk and may not be suitable for all investors. The high degree of leverage can work against Customer as well as for Customer. Before deciding to trade or invest in financial instruments Customer should carefully consider Customer investment objectives, level of experience, and risk appetite. Customer could sustain aloss of some or all of Customer investment and therefore Customer should not invest money thatCustomer cannot afford to lose. Customer should be aware of all the risks associated with financial instruments trading and also seek advice from an independent financial advisor.

3. MARKET INFORMATION AND OPINIONS

All opinions, news, research, analysis, prices or other information contained or provided with this service are provided as general market commentary and it is not intended to be investment advice. Vendor will not accept liability for any loss or damage, including, but without limitationto, any loss of profit and trading loss, which may arise directly or indirectly from use of or reliance on such information.

4. INTERNET TRADING RISKS

There are risks associated with use of all internet-based deal trading and order entry systems. These include but are not limited to, the failure of hardware, software and internet connections. Vendor does not control signal power, its reception or routing via the internet, configuration of

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Customer equipment or reliability of Customer connection and cannot be responsible for communication failures, distortions or delays when trading via the internet. Customer may employ

back-up systems and contingency plans to minimize the possibility of system failure, and tradingvia telephone may be available.

## 5.    ACCURACY OF INFORMATION

The content on the information provided with any strategy provided under this contract is subjectto change at any time without notice and is provided for the sole purpose of assisting traders in making independent investment decisions. Vendor has taken reasonable measures to ensure the accuracy of the information. However Vendor does not guarantee its accuracy and will not accept liability for any loss or damage which may arise directly or indirectly from the content or Customer inability to understand the provided information, or for any delay in or failure of the transmission or the receipt of any instruction or notification.

## 6.    MARKET RISKS and ONLINE TRADING FINANCIAL INSTRUMENTS

Trading platforms provide order entry and tracking of orders. All stoploss, limit and entry ordersare intended to minimize slippage but no guarantee can be made that it will do so, especially in volatile market conditions. Trading on-line, no matter how convenient or efficient does not necessarily reduce risks associated with trading of any financial instruments.

Factors that are particularly likely to affect price and interest rate levels and volatility, and thus trading volumes, include: global and domestic economic, political and market conditions; concerns over inflation, deflation, legislative and regulatory changes, government fiscal and monetary policy - including actions by the Federal Reserve, other foreign monetary units governing bodies, and investor and consumer confidence levels; weather conditions including hurricanes and other significant events, natural and other unnatural disasters like large oil spills that impact the production of commodities; war, acts of terrorism and any unforeseen market closures or disruptions in trading; real and perceived changes in the supply and demand of commodities under-lying the Vendor's service, including changes as a result of technological improvements; and credit quality of market participants, the availability of capital and the levels of assets under management. Any one or more of these factors may reduce trading activity, which could make the use of the Vendor Software less attractive, and in turn could further discourage existing and potential market participants and thus accelerate a decline in the level of trading activity and potentially related services such as data. Further, most of these factors are beyond the Vendor's control if any of these unfavourable conditions were to persist over a lengthy period of time and trading volumes were to decline substantially and for a long enough period. Global financial markets conditions and decreased trading volume may impact the Vendor Software's performance. The conditions in global financial markets will impact the Vendor Software's performance

Price movements for commodity interests are influenced by, among other things: changing supply and demand relationships; trade, fiscal, monetary, and exchange control programs and policies of governments; US and foreign political and economic events and policies; changes in national and international interest rates and rates of inflation; currency devaluations and

FOIA - CONFIDENTIAL TREATMENT REQUESTED                                                                    JH_00009893

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

revaluations; and emotions of the marketplace. None of these factors can be controlled by the Vendor and no assurance can be given that the Algorithmic trading will result in profitable trades, or thatCustomer will not incur substantial losses.

Revenues may decline due to competition from other alternative trading systems. A dramatic increase in computer-based or other electronic trading may adversely affect the Vendor Software's trading revenues, reduce participating in trading and associated access to market information andlead to the creation of new and stronger competitors. If the Vendor is unable to keep up with rapid changes in technology and client preferences, the Vendor may not be able to compete effectively. The Vendor uses some open-source software in its technology, most often as small components within a larger product or service, to augment algorithms, functionalities or librariesthe Vendor, its subsidiaries, or its affiliates create, and the Vendor may use more open-source software in the future. Open-source code is also contained in some third-party software the Vendor relies on. The Vendor Software may be harmed by computer and communications systems failures and delays. The Vendor and third party licensors support and maintain many of the systems that comprise of the Vendor Software and electronic platforms. The Vendor's or third party's failure to monitor or maintain these systems, or to find replacements for defective components within a system in a timely and cost-effective manner when necessary, could have a material adverse effect on the Vendor Software's performance.

The Vendor's systems, or those of its third party providers, may fail or be shut down or, due to capacity constraints, may operate slowly, causing one or more of the following: unanticipated disruption in service to its participants; slower response time and delays in its participants' trade execution and processing; incomplete or inaccurate accounting, recording or processing of trades; distribution of inaccurate or untimely market data to participants who rely on this data in their trading activity; or financial loss. The Vendor may experience system failures due to power or telecommunications failures, human error on the part of the Vendor's employees or on the partof its vendors or participants, natural disasters, fire, sabotage, hardware or software malfunctionsor defects, computer viruses, cyber attacks, intentional acts of vandalism or terrorism and similarevents. If any one or more of these situations were to arise, they could result in damage to the Vendor Software or electronic platform, which could prompt participants to trade elsewhere or expose the Vendor to litigation or regulatory sanctions. As a consequence, the Vendor Soft- ware's performance could suffer materially. Heavy use of computer systems during peak trading times or at times of unusual market volatility could cause those systems to operate slowly or even to fail for periods of time. However, the Vendor cannot assure the Customer that its esti- mates of future trading volume will be accurate or that the Vendor's systems will always be able to accommodate actual trading volume without failure or degradation of performance. Although many of the Vendor's systems are designed to accommodate additional volume and products andservices without redesign or replacement, the Vendor will need to continue to make significant investments in additional hardware and software and telecommunications infrastructure to ac- commodate the increases in volume of order and trading transaction traffic and to provide pro- cessing and other services to third parties. If the Vendor cannot increase the capacity and capa- bilities of its systems to accommodate an increasing volume of transactions and to execute the Vendor's business strategy, its ability of its Vendor Software to achieve profitability would be adversely affected. The Vendor's systems and those of its third party

Page 17 of 19

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A8DF-0195FA4A93C5

service providers may be vulnerable to security risks, hacking and cyber attacks, which could result in wrongful use of the Vendor's and Customer's information.

## 7.   NO ASSURANCES

This agreement does not make any assurance that use of the Vendor Software will be profitable. Because automated trading, trading software and investment advisory services, like many other industries, historically has been categorized by rapid regulatory changes and intense competition,specific market conditions may result in occasional or permanent reduction in the gains and amount of capital in the Customer's brokerage account. Trading volume on the Vendor's plat- form is driven by the degree of volatility - the magnitude and frequency of fluctuations - in prices and levels of the underlying commodities, forex, financial benchmarks or other instruments. Volatility increases the need to hedge price risk and creates opportunities for speculative or arbitrage trading. Were there to be a sustained period of stability in the prices or levels of the underlying commodities, securities, forex, benchmarks or other instruments, the Vendor Soft- ware may experience lower trading volumes, slower growth or declines in profitability.

### 11.8 REGULATORY RISKS

The Vendor's businesses and those of many of its clients have been and continue to be subject toincreased legislation and regulatory scrutiny, and the face the risk of changes to this regulatory environment and business in the future. The Vendor is and will continue to be subject to extensive regulation in the jurisdictions around the world in which it operates, and in particular in the
U.S. The Vendor faces the risk of significant actions by regulatory and taxing authorities in all jurisdictions in which the Vendor conducts its businesses and hold investments that may affect its business, the activity of its market participants, and as a consequence, the Vendor Software's results. Among other things, as a result of regulators enforcing existing laws and regulations, the Vendor could be censured, fined, prohibited from engaging in some of its business activities, subjected to limitations or conditions on its business activities or subjected to new or substantially higher taxes or other governmental charges in connection with the conduct of the Vendor'sbusiness or with respect to its employees. The Vendor's compliance and risk management methods, as well as the Vendor's fulfillment of its regulatory obligations, might not be effective. The Vendor's ability to comply with complex and changing laws and rules is largely dependent on itsestablishment and maintenance of compliance, audit and reporting systems. While the Vendor has policies and procedures to identify, monitor and manage its risks and regulatory obligations, the Vendor cannot assure that its policies and procedures will always be effective or that the Vendor will always be successful in monitoring or evaluating the risks to which the Vendor is ormay be exposed. If the Vendor fails to comply with any of these obligations, regulators could take a variety of actions that could impair the Vendor's ability to conduct its business.

## 11.  LIMITATIONS OF LIABILITY

1.        *No Consequential Damages*

**Page 18 of 19**

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR EXEMPLARY, PUNI-
TIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCLUD-
ING WITHOUT LIMITATION, INTERRUPTION OF BUSINESS, LOST PROFITS, LOST OR
CORRUPTED DATA OR CONTENT, LOST REVENUE ARISING OUT OF THIS AGREE-
MENT (INCLUDING WITHOUT LIMITATION THE SERVICE, THE USE OF THE SERVICE
OR THE INABILITY TO USE SERVICE), EVEN IF THE PARTY HAS BEEN ADVISED OF
THE POSSIBILITY OF SUCH DAMAGES.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009896

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

2.      *DIRECT DAMAGE LIMITATIONS*

2.1.    IN NO EVENT SHALL THE AGGREGATE LIABILITY OF VENDOR OR ANY THIRD PARTY VENDORS ARISING OUT OF OR IN CONNECTION WITH THIS AGREE- MENT, INCLUDING ANY LICENSE, USE, OR OTHER EMPLOYMENT OF THE SERVICE, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED ON BREACH OR REPUDIATION OF CONTRACT, BREACH OF WARRANTY, TORT, OR OTHERWISE, EX- CEED THE TOTAL AMOUNTS ACTUALLY PAID BY CUSTOMER IN THE ONE (1) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. THERE SHALL BE ONLY ONE AGGREGATE LIABILITY CAP UNDER THIS AGREEMENT EVEN IF THERE ARE MULTIPLE CLAIMS; EACH CLAIM SHALL REDUCETHE AMOUNT AVAILABLE IN THE AGGREGATE LIABILITY CAP.

2.2.    EXCEPT FOR A FAILURE OF VENDOR TO COMPLY WITH ITS OBLIGATIONS WITH RESPECT TO BACKUP SERVICES, AND SUBJECT TO SECTION 12.2.1 ABOVE, VENDOR SHALL NOT BE LIABLE FOR ANY DAMAGES RESULTING FROM THE LOSS OR CORRUPTION OF ANY DATA OR CONTENT WHETHER RESULTING FROM DE- LAYS, NONDELIVERIES, MISDELIVERIES, SERVICE INTERRUPTIONS OR OTHER- WISE.

3.      *EXCLUSIONS*

THE LIMITATIONS OF LIABILITY SET FORTH IN SECTIONS 12.1 AND 12.2 SHALL NOT APPLY WITH RESPECT TO: (I) DAMAGES TO PERSONS AND/OR TANGIBLE PROP- ERTY OCCASIONED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF A PARTY, (II) BREACHES BY CUSTOMER OF LICENSE TERMS APPLICABLE TO VEN- DOR PROVIDED SOFTWARE AND THIRD PARTY PRODUCTS AS SET FORTH IN SEC- TION 2 ABOVE, (III) CUSTOMER'S UNAUTHORIZED USE OF VENDOR'S OR THIRD PARTY VENDOR'S INTELLECTUAL PROPERTY, MATERIALS OR ASSETS; (IV) DAM- AGES INCURRED AS A RESULT OF A BREACH BY A PARTY OF ITS OBLIGATIONS UNDER SECTION 7.8 THAT RESULT IN THE DISCLOSURE OF CONFIDENTIAL INFOR- MATION OF THE OTHER PARTY, OR (V) CLAIMS THAT ARE THE SUBJECT OF INDEMNIFICATION PURSUANT TO SECTION 13 (WHICH ARE SUBJECT TO THE LIMITS, IF ANY CONTAINED THEREIN). DAMAGES AS LIMITED BY THIS SECTION 12 ARE CUS- TOMER'S SOLE AND EXCLUSIVE REMEDY IF ANOTHER REMEDY IS PROVIDED ANDSUCH REMEDY IS DEEMED TO FAIL OF ITS ESSENTIAL PURPOSE.

