**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-cv-23745-ALTMAN**

**COMMODITY FUTURES**
**TRADING COMMISSION**,

    *Plaintiff*,

*v.*

**TRADERS DOMAIN FX LTD.** *d/b/a*
**THE TRADERS DOMAIN**, *et al.*,

    *Defendants.*

_____/

**SEALED ORDER GRANTING PLAINTIFF'S EXPEDITED MOTION**
**FOR AN *EX PARTE* STATUTORY RESTRAINING ORDER, APPOINTMENT OF A**
**TEMPORARY RECEIVER, AND OTHER EQUITABLE RELIEF**

    The Plaintiff, the Commodity Futures Trading Commission ("Commission") has filed a Complaint for Injunctive Relief, Civil Monetary Penalties, Restitution, and Other Equitable Relief [ECF No. 1] and moved, pursuant to 7 U.S.C. § 13a-1(a) of the Commodity Exchange Act ("Act"), for an *ex parte* Statutory Restraining Order freezing assets, allowing inspection of records, appointing a Temporary Receiver, and granting expedited discovery, [ECF No. 5]. We have considered the pleadings, declarations, exhibits, and memorandum filed in support of the Commission's motion, and find as follows:

1.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). 7 U.S.C. § 13a-1(a) authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to

engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.

2.      Venue lies properly within this District pursuant to 7 U.S.C. § 13a-1(e).

3.      The Commission has made a proper *prima facie* showing that from at least at least November 2019 through present (the "Relevant Period"), Traders Domain FX LTD. d/b/a/ The Traders Domain, by and through its officers, employees, and agents, ("TD") and its co-owners Frederick Teddy Joseph Safranko a/k/a/ Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari"), individually and as controlling persons of TD (collectively, the "TD Defendants") orchestrated a multi-layered scheme to solicit funds for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts.  Many, if not all, of the offered leveraged or margined transactions were transactions described in Section 2(c)(2)(D) of the Act, 7 U.S.C. §2(c)(2)(D) ("leveraged or margined retail commodity transactions").  Not only did the TD Defendants directly solicit customers, the vast majority of whom lived in the U.S., but they also engaged other individuals and entities ("sponsors") to solicit U.S. customers on TD's behalf—with each sponsor acting like a spoke extending from the TD hub.  During the Relevant Period, the TD Defendants began soliciting individuals and/or entities ("customers") to deposit funds for the purpose of trading XAU/USD and other commodities on a leveraged or margined basis through various account offerings.  Starting in January 2021 and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in commodity pool operated by TD (the "TD Pool").  The TD Defendants committed fraud by knowingly or with reckless disregard making oral and written fraudulent and material misrepresentations and omissions, including through the TD website, thetradersdomain.com, on social media, via text messages, email,

newsletters, and/or in person in order to persuade potential and existing customers to transfer funds for the purpose of trading XAU/USD either through TD's various account offerings or via the TD Pool.  TD misappropriated customer funds by accepting customer money via third party bank accounts, payment processors, and crypto wallets, but failing to use at least some of those funds to trade XAU/USD and by charging commissions on purported trading profits that did not exist.  In addition, TD, and later it's successor in interest Ares Global d/b/a/ Trubluefx ("Trubluefx"), misappropriated customer funds by failing to return customer funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts.  TD and Safranko also falsified trading records and the TD Defendants failed to register as required under the Act.  In an effort to expand the scope of the fraud, the TD Defendants recruited entities and individuals to act as sponsors and solicit new customers in exchange for a percentage of purported trading profits in a manner akin to a multi-level marketing ("MLM") scheme.  In addition to the many sponsors spread all over the United States and internationally, the TD Defendants recruited the "Sponsor Defendants" (collectively with the TD Defendants and Trubluefx, "Defendants"), four distinct groups named in the complaint which drove the largest number of customers and funds to the TD Pool: (i) Algo Capital LLC ("Algo Capital") and Algo FX Capital Advisor, LLC ("Algo FX"), now known as Quant5 Advisor, LLC, by and through their officers, employees, and agents (collectively, "Algo"), Robert Collazo, Jr. ("Collazo"), Juan Herman ("Herman"), John Fortini ("Fortini"), and Stephen Likos (Likos) (collectively, the "Algo Defendants"); (ii) Michael Shannon Sims ("Sims"); (iii) Holton Buggs ("Buggs"); and (iv) Centurion Capital Group, Inc., by and through its officers, employees, and agents ("Centurion"), Alejandro Santiestaban a/k/a Alex Santi ("Santi"), Gabriel Beltran ("Beltran"), and Archie Rice ("Rice") (collectively, the "Centurion Defendants").  Each group of Sponsor Defendants engaged in a separate

fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU/USD. Although the Sponsor Defendants each intended the funds they solicited from customers to be traded in the TD Pool, at least some Sponsor Defendants purported to be soliciting for their own pools or "hedge funds." The Sponsor Defendants solicited funds for the TD Pool even though each knew or should have known that TD was not trading the funds as represented. Each of the Sponsor Defendants became aware of red flags that put them on notice that TD was not a legitimate trading operation. The Sponsor Defendants faced a choice: cease promoting TD in light of the alarming information they knew or follow the strong financial motivations they had to ignore the red flags and continue to collect generous commissions on the purported trading. Each of the Sponsor Defendants chose the latter. The Sponsor Defendants actively downplayed the red flags and continued to solicit customers, helping to create the false impression that customers were participating in legitimate trading even as the scheme was on the brink of collapse. Each of Sponsor Defendants knowingly made oral and written fraudulent and material misrepresentations and omissions on social media, via text messages, by telephone, and in person to potential and existing customers that they knew or should have known were false. The Sponsor Defendants misappropriated customer funds, including by accepting funds intended for trading into bank accounts they controlled and/or collecting commissions on customer profits despite that the Sponsor Defendants knew or should have known that TD was not trading the funds as purported. Some of the Sponsor Defendants also commingled customer funds and most were not registered as required under the Act. In the fall of 2022, the scheme began to unravel, and customers began to experience extreme withdrawal delays and/or were unable to withdraw their funds. To persuade customers that the withdrawal issues were not an indication of fraud, the TD Defendants provided numerous, conflicting excuses for the delays—including, in June

2023, announcing that TD had been acquired by Trubluefx.  The TD Defendants falsely assured customers that their funds were safe and withdrawals would be processed. Notwithstanding the significant withdrawal delays, the Sponsor Defendants ignored or downplayed the withdrawal issues and continued to solicit funds from new and existing customers to be traded in the TD Pool.  These misstatements allowed Defendants to continue their fraudulent scheme for more than six months and bilk customers out of millions of additional dollars.  Each defendant knowingly or with reckless disregard for the truth engaged in this fraudulent conduct.

4.      Therefore, there is good cause to believe that Defendants have engaged in, are engaging in, or are about to engage in acts and practices in violation of the Act, 7 U.S.C. §§ 6b(a)(2)(A)–(C), 6k(2), 6m(1), and 6*o*(1)(A)-(B), and Commission Regulations ("Regulations"), 17 C.F.R. §§ 4.20(a)(1), (b)–(c) (2023).

5.      There is also good cause to believe that immediate and irreparable damage to the Court's ability to grant effective final relief for customers in the form of monetary or other redress will occur through the withdrawal, transfer, removal, dissipation or other disposition of funds, assets or other property ("assets") and/or the destruction, alteration or disposition of books and records and other documents ("records") by Defendants, unless Defendants are immediately restrained and enjoined by Order of the Court.

6.      Therefore, there is good cause for the Court to freeze assets owned, controlled, managed or held by Defendants or in which they have any beneficial interest.

7.      There is also good cause for the Court to prohibit Defendants from destroying, altering or disposing of records, and/or denying representatives of the Commission access to inspect records, when and as requested, to ensure that Commission representatives have immediate and complete access to those records.

