UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-23745-ALTMAN

COMMODITY FUTURES
TRADING COMMISSION,

     *Plaintiff,*

v.

TRADERS DOMAIN FX LTD. *d/b/a,*
THE TRADERS DOMAIN, *et al.,*

     *Defendants.*

_____/

**RECEIVER'S RENEWED MOTION FOR SANCTIONS AND TO
HOLD DEFENDANT ALEX SANTI IN CIVIL CONTEMPT
AND MEMORANDUM OF LAW IN SUPPORT**

Kelly M. Crawford, the Court appointed Receiver, respectfully requests the Court require Defendant, Alex Santiesteban ("Santi"), to show cause as to why he should not be held in civil contempt for his repeated intentional violations of the clear orders of the Court, and in support states:

**SUMMARY**

Santi has violated the Court's orders by concealing assets and income while misrepresenting his activities and financial situation to the Court and the Receiver. Notwithstanding Santi's misrepresentations related to his involvement with Alpha Trader, Santi acted on behalf of the company and received at least $3,400,892.01 in payments toward an American Express credit card related to him during the pendency of the case. Santi used this undisclosed money to fund his lavish lifestyle, including vacations, luxury watches, luxury vehicles, and expensive gifts to his

fiancée. Santi concealed all of this through a series of actions, omissions, and misrepresentations to the Court and the Receiver contrary to the Court's orders. The Court should hold Santi in contempt, compel his compliance with the Court's orders, and require Santi's payment of coercive and compensatory sanctions, including the return of $3,400,892.01 to the Receivership Estate for the benefit of the investors defrauded by Santi.

## I.    FACTUAL BACKGROUND

1.    On January 29, 2025, the Receiver filed his first Show Cause Motion as to Defendant Sant [ECF No. 159] (the "First Contempt Motion"). The First Contempt Motion was based upon, *inter alia*, Santi's failure to provide documents and information related to his assets, including specifically, Alpha Trader Firm, LLC ("Alpha Trader"), and marks the emergence of the pattern of untruthful and deceptive conduct undertaken by Santi concerning his assets and Alpha Trader.

2.    After conducting a hearing on the First Contempt Motion, the Court compelled Santi to fully comply with the Statutory Restraining Order and Consent Preliminary Injunction (the "First Contempt Order"), and compelled Santi to produce all the records previously requested by the Receiver, including a complete financial disclosure and all records related to Alpha Trader. ECF No. 196.

3.    After taking Santi's deposition in February 2025, the Receiver again requested information responsive to the Receiver's pre-deposition requests (including Alpha Trader records), and additional information that was newly referenced or discussed by Santi at his deposition. ECF No. 234-1 at p. 8.

2

4.    Santi again failed to fully comply with the Receiver's requests, and the Court held a hearing on the Receiver's Renewed Show Cause Motion. ECF No. 234. After the hearing, the Court ordered Santi to provide all records related to Alpha Trader in his care, custody, or control within 14 days, and to turn over all documents and text messages regarding Santi's personal loans within 30 days (the "Second Contempt Order"). ECF No. 311.

### Santi's Untruthful and Inconsistent Testimony Concerning Alpha Trader and his Finances.

5.    Santi's efforts to conceal his involvement with Alpha Trader started early. On November 11, 2024, Santi provided a sworn Accounting and Declaration in which he failed to disclose his ownership interest in Alpha Trader. ECF No. 194-1.

6.    On January 21, 2025, Santi filed a motion to unfreeze the Alpha Trader bank account and permit Santi to earn new income for monthly living expenses (the "Unfreeze Motion"). ECF No. 146. In connection with the Unfreeze Motion, Santi asserted to the Court that:

> Santi is prohibited from doing any business related to the allegations contained in the Complaint and *can no longer take part in Alpha Trader* . . . At this time *if Alpha Trader continues to do business, it will be operated by third parties unrelated to Santi*. Santi's income must be derived from sources elsewhere.

*See* ECF No. 190 at pp. 5-6 (emphasis added).

7.    And Santi's sworn Declaration asserted that Alpha Trader only maintained two Morgan Stanley bank accounts. *See* ECF 190-3 at ¶ 8. At no time did Santi disclose that Alpha Trader had a separate, active bank account from which

3

Santi was actively benefitting. *See* Receiver's Declaration, attached as **Exhibit A** at ¶ 18.

