**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL CASE NO. 1:24-CV-23745-ALTMAN-LETT**

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

v.

TRADERS DOMAIN FX LTD. d/b/a THE TRADERS DOMAIN; FREDIRICK TEDDY JOSEPH SAFRANKO a/k/a TED SAFRANKO; DAVID WILLIAM NEGUS-ROMVARI; ARES GLOBAL LTD. d/b/a TRUBLUEFX; ALGO CAPITAL LLC; ALGO FX CAPITAL ADVISOR LLC n/k/a QUANT5 ADVISOR, LLC; ROBERT COLLAZO, JR.; JUAN HERMAN a/k/a JJ HERMAN; JOHN FORTINI; STEVEN LIKOS; MICHAEL SHANNON SIMS; HOLTON BUGGS, JR; CENTURION CAPITAL GROUP INC.; ALEJANDRO SANTIESTEBAN a/k/a ALEX SANTI; GABRIEL BELTRAN; and ARCHIE RICE,

Defendants.

**[PROPOSED] CONSENT ORDER FOR PERMANENT INJUNCTIVE RELIEF AND OTHER EQUITABLE RELIEF AGAINST DEFENDANT STEVEN LIKOS**

On September 30, 2024, Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC") filed a Complaint against Defendants Traders Domain FX Ltd. d/b/a The Traders Domain ("TD"), Fredirick Teddy Joseph Safranko a/k/a Ted Safranko, David William Negus-Romvari, Ares Global Ltd. d/b/a TruBlueFX ("Ares Global" or "TruBlueFX"), Algo Capital LLC ("Algo Capital"), Algo FX Capital Advisor LLC n/k/a Quant5 Advisor, LLC ("Algo FX") (Algo Capital and Algo FX are collectively "Algo"), Robert Collazo, Jr., Juan Herman a/k/a JJ Herman, John Fortini, Steven Likos, Michael Shannon Sims, Holton Buggs, Jr., Centurion Capital Group Inc. ("Centurion"), Alejandro Santiesteban a/k/a Alex Santi, Gabriel Beltran, and Archie Rice ("Defendants"), seeking injunctive and other equitable relief for violations of certain provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2025) ("Complaint"). The Court entered an ex parte statutory restraining order against Defendants on October 3, 2024, and a Consent Order of Preliminary Injunction as to Defendant Steven Likos on November 1, 2024. Of the sixteen Defendants, eight have appeared in this action: Collazo, Fortini, Likos, Beltran, Rice, Santi, Sims, and Buggs. The remaining eight Defendants have failed to appear. On January 13, 2025, the clerk entered default as to Defendants TD, Safranko, Negus-Romvari, Ares Global, Algo Capital, Algo FX, and Herman. Clerk's Default, ECF No. 138. On February 10, 2025, the Clerk entered a default against Centurion. Clerk's Default, ECF No. 185. To minimize the risk of conflicting judgments, the court has delayed the filing of any motions for final judgment by default until after resolution of the action against the defendants who have appeared and are defending. *See* ECF No. 155.

## I. <u>CONSENTS AND AGREEMENTS</u>

To effect settlement of all charges alleged in the Complaint against Likos without a trial on the merits or any further judicial proceedings, Likos:

1. Consents to the entry of this Consent Order for Permanent Injunction and Other Equitable Relief Against Defendant Steven Likos ("Consent Order");

2. Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3. Acknowledges service of the summons and Complaint;

4. Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5. Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6. Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7. Waive(s):

   (a) Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2025), relating to, or arising from, this action;

   (b) Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–253, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

   (c) Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

   (d) Any and all rights of appeal from this action;

8. Agrees that the Commission is the prevailing party in this action for purposes of

the waiver of any and all rights under the Equal Access to Justice Act specified in subpart (a) of Paragraph 7;

9. Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Likos now or in the future resides outside the jurisdiction of this Court;

10. Agrees that he will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

11. Consents to the entry of this Consent Order without admitting the allegations of the Complaint or any Findings of Fact or Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which he admits;

12. Consents to the use of the allegations of the Complaint and the Findings of Fact or Conclusions of Law in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

13. Does not consent, however, to the use of the allegations in the Complaint or the Findings of Fact or Conclusions of Law herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a statutory disqualification proceeding; a proceeding in bankruptcy or receivership; or a proceeding to enforce the terms of this Order;

14. Agrees to provide immediate notice to this Court and the Commission by certified

mail, in the manner required by paragraph 95 of Part V of this Consent Order, of any bankruptcy proceeding filed by, or on behalf of, or against him, whether inside or outside the United States; and

15. Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against him in any other proceeding.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction, and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein. The findings and conclusions in this Consent Order are not binding on any other party to this action.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

### A. Findings of Fact

#### 1. The Parties to This Consent Order

16. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1–26, and the Commission's Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2025).

