**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL CASE NO. 1:24-CV-23745-ALTMAN**

**COMMODITY FUTURES TRADING COMMISSION,**

**Plaintiff,**

**v.**

**TRADERS DOMAIN FX LTD. d/b/a THE TRADERS DOMAIN; FREDIRICK TEDDY JOSEPH SAFRANKO a/k/a TED SAFRANKO; DAVID WILLIAM NEGUS-ROMVARI; ARES GLOBAL LTD. d/b/a TRUBLUEFX; ALGO CAPITAL LLC; ALGO FX CAPITAL ADVISOR LLC n/k/a QUANT5 ADVISOR, LLC; ROBERT COLLAZO, JR.; JUAN HERMAN a/k/a JJ HERMAN; JOHN FORTINI; STEVEN LIKOS; MICHAEL SHANNON SIMS; HOLTON BUGGS, JR; CENTURION CAPITAL GROUP INC.; ALEJANDRO SANTIESTEBAN a/k/a ALEX SANTI; GABRIEL BELTRAN; and ARCHIE RICE,**

**Defendants.**

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS SIMS AND BUGGS AND INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. SUMMARY OF FACTS .......... 3

A. Sims's Fraudulent Scheme .......... 4

1. Sims Fraudulently Solicited Customers. .......... 4

2. Sims Misappropriated Customer Funds. .......... 7

B. Buggs's Fraudulent Scheme .......... 7

1. Buggs Fraudulently Solicited Customers .......... 7

2. Buggs Misappropriated Customer Funds .......... 11

III. LEGAL STANDARD .......... 11

IV. ARGUMENT .......... 12

A. Sims's Repeated Fifth Amendment Invocations Preclude Him from Offering Contrary Evidence and Warrant Adverse Inferences .......... 12

1. Sims May Not Withhold His Account During Discovery and Offer It at Summary Judgment. .......... 13

2. The Record Warrants Adverse Inferences Against Sims. .......... 14

B. Sims and Buggs Committed Fraud in Violation of Section 4b(a)(2)(A), (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C). .......... 16

1. Sims and Buggs Made Material Misrepresentations and Omissions with Scienter. .......... 16

a. Sims .......... 17

b. Buggs .......... 20

2. Sims and Buggs Misappropriated Customer Funds. .......... 24

a. Sims .......... 24

b. Buggs .......... 26

C. Sims's and Buggs's Conduct Was "In Connection with" Covered Commodity Transactions. .......... 27

1. The XAU/USD Transactions Were Covered Retail Commodity Transactions Subject to 7 U.S.C. § 6b. .......... 27

2. The Fraud Was "In Connection With" Commodity Trading. .......... 28

V. CONCLUSION .......... 30

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312 (11th Cir. 2024) .............................................. 12

*Baxter v. Palmigiano*, 425 U.S. 308 (1976)..................................................................... 15

*Celotex Corp. v. Catrett, 477 U.S. 317* (1986) ................................................................. 11

*CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035 (M.D. Fla. 2019) .............. 19, 24, 25, 26, 27

*CFTC v. Baldwin*, No. 1:21-cv-5707, 2025 WL 1047372 (S.D.N.Y. Apr. 8, 2025).................... 28

*CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181 (N.D. Ohio Feb. 26, 2014) ........................................................................................................................ 22

*CFTC v. Fleury*, No. CIV.A. 03-61199, 2010 WL 5146283 (S.D. Fla. June 18, 2010)......... 28, 29

*CFTC v. Gelfman Blueprint, Inc.*, No. 17-7181 (PKC), 2018 WL 6320656 (S.D.N.Y. Oct. 16, 2018) ........................................................................................................ 24, 25, 26

*CFTC v. Heffernan,* 245 F. Supp. 2d 1276 (S.D. Ga. 2003)......................................................... 20

*CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317 (S.D. Fla. 2014) ................. 28, 30

*CFTC v. Int'l Monetary Metals, Inc.*, No. 0:14-cv-62244, 2016 WL 8256852 (S.D. Fla. Aug. 1, 2016) ................................................................................................................... 28

*CFTC v. JBW Cap.*, 812 F.3d 98 (1st Cir. 2016)........................................................................ 29

*CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018)...................................................... 19

*CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428 (S.D. Fla. May 17, 2013).............. 24, 26

*CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321 (11th Cir. 2002).............................. 16, 19, 22, 23

*CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313 (11th Cir. 2018).............................. 16, 17, 18, 20, 21

*CFTC v. Smothermon*, No. 19 Civ. 4185, 2026 WL 2445609 (S.D.N.Y. Aug. 20, 2026) ........... 29

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ...................................................................... 28, 29

*CFTC v. WorldWideMarkets, Ltd.*, No. 21-CV-20715, 2025 WL 3771350 (D.N.J. Dec. 31, 2025) ........................................................................................................................ 24

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000) (en banc)........................................... 12

*Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539 (5th Cir. 2012) ...................................................... 13

*Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298 (11th Cir. 2009) ........... 15

*First Nat'l Bank of Las Vegas, New Mexico v. Estate of Russell*, 657 F.2d 668 (5th Cir. 1981) . 29

*FTC v. Williams, Scott & Associates, LLC*, 679 F. App'x 836 (11th Cir. 2017)................... 13, 14

*Grippo v. Perazzo*, 357 F.3d 1218 (11th Cir. 2004) ................................................................ 29

*Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir.1977) .............................................. 29

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................. 28

*R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165 (5th Cir. 2000) ................................................ 29

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) ...................................................... 28, 29

*SEC v. Blavin*, 760 F.2d 706 (6th Cir.1985) .............................................................................. 22

*SEC v. Calmes*, No. 09-80524-CIV, 2010 WL 11505260 (S.D. Fla. Nov. 19, 2010) ................. 14

*SEC v. Huff*, 758 F. Supp. 2d 1288 (S.D. Fla. 2010), *aff'd*, 455 F. App'x 882 (11th Cir. 2012) . 18

*SEC v. Scherm*, 854 F. Supp. 900 (N.D. Ga. 1993) .................................................................. 15

*SEC v. Zanford*, 535 U.S. 813 (2022) ................................................................................... 28, 29

*United States v. A Single Family Residence*, 803 F.2d 625 (11th Cir. 1986) .............................. 15

*United States v. Certain Real Prop. & Premises Known as 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78 (2d Cir. 1995) ....................................................................................................... 13

*United States v. Schlei*, 122 F.3d 944 (11th Cir. 1997) ............................................................ 29

*Whitehead v. BBVA Compass Bank*, 979 F.3d 1327 (11th Cir. 2020)........................................ 12

**Statutes**

7 U.S.C. § 1a(18)(A)(xi) ............................................................................................................ 27

7 U.S.C. § 2(c)(2)(D) .................................................................................................................. 27

7 U.S.C. § 6b(a)(2)(A) ...................................................................................................... 3, 12, 16

7 U.S.C. § 6b(a)(2)(C) ...................................................................................................... 3, 12, 16

7 U.S.C. § 9(1) ............................................................................................................................ 28

**Other Authorities**

Nat'l Futures Ass'n, Interpretive Notice 9065, *NFA Compliance Rule 2-10* (amended Mar. 1, 2020) .......... 2

**Rules**

Fed. R. Civ. P. 56(a) .......... 11

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1, Plaintiff Commodity Futures Trading Commission ("CFTC") respectfully moves for partial summary judgment as to liability against Defendants Michael Shannon Sims and Holton Buggs, Jr. and submits the following incorporated memorandum of law in support.

