**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:24-cv-23745-ALTMAN/Lett

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

v.

TRADERS DOMAIN FX LTD. d/b/a THE TRADERS DOMAIN, et al.,

Defendants.

**DEFENDANT HOLTON BUGGS, JR.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Defendant Holton Buggs, Jr. ("Buggs") opposes the Motion for Partial Summary Judgment (ECF No. 532) ("Motion" or "Mot.") filed by Plaintiff Commodity Futures Trading Commission (the "CFTC"). Buggs's response to the CFTC's Statement of Material Facts (ECF No. 533) ("SMF"), including his Additional Facts ("Add'l Facts"), is filed separately under Local Rule 56.1 ("Resp. SMF").[1]

[1] "Supp. Dep." is the July 20, 2026 deposition of Buggs (excerpts at ECF No. 533-1; complete transcript at Resp. SMF Ex. A). "Dep." is the March 6, 2026 deposition of Buggs (ECF No. 533-3). "BFS" is the production Bates-numbered BUGGS FIRST SUPP 1–378 (excerpts at ECF No. 533-8; complete production at Resp. SMF Ex. B). "RFA" is Buggs's Responses to the CFTC's First Set of Requests for Admission (ECF No. 533-6). "Viehmeyer Decl." is ECF No. 5-2. Its Exhibits 7–8

## I. INTRODUCTION

The CFTC asks the Court to decide, on a paper record, what Holton Buggs believed about Traders Domain ("TD"). That is a question for a jury. The CFTC reaches its answer by starting the story five months early, by quoting each message Buggs received without the explanation that came with it, and by relying on findings that factfinders made after trial or that courts entered against the people who ran the scheme. The full record shows a sponsor who asked the questions, received answers, kept more than $1 million of his own money in TD, and lost it with everyone else. A reasonable jury could find that he believed what he was told. The Motion should be denied as to Buggs.

Each theory the CFTC presses against Buggs turns on that one question. The CFTC's own exhibits describe a man who "relayed the information provided to him by Traders Domain" and believed it true when he said it. RFA 6–8, 20–21, 29–30. Whether he was a conduit or a co-schemer is for the jury.

Section IV.A of the Motion, which seeks adverse inferences from Fifth Amendment invocations, concerns Defendant Sims alone. Mot. at 12–15.

---

are at ECF No. 5-2 at 162–63, and Exhibits 92–94 are at ECF No. 5-3 at 342–48. The Chessler, Damji, and Wright declarations are at ECF No. 5-5. "Buggs Decl." is the Declaration of Holton Buggs, Jr. (Resp. SMF Ex. C). Citations to the Motion use its internal page numbers.

## II. STATEMENT OF FACTS

Buggs is a businessman, not a commodities professional. He had never heard of the National Futures Association ("NFA") and approached TD as he had approached TD Ameritrade, as a customer of a brokerage. Resp. SMF ¶¶ 89, 94.

Terrence Gray, a longtime business associate, introduced Buggs to TD through Joey McDermott and Juan Hernandez, whom Buggs did not know. Add'l Facts ¶ 109. McDermott opened a WhatsApp group on July 3, 2021, so Buggs could learn about TD and its owner, Ted Safranko. Add'l Facts ¶ 110. Buggs first spoke with Safranko on July 5, had no TD account on July 6, and first funded one on July 14, 2021. Add'l Facts ¶ 111.

Buggs asked Safranko for his FX Book, reviewed TD's public PAMM leaderboard, relied on an experienced trader, Googled Safranko, called participants, and asked about registration. Add'l Facts ¶¶ 113–15. Safranko told him he had worked in compliance, that TD had just completed an audit and was preparing for another, and later walked him through the order book and keystroke analysis on Zoom. Add'l Facts ¶¶ 115–17.

The summer of 2021 brought the episodes the CFTC now calls red flags: slippage adjustments, a sudden NFA audit, a loss day, trade corrections, and price discrepancies. Buggs usually raised the issue or relayed someone else's question, and

Safranko answered each with a specific explanation tied to TD's liquidity provider ("LP"). Add'l Facts ¶¶ 118–21.