## 12. INDEMNIFICATION

### 12.1.  *Personal Injury and Property Damage*

Each party (the "**Indemnifying Party**") agrees to defend at its expense and indemnify and hold harmless the other party and its affiliates, directors, officers, employees, agents, successors and assigns (each an "**Indemnified Party**"), in accordance with the procedures described in this

FOIA - CONFIDENTIAL TREATMENT REQUESTED                    JH_00009897

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Section, from and against any and all losses, costs, damages, liabilities and expenses including without limitation, reasonable legal fees and expenses paid to or for the benefit of an unaffiliated third party (collectively, "**Losses**") arising from or in connection with any such third party claim for:

(i) the death or bodily injury of any person caused by the negligence or willful misconduct of the Indemnifying Party; or (ii) the damage, loss or destruction of any real or tangible personal property caused by the negligence or willful misconduct of the Indemnifying Party.

### 12.2. Infringement

Vendor will indemnify, defend and hold harmless Customer for Losses Customer incurs as a direct result of any unaffiliated third party claim based on any claim that the Service infringes any U.S. copyright, trademark or trade secret, except to the extent resulting from (i) Customer's modification of the Service or combination by Customer the Services with other products or services if the Service would not have been infringing but for such combination or modification, (ii) Customer's use of the Service in a manner not authorized herein or for which it was not designed, (iii) Customer's failure to use an updated non-infringing version of the applicable intellectual property to the extent Customer was notified that the update cured an infringement, (iv) changes to the Service made by Vendor at the direction of the Customer or (v) Customer Data. If any item for which Vendor has an indemnification obligation under this Section becomes, or in Vendor's reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceed-ing, Vendor will, in addition to indemnifying Customer as provided in this Section, promptly take the following actions, at no additional charge to Customer, in the listed order of priority: (a) secure the right to continue using the item or (b) replace or modify the item to make it non-infringing. If neither of such actions can be accomplished by Vendor using commercially reasonable efforts, and only in such event, Vendor will remove the item from the Service and the applicable Service fee will be equitably adjusted to reflect such removal. This Section 13.2 states Customer's sole and exclusive remedy for Vendor's infringement or misappropriation of intellectual property of a third party.

### 12.3. Customer's Indemnity

Customer shall defend and indemnify Vendor and its Third Party Vendors against any and all Losses incurred by Vendor and its Third Party Vendors arising out of or in connection with a claim by a third party (i) alleging that the Customer Data or the Customer Trademarks, or any use thereof, infringes the rights of, or has caused harm to, a third party, or (ii) arising out of Customer's breach of Sections 7.5 and 7.8.

Customer will indemnify, defend and hold harmless Vendor, its affiliates, successors, and assigns, including the applicable officers, directors, employees, and agents thereof for damages, costs and attorneys' fees Vendor incurs from any unaffiliated third-party claim arising from Customer's Content or Customer's or any end user's use of the Services.

### 12.4. Indemnification Procedures

The party seeking indemnification shall give prompt notice of the claim and will tender the de-fence; provided, however, that such party's failure to provide notification shall not affect the indemnifying party's indemnification obligations except to the extent that the failure to notify

Page 21 of 19

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

delays or prejudices the indemnifying party's ability to defend the applicable claim. The indemnifying party shall conduct the defense and shall have control of the litigation, and the indemnified party shall cooperate in defending against the claim. The indemnified party shall have the right, at anytime and at its own expense, to participate in the defense of the claim with counsel of its own choosing. The indemnifying party shall not make any settlement of the claim that results in any liability or imposes any obligation on the indemnified party without the prior written consent of

the indemnified party. If the indemnifying party fails to (i) respond to the notice of a claim, or (ii)assume the defense of a claim, the party seeking indemnification shall have the right to defend theclaim in such manner as it may deem appropriate, at the reasonable cost, expense, and risk of the indemnifying party, and the indemnifying shall promptly reimburse the indemnified party for all such costs and expenses.

## 13. NOTICES

Except as otherwise provided in Section 7.4 above, any notice required or permitted under the terms of this Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by registered or certified mail return receipt requested, (c) sent by overnight courier, (d) sent by facsimile (with a hard copy mailed on the same date), (e) by email whose receipt is acknowledged by an officer of the receiving Party. If to Customer, a notice shall be forwarded to Customer at the address provided on the signature page herein. Notices shall be considered to have been given at the time of actual delivery in person, five business days after posting if by mail,one business day if by overnight courier service, or upon receipt of machine confirmation of successful transmission by facsimile or email as described herein.

## 14. SURVIVAL

The following provisions shall survive any termination of this Agreement: Sections 5, 7, 8, 10, 11, 12, 13, 14, 19 and 20.

## 15. NO ASSIGNMENT

Customer may not assign this Agreement without the prior written approval of Vendor. Any purported assignment in violation of this section shall be void.

## 16. U.S. GOVERNMENT RESTRICTED RIGHTS

Any use of the Service by or on behalf of the United States of America, its agencies and/or instrumentalities ("U.S. Government"), is provided with Restricted Rights. Use, duplication, or disclosure by the U.S. Government is subject to restrictions as set forth in subparagraph I(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 or subparagraphs I(1) and (2) of the Commercial Computer Software – Restricted Rights at 48 CFR 52.227-19, as applicable.

Page 22 of 19

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

## 17.  FORCE MAJEURE

Neither party will be liable to the other for any failure or delay in the performance of such party's non-monetary obligations due to causes beyond its control, such as failure or delay caused, directly or indirectly, by fire, flood, earthquakes, other elements of nature, acts of war, terrorism, riots, civil disorders, rebellions or revolutions, epidemics, communications line or power failures, or governmental laws, court orders, and regulations imposed after the fact.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009900

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

## 20   GENERAL PROVISIONS

Any action related to this Agreement will be governed by Florida law and controlling U.S. federal law. No choice of law rules of any jurisdiction will apply. Any disputes, actions, claims or causes of action arising out of or in connection with this Agreement or the Service shall be subject to the exclusive jurisdiction of the state and federal courts located in Miami-Dade, Florida. This Agreement, together with the Schedules annexed hereto, represents the parties' entire understanding relating to the use of the Service and supersedes any prior or contemporaneous, conflicting or additional, communications. No text or information set forth shall add to or vary the terms and conditions of this Agreement. If any provision of this Agreement is held by a court of competent juris-diction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect. No joint venture, partnership, employment, or agency relation-ship exists between Vendor and Customer as a result of this Agreement or use of the Service. The failure of Vendor to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by Vendor in writing Vendor re- serves the right to assign its right to receive and collect payments hereunder. Any rights not expressly granted herein are reserved by Vendor.

**IN WITNESS WHEREOF**, this Agreement is duly executed by an authorized representative of both parties as of the Effective Date.

| Vendor | Client |
|---|---|
| Signed: _John Fortini_ | Signed: _Y. A._ |
| On Behalf of Algo Capital | Name: Y. A. |
| Date: 7/12/2021 | Date: 7/5/2021 |

Address:
Redacted Borehamwood WD6 2Bn

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009901

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A8DF-0195FA4A93C5

Page 25 of 19

JH_00009902

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

### Schedule A – Vendor Licensed Software

The licenses set forth below shall be available to Customer during the term of the agreement.

| Licensed Software | Number of Shared Servers | Number of Named Users |
|---|---|---|
| Algo Capital Software | 1 | 1 |

### DESCRIPTION OF SERVICE:

The primary target of this algorithmic trading program is a continuous growth of the initial account budget. Strong development of the account balance by minimizing risks is the main aim of the Vendor Software. This is accomplished by the placement of trades and its related hedge trades in a very specific manner: combined with an advanced close logic which allows a balanced development of founds secured by a precisely calculated account size correlated to the trading volume.

The design as well as the code programming part of the main algorithms contained in the Vendor Software follows some well-known principles initially described by Ralph Nelson Elliot and Fib-onacci, as well as some additional fundamental and widely known paradigms. This very specific combination of components finally results in much more than only the simple summary of its parts.

In order to activate the service, Customer must select a broker, fund the brokerage account, and send an email to Vendor including the credentials for the brokerage account and instruction to activate the Vendor Software. After receiving instruction from the Customer, the Vendor shall activate the Vendor Software.

The Vendor Software shall use a proprietary intraday automated strategy that places, exits and monitors the trades, on behalf of the Customer. By activating the Vendor Software, the Customer assumes any and all risks associated with the Vendor Software, including risks highlighted in Section 10, 11, and any other occurrence that could result in financial injury to the Customer.

To deactivate the Vendor Software, Customer must email Vendor as outlined in Schedule B. Vendor shall deactivate the Vendor Software within twenty-four (24) hours after the close of any outstanding trade.

Broker Requirements:

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00009903

DocuSign Envelope ID: 9B7CA0EF-4E2F-4E78-A6DF-0195FA4A93C5

Customer shall select a broker which meets the following specifications: must be an ECN Bro- ker; use Metatrader and/or Ninjatrader platform; accepts US-based clients; have Webtrader ac-cessibility; API access FIX/REST.

Broker options include but are not limited to: MyFXChoice.com; TheTradersDomain.com;Oanda.com; Forex.Com

## SCHEDULE B – PRODUCT SUPPORT

During the Term of this Agreement and for so long as Customer is entitled to receive the Service hereunder, Vendor shall provide the following Product Support Services through its Support Centers ("SC") for the Vendor Software as follows

a. The SC will be the primary point of contact for all product support inquiries. The SC may be contacted via email at SUPPORT@ALGOCAPITAL.COM
b. The SC will receive, log, and respond to inquiries within 24 hours from the Customer concern-ing errors or defects in the Vendor Software.

## SCHEDULE C

Vendor and Customer have agreed on the following services, which is based on data from Customer, industry and vendor software.

BASE COMPONENTS:

Access to Vendor Software

Vendor Managed Shared

ServersVendor Managed Web

Support

Vendor Managed Firewalls and Managed VPN

Assumptions
- Vendor assumes that Customer will continue to pay support and maintenance for the userlicenses.
- Customer shall keep a funded brokerage account which the Vendor Software will use to execute trades on behalf of the Customer.
- Customer users will access the service via emailing Vendor for authorization.

**\*A $40 bank wire fee will be deducted from initial funds upon account activation. This de-duction will be reflected on your account balance\***

Page 27 of 19

| From: | Sender Unspecified |
|---|---|
| To: | Herman, JJ < Redacted >;Ted < Redacted @s.whatsapp.net> |
| Sent: | |
| Subject: | (No Subject) |

Ted < Redacted @s.whatsapp.net>
2019-03-13T15:02:22.00000002
The algo has been performing incredibly



**EXHIBIT**
175

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

**From:** Sender Unspecified
**To:** Herman, JJ <[redacted]>;Ted <[redacted]@s.whatsapp.net>
**Sent:**
**Subject:** (No Subject)

Herman, JJ <[redacted]>
2019-03-13T15:03:21.0000000Z
30% profit already in about 35 trading days

EXHIBIT
176
TO THE DECLARATION OF MAURA M. VIEHMEYER PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: 580C73A1-E3AD-4DAC-8D5A-DD76BE55C336

## RIDER TO
## SOFTWARE AS A SERVICE AGREEMENT

Whereas, Client desires to add an additional trading strategy to their account under the following terms:

**XAU/USD Trading Strategy:**

| Select Desired Strategy by placing an X in the appropriate row: | Strategy Variant | Potential Max Drawdown Range | License Fee |
|---|---|---|---|
| x | Aggressive | 50-60% | 50% |
| | Moderate | 30-40% | 50% |
| | Conservative | 20-25% | 50% |

### RISK DISCLOSURE FOR FINANCIAL INSTRUMENTS TRADING

Trading financial instruments on margin carries a high level of risk and may not be suitable for all investors. The high degree of leverage can work against Customer as well as for Customer. Before deciding to trade or invest in financial instruments Customer should carefully consider Customer investment objectives, level of experience, and risk appetite. Customer could sustain a loss of some or all of Customer investment and therefore Customer should not invest money that Customer cannot afford to lose. Customer should be aware of all the risks associated with financial instruments trading and also seek advice from an independent financial advisor. Algo Capital, LLC is not responsible for any trading losses arising from the Client's use of any strategy.

Signed: N.
Client:



DocuSigned by:
N. P.
B1642C936AC549D...

Name: asd

Title: Mgr

Date: 10/27/2021

EXHIBIT
177
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

## SEPERATELY MANAGED ACCOUNT AGREEMENT

5/6/2022

This Agreement is made this _____ date (the "Agreement"), by and between Algo Capital FX Advisor, LLC (the "Manager"), a Delaware Liability company, and ▮▮▮▮▮▮ S. ▮▮▮▮▮▮ (the "Client").