8. There is also good cause for the appointment of a Temporary Receiver to take control of all assets owned, controlled, managed or held by Defendants, or in which they have any beneficial interest ("Defendants' Assets"), so that the Temporary Receiver may preserve assets, investigate and determine customer claims, determine unlawful proceeds retained by Defendants and amounts due to customers as a results of Defendants' alleged violations, and distribute remaining funds under the Court's supervision.

9. There is also good cause to require an accounting by Defendants to the Temporary Receiver to determine the location and disposition of customer funds and ill-gotten gains.

10. There is also good cause to order repatriation of assets controlled by Defendants so that such assets can be controlled by the Temporary Receiver and to assure payment of restitution and disgorgement as authorized by the Court.

11. There is also good cause to remove the prohibition on early discovery to enable the Commission to determine the full extent of Defendants' wrongdoing (including, but not limited to, the possible involvement of others); to locate other customers; to identify and assess Defendants' entitlement to funds, assets and other property; and to clarify the sources of funds, assets, and other property in advance of a hearing to show cause as to why a preliminary injunction should not issue.

12. In the alternative, for the all the reasons listed above and for the reasons we stated on the record during our October 2, 2024, hearing, *see* Sealed Minute Order [ECF No. 9], we find that the issuance of a statutory restraining order and appointment of a temporary receiver under 7 U.S.C. § 13a-1(a) is appropriate because the Commission has satisfied all four elements of the traditional test for issuing temporary restraining orders and permanent injunctions. *See Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1023, 1034–35 (11th Cir. 2001) (holding that an injunction may be granted where "(a) there is a substantial likelihood of success on the merits;

(b) the TRO or preliminary injunction is necessary to prevent irreparable injury; (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (d) the TRO or preliminary injunction would not be averse to the public interest.").

13.     In summary, this is a proper case for granting a restraining order *ex parte* freezing assets, allowing inspection of records, appointing a temporary receiver, and granting expedited discovery because the Commission is likely to succeed on the merits.  Moreover, there is a reasonable likelihood that Defendants will transfer or dissipate assets or destroy or alter records.  For these reasons, we'll **GRANT** the Commission's Motion for a Statutory Restraining Order [ECF No. 5] and **ORDER and ADJUGE** as follows:

**DEFINITIONS**

14.     For the purposes of this Order, the following definitions apply:

15.     The term "assets" encompasses any legal or equitable interest in, right to, or claim to, any real or personal property, whether individually or jointly, directly or indirectly controlled, and wherever located, including but not limited to:  chattels, goods, instruments, equipment, fixtures, general intangibles, effects, leaseholds, mail or other deliveries, inventory, checks, notes, accounts (including, but not limited to, bank accounts and accounts at other financial institutions), credits, receivables, lines of credit, contracts (including spot, futures, options, or swaps contracts), insurance policies, and all funds, wherever located, whether in the United States or outside the United States.

16.     The term "records" encompasses "documents" and "electronically stored information" as those terms are used in Fed. R. Civ. P. 34(a), and includes, but is not limited to, all writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or other data compilations—stored in any medium from which information can be obtained or translated,

if necessary, into reasonably usable form.  The term "records" also refers to each and every such item in Defendants' actual or constructive possession, including but not limited to:  (i) all such items within the custody or control of any agents, employers, employees, or partners of the Defendants and; and (ii) all items which Defendants have a legal or equitable right to obtain from another person.  A draft or non-identical copy is a separate item within the meaning of the term.  A record also includes the file and folder tabs associated with each original and copy.

17.     "Defendants" means and refers to, collectively: Traders Domain FX LTD. d/b/a/ The Traders Domain and any and all of its successors in interest, including, but not limited to, Ares Global d/b/a/ Trubluefx; Ted Safranko; David Negus-Romvari; Algo Capital LLC; Algo FX Capital Advisor, LLC, now known as Quant5 Advisor, LLC; Robert Collazo, Jr.; Juan Herman; John Fortini; Steven Likos; Michael Sims; Holton Buggs, Jr.; Centurion Capital Group, Inc.; Alex Santi; Gabriel Beltran; and Archie Rice.