8.  When the Receiver took Santi's Court-ordered deposition on February 27, 2025, Santi testified that:

    a.  he originally owned 100% of Alpha Trader, but now owned 51% after he transferred 49% of his ownership interest to Ronnie Hale in exchange for a $1 million "loan" (*see* Santi Deposition Transcript, attached as **Exhibit B** at pp. 63-64, 67-68);

    b.  he was "never compensated" by Alpha Trader because he was not to be compensated until the Hale loan was paid back, but it was not yet fully paid back (*Id.* at p. 65);

    c.  Alpha Trader only had bank accounts at Morgan Stanley, and no other accounts with any other banks during 2024 (*Id.* at pp. 31, 65-66);

    d.  he did not have any personal bank accounts since October 2024 (*Id.* at pp. 30-31);

    e.  he had a Discover credit card and an American Express ("AmEx") credit card in his name, but Santi claimed he "ha[s]n't used" his credit cards and they were omitted from his sworn financial disclosure because he "hasn't used them[.]" *(Id.* at pp. 33).

9.  On July 30, 2025, Santi provided another Declaration in opposition to the Receiver's Renewed Contempt Motion [ECF No. 298-2], in which he claimed that Alpha Trader "[wa]s currently not doing business[.]" *See* ECF No. 298-2 at ¶ 7. And

Santi claimed that he was unable to transfer his ownership in Alpha Trader to the Receiver because Ronnie Hale, the 49% owner of Alpha Trader, would not consent to the transfer. *Id.*

10.     Finally, after several months of effort and unnecessary expense caused by Santi, Santi assigned his 51% interest in Alpha Trader to the Receiver pursuant to the Second Contempt Order. ECF No. 311.

### Santi Received Millions of Dollars from Alpha Trader and Continued to Operate and Act on its Behalf During the Entire Receivership

11.     While Santi was engaged in a pattern of delay and made the above misrepresentations to the Court and the Receiver, the Receiver's investigation recently revealed that Santi was engaged in a scheme to hide Alpha Trader's assets and operations from the Court and the Receiver – while simultaneously receiving millions of dollars from Alpha Trader.

12.     Days before the Receiver's appointment, Santi executed an ownership Purchase Agreement, in which Santi attempted to unilaterally transfer 100% of his ownership interests in Alpha Trader to a third-party. *See* Ex. A at ¶ 2. This attempted transfer was void, as it was in violation of the Alpha Trader Operating Agreement and Santi never received any consideration in exchange for the transfer. *Id.*[1]

13.     Santi failed to specifically disclose his 51% ownership interest in Alpha Trader until his February 2025 deposition (*see* Ex. B at pp. 67-68), and he later told the Court in July 2025 that Alpha Trader was not doing business. ECF 298-2 at p. 5.

---

[1] This was discovered by the Receiver in late January 2026.

14.     Contrary to Santi's deposition testimony that Alpha Trader only had Morgan Stanley bank accounts and no other bank accounts with any other bank in 2024 (*see* Ex. B at pp. 31, 65-66), the Receiver's investigation uncovered that a Regions Bank business checking account ending in 4588 was opened in Alpha Trader's name on October 15, 2024 (the "Regions Account"). *See* Ex. A at ¶ 3.

15.     Contrary to Santi's sworn statements that Alpha Trader was "not doing business," the Regions Account statements reflect that, throughout the duration of the Receivership, Alpha Trader generated millions of dollars in revenue, and millions of dollars were paid for the benefit of Santi and his various associates. *Id.* at ¶ 4-5. Specifically, between October 2024 and December 2025, **at least $3,400,892.01** was paid toward an AmEx credit card related to Santi. *Id.*; Summary of Regions Account Statements, attached as **Exhibit C**. Such payments made by Alpha Trader for the benefit of Santi reflect a shocking level of circumvention of his obligations under the Court's orders and directly contradict Santi's sworn statements.

16.     Also contrary to Santi's sworn statements that Alpha Trader was "not doing business, the Receiver's investigation uncovered that Alpha Trader has been actively operating out of a warehouse located in Medley, Florida (the "Warehouse") and generating hundreds of thousands of dollars in revenue per month. *See* Ex. A at ¶ 4-5, 7.