17. Defendant **Steven Likos** is a resident of Miami, Florida. Beginning in at least October 2021 and continuing through September 30, 2024 (the "Relevant Period"), Likos was a sales agent, investor, and client of Algo Capital, which has never been registered with the CFTC, and he received purported commissions paid into his TD trading account from Algo based on the

purported trading profits of customers that he solicited for Algo. Likos has never been registered with the CFTC.

**2. Traders Domain's Fraudulent Scheme**

18. From at least November 2019 through September 30, 2024, Defendants TD, Safranko, and Negus-Romvari (collectively the "TD Defendants") orchestrated a multi-layered scheme to solicit funds from individuals and/or entities ("customers") for the purpose of trading leveraged or margined retail commodity transactions, specifically gold-to-U.S. dollar pairs ("XAU/USD"), as well as assorted other commodities, through pooled and individual accounts. Many, if not all, of the offered leveraged or margined transactions were transactions described in Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D) ("leveraged or margined retail commodity transactions").

19. Starting in January 2021, and continuing thereafter, the TD Defendants also solicited customers for the specific purpose of participating in a commodity pool operated by the TD Defendants (the "TD Pool"). The TD Defendants committed fraud by knowingly or recklessly making oral and written fraudulent and material misrepresentations and omissions, including through the TD website, thetradersdomain.com, on social media, via text messages, email, newsletters, and/or in person, in order to persuade potential and existing customers to transfer funds for the purpose of trading XAU/USD either through the TD Defendants' various account offerings or via the TD Pool. The TD Defendants misappropriated customer funds by (i) accepting customer money via third-party bank accounts, payment processors, and crypto wallets, but failing to use at least some of those funds to trade XAU/USD, and (ii) charging commissions on purported trading profits that did not exist. In addition, TD and later its successor-in-interest TruBlueFX misappropriated customer funds by failing to return customer

funds despite repeated attempts by thousands of customers to access and/or liquidate their accounts and despite account statements showing existing customer funds. TD and Safranko also falsified trading records, and the TD Defendants failed to register as required under the Act.

20. Not only did TD directly solicit customers, the vast majority of whom lived in the U.S., but they also engaged other individuals and entities ("sponsors") to solicit U.S. customers on TD's behalf—with each sponsor acting like a spoke extending from the TD hub. In return the sponsors received a percentage of purported trading profits in a manner akin to a multi-level marketing scheme.

21. One such sponsor was Algo and certain of its officers, employees, and agents, including Collazo, Herman, and Fortini, who are named as Defendants in this action (collectively, the "Algo Defendants"). Algo engaged in a separate fraudulent scheme to solicit customers for the purpose of trading leveraged or margined XAU/USD. During the Relevant Period, Likos was a client and investor of Algo and acted as a sales agent of Algo by referring customers to Algo.

**3. Algo's Fraudulent Scheme**

22. Algo first became involved with TD in 2019, when it was shopping for a brokerage on which Algo could trade its own customer funds either manually or using its own algorithm. In or around October 2021, after suffering large trading losses, Algo advised its customers that it was switching to a "XAU/USD strategy." During the Relevant Period Algo stopped engaging in its own proprietary trading of customer funds and instead used those funds to participate in the TD Pool, while misrepresenting and/or failing to disclose this fact to actual and prospective customers.

23. Likos, in his capacity as a sales agent of Algo, fraudulently solicited customers for the purpose of participating in the pooled trading of leveraged or margined XAU/USD by Algo (the "Algo Pool") by making material misrepresentations and omissions to prospective and actual customers based on information from Algo and TD. Likos knew or was reckless in not knowing that TD was not trading customer funds as it purported. In addition, Algo, as well as Likos, misappropriated customer funds. Pursuant to this scheme, at least 242 Algo customers deposited no less than $39 million for the purpose of participating in the Algo Pool.

**a. Likos Fraudulently Solicited Customers.**

24. During the Relevant Period, the Algo Defendants, as well as Likos, in his capacity as a sales agent of Algo, made numerous misrepresentations and omissions regarding: (i) the operation of the trading business, and (ii) the ability of customers to withdraw their funds, including that customers were able to withdraw their funds within a certain period of time. These misstatements and omissions were false and/or deceptive, and Likos knew or was reckless in not knowing that the misstatements and omissions were false and/or deceptive.

25. At least some of Algo customers were individuals with amounts invested on a discretionary basis, the aggregate of which did not exceed $10 million, or $5 million if the individual entered into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

*i. Likos Omitted Information Regarding the Operation of the Trading Business.*

26. During the Relevant Period, Likos omitted to share material information with customers about how their funds were traded. For example, Likos failed to disclose to at least one prospective customer that TD was trading customer funds. Likos knew or was reckless in omitting this information.