## I. INTRODUCTION

This case involves a multi-layered fraudulent scheme through which thousands of customers lost at least $155 million deposited for the purported purpose of trading leveraged or margined retail commodities, primarily gold-to-U.S. dollar pairs ("XAU/USD"). Stmt. of Material Facts in Supp. of Pl.'s Mot. for Partial Summ. J. ("SMF") ¶¶ 2, 13. The CFTC filed this action on September 30, 2024, against sixteen Defendants, alleging that each participated in the fraudulent scheme and, in doing so, violated the Commodity Exchange Act ("CEA"). Compl. ECF No. 1. Of the sixteen Defendants, only two continue to litigate this matter: Michael Shannon Sims ("Sims") and Holton Buggs, Jr. ("Buggs").[1] The CFTC now seeks summary judgment as to the liability of each.[2]

At the "hub" of this multi-layered scheme was Traders Domain FX, LTD. d/b/a/ The Traders Domain ("TD")—an online brokerage incorporated in St. Vincent and the Grenadines in

---

[1] In addition to Defendants Sims and Buggs, Defendants John Fortini, Steven Likos, and Archie Rice each appeared in this action and entered into Consent Orders with the CFTC resolving the claims against them. *See* Order Approving and Entering Consent Decree, ECF No. 439; Order Approving and Entering Consent Judgments, ECF No. 518. Three other Defendants (Robert Collazo, Jr., Gabriel Beltran, and Alejandro Santiesteban) have reached settlement agreements in principle and are not subjects of this Motion. The other eight defendants failed to appear in this action and are in default (collectively, the "Defaulted Defendants"). *See* Clerk's Default, ECF Nos. 138, 185. Pursuant to the Court's Order on Default Final Judgment Procedure*s* (*see* ECF No. 150), Plaintiffs intend to move for the entry of default final judgment against the Defaulted Defendants "no later than 14 days after liability is resolved against all Defendants (*Id.*)."

[2] The CFTC's Motion addresses only the issue of Sims and Buggs's liability and reserves the question of the appropriate monetary and equitable remedies for future briefing or hearing before the Court.

2017 by its co-owners Frederick Teddy Joseph Safranko a/k/a Ted Safranko ("Safranko") and David Negus-Romvari ("Negus-Romvari") (collectively, with TD, "TD Defendants"). SMF ¶ 1.

No later than in or about June 2021, the TD Defendants began soliciting customers to deposit funds for the purpose of participating in a commodity pool operated by TD—specifically a "high-risk" PAMM[3] Account that exclusively traded XAU/USD (the "TD Pool"). SMF ¶ 2. To attract additional customers and funds to the TD Pool, TD recruited entities and individuals to act as "sponsors" to solicit new customers in exchange for a percentage of those customers' purported trading profits. SMF ¶ 4. Sims and Buggs each acted as a TD sponsor. SMF ¶ 5.

TD, however, was engaged in a massive fraud that Sims and Buggs knew or recklessly disregarded was occurring. SMF ¶¶ 6–13. TD did not trade customer funds as represented. SMF ¶ 6. Instead, customer funds intended for trading—including funds solicited by sponsors—were funneled into bank accounts and cryptocurrency wallets held in the names of third parties, as directed by sponsors, or in the sponsors' own names. The funds were never sent to TD, any other known trading firm, or any identifiable liquidity provider. SMF ¶¶ 6–7.

In or about the fall of 2022, TD's scheme began to unravel. SMF ¶ 8–9. Although customer accounts reflected positive returns, customers could no longer withdraw their funds. SMF ¶ 8. For months, the TD Defendants assured customers that their funds were safe and offered excuses for the withdrawal delays. Then, in or about March 2023, TD abruptly announced it was being acquired. SMF ¶ 9–10. In or about July 2023, customers received an email stating that their accounts had been transferred to Trubluefx, a platform operated by Ares Global Ltd. SMF ¶ 11. Like TD, Trubluefx falsely assured customers that their funds were safe

[3] PAMM stands for Percentage Allocation Management Module. A PAMM account is a type of pooled investment system where professional traders manage combined investor funds, with profits and losses distributed proportionally based on each investor's contribution. *See* Nat'l Futures Ass'n, Interpretive Notice 9065, *NFA Compliance Rule 2-10* (amended Mar. 1, 2020).

and that their withdrawals would be processed. SMF ¶ 12. The court-approved Receiver's claims process ultimately established, however, that thousands of customers were unable to recover their funds and suffered losses exceeding $155 million.[4] SMF ¶ 13.

Although the TD Defendants orchestrated this fraudulent scheme, Sims and Buggs each played a critical role in expanding it. In exchange for a promised share of the purported trading profits, each solicited additional customers and funds into the TD Pool despite numerous red flags concerning TD's fraud that they knew of or recklessly disregarded. SMF ¶¶ 18, 35, 42–43, 48, 49, 71–94, 106. Sims and Buggs also defrauded their own customers by making material misrepresentations, omitting material information, and misappropriating customer funds. SMF ¶¶ 18–48, 49-70, 84, 102–08. By this conduct, Sims and Buggs each violated the CEA.

For the reasons set forth in this Memorandum and the accompanying SMF and exhibits, Plaintiff is entitled to summary judgment on Count One of the Complaint (fraud in connection with leveraged or margined retail commodity transactions in violation of Section 4b(a)(2)(A), (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C)) as to the liability of Sims and Buggs. The Court should grant Plaintiff's Motion for Partial Summary Judgment (the "Motion") in its entirety.

## II. SUMMARY OF FACTS

Plaintiff incorporates the SMF, filed concurrently herewith, as if set forth fully herein. As described in the SMF and summarized below, Sims and Buggs each acted as a TD sponsor and, in so doing, perpetrated fraudulent schemes upon their customers by making representations they knew or recklessly disregarded were false, failing to disclose material facts necessary to make other statements not misleading, and misappropriating customer funds.

---

[4] On April 24, 2026, the Receiver filed a report in which he recommended that the Court approve claims totaling $155,252,275.43 for 2,219 victimized investors. *See* Receiver's Rep. Regarding Objs. to Receiver's Claims Rep. & Req. to Submit the App. of Objs. in Camera, ECF No. 451.

### A. Sims's Fraudulent Scheme[5]

#### 1. Sims Fraudulently Solicited Customers.

Sims solicited, referred, or assisted at least 42 customers who deposited more than $22 million into what he represented to be his "hedge fund." SMF ¶ 18. But, as described herein, no such fund existed. SMF ¶ 21. Instead, Sims acted as a TD sponsor and, without disclosing that role to his customers, directed his customers' funds to the TD Pool. SMF ¶¶ 5, 22–23, 38–41. Ultimately, in soliciting customers, Sims materially misrepresented or omitted facts about: (i) the nature and operation of the purported trading business (SMF ¶¶ 20–21, 27–28); (ii) the potential profits and risks associated with the deposits (SMF ¶¶ 29–33); and (iii) customers' ability to withdraw their funds (SMF ¶ 34).

Beginning in or about September 2021, Sims solicited customers to invest in what he claimed was his hedge fund. SMF ¶ 18. He told prospective customers that his fund had been operating for six to seven years—or, at other times, ten years—and that he employed a team of "experienced" traders to trade leveraged or margined XAU/USD on behalf of its customers. SMF ¶ 20. But those representations were false: Sims did not own a hedge fund and he did not employ any team of traders. SMF ¶ 21. Instead, Sims directed customers—who believed they were investing in his purported hedge fund—to set up accounts with TD, and he helped them download and set up a mobile application, the MetaTrader Trading App ("Trading App"), which allowed them to view those accounts. SMF ¶ 22. To the extent customers saw references to "TD" in their account statements or on the Trading App, they believed TD was the brokerage through which Sims's purported hedge fund was executing trades. SMF ¶ 24. Only after

---

[5] Sims repeatedly invoked the Fifth Amendment privilege against self-incrimination in his responses to the CFTC's interrogatories, requests for admission, and requests for production, and during both his CFTC deposition and the Receiver's deposition. As discussed below, the Court should draw adverse inferences from those invocations. *See infra* Section IV.A.

depositing their funds did some customers learn that TD and Safranko purportedly held and traded their funds in the TD Pool. SMF ¶ 25. Sims, however, failed to disclose to at least some customers, either when soliciting them or during the scheme, that TD—and not his purported hedge fund—would conduct the purported trading and that TD was an offshore, unregistered broker. SMF ¶¶ 1, 27.