Buggs put his own money in during the same weeks: more than $1 million by mid-August 2021 and about $500,000 more that September. Add'l Facts ¶¶ 122–24. He also helped fund accounts for his son, his father, and his cousin. Add'l Facts ¶ 124. He traded his own account beside Safranko's trades. Add'l Facts ¶ 125.

Customers generally wired funds directly to the accounts TD designated. Add'l Facts ¶ 126. Buggs pressed Safranko on fees, order matching, and support failures, and he reported recruiters and "bot" promoters who were using TD's name. Add'l Facts ¶ 127.

TD could not accept deposits for a period in 2022. A few customers who wanted to start wired funds to Buggs, and Buggs had Safranko approve each transfer and move the same amount from Buggs's TD balance to the customer's account, with no commission or discount. Add'l Facts ¶ 129. When TD collapsed, Buggs's balance went with it. Add'l Facts ¶ 130.

## III. LEGAL STANDARD

The CFTC bears the burden of proof at trial. It therefore "must show *affirmatively* the absence of a genuine issue of material fact" and "must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428,

1438 (11th Cir. 1991) (en banc) (quotation omitted); *see* Mot. at 12. The Court views the evidence in the light most favorable to Buggs. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (per curiam). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Scienter requires intent to deceive or an "extreme departure from the standards of ordinary care" presenting a danger "either known to the Defendant or so obvious that Defendant must have been aware of it." *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002). Negligence, even inexcusable negligence, does not suffice. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001). The Eleventh Circuit ordinarily treats "a party's state of mind (such as knowledge or intent)" as "a question of fact for the factfinder, to be determined after trial." *United States v. F.E.B. Corp.*, 52 F.4th 916, 927 (11th Cir. 2022) (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991)). Applying that rule, the Eleventh Circuit vacated summary judgment for the government because the evidence of the government's own intent did not "necessarily resolve[] the question in one party's favor." *Id.* at 927, 931. The same holds for scienter under § 4b. *CFTC v. Giddens*, No. 1:11-cv-2038-WSD, 2013 WL 12244536, at *11 (N.D. Ga. Jan. 31, 2013) ("Scienter generally is not appropriate for determination on summary judgment.").

## IV. ARGUMENT

### A. Every theory the CFTC presses against Buggs turns on what he believed.

The CFTC offers four theories against Buggs. Each reduces to the same disputed question.

The misrepresentation theory rests on profit, risk, and withdrawal statements that came from TD and its Trading App. RFA 6–9, 20–21; Dep. 201:2–25. They are fraud by Buggs only if he knew, or recklessly disregarded, that TD's numbers were false. *R.J. Fitzgerald*, 310 F.3d at 1328. The omission theory faults Buggs for withholding "information that Buggs possessed" concerning "the reliability of TD's purported results." Mot. at 21. What he possessed and believed about those results is the disputed fact. The ledger-transfer theory, by the CFTC's own description, depends on whether Buggs "knew or recklessly disregarded that the profits reflected in his TD account were false." SMF ¶ 104. The commission theory depends on the same knowledge. SMF ¶ 106; Mot. at 26–27.

The Motion therefore presents one question, not four: what did Buggs believe? The record would allow a reasonable jury to find that he believed TD was real.

**B. A jury could find that Buggs believed in TD.**

*a. The record starts in July 2021, not February.*

The CFTC dates Buggs's solicitation from "in or about February 2021." SMF ¶ 49. That date comes from Binyon Wright's account of when Buggs bought a trading-education company, not from anything about TD. Viehmeyer Decl. ¶ 129; Wright Decl. ¶ 4. The TD record begins five months later. Buggs first discussed TD with anyone other than Gray in early July 2021. Supp. Dep. 15:15–19. The chat created to introduce him to TD opened on July 3, he first spoke with Safranko on July 5, he had no account on July 6, and his first funding came on July 14. BFS 1, 7, 77–78, 154–56. The CFTC's investigator found that only about $391,000 of the $54.77 million she attributes to Buggs's customers arrived before September 2021. Viehmeyer Decl. ¶¶ 154, 157.