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's assets as Client shall from time to time assign to it (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and may: (a) buy, sell, exchange, convert and otherwise invest or trade in any commodity, commodity contract, crypto-currency, digital assets, stocks, bonds, options, units and other securities, including money market instruments, whether the issuer is organized in the United States or outside the United States, at such times and in such manner as Manager determines; (b) place orders for the execution of such assets transactions with or through such decentralized exchanges, brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) purchase, sell, exchange or convert foreign currency in the spot or forward markets as agent or principal, at the market rate, as determined by Manager in its sole discretion (d) . Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). The Guidelines and all Instructions, unless they expressly provide otherwise, shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid the rates specified in Exhibit B, based on the asset value of the Account as of the last day of each relevant period (the "Valuation Date"). The initial billing period will begin when initial funding has been made (the "Inception Date").

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

**EXHIBIT**

**178**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

(d) <u>Notice of Certain Events</u>. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. <u>Non-Exclusive Agreement</u>. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors or employees, to engage in any other business or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association or individual. Client understands that Manager provides investment advisory services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

7. <u>Liability of Manager</u>. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. <u>Brokerage</u>. Where Manager places orders, or directs the placement of orders, for the purchase or sale of portfolio securities for the Account, in selecting brokers or dealers to execute such orders. In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. <u>Confidential Relationship</u>. Each party agrees that all non-public confidential information concerning the other party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. <u>Reports</u>. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar month. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, foreign securities denominated in foreign currencies will be valued in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

11. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decision will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that securities, mutual funds and other non-deposit investments are not deposits or other obligations of, or guaranteed by, Manager or any affiliate, are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

12. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 15, and 16 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

13. Assignment. This Agreement may be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Manager may delegate all or part of its duties under this Agreement to any affiliate.

14. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

If to Client:

Email:    Redacted    @gmail.com

Attention:    C. S.

If to Manager:

Email: robert@bit5ive.com

Attention: Robert Collazo

Either party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

15. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Florida without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in Miami Dade County, Florida.

16. Entire Agreement; Modification. This Agreement: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

17. <u>Headings</u>. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

18. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

19. <u>Severability</u>. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

Client: ▊▊▊▊▊▊ S. I. ▊▊▊▊▊▊

By: C. S.

Name: C S          5/6/2022

Algo FX Capital Advisor, LLC

By: John Fortini

Name: John Fortini

Title: Authorized Person

11

## EXHIBIT A

### Statement of Investment Objectives

Initial objective will be focused on the implementation of a gold intra-day trading strategy. Future investment objective may include the implementation of algorithmic FX strategies and other asset classes.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

Managed Accounts – Trading Accounts

50% Performance Fee on gains calculated monthly

## EXHIBIT C

### CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
|      |       |                    |
|      |       |                    |
|      |       |                    |
|      |       |                    |

DocuSign Envelope ID: AF4D04E2-05A9-428C-B540-8DF43BB4F04E

## EXHIBIT D

## INVESTOR WIRE INSTRUCTIONS

| | |
|---|---|
| Name of Beneficiary | S. I. Redacted |
| Beneficiary Address | Redacted |
| City, State Zip Code | Miami, FL 33143 |
| | |
| Bank Account Number | Redacted 8360 |
| Bank Routing Number (ACH) | |
| Bank Routing Number (ABA) (Wire) | 267089712 |
| Bank SWIFT/BIC Number | |
| | |
| Bank Name | 1First Bank Florida |
| Bank Address | 9795 South Dixie Highway |
| City, State and Zip Code | Miami, FL 33156 |
| | |
| Reference Message | |

## INVESTOR CRYPTO TRANSFER INSTRUCTIONS

| | |
|---|---|
| ETH (ERC 20 ADDRESS) | |
| BTC ADDRESS | |

**IMPORTANT: Algo Capital accepts no responsibility for loss of funds due to incorrectly provided information. PLEASE DOUBLE CHECK YOUR ADDRESSES AND WIRE INSTRUCTIIONS PRIOR TO SUBMITTING.**

Wiring Instructions of Record: Please note that redemption payments, in accordance with both the current Anti-Money Laundering regulatory environment and industry best practice, will be paid only to the account used for the subscription payment. The titling of the bank account must match the titling of this subscription.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 20079961-1B57-488D-9766-B0F73A2C21E3

## INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 21th day of April, 2022 (the "Agreement"), by and between Algo Capital FX Advisor, LLC (the "Manager"), a Delaware Liability company, and ▇▇▇▇ ▇▇ ▇▇ (the "Client").

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's assets as Client shall from time to time assign to it (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and may: (a) buy, sell, exchange, convert and otherwise invest or trade in any commodity, commodity contract, crypto-currency, digital assets, stocks, bonds, options, units and other securities, including money market instruments, whether the issuer is organized in the United States or outside the United States, at such times and in such manner as Manager determines; (b) place orders for the execution of such assets transactions with or through such decentralized exchanges, brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) purchase, sell, exchange or convert foreign currency in the spot or forward markets as agent or principal, at the market rate, as determined by Manager in its sole discretion (d) . Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). The Guidelines and all Instructions, unless they expressly provide otherwise, shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid the rates specified in Exhibit B, based on the asset value of the Account as of the last day of each relevant period (the "Valuation Date"). The initial billing period will begin when initial funding has been made (the "Inception Date").

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

> **EXHIBIT**
> **179**
> TO THE DECLARATION OF MAURA M. VEHMEYER
> PURSUANT TO 28 U.S.C. § 1746

JH_00007133

DocuSign Envelope ID: 20079961-1B57-48BD-9766-B0F73A2C21E3

(d) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors or employees, to engage in any other business or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association or individual. Client understands that Manager provides investment advisory services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

7. Liability of Manager. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. Brokerage. Where Manager places orders, or directs the placement of orders, for the purchase or sale of portfolio securities for the Account, in selecting brokers or dealers to execute such orders. In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. Confidential Relationship. Each party agrees that all non-public confidential information concerning the other party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. Reports. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar month. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, foreign securities denominated in foreign currencies will be valued in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

DocuSign Envelope ID: 20079961-1B57-48BD-9766-B0F73A2C21E3

11. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decision will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that securities, mutual funds and other non-deposit investments are not deposits or other obligations of, or guaranteed by, Manager or any affiliate, are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

12. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 15, and 16 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

13. Assignment. This Agreement may be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Manager may delegate all or part of its duties under this Agreement to any affiliate.

14. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

If to Client:

Email:  Redacted @hotmail.com

Attention:  A. D.

If to Manager:

Email: robert@bit5ive.com

Attention: Robert Collazo

Either party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

15. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Florida without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in Miami Dade County, Florida.

16. Entire Agreement; Modification. This Agreement: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or

DocuSign Envelope ID: 20079961-1B57-48BD-9766-B0F73A2C21E3

waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

17. Headings. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

18. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

19. Severability. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

FOIA - CONFIDENTIAL TREATMENT REQUESTED

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

Client:  A. D.

By:

Name: A. D.                    4/26/2022

Algo FX Capital Advisor, LLC

By: John Fortini

Name: John Fortini
Title: Authorized Person

11

## EXHIBIT A

**Statement of Investment Objectives**

Initial objective will be focused on the implementation of a gold intra-day trading strategy. Future investment objective may include the implementation of algorithmic FX strategies and other asset classes.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

Managed Accounts – Trading Accounts

50% Performance Fee on gains calculated monthly

## EXHIBIT C

### CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
| --- | --- | --- |
| A. D. | Mr | |
| | | |
| | | |
| | | |

DocuSign Envelope ID: E715D0E1-DCCE-4CE0-A375-1BF0DFF7D9C3

## INVESTMENT MANAGEMENT AGREEMENT

This Agreement is made this 21th day of April, 2022 (the "Agreement") by and between Algo Capital FX Advisor, LLC (the "Manager"), a Delaware Liability company, and ████████ N C ████ (the "Client").

1. <u>Appointment.</u> Client hereby appoints Manager as an investment manager to manage such of Client's assets as Client shall from time to time assign to it (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. <u>Authority of Manager.</u> Manager is authorized to supervise and direct the investment and reinvestment of the assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and may: (a) buy, sell, exchange, convert and otherwise invest or trade in any commodity, commodity contract, crypto-currency, digital assets, stocks, bonds, options, units and other securities, including money market instruments, whether the issuer is organized in the United States or outside the United States, at such times and in such manner as Manager determines; (b) place orders for the execution of such assets transactions with or through such decentralized exchanges, brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) purchase, sell, exchange or convert foreign currency in the spot or forward markets as agent or principal, at the market rate, as determined by Manager in its sole discretion (d) . Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

3. <u>Guidelines and Instructions.</u> Attached hereto as <u>Exhibit A</u> is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). The Guidelines and all Instructions, unless they expressly provide otherwise, shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. <u>Fees.</u> As full compensation for its services under this Agreement, Manager shall be paid the rates specified in <u>Exhibit B</u>, based on the asset value of the Account as of the last day of each relevant period (the "Valuation Date"). The initial billing period will begin when initial funding has been made (the "Inception Date").

5. <u>Representations and Warranties.</u> Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) <u>Client Assets.</u> Client is the sole owner of all assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) <u>Authority.</u> The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) <u>Authorized Persons.</u> Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (<u>Exhibit C</u>) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager <u>Exhibit C</u> or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

**EXHIBIT**
**180**
TO THE DECLARATION OF MAURA M. WIDMEYER
PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: E715D0E1-DCCE-4CE0-A375-1BF0DFF7D9C3

(d) <u>Notice of Certain Events</u>. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. <u>Non-Exclusive Agreement</u>. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors or employees, to engage in any other business or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association or individual. Client understands that Manager provides investment advisory services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

7. <u>Liability of Manager</u>. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. <u>Brokerage</u>. Where Manager places orders, or directs the placement of orders, for the purchase or sale of portfolio securities for the Account, in selecting brokers or dealers to execute such orders. In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. <u>Confidential Relationship</u>. Each party agrees that all non-public confidential information concerning the other party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. <u>Reports</u>. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar month. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, foreign securities denominated in foreign currencies will be valued in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

DocuSign Envelope ID: E715D0E1-DCCE-4CE0-A375-1BF0DFF7D9C3

11. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decision will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that securities, mutual funds and other non-deposit investments are not deposits or other obligations of, or guaranteed by, Manager or any affiliate, are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

12. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 15, and 16 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

13. Assignment. This Agreement may be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Manager may delegate all or part of its duties under this Agreement to any affiliate.

14. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

If to Client:

Email: Redacted gmail.com

Attention: N. C.

If to Manager:

Email: robert@bit5ive.com

Attention: Robert Collazo

Either party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

15. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Florida without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in Miami Dade County, Florida.

16. Entire Agreement; Modification. This Agreement: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or

DocuSign Envelope ID: E715D0E1-DCCE-4CE0-A375-1BF0DFF7D9C3

waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

17. Headings. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

18. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

19. Severability. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

JH_00009077

DocuSign Envelope ID: E715D0E1-DCCE-4CE0-A375-1BF0DFF7D9C3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

Client: **N. C.**

By: _____

Name: **N. C.**                               5/4/2022

Algo FX Capital Advisor, LLC

By: _John Fortini_

Name: John Fortini
Title:  Authorized Person

11

## EXHIBIT A

### Statement of Investment Objectives

Initial objective will be focused on the implementation of a gold intra-day trading strategy. Future investment objective may include the implementation of algorithmic FX strategies and other asset classes.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

Managed Accounts – Trading Accounts

25% Performance Fee on gains calculated monthly

## EXHIBIT C

### CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|---|---|---|
| **S. S. P.** | NA | |
| | | |
| | | |
| | | |
| | | |

| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Herman, JJ < Redacted >;Ted < Redacted @s.whatsapp.net> |
| **Sent:** | |
| **Subject:** | (No Subject) |

Herman, JJ < Redacted >
2019-03-13T15:07:31.0000000Z
If we have to stay away from USA clients to avoid regulations and issues we are willing
to do so

**EXHIBIT**

**181**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| From: | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
|---|---|
| To: | A. P. |
| CC: | A H |
| Sent: | 29-Jun-20 1:15:43 PM |
| Subject: | Re: FX intro |

Hey ▮A.▮ of course we did do our Due diligence on this broker . In american Brokers can only offer 50 -1 Leverage , offshore brokers offer the 200-1 that is what is needed for our algo to offer the lowest risk of drawdown at a given time . The people who go on these brokers and blow their account with trades are the ones who then complain. In 2018 everyone here was a "professional trader " and if you don't have a proper strategy you will 100% lose your money . Some of these companies would send copy and paste trades for people to buy and regardless of the broker these people would lose their money . When we started our company we worked with 3 different brokers , but the Traders domain was the one we were able to build personal relationships with . The owner and lawyers have come to our office multiple times as our owner has been to Canada to meet them as well. Our main focus was actually meeting , and sitting with the owners of the brokers to build a real relationship . Our company is also working with the Owner of the Broker to build a separate Hedge Fund so we can continue to build as a team and protect our company and clients . If you had a broker you would like to use we would use yours as long as we can test the broker to ensure there are no irregularities in the broker and slippage in the trades being executed . We have clients in South america who use their own broker , and we have a few others here in the states . If you like we can jump on a call later today .