**RELIEF GRANTED**

**I.     Asset Freeze Order Prohibiting the Withdrawal, Transfer, Removal, Dissipation, and Disposal of Assets**

18.     Defendants are immediately restrained and enjoined, except as otherwise ordered by this Court, from directly or indirectly withdrawing, transferring, removing, dissipating or otherwise disposing of any assets, wherever located, including Defendants' assets held outside the United States, excepts as provided otherwise in Sections IV, V, and VI of this Order, or as otherwise ordered by the Court;

19.     Notwithstanding the provisions of this Section I, at the request of the Temporary Receiver, Defendants and any other person who has possession, custody, or control of any of Defendants' funds, assets, or property shall transfer possession of all assets subject to this Order to the Temporary Receiver in accordance with Section IV, V, and VI of this Order.

20.     The assets affected by this Order shall include existing assets and assets acquired after the effective date of this Order.

**II.     Maintenance of and Access to All Records Relating to the Business Activities and Business and Personal Finances**

21.     Defendants are restrained from directly or indirectly destroying, altering, or disposing of, in any manner any records that relate or refer to the business activities or business or personal finances of any Defendants.

22.     Representatives of the Commission shall be immediately allowed to inspect any records that, in part or in whole, contain, relate, or refer to the business activities or business or personal finances of the Defendants, including, but not limited to, both hard-copy documents and electronically stored information, wherever they may be situated and whether they are in the possession of the Defendants or others.  To ensure preservation and facilitate meaningful inspection and review of these records, Defendants shall allow representatives of the Commission to make copies of these records, including complete forensic images of any devices containing any such records, and if on-site copying of these records and/or forensic imaging of these devices is not practicable, representatives may make such copies and/or forensic images off-site.  After any such off-site copying and/or forensic imaging, Plaintiff shall promptly return the original documents and devices upon which electronic information is stored.

23.     To further facilitate meaningful inspection and review, Defendants shall, absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, promptly provide Commission staff with:

        a.     the location of all records relating or referring to the business activities and business and personal finances of the Defendants;

    b.     all identification numbers and other identifying information for websites, cloud storage services, email and smartphone accounts, online chat and messaging services, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) owned, controlled or operated by Defendants, or to which the Defendants have access; and

    c.     all passwords to, and the location, make and model of, all computers and/or mobile electronic devices owned and/or used by Defendants in connection with their business activities and business and personal finances.

24.    When inspecting and reviewing records and/or contents of forensic images that are subject to this Order, including those contained on computers and/or other devices, the Commission should undertake reasonable measures to prevent review of the Defendants' privileged communications and/or other nonbusiness, nonfinancial materials by the Commission's attorneys and other staff who are part of the litigation team in this matter.  Moreover, Defendants (or their counsel) shall promptly contact Plaintiff's counsel to assert any claims of privilege or other legal objections relating to the inspection and review of any records or contents of forensic images that are subject to this Order and promptly cooperate with Plaintiff's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed privileged and/or other nonbusiness, nonfinancial materials to the Commission's attorneys and other staff who are part of the litigation team in this matter.  However, nothing herein shall excuse Defendants from full and immediate compliance with this Court's Order permitting Plaintiff to inspect and review the records and contents of forensic images which relate to Defendants' business activities and their business and personal finances.

### III.    Notice to Financial Institutions and Others that Hold or Control Assets or Records

25.    To ensure the effectiveness of the asset freeze and pending further order of this Court, any financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or asset or other property of Defendants shall not, in active concert or participation with Defendants, permit Defendants or other persons to withdraw, transfer, remove, dissipate, or otherwise dispose of any of Defendants' assets, except as directed by further order of the Court.

26.    Any financial or brokerage institution, business entity, or person that receives notice of this Order by personal service or otherwise shall not, in active concert or participation with any Defendant, directly or indirectly destroy, alter, or dispose of, in any manner, any records relating to the business activities and business and personal finances of any Defendant.