17.     Further, posts on the Alpha Trader social media accounts[2] displayed several luxury vehicles at the Warehouse, including a white McLaren 765LT, a black Ferrari SF90 Stradale, and a white Rolls Royce Ghost. *Id.* at ¶ 9.  The white McLaren 765LT was previously featured in Santi Instagram posts showing the listing price of the McLaren (July 2022) and showing Santi standing next to the McLaren (August 2024) with a decal on the rear windshield of the McLaren bearing his Instagram username (@mr.alexsanti).  *Id.*

18.     The white Rolls Royce Ghost and black Ferrari were also featured on numerous Santi Instagram posts. *Id.*

 

---

[2] All such posts were removed from Alpha Trader's social media accounts after the Receiver's counsel sent the September 2025 Demand Letter to Santi. *See* Ex. A at ¶ 11.



19.     When the Receiver inquired to Santi's counsel regarding the Ferrari and Rolls Royce, Santi claimed that the cars were owned by his father-in-law. *Id.*

20.     On September 11, 2025, the Receiver demanded that Santi turn over, among other things, the luxury vehicles that were displayed inside of the Warehouse, and a Patek Phillipe watch. *Id.* at ¶ 10. The Receiver also demanded Santi to provide the Receiver the Warehouse lease agreement, and any other records or assets related to Alpha Trader, and to "immediately cease and desist from acting on behalf of, or in concert with, Alpha Trader and/or any individuals involved with Alpha Trader." *Id.*

21.     The Receiver also demanded the turnover of all records related to Alpha Trader, all documents or text messages related to the personal loans Santi received, and the Receiver emphasized that Santi was in violation of the Second Show Cause Order for having not already provided such documents to the Receiver. *Id.*

22.     On September 14, 2025, Santi's counsel responded:

> ***Santi's involvement in Alpha Trader LLC stopped upon service of the SRO.*** We asked permission for Santi to continue teaching but it was denied by the CFTC. He has now turned over his interest in Alpha Trader pursuant to the Court Order.
>
> ***Currently, Santi states he is not in possession, custody, or control of any Alpha Trader Firm business records, assets, or account credentials.*** He has not had access to Alpha Trader's servers, communications, data, or social media accounts. The photographs provided do not show Santi doing anything or having any connection with Alpha Trader and are again outdated photos to my client's knowledge used by others on their social media to which he has no control.

*See* Santi Response to Demand Letter, attached as **Exhibit D** (emphasis added).

Regarding the other demands for various assets and records, Santi merely claimed

that they were not in his possession, custody, or control. *Id.*

23.     Santi's claims regarding Alpha Trader are belied by the fact that Alpha

Trader paid $270,092.49 to AmEx for Santi's benefit less than two weeks before Santi

responded to the Demand Letter. *See* Ex. C.[3] And just days before responding to the

Demand Letter, Santi received text messages and emails from the Warehouse

landlord's agent containing paperwork related to the Warehouse.  *See* Ex. A at ¶ 10.

---

[3] In the Unfreeze Motion, Santi asserted that he was not earning income and submitted a budget of his monthly expenses to the Court which included $1,500 per month for credit card payments. ECF 146-1.  In fact, Alpha Trader paid $281,007.31 in credit card payments for Santi *that same month*. Santi did not disclose to the Receiver these credit card expenses or income or provide the Receiver with access to these accounts as required by the Consent PI Order.

24.     In fact, Santi was the signatory on the Alpha Trader Warehouse lease, which he never produced to the Receiver. *Id.* at ¶ 8. Santi was the main point of contact under the Warehouse lease, and communicated with the landlord, property manager, and building maintenance regarding various issues. *Id.*

25.     Santi held himself out as having authority to control and/or act on behalf of Alpha Trader. *Id.* at ¶ 8. For instance, on October 31, 2025, the landlord sent an email to Santi explaining that the Warehouse rent was past due. *Id.* On November 4, 2025, the Warehouse landlord sent another email and a text message to Santi again explaining that the Warehouse rent was past due, and Santi replied by text message stating, "Ill let my assistant know[.]" *Id.* On November 5, 2025, Santi sent an email to the landlord stating that the Warehouse rent would be sent that same week. *Id.* Then, on November 7, 2025, Santi sent an email to the landlord confirming that the Warehouse rent "has been sent out[.]" *Id.* The records reviewed by the Receiver confirm that a wire was sent from Alpha Trader to the landlord that same day. *Id.*