27. Algo also made false statements about the trading operation in written customer agreements. Agreements were sent to customers electronically though Algo's DocuSign account and through an Algo Support email account (support@algocapitalfx.com), including at the direction of Likos.

28. For example, in one version of its customer agreement, titled "Software As A Service Agreement," Algo provided a license to use its "proprietary algorithmic trading software" in exchange for 15% to 50% of the customer's trading profits. This version also stated that the "algorithmic trading program" would occur in a "hosted environment provided and maintained by [Algo]." Another version of the customer agreement, titled "Investment Management Agreement" or "Separately Managed Account Agreement," misleadingly stated that Algo would "buy, sell, exchange, convert and otherwise invest or trade" customer funds using its "gold intra-day trading strategy" and future investments may include other "algorithmic FX strategies," in exchange for 25% to 50% of the customer's trading profits.

29. These statements were false. Beginning in at least October 2021 (*i.e.*, the beginning of the Relevant Period), Algo stopped using its own proprietary algorithm to trade customer funds. Internal Algo communications, emails, and text messages acknowledged that, from at least October 2021 forward, Algo instead purportedly directed customer funds to the TD Pool. During a December 19, 2023 deposition in a creditor proceeding involving Algo Capital, a representative of Algo Capital testified that Algo stopped using its proprietary trading algorithm in October 2021. Moreover, Safranko acknowledged Algo's false claims in a text message sent to certain Algo Defendants on January 29, 2023: "[I] wish you guys had told them you weren[']t trading cause that is causing a lot of headache [sic][.] [E]veryone is asking why Algo cap claimed they had algos then [Safranko] was trading[.] [T]hat is the big issue[.]"

30. Moreover, the Algo Defendants, as well as Likos (to at least one prospective client), failed to disclose to prospective and current customers that Safranko, rather than Algo personnel or an Algo algorithm, was trading customer funds. For example, beginning in October 2021, Algo began having customers sign a "Rider" agreement that purportedly advised customers of its new trading strategy. Like the other customer agreements, the Rider was sent to customers through Algo's DocuSign account used by and through the Algo Support email account. The Rider did not disclose that Algo was no longer using its own trading algorithm, it failed to identify TD or Safranko, and did not state that Safranko, or anyone other than Algo, would be trading customer funds.

31. Throughout the Relevant Period, numerous customers were deceived by these fraudulent misrepresentations and omissions, including a customer who wrote the following message to the Algo Defendants in February 2023, after the withdrawal problems started and Algo began revealing information about TD: "For the record, please know I invested my money with Algo Capital, not Traders Domain. I was told that Algo was a trading software, but it appears that Ted from Traders Domain was facilitating all trades, not Algo's software."

*ii. Likos Made Misrepresentations and Omissions Regarding the Ability of Customers to Withdraw Their Funds.*

32. Likos made fraudulent misrepresentations and omissions to customers about withdrawals based on information relayed from Algo and TD, including: (i) making false and inconsistent statements about the timing of withdrawals; (ii) providing false assurances about the security of funds and the reasons for delays; and (iii) engaging at least one new customer without disclosing the significant withdrawal problems. These misrepresentations and omissions allowed the scheme to proceed for months after it initially began to unravel, and Likos knew or was

reckless in not knowing that the misrepresentations and omissions he was conveying to customers were false and/or misleading.

33. Algo misled customers to believe that Algo had control of their money by requiring customers to submit all withdrawal requests directly to Algo through a "Withdraw Request Form." Algo, in turn, submitted corresponding withdrawal requests to TD without copying its customers. As a result of this arrangement, Algo knew exactly how many of its customers were attempting to withdraw funds and how long those customers were waiting on withdrawals.

34. Beginning in or around August 2022, TD began experiencing significant delays in its ability to pay withdrawals, including to Algo's customers. On August 30, 2022, one of the Algo Defendants stated, in a chat with Safranko and another Algo Defendant, that Algo had customers who had been waiting 3 days for withdrawals. By September 20, 2022, the issue had become even more severe, and Algo had a backlog of more than 33 outstanding customer withdrawals, some of which had been pending since August 1. In the weeks and months thereafter, the backlog continued to grow and, as Algo's internal communications stated, the situation for TD and Algo was getting "uglier and uglier every day." By January 5, 2023, Algo had outstanding customer withdrawal requests to TD of approximately $27 million.

35. Despite knowing that Algo did not control the funds and TD was unable to repay customer withdrawals in a timely manner if at all, the Algo Defendants continued to make false promises to customers about the timing of withdrawals. For example, the "Withdrawal Request Form" email that Algo Defendants sent to customers, including at Likos's direction, during this time period falsely stated that it would "take seven to fourteen business days for the proceeds of [a] withdrawal to transmit to your account following the month end reconciliation."