Sims made false and misleading statements about purported trading performance, the risk of loss, and commissions. He repeatedly claimed that his hedge fund generated monthly trading profits of 40%, had been profitable every month, and had experienced only two "losing days" in the preceding six or seven years. SMF ¶¶ 29–30. These claims were false because the "hedge fund" did not exist and no customer funds were traded as Sims represented. SMF ¶ 31. Sims also falsely told at least one customer that stop-loss parameters were in place to prevent the loss of principal. SMF ¶ 32. And he failed to disclose to at least one customer that he would charge commissions on customers' investments. SMF ¶ 28.

Sims similarly misrepresented customers' ability to withdraw their funds. He told at least one customer that withdrawals would take 48 hours. SMF ¶ 33. But when customers began experiencing withdrawal delays in or about August 2022, Sims falsely attributed the delays to "banking issues," and claimed that "everything [would] start to get back on track" once Trubluefx acquired TD. SMF ¶ 34.

Separately, Sims knew of or recklessly disregarded numerous warning signs concerning TD's purported trading. As early as in or about November 2021, Sims knew that his customers' TD accounts sometimes reflected "big losses" that were later "corrected" by the end of the day, and he had been questioned by customers about these losses. SMF ¶¶ 35–36. Sims knew that TD attributed the discrepancies to "slippage" but nevertheless raised concerns with several other

Defendants after comparing TD's purported trades with trades executed through another brokerage that did not show similar slippage. SMF ¶¶ 35–36.

Sims also told his customers to conceal the purpose of the wires funding their accounts. Rather than identify the transfers as investments in his purported hedge fund, which customers believed their investments to be, Sims directed them to describe them as payments for "services." SMF ¶ 38. For example, on September 3, 2021, Sims sent a customer "updated instructions" to wire funds to a SACAP account with "services" in the memo line; and on February 18, 2022, he instructed the same customer to wire funds to a SECAP account, use "services" in the description, and include "[n]othing about investment/trading/hedge fund." SMF ¶ 38.

By in or about April 2022, Sims also knew that the National Futures Association[6] ("NFA") had issued warnings concerning TD. SMF ¶¶ 42–43. In connection with an examination of another TD sponsor with which Sims was involved, the NFA raised "serious" and "alarming" concerns, including that this TD sponsor lacked "any control over" customer funds, that such funds were being transferred to a third-party bank account, and that TD was not registered with the NFA. SMF ¶ 43. The NFA further advised that its bylaws prohibited registered commodity pools from "doing business with non-NFA Members" like TD. SMF ¶ 43. Despite these warnings, Sims continued soliciting customers for his purported hedge fund—which some customers later learned to be the TD Pool—without disclosing that TD was conducting the purported trading, that TD was an offshore brokerage, or that the NFA had warned against doing business with TD. SMF ¶¶ 18, 21–44. Moreover, Sims also failed to

[6] The National Futures Association is a self-regulatory organization for the U.S. derivatives industry. *See* About NFA, *https://www.nfa.futures.org/about/index.html*. The CEA requires certain firms and individuals that conduct business in the derivatives industry (including commodity pool operators) to register with the CFTC. *See* Registration and Membership, *https://www.nfa.futures.org/registration-membership/index.html*. The CFTC has delegated registration authority to the NFA. *Id.*

conduct basic due diligence concerning TD or Safranko: he did not conduct a background check or perform internet searches on Safranko; determine whether TD was registered with a financial regulatory agency; or investigate whether any financial regulatory agencies had issued warnings about TD. SMF ¶¶ 45–47.

**2. Sims Misappropriated Customer Funds.**

Sims misappropriated customer funds by accepting commissions based on purported trading profits from his customers' accounts. SMF ¶ 48. But, as Sims knew or recklessly disregarded, his customers' purported trading profits were not genuine because TD did not conduct the trading reflected in their accounts. SMF ¶¶ 6, 39–41, 48. He continued taking these commissions despite the numerous warning signs described above. SMF ¶¶ 42–48.

**B. Buggs's Fraudulent Scheme**

**1. Buggs Fraudulently Solicited Customers.**

Buggs solicited, referred, and/or assisted at least 517 customers in depositing at least $54 million for the purpose of participating in the TD Pool. SMF ¶ 49.[7] In soliciting customers to participate in the TD Pool, Buggs made material misrepresentations and omissions about: (i) the trading operation (SMF ¶¶ 53, 63–66); (ii) purported profits and risks associated with the trading (SMF ¶¶ 56–62); and (iii) the ability of customers to withdraw their funds (SMF ¶¶ 67–70).

Concerning the trading operation, Buggs misrepresented to at least one customer that a "very conservative" algorithmic trading bot was used to trade funds deposited in the TD Pool. SMF ¶ 63. Months later, when that customer questioned irregular trading activity in his account, Buggs explained that the purported trading was done by Safranko, not an algorithmic trading bot,

[7] At least some Buggs customers were introduced to TD through intermediaries, who he or his assistant referred to as "gatekeepers." SMF ¶¶ 105–06. In total, Buggs referred more than 1,700 customer accounts to TD, either directly or through intermediaries, representing at least 517 unique customers. SMF ¶¶ 49, 107–08.

prompting the customer to question Buggs as to his "inconsistent" representations. SMF ¶ 64. When touting TD as a potential investment to another customer, Buggs sought to assuage concerns raised by that customer about Safranko's legitimacy by falsely representing that he (Buggs) had traded "right beside [Safranko]." SMF ¶ 66. These statements concerning the trading operation were false. In fact, Buggs knew that Safranko exercised control over the TD Pool and knew of Safranko's irregular trading activities, but—instead of disclosing that fact to customers—he falsely vouched for Safranko's legitimacy. SMF ¶ 65.

Buggs also misrepresented the purported historical performance of the TD Pool and potential for profits, while downplaying the risk of loss. For example, Buggs falsely told customers the TD Pool had an "incredible winning streak" and that "he was making millions of dollars of profits each day." SMF ¶ 55–56. Buggs told at least one customer that his TD account was earning monthly returns of 30% or more and sent screenshots of those returns displayed in the Trading App, including screenshots showing the rate of return for the TD Pool for the year was 4,000%. SMF ¶ 57. The trading activity displayed to customers through the Trading App was nearly always positive, which led customers to believe that the TD Pool was generating substantial profits—when it was not—and encouraged them to deposit more funds. SMF ¶ 54.

Buggs further misrepresented to at least some customers that any risk associated with participating in the TD pool was minimal. For example, Buggs falsely represented to one prospective customer that the risk associated with trading XAU/USD was capped. SMF ¶ 58. He separately told another customer that the maximum potential loss was 1% of the account balance on any given day; on one occasion, however, that customer observed an account loss of approximately 30%. SMF ¶¶ 58–60. Some customers contacted Buggs to ask why they were seeing losses in excess of the maximum risk they had been promised. SMF ¶¶ 60–62. In

response, Buggs and Safranko falsely told at least one customer that losses were attributable to system updates. SMF ¶ 61. Buggs told another customer that losses were attributable to "slippage." SMF ¶ 62.