The date is key. Wright says Buggs "began involving" Safranko "[a]round May 2021" and that he warned Buggs then, two months before the record shows Buggs had heard of TD. Wright Decl. ¶ 6. Most of the statements the CFTC attributes to Buggs are undated. SMF ¶¶ 55–67. The CFTC never matches a statement to what Buggs knew on the day he made it. *See id.*

*b. Each "red flag" came with an answer, and Buggs usually asked the question.*

The CFTC's red flags are messages quoted without the replies that followed them. Mot. at 9–10, 23. Read in full, the chats show Buggs raising questions and Safranko answering each with a specific explanation:

- **July 12, 2021 (slippage).** Safranko reported slippage and said the LP would adjust trades. BFS 9. Buggs understood the LP performed a keystroke audit and honored the price at which Safranko struck the key, and slippage was familiar to him from trading stocks. Supp. Dep. 40:19–44:17. Once Safranko explained, Buggs "was fine with it." *Id.* at 45:2–4.

- **July 20, 2021 (NFA audit).** Buggs asked about the audit, and Safranko told him it went "great." Supp. Dep. 100:2–9. Buggs took the audit as a sign TD was registered: "if you are going through an audit, that you must be registered with an agency." Dep. 82:3–8. He read Safranko's hope that people would not speak to the NFA as a request that customers not speak for the company. Supp. Dep. 100:19–101:12.

- **July 23, 2021 (foreign customers).** Buggs forwarded a "know your customer" question. Safranko answered, "We do not solicit to those countries," and "We follow the same rules as usa." BFS 13–14; Supp. Dep. 45:11–47:14.

- **July 28, 2021 (trade lines).** Buggs relayed that "several people" saw trade lines removed after a loss day; he had not noticed it himself. Supp. Dep. 118:13–25. Safranko called it "a faster correction than adjusting the trade size" after the LP "pulled" matching positions. BFS 168.

- **July 30, 2021 (loss day).** Safranko wrote that the loss "was way too big and its my fault" and credited back 85%. Buggs replied, "Continue to trade your plan." BFS 171–73; Supp. Dep. 101:19–103:20. Buggs "gained more respect and confidence" in TD from the episode. Dep. 177:1–23.

- **August 2021 (price discrepancies).** Buggs flagged slippage on his own account, and Safranko reviewed tick data for the group. BFS 175–76. Buggs forwarded Avinash Omnia's screenshots of a repriced trade

to Safranko and asked him to join a call, because "any time I had an issue or a question, it was always addressed." BFS 19–21; Supp. Dep. 80:15–81:25.

- **December 2021 (loss day).** Buggs and Hernandez challenged Safranko's trading. Safranko warned, "It is a high risk investment. Losses can be sustained. Don't get used to this." Dep. 178:11–179:9. Buggs was "a little happy sometimes that it showed a loss," because customers "need to see and understand, hey, listen, trading is risky." *Id.* at 179:16–21.

The CFTC treats these episodes as proof that Buggs "knew that Safranko could alter customers' TD account trading records." SMF ¶ 73; *see* Mot. at 9. Buggs testified to what he understood: price corrections came from the LP's keystroke audit, not from Safranko. Supp. Dep. 40:21–43:19; Dep. 183:4–184:18, 211:6–12. He denied knowing that trade lines could simply be removed. Supp. Dep. 118:20–119:5. A jury could credit that understanding, particularly because Safranko showed him the order book and keystroke analysis on Zoom. Dep. 184:20–25, 187:1–6. Exposure to warning signs, without actual awareness of the danger, is at most negligence. *Ziemba*, 256 F.3d at 1202. *See Giddens*, 2013 WL 12244536, at *11–12 (denying the CFTC summary judgment on scienter where the defendants were not forex "professionals," investigated the trader, and invested their own money).