On Mon, Jun 29, 2020 at 7:26 AM <▮ Redacted ▮@gmail.com> wrote:

Guys, we did some due diligence on traders domain and this lot came up – any thoughts?


https://theforexreview.com/2018/10/31/thetradersdomain-review/


https://www.scamwatcher.org/the-traders-domain-review/


https://www.forexpeacearmy.com/forex-reviews/14449/thetradersdomain-forex-brokers


Some good but some bad and the bad ones are very bad.



AP



**From:** Support AlgoCapital <support@algocapitalfx.com>
**Sent:** 23 June 2020 23:30
**To:** V. P. ▮@Redacted.com>


EXHIBIT
182
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00056795

**Cc:** A. P. < Redacted @gmail.com>
**Subject: Re: FX intro**

Hey Guys works for me

On Tue, Jun 23, 2020 at 12:17 PM V. P. < @ Redacted com> wrote:

Thanks for the quick reply and thanks for the intro A.

Yes, let's do it

How about tomorrow at 16:00 UK time (11am in Miami)

I checked with A. and he's also available.



V. P.
Founder
@ Redacted com

**Twitter | Facebook | Instagram | LinkedIn**

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

On Tue, 23 Jun 2020 at 17:08, Support AlgoCapital <support@algocapitalfx.com> wrote:

Hey A. and V. , I am not sure how much the team has informed you about the Trading and our structure . Would you both like to get on a call this week?

On Tue, Jun 23, 2020 at 12:02 PM A. P. < Redacted @gmail.com> wrote:

Hi guys, I didn't seem get a reply reference my investment in non aggressive FX.

Please also meet V. P. my colleague who is a partner in one of my businesses and is also looking at investment opportunities.

JH_00056796

Best

A. P.

---

Thank you,

**Algo Capital Support**

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137
    support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137
w:  www.algocapitalfx.com   e: support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00056797

**a:** 3250 NE 1st Ave. Suite 208
Miami, FL 33137
**w:** www.algocapitalfx.com   **e:** support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

—

Thank you,

Algo Capital Support

**a:** 3250 NE 1st Ave. Suite 208
Miami, FL 33137
support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

**a:** 3250 NE 1st Ave. Suite 208

Miami, FL 33137
w:  www.algocapitalfx.com  e:  support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:  3250 NE 1st Ave. Suite 208
Miami, FL 33137
w:  www.algocapitalfx.com  e:  support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

 Virus-free. www.avg.com

--

Thank you,

Algo Capital Support

a:  3250 NE 1st Ave. Suite 208
Miami, FL 33137
support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dis the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, a who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any respo the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of

| From: | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
|---|---|
| To: | M. T. |
| BCC: | john@bit6ive.com |
| Sent: | 29-Sep-22 2:38:53 PM |
| Subject: | Re: Important Business Banking Alert |
| Importance: | High |

Good Morning **M.**

Thank you for the Banking alert.

Could you provide us the client information associated with this transfer and include their Algo Account #.

If this is a new client, please complete all KYC information in the link below:

Algo New Client Information Fom

Warm regards,

Algo Support



a: 3250 NE 1st Ave. Suite 208
Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

**From:** M. T. < Redacted @gmail.com>
**Date:** Thursday, September 29, 2022 at 10:31 AM
**To:** "Support@algocapitalfx.com" <Support@algocapitalfx.com>
**Subject:** Fwd: Important Business Banking Alert

M. T.
## Redacted

Sent from my iPhone

Begin forwarded message:

**From:** Chase <no-reply@alertsp.chase.com>

EXHIBIT
183
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

**Date:** September 29, 2022 at 10:03:36 AM EDT
**To:** ▮ Redacted ▮ @gmail.com
**Subject: Important Business Banking Alert**
**Reply-To:** Chase@alerts.chase.com

Dear Customer,

At Chase, we're committed to providing the tools you need to help you monitor your account(s). Below is a list of the latest transactions for the accounts in your profile:

   *We've started to process a  wire transfer of (USD) 30,000.00 from account ending in 2965 to Algo Capital LLC for a deliver by date of 09/29/2022.
   *We've started to process a wire transfer to Algo Capital LLC at  in the amount of 30,000.00 has been debited from your account ending in 2965 on 09/29/2022.  The reference number for this wire transfer is 0929B1QGC01C005043 and may be shared with your recipients to assist them in tracking this transfer with their financial institution.

If you have questions about the transaction(s) or this alert, please call 1-877-CHASEPC (1-877-242-7372). Our customer service representatives are available from 6 AM to midnight Eastern time, seven days a week.

Please do not reply to this automatic alert. Instead, you can sign in to www.Chase.com/businessbanking to send us a secure message.

We appreciate your business.

Sincerely,

Online Business Banking Team

| | |
|---|---|
| **From:** | K. G. ▮ Redacted @gmail.com> on behalf of ▮ K. G. ▮ < Redacted @gmail.com> |
| **To:** | Support AlgoCapital |
| **Sent:** | 03-Nov-20 11:14:12 PM |
| **Subject:** | Re: Wire Instructions |

Thank you! Processed the transfer. You should have received, or will be receiving, an email notification from Bank of America confirming the transaction.

Thanks.
K.

On Tue, Nov 3, 2020, 4:20 PM Support AlgoCapital <support@algocapitalfx.com> wrote:
Business checking

On Tuesday, November 3, 2020, ▮ K. G. ▮ < Redacted @gmail.com> wrote:
Hi - thank you. Is this a business checking or business savings account?

Thanks,
K.

On Tue, Nov 3, 2020 at 12:50 PM Support AlgoCapital <support@algocapitalfx.com> wrote:

Hello  J. , we have received your signed Docusign agreement . Below you will find our wire instructions . As soon as funds clear we will send over to the broker and begin your account setup.

Algo Capital
3250 Ne 1st ave suite 208
Miami Fl , 33137
TD BANK
Routing- 067014822
Account Redacted5056

--

Thank you,

Algo Capital Support

Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s) disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are no cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any d the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do no represent those of the company.

**EXHIBIT**

**184**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

JH_00045578

| | |
|---|---|
| **From:** | S. F. <Redacted>gmail.com> on behalf of S. F. <Redacted>gmail.com> |
| **To:** | Algo Capital |
| **Sent:** | 21-Feb-23 11:41:23 PM |
| **Subject:** | Re: Update: Regarding The Broker (The Traders Domain) |
| **Attachments:** | Please_DocuSign_Managed_Account_Agreement_-_.pdf |

Good afternoon,

As a concerned investor in Algo Capital, I'd like to know what your next steps are and how Aglo Capital will make this right by me? "The Broker" is not mentioned anywhere in my 7 page contract that I signed with Algo Capital. It was to my utmost surprise to find out that Algo was not in possession of my funds. I have attached my contract for reference.

I have been patient in waiting for a follow up email that never came. At this point I am frustrated but still willing to cooperate with Algo Capital to reclaim my funds. I would prefer not to explore any other means of recourse involving third parties if we can get this resolved in a timely manner. I appreciate your anticipated cooperation in this. I have itemized my withdrawals below.

1/16/23 $90,000 - Withdrawal requested and processed on 1/17/23. No confirmation email was sent until I made the request for the confirmation.
2/20/23 $78,695 - Withdrawal requested and not yet processed

Thank you,

S. F.

On Sat, Feb 18, 2023 at 11:24 AM Algo Capital <Support@algocapitalfx.com> wrote:

Dear Algo Capital Family,

This is a difficult e-mail to write.

In response to Traders Domain's excuses for why they cannot process withdrawals, plus other concerns raised by some of you, we have continued to maintain an open line of communication with Ted Safranko of Traders Domain. On several occasions, Ted has openly stated that Traders Domain is in possession of all funds belonging to Algo Capital customers. He has repeatedly promised that he would make Algo Capital customers whole. For a time, we believed that Ted would honor his clear commitments.

We are optimistic by nature, and it was optimism that led us to invest sizable amounts of our personal funds in Traders Domain as well. Unfortunately, recent events have dealt a severe blow to our optimism.

Ted's explanations have become increasingly superficial and unsatisfying. We have doubts Ted and Trader's Domain will honor their commitment to you and relinquish the



EXHIBIT
185
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

funds that belong to Algo Capital customers. We know that many of you share those doubts.

Understandably, some of you have asked us about pursuing legal claims against Ted. We are exploring all options now and invite any of our customers wishing to coordinate these efforts to contact us. We pledge our full cooperation and assistance in this endeavor.

In the event Algo Capital recovers any customer funds from Ted or Traders Domain, we commit to the following:

- We will promptly notify you if any funds arrive.

- We will hold those funds in trust for the benefit of all our customers until such time as we determine a fair and transparent way to distribute them.

- Because this is your money, we pledge to pay out any funds we might receive to our customers first. Only when all our customers' claims have been satisfied will we try to obtain a measure of recovery for the personal funds we have also invested, side by side, with yours.

**Finally, we are fully committed to honoring our client's wishes in regard to the status of their accounts. To that end, please let us know if you would like to close your Traders Domain account with us or transfer your account to yourself. Due to the circumstances, if you choose to leave your account open at this time, we are waiving all Algo Capital fees indefinitely.**

It is our sincere hope that, despite this hardship, we can forge ahead into a bright and promising future.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

Yours truly,

Algo Capital

*Copyright © 2023 Algo Capital, All rights reserved.*
You opted in when you registered as a Algo Capital Client

**Our mailing address is:**
Algo Capital
12301 NW 112th Ave Unit 112
Miami, FL 33178

Add us to your address book

Want to change how you receive these emails?
You can update your preferences or unsubscribe from this list.


Email Marketing
Powered by
Mailchimp

**From:** Redacted@Redacted.net
**To:** 'Support AlgoCapital'
**Sent:** 27-Feb-23 5:34:07 PM
**Subject:** RE: MT5 Redacted 2080
**Importance:** High

Good afternoon,

Thank you for the update.

For the record, please know I invested my money with Algo Capital, not Traders Domain. I was told that Algo was a trading software, but it appears that Ted from Traders Domain was facilitating all trades, not Algo's software. I don't think it's fair for my money to be held up in any legal battle between Algo and Traders Domain. I invested with Algo over eight months ago and have gotten nothing but excuses regarding my money. The communication has not been the greatest, and there are many other reasons why I have requested the closure of my account and the reimbursement of all my funds.

I hope to hear back on or before the end of this week.

Regards,

J. J.
Owner/Vice President



Cooper City, FL 33330
Office:   Redacted
Cell:   Redacted
Fax:   Redacted
Redacted@Redacted.net
www Redacted net
Apply Now



EXHIBIT
186
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

"CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may not use, disclose, copy, or disseminate this information. Please contact the sender by e-mail immediately and destroy all copies of the original message including all attachments."

**From:** Support AlgoCapital <support@algocapitalfx.com>
**Sent:** Friday, February 24, 2023 4:12 PM
**To:** Redacted@Redacted net
**Subject:** Re: MT5 Redacted 2080

Hello   J.

Unfortunately, the situation remains fluid, so I am unable to provide a definitive update at this point. Our team is working diligently to get the most accurate and up-to-date information about the status of your account, and we will update you as soon as more information is available.

Nonetheless, our legal team is actively preparing a course of action, and we expect to present it to you in the near future. We are committed to keeping you informed on your account situation and to providing you with the best solution possible.

I appreciate your patience and understanding during this process. If you have any questions or concerns in the meantime, we would be happy to schedule a call with you to discuss this matter further.

On Fri, Feb 24, 2023 at 12:36 PM <Redacted@Redactednet> wrote:
Good afternoon,

Can you please give me an ETA on the funds I am supposed to receive from my investment with Algo Capital? My account was closed on February 19th.

Please advised.

Thank you,



J. J.
Owner|Vice President
Redacted
Cooper City, FL 33330
(Office: Redacted
(Cell: Redacted
(Fax: Redacted
Redacted@Redactednet
www.Redactednet



"CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may not use, disclose, copy, or disseminate this information. Please contact the sender by e-mail immediately and destroy all copies of the original message including all attachments."