27.    Furthermore, any such financial or brokerage institution, business entity, or person that receives actual notice of this Order and holds, controls, or maintains custody of any account or asset titled in the name of, held for the benefit of, or otherwise under the control of any Defendants, or has held, controlled, or maintained custody of any such account or asset of any Defendants at any time since November 1, 2019, shall not, in active concert or participation with Defendants, deny a request by the Commission to inspect all records pertaining to every account or asset owned, controlled, managed, or held by, on behalf of, or for the benefit of Defendants, including, but not limited to, originals or copies of account applications, account statements, signature cards, checks, drafts, deposit tickets, transfers to and from the accounts, all other debit and credit instruments or slips, currency transaction reports, 1099 forms, and safe deposit box logs.  As an alternative to allowing inspection of records, a financial or brokerage institution, business entity or other person may provide copies of records requested by the Commission.

28.     Furthermore, any such financial or brokerage institution, business entity, or person that
receives actual notice of this Order shall:

a.      Within ten business days of a request by the Temporary Receiver, or such longer
period specified by the Temporary Receiver, provide the Temporary Receiver with
copies of all records pertaining to any account or asset owned, controlled, managed,
or held by, on behalf of, or for the benefit of Defendants, either individually or jointly,
including, but not limited to, originals or copies of account applications, account
statements, signature cards, checks, drafts, deposit tickets, transfers to and from the
accounts, all other debit and credit instruments or slips, currency transaction reports,
1099 forms, and safe deposit box logs; and

b.      Cooperate with all reasonable requests of the Temporary Receiver relating to
implementation of this Order, including transferring Defendants' funds at the
Temporary Receiver's direction, and producing records related to business activities
or business or personal finances of Defendants to the Temporary Receiver.

**IV.     Order Appointing Temporary Receiver**

29.   Kelly Crawford, Esq., is appointed Temporary Receiver, with the full powers of an equity
receiver for Defendants and their affiliates and subsidiaries owned or controlled by Defendants
(hereinafter referred to as the "Receivership Defendants"), and all of the funds, properties,
premises, accounts, income, now or hereafter due or owing to the Receivership Defendants, and
other assets directly or indirectly owned beneficially or otherwise, by the Receivership
Defendants (hereinafter the "Receivership Estate").  The Temporary Receiver shall be the agent
of this Court in acting as Temporary Receiver under this order.

30.   The Temporary Receiver is directed and authorized to accomplish the following:

a.     Assume full control of the Receivership Defendants by removing Defendants Safranko, Negus-Romvari, Collazo, Herman, Fortini, Likos, Sims, Buggs, Santi, Beltran and Rice, and any officer, independent contractor, employee, or agent of the Receivership Defendants, from control and management of the affairs of the Receivership Defendants as the Temporary Receiver deems appropriate;

b.     Take exclusive custody, control and possession of the Receivership Estate, which includes but is not limited to complete authority to sue for, collect, receive, and take possession of all goods, chattels, rights, credits, money, effects, land, leases, books, records, work papers, and records of accounts, including electronically-stored information, contracts, financial records, funds on hand in banks and other financial institutions, and other papers and records of the Receivership Defendants and customers or clients of any of the Receivership Defendants' business activities whose interests are now held by, or under the direction, possession, custody or control of, the Receivership Defendants;

c.     Take all steps necessary to secure the business and other premises under the control of the Receivership Defendants;

d.     Perform all acts necessary, including the suspension of operations to conserve, hold, manage, and preserve the value of the Receivership Estate in order to prevent an irreparable loss, damage, or injury to any customers or clients of any of Receivership Defendants' business activities;

e.     Prevent the withdrawal or misapplication of assets entrusted to the Receivership Defendants, and otherwise protect the interests of any customers or clients of any of Receivership Defendants' business activities;