26.     On February 5, 2026, the Receiver's counsel again notified Santi's counsel that Santi was unauthorized from directly or indirectly acting on behalf of Alpha Trader. *Id.* at ¶ 12. The Receiver's counsel then visited the Alpha Trader Warehouse and encountered several individuals associated with Santi and Alpha Trader, including Rayko Bellmas and Marc Mendez.[4] *Id.* at ¶ 13. The Receiver's counsel were denied entry into the Warehouse despite providing the individuals with

---

[4] Marc Mendez is closely associated with Santi and currently conducts the day-to-day operations of Alpha Trader. *See* Ex. A at ¶ 3. Mendez is one of the two signatories/authorized users on the Alpha Trader Regions Account. *Id.*

copies of the Court's orders, and those individuals told the Receiver's counsel and the police that they were occupying the Warehouse with Santi's permission. *Id.*

27.     After being denied entry, the Receiver's counsel notified Santi's counsel of such denial, reminded Santi that he is not permitted to act on behalf of Alpha Trader (the Warehouse tenant), explained that Santi and all other individuals associated with him and Alpha Trader were not permitted access to the Warehouse, and also requested their compliance for an orderly transition of the premises. *Id.* at ¶ 15.

28.     Instead of cooperating with the Receiver and refraining from taking further action on behalf of Alpha Trader, Santi immediately communicated directly with the Warehouse landlord and the landlord's agent. *Id.* at ¶ 16. After the Receiver's counsel were denied access into the Warehouse, Santi sent several text messages and emails to the landlord and its representatives seeking to solidify control of the Warehouse leased by Alpha Trader. *Id.*

29.     And, Although Santi testified during his deposition that Alpha Trader was in the business of selling "educational" courses, (*see* Ex. B at pp. 57-59) the Receiver's investigation reflects that Alpha Trader is a proprietary trading firm engaged in Forex and Futures trading markets.[5] *See* Ex. A at ¶ 6. Alpha Trader's help

---

[5] Prop trading firms allow customers to trade various markets using the firm's funds. New customers are typically required to complete an "evaluation phase" whereby they engage in a simulated training environment and must satisfy certain "challenges" in order to advance and complete the evaluation phase. Such evaluation phases are designed to mitigate risk for the firm and ensure traders are competent. Upon completing the evaluation phase, customers can gain access to "funded" accounts and begin trading the firm's money. For example, Alpha Trader allows

center specifies that customers can trade cryptocurrencies, Forex, and even commodity pairs such as XAU/USD. *Id.*

30.     In short, Santi represented to the Court and the Receiver that he was not involved with Alpha Trader, when in fact Santi has been actively controlling its operations, managing its assets, and receiving millions of dollars from it for his own benefit.

### Santi's Lavish Lifestyle and Excessive Expenditures

31.     Although Santi has not reported any income to the Receiver as required by the Court's Orders, the Receiver's investigation uncovered that Santi has been taking lavish vacations, wearing luxury watches, and driving luxury vehicles after receiving more than $3.4 million from Alpha Trader during the receivership. *See* Ex. A at ¶ 9, 17.

32.     Santi also appears to have recently become engaged to Liset M. Cabrera.[6] *Id.* at ¶ 17.  Over the past several months, Ms. Cabrera has posted images to social media detailing valuable gifts from Santi, including a Rolex Datejust (est. value $15,000), a Bvlgari Serpenti Viper necklace (est. value $58,000),  an Audemars Piguet Royal Oak (est. value $50,000), a Hermès Birkin bag (est. value $30,000), and

customers to access funded accounts with $150,000 in trading capital for an up-front fee of $699. Once trading within a funded account, customers are required to satisfy trading requirements before being eligible to withdraw profits. For instance, Alpha Trader requires certain customer accounts to maintain a 40% "trader score," which is a calculation based upon profits generated by the account.

[6] The Receiver has been attempting to serve Cabrera with a Subpoena for Deposition Duces Tecum since January 15, 2026, but she has been evading service.

what appears to be an expensive engagement ring. *Id.* And, Ms. Cabrera recently posted a picture of Santi driving her in a Rolls Royce. *Id.*[7]








[7] These photos also depict jewelry and other assets which Santi did not disclose to the Receiver despite direct inquiry.