36. In addition, Likos provided false assurances, based on information from Algo and TD, about the security of funds and the reasons for delays to customers who expressed concerns about the status of their funds, even though he knew or was reckless in not knowing that these statements were false. For example, on November 4, 2022, in discussions with another Algo Defendant regarding Safranko's failure to timely respond to a text from that Algo Defendant, Likos proclaimed "we're fucked." Thereafter, from November 11–17, 2022, an Algo Defendant informed Likos of payments from TD to Algo and Algo clients in the amount of over $600,000. The majority of customer withdrawals, however, were still outstanding. Based on the information from Algo, on November 15, 2022, Likos falsely assured an Algo customer about her pending withdrawal: "I can't apologize enough for this but ***there's no fear about the safety of your money***." (emphasis added).

37. In addition to these false assurances, the Algo Defendants used other means to lull their customers into believing that their funds were safe and withdrawals were forthcoming. For example, Likos told an Algo customer with an outstanding withdrawal request that Algo had been receiving tranches from TD and he expected more funds from TD to follow, based on representations from the Algo Defendants. Meanwhile, Likos told an Algo Defendant "I can buy us some time with that story." On the same day, the Algo Defendant told Likos that the funds would be sent that day to that Algo customer. Approximately one week later, unbeknownst to Likos, the Algo Defendants received a customer deposit, which increased Algo's bank account balance (which had a beginning balance of $151,712.38). That same day, Algo made a partial repayment to an Algo customer of $100,000 who had an outstanding withdrawal request.

38. Likos also provided false assurances to customers by repeating inconsistent timeframes provided by TD, despite the fact that he knew or was reckless in not knowing that

this information was false. Algo and Likos parroted statements from TD and Safranko, despite acknowledging among themselves on December 17, 2022, that there was "zero proof backing" anything Safranko said and comparing Safranko to another Ponzi-schemer who "held clients off for 2 years" with similar unsubstantiated excuses.

39. Moreover, between August 2022 and at least January 2023, Algo continued to solicit and/or accept funds from new customers without disclosing the significant withdrawal problems.

**b. Likos Knew or Recklessly Disregarded the Fact That TD Was Engaged in Fraud and Not Trading Funds as Represented.**

40. During the Relevant Period, Likos ignored numerous red flags that should have alerted him to the fact that TD was engaged in fraud and not trading customer funds as purported, including (i) evidence that TD was manipulating trade data and (ii) public warnings that TD was engaged in fraud.

*i. Likos Ignored Signs That TD Was Manipulating Trades.*

41. The Algo Defendants, as well as Likos, ignored and failed to disclose to prospective and current customers that TD manipulated trade data, including by erasing losing trades.

42. Once customers deposited funds with Algo, Algo provided instructions to download the Trading App that they could use to track trading activity and performance. Throughout the Relevant Period, customers observed results on the Trading App that were nearly always positive—a fact Algo used to encourage customers to deposit additional funds and recruit new customers.

43. On October 26, 2021, Likos, while discussing a list of questions from an Algo customer, sent the following question to another Algo Defendant: "If the liquidity provider can

refund bad trades how can we ensure that the profitable trades are being passed through the provider to the market?" In response, the other Algo Defendant attempted to respond to the Algo customer's questions and after several follow up questions from Likos, he dismissively stated "[l]et's handle what we need to not [J.H.'s] questions about if the trades are real," which was not a question the Algo customer asked.

44. On numerous occasions, Algo customers, while monitoring their accounts via the Trading App, observed suspicious trading patterns that they brought to the attention of Algo. In response, Algo consistently told customers that the irregularities were caused by technical issues, and they would be corrected by the broker. For example, on the morning of October 11, 2022, Algo customers observed trading losses in their accounts. Later that day, Algo sent an email to all customers which claimed the losses were the result of a "glitch" when the "servers did not update" and they did not represent actual trading losses. Algo assured its customers that their accounts would be updated, and the losses would be reversed.

45. Notwithstanding what they told customers, Likos acknowledged these suspicious trading patterns. For instance, on October 12, 2022, when discussing TD's trade adjustments, Likos and another Algo Defendant exchanged the following messages:

> Algo Defendant: "If u ever worked for bookie u know u can lose games cuz ur making the money off everyone. Else with ur percent/ I feel like Ted [Safranko] doing that/ But at some point losses can outdo his gains"
>
> Likos: "***Because u think he covered up old losses***"
>
> Algo Defendant: "***Yea for sure.*** In past the trades he closed stayed on the trade history he just deleted them[.]"

(emphasis added). Moreover, on October 17, 2022, the Algo Defendants observed Safranko close a trade at a price that they believed the market did not reach that day, although it did.