Buggs also misrepresented to customers that they could withdraw funds whenever they wanted and admitted in testimony that, in or about February 2023, he falsely reassured one customer that "[w]ithdrawals have steadily gone out" from TD. SMF ¶¶ 67–69. In fact, withdrawals had not gone out steadily since in or about August 2022. SMF ¶ 70.

Buggs knew or recklessly disregarded that all these representations were false. First, Buggs was aware of occasions in which Safranko altered customers' TD account balances (*e.g.*, "reversing" losing trades) or otherwise manipulated trades or trading history. SMF ¶ 72. As Buggs admitted in his testimony, by no later than July 28, 2021, he knew that Safranko could alter customers' TD account trading records by changing the size of, or completely removing, specific trades, and that those changes were reflected in the Trading App. SMF ¶ 73. By August 12, 2021, Buggs also knew that Safranko could change the prices of trades reflected in customers' TD accounts. SMF ¶¶ 74–75. Buggs knew that Safranko offered varying rationales for these alterations. For example, on some occasions, when losing trades were erased, Safranko credited customer accounts on the purported ground that he had "traded out of character"; on other occasions, Safranko attributed losses to "slippage." SMF ¶¶ 75–78.

Second, apart from having first-hand knowledge that TD, through Safranko, could alter completed trades, Buggs ignored other red flags about TD. Buggs ignored explicit warnings from individuals—including both (i) an experienced trader who owned a business that "taught clients how to trade" and had previously interacted with TD and (ii) the owner of another trading platform—that Safranko's actions were indicative of fraud. SMF ¶ 79. Buggs admitted that the

experienced trader told him that Safranko's act of crediting back the trading losses indicated that Safranko was probably "faking the trading." SMF ¶¶ 80–81. This trader also told Buggs that Safranko's control over both sides of the purported trades suggested that TD might not have been conducting any trades at all. SMF ¶ 81.

Buggs also ignored the same individual's warnings that neither Buggs nor TD was properly licensed or registered and that, "should [Buggs] go into business with []TD and Safranko, the CFTC could bring charges against him." SMF ¶ 82. He also disregarded a warning from another trading platform owner that TD was a "scam." SMF ¶ 83. Buggs also admitted in his testimony that he knew, but chose to ignore, that the NFA was "suddenly" conducting an unscheduled audit of an unspecified entity associated with Safranko and that Safranko was concerned about his business partners talking to the NFA during the audit of this entity. SMF ¶ 92–94.

As early as September 21, 2021, Buggs knew that Safranko did not want TD customers to mention TD in their funding wires because banks would "flag all their accounts." SMF ¶ 95. Ignoring this red flag, Buggs (like Sims) instructed customers to conceal the purpose of their deposits by referencing only "Services" in the wire transfer memorandum. SMF ¶ 98. Similarly, Buggs instructed some customers to direct their wires to various bank accounts in the name of a third-party entity, not TD. SMF ¶ 96. For U.S. customers funding their TD accounts with cryptocurrency, Buggs and/or his assistant instructed them to choose "crypto," rather than the United States, as their country of origin. SMF ¶ 100. Buggs knew that TD, as an offshore brokerage, was not allowed to solicit U.S. customers. SMF ¶ 99. Buggs also concealed the purposes of his own withdrawals from TD by using an entity he owned and controlled, Ibuumerang LLC, to submit invoices describing the withdrawals only as payments for

"Services," thereby enabling him to withdraw large amounts of money from his TD trading account. SMF ¶ 101.

Buggs also disregarded other warning signs, including the fact that Safranko and TD never gave him essential TD operating information about an entity to which Buggs sent millions in customer funds. For instance, Buggs was unaware of: (i) the location where TD held customer funds (SMF ¶ 89); (ii) the identities of TD's liquidity providers (SMF ¶ 90); and (iii) where the PAMM account trades were executed (SMF ¶ 90).

**2. Buggs Misappropriated Customer Funds.**

Buggs accepted a portion of customer funds via wire transfer into bank accounts he controlled. SMF ¶ 102–03. Buggs admitted in his testimony that he purported to fund customers' TD accounts from these bank accounts via a "ledger transaction"; however, none of the customer funds deposited into these Buggs-controlled accounts was ever sent to TD or any other brokerage or trading firm. SMF ¶ 104. Instead, Buggs misappropriated these funds for his personal use, including for the purchase of an expensive automobile (a "Lambo") and a condo. SMF ¶ 105. Buggs also misappropriated customer funds by taking commissions on purported trading profits on some, if not all, of the over 1,700 TD customer accounts he referred, despite the fact he knew or recklessly disregarded that TD was not trading the funds as purported and such profits did not exist. SMF ¶¶ 106–08.

## III. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact does not exist "unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023

(11th Cir. 2000) (en banc) (quotation omitted).

Where, as here, the movant bears the burden of proof at trial, it must affirmatively establish the absence of a genuine dispute of material fact with credible evidence that, if uncontroverted, would entitle it to a directed judgment at trial. *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1316–17 (11th Cir. 2024). Once the movant makes that showing, the nonmoving party must come forward with "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* at 1317 (quotation omitted). Although the Court must draw all reasonable inferences in favor of the nonmoving party, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328–29 (11th Cir. 2020) (citation omitted).

## IV. ARGUMENT

The undisputed record establishes that the CFTC is entitled to summary judgment on Sims's and Buggs's liability under Count One. As an initial matter, Sims's repeated invocation of the Fifth Amendment during discovery limits the contrary evidence he may now offer and warrants appropriate adverse inferences. The undisputed evidence establishes that Sims and Buggs each committed fraud in violation of 7 U.S.C. § 6b(a)(2)(A), (C) by: (i) making material misrepresentations and omissions with scienter; and (ii) misappropriating customer funds. Finally, that fraudulent conduct was "in connection with" covered leveraged or margined retail commodity transactions. Each issue is addressed in turn.

### A. Sims's Repeated Fifth Amendment Invocations Preclude Him from Offering Contrary Evidence and Warrant Adverse Inferences.

By repeatedly invoking his Fifth Amendment privilege against self-incrimination during discovery, Sims deprived the CFTC of the opportunity to obtain his account of the relevant events, test his asserted defenses, and pursue additional avenues of discovery. After years of

litigation, Sims should not now be permitted to break his silence and offer evidence he refused to provide during discovery in an effort to defeat summary judgment. Additionally, in evaluating the CFTC's Motion, the Court should draw appropriate adverse inferences from Sims's invocations and infer that truthful answers would have been unfavorable to his interests.

**1. Sims May Not Withhold His Account During Discovery and Offer It at Summary Judgment.**

It is axiomatic that a civil litigant may invoke the Fifth Amendment privilege during the discovery process to protect against compelled self-incrimination; however, such invocation is "far from costless" because it will "always disadvantage opposing parties—at least to some extent—since it keeps them from obtaining information they could otherwise get." *United States v. Certain Real Prop. & Premises Known as 4003–4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995). To preserve the truth-seeking function of civil litigation and to prevent the privilege from being transformed from a shield into a sword, courts may, in their discretion, preclude a party from later presenting evidence on topics about which they have refused to provide discovery. *See Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012); *Certain Real Prop. & Premises Known as 4003–4005 5th Ave.*, 55 F.3d at 82. Consistent with that principle, the Eleventh Circuit has upheld a district court's refusal to consider evidence offered at summary judgment to prove the same fact that the defendant had refused to address during his deposition. *FTC v. Williams, Scott & Associates, LLC*, 679 F. App'x 836, 838 (11th Cir. 2017).