TD's banking instructions fit the same pattern. The "services" memo reached Buggs on TD's own wire instructions, which said to use that description "[f]or safety of funds." BFS 174. Buggs "passed along exactly what he passed to me," Supp. Dep. 105:2–3, and did not know why Safranko objected to naming the broker on a wire,

*id.* at 107:18–108:2. TD's own support agent told customers to select "crypto" as their country, Viehmeyer Decl. ¶ 54, and Safranko told Chessler the instruction was for "compliance," Chessler Decl. ¶ 10. Safranko also required an invoice for any withdrawal over about $400,000, using the same description TD required on deposits. Dep. 240:9–241:5. These instructions might suggest that TD was sensitive about banks and regulators. They do not show that Buggs knew its trading was fake, which is what every theory against him requires. *See supra* Part IV.A.

*c. The "warnings" are disputed.*

The CFTC's warnings come from witnesses whose accounts Buggs disputes. Credibility belongs to the jury. *Anderson*, 477 U.S. at 255.

Wright says Buggs told him Safranko could credit losses because Safranko "owned TTD." Wright Decl. ¶ 7; SMF ¶ 80. Buggs testified the opposite: the credits came from the LP, "not because he owns the brokerage." Dep. 211:1–12. Wright says he warned Buggs that the CFTC could bring charges. Wright Decl. ¶ 6. Buggs denied that anyone told him he or TD had to register with the CFTC. RFA 26, 28; Dep. 220:13–24. Buggs does recall Wright saying Safranko was not trading "for real," Dep. 219:1–6, and he explained why a "both sides" theory makes no sense for a pooled account in which the master trader's money moves in the same direction as everyone else's, *id.* at 219:12–220:7. He did not credit Wright, who ran technology for Buggs's education company, was "not as much of a trader," and was not trading

at the time. Dep. 58:9–59:23; Supp. Dep. 133:4–9. Wright was a minority owner who resigned after disagreeing with Buggs's direction. Wright Decl. ¶¶ 4, 7, 10.

Wright's own conduct undercuts his account. Wright opened his own TD account after he complained to Buggs about it. Buggs Decl. ¶ 8. Buggs funded that account with $10,000 of his own money, and Wright later took withdrawals from it. *Id.* ¶¶ 9–10. Wright also had a reason to steer Buggs away from TD: he wanted Buggs to invest with a trading algorithm run by his partner, John Spencer. *Id.* ¶¶ 6–7. Spencer "criticized anybody else who was trading outside of him." Supp. Dep. 133:11–13. A jury could discount a warning from a witness who funded a TD account, withdrew from it, and was pushing a competing product. *See Anderson*, 477 U.S. at 255.

The September 2022 "scam" comment cuts the other way. When an executive of a competing platform called TD a scam, Buggs defended TD to him and then told Safranko about it. BFS 349–50; Supp. Dep. 115:10–116:12. Buggs understood that competing platforms routinely run each other down. Supp. Dep. 116:8–12. That exchange came a year after the statements the CFTC dates, and it shows a believer.

The Google search is no different. Buggs ran it before his first call with Safranko and raised what he found in that call. SMF ¶ 87; Dep. 79:7–12.

*d. Buggs looked. The CFTC's "no meaningful diligence" fact rests on a miscite.*

The CFTC says Buggs "admitted in testimony that he did not conduct any meaningful diligence." SMF ¶ 85; *see* Mot. at 22. The only cite for that paragraph is Supp. Dep. 77:21–81:1, which concerns the August 12, 2021 screenshots and says nothing about diligence. The same page range of the March deposition, which the CFTC cites in the next paragraph, describes a Google search, calls to participants, and questions to Safranko. Dep. 77:21–81:1. That next paragraph concedes that Buggs spoke with Safranko and "a couple of people who were involved" and watched Safranko trade. SMF ¶ 88.

The record shows more. Add'l Facts ¶¶ 113–17. A jury may decide whether that was enough. It is not an admission of no diligence.

*Complete Developments* is the opposite case. That promoter admitted, "We did not independently verify the accuracy" of anything, told investors he had done his "homework," and collected an undisclosed preferential return of 15% a month. *CFTC v. Complete Devs., LLC*, No. 4:10 CV 2287, 2014 WL 794181, at *3, *7, *17–18 (N.D. Ohio Feb. 26, 2014). The CFTC identifies no statement in which Buggs claimed to have investigated TD, and Buggs took no preferential return.