---

From: Support AlgoCapital <support@algocapitalfx.com>
Sent: Sunday, February 19, 2023 6:55 PM
To: Redacted <Redacted@Redactednet>
Subject: Re: MT5 Redacted080

Thank you Johanny , below is your closing withdrawal from the traders domain

On Sun, Feb 19, 2023 at 6:00 PM J. J. <Redacted@Redactednet> wrote:
Hello,

I would like to cancel all tradings for my account associated with this email address. Redacted@Redactednet. Please reimburse all funds in my account. My initial investment was $50,000 + $14,000 that were withdrawn last November that I never received. My Savvy wallet ID is below.



Please confirm receipt of my email.

J. J.
Owner|Vice President
Redacted

**Redacted**

Cooper City, FL 33330

Office: Redacted

Cell: Redacted

Fax: Redacted

Email: Redacted

**Redacted**

"CONFIDENTIALITY NOTICE: This e-mail message, including all attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If you are not the intended recipient, you may not use, disclose, copy, or disseminate this information. Please contact the sender by e-mail immediately and destroy all copies of the original message including all attachments."

--

Thank you,

Algo Capital Support

Support@algocapitalfx.com

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:  3250 NE 1st Ave. Suite 208
    Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

--

Thank you,

Algo Capital Support

Support@algocapitalfx.com

FOIA - CONFIDENTIAL TREATMENT REQUESTED

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

a:   3250 NE 1st Ave. Suite 208
     Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

FOIA - CONFIDENTIAL TREATMENT REQUESTED



EXHIBIT

187

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| | |
|---|---|
| **From:** | Sender Unspecified |
| **To:** | Herman, JJ < Redacted >;Ted < Redacted >s.whatsapp.net> |
| **Sent:** | |
| **Subject:** | (No Subject) |

Ted < Redacted @s.whatsapp.net>
2019-05-08T21:14:31.00000002
figure out what the total loss could be and if you want it erased I will get the
liquidity provider to pull the deals from the accounts



EXHIBIT
188
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

JH_00017317

| | |
|---|---|
| **From:** | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
| **To:** | Robert Collazo; richard@ Redacted Bit5ive |
| **CC:** | JJ@algocapitalfx.com |
| **Sent:** | 11-Oct-22 8:23:18 PM |
| **Subject:** | Algo Capital - Trading Glitch Tuesday October 11th 2022 |
| **Importance:** | High |

Gents,

I sent the email out to 300+ clients and our <u>sales team.</u> I did see several email bounce backs but the vast majority of clients have been notified.

Warm regards,

MS

**From:** R. A. < Redacted @gmail.com>
**Date:** Tuesday, October 11, 2022 at 1:19 PM
**To:** Support AlgoCapital <support@algocapitalfx.com>
**Subject:** Re: Algo Capital - Trading Glitch Tuesday October 11th 2022

Thanks for the update

On Tue, Oct 11, 2022 at 4:17 PM Support AlgoCapital <support@algocapitalfx.com> wrote:
Dear Client,

During this morning's trading session, we executed several trades at the price of $1,661, $1,662, and $1,663. The Metaquotes (MT5) servers did not update until the price reached $1,677, But our closing price was $1,663. This glitch was due to our servers not updating with the correct price, matching our trade logs. We were, however, able to notify the broker of the actual price we closed the trade.

Totaling 2.5-3% loss for the day

Your account will be updated with the correct amounts before the end of the day.

Algo Support





**EXHIBIT**

**189**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

**From:**     Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com>

**To:**        Support AlgoCapital

**BCC:**



**Sent:**        06-Dec-22 4:46:53 PM
**Subject:**     Algo Capital Important Update
**Importance:**  High

**EXHIBIT**

190

TO THE DECLARATION OF MAURA M. VENMEYER
PURSUANT TO 28 U.S.C. § 1746

**Dear Algo Client,**

We are committed to transparency and excellent service, so we wanted to apologize for the inconvenience that some of our clients have had to endure as of recently. In recent months, The Traders Domain (the broker) has undergone a number of changes. The process of creating our new systems has not been without its bumps, and we are working hard to ensure that they are smooth and efficient. We hope this update sheds some light on some concerns you might have about what's going on behind the scenes and where we're heading.

Our business has been challenged in recent months but it's not because of anything within our walls. Rather, it's been because of events in the financial sector and the economy, which have led banks to take a more cautious perspective. We appreciate your understanding and patience as we address some concerns you've had recently about the broker's withdrawal process. We know change can be difficult, especially when it comes to finances.

**Withdrawal Delays**

Firstly, we would like to address the recent concerns regarding delays in client withdrawals from the broker. We know that this is a stressful situation for everyone involved and they are working hard every day to prevent further delays.

**What Caused the delays?**

It is important to understand how money moves when you are investing. The broker is Offshore (registered in Belize), so funds must always move from their liquidity pool to a trust account to a banking provider before being transferred to the client. In order to request a withdrawal, clients

must submit their account and routing numbers. Often clients made mistakes when entering their account details; this usually occurs because they mislabeled the account or entered the routing number incorrectly. Banks take compliance very seriously to ensure that customers' funds are protected. When errors are identified in a large batch of transactions, banks will often pause the transfer until they can obtain more information from the client. This is done to ensure that all regulatory and internal protocols are being followed.

### What is the solution?

The Savvy Wallet allows the broker to transfer funds directly to the wallets of our clients. Client deposits and withdrawals are now individualized, ensuring that any errors or delays affect only the client and not the entire brokerage. Consequently, all clients will experience fewer delays and their transactions will be secure.

*NOTE: Everybody should set up their Savvy Wallet and make sure they are KYC-approved. Please contact our support team for instructions if you have not done so.*

### Backlog

While the broker currently has a backlog of withdrawal requests, they're working to get them processed as soon as possible. In spite of the frustration clients experience when their withdrawal request is not processed immediately. Traders Domain is a brokerage firm that services 50,000 clients. Even though we would like to get some kind of priority, the brokerage ultimately manages the queue. The broker is working on a backlog of withdrawals for all its clients We understand how frustrating this can be, and we want to assure you that we are doing our best to get your withdrawals processed as soon as possible. The broker is working hard to clear the backlog of withdrawal requests from all their client groups in the most efficient way. We thank you for your patience and understanding while they work through it.

### Timelines

In light of all this, our broker expects to complete the withdrawals for August & September, and October within the coming weeks. The broker is also confident that November requests will be completed by the end of December or, at the latest, early January. Consequently, we will be able to start the new year fresh.

### What does the future look like for Traders Domain and its clients?

Moving forward, the Broker's withdrawal processing times could take up to 45 days.
Knowing these timelines makes it easier to manage your expectations and plan accordingly. It is important to consider these timelines when planning withdrawals, whether they are for personal or investment purposes. As we embark on a new chapter in our six-year journey as friends and family fund and continue working with the broker in 2023, we will be able to alleviate issues and ensure consistency. We appreciate your patience and understanding as we work through these challenges. We hope this update gives you some additional insight into what's happening behind the scenes. With these new efficiencies, Traders Domain can ensure a better customer experience while still ensuring accuracy and quality in each transaction.

Again, thank you for your continued trust and support. We value every one of our clients, and we appreciate how patient and understanding you have been through this process.

Customer Support is open Monday through Friday from 9am to 5pm Eastern central time (Closed Holidays). Please expect a 24-48-hour response time.

Warm Regards,

**Algo Support**

ALGO CAPITAL

a: 3250 NE 1st Ave. Suite 208
Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

| | |
|---|---|
| **From:** | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
| **To:** | K. Z. |
| **CC:** | K @ Redacted com |
| **Sent:** | 15-Dec-22 3:29:39 AM |
| **Subject:** | Re: Open transfer |

Good Evening K. we are expecting all clients past funds to be sent by the broker before the end of next week. We sent out a company update to all our clients last week explaining the issues and the solutions the broker is implementing . Did you receive the email ? If not we can resend .

On Wed, Dec 14, 2022 at 8:57 PM K. Z. <Redacted@Redacted.de> wrote:

Hello everybody,

hello J.

I still have neither gotten my money transfer nor the announced email why the transfer couldn't be done.

Please answer now immediately!

Yours sincerely

K. Z.

--

Thank you,

Algo Capital Support



Support@algocapitalfx.com



This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s) disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are no cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any d the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do n represent those of the company.

| From: | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
|---|---|
| To: | S. |
| Sent: | 19-Dec-22 4:38:52 PM |
| Subject: | Re: Algo Capital Important Update |

S.

August, September, and October requests should be wrapped up this month and sent to your Savvy Digital Wallet.

**Warm Regards,**

**Algo Support**



a: 3250 NE 1st Ave. Suite 208
   Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

**From:** S. W. < Redacted @gmail.com>
**Date:** Thursday, December 15, 2022 at 12:08 PM
**To:** Support AlgoCapital <support@algocapitalfx.com>
**Subject:** Re: Algo Capital Important Update

Please, what does "the coming weeks" mean? This year, next year, the year after?

Sent from my iPad

On 15 Dec 2022, at 6:33 p.m., Support AlgoCapital <support@algocapitalfx.com> wrote:

S.

The update we received from our broker is that he expects to complete the withdrawals for August & September, and October within the coming weeks. We do not have an exact date for these to be completed however we have daily communication with him and hope to have those wrapped up soon.

We apologize again for the delays.

**Warm Regards,**

**Algo Support**



EXHIBIT
192

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746



**a:** 3250 NE 1st Ave. Suite 208
Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

**From:** S. W. < Redacted @gmail.com>
**Date:** Thursday, December 15, 2022 at 8:42 AM
**To:** Support AlgoCapital <support@algocapitalfx.com>
**Subject:** Re: Algo Capital Important Update

Dear All

This update is very timely and helpful, but I need a little more detail. Funds were withdrawn from my account on 5th October, I just want to know when they will be credited to my Savvy Wallet.

Sent from my iPhone

On 6 Dec 2022, at 16:40, Support AlgoCapital <support@algocapitalfx.com> wrote:

**Dear Algo Client,**
We are committed to transparency and excellent service, so we wanted to apologize for the inconvenience that some of our clients have had to endure as of recently. In recent months, The Traders Domain (the broker) has undergone a number of changes. The process of creating our new systems has not been without its bumps, and we are working hard to ensure that they are smooth and efficient. We hope this update sheds some light on some concerns you might have about what's going on behind the scenes and where we're heading.
Our business has been challenged in recent months but it's not because of anything within our walls. Rather, it's been because of events in the financial sector and the economy, which have led banks to take a more cautious perspective. We appreciate your understanding and patience as we address some concerns you've had recently about the broker's withdrawal process. We know change can be difficult, especially when it comes to finances.
**Withdrawal Delays**
Firstly, we would like to address the recent concerns regarding delays in client withdrawals from the broker. We know that this is a stressful situation for everyone involved and they are working hard every day to prevent further delays.
**What Caused the delays?**
It is important to understand how money moves when you are investing. The broker is Offshore (registered in Belize), so funds must always move from their liquidity pool to a trust account to a banking provider before being transferred to the client. In order to request a withdrawal, clients must submit their account and routing numbers. Often clients made mistakes when entering their account details; this usually occurs because they mislabeled the account or entered the routing number incorrectly. Banks take compliance very seriously to ensure that customers' funds are

protected. When errors are identified in a large batch of transactions, banks will often pause the transfer until they can obtain more information from the client. This is done to ensure that all regulatory and internal protocols are being followed.

**What is the solution?**

The Savvy Wallet allows the broker to transfer funds directly to the wallets of our clients. Client deposits and withdrawals are now individualized, ensuring that any errors or delays affect only the client and not the entire brokerage. Consequently, all clients will experience fewer delays and their transactions will be secure.

*NOTE: Everybody should set up their Savvy Wallet and make sure they are KYC-approved. Please contact our support team for instructions if you have not done so.*

**Backlog**

While the broker currently has a backlog of withdrawal requests, they're working to get them processed as soon as possible. In spite of the frustration clients experience when their withdrawal request is not processed immediately. Traders Domain is a brokerage firm that services 50,000 clients. Even though we would like to get some kind of priority, the brokerage ultimately manages the queue. The broker is working on a backlog of withdrawals for all its clients We understand how frustrating this can be, and we want to assure you that we are doing our best to get your withdrawals processed as soon as possible. The broker is working hard to clear the backlog of withdrawal requests from all their client groups in the most efficient way. We thank you for your patience and understanding while they work through it.

**Timelines**

In light of all this, our broker expects to complete the withdrawals for August & September, and October within the coming weeks. The broker is also confident that November requests will be completed by the end of December or, at the latest, early January. Consequently, we will be able to start the new year fresh.

**What does the future look like for Traders Domain and its clients?**

Moving forward, the Broker's withdrawal processing times could take up to 45 days.