f.  Manage and administer the Receivership Defendants and the Receivership Estate by performing all acts incidental thereto that the Temporary Receiver deems appropriate, including hiring or dismissing any and all personnel, suspending operations, and/or entering into agreements, including but not limited to:  (1) the retention and employment of investigators, attorneys or accountants, appraisers, and other independent contractors and technical specialists of the Temporary Receiver's choice, including without limitation members and employees of the Temporary Receiver's firm, to assist, advise, and represent the Temporary Receiver; and (2) the movement and storage of any equipment, furniture, records, files, or other physical property of the Receivership Defendants;

g.  Collect all funds owed to the Receivership Defendants;

h.  Initiate, defend, compromise adjust, intervene, dispose of, or become a party to, any actions or proceedings in state, federal, or foreign court that the Temporary Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate or that the Temporary Receiver deems necessary and advisable to carry out the Temporary Receiver's mandate under this Order;

i.  Issue subpoenas to obtain records pertaining to the Receivership and conduct discovery in this action on behalf of the Receivership Estate;

j.  Open one or more bank accounts and deposit all funds of the Receivership Estate in such designated accounts and make all payments and disbursements from the Receivership Estate from such accounts;

k.  Make payments and disbursements from the Receivership Estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, provided that the Temporary Receiver shall apply to the Court for prior

14

approval of any payment of any debt or obligation incurred by the Receivership Defendants prior to the date of entry of this Order except for payments that the Temporary Receiver deems necessary or advisable to secure the Receivership Estate from immediate and irreparable loss; and

l.      Maintain written accounts itemizing receipts and expenditures, describing properties held or managed, and naming the depositories holding funds or other assets of the Receivership Estate; make such written accounts and supporting documentation available to the Commission for inspection; and, within sixty days of being appointed and periodically thereafter, as directed by the Court, file with the Court and serve on the parties a report summarizing efforts to marshal and collect assets, administer the Receivership Estate, and otherwise perform the duties mandated by this Order.

**V.      Accounting and Transfer of Fund and Records to the Temporary Receiver**

31.    Absent a valid assertion by Defendants of their respective rights against self-incrimination under the Fifth Amendment, each Defendant shall, within five business days following the service of this Order:

a.      Provide the Temporary Receiver with a full detailed accounting of all assets, including the assets inside and outside of the United States that are held by each and every Defendant, for their benefit, or under their direct or indirect control, whether jointly or singly, and the location of all records of the Receivership Estate.

b.      Transfer to the territory of the United States and deliver to the possession, custody, and control of the Temporary Receiver, all records and assets (other than real property) located outside of the United States that are held by each and every Defendant, for their benefit, or under their direct or indirect control, whether jointly or singly.

15

    c.  Provide the Temporary Receiver access to all records of accounts or assets of the Defendants held by financial or brokerage institutions located within or outside the territorial United States by signing any necessary consent forms.

32. Absent a valid assertion by Defendants of their respective rights against self-incrimination under the Fifth Amendment, Defendants shall, within twenty-four hours of the issuance of this Order cause to be prepared and delivered to the Temporary Receiver a detailed and complete schedule of all passwords and identification (ID) numbers for all websites, cloud storage services, email and smartphone accounts, online chat and messaging services, and all accounts at any bank, financial institution, or brokerage firm (including any introducing broker or futures commission merchant) controlled or operated by or to which any of the Defendants have access in connection with their business activities and business and personal finances.

33. Absent a valid assertion by Defendants of their respective rights against self-incrimination under the Fifth Amendment, Defendants shall, within twenty-four hours of the issuance of this Order, cause to be prepared and delivered to the Temporary Receiver, a detailed and complete schedule of all passwords to, and the location, make and model of, all computers and mobile electronic devices owned and/or used by Defendants in connection with their business activities and business and personal finances.  The schedules required by this section shall include at a minimum the make, model and description of each, along with the location, the name of the person primarily assigned to use the computer and/or mobile device, and all passwords necessary to access and use the software contained on the computer and/or mobile device.