33.     Not only has Santi violated the Court's orders by engaging in such excessive spending throughout the duration of the receivership, but he has also greatly prejudiced the Estate, as such funds could have gone toward the benefit of the victims of his fraud, instead of being used to willfully disregard and circumvent court orders to fund his lavish lifestyle.

34.     And, Santi's failure to cooperate with, and assist, the Receiver has forced the Receiver to obtain accurate information related to Santi's assets by discovery and other means, creating unnecessary expense for the Estate. Santi has also repeatedly shown his disdain for this Court's orders and continues to needlessly waste judicial resources by failing to turn over records which existed and were in his possession or control, and by failing to disclose vital information related to his assets.

## II.    ARGUMENT

Santi should be held in contempt of court for his repeated failure to disclose information related to his assets and his unwillingness to comply with demands made by the Receiver, as required by the Court's orders. District courts possess inherent power to enforce their orders though contempt proceedings. *Citronelle-Mobile Gathering, Inc. v. Watkins,* 943 F.2d 1297, 1302 (11th Cir. 1991) (*citing Shillitani v. United States,* 384 U.S. 364, 370 (1966). The Eleventh Circuit identifies three elements for civil contempt: 1) there was a lawful and valid order; 2) the order was clear, definite, and unambiguous; and 3) the alleged violator had the ability to comply with the order. *Zow v. Regions Fin. Corp.,* 595 F. App'x 887, 889 (11th Cir. 2014).

14

The Court's proper focus is whether the order was violated, not the subjective belief or intent of the alleged violator. *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1546 (11th Cir. 1990). Further, civil contempt may serve two different purposes: enforcing compliance with an order or compensating an injured party. *U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, No. 14-22739-CIV, 2017 WL 2875427 (S.D. Fla. May 15, 2017), *report and recommendation adopted,* No. 14-22739-CIV, 2017 WL 3835692 (S.D. Fla. Sept. 1, 2017).

Each of the elements for civil contempt exists with respect to Santi.  The SRO, Consent PI Order, and First and Second Contempt Orders (collectively, the "Orders") are Court orders in effect which clearly and unambiguously order Santi, as a Receivership Defendant, to provide information to, and fully cooperate with and assist, the Receiver. *See* ECF Nos. 10, 40, 41, 196. Further, the Orders clearly and unambiguously required Santi to provide all records related to Alpha Trader to the Receiver. *See* ECF No. 311 at p. 2. Santi had notice of the Orders and violated them as outlined below.

Santi violated paragraphs 18 and 31(a) of the SRO, by: "directly or indirectly withdrawing, transferring, removing, dissipating or otherwise disposing of any assets" (¶ 18), and failing to provide the Receiver with "a full detailed accounting of all assets" held by him (¶ 31(a)). Specifically, Santi never disclosed the existence of the Alpha Trader Regions Account or that he received more than $3.4 million from Alpha Trader for his own benefit during the receivership. Additionally, Santi failed or willfully refused to disclose his assets, as evidenced by his Accounting, financial

affidavits, deposition testimony, and various sworn statements submitted to the Court. At no time did Santi disclose that Alpha Trader was substantially funding Santi's lavish lifestyle since the inception of the receivership. *See* Ex. A at ¶ 18.

Moreover, Santi violated paragraphs 20, 21(a), and 21(e) of his Consent PI Order, by: failing to "cooperate fully with and assist the Receiver" (¶ 20); failing to turn over possession and custody of records in connection with his business activities and business and personal finances (¶ 21(a)); and failing to provide information identifying accounts, properties, and other assets (¶ 21(e)). Specifically, Santi has failed or refused to disclose information related to Alpha Trader, including, most importantly, the existence of the Alpha Trader Regions Account which Santi has substantially benefitted from during the receivership. Further, the Receiver has uncovered the existence of numerous Alpha Trader records, including the Regions Account records, Warehouse lease and related communications, and Purchase Agreement, which directly contradicts Santi's prior assertions that such records did not exist or were not within his control or possession.