Likos and another Algo Defendant, in a text exchange, expressed disbelief about how this was possible:

> Likos: "How the fuck would he take profit at 1657 if it never reached there? Or am I reading something wrong"
>
> Algo Defendant: "Not sure but maybe our charts not same"
>
> Likos: "I mean.:: no where [sic] ever close lol"
>
> Algo Defendant: "Yea 1659"

46. Similarly, on December 13, 2022, after suspicions arose due to delays with withdraws and Likos became aware of the Red List, Likos and another Algo Defendant were discussing certain trades that Safranko manipulated. The Algo Defendant stated, "He obviously can change orders." Likos responded that Safranko "deleted [a] bunch of trades completely." Likos asked how they can explain this to Algo's customers and the Algo Defendant responded, "No idea . . ." and noted that he was not going to confront Safranko about this manipulation because "I want to get money out."

*ii. Likos Ignored Public Warnings That TD Engaged in Fraud.*

47. Likos repeatedly ignored or was reckless in disregarding public information indicating that TD was engaged in fraud. For example, on June 29, 2020, a prospective customer emailed certain Algo Defendants and told them he did due diligence on TD, which was listed as one of Algo's potential brokers, before investing with Algo and found three concerning articles. The customer shared the articles with the Algo Defendants in his email. The first article, https://theforexreview.com/2018/10/31/thetradersdomain-review/, identified TD as an "offshore broker"; described it as a "scam"; gave it a rating of 1/5 stars (with 1 being the lowest) and a similar 1/5 for "Safety of funds"; and contained several customer reviews that described Safranko as "a well known scammer' who stole funds from the brokerage. The second article,

https://www.forexpeacearmy.com/forex-reviews/14449/thetradersdomain-forex-brokers, contained some similarly negative customer reviews. The third article, https://scamwatcher.org/the-traders-domain-review/, identified numerous red flags including that TD: was an unregulated broker, not transparent, communicated poorly, did not let customers withdraw their funds, and did not guarantee the safety of customer funds.

48. In addition to the numerous red flags about TD that Likos had direct knowledge of, yet chose to dismiss, other public information should have alerted him to the fact that TD was engaged in fraud. In September 2022, the Trading App was removed from the Apple App Store. As explained in a September 24, 2022 Foxnewsgroup.com article that referenced a September 2022 *Forbes* article, the Trading App had a plug-in "which can be used by scammers to manipulate those market prices, and simulate account balances, profits or losses." The *Forbes* article also noted that "Everything looks and feels real, but it's all fabrication."

49. Despite observing numerous losing trades disappear in real time and either knowing or recklessly disregarding numerous internet warnings and red flags regarding TD's fraudulent activity, the Algo Defendants, as well as Likos, continued to solicit customers for the scheme.

**c. Likos Misappropriated Customer Funds.**

50. Once prospective customers indicated their desire to participate in the Algo Pool, Algo sent them one or more of the customer agreements described above for their electronic signature. The Algo Defendants, as well as Likos, also provided customers with instructions to deposit funds, which directed customers to deposit funds into Algo bank accounts controlled by Algo Defendants that controlled Algo.

51. During the Relevant Period, rather than accept funds in the name of the Algo Pool as is required under the Act, the Algo Defendants instead accepted funds into bank accounts held

in the name of Algo Capital (the "Algo Accounts") that were controlled by the Algo Defendants that controlled Algo.

52. Algo accepted no less than $32 million from Algo customers into Algo Capital's Toronto-Dominion Bank account ending in *6056.

53. Algo accepted no less than $105,000 from Algo customers into Algo Capital's Oceans Bank account ending in *7405.

54. Algo never sent any customer funds from the Algo Accounts directly to TD or any other brokerage or trading firm.

55. Instead, at times, Algo sent some of the customer funds to third-party bank accounts at the direction of Traders Domain and those funds were not transferred by those third parties to any brokerage or trading firm. At other times, Algo retained the customer funds in its bank accounts but claims to have engaged in ledger maneuvers to purportedly fund Algo customer accounts at TD. In limited instances, Likos, with the knowledge of his participating customers, also accepted some customer funds into his personal bank accounts and Algo then engaged in ledger transactions to fund those TD customer accounts. In other instances, Likos transferred funds from his personal bank accounts to certain Algo customers. Algo then used internal ledger transfers to transfer corresponding amounts from those customers' TD account to Likos's TD account. Algo made, and Likos did not object to, these ledger transfers, even though Algo and Likos knew or were reckless in not knowing that TD was not trading customer funds as purported. Despite the fact that none of the customer funds were actually sent to TD, after depositing money into the Algo Accounts and in limited instances into Likos's personal bank accounts, customers nonetheless observed via the Trading App that their trading accounts appeared to be funded, typically within a few hours or days.

56. Likos also misappropriated funds by taking purported commissions from Algo, which were paid by Algo through internal ledger transfers directly into his TD Account, that ranged from 15 to 25% of the purported trading profits, despite the fact that he knew or was reckless in not knowing that those profits did not really exist.