Here, the CFTC gave Sims repeated opportunities—in interrogatories, requests for admission, requests for production, and a deposition—to explain or contest the evidence concerning his conduct. SMF ¶ 15. Sims refused and instead invoked the Fifth Amendment on the subjects at the heart of the CFTC's claims: his solicitation of customers and the representations and omissions he made to them; the routing of customer funds; the compensation

he received; and his knowledge of warning signs concerning TD. SMF ¶¶ 18–23, 27–30, 32–40, 42–44, 46–48. Sims's invocations were also selective rather than indiscriminate. He answered questions when he *could* deny an allegation, qualify his response, or supply an ostensibly exculpatory explanation, but invoked when asked to address the substance of his participation in the fraudulent scheme.[8] SMF ¶ 15. Having thwarted the CFTC's attempts at reasonable and relevant discovery, Sims should not now be permitted to mount a surprise defense. Doing so would convert the Fifth Amendment privilege from a shield to a sword and undermine the discovery process provided for under the Federal Rules of Civil Procedure. *Williams, Scott & Associates, LLC*, 679 F. App'x at 838; *see also SEC v. Calmes*, No. 09-80524-CIV, 2010 WL 11505260, at *4 (S.D. Fla. Nov. 19, 2010) (agreeing that it "would be prejudicial to the [SEC] to allow [defendant] to offer testimony after the close of discovery on issues for which he refused to provide information during discovery").

Accordingly, to the extent Sims attempts to submit an affidavit, declaration, testimony, or other evidence presenting his own exculpatory account of matters as to which he invoked the Fifth Amendment, the Court should decline to consider it. To do otherwise would reward Sims for withholding his account until the CFTC no longer had a fair opportunity to examine and test it through discovery.

**2. The Record Warrants Adverse Inferences Against Sims.**

Consistent with the Fifth Amendment, a court may draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered

[8] Sims also invoked with express notice of the potential civil consequences. For example, when Sims first invoked during his CFTC deposition, the CFTC explained that an adverse inference could be drawn from his refusal to answer in a civil or administrative proceeding and paused the deposition so that Sims could consult with counsel. After that consultation, Sims continued to invoke the Fifth Amendment concerning his customer referrals, compensation, and other subjects central to the CFTC's claims. SMF ¶¶ 16–17.

against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("In a civil suit such as this one, the court may draw adverse inferences against a party that invokes the Fifth Amendment."). The appropriate inference is that the litigant's answers, had they been given, would have been unfavorable to his interests. *See United States v. A Single Family Residence*, 803 F.2d 625, 629 n. 4 (11th Cir. 1986); *SEC v. Scherm*, 854 F. Supp. 900, 904–05 (N.D. Ga. 1993). Courts may draw an adverse inference at the summary judgment stage, provided there is independent evidence supporting the facts at issue. *See Eagle Hosp. Physicians*, 561 F.3d at 1304; *Scherm*, 854 F. Supp. 904–05.

Here, the Court should draw adverse inferences from Sims's informed refusals to answer, and it should consider those inferences alongside the extensive documentary and testimonial evidence establishing his participation in the fraud. As detailed elsewhere in this Motion, contemporaneous communications, financial records, referral and compensation records, customer declarations, and Sims's own limited admissions, among other evidence, all independently establish the relevant facts. *See infra* Sections B.1.a and 2.a. Against that evidentiary backdrop, Sims repeatedly refused to answer questions that would have allowed him to deny, explain, or rebut the CFTC's evidence. SMF ¶¶ 18–23, 27–30, 32–40, 42–44, 46–48. Accordingly, the Court may infer that truthful answers would have been adverse to Sims's interests. Indeed, when considered in the context of the other evidence supporting this Motion, Sims's silence is particularly damning, *Baxter*, 425 U.S. at 319 ("Silence is often evidence of the most persuasive character."), and reinforces the CFTC's showing that he made numerous fraudulent misrepresentations and omissions and misappropriated customer funds.

**B. Sims and Buggs Committed Fraud in Violation of Section 4b(a)(2)(A), (C) of the CEA, 7 U.S.C. § 6b(a)(2)(A), (C).**

7 U.S.C. § 6b(a)(2)(A), (C), makes it unlawful:

> for any person, in or in connection with an order to make, or the making of, a contract of sale of any commodity for future delivery made, to be made, for or on behalf of any other person . . . . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; … [or] (C) willfully to deceive or attempt to deceive such other person by any means whatsoever . . .

Sims and Buggs each independently committed fraud in violation of this provision by (i) making material misrepresentations and omissions with scienter and (ii) misappropriating customer funds.

**1. Sims and Buggs Made Material Misrepresentations and Omissions with Scienter.**

To establish fraud through misrepresentations and omissions, the CFTC must prove: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). Whether a misrepresentation or misleading statement "has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325–26 (11th Cir. 2018) (quoting *R.J. Fitzgerald & Co.*, 310 F.3d at 1328). An omission is actionable when necessary to keep affirmative statements from being misleading. *See id.* at 1325–26. A representation or omission is material if "a reasonable investor would consider it important in deciding whether to make an investment." *Id.* at 1327 (quoting *R.J. Fitzgerald & Co.*, 310 F.3d at 1328–29). And scienter exists where a defendant intends to defraud, manipulate, or deceive or acts with "an extreme departure from the standards of ordinary care"—*i.e.*, where the "danger of misleading" customers "is either known to the Defendant or so obvious that Defendant must have been aware of it." *Id.* (quoting *R.J.*

*Fitzgerald & Co.*, 310 F.3d at 1328). The undisputed facts establish—and thus there is no genuine dispute—that Sims and Buggs each knowingly or recklessly made material misrepresentations and omissions.

**a. Sims**

Sims materially misrepresented and omitted information concerning the nature and operation of the investment he was soliciting. Sims told customers that they were investing in his hedge fund, which he claimed had operated for six to seven years—or, at other times, ten years—and employed a "team of traders" who "were really good," "experienced," and "knew what they were doing" to trade XAU/USD. SMF ¶¶ 18, 20. But Sims did not own or operate a hedge fund and he did not employ a team of experienced traders to trade XUA/USD. Instead, he directed his customers—who believed they were investing in his hedge fund—to set up TD accounts, and he helped them download the MetaTrader Trading App to view those accounts. SMF ¶ 22. And, to the extent customers saw references to "TD" in their account statements or on the Trading App, they believed TD was the brokerage through which Sims's purported hedge fund was executing trades. SMF ¶ 24. Only after depositing their funds did some customers learn that TD and Safranko purportedly held and traded their funds in the TD Pool. SMF ¶ 27.

Sims compounded his misrepresentations by failing to disclose to at least some customers that TD—and not his hedge fund—would conduct the purported trading and was an offshore, unregistered brokerage. SMF ¶¶ 1, 27. Both the affirmative misrepresentations and omitted facts concerned the essential nature of the investment—who customers were entrusting with their money, who would trade it, and through what entity that trading would occur. A reasonable customer deciding whether to invest money would consider such information material. *See S. Tr. Metals*, 894 F.3d at 1325–27 (affirming a finding of materiality where customers were misled about the fundamental nature of their investment and purported loans used to finance them); *see*

*also SEC v. Huff*, 758 F. Supp. 2d 1288, 1330–31 (S.D. Fla. 2010) (finding material omissions concerning who actually controlled the issuer and the affiliated entity receiving funds), *aff'd*, 455 F. App'x 882 (11th Cir. 2012).

Sims also omitted material information bearing directly on the representations he was making about that investment. By in or about April 2022, Sims knew that the NFA had expressly warned against doing business with TD because: (i) TD was not registered with the NFA; (ii) funds transferred to TD were being transferred to a third-party bank account; and (iii) registered commodity pools could not be "doing business with non-NFA Members" such as TD. SMF ¶¶ 42–43. Yet Sims continued soliciting customers without disclosing those concerns or warning customers. SMF ¶ 44. Those omissions were material. A reasonable investor being asked to entrust funds to Sims would consider it important that the NFA—a CFTC-designated registered futures association and self-regulatory organization for the U.S. derivatives industry (SMF ¶ 42)—had identified concerns about where customer money was being sent, TD's registration status, and whether a commodity pool could do business with TD. *See S. Tr. Metals*, 894 F.3d at 1325–27. And in the context of Sims's representations that customers were investing through his own longstanding hedge fund, withholding those facts further obscured the actual nature and risks of the investment.