*e. Buggs kept his own money in.*

A jury could find that a man who knew TD's profits were fake would not have funded his own account, his son's, and his father's. Buggs's own account showed

$857,851.59 in deposits and a $121,653 trading loss on August 5, 2021. BFS 175. He told Hernandez on August 13, "We need more consistency from Ted before I turn it on," meaning before he added more of his own money; Hernandez answered that Buggs was "already at $998k in capital . . . Plus your $150k original." BFS 92–93; Supp. Dep. 91:18–92:19. Buggs then sent $297,000 from his company and $210,000 from his personal checking account into TD in September 2021. BFS 205, 211. He helped fund accounts for his son, father, and cousin. BFS 157, 210–11, 216–17. He described his February 21, 2022 request as his "1st withdrawal request." BFS 310. When TD failed, he reported close to $30 million missing from his account. BFS 368.

Losses do not "automatically" negate scienter, *Complete Devs.*, 2014 WL 794181, at *16, and by themselves they do not prove good faith, *Giddens*, 2013 WL 12244536, at *12. They are, however, evidence a jury may weigh.

*f. Buggs was not an industry professional.*

*R.J. Fitzgerald* inferred recklessness from the defendant's status as "a federally registered professional, knowledgeable in the nuances and complexities of the industry." 310 F.3d at 1330. Buggs was neither. He had never heard of the NFA, and his knowledge of trading at the time was "much more limited than it is now." Dep. 82:9–13, 83:1–3.

### C. The authorities the CFTC cites against Buggs were decided by factfinders, by default, or against principals.

Only one of the CFTC's authorities resolved a contested question of intent on summary judgment over an opposition. Two were decided after bench trials, where a factfinder heard the witness. *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322, 1326–27 (11th Cir. 2018); *R.J. Fitzgerald*, 310 F.3d at 1324–25. Others were unopposed, entered by default, or rested on consent orders. *CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1043 (M.D. Fla. 2019); *CFTC v. Gelfman Blueprint, Inc.*, No. 17-7181 (PKC), 2018 WL 6320656, at *1 (S.D.N.Y. Oct. 16, 2018); *CFTC v. Milton*, No. 10-80738-CV, 2013 WL 2158428, at *1, *4 (S.D. Fla. May 17, 2013). The *Complete Developments* court first denied summary judgment on scienter. 2014 WL 794181, at *4. It granted a renewed motion only after the promoter made the admissions and then failed to oppose on time. *Id.* at *1, *3, *7, *17–18.

Those defendants also controlled the scheme or the proof of its falsity. Escobio was the CEO, an experienced commodities professional, and signed the account documents that contradicted his statements. *S. Tr. Metals*, 894 F.3d at 1326. Fitzgerald was a registered principal whose own advertisements were the misrepresentations. 310 F.3d at 1329–31. Gelfman was the head trader who generated the fake balances. 2018 WL 6320656, at *2, *5–7. The *Milton* and *Allied Markets* defendants ran the pools and kept the books. 2013 WL 2158428, at *2–3; 371 F. Supp. 3d at 1044–45. Buggs did none of those things. He never traded

customer accounts, controlled customer funds, or had access to TD's bank accounts. Dep. 212:22–213:12.

The one fully contested motion the CFTC cites ended in a denial of summary judgment for the one defendant who did not run the scheme. *CFTC v. WorldWideMarkets, Ltd.*, No. 21-CV-20715, 2025 WL 3771350, at *29 (D.N.J. Dec. 31, 2025). That defendant, the company's CFO, admitted knowing that customer funds were not segregated and had labeled the transfers a "customer debit bridge." *Id.* at *28. The court still held that a jury could find in his favor "simply by drawing different (yet still reasonable) inferences from the undisputed facts." *Id.* at *29.[2] Buggs falls on that side of the line.

**D. Buggs relayed what TD told him and what the Trading App displayed.**

The statements the CFTC attributes to Buggs either came from TD or are disputed.