Knowing these timelines makes it easier to manage your expectations and plan accordingly. It is important to consider these timelines when planning withdrawals, whether they are for personal or investment purposes. As we embark on a new chapter in our six-year journey as friends and family fund and continue working with the broker in 2023, we will be able to alleviate issues and ensure consistency. We appreciate your patience and understanding as we work through these challenges. We hope this update gives you some additional insight into what's happening behind the scenes. With these new efficiencies, Traders Domain can ensure a better customer experience while still ensuring accuracy and quality in each transaction.

Again, thank you for your continued trust and support. We value every one of our clients, and we appreciate how patient and understanding you have been through this process.

Customer Support is open Monday through Friday from 9am to 5pm Eastern central time (Closed Holidays). Please expect a 24-48-hour response time.

**Warm Regards,**

**Algo Support**

\<image001.png\>

a:  3250 NE 1st Ave, Suite 208
    Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

| From: | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
|---|---|
| To: | J. G. |
| Sent: | 28-Oct-22 3:47:13 PM |
| Subject: | Re: Transfer |

Good Afternoon,

We revised our withdraw process in an effort to execute these requests in a timelier manner. Open the link below and complete all the required information prior to current month end. Save this email link for future monthly requests -

Withdraw Request Form

Note: *Please be advised, it may take seven to fourteen business days for the proceeds of this withdrawal to transmit to your account following the month end reconciliation. Additionally, please ensure that you list the correct Savvy Wallet or BTC information. Failure to provide the correct information will delay your transfer.*

Warm Regards,

**Algo Support Team**



a:  3250 NE 1st Ave. Suite
208
Miami, FL 33137

This e-mail message may contain confidential or legally privileged information and is intended only for the use of the intended recipient(s). Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. E-mails are not secure and cannot be guaranteed to be error free as they can be intercepted, amended, or contain viruses. Anyone who communicates with us by e-mail is deemed to have accepted these risks. Algo Capital is not responsible for errors or omissions in this message and denies any responsibility for any damage arising from the use of e-mail. Any opinion and other statement contained in this message and any attachment are solely those of the author and do not necessarily represent those of the company.

**From:** J. G. <Redacted@aol.com>
**Date:** Friday, October 28, 2022 at 7:43 AM
**To:** Support AlgoCapital <support@algocapitalfx.com>
**Subject:** Transfer

Please transfer $50,000 to my Savvy wallet. My Algo account number is Redacted676. My wallet is is:

Redacted

Thanks,
J. G.

**EXHIBIT**
193
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

| | |
|---|---|
| **From:** | Support AlgoCapital <support@algocapitalfx.com> on behalf of Support AlgoCapital <support@algocapitalfx.com> |
| **To:** | G. |
| **Sent:** | 14-Dec-22 5:13:47 PM |
| **Subject:** | Re: Withdraw from my Savvywallet |

Good Afternoon,

We revised our withdraw process in an effort to execute these requests in a timelier manner. Open the link below and complete all the required information prior to current month end. Save this email link for future monthly requests -

Withdraw Request Form

Note: *Please be advised, it may take seven to fourteen business days for the proceeds of this withdrawal to transmit to your account following the month end reconciliation. Additionally, please ensure that you list the correct **Savvy Wallet** or **BTC** information. Failure to provide the correct information will delay your transfer.*

---

**From:** G. <Redacted@gmail.com>
**Date:** Wednesday, December 14, 2022 at 9:05 AM
**To:** "support@algocapitalfx.com" <support@algocapitalfx.com>
**Cc:** Redacted@gmail.com" <Redacted@gmail.com>
**Subject:** Withdraw from my Savvywallet

ATTENTION  John this is my first time Attempting to withdrawl please reply back let me know of this is all correct

like to withdrawl $9500 from
My Account # Redacted239
          Redacted

Sent from my T-Mobile 4G LTE Device



**EXHIBIT**
**194**

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 38 U.S.C. § 1746

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00076838

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

## SEPARATELY MANAGED ACCOUNT AGREEMENT

9/19/2022

This Agreement is made this _____ date (the "Agreement"), by and between Algo FX Capital Advisor, LLC (the "Manager"), a Delaware Limited Liability company, and ⬛A. S.⬛ _____ (the "Client").

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's assets as Client shall from time to time assign to it (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and may: (a) buy, sell, exchange, convert and otherwise invest or trade in any commodity, commodity contract, crypto-currency, digital assets, stocks, bonds, options, units and other securities, including money market instruments, whether the issuer is organized in the United States or outside the United States, at such times and in such manner as Manager determines; (b) place orders for the execution of such assets transactions with or through such decentralized exchanges, brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) purchase, sell, exchange or convert foreign currency in the spot or forward markets as agent or principal, at the market rate, as determined by Manager in its sole discretion (d) . Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). The Guidelines and all Instructions, unless they expressly provide otherwise, shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid the rates specified in Exhibit B, based on the asset value of the Account as of the last day of each relevant period (the "Valuation Date"). The initial billing period will begin when initial funding has been made (the "Inception Date").

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly



EXHIBIT
195

TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(d) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors or employees, to engage in any other business or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association or individual. Client understands that Manager provides investment advisory services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

7. Liability of Manager. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character and with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. Brokerage. Where Manager places orders, or directs the placement of orders, for the purchase or sale of portfolio securities for the Account, in selecting brokers or dealers to execute such orders. In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. Confidential Relationship. Each party agrees that all non-public confidential information concerning the other party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. Reports. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar month. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, foreign securities denominated in foreign currencies will be valued in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account are subject to various market, currency, economic, and business risks as well as the risk that those investment decision will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that securities, mutual funds and other non-deposit investments are not deposits or other obligations of, or guaranteed by, Manager or any affiliate, are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

12. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 15, and 16 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

13. Assignment. This Agreement may be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Manager may delegate all or part of its duties under this Agreement to any affiliate.

14. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

If to Client:

Email: Redacted @yahoo.com

Attention: A. S.

If to Manager:

Email: Support@algocapitalfx.com

Attention: John Fortini

Either party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

15. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Florida without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in Miami Dade County, Florida.

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

16. Entire Agreement; Modification. This Agreement: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

17. Headings. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

18. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

19. Severability. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

Client:

A. S.

DocuSigned by:

A. S.                                     9/19/2022

By:
Name:      A S

Algo FX Capital Advisor, LLC

DocuSigned by:

John Fortini

By:
Name:   John Fortini
Title:    Authorized Person

11

## EXHIBIT A

**Statement of Investment Objectives**

Initial objective will be focused on the implementation of a gold intra-day trading strategy. Future investment objective may include the implementation of algorithmic FX strategies and other asset classes.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

Managed Accounts – Trading Accounts

50% Performance Fee on gains calculated monthly

## EXHIBIT C

### CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
|      |       |                    |
|      |       |                    |
|      |       |                    |
|      |       |                    |
|      |       |                    |

DocuSign Envelope ID: 4166114B-0DFF-4BB9-A7F3-684C36287108

**EXHIBIT D**

**INVESTOR WIRE INSTRUCTIONS**

| | |
|---|---|
| Name of Beneficiary | A. S. |
| Beneficiary Address | Redacted |
| City, State Zip Code | Boynton Beach FL 33437 |
| | |
| Bank Account Number | Redacted 5102 |
| Bank Routing Number (ACH) | 267084131 |
| Bank Routing Number (ABA) (Wire) | 021000021 |
| Bank SWIFT/BIC Number | CHASUS33 |
| | |
| Bank Name | Chase Bank |
| Bank Address | |
| City, State and Zip Code | |
| | |
| Reference Message | |

**INVESTOR CRYPTO TRANSFER INSTRUCTIONS**

| | |
|---|---|
| ETH (ERC 20 ADDRESS) | |
| BTC ADDRESS | |

**IMPORTANT: Algo Capital accepts no responsibility for loss of funds due to incorrectly provided information. PLEASE DOUBLE CHECK YOUR ADDRESSES AND WIRE INSTRUCTIIONS PRIOR TO SUBMITTING.**

<u>Wiring Instructions of Record:</u> Please note that redemption payments, in accordance with both the current Anti-Money Laundering regulatory environment and industry best practice, will be paid only to the account used for the subscription payment. The titling of the bank account must match the titling of this subscription.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

JH_00007067

DocuSign Envelope ID: 4166114B-00FF-4BB9-A7F3-684C36287108



The following are instructions for making a wire transfer for Algo Capital. The funds will be wired to an account at TD Bank, N.A.

The instructions are:

**TD Bank, N.A.**
Beneficiary: Algo Capital, LLC
Account #: Redacted 6056
Routing #: 067014822
Fed Wire #: 031101266
Swift code: NRTHUS33
16200 NW 57th Ave
Miami Lakes, FL 33014
M: #305.817.9729

Memo: Algo Capital Client Name

Please Note: Following receipt of funds transfer, accounts creation will be completed in 2-3 business days.

Please contact John Fortini prior to initiating a wire transfer as our transfer instructions are  subject to change.

**John Fortini**
CFO Portfolio Management, ALGO Capital
3250 NE 1st Ave
Suite 208
Miami, FL 33137
C: Redacted
E: support@algocapitalfx.com
IMPORTANT: *Please ensure you verify the wire information above during your transfer to ALGO Capital / TD Bank, N.A. ALGO Capital and its founders, executives and /or employees are not responsible for any errors as a result of entering inaccurate Account or Routing information. Please verify all the information above with your banking institution prior to initiating a transfer.*

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702

## SEPARATELY MANAGED ACCOUNT AGREEMENT

11/17/2022

This Agreement is made this _____ date (the "Agreement"), by and between Algo FX Capital Advisor, LLC (the "Manager"), a DelawareLimited Liability company, and [A. M.] _____ (the "Client").

1. Appointment. Client hereby appoints Manager as an investment manager to manage such of Client's assets as Client shall from time to time assign to it (the "Account"). Client shall promptly notify Manager in writing of any increase or reduction in the amount of the Account's assets subject to Manager's investment direction.

2. Authority of Manager. Manager is authorized to supervise and direct the investment and reinvestment of the assets in the Account, subject to such limitations as are contained in the Guidelines described in Section 3 of this Agreement, as they may be from time to time amended, and subject to Client's right to direct the investment of the Account by means of Instructions as described in Section 3 of this Agreement. Manager, as Client's agent and attorney-in-fact with respect to the Account, when it deems appropriate and may: (a) buy, sell, exchange, convert and otherwise invest or trade in any commodity, commodity contract, crypto-currency, digital assets, stocks, bonds, options, units and other securities, including money market instruments, whether the issuer is organized in the United States or outside the United States, at such times and in such manner as Manager determines; (b) place orders for the execution of such assets transactions with or through such decentralized exchanges, brokers, dealers or issuers as Manager may select, which brokers or dealers are entitled to receive compensation out of the Account for their services; and (c) purchase, sell, exchange or convert foreign currency in the spot or forward markets as agent or principal, at the market rate, as determined by Manager in its sole discretion (d) . Manager may give a copy of this Agreement to any broker, dealer or other party to a transaction, as evidence of its authority to act on the Account's behalf.

3. Guidelines and Instructions. Attached hereto as Exhibit A is a statement of the investment objectives of Client together with a statement of any and all specific investment restrictions applicable to the investment of the Account (the "Guidelines"). Client shall have the right at all times to modify the Guidelines or to give Manager instructions ("Instructions") to buy, sell or retain any investment, but no modification of the Guidelines and no Instructions or modifications of Instructions shall be binding upon Manager unless Manager has received written notice of them from an Authorized Person (as defined in Section 5(d)). The Guidelines and all Instructions, unless they expressly provide otherwise, shall continue to be effective until duly canceled by subsequent modifications duly communicated to Manager in writing.

4. Fees. As full compensation for its services under this Agreement, Manager shall be paid the rates specified in Exhibit B, based on the asset value of the Account as of the last day of each relevant period (the "Valuation Date"). The initial billing period will begin when initial funding has been made (the "Inception Date").

5. Representations and Warranties. Client hereby acknowledges, represents and warrants to, and agrees with Manager, as follows:

(a) Client Assets. Client is the sole owner of all assets in the Account and (i) there are no restrictions on the transfer, sale or public distribution of any such assets and (ii) no option, lien, charge, security or encumbrance exists over such assets, except as disclosed to Manager in writing.

(b) Authority. The Client has full authority and power to engage Manager under the terms and conditions of this Agreement, and such engagement does not violate Client's constituent documents, any other material agreement, order or judgment of any court or governmental authority, or any law applicable to Client. Client further represents that all investments permitted herein are within its power to enter into and have been duly authorized.