## VI.    Turning Over Assets and Records to the Temporary Receiver

34. Upon service of this Order, and absent a valid assertion by Defendants of their respective rights against self-incrimination under the Fifth Amendment, Defendants and any other person or

entity served with a copy of this Order, shall immediately or within such time as permitted by the Temporary Receiver in writing, deliver over to the Temporary Receiver:

    a.  Possession and custody of all assets of the Receivership Defendants, wherever situated, including those owned beneficially or otherwise;

    b.  Possession and custody of records of the Receivership Defendants in connection with their business activities and business and personal finances, including but not limited to, all records of accounts, all financial and accounting records, balance sheets, income statements, bank records (including monthly statements, canceled checks, records of wire transfers, and check registers), client lists, title documents and other Receivership Defendants;

    c.  Possession and custody of all assets belonging to members of the public now held by the Receivership Defendants;

    d.  All keys, passwords, entry codes, and combinations to locks necessary to gain or to secure access to any of the assets or records of the Receivership Defendants related to their business activities and business and personal finances, including, but not limited to, access to the Receivership Defendants' business premises, means of communication, accounts, computer systems, mobile electronic devices, or other property; and

    e.  Information identifying the accounts, employees, and properties or other assets or obligations of the Receivership Defendants.

## VII.   Directive To Cooperate with Temporary Receiver

35.  Absent a valid assertion of their respective rights against self-incrimination under the Fifth Amendment, Defendants, and all other persons or entities served with a copy of this order shall cooperate fully with and assist with the Temporary Receiver.  This cooperation and assistance

shall include, but not be limited to, providing any information to the Temporary Receiver that the Temporary Receiver deems necessary to exercising the authority as provided in this Order; providing any password required to access any computer or electronic files in any medium; and discharging the responsibilities of the Temporary Receiver under this Order, and advising all persons who owe debts to the Receivership Defendants that all debts should be paid directly to the Temporary Receiver.

## VIII.   Stay on Actions Against the Receivership Defendants

36.   Except by leave of the Court, during the pendency of the receivership ordered herein, the Defendants and all other persons and entities shall be and hereby are stayed from taking any action (other than the present action by the Commission) to establish or enforce any claim, right or interest for, against, on behalf of, in, or in the name of, the Receivership Defendants, the Temporary Receiver, the Receivership Estate, or the Temporary Receiver's duly authorized agents acting in their capacities as such, including but not limited to, the following actions:

    a.   Petitioning, or assisting in the filing of a petition, that would cause the Receivership Defendants to be placed in bankruptcy;

    b.   Commencing, prosecuting, litigating, or enforcing any suit or proceeding against any of the Receivership Defendants, or any of their subsidiaries or affiliates, except that such actions may be filed to toll any applicable statute of limitations;

    c.   Commencing, prosecuting, continuing, or entering any suit or proceeding in the name or on behalf of any of the Receivership Defendants, or any of their subsidiaries, or affiliates;

    d.   Accelerating the due date of any obligation or claimed obligation, enforcing any lien upon, or taking or attempting to take possession of, or retaining possession of, property of the Receivership Defendants, or any of their subsidiaries or affiliates or

any property claimed by any of them, or attempting to foreclose, forfeit, alter, or terminate any of the Receivership Defendants' interests in property, including without limitation, the establishment, granting, or perfection of any security interest, whether such acts are part of a judicial proceeding or otherwise;

e.  Using self-help or executing or issuing, or causing the execution or issuance of, any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with, or creating or enforcing a lien upon any property, wherever located, owned by or in the possession of the Receivership Defendants, or any of their subsidiaries or affiliates, or the Temporary Receiver, or any agent of the Temporary Receiver; and

f.  Doing any act or thing whatsoever to interfere with the Temporary Receiver taking control, possession, or management of the property subject to the receivership, or to in any way interfere with the Temporary Receiver or to harass or interfere with the duties of the Temporary Receiver; or to interfere in any manner with the exclusive jurisdiction of this Court over the property and assets of the Receivership Defendants, or their subsidiaries or affiliates.

Provided, however, that nothing in this section shall prohibit any federal or state law enforcement or regulatory authority from commencing or prosecuting an action against the Receivership Defendants.