Santi violated paragraph 28 of his Consent PI Order, in which he agreed that he would not:

> engage in any activity related to commodities, or derivatives, including but not limited to soliciting, receiving, or accepting any funds from any person or entity for the purpose of purchasing, selling, or otherwise investing in commodities, derivatives, virtual currency, binary options, or foreign currency (the "Restricted Activity") or receive any income, salary, wages, commissions, dividends, draws, or other forms of compensation or passive income from any person or entity engaged in said activities.

16

*See* Consent PI Order at ¶ 28. As detailed above, Santi has directly or indirectly controlled and/or operated Alpha Trader throughout the entirety of the receivership, and Alpha Trader is a prop trading firm which is engaged in the exact "Restricted Activities" outlined in the Consent PI Order. Further, no less than $3.4 million was paid from the Alpha Trader Regions Account for Santi's benefit since the commencement of the receivership. These are direct violations of the Consent PI Order and reflect Santi's disdain and/or lack of care for the mechanisms employed by this Court to preserve the status quo while the action is pending.

Santi also violated paragraph 29 of the Consent PI Order by failing to report to the Receiver any source of new income "[w]ithin two days . . . of securing any New Income[.]" Specifically, as detailed above, Santi concealed and/or failed to disclose that Alpha Trader was substantially funding his lavish lifestyle during the receivership.

The First Contempt Order warned that "[a]ny further noncompliance may result in additional sanctions, including a daily coercive sanction for each day of non-compliance." ECF No. 196 at ¶ 5. And, Santi failed to fully comply with the Second Contempt Order [ECF No. 311] by: failing or refusing to provide any documents or text messages related to the loans from Rayko Bellmas; and failing or refusing to provide any records related to Alpha Trader. Further, Santi failed or refused to disclose that Alpha Trader was actively operating and directly funding his lavish lifestyle throughout the duration of the receivership.

17

Santi's actions demonstrate a pattern of dishonesty and disdain for the legal process. Santi has repeatedly provided false and/or inconsistent testimony under oath, actively concealed and/or disposed of potential receivership assets, and concealed or failed to disclose a multi-million-dollar payment rail that he used to fund his lavish lifestyle throughout the entirety of the receivership. Such conduct is contrary to the intent and purpose of the Orders, and Santi's repeated contempt requires the imposition of coercive sanctions to protect the integrity of this Court's Orders.

### III.    RELIEF REQUESTED

To maintain the integrity of its own orders, and to ensure that its Orders are not casually disregarded, the Court should hold Santi civil contempt.[8] The Receiver requests the Court to:

1) hold Santi in contempt of Court;

2) compel immediate turnover of the assets, information, records and all other information specifically requested by the Receiver as required in the Orders, including without limitation all documents, communications, and other records reflecting or relating to Alpha Trader and its assets and operations;

3) impose a fine of reasonable attorney's fees and expenses to compensate the Estate for the further efforts expended by the Receiver and his attorneys to

---

[8] To the extent necessary, the Receiver also requests an evidentiary hearing on this motion.

obtain Santi's compliance with the Orders in an amount to be presented by the Recevier;

4) impose a compensatory sanction of $3,400,892.01 for the total losses incurred by the Estate (*see FTC v. Leshin, 719 F.3d 1227, 1233 (11th Cir. 2013)*); and

5) impose a coercive sanction of $500 for each day of non-compliance since the original deadline of March 7, 2025 that was previously set by the Court. *See* ECF No. 196; *Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1557-58 (11th Cir. 1996).

WHEREFORE, the Receiver respectfully requests that the Court grant the relief requested above and any such further relief as the Court deems proper.

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(a)(3), the Receiver conferred with counsel for the CFTC, who does not oppose the relief sought in this motion. On February 11, 2026 counsel for the Receiver attempted to confer by email with counsel for Defendant Alex Santi, but as of the time of this filing, counsel did not state a position.

Respectfully submitted,

*/s/ Vincenzo Lamonica*
Russell Landy
Florida Bar No. 44417
Email: rlandy@dvllp.com
Vincenzo Lamonica
Florida Bar No. 1058073
Email: vlamonica@dvcattorneys.com
DAMIAN | VALORI | CULMO
*Counsel for the Receiver*
1000 Brickell Avenue, Suite 1020

Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 11, 2026, I electronically filed the foregoing document with the clerk of the U.S. District Court, Southern District of Florida, using the electronic case filing system of the court, and the electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record.

*/s/ Vincenzo Lamonica*
Vincenzo Lamonica

20