**4. Likos Failed to Register with the CFTC.**

57. During the Relevant Period, Likos acted as an unregistered AP of Algo Capital, an unregistered CPO, by soliciting customers to participate in the Algo Pool while associated with Algo as a partner, officer, employee, or similar agent.

58. Likos was never registered as an AP of Algo.

**B. Conclusions of Law**

**Jurisdiction and Venue**

59. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that the Commission may bring actions for injunctive relief or to enforce compliance with the Act or any rule, regulation, or order thereunder in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

60. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because certain Defendants reside in this jurisdiction and the acts and practices in violation of the Act and Regulations occurred within this District.

**Count I – Fraud in Connection with Leveraged or Margined Retail Commodity Transactions**

61. 7 U.S.C. § 6b(a)(2)(A), (C) makes it unlawful:

> (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> > (A) to cheat or defraud or attempt to cheat or defraud the other person; [or]
> >
> > (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

62. Pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D), retail commodity transactions, including the XAU/USD transactions described herein, are subject to 7 U.S.C. § 6b "as if the agreement, contract, or transaction were a contract of sale of a commodity for future delivery" provided that it is "entered into with or offered to" (i) a "person that is not an eligible contract participant" (ii) "on a leveraged or margined basis."

63. Section la(18)(A)(xi) of the Act, 7 U.S.C. § la(18)(A)(xi), defines an eligible contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

64. Some, if not all, of the customers who deposited money at the direction of Algo and, in turn, Likos for the purposes of trading leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)) are not ECPs.

65. As described in paragraphs 16 through 58 above, during the Relevant Period, Likos, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in connection with retail commodity transactions that were offered on a leveraged or margined basis, knowingly or recklessly (1) cheated or defrauded, or attempted to cheat or defraud other persons, and/or (2) deceived or attempted to deceive other persons. Likos did so by making material misrepresentations and omissions with scienter, by: failing to disclose that TD, an offshore brokerage, was purporting to trade customer funds to at least one prospective customer; misrepresenting that customers would be able to withdrawal funds based on information from TD and Algo; and failing to disclose the significant withdrawal problems Algo customers were experiencing to at least one prospective customer. In addition, Likos misappropriated customer funds by directing customers to deposit funds in bank accounts knowing or recklessly not knowing those funds were not being sent to TD for trading and accepting commissions on purported trading profits into his Algo Trading Account when he knew or was reckless in not knowing that TD was not trading funds as purported.

66. By reason of the foregoing, Likos violated 7 U.S.C. § 6b(a)(2)(A), (C).

67. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Likos will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

**Count II – Fraud and Deceit by an AP of CPOs**

68. Section la(l l)(A)(i) of the Act, 7 U.S.C. § la(l l)(A)(i), defines a CPO, in relevant part, as any person:

> [E]ngaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital

> contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests, including any . . . (II) agreement, contract, or transaction described in [S]ection 2(c)(2)(D)(i) [of the Act].

69. Regulation 1.3, 17 C.F.R. § 1.3 (2025), defines an AP of a CPO as any natural person associated with:

> (3) A [CPO] as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged[.]

70. During the Relevant Period, Algo solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX (collectively, Algo) were acting as CPOs, as defined by 7 U.S.C. § la(l l)(A)(i)(II).

71. During the Relevant Period, Likos was associated with Algo Capital as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged. Therefore, Likos was an AP of a CPO.

72. 7 U.S.C. § 6*o*(1) prohibits CPOs and APs of CPOs, whether registered with the Commission or not, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, from "(A) . . . employ[ing] any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) . . . engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant."

73. As described in paragraphs 16 through 58 above, during the Relevant Period, while acting as an unregistered AP of a CPO, Likos, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly: (1) knowingly or recklessly employed devices, schemes or artifices to defraud pool participants and prospective pool participants; or (2) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon pool participants or prospective pool participants. Likos did so by making material misrepresentations and omissions with scienter, including by: failing to disclose that TD, an offshore brokerage, was purporting to trade customer funds to at least one prospective customer; misrepresenting that customers would be able to withdraw funds based on information from TD and Algo; and failing to disclose the significant withdrawal problems Algo customers were experiencing to at least one prospective customer. In addition, Likos knowingly or recklessly misappropriated customer funds by (i) directing customers to deposit funds in bank accounts while knowing or recklessly not knowing those funds were not being sent to TD for trading and (ii) accepting commissions into his Algo trading account on purported trading profits while knowing or recklessly not knowing that TD was not trading funds as purported.

74. By reason of the foregoing, Likos violated 7 U.S.C. § 6*o*(l)(A) and (B).

75. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Likos will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

**Count III – Failure to Register as an AP of CPOs**

76. Subject to certain exceptions not relevant here, 7 U.S.C. § 6k(2)(i) makes it unlawful for any person to be associated with a CPO as a "partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a

commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the [CFTC]" as an AP of the CPO.