Sims likewise made material misrepresentations regarding historical performance and risk of loss. He represented that his purported hedge fund generated approximately 40% in monthly trading profits, had been profitable every month, and had experienced only two losing days over the preceding six or seven years. SMF ¶¶ 29–30. He further represented to at least one customer that stop-loss parameters were in place to prevent the loss of capital. SMF ¶ 32. Each of these representations was false because his purported hedge fund did not exist and was

not trading customer funds as claimed by Sims. SMF ¶ 31. Sims also failed to disclose information he possessed that materially undermined the picture he presented. Specifically, by in or about November 2021, he knew that large losses could appear in TD customer accounts and later disappear, and his own comparison of TD's purported trades with those at another brokerage caused him to question TD's explanation that discrepancies resulted from "slippage." SMF ¶¶ 35–37. Representations of extraordinary, virtually uninterrupted returns coupled with assurances against loss, while failing to disclose known irregularities calling the purported returns into question, convey a materially misleading picture of precisely the considerations that drive an investment decision—the likelihood of profit and the risk of loss. *See R.J. Fitzgerald*, 310 F.3d at 1329–33.

Finally, Sims materially misrepresented customers' ability to withdraw their funds. He represented to at least one customer that withdrawals would take approximately 48 hours and, once withdrawals began to stall in or about August 2022, continued providing assurances and explanations concerning when customers would receive their money. SMF ¶¶ 33–34. Whether customer funds could in fact be withdrawn would plainly be important to a customer deciding whether to invest. *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 720 (E.D.N.Y. 2018) (finding withdrawal-related misrepresentations and omissions material).

The record also establishes Sims's scienter. As to the nature and operation of the investment, Sims knew that he did not operate the longstanding hedge fund he described (because it did not exist) and that TD was instead responsible for the purported trading. SMF ¶¶ 18–25; *see CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1049 (M.D. Fla. 2019) (finding that "[n]o reasonable jury could find that Defendants acted without scienter" where Defendants knew their statements to customers were false). As to TD's legitimacy, trading performance, the

risk of loss, and the ability of customers to withdraw their funds, Sims personally observed the unexplained trading irregularities, questioned TD's "slippage" explanation after comparing its trades with those at another brokerage, knew that he had instructed customers to conceal the purposes of wires funding their TD accounts, later learned of the NFA's specific concerns and warning, and knew that customers were experiencing unexplained delays in withdrawing their funds. SMF ¶¶ 34, 35–37, 42–43. Nevertheless, he continued soliciting customers while making the misrepresentations and omissions described above. SMF ¶ 44. *See CFTC v. Heffernan,* 245 F. Supp. 2d 1276, 1295–96 (S.D. Ga. 2003) (finding scienter because "it was obvious, and Heffernan must have known, that the missing information was likely to cause an investor to be misled."). At minimum, Sims's continued misrepresentations and omissions concerning the nature, operation, performance, and safety of customers' investments presented a danger of misleading customers so obvious that Sims must have been aware of it.[9] *See S. Tr. Metals*, 894. 3d at 1327.

**b. Buggs**

Buggs solicited customers to trade in the TD Pool—unlike Sims, who solicited customers for his purported hedge fund (which some customers later learned to be the TD Pool). SMF ¶¶ 18, 49. Buggs engaged in material misrepresentations and omissions concerning who controlled customer funds and how those funds were purportedly traded. Buggs represented to at least one customer that a "very conservative" algorithmic trading bot traded the funds in the TD Pool. SMF ¶ 63. Yet, when that customer later questioned irregular trading activity, Buggs acknowledged that Safranko—not an algorithm—was conducting the purported trading. SMF ¶ 64. Buggs separately reassured another customer concerned about Safranko by representing that

[9] The adverse inferences arising from Sims's Fifth Amendment invocations further support this conclusion. *See supra* Section IV.A.

he (Buggs) had traded "right beside" Safranko. SMF ¶ 66. Those representations were false: Buggs knew Safranko exercised control over the TD Pool, and Buggs did not himself control the customer funds purportedly being traded by TD. SMF ¶ 65. Buggs did not disclose this knowledge when making contrary assurances to customers. SMF ¶¶ 65–66. As in *Southern Trust Metals*, representations and omissions concerning who actually controls an investor's money and how it is being invested concern the fundamental nature of the transaction and are material. *See* 894 F.3d at 1325–27.

Buggs also materially misrepresented and omitted information concerning the TD Pool's performance and risk. He represented that the TD Pool had an "incredible winning streak," that he was "making millions of dollars of profits each day," and that the TD Pool generated monthly returns of 30% or more. SMF ¶¶ 55–57. He also sent a customer a screenshot from the Trading App purporting to show that the TD Pool had an annual return of approximately 4,000%. SMF ¶ 57. At the same time, he represented that downside risk was tightly limited, telling customers that the maximum daily loss was 1% of the account balance. SMF ¶ 58. Those representations were false and failed to convey information that Buggs possessed but omitted to tell customers concerning the reliability of TD's purported results. By in or about August 2021, Buggs knew that purported losing trades could be erased or repriced after TD attributed them to "slippage," and that at least one customer experienced a loss of approximately 30%, far exceeding the limits Buggs had represented. SMF ¶¶ 60–62, 71–78. And Buggs later received direct warnings from individuals with extensive trading knowledge and experience that Safranko might be "faking the trading," that, because Safranko appeared to control both sides of the purported transactions, no genuine trading might be occurring at all, and that ""should [Buggs] go into business with []TD and Safranko, the CFTC could bring charges against him." SMF ¶¶ 79–83. Given Buggs's

affirmative portrayal of extraordinary returns and tightly limited downside risk, those omitted facts were material because they directly undermined the accuracy of the risk-and-return picture presented to customers. *R.J. Fitzgerald*, 310 F.3d at 1332–33.

Buggs also acted with scienter. Buggs admitted in his testimony that he failed to perform any meaningful due diligence on Safranko or TD. SMF ¶¶ 85–90. When a person makes false statements while marketing an investment opportunity to the public, that person can be held liable for fraud when the person turns a blind eye by not conducting sufficient diligence to confirm the accuracy of their representations, even if the person did not know that the statements were false. *See, e.g.*, *CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *15 (N.D. Ohio Feb. 26, 2014) (citing *SEC v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985)) ("[P]romoting investment programs without verifying the legitimacy of the programs [violates the antifraud provisions of the CEA] . . . Relying without thorough investigation on information provided by corporate representatives is also reckless conduct sufficient to establish scienter."). In *Complete Developments*, an intermediary made extensive material misrepresentations when marketing a forex investment program without independently verifying that information for accuracy and did so in the face of red flags about the investment program. The Court found that the intermediary "was at least reckless when it made false representations to potential investors without independent verification of the accuracy of information provided by . . . corporate representatives regarding [the] forex programs [at issue]." *Complete Devs.*, 2014 WL 794181, at *18.