The performance admissions the CFTC cites say Buggs "relayed the information provided to him by Traders Domain." RFA 6, 7. The "winning streak" was TD's displayed history, visible to everyone who logged in. Dep. 201:2–25. The 4,000% figure was TD's own PAMM performance card, not Buggs's account.

[2] The CFO was charged with aiding and abetting, so the elements differed. *WorldWideMarkets*, 2025 WL 3771350, at *26. The point about competing inferences is the same.

Viehmeyer Decl. ¶ 140; Dep. 207:1–6. The balances he showed were the balances TD's App displayed. Dep. 207:15–23; RFA 9. The "Money Printing Machine" message did not concern TD. SMF ¶ 56; Viehmeyer Decl. Ex. 94. Buggs sent it about a different investment, FX Winning. Buggs Decl. ¶¶ 2–5.

Second, the “right beside” statement was true. The full message reads: "I often trade right beside him and have made upwards of 6% in a day on my own getting the market when he does." Viehmeyer Decl. ¶ 133 & Ex. 93. Buggs traded his own TD account alongside Safranko's trades and described himself as a "shadow trader." BFS 191–96; Dep. 198:2–199:19, 212:3–21. The CFTC's own declarant confirms that Buggs was "doing some of the trading himself." Wright Decl. ¶ 5.

Third, Safranko set TD's risk level and let each customer set a personal risk limit. BFS 24–25; Dep. 89:12–25. Buggs denied telling customers that risk was capped, that risk was 3–4% per trade, or that the daily maximum was 1%. RFA 10–12. The 3–4% statement rests on a customer interview recounted in the investigator's declaration. Viehmeyer Decl. ¶ 138. That is hearsay the CFTC has not shown it can present in admissible form. Fed. R. Civ. P. 56(c)(2); *Macuba v. DeBoer*, 193 F.3d 1316, 1322–24 (11th Cir. 1999). Chessler attributes the same figure to Safranko. Chessler Decl. ¶ 8.

Fourth, only Damji says Buggs described a "bot." Damji Decl. ¶¶ 6–7. Buggs denied it. RFA 13. The CFTC's own declarant says Buggs used automated bots in

his personal trading, Wright Decl. ¶ 5, and Buggs reported third-party promoters who were marketing TD as a "Trading Bot," BFS 336. Whether Damji misremembers or misattributes is for the jury.

Fifth, the "system hadn't updated" explanation for the loss came from Safranko's own texts. Chessler Decl. ¶ 11. Buggs relayed TD's slippage explanation to Damji, RFA 20–21, and the loss Damji saw fell from $400,000 to $48,000 the same day, Damji Decl. ¶ 19.

Sixth, the February 2023 statement that "[w]ithdrawals have steadily gone out," Damji Decl. ¶ 23, rested on daily withdrawal lists Safranko posted in an open forum and on people Buggs knew who had been paid in late 2022. Dep. 214:3–25. Damji himself had been told in November 2022 that withdrawals were "just taking longer than normal." Damji Decl. ¶ 20. The CFTC's proof of a stall comes from other sponsors' communications and TD newsletters announcing longer processing times, none involving Buggs. Viehmeyer Decl. ¶¶ 192–93. Whether the statement was false, and whether Buggs knew it, are fact questions.

**E. The ledger customers received what they paid for, and the commission theory is scienter again.**

TD could not accept deposits for a period in 2022. Dep. 222:24–223:4. A few customers who wanted to start wired funds to Buggs. Buggs had Safranko approve each transfer and move "the corresponding amount that they sent" from Buggs's TD balance to the customer's account: "I wouldn't take any commission or discount off

of that whatsoever." *Id.* at 223:8–20. The CFTC's investigator describes the same arrangement and never says any customer went uncredited. Viehmeyer Decl. ¶ 150. Chessler received $1 million in credit this way. Chessler Decl. ¶ 12. Two of the April 2022 customers used the arrangement twice within ten days, which is not what a customer does after being shorted. Viehmeyer Decl. Exs. 7, 8.