(c) Authorized Persons. Any individual whose signature is affixed to this Agreement on Client's behalf has full authority and power to execute this Agreement on Client's behalf. Client represents that the officer specified on the attached Certification of Authorized Persons (Exhibit C) is authorized to act for Client and to certify to Manager from time to time, by listing on, and delivering to Manager Exhibit C or a substantially similar form, those other persons who also are so authorized to act on Client's behalf ("Authorized Persons"). The Client shall promptly



EXHIBIT
196

JH_00007198

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702

notify Manager in writing of any event that could reasonably be anticipated to affect any such individual's authority under this Agreement.

(d) Notice of Certain Events. Client will promptly notify Manager in writing of any occurrence that results, or threatens to result, in any representations by Client contained in this Agreement becoming inaccurate, false, misleading or incomplete.

6. Non-Exclusive Agreement. Nothing in this Agreement shall be deemed to limit or restrict Manager's right, or the right of any of its officers, directors or employees, to engage in any other business or to devote time and attention to the management or other aspects of any business, whether of a similar or dissimilar nature, or to render investment advisory services or services of any kind to any other corporation, firm, association or individual. Client understands that Manager provides investment advisory services to numerous other clients and accounts. Client also understands that Manager may give advice and take action with respect to any of its other clients or for its own account which may differ from the timing or nature of action taken by Manager with respect to the Account.

7. Liability of Manager. Except as may otherwise be provided by law, Client specifically agrees that Manager shall not be liable for: (a) any loss that Client may suffer by reason of any investment decision made or other action taken or omitted in good faith and with that degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an enterprise of a like character with like aims; (b) any loss, expense or other liability (including but not limited to attorneys' fees) incurred by Client or Manager arising from or in connection with Manager's compliance with the Guidelines or Instructions believed by Manager to be accurate; (c) any act or failure to act by any broker or other person with whom Manager or Client may deal in connection with the subject matter of this Agreement; or (d) any loss or failure or delay in performance of any obligation under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond Manager's reasonable control, including, without limitation, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utility, computer software or hardware, transportation or communication service, accidents, labor disputes, acts of civil or military authority, governmental actions and inability to obtain labor, material, equipment or transportation.

8. Brokerage. Where Manager places orders, or directs the placement of orders, for the purchase or sale of portfolio securities for the Account, in selecting brokers or dealers to execute such orders. In no event shall Manager be obligated to effect or place an order for any transaction for Client which Manager believes would violate any applicable state or federal law, rule, or regulation, or of the regulations of any regulatory or self-regulatory body to which Manager or any of its affiliates is subject to at the time of the proposed transaction.

9. Confidential Relationship. Each party agrees that all non-public confidential information concerning the other party which may become available to such party in connection with services, transactions or relationships contemplated in this Agreement shall at all times be treated in strictest confidence and shall not be disclosed to third persons except as (a) may be required by law or regulatory authority, including but not limited to any subpoena, administrative, regulatory or judicial demand or court order, (b) as otherwise set forth in this Agreement, or (c) upon the prior written approval of the other party to this Agreement. Client authorizes Manager (i) to include Client's name in a representative or sample client list prepared by Manager, provided Manager shall not disclose Client contact information or any information about Client's holdings, and (ii) to use Manager's investment experience with respect to the Account, or the Account's performance, in composite performance presentations, marketing materials, attribution analyses, statistical compilations, or other similar compilations or presentations, provided such use does not disclose Client's identity except to the extent permitted by Client.

10. Reports. Manager shall send to Client a written report of the Account as of the Valuation Date of each calendar month. Such reports shall be submitted within a reasonable period following such Valuation Date. For the purposes of all reports made by Manager to Client, foreign securities denominated in foreign currencies will be valued in United States dollars, unless otherwise agreed by Manager and Client. Client shall examine promptly each such report and any other report provided by Manager. To the extent permissible under applicable law, upon the expiration of the sixty (60) day period immediately following the date of such report, or the termination of this Agreement as provided herein, if earlier, Manager shall be forever released and discharged from all liability and accountability to anyone with respect to each such report, including, without limitation, all acts and omissions of Manager shown or reflected in each such report, except with respect to any acts or omissions as to which Client shall

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702

have filed written objections with Manager within such sixty (60) day period. Nothing herein shall impair the right of Manager to a judicial settlement of any report rendered by it.

11. Acknowledgment of Investment Risk. Notwithstanding any provision herein to the contrary, Client understands that the value of investments made for the Account may go down as well as up and is not guaranteed. Client agrees that Manager has not made and is not making any guarantees, including without limitation a guarantee as to any specific level of performance of the Account. Client further understands and acknowledges that investment decisions made on behalf of Client's Account by Manager are subject to various market, currency, economic, and business risks as well as the risk that those investment decision will not always be profitable. Client acknowledges that past performance results achieved by accounts supervised or managed by Manager are not indicative of the future performance of the Account. Client understands that securities, mutual funds and other non-deposit investments are not deposits or other obligations of, or guaranteed by, Manager or any affiliate, are not insured by the Federal Deposit Insurance Corporation ("FDIC") or any other government agency, and are subject to investment risk, including possible loss of principal amounts invested.

12. Termination; Survival. This Agreement may be terminated by either party upon thirty (30) days' written notice to the other party. Such termination will not, however, affect the liabilities or obligations of the parties under this Agreement arising from transactions initiated prior to such termination. Sections 4, 7, 9, 10, 15, and 16 shall survive the termination of this Agreement. Upon any termination of this Agreement, Manager shall have no further obligations hereunder, provided that: (a) any liability under this Agreement of one party to the other shall survive and remain in full force and effect, notwithstanding such termination, with respect to any claim or matter on which either of the parties has given the other written notice prior to such termination (except that Manager may render to Client a statement of fees due Manager through the date of termination after such date), until such liability has been finally settled; (b) Manager retains the right to complete any transactions open as of the termination date and to retain amounts in the Account sufficient to effect such completion; and (c) Manager shall be entitled to its fees and expenses, pro rated to the date of termination. Upon termination, it shall be Client's exclusive responsibility to issue instructions in writing regarding any assets in the Account.

13. Assignment. This Agreement may be assigned (within the meaning of the Investment Advisers Act of 1940, as amended), in whole or in part, by Manager without the prior written consent of Client. Manager may delegate all or part of its duties under this Agreement to any affiliate.

14. Communications. All reports and other communications required hereunder to be in writing shall be delivered in person or sent by first-class mail postage prepaid, overnight courier, or confirmed facsimile with original to follow.

If to Client:

Email: Redacted @gmail.com

Attention: A. M.

If to Manager:

Email: Support@algocapitalfx.com

Attention: John Fortini

Either party to this Agreement may, by written notice given at any time, designate a different address for the receipt of reports and other communications due hereunder.

15. Governing Law; Venue. This Agreement shall be governed by and construed and enforced in accordance with the laws of the United States and with the laws of the State of Florida without giving effect to the choice of law or conflict of law provisions thereof. The parties hereby consent to jurisdiction and venue in the federal and state courts located in Miami Dade County, Florida.

JH_00007187

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702

16. Entire Agreement; Modification. This Agreement: (a) sets forth the entire understanding of the parties with respect to the subject matter hereof; (b) supersedes any and all previous agreements, understandings and communications, oral or written, regarding this subject matter; and (c) may not be modified, amended, or waived except by a specific written instrument duly executed by the party against whom such modification, amendment, or waiver is sought to be enforced. In the event of any conflict or inconsistency with this Agreement and any instructions or investment guidelines that are not made part of this Agreement or any investment policy statement, this Agreement will control.

17. Headings. The headings of the sections of this Agreement are for convenience of reference only and will not affect the meaning or operation of this Agreement. As used herein, references in the singular shall, as and if appropriate, include the plural.

18. Counterparts. This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

19. Severability. In the event that any provision of this Agreement is deemed to be void, voidable, illegal, or invalid for any reason, such provision will be of no force and effect only to the extent that it is so declared void, voidable, illegal, or invalid. All of the provisions of this Agreement not specifically found to be so deficient will remain in full force and effect.

[SIGNATURE PAGE FOLLOWS]

FOIA - CONFIDENTIAL TREATMENT REQUESTED

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized officers to be effective as of the date first written above.

Client:

A. M.

DocuSigned by:

11/17/2022

By: A. M.

Name: A. M.

Algo FX Capital Advisor, LLC

DocuSigned by:

*John Fortini*

By: ───────────────
DE5ED22422DD468

Name: **John Fortini**

Title: **Authorized Person**

11

## EXHIBIT A

### Statement of Investment Objectives

Initial objective will be focused on the implementation of a gold intra-day trading strategy. Future investment objective may include the implementation of algorithmic FX strategies and other asset classes.

## EXHIBIT B

### FEE SCHEDULE

As compensation for managing the Account, Manager shall be paid as follows:

Managed Accounts – Trading Accounts

50% Performance Fee on gains calculated monthly

## EXHIBIT C

### CERTIFICATION OF AUTHORIZED PERSONS

I certify, as the following persons are "Authorized Persons" under the Agreement:

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
|      |       |                    |
|      |       |                    |
|      |       |                    |
|      |       |                    |

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702

**EXHIBIT D**

**INVESTOR WIRE INSTRUCTIONS**

| | |
|---|---|
| Name of Beneficiary | A. M. |
| Beneficiary Address | |
| City, State Zip Code | |
| | |
| Bank Account Number | |
| Bank Routing Number (ACH) | |
| Bank Routing Number (ABA) (Wire) | |
| Bank SWIFT/BIC Number | |
| | |
| Bank Name | |
| Bank Address | |
| City, State and Zip Code | |
| | |
| Reference Message | |

**INVESTOR CRYPTO TRANSFER INSTRUCTIONS**

| | |
|---|---|
| ETH (ERC 20 ADDRESS) | |
| BTC ADDRESS | |

**IMPORTANT:** Algo Capital accepts no responsibility for loss of funds due to incorrectly provided information. PLEASE DOUBLE CHECK YOUR ADDRESSES AND WIRE INSTRUCTIIONS PRIOR TO SUBMITTING.

Wiring Instructions of Record: Please note that redemption payments, in accordance with both the current Anti-Money Laundering regulatory environment and industry best practice, will be paid only to the account used for the subscription payment. The titling of the bank account must match the titling of this subscription.

FOIA - CONFIDENTIAL TREATMENT REQUESTED

DocuSign Envelope ID: 30D0F734-C8A3-4A01-BD34-CF4D3D467702



The following are instructions for making a wire transfer for Algo Capital. The funds will be wired to an account at TD Bank, N.A.

The instructions are:

**TD Bank, N.A.**
Beneficiary: Algo Capital, LLC
Account #: Redacted6056
Routing #: 067014822
Fed Wire #: 031101266
Swift code: NRTHUS33
16200 NW 57th Ave
Miami Lakes, FL 33014
M: #305.817.9729

Memo: Algo Capital Client Name

Please Note: Following receipt of funds transfer, accounts creation will be completed in 2-3 business days.

Please contact John Fortini prior to initiating a wire transfer as our transfer instructions are subject to change.

**John Fortini**
CFO Portfolio Management, ALGO Capital
3250 NE 1st Ave
Suite 208
Miami, FL 33137
C: Redacted
E: support@algocapitalfx.com
IMPORTANT: *Please ensure you verify the wire information above during your transfer to ALGO Capital / TD Bank, N.A. ALGO Capital and its founders, executives and /or employees are not responsible for any errors as a result of entering inaccurate Account or Routing information. Please verify all the information above with your banking institution prior to initiating a transfer.*

DocuSign Envelope ID: 5F4637A3-F1FD-4CCF-B524-8F17BCA2B5EB



The following are instructions for making a wire transfer for Algo Capital. The funds will be wired to an account at TD Bank, N.A.

The instructions are:

**TD Bank, N.A.**
Beneficiary: Algo Capital, LLC
Account #: Redacted5056
Routing #: 067014822
Fed Wire #: 031101266
Swift code: NRTHUS33
16200 NW 57th Ave
Miami Lakes, FL 33014
M: #305.817.9729

Memo: Algo Capital Client Name

Please Note: Following receipt of funds transfer, accounts creation will be completed in 2-3 business days.

Please contact John Fortini prior to initiating a wire transfer as our transfer instructions are subject to change.