## IX.  Compensation for Temporary Receiver and Personnel Hired by the Temporary Receiver

37.  The Temporary Receiver and all personnel hired by the Temporary Receiver as herein authorized, including counsel to the Temporary Receiver, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them for those services authorized by this Order that when

rendered were: (1) reasonably likely to benefit the receivership estate; or (2) necessary to the administration of the estate. However, the Temporary Receiver and any personnel hired by the Temporary Receiver shall not be compensated or reimbursed by, or otherwise be entitled to, any funds from the Court or the Commission. The Temporary Receiver shall file with the Court and serve on the parties periodic requests for the payment of such reasonable compensation, with the first such request filed no more than sixty days after the date of this Order and subsequent requests filed quarterly thereafter. The requests for compensation shall itemize the time and nature of services rendered by the Temporary Receiver and all personnel hired by the Temporary Receiver.

## X.   Persons Bound By this Order

38.   This Order is binding on any person who receives actual notice of this Order by personal service or otherwise and is acting in the capacity of an officer, agent, servant, employee, or attorney of the Defendants, or is in active concert or participation with the Defendants.

## XI.   Bond Not Required of Plaintiff or the Temporary Receiver

39.   As Plaintiff Commission has made a proper showing under 7 U.S.C. § 13a-1(b), it is not required to post any bond in connection with this Order. The Temporary Receiver is similarly not required to post bond.

## XII.   Service of Order and Assistance of United States Marshals Service and/or Other Law Enforcement Personnel

40.   Copies of this Order may be served by any means, including via email or facsimile transmission, upon any financial institution or other entity or person that may have possession, custody, or control of any records or assets of any Defendants or that may be subject to any provision of this Order.

41.   Alison B. Wilson, Kelly Folks, Sean Hennessy, Sarah M. Wastler, Maura M. Viehmeyer and

representatives of the United States Marshals Service are specially appointed by the Court to effect service.

42. The United States Marshals Service is authorized to:  a) accompany and assist the Commission representatives in the service and execution of the Summons, Complaint and this Order on the Defendants, and b) help maintain lawful order while Commission representatives inspect records as provided in this Order.

**XIII.   Service on the Commission**

43. Defendants shall comply with all electronic filing rules and requirements of the U.S. District Court for the Southern District of Florida and shall serve all pleadings, correspondence, notices required by this Order, and other materials on the Commission by delivering a copy to **Alison B. Wilson, Chief Trial Attorney, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, D.C. 20581**, by electronic filing, e-mail, personal delivery, or courier service (such as Federal Express or United Parcel Service) and not by regular mail due to potential delay resulting from heightened security and decontamination procedures applicable to the Commission's regular mail.

**XIV.   Further Proceedings**

44. Good cause having been shown and the burden for issuing a preliminary injunction having been met by the Commission, this Court hereby orders Defendants to show cause why a Preliminary Injunction should not issue.  The Order to Show Cause is set for hearing for **October 29, 2024**, at **2:00 p.m.** in **Courtroom 12-4** at the United States Courthouse for the Southern District of Florida, 400 N. Miami Ave, Miami, FL 33128.  Should any party wish to file a memorandum of law or other papers concerning the issuance of a preliminary injunction against the Defendants, such materials shall be filed, served, and received by all parties at least two full days before the hearing ordered above.

45.   Plaintiff's request for expedited discovery is also granted.  In advance of the hearing to show cause as to why a preliminary injunction should not issue, the parties may conduct expedited discovery, and the prohibition upon discovery before the early meeting of counsel pursuant to Rule 26(f), in accordance with Rule 26(d), is removed.  Depositions of parties and non-parties may be taken subject to two calendar days' notice pursuant to Rule 30(a) and 45, that notice may be given personally, by facsimile, or by electronic mail, and, if necessary, any deposition may be taken remotely.

### XV.   Force and Effect

46.   This Order shall remain in full force and effect until **October 29, 2024**, unless extended further by order of this Court by order of this Court. This Court retains jurisdiction of this matter for all purposes.

   **DONE AND ORDERED** in the Southern District of Florida on October 3, 2024.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**