77. During the Relevant Period, Algo, while using the mails or any means or instrumentality of interstate commerce, solicited funds, securities, or property for pooled investment vehicles for the purpose of trading in leveraged or margined retail commodity transactions (as described in 7 U.S.C. § 2(c)(2)(D)(i)); therefore, Algo Capital and Algo FX (collectively, Algo) were acting as CPOs, as defined by 7 U.S.C. § la(l l)(A)(i)(II).

78. Algo Capital, unlike Algo FX, was not registered with the Commission as a CPO in violation of 7 U.S.C. § 6m(l).

79. During the Relevant Period, Likos associated with Algo Capital as a partner, officer, employee, consultant, or agent, in a capacity that involved the solicitation of funds, securities, or property for participation in a commodity pool or supervision of someone so engaged; therefore, Likos acted as an AP of Algo Capital, as defined by 7 U.S.C. § 6k(2)(i).

80. Likos was not registered with the Commission as an AP of Algo; thus, Likos acted as an unregistered AP of a CPO in violation of 7 U.S.C. § 6k(2)(i).

81. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Likos will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## III. PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT**:

82. Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Likos is permanently restrained, enjoined, and prohibited from directly or indirectly:

a. cheating, defrauding, willfully deceiving, or attempting to cheat, defraud, or willfully deceive, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person, in violation of Section 4b(a)(2)(A), (C) of the Act, 7 U.S.C. § 6b(a)(2)(A), (C);

b. employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant, or engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4*o*(l)(A)–(B) of the Act, 7 U.S.C. § 6*o*(l)(A)–(B); and

c. acting as an AP of a CPO without being registered with the Commission, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2).

83. Likos is also permanently restrained, enjoined, and prohibited from directly or indirectly:

a. trading on or subject to the rules of any registered entity (as that term is defined by Section la(40) of the Act, 7 U.S.C. § la(40));

b. entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)), for accounts held in his name or for accounts in which he has a direct or indirect interest;

c. having any commodity interests traded on his behalf;

d. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

f. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and

g. acting as a principal (as that term is defined in Regulation 3.l(a), 17 C.F.R. § 3.l(a) (2025)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § la(38) (2025)), registered, exempted from registration, or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025).

## IV. DISGORGEMENT

84. Likos shall pay disgorgement in the amount of three hundred and twenty thousand forty-one dollars and thirty-eight cents ($320,041.38) ("Disgorgement Obligation"), representing gains Likos received in connection with the violations set forth in this order. If the Disgorgement Obligation is not paid in full immediately, then post-judgement interest shall accrue on the unpaid portion of the Disgorgement Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order, pursuant to 28 U.S.C. § 1961.

85. Likos shall pay his Disgorgement Obligation and any post-judgment interest to the Receiver in the name of "*CFTC v. Likos, et al*. (S.D. Fla. 1:24-CV-23745-ALTMAN-LETT) – Disgorgement Obligation" and shall send such payments by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order to the Receiver at 500 North Akard Street, Suite 2700, Dallas, TX 75201. If payment by electronic funds

transfer is chosen, Likos shall contact the Receiver at kelly.crawford@solidcounsel.com to receive payment instructions and shall fully comply with those instructions. Likos shall accompany payment of the Disgorgement Obligation with a cover letter that identifies Likos and the name and docket number of this proceeding. Likos shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

86. Likos shall receive a dollar-for-dollar credit against the Disgorgement Obligation for any amount paid to the Receiver by him in connection with this action or held in the Receivership Estate.

87. Upon the termination of the receivership estate, the Receiver shall provide the Commission with a report detailing the disbursement of funds to customers. The Receiver shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

88. After termination of the receivership estate, Likos shall pay any remaining Disgorgement Obligation and post-judgment interest to the Commodity Futures Trading Commission by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
6500 S. MacArthur Blvd.
HQ Room 266
Oklahoma City, OK 73169
9-amz-ar-cftc@faa.gov

If payment by electronic funds transfer is chosen, Likos shall contact the Federal Aviation Administration at the email address above to receive payment instructions and shall fully comply with those instructions. Likos shall accompany payment of the Disgorgement Obligation with a cover letter that identifies "*CFTC v. Likos, et al.* (S.D. Fla. 1:24-CV-23745-ALTMAN-LETT) – Disgorgement Obligation." Likos shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

89. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Likos or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

90. Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the Disgorgement Obligation that has not been paid by Likos to ensure continued compliance with any provision of this Consent Order and to hold Likos in contempt for any violations of any provision of this Consent Order.

91. To the extent that any funds accrue to the U.S. Treasury for satisfaction of Likos's Disgorgement Obligation, such funds shall be transferred to the Receiver for disbursement in accordance with the procedures set forth above.