Here, Buggs recklessly touted TD's "extremely large" profits and represented to customers that he was making "millions of dollars of profits each day," that TD was a "Money Printing Machine," that he purported to have an "over $100 million" account balance, that he

was making "around 30% monthly returns," and that the TD Pool had an over 4000% annual return, while also assuring customers that the TD Pool had a 3 to 4% risk cap per trade with a maximum potential daily loss of 1%. SMF ¶¶ 55–58. Meanwhile, as Buggs admitted in his testimony, he failed to conduct basic diligence, verify if TD or Safranko was registered with any financial regulatory agencies, or confirm where TD held customer funds, who provided TD liquidity, or where TD executed its purported PAMM account trades. SMF ¶¶ 85–90. As in *Complete Developments*, Buggs was "at least reckless" when he made "false representations to potential investors without independent verification of the accuracy of information provided by" TD and Safranko. *Complete Devs.*, 2014 WL 794181, at *18.

Buggs did not merely fail to investigate TD and Safranko. He personally observed that TD could erase or alter purported trades, and had Safranko's Trading App credentials, permitting him to personally monitor the trading activity. SMF ¶¶ 72–78. He then received explicit warnings that the trading could be fictious. SMF ¶¶ 79–83. He also knew of regulatory concerns surrounding TD and Safranko, SMF ¶¶ 86, 92–93, and that Safranko wanted customers to obscure TD's identity on funding wires because banks might flag the accounts, SMF ¶ 95. Buggs himself instructed customers to describe those transfers merely as "Services." SMF ¶ 96. Despite all of this, Buggs continued "substantially inflating . . . profit expectations while downplaying risk of loss," *R.J. Fitzgerald,* 310 F.3d at 1330, leading at least some of his customers to believe that participating in the pool was equivalent to having "a Money Printing Machine"—*i.e.*, customers could expect consistently high profits without fear of loss. SMF ¶ 56. At minimum, these misrepresentations and omissions presented an obvious danger of misleading customers and thus represented an extreme departure from the standards of ordinary care. *See R.J. Fitzgerald*, 310 F.3d at 1330 (holding scienter established "as a matter of law" where

defendant's misrepresentations about profit and loss "deviated in an extreme manner from the standards of ordinary care"); *Allied Markets*, 371 F. Supp. 3d at 1049 ("[A]ny individual trading . . . any . . . commodity, really, should know that a certain rate of return cannot be guaranteed—markets are often volatile and Defendants must have known that they could do nothing to influence or change those markets[.]").

**2. Sims and Buggs Misappropriated Customer Funds.**

Misappropriating customer funds entrusted for trading constitutes fraud under 7 U.S.C. § 6b(a)(2). *See Allied Markets*, 371 F. Supp. 3d at 1048–49 (finding defendants who had used funds entrusted for trading to pay business and personal expenses had misappropriated customers funds and violated 7 U.S.C. § 6b(a)(2)); *see also CFTC v. WorldWideMarkets, Ltd.*, No. 21-CV-20715, 2025 WL 3771350, at *22 (D.N.J. Dec. 31, 2025) (collecting cases) ("[C]ourts have repeatedly recognized that misappropriation itself constitutes willful and blatant activity that violates 7 U.S.C. § 6b(a)(2)."). The same principle applies where a defendant takes commissions or fees based on purported trading profits that do not exist: absent genuine profits from which to pay those commissions, the amounts taken are customer funds. *See CFTC v. Gelfman Blueprint, Inc.*, No. 17-7181 (PKC), 2018 WL 6320656, at *6 (S.D.N.Y. Oct. 16, 2018) (default judgment) (finding that fees deducted from customer funds based on fictitious trading profits constituted misappropriation); *CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at *3 (S.D. Fla. May 17, 2013) (finding that defendants misappropriated customer funds by taking commissions during unprofitable months despite having "told prospective participants that Trade, LLC intended to earn commissions based on profits"). The undisputed evidence establishes—and thus there is no genuine dispute—that both Sims and Buggs misappropriated customer funds.

**a. Sims**

Sims misappropriated customer funds by taking commissions calculated from fictitious

trading profits. Specifically, Sims received payments in the form of commissions based on profits from the accounts of customers he brought to TD. SMF ¶ 48. But those purported profits were not genuine trading profits because TD did not actually conduct the trading reflected in those accounts. SMF ¶¶ 6–7, 48. Accordingly, because no genuine trading profits existed, the payments made to Sims necessarily came from customer funds rather than trading gains. *See Gelfman Blueprint, Inc*, 2018 WL 6320656 at *6; *Milton*, 2013 WL 2158428, at *3.

The record also establishes Sims's scienter. Sims continued taking commissions after learning facts that directly called into question the legitimacy of TD's purported trading and profits. Specifically, as early as in or about November 2021, Sims observed substantial losses appearing in TD accounts and then disappearing, questioned TD's explanation of those discrepancies (*i.e.*, that they resulted from "slippage"), and compared TD's purported trades with "the same xau/usd pair" at another brokerage that did not reflect the same irregularities. SMF ¶¶ 35–37. By in or about April 2022, Sims also knew the NFA had raised concerns regarding TD's lack of registration and the routing of customer funds to third-party accounts and had warned against doing business with TD. SMF ¶¶ 42–43. Sims also instructed his customers to disguise the purpose of their wire transfers by writing "Services" in the memo line, making clear that he must have been aware that TD was engaged in potentially illegal activities. SMF ¶¶ 38–39. Despite all these warnings, Sims continued receiving payments. SMF ¶ 48.

Thus, Sims accepted commission payments calculated from purported trading profits that he knew or recklessly disregarded did not exist, which constitutes misappropriation. *See also Allied Markets LLC*, 371 F. Supp. 3d at 1048 ("Defendants' use of invested funds to pay Allied's and Defendants' expenses, as well as to pay 'returns' to other customers, when the invested funds were meant to be used only for trading, constitutes misappropriation.").

**b. Buggs**

Buggs's misappropriation is established, at the very least, by his direct diversion of customer deposits. Although customers solicited by Buggs generally funded accounts by wire transfer to a third party, Buggs sometimes directed customer funds into at least one bank account that he controlled. SMF ¶¶ 102–03. None of the customer funds deposited into that account were ever sent to TD or any other brokerage or trading firm. SMF ¶ 104. Instead, as Buggs admitted in his testimony, he purported to credit the customers' accounts through a "ledger transaction." SMF ¶ 104. He then used some of the funds for purposes unrelated to trading, such as paying the "[b]alance for [a] Lambo[rghini]" or purchasing a condo. SMF ¶ 105. This intentional diversion of funds entrusted to Buggs for trading is the paradigm of misappropriation. *Allied Markets LLC*, 371 F. Supp. 3d at 1048–49 (finding misappropriation where defendants used investor funds for the "lavish personal expenses of Defendants, including gym memberships and luxury car rentals").

Like Sims, Buggs also independently misappropriated customer funds by taking commissions calculated from fictitious trading profits. Buggs received commissions based on purported profits attributed to some, if not all, of the more than 1,700 customer accounts he referred. SMF ¶¶ 106–08. Such profits were fictious and the resulting commissions therefore came from customer funds rather than genuine trading gains. SMF ¶ 106. *See Gelfman Blueprint, Inc*, 2018 WL 6320656 at *6; *Milton*, 2013 WL 2158428, at *3. And Buggs continued taking those commissions despite receiving warnings that Safranko was probably "faking the trading" and that TD was not registered with the CFTC as required. SMF ¶ 79–84. Moreover, Buggs instructed customers making wire transfers to disguise their true purpose by writing "Services" in the memo line. SMF ¶ 98. Buggs—who no later than July 23, 2021, knew that TD was not allowed to solicit U.S. customers—similarly advised U.S. customers to select

the term "crypto" from the menu when choosing their country of origin, to conceal the U.S. as their true country of origin. SMF ¶¶ 99–100. In addition, Buggs was at least reckless in not following up on the complaints and "negative information" about Safranko in the public domain. SMF ¶ 87. On these undisputed facts, Buggs at minimum recklessly disregarded the fact that the purported profits on which his commissions were based were not genuine. *See Allied Markets LLC*, 371 F. Supp. 3d at 1049. Taking commissions of purported profits that Buggs knew or recklessly disregarded did not exist constitutes misappropriation.