Misappropriation "must involve, at a minimum, the intentional taking or use of an investor's money in violation of the terms agreed to by the investor." *Giddens*, 2013 WL 12244536, at *9. The CFTC's own authority frames it the same way, asking what the funds "were meant to be used" for. *Allied Markets*, 371 F. Supp. 3d at 1048. These customers' funds were meant to buy an equal TD balance, and they received it. Dep. 223:8–20; Viehmeyer Decl. ¶ 150. Once they did, the dollars were Buggs's. *See Giddens*, 2013 WL 12244536, at *9; *Allied Markets*, 371 F. Supp. 3d at 1048. The CFTC will answer that Buggs's TD balance was fictitious. That brings the theory back to scienter, which the CFTC itself builds into the claim: whether Buggs "knew or recklessly disregarded that the profits reflected in his TD account were false." SMF ¶ 104. A man who believed his balance was real sold what he believed was real value, dollar for dollar.

The Lamborghini and condominium payments do not change that analysis. SMF ¶ 105. If the customers received the credit they bargained for, the funds were Buggs's to spend. If Buggs knew his balance was fake, the purchases add nothing to

the fraud. Either way, the question is scienter. Proof that a defendant spent money that originated with customers is not proof of misappropriation. *Giddens*, 2013 WL 12244536, at *10 (denying the CFTC summary judgment where a trader spent investor-origin funds, including $27,400 for a vehicle, because the CFTC offered no evidence "that he retained and spent the money in violation of an agreement with the investors").

Regarding commissions, the commission theory depends on the same disputed knowledge. SMF ¶ 106; Mot. at 26–27. Its authorities, *Gelfman* and *Milton*, are the default and consent-order cases distinguished above. *See supra* Part IV.C. Buggs did not run TD or keep its books. Dep. 212:22–213:12. The fee disclosed to at least some customers was 40% of monthly profit, and the CFTC's investigator found no document showing what commissions Buggs received. Viehmeyer Decl. ¶ 141. The CFTC's assertion that Buggs took commissions on "some, if not all" of the accounts he referred, SMF ¶ 108, concedes that it cannot say which. *See Giddens*, 2013 WL 12244536, at *10 (denying summary judgment where the court could not "determine how much, if any, of the retained funds were not commissions").[3]

---

[3] Buggs preserves his position that a ledger transfer of an existing TD balance is at most secondarily related to commodity trading and does not satisfy the "in connection with" element. *See CFTC v. Svejda*, 705 F. Supp. 3d 971, 976–77 (D. Neb. 2023) (denying summary judgment where fraud in the purchase of equity in a commodity advisory business "may have been only secondarily related to trading contracts"); *Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 122–23 (5th Cir.

**F. Alternatively, the Court should deny the Motion in part.**

If the Court finds any part of the CFTC's showing sufficient, it should deny the Motion as to every theory that depends on scienter, including commission-based misappropriation. Two limits apply in any event: no statement or conduct before July 2021 can support liability, and no statement can be judged by a warning that came after it. *See R.J. Fitzgerald*, 310 F.3d at 1328.

## V. CONCLUSION

The CFTC asks the Court to decide what Holton Buggs believed without hearing him. The record would allow a reasonable jury to find that he believed in TD, asked the questions a believer asks, and lost his own money when it failed. The Court should deny the Motion as to Buggs.

Dated: November 24, 2026

Respectfully submitted,

DESCALZO LAW, P.A.
2 S. Biscayne Blvd., Suite 2530
Miami, Florida 33131
Tel.: 305-489-1018

By: /s/ Marissel Descalzo
Marissel Descalzo, Esq.
Florida Bar No. 669318
MD@DescalzoLaw.com
Service@DescalzoLaw.com

1996) (no § 6b(a) claim where plaintiffs "were never parties to an order for the sale of a commodity").

COKER & COKER, PLLC
901 Main Street, Suite 5330
Dallas, Texas 75202
Telephone: (832) 240-1047
kyle@cokerlawoffice.com
*Counsel for Defendant Holton Buggs, Jr.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 24, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve a copy on all counsel of record.

/s/ Marissel Descalzo
Marissel Descalzo