**John Fortini**
CFO Portfolio Management, ALGO Capital
3250 NE 1st Ave
Suite 208
Miami, FL 33137
C: Redacted
E: support@algocapitalfx.com
IMPORTANT: *Please ensure you verify the wire information above during your transfer to ALGO Capital / TD Bank, N.A. ALGO Capital and its founders, executives and /or employees are not responsible for any errors as a result of entering inaccurate Account or Routing information. Please verify all the information above with your banking institution prior to initiating a transfer.*

**EXHIBIT**
197
TO THE DECLARATION OF MAURA M. VIDMEYER
PURSUANT TO 28 U.S.C. § 1746

◀ TELEGRAM

## The Traders Domain Official C...
932 members, 210 online

**Pinned Message**
Yes

Joseph was accepted to the group

JFowler was accepted to the group

Jamie Fa was accepted to the group

Ali S was accepted to the group

Ari Mindel was accepted to the group

**Ted Broker**                    Uncle Ted
I am no longer hosting any zoom
sessions or live chats

👍 4
                                    11:35 AM

They have been recorded and sent
to the authorities and I am now
being investigated

👎 18    😢 3    😨 2
                                    11:35 AM

I have retained legal counsel and
will be answering questions
accordingly

🙏 10
                                    11:36 AM

It will not impact Traders Domain

❤️ 9
                                    11:39 AM

It will impact me but I am already
prepared

🙏 13    ❤️ 6    👍 3
                                    11:39 AM



EXHIBIT
198
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746

Sending messages is not allowed in this group.

[11/22/22, 1:50:49 PM] john: Why wouldn't they be in system we processed those in October

Redacted @gmail.com
Was 100,000
October 10th

Redacted @gmail.com
115,575
October 6th
[11/22/22, 1:51:47 PM] john: And we closed

Pjcamp217@gmail.com
On 11/9 that can wait
[11/22/22, 1:54:03 PM] john: Those are their saavy
[11/22/22, 1:54:05 PM] Ted Broker: Alright we are waiting for funds to be released and ill get the team to process that
[11/22/22, 1:54:19 PM] john: Ok thank you
[11/22/22, 2:03:29 PM] Ted Broker: Why are clients emailing my support team asking for Ted?
[11/22/22, 2:03:44 PM] Ted Broker: how do clients know my name?
[11/22/22, 2:03:54 PM] Ted Broker: and why are they sending notes to support like I am the one answering?
[11/22/22, 2:04:02 PM] Ted Broker: honestly this is not good at all.
[11/22/22, 2:04:16 PM] Ted Broker: I am ready to cut the entire program
[11/22/22, 2:05:06 PM] john: I'm not sure what client but a lot of clients know you the owner of broker since all the broker issues all the Miami groups talked
[11/22/22, 2:05:23 PM] john: No one knew in the past we never gave out information
[11/22/22, 2:05:37 PM] Ted Broker: This is incredible
[11/22/22, 2:05:44 PM] Ted Broker: the entire platform will get shut down shortly now
[11/22/22, 2:05:55 PM] Ted Broker: everyone is going to lose everything the way people are handling themselves
[11/22/22, 2:06:31 PM] john: Yea I have mentioned in past that ppl at local bars knew the broker and you
[11/22/22, 2:06:38 PM] Robert Collazo: MLM guys cause chaos in every industry
[11/22/22, 2:06:44 PM] john: Miami spreads like wildfire any info
[11/22/22, 2:07:06 PM] Ted Broker: Yeah its ok this entire thing will get frozen now by the cftc
[11/22/22, 2:07:29 PM] Ted Broker: Not going to impact me but every usa client who has funds and anyone who has referred anyone and taken money from fees
[11/22/22, 2:07:50 PM] Robert Collazo: We'll hopefully not us lol
[11/22/22, 2:08:25 PM] Ted Broker: Everyone in the usa
[11/22/22, 2:08:39 PM] Ted Broker: The government is going to go after everyone.  Especially with this ftx blow up
[11/22/22, 2:08:44 PM] Ted Broker: People are playing with fire.
[11/22/22, 2:09:56 PM] Robert Collazo: We're registered with cftc and everyone licensed
[11/22/22, 2:11:28 PM] john: Ted can we do 5 min call in with rob now and Jj available so we can get in front of clients using your name and issues you want us to get in front of .
[11/22/22, 2:13:01 PM] john: Also think a lot clients and clients ppl follow you on ig
[11/22/22, 2:19:09 PM] Ted Broker: I dont have time for calls i am on other calls with banks trying to move fudns
[11/22/22, 2:19:32 PM] Ted Broker: people are responsible for their clients.  Not me
[11/22/22, 2:25:22 PM] Robert Collazo: The reality is a lot of this we'll go away as the MLM people go away.
And if people continue getting funds then it goes away.
We have had no issues since we started with you.  Which is about 4-5 years now
[11/22/22, 2:26:45 PM] Ted Broker: yes but your clients are now threatening the system
[11/22/22, 2:26:48 PM] Ted Broker: its not mlm clients
[11/22/22, 2:29:59 PM] Robert Collazo: That's why we are trying to eliminate those



Our objective is eliminating the troublesome ones

We have no way of knowing who is contacting you
[11/22/22, 2:30:37 PM] john: We closed issue clients and we're gonna continue
[11/22/22, 2:30:43 PM] Ted Broker: ok
[11/22/22, 2:30:45 PM] john: Sorry
[11/22/22, 2:30:52 PM] Ted Broker: they should have been vetted better on your side
[11/22/22, 2:31:08 PM] john: Yep agree we allowed ppl who didn't deserve
[11/22/22, 2:31:11 PM] john: And we will fix
[11/22/22, 2:31:30 PM] Ted Broker: these people have made monstrous gains because of the platform. they obviously weren't fully educated about fx or lied to you guys
[11/22/22, 2:31:34 PM] Robert Collazo: The all are.  Everyone is good until something happens.   Let's be honest the FTX issue does not help.  As all it does is make people more nervous
[11/22/22, 2:31:50 PM] Ted Broker: yeah lack of education
[11/22/22, 2:31:53 PM] john: Yea  agree
[11/22/22, 2:32:04 PM] Robert Collazo: Our disclosures are very clear on how everything works
[11/22/22, 2:32:20 PM] john: We will be handling and adjusting our busines
[11/22/22, 5:34:57 PM] john: Hey ted we saw the first client get handled thank you 🙏
[11/22/22, 5:55:05 PM] Ted Broker: Yes we are pushing out more as well
[11/22/22, 5:58:45 PM] john: Thank you ted
[11/22/22, 6:02:16 PM] Robert Collazo: Thank you
[11/22/22, 6:04:01 PM] Ted Broker: No worries we are clearing  out as much as we can as fast as possible
[11/24/22, 10:03:46 AM] john: Good morning ted , is it possible to get the other client handled today/tomorrow that Robert mentioned ? Thank you
[11/25/22, 3:04:00 AM] Ted Broker: this one hasn't completed their savvy profile.  Their wallet doesn't show up.  We sent it to your main wallet.
[11/25/22, 8:14:42 AM] john: Good morning ted thank you .
[11/25/22, 8:15:01 AM] Ted Broker: no problem
[11/25/22, 8:57:52 AM] john: We still have a bunch more from august do you think any thing going out this weekend ? Or next week ? Then we have September we can work on .
[11/25/22, 12:20:05 PM] Ted Broker: We are working through them we can't tel until funds reach savvy
[12/1/22, 9:14:36 AM] john: Morning ted , we sent the google meet invite via email to you last night but here the link as well
[12/1/22, 9:14:39 AM] john: Here's the Google meet info (it's also on the calendar event details)


Algo Team Call
Thursday, December 1 · 11:00am – 12:00pm
Google Meet joining info
Video call link: https://meet.google.com/tfj-hafb-gmv
Or dial: (US) +1 740-841-6282 PIN: ▓Redacted▓ #
More phone numbers: https://tel.meet/tfj-hafb-gmv?pin=1203799246522
[12/1/22, 10:18:03 AM] Ted Broker: Ok perfect
[12/2/22, 10:36:32 AM] john: Good morning ted , we received 100k thru saavy thank you ! Just want to make sure I allocate it .  can we put that towards august ? Or is that for ▓F.▓ ? Or are you sending fatima small payments directly from your end.   Thank you
[12/2/22, 11:46:17 AM] Ted Broker: Yes allocate as toy see fit
[12/2/22, 11:46:29 AM] Ted Broker: You can clear any accounts
[12/2/22, 11:46:57 AM] john: Ok perfect we'll get this to some august clients Thank you
[12/7/22, 11:33:27 AM] john: Hey buddy we got 150k just now thank you .  We're gonna allocate this towards Aug and sept .  Just wanted to clarify ▓F.▓ will be sent from traders to her saavy most likely when we do the big deposits this month right? I don't want to pay her if she is getting hers from her saavy request on broker .
[12/7/22, 11:33:52 AM] Ted Broker: yes
[12/7/22, 11:34:00 AM] Ted Broker: if you do pay here a portion let me know

[2/12/21, 10:42:39 AM] john: Hey buddy can you send me wire instructions for saeg not international
[2/12/21, 10:42:48 AM] john: The fund is sendin usd and
[2/12/21, 10:43:28 AM] Tinman: Receiving Bank:
Incoming Domestic Wire Instructions
Beneficiary Bank: The First, A National Banking Association
6480 US Hwy 98 West
PO Box 15549
Hattiesburg, MS 39404-5549
ABA/Routing No: 065303360
Beneficiary Account Number: Redacted 2712
Beneficiary Account Name: Saeg Capital Limited
Beneficiary Account Address: 335 Slaughter Station Road, Hartly, DE 19953
[2/16/21, 1:20:42 PM] Tinman: hey john should we be expecting a wire this week? just checking up on the wire you were mentioning last week
[2/16/21, 1:21:00 PM] john: Yes sir supposed was sent Friday
[2/16/21, 1:21:04 PM] john: So should arrive tomrorow
[2/16/21, 1:21:08 PM] Tinman: ok
[2/16/21, 1:21:15 PM] Tinman: hey ill be in town thursday
[2/16/21, 1:21:27 PM] Tinman: well wed night but thursday until.. i dunno
[2/16/21, 1:21:26 PM] john: Perfect
[2/16/21, 1:21:31 PM] Tinman: just one way and see
[2/16/21, 1:21:51 PM] Tinman: leave on sat or sunday.. just going to play by ear
[2/19/21, 8:16:29 AM] Tinman: Happy birthday brother!
[2/21/21, 12:34:51 AM] Tinman: Missed voice call
[2/21/21, 12:34:58 AM] Tinman: Hey I'm outside
[2/21/21, 12:35:57 AM] Tinman: Missed voice call
[2/22/21, 9:42:32 AM] john: Hey my bro thank you for coming out for my bday .  The dinner was amazing i appreciated it
[2/22/21, 9:42:47 AM] john: Cops came and shut us down saturdga killed my vibe and was dealing with that
[2/22/21, 10:56:08 AM] Tinman: No worries brother. Yeah I understand.. soon as I saw everyone and no music.. game over.
[2/22/21, 2:52:57 PM] john: Perfect got the email and I filled out the pin
[2/22/21, 2:52:59 PM] john: Thank you
[2/22/21, 3:01:15 PM] Tinman: Ok perfect
[2/22/21, 3:18:42 PM] Tinman: im processing your wire so you should be good for tomorrow.
[2/22/21, 3:18:56 PM] Tinman: you will keep. your promise!
[2/22/21, 3:19:06 PM] john: Thank you bro !
[2/22/21, 3:19:43 PM] Tinman: no problem. ill be back sthere next week for some meetings. should meet for liunch or so and meet my partner dave in the brokerage and fund
[2/22/21, 3:19:54 PM] john: Ok perfect ! Yes for sure
[2/24/21, 10:12:34 AM] Tinman: wire should be in
[2/24/21, 11:25:29 AM] john: Yes thank you my bro
[3/21/21, 10:25:14 PM] john: Yooo JJ said u in town
[3/22/21, 7:01:15 AM] Tinman: Yeah my bad about yesterday. My boys got me messed up where I knocked out at the mansion
[4/2/21, 10:09:39 AM] john: Hey homie
[4/2/21, 10:09:47 AM] john: Can you check  T. R.  wire
[4/2/21, 10:09:50 AM] john: I sent it Thursday
[4/2/21, 10:11:13 AM] Tinman: Let me see
[4/2/21, 10:11:38 AM] Tinman: It takes a can take up to a couple of days
[4/2/21, 10:12:15 AM] john: Yea it's been super quick lately
[4/2/21, 10:12:43 AM] Tinman: Yeah let me check. Once I get it I send it out. Nothing yet
[4/2/21, 10:13:00 AM] john: It was 2500
[4/2/21, 10:13:17 AM] Tinman: Ok let me see if I can get it through
[4/2/21, 10:16:00 AM] john: <attached: 00000262-PHOTO-2021-04-02-10-15-59.jpg>

EXHIBIT
200
TO THE DECLARATION OF MAURA M. VIEHMEYER
PURSUANT TO 28 U.S.C. § 1746