92. Partial Satisfaction: Except as provided under paragraph 95, acceptance by the Commission of any partial payment of the Disgorgement Obligation shall not be deemed a

waiver of Likos's obligation to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

93. Asset Freeze: On October 3, 2024, the court entered an asset freeze order prohibiting the transfer, removal, dissipation and disposal of, among other Defendants, Likos's assets ("Asset Freeze Order'). The court hereby lifts the Asset Freeze Order as to Likos.

## V. MISCELLANEOUS PROVISIONS

94. Cooperation: Subject to Likos's rights under the Fifth Amendment of the Constitution, Liko shall cooperate fully and expeditiously with the Commission, including the Commission's Division of Enforcement and any other governmental agency or any self-regulatory organization, in this action, and in any current or future Commission investigation or action related thereto. Subject to Likos's rights under the Fifth Amendment of the Constitution, Likos shall also cooperate in any investigation, civil litigation, or administrative matter related to, or arising from, this action. As part of such cooperation, Likos agrees to:

a) preserve and produce to the Commission in a responsive and prompt manner, as requested by the Commission, all non-privileged documents, information, and other materials wherever located, in the possession, custody, or control of Likos;

b) utilize his knowledge and skill to explain transactions, interpret information and terminology, as requested by the Commission;

c) prepare and appear for interviews and testimony, at such times and places and as requested by the Commission;

d) respond completely and truthfully to all inquiries and interviews, as requested by the Commission;

e) identify and authenticate documents, execute affidavits or declarations, and testify completely and truthfully at depositions, trial, and other judicial proceedings;

f) accept service by mail, electronic mail, or facsimile transmission of notices or subpoenas for documents and/or testimony at depositions, hearings, or trials; and

g) waive the territorial limits on service contained in Rule 45 of the Federal Rules of Civil Procedure and any applicable local rules in connection with requests or subpoenas of the Commission.

95. Until such time as Likos satisfies in full his Disgorgement Obligation under this Consent Order, upon the commencement by or against Likos of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of Likos's debts, all notices to creditors required to be furnished to the Commission under Title 11 of the United States Code or other applicable law with respect to such insolvency, receivership bankruptcy or other proceedings, shall be sent to the address below:

Secretary of the Commission
Office of the General Counsel
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street N.W.
Washington, DC 20581

96. Notice: All notices required to be given by any provision in this Consent Order shall be sent via certified mail, return receipt requested, as follows:

Notice to Commission:

Charles D. Marvine, Chief of the Retail Fraud and General Enforcement Task Force, Division of Enforcement
Alison Wilson, Acting Associate Director
Commodity Futures Trading Commission
1155 21st Street, NW Washington, D.C. 20581
Telephone: (202) 418-5000

Notice to Likos

Steven Likos
3050 S.W. 37th St., Apt. 3309
Miami, FL 33133

All such notices to the Commission shall reference the name and docket number of this action.

97. Change of Address/Phone: Until such time as Likos satisfies in full his Disgorgement Obligation as set forth in this Consent Order, Likos shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

98. Entire Agreement and Amendments: This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

99. Invalidation: If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

100. Waiver: The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order. No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

101. Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Likos to modify or for relief from the terms of this Consent Order.

102. Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon the following persons who receive actual notice of this Consent Order, by personal service or otherwise: (1) Likos; (2) any officer, agent, servant, employee, or attorney of Likos; and (3) any other persons who are in active concert or participation with any persons described in subsections (1) and (2) above.

103. Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

104. Contempt: Likos understands that the terms of the Consent Order are enforceable through contempt proceedings to the fullest extent of applicable law, and that, in any such proceedings he may not challenge the validity of this Consent Order.

105. Agreements and Undertakings: Likos shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunctive Relief and Other Equitable Relief Against Defendant Steven Likos* forthwith and without further notice.

**CONSENTED TO AND APPROVED BY:**

| **PLAINTIFF COMMODITY FUTURES TRADING COMMISSION** | **DEFENDANT STEVEN LIKOS** |
|---|---|
| Alison B. Wilson, *pro hac vice*<br>(Attorney-In-Charge)<br>Daniel C. Jordan, *pro hac vice*<br>Brendan Forbes, *pro hac vice*<br>Kelly Folks, *pro hac vice*<br><br>COMMODITY FUTURES TRADING COMMISSION<br>1155 21st Street, NW<br>Washington, D.C. 20581<br>Telephone: (202) 418-5000<br>awilson@cftc.gov<br>djordan@cftc.gov<br>bforbes@cftc.gov<br>kfolks@cftc.gov | Steven Likos<br><br>Michael B. Homer, Dynamis LLP<br>Counsel for Steven Likos<br><br>Dated: June 23, 2026 |

**IT IS SO ORDERED** on this ____day of July, 2026

_________________________________
Judge Roy K. Altman
UNITED STATES DISTRICT JUDGE