### C. Sims's and Buggs's Conduct Was "In Connection with" Covered Commodity Transactions.

Finally, there can be no dispute that Sims's and Buggs's conduct was "in connection with" transactions in a covered retail commodity, specifically leveraged or margined XAU/USD.

#### 1. The XAU/USD Transactions Were Covered Retail Commodity Transactions Subject to 7 U.S.C. § 6b.

Section 2(c)(2)(D) of the CEA, 7 U.S.C. § 2(c)(2)(D), gives the CFTC jurisdiction over "any agreement, contract, or transaction in any commodity that is . . . entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant[10] . . . on a leveraged or margined basis" and which does not result in actual delivery within 28 days, and further provides that any such contracts are subject to the fraud provisions set forth in 7 U.S.C. § 6b. 7 U.S.C. § 2(c)(2)(D)(i), (ii)(III)(aa), (iii).

Here, the undisputed evidence establishes that Sims and Buggs each solicited retail customers to deposit funds for the purpose of trading XAU/USD contracts that did not result in

[10] Section 1a(18)(A)(xi) of the CEA, 7 U.S.C. § 1a(18)(A)(xi), defines an eligible contract participant ("ECP"), in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual.

actual delivery. SMF ¶ 18, 49. XAU/USD refers to spot gold traded against the U.S. dollar, with the quoted price representing the cost of one ounce of gold in U.S. dollars. SMF ¶ 3. Gold is a commodity under the CEA. *See, e.g.*, *CFTC v. Baldwin*, No. 1:21-cv-5707, 2025 WL 1047372, at *5 (S.D.N.Y. Apr. 8, 2025) (stating that gold is a commodity under Section 1a(9) of the CEA, 7 U.S.C. § 1a(9)); *CFTC v. Int'l Monetary Metals, Inc.*, No. 0:14-cv-62244, 2016 WL 8256852, at *4 (S.D. Fla. Aug. 1, 2016) (same). There is also no dispute that the TD Pool was purporting to trade the XAU/USD contracts with leverage. SMF ¶ 2. In addition, the record establishes that at least some of Sims's and Buggs's customers were not ECPs. SMF ¶ 14. Thus, these transactions are covered transactions subject to the fraud prohibitions in 7 U.S.C. § 6b.

**2. The Fraud Was "In Connection With" Commodity Trading.**

Sims's and Buggs's misrepresentations and omissions were "in connection with" the XAU/USD transactions. The plain language of 7 U.S.C. § 6b is broad. *See CFTC v. Fleury*, No. CIV.A. 03-61199, 2010 WL 5146283, at *14 (S.D. Fla. June 18, 2010) ("In government enforcement actions, the 'in connection with' element merely requires that the fraud has "some nexus" with the subject transaction."); *see also CFTC v. Vartuli*, 228 F.3d 94, 101 (2d Cir. 2000) (explaining that the "'plain meaning of such broad language cannot be ignored'") (quoting *Saxe v. E.F. Hutton & Co*., 789 F.2d 105, 110–11 (2d Cir.1986)). Like analogous language in Section 10(b) of the Securities Exchange Act, the "in connection with" requirement found in Section 6b "'should be construed not technically and restrictively, but flexibly to effectuate [its] remedial purposes.'" *See CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347–48 (S.D. Fla. 2014) (quoting *SEC v. Zanford*, 535 U.S. 813, 819 (2022)) (construing analogous "in connection with" language in Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1)); *see also In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 361–63 (S.D.N.Y. 2011) (concluding that the "in connection with" requirement, broadly read pursuant to *Zandford*, can be met even in cases

involving "completely fictitious" securities transactions).[11]

Simply put, the "'in connection with'" requirement is satisfied where "'the scheme to defraud and the [subject transactions] coincide,'" a standard which is "'easily satisfied.'" *CFTC v. Smothermon*, No. 19 Civ. 4185, 2026 WL 2445609, at *4 (S.D.N.Y. Aug. 20, 2026) (quoting *Zandford*, 535 U.S. at 815, 822); *see also Fleury*, 2010 WL 5146283, at *14 (applying *Zandford* when considering the "in connection" element of 7 U.S.C. § 6b and finding the "'in connection' with element merely requires that the fraud has 'some nexus' with the subject transaction").

"[A]ctionable misrepresentations include those made to persons when soliciting funds." *CFTC v. JBW Cap.*, 812 F.3d 98, 109 (1st Cir. 2016) (citing *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir. 1986) and *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 103–04 (7th Cir.1977)). Here, as set forth above, Sims and Buggs each made misrepresentations and omissions regarding how customer funds would be traded, who would be doing the trading, and the historical profits and/or risk of loss associated with the trading, in order to induce customers to deposit funds for purposes of trading. These misrepresentations are precisely the type courts have found to satisfy the "in connection with" requirement. *See, e.g.*, *Vartuli*, 228 F.3d at 101 (holding that misrepresentations about a futures-trading system, including "the way it functioned, the risks involved in using it, and the results it would produce" were made "in connection with" the futures transactions it directed); *R&W Tech. Servs., Ltd. v. CFTC*, 205 F.3d 165, 172–73 (5th Cir. 2000) (upholding the Commission's determination that misrepresentations about trading

---

[11] *C.f. Grippo v. Perazzo*, 357 F.3d 1218, 1223 (11th Cir. 2004) (applying *Zandford* and holding that accepting customer funds as payment for securities satisfied the "in connection with" requirement despite the absence of proof that securities were actually purchased); *United States v. Schlei*, 122 F.3d 944, 972 (11th Cir. 1997) ("'The fraud provisions are not defeated by the fact that a security purportedly traded is nonexistent or fictitious . . . . A contrary result would encourage rather than curb fraud.'") (quoting *First Nat'l Bank of Las Vegas, New Mexico v. Estate of Russell*, 657 F.2d 668 (5th Cir. 1981)).

risks and the reliability of software used solely to select futures trades satisfied the "in connection with" requirement of 7 U.S.C. § 6b); *see also CFTC v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1347–48 (S.D. Fla. 2014) (finding that misrepresentations and omissions concerning the return and risks of commodities transactions satisfied the analogous "in connection with" requirement in 7 U.S.C. § 9(1)). As a result, Sims's and Buggs's conduct was in connection with covered commodity transactions.

## V. CONCLUSION

For the foregoing reasons, Plaintiff submits that there is no genuine dispute as to any material fact that precludes entry of judgment as a matter of law in favor of the CFTC on any of the above-identified issues. Accordingly, Plaintiff requests the Court to grant Plaintiff's Motion in its entirety and enter judgment as a matter of law as to liability against Sims and Buggs on Count One (fraud in connection with leveraged or margined retail commodity transactions in violation of 7 U.S.C. § 6b(a)(2)(A), (C)).

Dated: November 10, 2026

Respectfully submitted,

*/s/ Alison B. Wilson*

ALISON B. WILSON (FL Bar A5503268)
DANIEL C. JORDAN (FL Bar A5501473)
BRENDAN FORBES (FL Bar A5503351)
KELLY M. FOLKS (FL Bar A5503269)
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
1155 21st Street, N.W.
Washington, DC 20581
Telephone: (202) 418-5000
awilson@cftc.gov
djordan@cftc.gov
bforbes@cftc.gov
kfolks@cftc.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on this 10th day of November, 2026, upon all counsel and/or parties who have appeared in the above-styled action.

*/s/ Alison B. Wilson*
Alison B. Wilson